**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 CR 673-6** |
| | ) | |
| **CHRISTOPHER HUNTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

A grand jury indicted Christopher Hunter and fourteen other co-defendants for offenses relating to their alleged participation in a drug trafficking conspiracy. During the investigation that preceded Hunter's indictment, government agents intercepted and monitored telephone conversations involving the defendants pursuant to orders issued by Chief Judge Holderman under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518. Hunter has moved to suppress all of the evidence the government obtained from wiretaps on four telephones allegedly used by the defendants. For the reasons stated below, the Court denies Hunter's motion.

**Background**

In approximately August 2009, the Chicago Police Department and the Drug Enforcement Agency opened an investigation into the suspected drug trafficking activities of the New Breeds street gang on the west side of Chicago, Illinois. During the course of the investigation, the government identified several members of the New

Breeds, including their leader, Dana Bostic, as well as the organization's drug suppliers and wholesale customers. In early 2010, after using physical surveillance, undertaking controlled drug buys, and exploiting leads provided by confidential informants and cooperating witnesses, the government began submitting applications and affidavits for authorization to intercept wire communications on telephone lines used by the alleged participants in the drug ring.

On February 3, 2010, Chief Judge Holderman signed an order authorizing a wiretap for thirty days on a telephone that the government suspected was used by defendant Brandon Richards (Target Phone 1). On March 5, 2010, Chief Judge Holderman signed an order authorizing the continued wiretapping of Target Phone 1 for an additional thirty days. On March 16, 2010, Chief Judge Holderman signed an order authorizing a thirty-day wiretap on a different telephone that the government suspected Bostic was using (Target Phone 2). On March 30, 2010, Chief Judge Holderman signed an order authorizing a thirty-day wiretap on another telephone allegedly used by Richards (Target Phone 3). On April 15, 2010, Chief Judge Holderman signed an order authorizing a thirty-day wiretap on yet another telephone purportedly used by Bostic (Target Phone 4). Finally, on April 28, 2010 and May 14, 2010, Chief Judge Holderman signed orders authorizing thirty-day extensions of the wiretaps on Target Phone 3 and Target Phone 4, respectively. The government also requested and obtained orders authorizing wiretaps on three other telephones, but Hunter was not intercepted on these wiretaps and does not seek to suppress their contents in this motion.

Ultimately, the government's investigation resulted in the arrest of the defendants and the seizure of roughly eight kilograms of heroin, approximately $350,000 in U.S.

currency, and an unspecified number of firearms.  On August 11, 2010, the government filed a criminal complaint charging Hunter, Bostic, Richards, and a number of other co-defendants with conspiracy to knowingly and intentionally possess heroin in violation of 21 U.S.C. § 846.  A grand jury later indicted Parker and his co-defendants for narcotics conspiracy and other narcotics-related offenses.  Hunter filed the present motion to suppress the fruits of the wiretaps on Target Phones 1-4 on March 17, 2011.

## Discussion

Title III bars the government from intercepting wire and electronic communications except with court authorization in accordance with the requirements of the statute.  18 U.S.C. § 2511.  The government must present a sworn, written application to the court containing a "full and complete statement of the facts and circumstances relied upon by the applicant" in seeking a wiretapping order.  *Id.* § 2518(1)(b).  Additionally, the government must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *Id.* § 2518(1)(c).  The application must also contain "a full and complete statement of the facts concerning all previous applications" for wiretaps involving the persons, facilities, or places described in the application.  *Id.* § 2518(1)(e).

Before authorizing a wiretap, the judge must determine that (1) there is probable cause to believe that a person is committing, has committed, or is about to commit an offense listed in 18 U.S.C. § 2516; (2) there is probable cause to believe that communications concerning that offense will be obtained through such interception; (3) normal investigative procedures have been tried and have failed or reasonably appear

unlikely to succeed or are too dangerous to try; and (4) there is probable cause to believe that the facilities from which the communications will be intercepted are either being used or are about to be used in connection with the offense, or alternatively, are listed to or commonly used by a person identified in the application. *Id.* § 2518(3). A judge may require the government to furnish additional testimonial or documentary evidence in support of the wiretapping application. *Id.* § 2518(2).

Hunter seeks suppression of the evidence obtained from the wiretaps on Target Phones 1-4 on four grounds. First, he contends that the government failed to establish that the wiretap on Target Phone 1 was necessary. Second, he argues that the government's application for the wiretap on Target Phone 2 was not supported by probable cause. Third, he asserts that the investigating agents failed to properly minimize their interception of non-pertinent communications on all four wiretaps. Fourth and finally, Hunter contends that the government's applications for wiretaps on Target Phones 1-4 contained knowingly or recklessly false statements or omissions regarding the government's minimization efforts and its use of certain confidential informants, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).

**1.    Necessity**

Hunter first argues that the government failed to establish the necessity of its wiretaps on Target Phone 1. In his view, the government's initial application ignored or prematurely dismissed traditional investigative tools and failed to provide case-specific facts regarding why a wiretap was necessary. Def.'s Opening Br. at 34-36. Hunter also argues that the government's application for an extension of the wiretap on Target

Phone 1 was deficient because the government "had gathered sufficient evidence through the first six months of normal investigative procedures" and again failed to discuss the efficacy of these procedures with case-specific facts. *Id.* at 36-38.

As noted above, Title III "requires the government, in its application for an interception order, to provide 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003) (quoting 18 U.S.C. § 2518(1)(c)). Because section 2518 sets forth these factors in the alternative, the government need only establish one of them. *Id.* at 919. This requirement, commonly referred to as the necessity requirement, "was intended to ensure not that wiretaps are used only as a last resort in an investigation, but that they 'were not to be routinely employed as the initial step in criminal investigation.'" *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). The government "need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means." *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006).

The record refutes Hunter's argument that the government ignored conventional investigative techniques or used only boilerplate generalizations in seeking to intercept calls on Target Phone 1. The government's eighty-eight page affidavit in support of its February 3, 2010 application contains extensive and specific information about the course and fruits of the investigation up to that point. For example, the affidavit

discusses, in great detail, investigative leads that the government obtained from five confidential informants. These informants provided the government with extensive information about the structure and operations of the New Breeds drug ring. *See* Def.'s Opening Br., Ex. 1 at 22-32. The affidavit also contained specific details about several controlled purchases (or attempted purchases) of drugs from suspected members of the drug ring executed by undercover police officers in late 2009. *Id.* at 33-57. Further, the government discussed evidence of drug activity garnered from telephone calls made by Bostic from the Cook County Jail in late 2009 and obtained by the government via a state grand jury subpoena. *Id.* at 58-64. Finally, the government recounted its use of pen registers and trap-and-trace devices on Target Phone 1 in December 2009 and January 2010, which, in combination with other evidence, helped the government identify patterns of communication between various suspects. *Id.* at 64-67. In short, the government plainly did not resort to wiretaps as the "initial step" in its investigation of the New Breeds drug ring. *Thompson*, 944 F.2d at 1340. It sought wiretaps only after employing a variety of other investigatory tools.

Nor did the government fail to adequately explain the limits of less intrusive investigative methods in this case. The February 3, 2010 affidavit stated that although physical surveillance had enabled the government to identify participants in the alleged conspiracy, it did not reveal what the suspects were doing during their meetings. Def.'s Opening Br., Ex. 1 at 68-70. Similarly, the government explained that pen register data could not reveal details of the conspiracy's operations, even though it helped draw general links between suspects. *Id.* at 72-73. The government's affidavit also

contained a detailed discussion of the government's inability to obtain incriminating evidence against high-ranking members of the conspiracy using undercover operations and informants or cooperating witnesses. *Id.* at 73-75. Hunter argues that the government failed to provide specific facts regarding the utility of warranted searches or suspect interviews, but the affidavit discussed particular gaps in the government's knowledge that made warranted searches unlikely to bear fruit in this case. *See id.* at 76-79. Though the government also relied on its affiant's informed beliefs about the efficacy of various investigative techniques, this does not render the affidavit deficient. *See United States v. Campos*, 541 F.3d 735, 747 (7th Cir. 2008) (noting that such facts "support the finding of necessity"); *see also McLee*, 436 F.3d at 763 (internal quotation marks omitted) (courts review evidence of necessity "in a practical and common-sense fashion"). Put simply, the government provided a great deal of specific information in support of its contention that more intrusive surveillance was necessary.

Hunter's arguments also fail with respect to the government's March 5, 2010 application for an extension of the Target Phone 1 wiretap. He argues that the government "had gathered sufficient evidence with its initial wiretap" and provided little or no new evidence in support of the extension. Def.'s Opening Br. at 36-37. In fact, as the government's extension affidavit states, the initial thirty-day wiretap had yielded limited information regarding the heroin distribution activities of certain suspects, and continued interception of calls likely would incriminate other individuals and provide additional information regarding the drug ring's operations, customers, and arms dealers. *See* Def.'s Opening Br., Ex. 2 at 40-42. The Seventh Circuit has upheld

necessity findings under similar circumstances.  *See, e.g.*, *United States v. Long*, 639

F.3d 293, 301 (7th Cir. 2011) ("[T]he fact that arrest could have occurred earlier does

not preclude a finding of necessity where, as here, the basis for necessity was a

demonstrated need to root out additional co-conspirators"); *Fudge*, 325 F.3d at 919

(rejecting argument that "evidence of a specific individual engaging in a criminal activity

obviates the need for" a wiretap, since "the government used the wiretap for a number

of reasons, not the least of which was to obtain more incriminating evidence.  We do

not find such a basis problematic.").  Moreover, an extension affidavit is not deficient

merely because it relies in part on information from a previous affidavit; indeed, this is

likely inevitable in an ongoing investigation.  *See, e.g.*, *United States v. Merton*, 274 F.

Supp. 2d 1156, 1170 (D. Colo. 2003) (finding that extension affidavit containing some

new information satisfied section 2518(1)(c) even though it "contain[ed] much of the

same information from the original Affidavit").

     In summary, the government did not ignore traditional investigative methods prior

to seeking an extension on this wiretap.  To the contrary, it had already employed

several of these methods and thoroughly explained their limitations in its February 3,

2010 and March 5, 2010 applications for a wiretap on Target Phone 1.  The Court

concludes that the government established the necessity of these wiretaps.

**2.    Probable cause**

     Next, Hunter argues that the government's March 15, 2010 application for a

wiretap on Target Phone 2 was facially deficient with regard to probable cause because

"there was no evidence that Bostic was using Target Phone 2."  Def.'s Opening Br. at

38.  The government counters that the evidence in its application raised a reasonable probability that Target Phone 2 was being used for criminal activity.

Under Title III, a court may not enter an order authorizing a wiretap unless it finds probable cause that an individual is committing, has committed, or is about to commit a crime listed in 18 U.S.C. § 2516, such as a narcotics-related federal offense.  18 U.S.C. §§ 2518(3)(a), 2516(e).  The probable cause standard in this context is identical to that applied under the Fourth Amendment.  *See, e.g.*, *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988).  Probable cause exists when "'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This standard requires only "a reasonable probability" that evidence of a crime will be found; "neither an absolute certainty nor even a preponderance of the evidence is necessary."  *Id.*  Rather, the government's affidavit "need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place."  *Id.*

Hunter's argument regarding Bostic's use of Target Phone 2 is again undermined by the record.  The government's March 15, 2010 affidavit provided details of several telephone calls between Target Phone 1 and Bostic using Target Phone 2 that the government intercepted in February 2010.  *See* Def.'s Opening Br., Ex. 3 at 17-19.  One of these conversations included what appeared to be an exchange in coded

language between Bostic and Richards regarding drug sales.  *See id.*  In short, the government presented evidence that Bostic used Target Phone 2.  Moreover, this evidence raises a reasonable inference that, at least in early February 2010, Bostic did so in furtherance of criminal activity.

Hunter counters that this evidence became stale by the time the government sought a wiretap on Target Phone 2 because other calls showed that Bostic was using Target Phone 1 at various points after he used Target Phone 2.  *See* Def.'s Reply Br. at 3-4.  Hunter is correct that probable cause may cease to exist as time passes and evidence becomes outdated.  *See, e.g.*, *United States v. Grubbs*, 547 U.S. 90, 96 n.2 (2006).  At the same time, however, "the age of inculpatory information is only one factor" in determining probable cause, and the "[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity."  *United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999) (internal quotation marks omitted). The government's March 15, 2010 affidavit included such facts:  pen register and trap-and-trace data indicated that Target Phone 2 was being used continuously well into March 2010.  *See* Def.'s Opening Br., Ex. 3 at 41 (noting a total of 3,604 calls made or received using Target Phone 2 between February 4, 2010 and March 3, 2010).  Further, other evidence discussed in the affidavit suggested that various members of the alleged conspiracy, including Hunter, Richards, Donnie Ackers, James Kirkendall, Maurice Davis, Dandre London, and Aaron Bagley, were using phone numbers that appeared in the call log for Target Phone 2.  *See id.* at 41-47.

The Court is unpersuaded by Hunter's staleness argument in light of the evidence

discussed above.  The recorded calls of Bostic using Target Phone 2 were barely one month old when the government presented its Target Phone 2 wiretap application to Chief Judge Holderman, and Target Phone 2 contacted other members of the alleged conspiracy well into March 2010.  Considering these facts, as well as the totality of the evidence in the March 15, 2010 affidavit, the Court finds that a person of reasonable caution could conclude that Target Phone 2 was being used in furtherance of narcotics-related criminal activity.  It was also reasonable to believe that a wiretap on that telephone would yield additional evidence of such criminal activity.  Therefore, the government's application for a wiretap on Target Phone 2 was supported by probable cause.

**3.    Minimization**

Harrison also contends that suppression is appropriate because the government violated Title III's minimization requirements and "listened to all manner of personal phone calls, of varying length, with little or no attempt to minimize calls."  Def.'s Opening Br. at 40.  The government responds that its agents' efforts to minimize their monitoring of non-pertinent calls on all four wiretaps were objectively reasonable.

The government has a statutory obligation to "minimize the interception of communications not otherwise subject to interception" under Title III.  18 U.S.C. § 2518(5).  "What the minimization requirement means, essentially, is that once the monitoring agent has had a reasonable opportunity to assess the nature of an intercepted communication, he or she must stop monitoring that communication if it does not appear relevant to the government's investigation."  *United States v. Mansoori*,

304 F.3d 635, 646 (7th Cir. 2002).  The Court considers whether the government's minimization efforts were "objectively reasonable given the circumstances confronting the agents."  *Id.* at 647.  Relevant factors in this inquiry include (1) the kind and scope of criminal enterprise at issue, (2) the thoroughness of the government's efforts to limit monitoring of non-pertinent calls, (3) the degree to which it was foreseeable that certain types of calls would be innocent and therefore subject to minimization, (4) the targets' use of coded language, and (5) the degree to which the issuing judge oversaw the government's interception efforts.  *Id.*  "The adequacy of the government's minimization efforts necessarily depends on the facts of each case."  *Id.*

At least three of the *Mansoori* factors plainly weigh in favor of the government in this case.  First, the defendants were suspected of participating in a narcotics trafficking conspiracy of undetermined scope.  Indeed, one of the government's chief arguments in support of its initial application for a wiretap was that other investigative tools, such as cooperating witnesses, were not enabling the government to identify all of the members of the conspiracy, including drug suppliers.  *See, e.g.,* Def.'s Opening Br., Ex. 1 at 75-76; *Mansoori*, 304 F.3d at 647 (internal quotation marks omitted) ("Where an investigation involves a drug ring of unknown proportion . . . the need to allow latitude to eavesdroppers is close to its zenith").  Second, as alluded to above, the targets often used coded language when speaking with each other, thereby complicating any effort to discern the pertinence of a given conversation.  *See, e.g.,* Def.'s Opening Br., Ex. 1 at 50 (suspect used coded language when speaking with undercover officer).  Third, the government submitted ten-day progress reports to Chief Judge Holderman that

summarized the government's interception efforts with respect to Target Phones 1, 3, and 4.  *See generally* Exhibits to Pl.'s Resp. Br.  Though the government does not appear to have submitted such reports with respect to Target Phone 2, its other reports reveal that there was at least some judicial oversight of the government's wiretapping efforts.

The thoroughness of the government's minimization efforts, however, presents a more complex question.  The government is correct that Hunter has identified a small subset of calls that were, in his view, minimized improperly or not at all.  The parties also agree that a large proportion of the monitored calls were less than two minutes in length and therefore did not have to be minimized.  *See* Pl.'s Resp. Br. at 27-28; Def.'s Reply Br. at 6; *see also Mansoori*, 304 F.3d at 647 (noting with approval that "[a] number of other courts have found that two to three minutes is a reasonable period of time within which to make an initial judgment as to the pertinence of a conversation").  In his opening brief, Hunter provided charts containing details about each monitored call that lasted longer than two minutes.  *See* Def.'s Opening Br. at 11-16 (Target Phone 1, initial); *id.* at 21 (Target Phone 1, extension); *id.* at 24-25 (Target Phone 2); *id.* at 25-27 (Target Phone 3 through April 25, 2010); *id.* at 28-29 (Target Phone 4 from April 15-25, 2010).  As these charts indicate, Hunter concedes that the government actually minimized many of the calls that were longer than two minutes.

For ease of reference, the Court has attached its own chart summarizing those calls which, in Hunter's view, were either minimized improperly or not minimized at all.  *See* App. 1.  As the chart reveals, a large proportion of these calls were not subject to

minimization.  First, many of the calls were roughly two or three minutes in length.  *See generally id.*  This fact alone reduces significantly the amount of potential government misconduct.  *Cf. United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) (citations omitted) (noting that defendants' framing of the government's minimization efforts was "not particularly helpful" because defendants "did not exclude shorter calls from their analysis").  Additionally, Hunter's notes regarding the calls listed on his charts strongly suggest that many of them were appropriately subject to monitoring because they were pertinent or contained no conversation.  *See* App. 1.  Finally in his reply brief, Hunter concedes that based on a clerical error, "a handful of calls that Defense counsel listened to and thought were not minimized may have actually been minimized."  Def.'s Reply at 5 n.1.  Though Hunter does not specify the calls to which he is referring, his admission casts further doubt on the accuracy of his analysis of the government's minimization efforts.

In sum, Hunter has identified approximately forty-four non-pertinent calls that were subject to minimization but were not minimized properly or at all.  *See* App. 1.  Of these, the government has offered a reasonable explanation (based, for example, on pertinence, technical problems, or the absence of a conversation) for nineteen calls.  *Id.; see also* Pl.'s Resp. Br. at 30-44.  That leaves roughly twenty-five unexplained, non-minimized calls out of a universe of several thousand monitored wire communications.

The Court is troubled by the government's failure to provide an explanation for these calls.  Under the circumstances, however, the Court cannot conclude that the government's minimization efforts were objectively unreasonable.  The government

plainly made significant efforts to minimize and spot-check calls for pertinence, and in an investigation involving the monitoring of several thousand telephone calls, some mistakes are inevitable. Moreover, even if Hunter could show that the government monitored certain calls unreasonably, he has not offered evidence that he was a party to any such calls. As such, he does not have standing to seek suppression of evidence derived from these calls. *See Thompson*, 944 F.2d at 1339 (noting that "[t]he interception of calls to which [defendant] was not a party did not intrude upon [his] [F]ourth [A]mendment rights . . . so he has no standing to seek suppression of evidence gathered from those intercepts"); *see also United States v. Vargas*, 116 F.3d 195, 196 (7th Cir. 1997) (same).

Hunter nevertheless argues that he has offered evidence showing a "clear pattern of abuse" by the government that justifies suppression of all wiretap evidence. Def.'s Reply Br. at 8-9. Considering the government's actions as a whole and in light of the nature of the criminal enterprise at issue and the evidence discussed above, the Court disagrees. Although courts sometimes order total suppression upon a finding that the government engaged in pervasive disregard of the minimization requirement, *see United States v. Goffer*, 756 F. Supp. 2d 588, 588, 595-96 (S.D.N.Y. 2011), no pattern of pervasive disregard appears to exist in this case. The government failed to minimize only a relatively small number of calls that should have been subject to minimization. It otherwise appears to have made a good-faith effort to comply with the requirements of Title III. As such, this is not the "particularly horrendous case" in which the total suppression of wiretap evidence would be justified. *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (internal quotation marks omitted). Therefore, Hunter is not

entitled to suppression on the grounds that the government's minimization efforts were objectively unreasonable.

## 4.    *Franks* violations

Finally, Hunter asserts that the government's applications for wiretaps on Target Phone 2, Target Phone 3, and Target Phone 4 "included demonstrably untrue sworn statements . . . regarding minimization," because there is "pervasive evidence that government agents failed to minimize calls in any meaningful way."  Def.'s Opening Br. at 40-41.  He also argues that the government's application for a wiretap on Target Phone 1 contained a material omission regarding the government's use of additional confidential informants that distorted Chief Judge Holderman's assessment of the necessity of this wiretap.  *Id.* at 41.  The government argues that its affidavits contained no material and knowingly or recklessly false misrepresentations or omissions.

A defendant may seek the suppression of evidence obtained pursuit to a court order that was issued based on a false or misleading affidavit.  Specifically, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless regard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary" to the issuing court's decision to authorize a search, the court must hold a hearing on the defendant's argument.  *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).  If, at the hearing, the defendant can prove his allegation of perjury or reckless disregard by a preponderance of the evidence and the court would not have issued its order without the affidavit's false material, the evidence obtained by way of the court's order must be suppressed.

*See id.* at 156.  The rule from *Franks* applies to omissions as well as affirmatively false statements.  *See United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984).  An omission is not material "if, in context, the information was of such minimal significance that its omission could not reasonably have affected the magistrate's judgment," and "[m]ere negligence by the affiant does not constitute reckless disregard for the truth." *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990), *overruled on other grounds*, *United States v. Westmoreland*, 240 F.3d 618, 632-33 (7th Cir. 2001).

The Court concludes that Hunter has not met his preliminary burden under *Franks* with respect to Target Phones 2-4.  As discussed above, government agents made objectively reasonable efforts to comply with Title III's minimization requirement.  As such, a reasonable decision-maker could not find that the government's affiant made a materially false or misleading statement by asserting that "'monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to [interception].'"  Def.'s Opening Br. at 40 (quoting *id.*, Ex. 3 at 69).  Moreover, as the government points out, Hunter has offered no evidence or argument suggesting that the government's affiant made this statement with intent to mislead Chief Judge Holderman, or with reckless disregard for the fact that he might do so.  *See* Pl.'s Resp. Br. at 49.  Hunter offers no response to this argument in his reply brief.  Because he has not made a substantial preliminary showing regarding the mental state of the government's affiant, Hunter cannot establish that he is entitled to a *Franks* hearing.

Additionally, and for two reasons, Hunter has not shown that he is entitled to a

*Franks* hearing based on an omission regarding the government's use of additional confidential informants. First, Hunter is correct that the government's affidavit in support of its application for the Target Phone 1 wiretap did not mention two additional informants who provided information about drug transactions between Bostic and another defendant, Donnie Ackers. Based on the current record, however, the Court cannot conclude that the information was significant enough that its inclusion would have led a reasonable decision-maker to find that the requested wiretap was unnecessary. Although these informants appear to have provided some information about Bostic's dealings with Ackers, the government sought a wiretap on Target Phone 1 for reasons beyond obtaining evidence against these two individuals. For example, the Target 1 wiretap affidavit indicated that confidential informant testimony would be unlikely to yield evidence against highly culpable individuals outside of the New Breeds with whom Bostic had dealings, such as drug suppliers. *See* Def.'s Opening Br., Ex. 1 at 76. Moreover, the government's subsequent application for a wiretap on Target Phone 2 made clear that these two informants "have limited to non-existent relationships with Bostic and Richards and non-existent relationships with other members of the conspiracy" and therefore were "not able to furnish information that fully identifies all members of the conspiracy and their respective roles, including the source(s) of supply of narcotics to Bostic and his drug associates." Def.'s Opening Br., Ex. 3 at 62-63. In the absence of countervailing evidence suggesting that the information provided by these additional informants would have enabled the government to achieve the broader goals of its investigation, the Court cannot conclude that Hunter has met his preliminary burden under *Franks.*

Second and perhaps more importantly, even if the government's omission was material, Hunter has provided no evidence suggesting that the government's affiant omitted the information intentionally or with reckless disregard for the truth. Indeed, the government informed Chief Judge Holderman about these two informants in its subsequent application for a wiretap on Target Phone 2. *See* Def.'s Opening Br., Ex. 3 at 14-17. Particularly given the absence of any other evidence of fraudulent intent, these facts suggest that the government's failure to bring these two informants to Chief Judge Holderman's attention when it applied for the Target Phone 1 wiretap was, at worst, negligent. Hunter is not entitled to a *Franks* hearing on this ground. *See McNeese*, 901 F.2d at 594.

## Conclusion

For the reasons stated above, the Court denies defendant's motion to suppress Title III materials [docket no. 312].

MATTHEW F. KENNELLY
United States District Judge

Date: September 15, 2011

# Appendix 1: Purportedly Non-Minimized Calls that are Two Minutes or Greater in Length

| Summary Chart | |
|---|---|
| 44 | Approximate # of non-minimized/improperly minimized calls |
| 19 | Number of calls from above that were adequately explained by gov't |
| **25** | **Total # of inexplicably non-minimized/improperly minimized calls** |

| Wiretap | Call # | Length | Hunter's Notes | Length OK | OK Based on Notes | Adequate Gov't Response | Rem'ng |
|---|---|---|---|---|---|---|---|
| TP1 init. | 40 | 2:13 | Food order | Y | | | |
| TP1 init. | 89 | 6:35 | Improperly minimized | | Y | | |
| TP1 init. | 600 | 2:41 | Phone rang with no answer | Y | | | |
| TP1 init. | 1173 | 4:33 | Call from Cook County Jail | | | | X |
| TP1 init. | 1174 | 11:46 | Call from CCDOC | | | | X |
| TP1 init. | 1304 | 2:02 | Conversation re: soccer van, altercation | Y | Y | | |
| TP1 init. | 1499 | 2:06 | Random conversation | Y | | | |
| TP1 init. | 1866 | 5:52 | Spot checked; discusses "two bags" | | Y | | |
| TP1 init. | 1996 | 2:37 | No conversation | Y | | | |
| TP1 init. | 2121 | 2:25 | Discussion of heroin | Y | Y | | |
| TP1 init. | 2226 | 4:32 | Discussion of money | | | | X |
| TP1 init. | 2227 | 3:41 | No conversation | | Y | | |
| TP1 init. | 2599 | 3:23 | Discussion of police, collecting things, etc. | | Y | | |
| TP1 init. | 2665 | 2:02 | Discussion of getting food | Y | | | |
| TP1 init. | 2669 | 2:15 | Possible discussion of heroin | Y | Y | | |
| TP1 init. | 2919 | 2:40 | No conversation | Y | Y | | |
| TP1 init. | 3405 | 2:03 | Discussion of food | Y | | | |
| TP1 init. | 4205 | 3:16 | No conversation | | Y | | |
| TP1 init. | 4300 | 4:47 | No conversation | | Y | | |
| TP1 init. | 4396 | 2:00 | No conversation | | Y | | |
| TP1 init. | 4809 | 3:14 | Talk about a possible gun; stabbing; etc. | | Y | | |
| TP1 init. | 4826 | 2:05 | Talk about person going to jail | | Y | | |
| TP1 init. | 5204 | 5:29 | No conversation | | | | X |
| TP1 init. | 5281 | 2:31 | Discuss a shooting. | | Y | | |
| TP1 ext. | 5444 | 2:44 | No info | Y | | | |
| TP1 ext. | 5607 | 2:11 | Talking about dope | Y | Y | | |

| | | | | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|---|---|---|
| TP1 ext. | 5645 | 2:26 | Giving directions to some place | Y | | | |
| TP1 ext. | 5783 | 2:11 | Directions again | Y | | | |
| TP2 | 35 | 4:41 | Improperly minimized | | | Y | |
| TP2 | 53 | 2:37 | Conversation re: legalizing marijuana | Y | Y | | |
| TP2 | 62 | 7:20 | Conversation about cards, dice | | | Y | |
| TP2 | 70 | 9:09 | Conversation about gambling & a car | | | | X |
| TP2 | 84 | 3:05 | Conversation about meeting up w/friends | Y | | | |
| TP2 | 123 | 11:21 | Improperly minimized | | | Y | |
| TP2 | 124 | 9:42 | N/A | | | Y | |
| TP2 | 139 | 4:51 | Improperly minimized | | | Y | |
| TP2 | 185 | 2:40 | N/A | Y | | | |
| TP2 | 202 | 2:47 | Marked pertinent by gov't, but unclear from tape | Y | Y | | |
| TP2 | 213 | 2:36 | N/A | Y | | | |
| TP2 | 252 | 2:04 | Rental of an apartment | Y | | | |
| TP3 | 2371 | 6:49 | Only minimized after first 6 minutes | | | Y | |
| TP3 | 2522 | 2:30 | N/A | Y | | | |
| TP3 | 2621 | 2:09 | N/A | Y | | | |
| TP3 | 2625 | 18:59 | Improperly minimized | | | | X |
| TP3 | 2626 | 2:33 | N/A | Y | | | |
| TP3 | 2692 | 2:15 | N/A | Y | | | |
| TP3 | 2698 | 10:45 | Family call | | | Y | |
| TP3 | 2763 | 2:33 | Weather | Y | | | |
| TP3 | 2819 | 5:44 | Improperly minimized | | | | X |
| TP3 | 2820 | 12:03 | Improperly minimized | | | | X |
| TP3 | 3016 | 2:31 | Market pertinent by gov't, discusses stolen car | Y | Y | | |
| TP3 | 3155 | 5:31 | Improperly minimized | | | | X |
| TP3 | 3253 | 2:30 | Marked pertinent by gov't | Y | Y | | |
| TP3 | 3367 | 2:47 | N/A | Y | | | |
| TP3 | 3402 | 3:55 | Conversation about chuckee cheese | | | Y | |
| TP3 | 3403 | 3:20 | No conversation | | Y | | |
| TP3 | 3418 | 16:10 | Improperly minimized | | | | X |
| TP3 | 3430 | 4:18 | No conversation | | Y | | |
| TP3 | 3438 | 2:02 | No conversation | | Y | | |
| TP3 | 3441 | 2:51 | No conversation | | Y | | |

| TP | Number | Time | Description | | | | |
|---|---|---|---|---|---|---|---|
| TP3 | 3453 | 5:42 | Improperly minimized | | | | X |
| TP3 | 3486 | 4:02 | No conversation | | Y | | |
| TP3 | 3492 | 3:30 | N/A | Y | | | |
| TP3 | 3515 | 2:30 | N/A | Y | | | |
| TP3 | 3517 | 9:44 | Improperly minimized | | | | X |
| TP3 | 3679 | 2:22 | N/A | Y | | | |
| TP3 | 3700 | 3:12 | N/A | Y | | | |
| TP3 | 3703 | 8:01 | Improperly minimized | | | | X |
| TP3 | 3767 | 4:27 | No conversation | | Y | | |
| TP3 | 3770 | 4:17 | Gov't contends pertinent | | | | X |
| TP3 | 3777 | 2:23 | N/A | Y | | | |
| TP3 | 3778 | 2:15 | N/A | Y | | | |
| TP3 | 3881 | 2:39 | N/A | Y | | | |
| TP3 | 4021 | 3:03 | N/A | Y | | | |
| TP3 | 4034 | 3:50 | N/A | | | | X |
| TP3 | 4038 | 2:31 | N/A | Y | | | |
| TP3 | 4153 | 2:09 | Checking voicemail | Y | | | |
| TP3 | 4154 | 2:09 | N/A | Y | | | |
| TP3 | 4262 | 3:26 | N/A | Y | | | |
| TP3 | 4333 | 2:21 | N/A | Y | | | |
| TP3 | 4336 | 3:30 | N/A | Y | | | |
| TP3 | 4351 | 20:51 | Personal call with female | | | Y | |
| TP3 | 4352 | 2:17 | N/A | Y | | | |
| TP3 | 4356 | 3:02 | N/A | Y | | | |
| TP3 | 4404 | 2:59 | N/A | Y | | | |
| TP3 | 4428 | 2:02 | N/A | Y | | | |
| TP3 | 4452 | 2:08 | N/A | Y | | | |
| TP3 | 4496 | 4:35 | N/A | | | Y | |
| TP3 | 4495 | 4:36 | N/A | | | Y | |
| TP3 | 4498 | 14:08 | N/A | | | | X |
| TP3 | 4539 | 2:38 | N/A | Y | | | |
| TP3 | 4586 | 2:03 | N/A | Y | | | |
| TP3 | 4631 | 3:27 | N/A | Y | | | |
| TP3 | 4648 | 2:45 | N/A | Y | | | |
| TP3 | 4763 | 3:44 | N/A | | | | X |
| TP3 | 4785 | 3:52 | N/A | | | | X |
| TP4 | 34 | 4:34 | N/A | | | Y | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TP4 | 36 | 8:26 | N/A | | | Y | |
| TP4 | 71 | 3:31 | N/A | Y | | | |
| TP4 | 126 | 2:05 | N/A | Y | | | |
| TP4 | 130 | 8:30 | N/A | | | Y | |
| TP4 | 131 | 2:58 | N/A | Y | | | |
| TP4 | 134 | 4:31 | N/A | | | Y | |
| TP4 | 141 | 2:31 | N/A | Y | | | |
| TP4 | 190 | 2:32 | N/A | Y | | | |
| TP4 | 192 | 2:07 | N/A | Y | | | |
| TP4 | 238 | 2:13 | N/A | Y | | | |
| TP4 | 239 | 3:36 | N/A | | | | **X** |
| TP4 | 330 | 3:57 | N/A | | | | **X** |
| TP4 | 343 | 2:29 | N/A | Y | | | |
| TP4 | 358 | 5:27 | N/A | | | Y | |
| TP4 | 361 | 2:40 | N/A | Y | | | |
| TP4 | 370 | 11:45 | N/A | | | Y | |
| TP4 | 379 | 2:45 | N/A | Y | | | |
| TP4 | 432 | 26:33 | N/A | | | Y | |
| TP4 | 440 | 5:36 | N/A | | | Y | |
| TP4 | 512 | 5:28 | N/A | | | | **X** |
| TP4 | 613 | 2:07 | N/A | Y | | | |
| TP4 | 658 | 2:54 | N/A | Y | | | |
| TP4 | 663 | 2:38 | N/A | Y | | | |
| TP4 | 744 | 2:23 | N/A | Y | | | |
| TP4 | 820 | 2:51 | N/A | Y | | | |
| TP4 | 826 | 4:14 | N/A | | | | **X** |
| TP4 | 861 | 2:21 | N/A | Y | | | |
| TP4 | 864 | 3:45 | N/A | Y | | | |
| TP4 | 878 | 2:33 | N/A | Y | | | |
| TP4 | 922 | 4:39 | N/A | | | | **X** |
| TP4 | 926 | 4:16 | N/A | | | | **X** |
| TP4 | 984 | 3:30 | N/A | Y | | | |
| TP4 | 1142 | 2:33 | N/A | Y | | | |
| TP4 | 1148 | 2:10 | N/A | Y | | | |
| TP4 | 1154 | 4:15 | N/A | | | | **X** |