01:43:18

1

2

3

4               UNITED STATES DISTRICT COURT
5               NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
6

7  UNITED STATES OF AMERICA,        Case No. 1:09-cr-00673

8    Plaintiff,                     Chicago, Illinois
                                    June 1, 2011
9         v.                        Trial
                                    1:30 P.M. SESSION
10
   RON COLLINS,
11
     Defendant.
12 -------------------------------

13

14                        VOLUME 2-B
                      TRANSCRIPT OF TRIAL
15         BEFORE THE HONORABLE VIRGINIA M. KENDALL
            UNITED STATES DISTRICT JUDGE, AND A JURY
16

17

18 APPEARANCES:

19


20
   For the Government:    Office of the U.S. Attorney
21                        By:  Halley B. Guren, and
                               Renai S. Rodney
22                        219 S. Dearborn St., 5th Fl.
                          Chicago, IL 60604
23                        (312) 353-5300

24

25

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

1

2

3    <u>APPEARANCES (Cont'd)</u>:

4

5

6    For the Defendant:        Frank A. Rubino
                               1001 Brickell Bay Dr., Ste. 2206
                               Miami, FL 33131
7                              (305) 858-5300

8

9

10   <u>COURT REPORTER</u>:           FEDERAL OFFICIAL COURT REPORTER
                               April M. Metzler, RPR, CRR, FCRR
11                             219 South Dearborn St., Rm. 2318-A
                               Chicago, IL 60604
12                             (312) 408-5154
                               April_Metzler@ilnd.uscourts.gov
13

14

15

16

17

18

19

20

21

22

23

24
     **Proceedings recorded by mechanical stenography; transcript
25   produced by notereading.**

<u>**I N D E X**</u>

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

ANTONIO AGUILERA, DIRECT EXAMINATION                        434
BY MS. GUREN

ANTONIO AGUILERA, CROSS-EXAMINATION                         469
BY MR. RUBINO

ANTONIO AGUILERA, REDIRECT EXAMINATION                      481
BY MS. GUREN

MATTHEW McCARTHY, DIRECT EXAMINATION                        485
BY MS. GUREN

MATTHEW McCARTHY, CROSS-EXAMINATION                         490
BY MR. RUBINO

MATTHEW McCARTHY, REDIRECT EXAMINATION                      507
BY MS. GUREN

MATTHEW McCARTHY, RECROSS-EXAMINATION                       508
BY MR. RUBINO

KARYN MASTRICOLA, DIRECT EXAMINATION                        510
BY MS. RODNEY

KARYN MASTRICOLA, CROSS-EXAMINATION                         532
BY MR. RUBINO

KARYN MASTRICOLA, REDIRECT EXAMINATION                      536
BY MS. RODNEY

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

433

1    JACOB GALVAN, DIRECT EXAMINATION                    537
     BY MS. GUREN
2

3    JACOB GALVAN, CROSS-EXAMINATION                     541
     BY MR. RUBINO
4

5    ERIC DURANTE, DIRECT EXAMINATION                    550
     BY MS. RODNEY
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | (Resumed at 1:59 p.m.) |
| | 2 | (Whereupon the following discussion was had in open |
| 01:59:39 | 3 | court, outside the presence of the jury:) |
| 01:59:39 | 4 | THE COURT:  Okay.  Be please be seated.  Tell the CSO |
| 01:59:43 | 5 | he can bring them on in. |
| 02:00:13 | 6 | (The jury enters the courtroom.) |
| 02:00:13 | 7 | THE COURT:  Okay, folks, please be seated. |
| 02:00:14 | 8 | I hope you had a nice lunch.  I just do want to |
| 02:00:20 | 9 | remind you that you need to take those north elevator banks, |
| 02:00:26 | 10 | okay, so we saw somebody in the south elevator banks.  It's |
| 02:00:27 | 11 | just a precaution.  Take the ones to my right, and that's over |
| 02:00:30 | 12 | on the north end of the building. |
| 02:00:32 | 13 | Okay.  And you can call your next witness. |
| 02:00:34 | 14 | MS. GUREN:  Thank you, your Honor.  The Government |
| 02:00:35 | 15 | calls Antonio Aguilera. |
| 02:00:59 | 16 | (Witness takes the stand.) |
| 02:00:59 | 17 | THE COURT:  Raise your right hand. |
| 02:00:59 | 18 | (The witness was sworn.) |
| 02:01:00 | 19 | THE COURT:  Okay.  Have a seat. |
| 02:01:00 | 20 | - - - |
| 02:01:00 | 21 | ANTONIO AGUILERA, DIRECT EXAMINATION |
| 02:01:00 | 22 | BY MS. GUREN: |
| 02:01:05 | 23 | Q.  Good afternoon, Mr. Aguilera. |
| 02:01:06 | 24 | Can you state and spell your last name for the |
| 02:01:09 | 25 | record? |

| | | |
|---|---|---|
| 02:01:09 | 1 | A. Antonio Aguilera, A-g-u-i-l-e-r-a. |
| 02:01:13 | 2 | Q. How old are you, Mr. Aguilera? |
| 02:01:15 | 3 | A. 27 -- 37. |
| 02:01:18 | 4 | Q. Where do you live generally? |
| 02:01:21 | 5 | A. South suburbs. |
| 02:01:23 | 6 | Q. How long have you lived in the South suburbs? |
| 02:01:26 | 7 | A. Twelve years, plus. |
| 02:01:28 | 8 | Q. Before that where did you grow up? |
| 02:01:31 | 9 | A. Chicago. |
| 02:01:32 | 10 | Q. How far did you go in school? |
| 02:01:34 | 11 | A. Sophomore. |
| 02:01:36 | 12 | Q. What do you do now for a living? |
| 02:01:38 | 13 | A. Repossessor. |
| 02:01:39 | 14 | Q. What does it mean to be a repossessor? |
| 02:01:43 | 15 | A. Repossess vehicles. |
| 02:01:49 | 16 | Q. Do you need a license for that work? |
| 02:01:51 | 17 | A. Yes. |
| 02:01:51 | 18 | Q. What kind of license is that? |
| 02:01:52 | 19 | A. Repossess license. |
| 02:01:54 | 20 | Q. Who issues it? |
| 02:01:55 | 21 | A. Chicago. |
| 02:01:56 | 22 | Q. Do you have a nickname? |
| 02:01:57 | 23 | A. Yes. |
| 02:01:58 | 24 | Q. What's your nickname? |
| 02:01:59 | 25 | A. T-bag. |

| | | |
|---|---|---|
| 02:02:01 | 1 | Q. Turning your attention now to March 24th, 2010, at that |
| 02:02:07 | 2 | time did you plead guilty to a federal drug charge? |
| 02:02:10 | 3 | A. Yes. |
| 02:02:11 | 4 | Q. In your own words, what did you plead guilty to? |
| 02:02:14 | 5 | A. Conspiracy. |
| 02:02:16 | 6 | Q. Conspiracy to do what? |
| 02:02:20 | 7 | A. Deliver drugs. |
| 02:02:22 | 8 | Q. What are the maximum penalties of that conspiracy charge? |
| 02:02:27 | 9 | A. Ten to life. |
| 02:02:28 | 10 | Q. Is there also a maximum fine associated with that? |
| 02:02:30 | 11 | A. Yes. |
| 02:02:31 | 12 | Q. What's the maximum fine? |
| 02:02:32 | 13 | A. 4 million. |
| 02:02:34 | 14 | Q. At the time that you pleaded guilty, did you plead guilty |
| 02:02:38 | 15 | to a plea agreement with the Government, or did you plead |
| 02:02:41 | 16 | guilty on your own? |
| 02:02:42 | 17 | A. On my own. |
| 02:02:43 | 18 | Q. Although you didn't plead guilty to an agreement with the |
| 02:02:46 | 19 | Government, is it your understanding that you are making |
| 02:02:49 | 20 | efforts to cooperate with the Government? |
| 02:02:51 | 21 | A. Yes. |
| 02:02:52 | 22 | Q. What do you understand you have to do in terms of your |
| 02:02:55 | 23 | cooperation with the Government? |
| 02:02:56 | 24 | A. Tell the truth. |
| 02:02:57 | 25 | Q. In exchange for your truthful testimony, what, if |

437

| | | |
|---|---|---|
| 02:03:01 | 1 | anything, do you expect from the Government? |
| 02:03:04 | 2 | A.  A reduced sentence. |
| 02:03:05 | 3 | Q.  I'm sorry.  Say it again? |
| 02:03:07 | 4 | A.  Reduced sentence. |
| 02:03:08 | 5 | Q.  And do you expect that as a recommendation? |
| 02:03:11 | 6 | A.  Yes. |
| 02:03:11 | 7 | Q.  Have you been sentenced yet? |
| 02:03:15 | 8 | A.  No. |
| 02:03:15 | 9 | Q.  Do you know what your sentence will be? |
| 02:03:17 | 10 | A.  No. |
| 02:03:17 | 11 | Q.  Who will determine your sentence ultimately? |
| 02:03:19 | 12 | A.  The judge. |
| 02:03:20 | 13 | Q.  Which judge is that? |
| 02:03:23 | 14 | A.  Judge Zagel. |
| 02:03:25 | 15 | Q.  Is that the judge in your criminal case? |
| 02:03:27 | 16 | A.  No. |
| 02:03:28 | 17 | Q.  I'm sorry.  Let me -- |
| 02:03:29 | 18 | A.  Here? |
| 02:03:31 | 19 | Q.  Let me ask you that question again. |
| 02:03:33 | 20 | Is that the judge -- is Judge Zagel the judge in your |
| 02:03:38 | 21 | criminal case? |
| 02:03:38 | 22 | A.  Yes. |
| 02:03:38 | 23 | Q.  In order for the Government to recommend a reduced |
| 02:03:41 | 24 | sentence, what do you have to do? |
| 02:03:43 | 25 | A.  Tell the truth. |

| | | |
|---|---|---|
| 02:03:44 | 1 | Q. What's your understanding of what happens if you don't |
| 02:03:47 | 2 | tell the truth during your testimony? |
| 02:03:51 | 3 | A. I won't get a reduced sentence. |
| 02:03:55 | 4 | Q. Directing your attention now to -- excuse me. Let me just |
| 02:04:00 | 5 | go back a sec. |
| 02:04:02 | 6 | Have you ever tried marijuana? |
| 02:04:04 | 7 | A. Yes. |
| 02:04:04 | 8 | Q. When was that? |
| 02:04:06 | 9 | A. Freshman year. |
| 02:04:08 | 10 | Q. How often did you do it? |
| 02:04:12 | 11 | A. Not too much. |
| 02:04:12 | 12 | Q. For what length of time? |
| 02:04:13 | 13 | A. Once, twice a month. |
| 02:04:14 | 14 | Q. When was the last time you used marijuana? |
| 02:04:17 | 15 | A. Freshman year. |
| 02:04:19 | 16 | Q. Now, directing your attention to 2004, were you working |
| 02:04:23 | 17 | then? |
| 02:04:24 | 18 | A. Yes. |
| 02:04:25 | 19 | Q. What types of legitimate jobs did you have at that time? |
| 02:04:32 | 20 | A. Carpentry, mechanic, stuff like that. |
| 02:04:36 | 21 | Q. Was this steady work? |
| 02:04:38 | 22 | A. No. |
| 02:04:39 | 23 | Q. At that -- turning to the end of 2004, besides for these |
| 02:04:45 | 24 | legitimate jobs, did you earn money in any other way? |
| 02:04:48 | 25 | A. Yes. |

439

| | | |
|---|---|---|
| 02:04:48 | 1 | Q.  What was that? |
| 02:04:49 | 2 | A.  Working for Junior and Peter. |
| 02:04:55 | 3 | Q.  Do you know Junior and Peter's last name? |
| 02:04:57 | 4 | A.  Flores. |
| 02:04:58 | 5 | Q.  Now, I'm going to hand you several folders of photos.  One |
| 02:05:03 | 6 | of them is Government Exhibit Photo 1 and Government Exhibit |
| 02:05:08 | 7 | Photo 2.  I'm going to ask that you only look at each folder |
| 02:05:12 | 8 | as I talk about each folder, or you can look at the screen |
| 02:05:16 | 9 | next to you. |
| 02:05:21 | 10 | Turning first to Government Exhibit Photo 1 -- and, |
| 02:05:29 | 11 | your Honor, may we have permission to publish this photo? |
| 02:05:30 | 12 | It's already been admitted. |
| 02:05:32 | 13 | THE COURT:  That's fine. |
| 02:05:34 | 14 | BY MS. GUREN: |
| 02:05:34 | 15 | Q.  Do you recognize that photo? |
| 02:05:35 | 16 | A.  Yes. |
| 02:05:35 | 17 | Q.  Who is that? |
| 02:05:36 | 18 | A.  Peter. |
| 02:05:39 | 19 | Q.  Turning now to Government Exhibit Photo 2 -- and, your |
| 02:05:42 | 20 | Honor, permission to publish Photo 2? |
| 02:05:44 | 21 | THE COURT:  You may. |
| 02:05:45 | 22 | BY MS. GUREN: |
| 02:05:45 | 23 | Q.  Do you recognize that photo? |
| 02:05:46 | 24 | A.  Yes. |
| 02:05:47 | 25 | Q.  Who is that? |

```
02:05:48   1   A.  Junior.
02:05:49   2   Q.  Did you know Junior by any other name?
02:05:51   3   A.  Margarito and J.
02:05:57   4   Q.  How old were you when you first met the Flores brothers?
02:06:09   5   A.  I don't know.  Since I was young.
02:06:10   6   Q.  How did you know them when you were young?
02:06:13   7   A.  Parents, my parents know their parents.
02:06:15   8   Q.  You testified that you started working for them around the
02:06:18   9   end of 2004.  What types of work did you do for the Flores
02:06:22  10   brothers, when you started working for them?
02:06:25  11   A.  Delivered and picked up drugs.
02:06:28  12   Q.  Before you started delivering and picking up drugs for the
02:06:31  13   Flores brothers, did you ever try to get drugs from them for
02:06:34  14   your own sale?
02:06:36  15   A.  Yeah.
02:06:39  16   Q.  Tell the jury about that.
02:06:40  17   A.  I asked them if they would sell me something, and he said
02:06:44  18   he would.  I might talk to Margarito, Junior, and he said he
02:06:52  19   would talk to Peter about it.  And then when I told him who I
02:06:55  20   was going to give them to, he just sold them to the guy
02:06:58  21   directly and didn't give me none.
02:07:00  22   Q.  So did you ever end up getting cocaine for your own sale
02:07:04  23   from the Flores brothers?
02:07:05  24   A.  No.
02:07:05  25   Q.  How long in total did you end up working for the Flores
```

| | | |
|---|---|---|
| 02:07:14 | 1 | brothers? |
| 02:07:14 | 2 | A.  A little over three years. |
| 02:07:16 | 3 | Q.  When did you stop approximately in terms of years? |
| 02:07:19 | 4 | A.  In the middle of 2007. |
| 02:07:21 | 5 | Q.  You talked about the fact that you picked up drugs for the |
| 02:07:27 | 6 | Flores brothers.  What kind of drugs? |
| 02:07:29 | 7 | A.  Cocaine. |
| 02:07:34 | 8 | Q.  What did you first do for the Flores brothers when you |
| 02:07:36 | 9 | first started working for them? |
| 02:07:39 | 10 | A.  Security for Cesar. |
| 02:07:41 | 11 | Q.  Who is Cesar? |
| 02:07:43 | 12 | A.  One of the workers. |
| 02:07:48 | 13 | Q.  When did you meet Cesar? |
| 02:07:50 | 14 | A.  2001. |
| 02:07:51 | 15 | Q.  Do you know Cesar's last name? |
| 02:07:55 | 16 | A.  Perez. |
| 02:07:55 | 17 | Q.  What was Cesar doing that he needed security for from you? |
| 02:08:00 | 18 | A.  He was delivering drugs. |
| 02:08:03 | 19 | Q.  Delivering what? |
| 02:08:04 | 20 | A.  Drugs. |
| 02:08:05 | 21 | Q.  After -- how long did you provide security for Cesar, |
| 02:08:09 | 22 | before you started doing your own picking up of drugs? |
| 02:08:13 | 23 | A.  2005, in the winter, beginning, beginning of 2005. |
| 02:08:19 | 24 | Q.  When you were picking up cocaine, where were you picking |
| 02:08:25 | 25 | up the cocaine from? |

442

| | | |
|---|---|---|
| 02:08:29 | 1 | A.  Well, warehouses and other places. |
| 02:08:33 | 2 | Q.  Where would you -- well, how would you pick up the |
| 02:08:36 | 3 | cocaine? |
| 02:08:36 | 4 | A.  In the SUV. |
| 02:08:38 | 5 | Q.  Was there any -- where would you bring the cocaine to? |
| 02:08:43 | 6 | A.  Stash house. |
| 02:08:45 | 7 | Q.  What's a stash house? |
| 02:08:47 | 8 | A.  A house that's rented under somebody else's name, no one |
| 02:08:50 | 9 | lives there, just use it to store drugs. |
| 02:08:53 | 10 | Q.  After you picked up the cocaine, did you do anything for |
| 02:08:57 | 11 | the Flores brothers? |
| 02:09:00 | 12 | A.  What do you mean? |
| 02:09:01 | 13 | Q.  I'm sorry.  Let me rephrase. |
| 02:09:02 | 14 | In addition to picking up the cocaine, did you do |
| 02:09:05 | 15 | anything else for the Flores brothers? |
| 02:09:07 | 16 | A.  Yeah.  I installed a stash compartment to vehicles. |
| 02:09:11 | 17 | Q.  Backing up. |
| 02:09:12 | 18 | Before that did you do anything with the cocaine |
| 02:09:15 | 19 | besides picking it up? |
| 02:09:17 | 20 | A.  Count it, deliver it. |
| 02:09:20 | 21 | Q.  Okay.  Going through that, first, about how much cocaine |
| 02:09:24 | 22 | would you pick up at a time? |
| 02:09:27 | 23 | A.  50 to 350. |
| 02:09:32 | 24 | Q.  About how many times did you pick up cocaine from these |
| 02:09:34 | 25 | parking lots and warehouses? |

443

| | | |
|---|---|---|
| 02:09:38 | 1 | A. I don't know, at least a hundred times. |
| 02:09:43 | 2 | Q. When you say that you counted it, what did you do when you |
| 02:09:46 | 3 | counted it? |
| 02:09:47 | 4 | A. What do you mean? |
| 02:09:48 | 5 | Q. How did you count it? Or where did you -- |
| 02:09:51 | 6 | A. Individually. |
| 02:09:52 | 7 | Q. -- count it? |
| 02:09:52 | 8 | A. We take it out, put it in the house, and count each one |
| 02:09:55 | 9 | individually. |
| 02:09:56 | 10 | Q. How was the cocaine packaged? |
| 02:09:58 | 11 | A. Square, like a book. |
| 02:10:01 | 12 | Q. Was it in certain quantities? |
| 02:10:06 | 13 | A. (No response.) |
| 02:10:07 | 14 | Q. Like how much did the book weigh? |
| 02:10:09 | 15 | A. A thousand grams. |
| 02:10:11 | 16 | Q. Is that also known as a kilogram? |
| 02:10:13 | 17 | A. Yes. |
| 02:10:14 | 18 | Q. Now, you also mentioned that you delivered cocaine in |
| 02:10:17 | 19 | addition to picking it up and counting it? |
| 02:10:19 | 20 | A. What do you mean? |
| 02:10:20 | 21 | Q. You said you delivered cocaine in addition to picking it |
| 02:10:23 | 22 | up and counting it? |
| 02:10:24 | 23 | A. Yeah. |
| 02:10:24 | 24 | Q. Who did you deliver the cocaine to? |
| 02:10:27 | 25 | A. Whoever Margarito or Peter asked me to deliver it to. |

| | | |
|---|---|---|
| 02:10:33 | 1 | Q.  How many people in total did you deliver cocaine to? |
| 02:10:40 | 2 | A.  I don't know.  A lot, at least 30. |
| 02:10:42 | 3 | Q.  At least 30. |
| 02:10:44 | 4 | During what time period? |
| 02:10:48 | 5 | A.  2005, 2007. |
| 02:10:49 | 6 | Q.  What was the range of cocaine amounts that you would |
| 02:10:53 | 7 | deliver to a customer at a time? |
| 02:10:55 | 8 | A.  From 5 to 50. |
| 02:10:58 | 9 | Q.  How were you paid for delivering that cocaine? |
| 02:11:02 | 10 | A.  By each one, cash. |
| 02:11:05 | 11 | Q.  And how much did -- when you say each one, each one of |
| 02:11:08 | 12 | what? |
| 02:11:08 | 13 | A.  Each kilo. |
| 02:11:10 | 14 | Q.  How much did you get paid in cash for each kilogram? |
| 02:11:12 | 15 | A.  Hundred bucks. |
| 02:11:21 | 16 | Q.  How often did you deliver cocaine to customers during the |
| 02:11:26 | 17 | time period that you were doing that? |
| 02:11:29 | 18 | A.  How often what? |
| 02:11:30 | 19 | Q.  How often did you deliver cocaine to customers during the |
| 02:11:34 | 20 | time period of 2005 to 2007? |
| 02:11:37 | 21 | A.  I don't know.  It's a lot, man.  Maybe fifteen times a |
| 02:11:49 | 22 | month. |
| 02:11:50 | 23 | Q.  And did that amount depend on anything? |
| 02:11:54 | 24 | A.  Yeah, it depended on what was there, like who we picked up |
| 02:11:58 | 25 | from or whatever was in the house. |

| | | |
|---|---|---|
| 02:12:00 | 1 | Q.  And when you say whatever was in the house, what are you |
| 02:12:03 | 2 | referring to? |
| 02:12:03 | 3 | A.  Drugs. |
| 02:12:04 | 4 | Q.  How did you know to deliver to a customer? |
| 02:12:08 | 5 | A.  Margarito or Peter would call me on my phone. |
| 02:12:14 | 6 | Q.  And when you say that this phone -- did you have one phone |
| 02:12:16 | 7 | the entire time you worked for the Flores brothers? |
| 02:12:19 | 8 | A.  No. |
| 02:12:20 | 9 | Q.  How many phones did you have? |
| 02:12:23 | 10 | A.  We'd change like every two months, a month to two months. |
| 02:12:27 | 11 | Q.  Did you have one phone at a time and then change? |
| 02:12:29 | 12 | A.  Yeah. |
| 02:12:31 | 13 | Q.  When you got instructions from Pete or Junior Flores, what |
| 02:12:36 | 14 | types of things did they tell you? |
| 02:12:42 | 15 | A.  Where to pick up, where to drop off, who to drop off to. |
| 02:12:46 | 16 | Q.  Did you ever talk directly by phone to the people you were |
| 02:12:50 | 17 | delivering cocaine to? |
| 02:12:51 | 18 | A.  No. |
| 02:12:52 | 19 | Q.  What types of locations did you meet the people who you |
| 02:12:56 | 20 | were delivering cocaine to? |
| 02:12:58 | 21 | A.  Parking garages, buildings, side streets. |
| 02:13:01 | 22 | Q.  Was it the same spot for all customers? |
| 02:13:06 | 23 | A.  Mostly -- well, each one had their own spots. |
| 02:13:10 | 24 | Q.  So each customer had its own spot? |
| 02:13:12 | 25 | A.  Yeah. |

| | | |
|---|---|---|
| 02:13:13 | 1 | Q. Or had their own spots? |
| 02:13:15 | 2 | A. Yes. |
| 02:13:18 | 3 | Q. When you delivered the cocaine, how did you bring the |
| 02:13:21 | 4 | cocaine to the customers? |
| 02:13:25 | 5 | A. Inside the vehicle, we would just pack it up, whatever he |
| 02:13:29 | 6 | would tell us to take, we would put it inside the stash of the |
| 02:13:33 | 7 | SUV, and go take it and put it in a duffle bag and give it to |
| 02:13:40 | 8 | them or put it in the car. |
| 02:13:43 | 9 | Q. I'm sorry. I missed some of that. |
| 02:13:44 | 10 | How was it in the SUV? |
| 02:13:46 | 11 | A. In the stash compartment. |
| 02:13:48 | 12 | Q. What's a stash compartment? |
| 02:13:49 | 13 | A. A hidden compartment in the vehicle. |
| 02:13:51 | 14 | Q. When you delivered cocaine to these customers, did you |
| 02:13:55 | 15 | ever pick up anything from the customers? |
| 02:13:57 | 16 | A. Rarely. |
| 02:13:59 | 17 | Q. What did you rarely pick up? |
| 02:14:01 | 18 | A. Money. |
| 02:14:07 | 19 | Q. Where did you take the money when you did get it on those |
| 02:14:10 | 20 | rare occasions? |
| 02:14:11 | 21 | A. To a different stash house, one of the other guys' house, |
| 02:14:15 | 22 | Little Man or Pug's house. |
| 02:14:19 | 23 | Q. And you said a different stash house, different from what? |
| 02:14:20 | 24 | A. A different one was used for drugs, and the other one is |
| 02:14:23 | 25 | used for money. |

| | | |
|---|---|---|
| 02:14:24 | 1 | Q.  You also mentioned the names Little Man and Pugs.  Who |
| 02:14:29 | 2 | were they? |
| 02:14:30 | 3 | A.  Some of the other workers. |
| 02:14:31 | 4 | Q.  Where did they work? |
| 02:14:32 | 5 | A.  They worked for Junior or Peter. |
| 02:14:34 | 6 | Q.  I'm sorry. |
| 02:14:34 | 7 |      Where did they work? |
| 02:14:36 | 8 | A.  In the house. |
| 02:14:37 | 9 | Q.  What kind of house? |
| 02:14:38 | 10 | A.  In the stash house. |
| 02:14:39 | 11 | Q.  What was their stash house for? |
| 02:14:41 | 12 | A.  For counting money. |
| 02:14:43 | 13 | Q.  Did you ever count the money yourself? |
| 02:14:45 | 14 | A.  No. |
| 02:14:46 | 15 | Q.  When you weren't delivering cocaine to customers, did you |
| 02:14:50 | 16 | ever meet the customers for other reasons? |
| 02:14:54 | 17 | A.  Yes. |
| 02:14:54 | 18 | Q.  What were those reasons? |
| 02:14:57 | 19 | A.  Just drop off a phone or pick up something, vehicle, |
| 02:15:04 | 20 | money, other small stuff. |
| 02:15:06 | 21 | Q.  In terms of the phones, who, if anyone, instructed you to |
| 02:15:10 | 22 | drop off phones? |
| 02:15:12 | 23 | A.  Junior or Peter. |
| 02:15:15 | 24 | Q.  At a certain point -- and you started to mention this |
| 02:15:18 | 25 | earlier -- but did you focus on doing something else for the |

| | | |
|---|---|---|
| 02:15:21 | 1 | Flores brothers instead of customer deliveries of cocaine? |
| 02:15:24 | 2 | A. Yes. |
| 02:15:24 | 3 | Q. What was that? |
| 02:15:25 | 4 | A. Installing stash compartments. |
| 02:15:28 | 5 | Q. And are those the secret compartments that you're talking |
| 02:15:31 | 6 | about? |
| 02:15:31 | 7 | A. Yes. |
| 02:15:31 | 8 | Q. Where were those -- when did you start doing those secret |
| 02:15:35 | 9 | compartments? |
| 02:15:36 | 10 | A. The beginning of 2007. |
| 02:15:38 | 11 | Q. When did you stop doing those secret compartments? |
| 02:15:42 | 12 | A. In the middle of 2007. |
| 02:15:44 | 13 | Q. Who ordered you to install the secret compartments? |
| 02:15:47 | 14 | A. Peter. |
| 02:15:49 | 15 | Q. And I didn't ask you this in terms of your contact with |
| 02:15:52 | 16 | Peter and Junior Margarito, but how did they give you |
| 02:15:56 | 17 | instructions for these various things? |
| 02:15:59 | 18 | A. On the cellphone. |
| 02:16:01 | 19 | Q. Turning back to the secret compartments, how -- I guess |
| 02:16:04 | 20 | just to clarify, where were these secret compartments being |
| 02:16:09 | 21 | installed inside of? |
| 02:16:10 | 22 | A. Mainly in the SUV, the cargo area. |
| 02:16:12 | 23 | Q. How did you get these SUVs to install these secret |
| 02:16:15 | 24 | compartments? |
| 02:16:17 | 25 | A. From whoever, whoever they would tell me to pick it up |

| | | |
|---|---|---|
| 02:16:21 | 1 | from or someone would drop it off. |
| 02:16:23 | 2 | Q.  Did you get paid for installing these secret compartments? |
| 02:16:27 | 3 | A.  Yes. |
| 02:16:27 | 4 | Q.  How much did you get paid? |
| 02:16:29 | 5 | A.  7, 7,000. |
| 02:16:31 | 6 | Q.  In total, during the time that you worked for the Flores |
| 02:16:35 | 7 | brothers, how much cocaine can you estimate that you |
| 02:16:39 | 8 | delivered? |
| 02:16:43 | 9 | A.  I don't know.  It's a lot. |
| 02:16:44 | 10 | Q.  Was it -- can you give at least a basement number that it |
| 02:16:50 | 11 | was above? |
| 02:16:50 | 12 | A.  Thousands. |
| 02:16:51 | 13 | Q.  How much money did you get in total for your time that you |
| 02:16:54 | 14 | worked with the Flores brothers? |
| 02:16:58 | 15 | A.  How much did I get? |
| 02:16:58 | 16 | Q.  Yes. |
| 02:16:59 | 17 | A.  What, total? |
| 02:17:00 | 18 | Q.  Yes. |
| 02:17:01 | 19 | A.  I don't know.  Maybe about 50 a year. |
| 02:17:12 | 20 | Q.  Is that 50,000? |
| 02:17:13 | 21 | A.  Yes. |
| 02:17:15 | 22 | Q.  Turning now to look around the room, can you look around |
| 02:17:19 | 23 | the room? |
| 02:17:19 | 24 | A.  Yes. |
| 02:17:20 | 25 | Q.  Do you recognize anyone that you delivered to? |

| | | |
|---|---|---|
| 02:17:22 | 1 | A.  Yes. |
| 02:17:24 | 2 | Q.  Can you identify the individual by a piece of clothing |
| 02:17:28 | 3 | that he's wearing? |
| 02:17:29 | 4 | A.  Yes. |
| 02:17:29 | 5 | Q.  Will you do so, for the record? |
| 02:17:31 | 6 | A.  Navy blue suit and the white shirt. |
| 02:17:41 | 7 | MS. GUREN:  May the record reflect that the witness |
| 02:17:43 | 8 | has identified the defendant? |
| 02:17:45 | 9 | THE COURT:  It will. |
| 02:17:46 | 10 | BY MS. GUREN: |
| 02:17:48 | 11 | Q.  What did you know this person by, in terms of his name? |
| 02:17:50 | 12 | A.  Ron Ron. |
| 02:17:53 | 13 | Q.  Who was Ron Ron? |
| 02:17:55 | 14 | A.  What? |
| 02:17:56 | 15 | Q.  I'm sorry.  Let me ask a different question a different |
| 02:17:59 | 16 | way. |
| 02:17:59 | 17 | How are you familiar with Ron Ron? |
| 02:18:02 | 18 | A.  By meeting him, meeting him to drop off drugs. |
| 02:18:07 | 19 | Q.  Approximately how many times did you deliver drugs to the |
| 02:18:12 | 20 | defendant? |
| 02:18:13 | 21 | A.  It was a lot, but I only -- I could only remember five |
| 02:18:17 | 22 | times specifically. |
| 02:18:18 | 23 | Q.  So when you say it was a lot but you can only remember |
| 02:18:21 | 24 | five times specifically, would in your -- do you believe it |
| 02:18:27 | 25 | was more than five times but you remember five specifically? |

| | | |
|---|---|---|
| 02:18:30 | 1 | A.  Yeah. |
| 02:18:30 | 2 | Q.  And what kind of drugs did you drop off? |
| 02:18:33 | 3 | A.  I wouldn't know what was in there.  I guess cocaine. |
| 02:18:38 | 4 | Q.  Over what period of time? |
| 02:18:40 | 5 | A.  Between 2005, 2007. |
| 02:18:45 | 6 | Q.  About how often? |
| 02:18:51 | 7 | A.  I didn't see him too much. |
| 02:18:52 | 8 | Q.  How many times a year, could you estimate? |
| 02:18:55 | 9 | A.  I don't know.  Maybe once or twice a month.  I mean -- |
| 02:19:05 | 10 | Q.  Approximately -- |
| 02:19:06 | 11 | A.  I didn't see him that much.  I think I seen him only once |
| 02:19:09 | 12 | a month. |
| 02:19:09 | 13 | Q.  About once a month? |
| 02:19:11 | 14 | A.  But I don't remember what it was for, you know. |
| 02:19:13 | 15 | Q.  So when you say you don't remember what it was for, were |
| 02:19:16 | 16 | there other things that you met the defendant for? |
| 02:19:19 | 17 | A.  Yeah, to give him a phone or something, something else. |
| 02:19:22 | 18 | Q.  Besides for a phone, do you remember -- and cocaine, was |
| 02:19:25 | 19 | there other things that you remember meeting the defendant |
| 02:19:27 | 20 | for? |
| 02:19:28 | 21 | A.  Yeah, usually give him a phone or pick up something from |
| 02:19:31 | 22 | him, jewelry, or give him a phone number or something. |
| 02:19:36 | 23 | Q.  Approximately how much cocaine at a time did you deliver |
| 02:19:40 | 24 | to the defendant? |
| 02:19:42 | 25 | A.  Approximately how many times? |

| | | |
|---|---|---|
| 02:19:44 | 1 | Q.  No. |
| 02:19:45 | 2 | How much cocaine did you deliver at a time to the |
| 02:19:48 | 3 | defendant? |
| 02:19:49 | 4 | A.  Oh, 50. |
| 02:19:50 | 5 | Q.  Was it sometimes less than 50? |
| 02:19:52 | 6 | A.  Yes. |
| 02:19:53 | 7 | Q.  What was the least amount of cocaine you recall delivering |
| 02:19:56 | 8 | to the defendant at a time? |
| 02:19:57 | 9 | A.  30, 35. |
| 02:19:59 | 10 | Q.  Do you need some water by any chance? |
| 02:20:01 | 11 | A.  No, I'm fine. |
| 02:20:02 | 12 | Q.  There's actually a water pitcher right next to you and |
| 02:20:06 | 13 | cups.  If you do need it, we can stop and get you some water. |
| 02:20:14 | 14 | When did you first meet the defendant? |
| 02:20:17 | 15 | A.  2005. |
| 02:20:20 | 16 | Q.  Where did you first meet the defendant? |
| 02:20:27 | 17 | A.  By a firehouse. |
| 02:20:28 | 18 | Q.  When you say by a firehouse, do you remember the streets |
| 02:20:32 | 19 | nearby? |
| 02:20:36 | 20 | A.  Madison and Monroe. |
| 02:20:38 | 21 | Q.  Turning to Government Exhibit Photo 5, which I believe you |
| 02:20:42 | 22 | have in front of you, can you take a look at that? |
| 02:20:49 | 23 | A.  In here? |
| 02:20:50 | 24 | Q.  Yes.  And I'll also put it up on the screen for you. |
| 02:20:54 | 25 | Do you see it on the screen? |

453

| | | |
|---|---|---|
| 02:20:54 | 1 | A.  Yes. |
| 02:20:55 | 2 | Q.  Do you recognize that? |
| 02:20:56 | 3 | A.  Yes. |
| 02:20:58 | 4 | Q.  What is that? |
| 02:20:59 | 5 | A.  The apartment building. |
| 02:21:01 | 6 | Q.  What apartment building? |
| 02:21:03 | 7 | A.  Across the street from the firehouse. |
| 02:21:07 | 8 | Q.  Is that a fair and accurate representation of that |
| 02:21:09 | 9 | building? |
| 02:21:11 | 10 | A.  Yes. |
| 02:21:12 | 11 | MS. GUREN:  At this time the Government would move |
| 02:21:13 | 12 | into evidence Government Exhibit Photo 5. |
| 02:21:15 | 13 | THE COURT:  Okay.  It will be admitted, and you can |
| 02:21:19 | 14 | publish. |
| 02:21:20 | 15 | MS. GUREN:  Thank you, your Honor. |
| 02:21:21 | 16 | BY MS. GUREN: |
| 02:21:24 | 17 | Q.  When you were talking about the fire station, is this the |
| 02:21:26 | 18 | building that's across from the fire station where you met the |
| 02:21:29 | 19 | defendant? |
| 02:21:30 | 20 | A.  Yes. |
| 02:21:32 | 21 | Q.  Now, I want to show you, in your folder and again on the |
| 02:21:37 | 22 | screen, Government Exhibit Photo 4.  Do you recognize that |
| 02:21:41 | 23 | photo? |
| 02:21:42 | 24 | A.  Yes. |
| 02:21:46 | 25 | Q.  What is that photo? |

| | |
|---|---|
| 02:21:47 | 1 |
| 02:21:48 | 2 |
| 02:21:51 | 3 |
| 02:21:53 | 4 |
| 02:21:53 | 5 |
| 02:21:56 | 6 |
| 02:21:58 | 7 |
| 02:22:01 | 8 |
| 02:22:05 | 9 |
| 02:22:06 | 10 |
| 02:22:09 | 11 |
| 02:22:11 | 12 |
| 02:22:11 | 13 |
| 02:22:15 | 14 |
| 02:22:15 | 15 |
| 02:22:16 | 16 |
| 02:22:17 | 17 |
| 02:22:20 | 18 |
| 02:22:23 | 19 |
| 02:22:23 | 20 |
| 02:22:28 | 21 |
| 02:22:30 | 22 |
| 02:22:34 | 23 |
| 02:22:35 | 24 |
| 02:22:36 | 25 |

A.  The firehouse across the street.

Q.  Is that a fair and accurate representation of what the firehouse looks like?

A.  Yes.

        MS. GUREN:  At this time we would move to admit Government Exhibit Photo 4 into evidence.

        THE COURT:  It will be admitted, and you can publish.

        MS. GUREN:  Thank you, your Honor.

BY MS. GUREN:

Q.  When you were talking about the fire station, is this the across-the-street fire station?

A.  Yes.

Q.  When you first met the defendant that very first time, was anyone else with you?

A.  Yes.

Q.  Who else was with you?

A.  Cesar.

Q.  How did you -- and is that Cesar Perez?

A.  Yes.

Q.  How did you and Cesar Perez get to that area?

A.  In the SUV.

Q.  What, if anything, did the SUV have?

A.  Drugs.

Q.  What kind of drugs?

A.  Cocaine.

| | | |
|---|---|---|
| 02:22:39 | 1 | Q.  And just to clarify -- I'm not sure if you said this |
| 02:22:42 | 2 | before -- when you were delivering to the defendant, you said |
| 02:22:44 | 3 | 50.  Did you say 50 what of cocaine? |
| 02:22:46 | 4 | A.  50 kilos. |
| 02:22:47 | 5 | Q.  And is that kilograms? |
| 02:22:50 | 6 | A.  Yes. |
| 02:22:51 | 7 | Q.  Did you know how much -- how much cocaine the SUV had? |
| 02:22:56 | 8 | A.  Yes. |
| 02:22:57 | 9 | Q.  How much cocaine did the SUV have that first time? |
| 02:23:00 | 10 | A.  50. |
| 02:23:03 | 11 | Q.  How do you know? |
| 02:23:05 | 12 | A.  I seen them load it.  I was there while Cesar was loading |
| 02:23:10 | 13 | it. |
| 02:23:10 | 14 | Q.  Why were you going to meet the defendant at that location |
| 02:23:13 | 15 | with Cesar Perez? |
| 02:23:19 | 16 | A.  Margarito, Peter, he called, and they told us to go meet, |
| 02:23:27 | 17 | load up 50, and go meet him. |
| 02:23:29 | 18 | Q.  When you arrived at that location by the apartment |
| 02:23:34 | 19 | building on Madison and Monroe -- or near Madison and Monroe, |
| 02:23:38 | 20 | did you see the defendant? |
| 02:23:40 | 21 | A.  Yes. |
| 02:23:41 | 22 | Q.  Describe how you first saw the defendant. |
| 02:23:48 | 23 | A.  White T-shirt, jeans, white shoes, gym shoes. |
| 02:23:53 | 24 | Q.  Was he in a car when you first saw him? |
| 02:23:55 | 25 | A.  No. |

456

| | | |
|---|---|---|
| 02:23:55 | 1 | Q.  How was he? |
| 02:23:56 | 2 | A.  Walking. |
| 02:23:58 | 3 | Q.  Where did he walk to? |
| 02:24:00 | 4 | A.  He walked toward us from the corner of the building. |
| 02:24:03 | 5 | Q.  What, if anything, happened when he walked toward you -- |
| 02:24:06 | 6 | after he walked towards you? |
| 02:24:07 | 7 | A.  We gave him the keys to the vehicle. |
| 02:24:10 | 8 | Q.  Once you gave him the keys to the vehicle, what, if |
| 02:24:14 | 9 | anything, did you and Cesar Perez then do? |
| 02:24:16 | 10 | A.  Cesar got in the car with me, and we left. |
| 02:24:22 | 11 | Q.  And to clarify, when you say Cesar got into the car with |
| 02:24:26 | 12 | you, had you driven a separate car? |
| 02:24:29 | 13 | A.  Yes. |
| 02:24:29 | 14 | Q.  What car had you driven? |
| 02:24:31 | 15 | A.  A Cherokee. |
| 02:24:32 | 16 | Q.  And how had you gotten to the location? |
| 02:24:36 | 17 | A.  I followed him. |
| 02:24:39 | 18 | Q.  (Indicating.) |
| 02:24:40 | 19 | A.  I followed Cesar. |
| 02:24:41 | 20 | Q.  Did the defendant say anything or did you hear the |
| 02:24:43 | 21 | defendant say anything when he approached the car that Cesar |
| 02:24:48 | 22 | was driving? |
| 02:24:49 | 23 | A.  Try to be back fifteen minutes. |
| 02:24:53 | 24 | Q.  Did the defendant come back? |
| 02:24:56 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 02:24:57 | 1 | Q.  How long did it take for the defendant to come back? |
| 02:25:02 | 2 | A.  About 30 minutes. |
| 02:25:03 | 3 | Q.  What did you do in the meantime? |
| 02:25:05 | 4 | A.  Drove around. |
| 02:25:07 | 5 | Q.  How did you know to come back to that location? |
| 02:25:12 | 6 | A.  Peter called us, told us to come back. |
| 02:25:16 | 7 | Q.  How did Peter contact you? |
| 02:25:17 | 8 | A.  Cellphone. |
| 02:25:19 | 9 | Q.  When you came back to the fire station, what, if anything, |
| 02:25:22 | 10 | happened? |
| 02:25:24 | 11 | A.  He gave us the keys and Cesar got in his car and we left. |
| 02:25:29 | 12 | Q.  Did the defendant say anything when he came back? |
| 02:25:32 | 13 | A.  No. |
| 02:25:33 | 14 | Q.  Was the cocaine gone? |
| 02:25:36 | 15 | A.  Yes. |
| 02:25:36 | 16 | Q.  How do you know? |
| 02:25:38 | 17 | A.  We went back to load up the vehicle to go see somebody |
| 02:25:42 | 18 | else. |
| 02:25:42 | 19 | Q.  Did the defendant give you anything on that occasion? |
| 02:25:46 | 20 | A.  No. |
| 02:25:47 | 21 | Q.  Did you see him -- whether or not he gave anything to |
| 02:25:50 | 22 | Cesar Perez? |
| 02:25:51 | 23 | A.  No. |
| 02:25:51 | 24 | Q.  After that very first time at the area by the fire |
| 02:25:56 | 25 | station, did you meet with the defendant again at the fire |

458

| | | |
|---|---|---|
| 02:25:59 | 1 | station? |
| 02:25:59 | 2 | A.  Yes. |
| 02:26:00 | 3 | Q.  When was that? |
| 02:26:03 | 4 | A.  A couple months later. |
| 02:26:05 | 5 | Q.  Was anyone with you that time? |
| 02:26:07 | 6 | A.  Danny Torres. |
| 02:26:09 | 7 | Q.  That time at the fire station was anyone with you? |
| 02:26:12 | 8 | A.  At the fire station? |
| 02:26:14 | 9 | Q.  Yes. |
| 02:26:14 | 10 | A.  Cesar was. |
| 02:26:15 | 11 | Q.  Not the first time at the fire station.  The second time |
| 02:26:18 | 12 | at the fire station, was anyone with you? |
| 02:26:20 | 13 | A.  The second time? |
| 02:26:21 | 14 | Q.  Yes. |
| 02:26:21 | 15 | A.  Cesar, both times was Cesar. |
| 02:26:25 | 16 | Q.  Cesar was with you both times? |
| 02:26:28 | 17 | A.  Yeah. |
| 02:26:28 | 18 | Q.  How did you know to meet the defendant there? |
| 02:26:31 | 19 | A.  It's like the same place.  He just tells you to go see a |
| 02:26:35 | 20 | person.  And if it's a different place, then you go to a |
| 02:26:37 | 21 | different place.  But if it's the same place, he tells you to |
| 02:26:40 | 22 | go to the same place. |
| 02:26:42 | 23 | Q.  How did you get to the fire station that time? |
| 02:26:45 | 24 | A.  Same way. |
| 02:26:47 | 25 | Q.  Did you drive two cars or one car? |

| | | |
|---|---|---|
| 02:26:49 | 1 | A.  Two cars. |
| 02:26:51 | 2 | Q.  What, if anything, did you have in the SUV? |
| 02:26:54 | 3 | A.  50 kilos again, same thing. |
| 02:26:57 | 4 | Q.  Was it in the car that you were driving? |
| 02:26:59 | 5 | A.  Yes. |
| 02:27:00 | 6 | Q.  Where was the kilograms of cocaine? |
| 02:27:03 | 7 | A.  In the stash compartment. |
| 02:27:07 | 8 | Q.  What happened when you got there? |
| 02:27:08 | 9 | A.  Same thing, call Peter, he came out from the corner of the |
| 02:27:14 | 10 | building, gave him the keys, we left, said he'd be back in a |
| 02:27:19 | 11 | bit. |
| 02:27:19 | 12 | Q.  Did he come back? |
| 02:27:20 | 13 | A.  Yes. |
| 02:27:21 | 14 | Q.  And when you say he, are you referring to the defendant? |
| 02:27:23 | 15 | A.  Yes. |
| 02:27:23 | 16 | Q.  How long did it take him to come back? |
| 02:27:29 | 17 | A.  I don't remember.  About the same time, I guess, |
| 02:27:33 | 18 | 30 minutes. |
| 02:27:33 | 19 | Q.  When he returned, what, if anything, did you do? |
| 02:27:37 | 20 | A.  We left, got the keys from him, got in the vehicle, and |
| 02:27:41 | 21 | left. |
| 02:27:41 | 22 | Q.  Was the cocaine still in the car? |
| 02:27:43 | 23 | A.  No. |
| 02:27:44 | 24 | Q.  Were there other locations besides -- or near the fire |
| 02:27:49 | 25 | station where you met the defendant to deliver cocaine? |

| | | |
|---|---|---|
| 02:27:52 | 1 | A.  Yes. |
| 02:27:53 | 2 | Q.  Was any of those locations outside the City of Chicago? |
| 02:27:56 | 3 | A.  Yes. |
| 02:27:57 | 4 | Q.  Where was that location? |
| 02:27:59 | 5 | A.  By the pool hall. |
| 02:28:05 | 6 | Q.  And where -- how did you get to the pool hall? |
| 02:28:08 | 7 | A.  In the vehicle, same thing. |
| 02:28:10 | 8 | Q.  Oh.  In your SUV, what roads did you take? |
| 02:28:14 | 9 | A.  I-55. |
| 02:28:16 | 10 | Q.  How many times did you meet the defendant at the pool |
| 02:28:19 | 11 | hall? |
| 02:28:20 | 12 | A.  Twice. |
| 02:28:23 | 13 | Q.  Showing you now -- your Honor, may I publish photo -- |
| 02:28:28 | 14 | Government Exhibit Photo 3, which is already in evidence? |
| 02:28:30 | 15 | THE COURT:  You may. |
| 02:28:35 | 16 | BY MS. GUREN: |
| 02:28:36 | 17 | Q.  Showing you on your screen Government Exhibit Photo 3, do |
| 02:28:40 | 18 | you recognize that photo? |
| 02:28:41 | 19 | A.  Yes. |
| 02:28:41 | 20 | Q.  What is that? |
| 02:28:42 | 21 | A.  The pool house. |
| 02:28:45 | 22 | Q.  The first time you went to the pool hall to meet the |
| 02:28:48 | 23 | defendant, was anyone with you? |
| 02:28:50 | 24 | A.  Yes. |
| 02:28:50 | 25 | Q.  Who was with you? |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 02:28:51 | 1 | A.  Danny. |
| 02:28:51 | 2 | Q.  How did you get to the pool hall? |
| 02:28:57 | 3 | A.  I followed Danny there. |
| 02:29:00 | 4 | Q.  What, if anything, was in -- was anything in your car? |
| 02:29:03 | 5 | A.  In my car, no. |
| 02:29:04 | 6 | Q.  Was anything in Danny Torres' car? |
| 02:29:07 | 7 | A.  Yes. |
| 02:29:07 | 8 | Q.  What was in Danny Torres' car? |
| 02:29:09 | 9 | A.  50. |
| 02:29:10 | 10 | Q.  50 what? |
| 02:29:11 | 11 | A.  50 kilos. |
| 02:29:12 | 12 | Q.  Of what? |
| 02:29:13 | 13 | A.  Cocaine. |
| 02:29:14 | 14 | Q.  How did you know that? |
| 02:29:17 | 15 | A.  I was there when he loaded it. |
| 02:29:20 | 16 | Q.  How did you know to meet the defendant by the pool hall? |
| 02:29:24 | 17 | A.  We didn't.  Peter told us to get on I-55, get off on the |
| 02:29:29 | 18 | expressway and look for a spot to pull over and call when we |
| 02:29:33 | 19 | got there. |
| 02:29:34 | 20 | Q.  And once you got off the expressway and looked for a spot, |
| 02:29:37 | 21 | what spot did you see? |
| 02:29:39 | 22 | A.  We seen the billiard's and said we could go in there and |
| 02:29:45 | 23 | play a game of pool until he comes back with the vehicle, so |
| 02:29:48 | 24 | we picked that spot. |
| 02:29:49 | 25 | Q.  Did you end up being able to play a game of pool? |

| | | |
|---|---|---|
| 02:29:53 | 1 | A. No. |
| 02:29:53 | 2 | Q. Why not? |
| 02:29:54 | 3 | A. Was closed. |
| 02:29:55 | 4 | Q. When you got there, was the defendant already at the |
| 02:29:57 | 5 | parking lot? |
| 02:29:58 | 6 | A. No. |
| 02:29:59 | 7 | Q. Did you see the defendant arrive? |
| 02:30:01 | 8 | A. Yes. |
| 02:30:02 | 9 | Q. How did he arrive? |
| 02:30:05 | 10 | A. In a vehicle. |
| 02:30:07 | 11 | Q. Do you remember what kind of vehicle? |
| 02:30:13 | 12 | A. It's a two-door silver car. |
| 02:30:16 | 13 | Q. Did the defendant say anything to you this time at the |
| 02:30:19 | 14 | pool hall? |
| 02:30:22 | 15 | A. He said he'd be back in a bit. |
| 02:30:25 | 16 | Q. What, if anything -- did the defendant leave? |
| 02:30:30 | 17 | A. Yes. |
| 02:30:30 | 18 | Q. How did he leave? |
| 02:30:31 | 19 | A. In Danny's -- the truck Danny was driving. |
| 02:30:37 | 20 | Q. How did he get Danny's car? |
| 02:30:37 | 21 | A. Danny gave him the keys. |
| 02:30:39 | 22 | Q. How long -- did the defendant end up returning? |
| 02:30:41 | 23 | A. Yes. |
| 02:30:42 | 24 | Q. How long was the defendant gone? |
| 02:30:44 | 25 | A. A little longer, about 40 minutes. |

| | | |
|---|---|---|
| 02:30:47 | 1 | Q. When he returned, what happened? |
| 02:30:57 | 2 | A. We left. |
| 02:31:00 | 3 | Q. What cars did you leave in? |
| 02:31:02 | 4 | A. Danny got in the vehicle, and he left.  And I got in |
| 02:31:06 | 5 | mine -- I was still in mine, and we left. |
| 02:31:08 | 6 | Q. Do you know if the cocaine was still in Danny's car? |
| 02:31:12 | 7 | A. No, no, no, I didn't see that time. |
| 02:31:17 | 8 | Q. Do you know if anything new was in Danny's car? |
| 02:31:21 | 9 | A. No, not that time. |
| 02:31:23 | 10 | Q. Did you meet the defendant at the pool hall on another |
| 02:31:27 | 11 | occasion? |
| 02:31:27 | 12 | A. Yes. |
| 02:31:28 | 13 | Q. When was that? |
| 02:31:30 | 14 | A. Maybe a couple months later after that. |
| 02:31:34 | 15 | Q. Was anyone with you that time? |
| 02:31:36 | 16 | A. No. |
| 02:31:37 | 17 | Q. How did you know to meet the defendant there? |
| 02:31:40 | 18 | A. Peter told me. |
| 02:31:41 | 19 | Q. What, if anything, did you have in your car? |
| 02:31:44 | 20 | A. 50 kilos. |
| 02:31:46 | 21 | Q. Did you see the defendant when you arrived at the pool |
| 02:31:50 | 22 | hall? |
| 02:31:50 | 23 | A. Yes. |
| 02:31:51 | 24 | Q. Where was the defendant? |
| 02:31:53 | 25 | A. In his car. |

464

| | | |
|---|---|---|
| 02:31:54 | 1 | Q. What kind of car? |
| 02:31:56 | 2 | A. A silver Cherokee. |
| 02:31:59 | 3 | Q. Did he say anything to you? |
| 02:32:01 | 4 | A. Be back in a little bit. |
| 02:32:04 | 5 | Q. What, if anything, did you do? |
| 02:32:06 | 6 | A. He gave me the keys to his vehicle, and I took his |
| 02:32:09 | 7 | vehicle; he took mine. |
| 02:32:10 | 8 | Q. Did you end up returning to the parking lot? |
| 02:32:14 | 9 | A. No. |
| 02:32:15 | 10 | Q. Did he end up returning to the parking lot? |
| 02:32:18 | 11 | A. I don't -- I don't think so. |
| 02:32:20 | 12 | Q. What -- I guess that that is a bad question. |
| 02:32:23 | 13 | What did you do in the meantime -- what did you do |
| 02:32:25 | 14 | after you left the pool hall? |
| 02:32:28 | 15 | A. I left went about my business, driving around, went to a |
| 02:32:32 | 16 | store. |
| 02:32:32 | 17 | Q. Did you ever give the defendant's car back to him? |
| 02:32:35 | 18 | A. Yes. |
| 02:32:36 | 19 | Q. When was that? |
| 02:32:37 | 20 | A. A couple hours later. |
| 02:32:39 | 21 | Q. Where? |
| 02:32:44 | 22 | A. Same place. |
| 02:32:44 | 23 | Q. So back at the pool hall then? |
| 02:32:46 | 24 | A. Yeah. |
| 02:32:46 | 25 | Q. Did the defendant say anything to you? |

```
02:32:49   1   A.  No.
02:32:50   2   Q.  Was there -- did you check the trap to see if there was
02:32:54   3   still cocaine in that stash compartment?
02:32:56   4   A.  I didn't check it until after Peter called me.
02:32:59   5   Q.  When was -- when did Peter call you?
02:33:02   6   A.  After I was -- when I was driving home.
02:33:04   7   Q.  At that time did you check it?
02:33:07   8   A.  No, actually, no.  He called me.  He told me that there's
02:33:11   9   something in there and go by Little Man's house.  So I went to
02:33:14  10   Little Man's house, and then we opened it and opened the
02:33:17  11   compartment.  There was money in there.  Little Man took it
02:33:20  12   out.
02:33:20  13   Q.  What did the money look like?
02:33:25  14   A.  Bundles.  It was like wrapped up in bundles, rubber bands.
02:33:31  15   Q.  Could you estimate how much money was in there?
02:33:34  16   A.  No.
02:33:35  17   Q.  Did you end up counting the money that day?
02:33:38  18   A.  No.
02:33:38  19   Q.  Was there a third location that you would meet -- that you
02:33:41  20   met the defendant to deliver cocaine?
02:33:43  21   A.  Just once.
02:33:44  22   Q.  Where was that?
02:33:48  23   A.  Downtown.
02:33:49  24   Q.  Where specifically?
02:33:52  25   A.  Off of 13th and Roosevelt.
```

466

| | | |
|---|---|---|
| 02:33:55 | 1 | Q.  Turning -- when was that? |
| 02:33:58 | 2 | A.  2007. |
| 02:34:00 | 3 | Q.  Was there a season? |
| 02:34:02 | 4 | A.  Winter. |
| 02:34:06 | 5 | Q.  Showing you on your screen and in the folder Government |
| 02:34:14 | 6 | Exhibit Photo 10, do you recognize that photo? |
| 02:34:16 | 7 | A.  Yes. |
| 02:34:21 | 8 | Q.  Was that photo? |
| 02:34:22 | 9 | A.  It's an apartment building we went to. |
| 02:34:24 | 10 | Q.  Is that a fair and accurate representation of what that |
| 02:34:27 | 11 | apartment looked like? |
| 02:34:28 | 12 | A.  Yes. |
| 02:34:28 | 13 |     MS. GUREN:  The Government would move into evidence |
| 02:34:31 | 14 | Government Exhibit Photo 10 and ask to publish. |
| 02:34:33 | 15 |     THE COURT:  It will be admitted.  You can publish it. |
| 02:34:36 | 16 | BY MS. GUREN: |
| 02:34:37 | 17 | Q.  Now, it looks like that intersection is 13th and Prairie. |
| 02:34:39 | 18 | Is that accurate as to where you met the defendant? |
| 02:34:44 | 19 | A.  Yes. |
| 02:34:46 | 20 | Q.  How did you know to meet the defendant at this specific |
| 02:34:48 | 21 | location? |
| 02:34:49 | 22 | A.  Peter told -- called me, told me to meet him there. |
| 02:34:53 | 23 | Q.  Did Peter instruct you on how much kilograms of cocaine to |
| 02:34:57 | 24 | bring? |
| 02:34:57 | 25 | A.  Yeah.  He told me to fit the most I could fit in there, |

| | | |
|---|---|---|
| 02:35:03 | 1 | and I could only fit 35. |
| 02:35:05 | 2 | Q. Did you -- when you arrived -- well, first of all, how did |
| 02:35:12 | 3 | you get to the location? |
| 02:35:12 | 4 | A. In the SUV. |
| 02:35:13 | 5 | Q. Where was the cocaine in the SUV? |
| 02:35:15 | 6 | A. In the stash compartment. |
| 02:35:18 | 7 | Q. When you arrived, did you see the defendant? |
| 02:35:21 | 8 | A. Yes. |
| 02:35:21 | 9 | Q. Where was the defendant? |
| 02:35:22 | 10 | A. He was in the lobby. He came out to the corner of the |
| 02:35:26 | 11 | building, got in the vehicle with me. |
| 02:35:27 | 12 | Q. What, if anything, did he do once he was in the vehicle |
| 02:35:30 | 13 | with you? |
| 02:35:30 | 14 | A. Told me to go around, go through the side door in the |
| 02:35:33 | 15 | garage. He opened the garage door and we drove up. |
| 02:35:37 | 16 | Q. Where did you drive up to? |
| 02:35:38 | 17 | A. I don't remember. He just told me to drive up in circles. |
| 02:35:42 | 18 | Q. And at some point what happened? |
| 02:35:46 | 19 | A. Pulled over in a spot, parking spot. |
| 02:35:49 | 20 | Q. Once you pulled over at the parking spot, what did you do? |
| 02:35:52 | 21 | A. I opened it up, took them out, put them in a duffle bag, |
| 02:35:56 | 22 | gave him the bag, closed the compartment, and left. |
| 02:35:59 | 23 | Q. Did the defendant say anything to you? |
| 02:36:02 | 24 | A. No. |
| 02:36:04 | 25 | Q. Did you ever deliver to the defendant again after this |

468

| | | |
|---|---|---|
| 02:36:07 | 1 | time in the winter of 2007? |
| 02:36:09 | 2 | A.  No. |
| 02:36:10 | 3 | Q.  Did you ever -- you had talked about delivering other |
| 02:36:13 | 4 | things to the defendant and you had talked about it being |
| 02:36:17 | 5 | cellphones.  How many times did you deliver cellphones to the |
| 02:36:20 | 6 | defendant approximately? |
| 02:36:21 | 7 | A.  Every other month, two months. |
| 02:36:24 | 8 | Q.  Where did you meet the defendant to deliver cellphones to |
| 02:36:27 | 9 | him? |
| 02:36:28 | 10 | A.  Anywhere, off a street corner. |
| 02:36:32 | 11 | Q.  How did you know to meet him in these places? |
| 02:36:35 | 12 | A.  Peter would tell me to go. |
| 02:36:36 | 13 | Q.  When you would see the defendant, what types of cars was |
| 02:36:39 | 14 | the defendant driving? |
| 02:36:42 | 15 | A.  Cars and SUVs. |
| 02:36:45 | 16 | Q.  Were -- do you remember the models or anything about the |
| 02:36:49 | 17 | cars and SUVs? |
| 02:36:50 | 18 | A.  A Mercedes McLaren, a Jeep Grand Cherokee, SRT8, silver |
| 02:36:57 | 19 | BMW, silver Dodge, Stratus. |
| 02:37:06 | 20 | MS. GUREN:  May I have a moment, your Honor? |
| 02:37:07 | 21 | THE COURT:  You may. |
| 02:37:19 | 22 | MS. GUREN:  No further questions, your Honor. |
| 02:37:22 | 23 | THE COURT:  Okay.  Mr. Rubino, any cross? |
| 02:37:24 | 24 | MR. RUBINO:  Yes, your Honor. |
| 02:37:28 | 25 | - - - |

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 02:37:28 | 1  | ANTONIO AGUILERA, CROSS-EXAMINATION                                |
| 02:37:28 | 2  | BY MR. RUBINO:                                                      |
| 02:37:41 | 3  | Q.  Good afternoon, Mr. Torres -- or excuse me.  Mr. Aguilera,     |
| 02:37:46 | 4  | my mistake.                                                        |
| 02:37:55 | 5  |         Sir, you are out on bond, are you not?                     |
| 02:37:59 | 6  | A.  Yes.                                                           |
| 02:38:01 | 7  | Q.  And during the period -- you've been out on bond ever         |
| 02:38:06 | 8  | since this case began; is that correct?                            |
| 02:38:08 | 9  | A.  Yes.                                                           |
| 02:38:09 | 10 | Q.  And during the period you've been out on bond, have you       |
| 02:38:14 | 11 | ever talked to Daniel Torres?                                      |
| 02:38:17 | 12 | A.  Yes.                                                           |
| 02:38:18 | 13 | Q.  And have you ever talked to Cesar Perez?                       |
| 02:38:21 | 14 | A.  Yes.                                                           |
| 02:38:22 | 15 | Q.  And have you ever talked to Jorge Llamas?                      |
| 02:38:27 | 16 | A.  No.                                                            |
| 02:38:30 | 17 | Q.  Torres and Perez are friends of yours, are they not?          |
| 02:38:34 | 18 | A.  Yes.                                                           |
| 02:38:36 | 19 | Q.  And how many times would you say you've talked to Torres      |
| 02:38:40 | 20 | since you've been out on bond?                                     |
| 02:38:43 | 21 | A.  A couple.                                                      |
| 02:38:44 | 22 | Q.  How about Perez?                                               |
| 02:38:47 | 23 | A.  Also a couple.                                                 |
| 02:38:48 | 24 | Q.  Also a couple.                                                 |
| 02:38:50 | 25 |         Now, you're not sitting here as a good citizen            |

470

| | | |
|---|---|---|
| 02:38:58 | 1 | testifying to fight crime, are you? |
| 02:39:00 | 2 | MS. GUREN: Objection, your Honor, form. |
| 02:39:01 | 3 | THE COURT: Okay. Sustained. |
| 02:39:04 | 4 | BY MR. RUBINO: |
| 02:39:05 | 5 | Q. Tell us why you're sitting here testifying. |
| 02:39:09 | 6 | A. It's part of my agreement, to tell the truth. |
| 02:39:12 | 7 | Q. So you're here for no other reason in this world than to |
| 02:39:16 | 8 | tell the truth, right? |
| 02:39:18 | 9 | A. Well, to get a reduced sentence. |
| 02:39:19 | 10 | Q. You want to get something out of it, don't you? |
| 02:39:24 | 11 | A. (No response.) |
| 02:39:25 | 12 | Q. Do you? |
| 02:39:25 | 13 | A. Yeah. |
| 02:39:26 | 14 | Q. And what you want to get out of it is as little time in |
| 02:39:30 | 15 | prison as can be, correct? |
| 02:39:32 | 16 | A. Yes. |
| 02:39:32 | 17 | Q. You realize that all the drug dealing you did, the penalty |
| 02:39:38 | 18 | you're facing is a minimum of ten years and a maximum of life |
| 02:39:43 | 19 | in prison, don't you? |
| 02:39:45 | 20 | A. Yes. |
| 02:39:46 | 21 | Q. You certainly don't want to spend the rest of your life in |
| 02:39:49 | 22 | prison, do you? |
| 02:39:51 | 23 | A. Correct. |
| 02:39:54 | 24 | Q. And you don't want to spend 30 years or 20 years, if you |
| 02:39:57 | 25 | don't have to, do you? |

| | | |
|---|---|---|
| 02:39:59 | 1 | A.  Yes. |
| 02:39:59 | 2 | Q.  You want to cut your losses to as low as you can, don't |
| 02:40:03 | 3 | you? |
| 02:40:03 | 4 | A.  Yes. |
| 02:40:03 | 5 | Q.  And that's the only way you can do it, by coming in here |
| 02:40:06 | 6 | and testifying, isn't it? |
| 02:40:08 | 7 | A.  I guess, yes. |
| 02:40:09 | 8 | Q.  I couldn't hear your answer. |
| 02:40:12 | 9 | A.  Yes. |
| 02:40:17 | 10 | Q.  Now, have you been previously convicted of drugs? |
| 02:40:29 | 11 | A.  No. |
| 02:40:31 | 12 | Q.  You have an early marijuana case.  You were not convicted |
| 02:40:35 | 13 | of that? |
| 02:40:36 | 14 | MS. GUREN:  Objection, your Honor. |
| 02:40:37 | 15 | THE COURT:  Sustained. |
| 02:40:39 | 16 | THE WITNESS:  That was when I was young, yeah.  There |
| 02:40:42 | 17 | was a couple joints.  They told me I wasn't getting a |
| 02:40:44 | 18 | conviction. |
| 02:40:44 | 19 | MS. GUREN:  Can the witness be instructed not to |
| 02:40:46 | 20 | answer? |
| 02:40:46 | 21 | THE COURT:  Yes.  Okay.  The objection is sustained, |
| 02:40:49 | 22 | and you'll disregard his answer to that question. |
| 02:40:53 | 23 | And you don't need to answer the question regarding |
| 02:40:55 | 24 | that. |
| 02:40:56 | 25 | You can move on to something else. |

472

| | |
|---|---|
| 02:40:58 | 1 |
| 02:40:59 | 2 |
| 02:41:02 | 3 |
| 02:41:03 | 4 |
| 02:41:05 | 5 |
| 02:41:10 | 6 |
| 02:41:14 | 7 |
| 02:41:16 | 8 |
| 02:41:19 | 9 |
| 02:41:24 | 10 |
| 02:41:27 | 11 |
| 02:41:28 | 12 |
| 02:41:29 | 13 |
| 02:41:31 | 14 |
| 02:41:34 | 15 |
| 02:41:35 | 16 |
| 02:41:40 | 17 |
| 02:41:42 | 18 |
| 02:41:45 | 19 |
| 02:41:50 | 20 |
| 02:41:53 | 21 |
| 02:41:56 | 22 |
| 02:41:57 | 23 |
| 02:42:01 | 24 |
| 02:42:04 | 25 |

BY MR. RUBINO:

Q.  Sir, you've been around drugs since a very young age, haven't you?

A.  Yes.

Q.  And when you started working for the Flores brothers delivering drugs, was that the first time you were involved in drugs?

A.  No.

Q.  Tell us what you were doing with drugs before the Flores brothers.

A.  I don't know.

Q.  (Indicating.)

A.  I don't know.  Nothing really.

Q.  You don't know?

A.  (No response.)

Q.  Were you dealing drugs?  Were you delivering drugs?  Were you selling drugs?  What were you doing?

A.  Nothing.  I smoke, when I was freshman year, after that. I mean, I know a lot of guys that sell drugs and buy drugs from where I used to work at, you know, and they would always ask me -- always see them doing deals in front of me, stuff like that.

Q.  Now, you said in 2004 you tried to get cocaine from the Flores brothers for your own sales, remember that?

A.  Yeah.

| | | |
|---|---|---|
| 02:42:04 | 1 | Q.  Who were you selling drugs to at that time? |
| 02:42:08 | 2 | A.  Another person. |
| 02:42:09 | 3 | Q.  (Indicating.) |
| 02:42:10 | 4 | A.  Another person. |
| 02:42:11 | 5 | Q.  Who was that person? |
| 02:42:13 | 6 | A.  Derek. |
| 02:42:14 | 7 | Q.  Eric who? |
| 02:42:15 | 8 | A.  Derek, I said. |
| 02:42:18 | 9 | Q.  Does he have a last name? |
| 02:42:19 | 10 | A.  I don't know his last name. |
| 02:42:21 | 11 | MS. GUREN:  Objection, your Honor. |
| 02:42:23 | 12 | THE COURT:  Sustained on relevance. |
| 02:42:25 | 13 | BY MR. RUBINO: |
| 02:42:26 | 14 | Q.  How long had you been selling him drugs? |
| 02:42:28 | 15 | A.  I didn't sell him none. |
| 02:42:34 | 16 | Q.  How many people had you delivered drugs to before you |
| 02:42:37 | 17 | started working for the Flores brothers? |
| 02:42:40 | 18 | A.  None. |
| 02:42:46 | 19 | Q.  You said you worked security for Cesar, correct? |
| 02:42:52 | 20 | A.  Yes. |
| 02:42:53 | 21 | Q.  Did you carry a gun in that security? |
| 02:42:55 | 22 | A.  No. |
| 02:42:56 | 23 | Q.  Did you carry any kind of weapon? |
| 02:42:58 | 24 | A.  No. |
| 02:43:02 | 25 | Q.  How many kilos a year would you deliver for the Flores |

474

| | | |
|---|---|---|
| 02:43:09 | 1 | brothers? |
| 02:43:09 | 2 | A.  How many a year? |
| 02:43:10 | 3 | Q.  Mm-hmm. |
| 02:43:13 | 4 | A.  I don't know.  A lot. |
| 02:43:17 | 5 | Q.  Well, what's a lot to you? |
| 02:43:20 | 6 | A.  Over a thousand. |
| 02:43:27 | 7 | Q.  And you were paid $100 a kilo? |
| 02:43:32 | 8 | A.  Yes. |
| 02:43:33 | 9 | Q.  So that would mean you made at least a hundred thousand |
| 02:43:37 | 10 | dollars? |
| 02:43:38 | 11 | A.  Yes. |
| 02:43:38 | 12 | Q.  Not the $50,000 you told us, right? |
| 02:43:40 | 13 |         MS. GUREN:  Objection, foundation. |
| 02:43:42 | 14 |         THE COURT:  It's sustained for misstating the |
| 02:43:44 | 15 | evidence. |
| 02:43:45 | 16 | BY MR. RUBINO: |
| 02:43:47 | 17 | Q.  Did you tell us that you made about $50,000 a year working |
| 02:43:51 | 18 | for the Flores? |
| 02:43:54 | 19 | A.  Yes. |
| 02:43:54 | 20 | Q.  You did tell us that? |
| 02:43:55 | 21 | A.  Yes, I did. |
| 02:43:56 | 22 | Q.  Okay.  But if you delivered 100 -- or if you delivered a |
| 02:44:03 | 23 | thousand kilos a year, at $100 a kilo, wouldn't you have made |
| 02:44:08 | 24 | a hundred thousand a year? |
| 02:44:10 | 25 | A.  I guess, yeah. |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 02:44:19 | 1 | Q. Now, you've identified Ron Collins. You've called him Ron |
| 02:44:31 | 2 | Ron, correct? |
| 02:44:32 | 3 | A. Correct. |
| 02:44:33 | 4 | Q. Did you ever call him Ronnie? |
| 02:44:35 | 5 | A. No. |
| 02:44:35 | 6 | Q. Do you know anybody named Ronnie? |
| 02:44:38 | 7 | A. Yes. |
| 02:44:42 | 8 | Q. You used to deliver drugs to somebody named Ronnie, didn't |
| 02:44:46 | 9 | you? |
| 02:44:46 | 10 | MS. GUREN: Objection, relevance. |
| 02:44:47 | 11 | THE COURT: Sustained. |
| 02:44:48 | 12 | BY MR. RUBINO: |
| 02:44:48 | 13 | Q. Did you ever deliver drugs to anyone's name was like Ron |
| 02:44:55 | 14 | Collins' name? |
| 02:44:56 | 15 | A. Yes. |
| 02:44:56 | 16 | Q. So the Flores brothers had other customers with similar |
| 02:45:02 | 17 | names to Ron Collins, didn't they? |
| 02:45:04 | 18 | A. Yes. |
| 02:45:10 | 19 | Q. Now, you have identified Ron Collins here in court, |
| 02:45:24 | 20 | correct? |
| 02:45:25 | 21 | A. Yes. |
| 02:45:26 | 22 | Q. And you've identified photos in court, have you not? |
| 02:45:29 | 23 | A. Yes. |
| 02:45:32 | 24 | Q. Was there a time before a federal grand jury where you |
| 02:45:36 | 25 | misidentified someone? |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 02:45:37 | 1  | MS. GUREN:  Objection, your Honor, relevance.                |
| 02:45:40 | 2  | MR. RUBINO:  Goes to his --                                  |
| 02:45:42 | 3  | THE COURT:  Hold on.  Hold on.  Let's have a sidebar         |
| 02:45:44 | 4  | on that.                                                     |
| 02:45:45 | 5  | Okay.  Excuse me, folks.                                     |
| 02:45:45 | 6  | (Whereupon the following discussion was had at the           |
| 02:46:07 | 7  | bench, outside the hearing of the jury:)                     |
| 02:46:07 | 8  | THE COURT:  Okay.  Where are you headed?                     |
| 02:46:09 | 9  | MR. RUBINO:  Okay.  He testified at a federal grand          |
| 02:46:11 | 10 | jury.  He identified someone who's nickname was Old Boy.  He |
| 02:46:15 | 11 | testified that person had delivered -- he had delivered to   |
| 02:46:18 | 12 | this person as many as 50 kilos in five or ten times.        |
| 02:46:22 | 13 | Then when confronted later, he said, Oh, I was wrong,        |
| 02:46:26 | 14 | I identified the wrong person.                               |
| 02:46:27 | 15 | MS. GUREN:  That's not exactly accurate.                     |
| 02:46:30 | 16 | THE COURT:  Okay.  Go ahead.                                 |
| 02:46:30 | 17 | MS. GUREN:  He was shown a picture of this -- he was         |
| 02:46:33 | 18 | shown a picture and he identified the person -- he           |
| 02:46:36 | 19 | misidentified a picture.  However, his testimony was         |
| 02:46:39 | 20 | consistent that this person Old Boy was who he delivered to. |
| 02:46:43 | 21 | Later he testified at a federal trial where he was able to   |
| 02:46:47 | 22 | identify the person and he later correctly identified the    |
| 02:46:49 | 23 | person by a photo.                                           |
| 02:46:50 | 24 | THE COURT:  Okay.  Do I have this right?  So he -- in        |
| 02:46:53 | 25 | the grand jury he looks at the photo.  He says, This is Old  |

| 02:46:53 | 1 | Boy. |
|---|---|---|

02:46:53    1    Boy.

02:46:56    2          MS. GUREN:  Yes.

02:46:57    3          THE COURT:  And Old Boy I distributed X number of

02:46:59    4    kilos to.  So what was the mistake?

02:47:01    5          MS. GUREN:  And the photo was not Old Boy.

02:47:03    6          THE COURT:  Oh.  And the photo was not Old Boy.

02:47:04    7    Okay.

02:47:05    8          MS. GUREN:  Later on he did correctly identify Old

02:47:07    9    Boy from a photograph.

02:47:07    10          THE COURT:  In the same grand jury?

02:47:08    11          MS. GUREN:  Not in that same grand jury.

02:47:11    12          MS. RODNEY:  If I could just add, your Honor, the

02:47:13    13    defendant delivered to two people who went by the nickname Old

02:47:15    14    Boy.  And in the grand jury he identified the wrong Old Boy,

02:47:21    15    as who he delivered to five to ten times.

02:47:24    16          The other Old Boy went to trial and he correctly

02:47:27    17    identified him at trial.

02:47:28    18          THE COURT:  Okay.  So in the grand jury testimony,

02:47:31    19    when he looks at a picture and he misidentifies, is it ever

02:47:34    20    corrected in the grand jury testimony?

02:47:36    21          MS. RODNEY:  No, it's corrected during a later

02:47:39    22    meeting --

02:47:39    23          THE COURT:  Right.

02:47:40    24          MS. RODNEY:  -- with agents.

02:47:41    25          THE COURT:  Okay.  Well, that's impeachable material,

| | | |
|---|---|---|
| 02:47:45 | 1 | though, that he made the misidentification at that time and |
| 02:47:47 | 2 | then you can redirect to explain the difference between the |
| 02:47:49 | 3 | two. |
| 02:47:50 | 4 | But the point is, is that in the grand jury at one |
| 02:47:52 | 5 | point he falsely identified an individual that, you know, |
| 02:47:56 | 6 | later you can rehabilitate it, but that's fair impeachment. |
| 02:48:00 | 7 | Okay. |
| 02:48:01 | 8 | MR. RUBINO:  Thank you, your Honor. |
| 02:48:01 | 9 | (End of sidebar discussion.) |
| 02:48:20 | 10 | THE COURT:  Okay.  You may continue. |
| 02:48:22 | 11 | MR. RUBINO:  Thank you, your Honor. |
| 02:48:22 | 12 | BY MR. RUBINO: |
| 02:48:23 | 13 | Q.  Sir, before we broke I asked you about someone you knew as |
| 02:48:27 | 14 | Old Boy, you remember that? |
| 02:48:28 | 15 | A.  Yes. |
| 02:48:30 | 16 | Q.  And do you remember testifying in a federal grand jury? |
| 02:48:35 | 17 | A.  Yes. |
| 02:48:38 | 18 | Q.  And at that grand jury did you either mistakenly or |
| 02:48:41 | 19 | intentionally misidentify the photograph of Old Boy? |
| 02:48:45 | 20 | A.  Mistake. |
| 02:48:47 | 21 | Q.  But you made a mistake and said someone had committed a |
| 02:48:51 | 22 | crime that they hadn't, correct? |
| 02:48:54 | 23 | A.  Well, not really.  There's two different people. |
| 02:48:57 | 24 | Q.  Well, two different people, right? |
| 02:48:59 | 25 | A.  Yes, two customers, the same name. |

| | | |
|---|---|---|
| 02:49:02 | 1 | Q.  I understand. |
| 02:49:03 | 2 | Okay.  Now, you told us that Ron Collins, you had |
| 02:49:09 | 3 | seen him driving a silver Cherokee, a silver Mercedes.  What |
| 02:49:14 | 4 | color is the BMW? |
| 02:49:16 | 5 | A.  Silver. |
| 02:49:16 | 6 | Q.  Silver BMW, and a Dodge.  Was that also silver? |
| 02:49:21 | 7 | A.  (No response.) |
| 02:49:22 | 8 | Q.  So you never saw him driving an Audi or an Infinity; is |
| 02:49:28 | 9 | that correct? |
| 02:49:28 | 10 | A.  Not an Audi. |
| 02:49:30 | 11 | Q.  I can't -- |
| 02:49:30 | 12 | A.  No. |
| 02:49:31 | 13 | Q.  No. |
| 02:49:33 | 14 | So at no time did you meet with him when he was |
| 02:49:38 | 15 | driving an Audi or an Infinity, correct? |
| 02:49:41 | 16 | A.  Correct. |
| 02:49:43 | 17 | Q.  The times you claim that you met with him, what kind of -- |
| 02:49:47 | 18 | you were driving an SUV.  What kind of SUV? |
| 02:49:49 | 19 | A.  It was -- mine? |
| 02:49:52 | 20 | Q.  What were you driving when you claimed you met with Ron |
| 02:49:56 | 21 | Collins? |
| 02:49:56 | 22 | A.  The first time, second time, third time? |
| 02:49:59 | 23 | Q.  Go ahead.  First time? |
| 02:50:04 | 24 | A.  Pewter Trail Blazer. |
| 02:50:06 | 25 | Q.  Second time? |

| | | |
|---|---|---|
| 02:50:08 | 1 | A. Pewter Trail Blazer. |
| 02:50:10 | 2 | Q. Third time? |
| 02:50:11 | 3 | A. Black Grand Cherokee. |
| 02:50:13 | 4 | Q. Fourth time? |
| 02:50:14 | 5 | A. Black Grand Cherokee. |
| 02:50:16 | 6 | Q. Fifth time? |
| 02:50:17 | 7 | A. Silver Grand Cherokee. |
| 02:50:33 | 8 | Q. Now, Mr. Torres you told us went with you, when you |
| 02:50:41 | 9 | claimed to have delivered to Ron Collins, correct? |
| 02:50:44 | 10 | A. Yes. |
| 02:50:45 | 11 | Q. On how many occasions did Mr. Torres go with you? |
| 02:50:51 | 12 | A. The first two times when I seen him. |
| 02:50:53 | 13 | Q. So two times Mr. Torres was side by side with you, |
| 02:50:57 | 14 | correct? |
| 02:51:01 | 15 | A. Two times we seen him at the pool hall, yeah. |
| 02:51:05 | 16 | Q. Okay. |
| 02:51:07 | 17 | A. Not side by side, but he was in my car. |
| 02:51:08 | 18 | Q. Yes. |
| 02:51:09 | 19 | A. Yeah. |
| 02:51:10 | 20 | Q. Now, did you tell us that -- Mr. Collins, you say, came |
| 02:51:20 | 21 | walking up to you, got the keys to your SUV, and drove it off. |
| 02:51:28 | 22 | That's what you've testified, is it not? |
| 02:51:30 | 23 | A. Yes. |
| 02:51:31 | 24 | Q. So Mr. Collins didn't come up in his own car and you |
| 02:51:35 | 25 | swapped keys? |

```
02:51:39   1   A.  Only -- only one time.

02:51:42   2   Q.  Which time was that?

02:51:44   3   A.  The fourth time.

02:51:46   4   Q.  The fourth time?

02:51:48   5   A.  Yeah.

02:51:49   6   Q.  So when you were with -- the two times you were with

02:51:53   7   Mr. Torres, Mr. Collins came walking up to you, correct?

02:52:01   8   A.  Yeah.

02:52:02   9   Q.  Yes?

02:52:02  10        MS. GUREN:  Your Honor, can we lay a little bit more

02:52:04  11   foundation about where?

02:52:05  12        THE COURT:  Okay.  Objection to foundation is

02:52:08  13   granted.

02:52:10  14        MR. RUBINO:  I have nothing further.

02:52:11  15        THE COURT:  Oh, okay.

02:52:12  16        MR. RUBINO:  I'm good.

02:52:12  17                        - - -

02:52:12  18        ANTONIO AGUILERA, REDIRECT EXAMINATION

02:52:12  19   BY MS. GUREN:

02:52:19  20   Q.  Mr. Aguilera, just to clarify, the first time that you

02:52:22  21   went to the pool hall parking lot to meet the defendant?

02:52:27  22   A.  Yes.

02:52:28  23   Q.  Who was with you?

02:52:29  24   A.  Danny.

02:52:30  25   Q.  Danny.
```

| | | |
|---|---|---|
| 02:52:30 | 1 | And when you were saying that the defendant walked up |
| 02:52:34 | 2 | to you, how had he -- how did you see him get to the pool |
| 02:52:37 | 3 | hall? |
| 02:52:38 | 4 | A.  In his vehicle. |
| 02:52:39 | 5 | Q.  What happened to his vehicle? |
| 02:52:41 | 6 | A.  He parked it, got out, and walked to me. |
| 02:52:45 | 7 | Q.  And then what did you and Danny do? |
| 02:52:47 | 8 | A.  Got out of the vehicle, came -- gave him keys to my |
| 02:52:52 | 9 | vehicle and he left, we got in his vehicle and we left. |
| 02:52:55 | 10 | Q.  Did you also meet the defendant at the pool hall by |
| 02:52:58 | 11 | yourself? |
| 02:52:58 | 12 | A.  Yes. |
| 02:52:59 | 13 | Q.  And when that happened, how did the defendant arrive at |
| 02:53:02 | 14 | the pool hall parking lot? |
| 02:53:04 | 15 | A.  In the vehicle. |
| 02:53:06 | 16 | Q.  And what happened in that vehicle?  What happened to that |
| 02:53:09 | 17 | vehicle? |
| 02:53:10 | 18 | A.  Which time? |
| 02:53:12 | 19 | Q.  That time you were alone in the pool hall. |
| 02:53:15 | 20 | A.  Oh, the time that I was alone, I took his car.  The |
| 02:53:21 | 21 | second -- |
| 02:53:21 | 22 | Q.  And so did you swap keys that time? |
| 02:53:24 | 23 | A.  Yeah. |
| 02:53:24 | 24 | Q.  Going -- |
| 02:53:24 | 25 | A.  The other times we just give him the keys. |

02:53:24  1   Q.  I'm sorry?  Say it again?
02:53:25  2   A.  The other times I just give him the keys.  If he's taking
02:53:29  3   the vehicle, then we just give him the keys.  If he's giving
02:53:33  4   us, like we need a ride back home, we're by ourselves, then he
02:53:38  5   gives us keys to his vehicle.
02:53:38  6   Q.  So you would only take his car when you needed a car to
02:53:41  7   leave?
02:53:42  8   A.  Yes.
02:53:42  9   Q.  So, for example, when you went with Danny Torres, you went
02:53:45  10  in two vehicles?
02:53:46  11  A.  Yes.
02:53:46  12  Q.  So you had a vehicle to leave?
02:53:48  13  A.  Yes.
02:53:48  14  Q.  Turning back to around the fire station, did you swap
02:53:53  15  vehicles with the defendant then?
02:53:56  16  A.  No.
02:53:57  17  Q.  And is that because you also arrived in two vehicles?
02:54:00  18  A.  Yes.
02:54:04  19  Q.  Just to clarify, there was some questions to you about
02:54:09  20  sales before you started working with the Flores brothers of
02:54:13  21  cocaine.
02:54:14  22  A.  Yes.
02:54:15  23  Q.  Did you try to get cocaine from the Flores brothers before
02:54:17  24  you started working for them?
02:54:19  25  A.  Yes.

| | | |
|---|---|---|
| 02:54:19 | 1 | Q. Did they ever actually give you cocaine to sell? |
| 02:54:22 | 2 | A. No. |
| 02:54:25 | 3 | Q. You were asked some questions about a photograph that you |
| 02:54:28 | 4 | identified in the grand jury. |
| 02:54:31 | 5 | A. Yes. |
| 02:54:31 | 6 | Q. You started to say that there were two customers? |
| 02:54:35 | 7 | A. Yes. |
| 02:54:36 | 8 | Q. What were the nicknames that you knew those two customers |
| 02:54:39 | 9 | by? |
| 02:54:39 | 10 | A. Old Boy. |
| 02:54:41 | 11 | Q. Did they have the same nickname? |
| 02:54:44 | 12 | A. Yes. |
| 02:54:44 | 13 | Q. Were they two different customers? |
| 02:54:46 | 14 | A. Yes. |
| 02:54:46 | 15 | Q. When you were testifying, did the testimony you had given |
| 02:54:52 | 16 | the grand jury about one of the customers, Old Boy, was that |
| 02:54:52 | 17 | true? |
| 02:54:53 | 18 | A. Yes. |
| 02:54:54 | 19 | Q. Were there ever two customers named Ron Ron? |
| 02:54:58 | 20 | A. No. |
| 02:55:06 | 21 | MS. GUREN: One moment, your Honor? |
| 02:55:07 | 22 | THE COURT: Sure. |
| 02:55:10 | 23 | MS. GUREN: No further questions. |
| 02:55:11 | 24 | THE COURT: Okay. Anything for you, sir? |
| 02:55:13 | 25 | MR. RUBINO: No, your Honor. |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 02:55:13 | 1 | THE COURT:  Okay.  Sir, you may step down and be |
| 02:55:17 | 2 | excused. |
| 02:55:19 | 3 | (Witness leaves the stand.) |
| 02:55:19 | 4 | THE COURT:  And you can call your next witness. |
| 02:55:19 | 5 | MS. GUREN:  Your Honor, the Government calls Matt |
| 02:55:21 | 6 | McCarthy. |
| 02:55:22 | 7 | THE COURT:  Okay. |
| 02:55:43 | 8 | (Witness takes the stand.) |
| 02:55:44 | 9 | THE COURT:  Please raise your right hand. |
| 02:55:47 | 10 | (The witness was sworn.) |
| 02:55:51 | 11 | THE COURT:  Okay.  Have a seat. |
| 02:55:51 | 12 | - - - |
| 02:55:51 | 13 | MATTHEW McCARTHY, DIRECT EXAMINATION |
| 02:55:51 | 14 | BY MS. GUREN: |
| 02:55:59 | 15 | Q.  Good afternoon. |
| 02:56:00 | 16 | A.  Good afternoon. |
| 02:56:01 | 17 | Q.  Can you introduce yourself and spell your last name for |
| 02:56:04 | 18 | the jury? |
| 02:56:04 | 19 | A.  Sure.  My name is Matthew McCarthy, that's |
| 02:56:09 | 20 | M-c-C-a-r-t-h-y.  I'm a special agent with the Drug |
| 02:56:13 | 21 | Enforcement Administration, currently assigned to the |
| 02:56:14 | 22 | Milwaukee district office. |
| 02:56:19 | 23 | Q.  So you've come down from Milwaukee today? |
| 02:56:21 | 24 | A.  Yes. |
| 02:56:21 | 25 | Q.  How long have you worked with DEA? |

| | | |
|---|---|---|
| 02:56:23 | 1 | A.  A little over eight years. |
| 02:56:25 | 2 | Q.  What are your responsibilities there? |
| 02:56:27 | 3 | A.  I investigate violations of state and federal drug laws. |
| 02:56:31 | 4 | Q.  Did you receive any training as part of becoming an agent? |
| 02:56:34 | 5 | A.  Yes, I did. |
| 02:56:35 | 6 | Q.  What training was that, just briefly? |
| 02:56:38 | 7 | A.  At Quantico with the Drug Enforcement Administration |
| 02:56:41 | 8 | academy, basic instruction into investigations and the like. |
| 02:56:48 | 9 | Q.  Before becoming a special agent with the DEA, what was |
| 02:56:51 | 10 | your job? |
| 02:56:52 | 11 | A.  I was a Deputy U.S. Marshal. |
| 02:56:54 | 12 | Q.  Where were you assigned? |
| 02:56:56 | 13 | A.  I was assigned to Superior Court in Washington, D.C. for |
| 02:57:00 | 14 | approximately a little over eighteen months. |
| 02:57:02 | 15 | Q.  Before that did you have -- what types of jobs did you |
| 02:57:05 | 16 | have? |
| 02:57:05 | 17 | A.  And before that pretty much from my previous professional |
| 02:57:10 | 18 | life I was a reporter.  I worked as a sports anchor and a |
| 02:57:14 | 19 | sport -- and a news anchor for an NBC affiliate in West |
| 02:57:20 | 20 | Virginia.  I did that for about ten years. |
| 02:57:21 | 21 | MS. GUREN:  Your Honor, permission to publish |
| 02:57:23 | 22 | Government Exhibit Photo 1? |
| 02:57:24 | 23 | THE COURT:  Sure. |
| 02:57:37 | 24 | BY MS. GUREN: |
| 02:57:37 | 25 | Q.  Showing you Government Exhibit Photo 1, do you recognize |

| | |
|---|---|
| 02:57:41 | 1 |
| 02:57:42 | 2 |
| 02:57:42 | 3 |
| 02:57:44 | 4 |
| 02:57:51 | 5 |
| 02:57:53 | 6 |
| 02:57:54 | 7 |
| 02:57:55 | 8 |
| 02:57:56 | 9 |
| 02:57:57 | 10 |
| 02:57:58 | 11 |
| 02:58:00 | 12 |
| 02:58:08 | 13 |
| 02:58:11 | 14 |
| 02:58:16 | 15 |
| 02:58:19 | 16 |
| 02:58:22 | 17 |
| 02:58:23 | 18 |
| 02:58:28 | 19 |
| 02:58:37 | 20 |
| 02:58:41 | 21 |
| 02:58:43 | 22 |
| 02:58:46 | 23 |
| 02:58:47 | 24 |
| 02:58:47 | 25 |

1  this individual?

2  A.  Yes.

3  Q.  Who is this?

4  A.  I believe that is Pedro Flores.

5        MS. GUREN:  Your Honor, permission to publish

6  Government Exhibit Photo 2?

7        THE COURT:  Yes.

8  BY MS. GUREN:

9  Q.  Showing you Government Exhibit Photo 2, do you recognize

10  that photo?

11  A.  Yes, I believe that is Margarito Flores.

12  Q.  Turning to around November and December of 2008, what, if

13  anything, was your role in an investigation involving Pedro

14  and Margarito Flores?

15  A.  Well, they were --

16  Q.  Just briefly, what was your role, in terms of other

17  agents?

18  A.  Well, part of the role I had with them was I was along

19  with them conducting controlled calls to their drug customers.

20  So I -- as part of that, I was recording calls and I was

21  also -- I had possession of telephones.

22  Q.  And just to back up a minute, are you familiar with the

23  term case agent?

24  A.  Yes.

25  Q.  What is a case agent?

| | | |
|---|---|---|
| 02:58:49 | 1 | A.  A case agent is an individual who essentially runs an |
| 02:58:54 | 2 | investigation. |
| 02:58:56 | 3 | Q.  And was that part of your role in this general |
| 02:59:00 | 4 | investigation? |
| 02:59:00 | 5 | A.  Yes. |
| 02:59:01 | 6 | Q.  When you talked about recording calls, was that -- where |
| 02:59:05 | 7 | did that take place? |
| 02:59:06 | 8 | A.  That was in Milwaukee and in Chicago. |
| 02:59:10 | 9 | Q.  And was that in December of 2008? |
| 02:59:14 | 10 | A.  Yes. |
| 02:59:14 | 11 | Q.  Turning your attention to the end of November 2008 -- |
| 02:59:18 | 12 | A.  Okay. |
| 02:59:18 | 13 | Q.  -- and the beginning of December, did you see Pete and |
| 02:59:21 | 14 | Margarito Flores in person? |
| 02:59:22 | 15 | A.  Yes. |
| 02:59:23 | 16 | Q.  And in what country was that? |
| 02:59:25 | 17 | A.  That was in Mexico. |
| 02:59:26 | 18 | Q.  What, if anything, did Pete Flores give you? |
| 02:59:31 | 19 | A.  He gave me -- essentially had a student backpack.  It was |
| 02:59:34 | 20 | just a typical backpack.  And it contained telephones, |
| 02:59:38 | 21 | telephone chargers, and the multi-plugs [sic], where you plug |
| 02:59:44 | 22 | into the wall and then you have five, six, seven different |
| 02:59:47 | 23 | plugs that you can plug into. |
| 02:59:48 | 24 | Q.  How did these cellphones look? |
| 02:59:51 | 25 | A.  Just a variety of different cellphones, all makes and |

| | | |
|---|---|---|
| 02:59:54 | 1 | models. |
| 02:59:55 | 2 | Q. When did you leave Mexico, what date? |
| 02:59:59 | 3 | A. I believe it was the -- I believe it was the last day of |
| 03:00:03 | 4 | November of 2008. |
| 03:00:04 | 5 | Q. What, if anything, did you do with the phones when you |
| 03:00:06 | 6 | left Mexico? |
| 03:00:07 | 7 | A. They were in my possession. |
| 03:00:09 | 8 | Q. At some point did you give the phones to anyone else? |
| 03:00:14 | 9 | A. Approximately one week later I did, correct, yes. |
| 03:00:17 | 10 | Q. Approximately one week later, who did you give the |
| 03:00:20 | 11 | cellphones to? |
| 03:00:21 | 12 | A. Eric Durante. |
| 03:00:25 | 13 | Q. I'm going to hand you what's been marked as Government |
| 03:00:30 | 14 | Exhibit Phone 1 and just ask you to take a look at that. Do |
| 03:00:41 | 15 | you recognize Government Exhibit Phone 1? |
| 03:00:43 | 16 | A. Yes. |
| 03:00:43 | 17 | Q. What is it? |
| 03:00:44 | 18 | A. That's a -- it's a cellphone, a Nokia cellphone, one of |
| 03:00:48 | 19 | the phones I received from Pedro Flores. |
| 03:00:51 | 20 | Q. How do you recognize it as one of the phones you received |
| 03:00:54 | 21 | from Pedro Flores? |
| 03:00:55 | 22 | A. Well, it -- the way it looked with the silver top, Nokia. |
| 03:01:00 | 23 | I just remember it. |
| 03:01:01 | 24 | Q. And is it in substantially the same condition in which you |
| 03:01:05 | 25 | gave the phone to Agent Durante? |

| | | |
|---|---|---|
| 03:01:08 | 1 | A.  Yes, other than there may have been a sticker on the back |
| 03:01:14 | 2 | of it, but, yes, it looks exactly the same. |
| 03:01:17 | 3 | Q.  And with regard to the phone -- your Honor, at this time |
| 03:01:22 | 4 | we would move Government Exhibit Phone 1 into evidence? |
| 03:01:25 | 5 | THE COURT:  Okay.  It will be admitted. |
| 03:01:30 | 6 | MS. GUREN:  One moment, your Honor. |
| 03:01:44 | 7 | No further questions, your Honor. |
| 03:01:48 | 8 | THE COURT:  Okay. |
| 03:01:48 | 9 | - - - |
| 03:01:48 | 10 | MATTHEW McCARTHY, CROSS-EXAMINATION |
| 03:01:48 | 11 | BY MR. RUBINO: |
| 03:01:50 | 12 | Q.  Good afternoon, Agent. |
| 03:01:52 | 13 | A.  Good afternoon, sir. |
| 03:01:56 | 14 | Q.  Sir, you told us that you went to Mexico, correct? |
| 03:02:04 | 15 | A.  That's correct. |
| 03:02:05 | 16 | Q.  In when?  When did you arrive in Mexico? |
| 03:02:09 | 17 | A.  Late November 2008. |
| 03:02:13 | 18 | Q.  Can you give me a better time than late November?  Was it |
| 03:02:18 | 19 | before or after Thanksgiving? |
| 03:02:19 | 20 | A.  It was after.  Approximately the -- perhaps the 28th |
| 03:02:23 | 21 | or 29th. |
| 03:02:24 | 22 | Q.  And what was your purpose in going there? |
| 03:02:28 | 23 | MS. GUREN:  Objection, your Honor.  May we have a |
| 03:02:30 | 24 | brief sidebar? |
| 03:02:32 | 25 | THE COURT:  Okay. |

| | |
|---|---|
| 03:02:33 | 1 |
| 03:02:50 | 2 |
| 03:02:50 | 3 |
| 03:02:53 | 4 |
| 03:02:56 | 5 |
| 03:02:57 | 6 |
| 03:02:58 | 7 |
| 03:02:59 | 8 |
| 03:03:01 | 9 |
| 03:03:03 | 10 |
| 03:03:07 | 11 |
| 03:03:13 | 12 |
| 03:03:16 | 13 |
| 03:03:18 | 14 |
| 03:03:18 | 15 |
| 03:03:18 | 16 |
| 03:03:20 | 17 |
| 03:03:21 | 18 |
| 03:03:24 | 19 |
| 03:03:25 | 20 |
| 03:03:25 | 21 |
| 03:03:26 | 22 |
| 03:03:28 | 23 |
| 03:03:30 | 24 |
| 03:03:32 | 25 |

(Whereupon the following discussion was had at the bench, outside the hearing of the jury:)

MS. GUREN:  Your Honor, how exactly they got out -- the twins got out of Mexico has been something that we have been trying.

MR. RUBINO:  I'm sorry.  I didn't hear.  I couldn't hear you.

MS. GUREN:  How exactly the twins got out of Mexico has been something that we have been trying to keep off the record of this trial.  I believe it's beyond the scope of this examination, but it is not fully disclosed that -- how -- the nature of how the twins left Mexico.

THE COURT:  But does this question call for that answer --

MS. GUREN:  Yes.

THE COURT:  Why did you go there?

MR. RUBINO:  Why did you go there?

MS. GUREN:  He went there ...

THE COURT:  Oh, to help them out or something?

MS. GUREN:  Yeah.

THE COURT:  Oh.

MR. RUBINO:  I didn't ask him how, whether he went out on some secret jet or --

THE COURT:  No, but he was directed by the Government to go down to Mexico to get them out.

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 03:03:34 | 1  | MR. RUBINO: But you can't -- the Government can't                         |
| 03:03:36 | 2  | just, you know, open the door a bit and then not expect me to            |
| 03:03:39 | 3  | want to walk through it.                                                  |
| 03:03:40 | 4  | I mean, the testimony is that he went to Mexico.                         |
| 03:03:42 | 5  | Now, he got phones. Now, I need to know -- I have the right,              |
| 03:03:46 | 6  | I believe, to find out the details --                                    |
| 03:03:47 | 7  | THE COURT: Well, I think what would be appropriate                       |
| 03:03:50 | 8  | is for a limited response where they could say -- I think I              |
| 03:03:53 | 9  | would give you a minute to talk to him to say that he went               |
| 03:03:56 | 10 | there at the Government's direction. Because isn't that                  |
| 03:04:00 | 11 | really what you want? It gives you the impeachment, but not              |
| 03:04:04 | 12 | to go into the superfluous issue as to how others were                   |
| 03:04:07 | 13 | extracted from Mexico, right?                                            |
| 03:04:09 | 14 | MR. RUBINO: Well, how they got back -- if you're                         |
| 03:04:11 | 15 | worried about I'm going to ask whether he took a train, a                |
| 03:04:15 | 16 | plane, a bus, or a boat, I don't care. I'm more interested in            |
| 03:04:18 | 17 | his -- he's down there. He is a drug dealer --                           |
| 03:04:21 | 18 | THE COURT: Cooperating with the Government, right?                       |
| 03:04:23 | 19 | MR. RUBINO: Well, I don't know that yet --                               |
| 03:04:24 | 20 | THE COURT: No, no. Hold on.                                              |
| 03:04:25 | 21 | MR. RUBINO: I'm sorry.                                                    |
| 03:04:25 | 22 | THE COURT: Take it easy.                                                  |
| 03:04:27 | 23 | No. The point, though, is that what you want, which                      |
| 03:04:31 | 24 | is impeachable, is that he went down there in the first place            |
| 03:04:35 | 25 | at their direction; isn't that right?                                    |

03:04:36  1       MR. RUBINO:  At the government's direction, of

03:04:38  2   course.

03:04:38  3       THE COURT:  Right.

03:04:38  4       MR. RUBINO:  Well, he may not have went at their

03:04:39  5   direction.  He could have went at his own.  He was the case

03:04:40  6   agent.  He had the right to do that.

03:04:43  7       But I'm more interested -- what I'm heading for --

03:04:46  8   and I'll be honest with you up front here instead of later.

03:04:49  9       THE COURT:  Sure, go ahead.

03:04:49  10      MR. RUBINO:  What I'm heading for is how is he

03:04:52  11  contacted -- did he contact the Floreses?  Did they contact

03:04:56  12  him?  What kind of an agreement did he make?  Were they

03:04:57  13  getting some sort of immunity to meet with him, to talk to

03:05:00  14  him.  The whole thing.  I want to open it up --

03:05:03  15      THE COURT:  Okay.  For what reason?

03:05:03  16      MR. RUBINO:  Because I think it's important --

03:05:05  17      THE COURT:  To what?

03:05:06  18      MR. RUBINO:  -- that we're coming in -- we're going

03:05:08  19  to -- the Government's going to put in tape recordings made by

03:05:10  20  the Floreses.

03:05:12  21      THE COURT:  Right.

03:05:13  22      MR. RUBINO:  Now, the Floreses, have they received

03:05:15  23  some immunity from the Government?  He may know if they have

03:05:17  24  or not.  Have they made some kind of deal with the Government?

03:05:20  25  He may know.  They have obviously met and been debriefed by

| | | |
|---|---|---|
| 03:05:23 | 1 | the Government, so they in some way waived some constitutional |
| 03:05:26 | 2 | rights in order to do that. |
| 03:05:27 | 3 | I don't know what promises were made to Floreses, if |
| 03:05:31 | 4 | any. He would know. He met with them. |
| 03:05:32 | 5 | THE COURT: Right. However, then you could ask him |
| 03:05:35 | 6 | those questions directly. When you met with them, were -- did |
| 03:05:39 | 7 | you provide them with -- |
| 03:05:40 | 8 | MR. RUBINO: Exactly. |
| 03:05:41 | 9 | THE COURT: -- benefits or promises of leniency or |
| 03:05:44 | 10 | whatever? Because the people that are important for |
| 03:05:47 | 11 | cross-examining on that issue are either the Flores |
| 03:05:50 | 12 | brothers -- |
| 03:05:50 | 13 | MR. RUBINO: Which I don't have. |
| 03:05:51 | 14 | THE COURT: -- or whether he gave that. |
| 03:05:52 | 15 | So I think we're kind of skirting around what you |
| 03:05:56 | 16 | need and what you're entitled to and what is really a frolic |
| 03:06:01 | 17 | and detour, which would go off on a prejudicial angle. |
| 03:06:05 | 18 | So his purpose in going down to Florida [sic], you're |
| 03:06:08 | 19 | saying, was to aid in the removal of these individuals, which |
| 03:06:13 | 20 | is confidential to the extent that you are trying to keep that |
| 03:06:17 | 21 | option available or whatever -- |
| 03:06:19 | 22 | MR. RUBINO: I don't need that. |
| 03:06:21 | 23 | MS. GUREN: Exactly. |
| 03:06:21 | 24 | THE COURT: -- so we don't need to go there. |
| 03:06:24 | 25 | MS. GUREN: But the cooperation -- |

| | | |
|---|---|---|
| 03:06:25 | 1 | THE COURT: Right. |
| 03:06:25 | 2 | MS. GUREN: -- we have no objection to him asking |
| 03:06:27 | 3 | about the promises directly. |
| 03:06:29 | 4 | THE COURT: Right. So why don't we just cut right to |
| 03:06:31 | 5 | the chase then -- |
| 03:06:31 | 6 | MR. RUBINO: Sure. |
| 03:06:32 | 7 | THE COURT: -- and then have him -- you can just ask |
| 03:06:34 | 8 | him about, Now, you had a working relationship, I suppose, |
| 03:06:38 | 9 | with these individuals. Did you give them offers of leniency? |
| 03:06:43 | 10 | Did you give them benefits? Whatever it is, because he has to |
| 03:06:45 | 11 | answer those questions, and then you don't worry about -- |
| 03:06:49 | 12 | MR. RUBINO: Yeah, I don't care -- |
| 03:06:51 | 13 | MS. GUREN: That was exactly our issue. |
| 03:06:52 | 14 | THE COURT: Okay. |
| 03:06:52 | 15 | MR. RUBINO: That's not where I'm heading. |
| 03:06:54 | 16 | THE COURT: All right. Fine. Thanks. |
| 03:07:15 | 17 | (End of sidebar discussion.) |
| 03:07:15 | 18 | THE COURT: Okay. You may proceed, sir. |
| 03:07:17 | 19 | MR. RUBINO: Thank you, your Honor. |
| 03:07:17 | 20 | BY MR. RUBINO: |
| 03:07:18 | 21 | Q. Sir, the Flores brothers, who have been identified by |
| 03:07:21 | 22 | photographs by yourself, that you went down to -- where in |
| 03:07:24 | 23 | Mexico did you go? |
| 03:07:28 | 24 | A. Well, we eventually picked them up in Guadalajara. |
| 03:07:32 | 25 | Q. Guadalajara. Not in Monterrey? |

| | | |
|---|---|---|
| 03:07:35 | 1 | A.  No. |
| 03:07:35 | 2 | Q.  Okay.  So those Flores brothers that we're talking about, |
| 03:07:38 | 3 | these are major drug dealers, right? |
| 03:07:41 | 4 | A.  Yes. |
| 03:07:41 | 5 | Q.  So you went to Mexico to meet with two major drug dealers, |
| 03:07:47 | 6 | correct? |
| 03:07:48 | 7 | A.  Correct. |
| 03:07:48 | 8 | Q.  Who set this up?  How did that occur?  Who set that |
| 03:07:53 | 9 | meeting up? |
| 03:07:55 | 10 | A.  It was -- I mean, it took over the course of several |
| 03:07:59 | 11 | months.  It was set up essentially by the U.S. Attorney's |
| 03:08:06 | 12 | Office in Wisconsin and with the Flores twins, with their |
| 03:08:11 | 13 | representatives and -- |
| 03:08:13 | 14 | Q.  What I'm getting at is -- |
| 03:08:14 | 15 | A.  Okay. |
| 03:08:15 | 16 | Q.  -- I think it's obvious, and correct me if I'm wrong, you |
| 03:08:17 | 17 | didn't just fly down to Mexico, get in a cab, and go over to |
| 03:08:21 | 18 | the Flores brothers' house and knock on the door and say, Hi, |
| 03:08:24 | 19 | I'd like to interview you, did you? |
| 03:08:26 | 20 | A.  No, I didn't. |
| 03:08:27 | 21 | Q.  This is something that had been arranged, as you now tell |
| 03:08:31 | 22 | me, over a couple of months? |
| 03:08:32 | 23 | A.  Yes. |
| 03:08:32 | 24 | Q.  Okay.  Now, during those -- and it had been arranged by |
| 03:08:36 | 25 | law enforcement, of course? |

| 03:08:37 | 1 | A.  Yes, yes. |
| 03:08:37 | 2 | Q.  Of course, I understand that. |
| 03:08:38 | 3 | A.  By case agents and -- |
| 03:08:40 | 4 | Q.  Right. |
| 03:08:40 | 5 | Now, you said you were, in fact, the case agent, |
| 03:08:43 | 6 | correct? |
| 03:08:43 | 7 | A.  I was one of them. |
| 03:08:45 | 8 | Q.  Okay.  Were you the one who made first contact with the |
| 03:08:49 | 9 | Flores brothers? |
| 03:08:49 | 10 | A.  No. |
| 03:08:50 | 11 | Q.  Who was that? |
| 03:08:56 | 12 | A.  Well, initially it was a -- just a separate -- a different |
| 03:09:00 | 13 | agent from the Chicago Field Division, and I honestly can't |
| 03:09:03 | 14 | recall the name, but essentially it did come to me. |
| 03:09:07 | 15 | Q.  Okay.  Did the agent contact the Flores brothers or did |
| 03:09:13 | 16 | the Flores brothers contact the agent?  The initial contact, |
| 03:09:16 | 17 | first contact, we'll call it. |
| 03:09:18 | 18 | A.  The Flores brothers contacted their attorney, who then in |
| 03:09:23 | 19 | turn contacted DEA. |
| 03:09:25 | 20 | Q.  Okay.  And that would have been as early as when? |
| 03:09:33 | 21 | A.  Perhaps April of 2008 or even, you know, sometime in the |
| 03:09:38 | 22 | spring of 2008. |
| 03:09:40 | 23 | Q.  Okay.  Now, were any meetings had prior to the meeting you |
| 03:09:49 | 24 | have talked about -- |
| 03:09:50 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 03:09:50 | 1 | Q. -- with the Flores brothers in Mexico? |
| 03:09:52 | 2 | A. Yes. |
| 03:09:53 | 3 | Q. Okay. With law enforcement, is what I'm -- |
| 03:09:56 | 4 | A. Yes. |
| 03:09:56 | 5 | Q. Okay. When is the first time law enforcement went to |
| 03:09:59 | 6 | Mexico and met with the Flores brothers? |
| 03:10:01 | 7 | MS. GUREN: Objection, your Honor. If we could just |
| 03:10:03 | 8 | have foundation as to whether or not this agent was at those |
| 03:10:06 | 9 | meetings. |
| 03:10:06 | 10 | THE COURT: Okay. That's sustained to foundation. |
| 03:10:10 | 11 | Who was present? |
| 03:10:12 | 12 | BY MR. RUBINO: |
| 03:10:13 | 13 | Q. Okay. Who was present at the first meeting? |
| 03:10:17 | 14 | A. I was present, another agent from the Milwaukee office, |
| 03:10:23 | 15 | Jill Sorin (phonetic), an agent in Monterrey, Mexico. |
| 03:10:32 | 16 | Q. An American agent? |
| 03:10:33 | 17 | A. Yes. |
| 03:10:33 | 18 | Q. Okay. |
| 03:10:34 | 19 | A. Assigned to the Monterrey office. And I believe an ATF |
| 03:10:40 | 20 | agent in Monterrey, as well, at that time. |
| 03:10:43 | 21 | Q. Okay. So the first meeting was in the spring, probably |
| 03:10:46 | 22 | April -- |
| 03:10:47 | 23 | A. No. |
| 03:10:47 | 24 | Q. I'm sorry. |
| 03:10:48 | 25 | A. No, the first meeting -- we had multiple phone calls over |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

03:10:52  1   the course of several months.

03:10:53  2   Q.  Okay.  First --

03:10:54  3   A.  The first in-person meeting, I believe, was August 6th of

03:10:58  4   2008 in Monterrey, Mexico, and that was those individuals I

03:11:03  5   just mentioned, myself, Agent Sorin.

03:11:07  6   Q.  Okay.  Let's try chronologically.

03:11:10  7   A.  Okay.

03:11:10  8   Q.  First contact -- and I may be confusing you using the word

03:11:13  9   contact and meeting, and I don't mean to be.

03:11:15  10  A.  Okay.

03:11:16  11       MS. GUREN:  Objection, your Honor.  I just think the

03:11:17  12  defense attorney needs to clarify with questions whether or

03:11:20  13  not this agent has personal knowledge of these individual

03:11:22  14  occurrences.

03:11:23  15       THE COURT:  Okay.  It's overruled, because he just

03:11:25  16  answered for the first meeting that he was present.  So for

03:11:29  17  that one he can answer.

03:11:30  18  BY MR. RUBINO:

03:11:31  19  Q.  Okay.  Let's talk about the first contact.

03:11:32  20       First contact --

03:11:34  21  A.  Okay.

03:11:34  22  Q.  -- was done by -- the Flores brothers' attorney contacted

03:11:38  23  the DEA, correct?

03:11:39  24  A.  Yes.

03:11:40  25  Q.  Okay.  Then there were subsequent phone conversations --

```
03:11:45   1   A.  Yes.

03:11:45   2   Q.  -- between law enforcement personnel?

03:11:48   3   A.  Yes.

03:11:48   4   Q.  And the Flores brothers?

03:11:50   5   A.  Yes.

03:11:50   6   Q.  Am I correct?

03:11:51   7   A.  That's correct.

03:11:52   8   Q.  Did you participate in any --

03:11:54   9   A.  Yes, I did.

03:11:55  10   Q.  That was going to be my question.

03:11:57  11        You actually did participate?

03:11:58  12   A.  Yes, I did.

03:11:58  13   Q.  So you were the guy, so to speak, who was dealing with

03:12:02  14   them; is that fair?

03:12:04  15   A.  Yes.

03:12:04  16   Q.  Good.

03:12:05  17        Approximately how many times had you spoken to the

03:12:08  18   Flores brothers before the first face-to-face meeting, which I

03:12:13  19   think you said was on August 6th; am I right?

03:12:17  20   A.  Yes.

03:12:17  21   Q.  Okay.

03:12:17  22   A.  First face-to-face was August 6th.

03:12:20  23   Q.  Okay.  The question is, how many times did you talk to

03:12:22  24   them, between the spring -- which I think you said was April

03:12:26  25   about -- when you first made contact, how many phone calls?
```

| | | |
|---|---|---|
| 03:12:29 | 1 | A.  Five to ten. |
| 03:12:30 | 2 | Q.  Okay.  And what was the substance of those phone calls? |
| 03:12:37 | 3 | A.  Essentially they were -- at the time they were -- they're |
| 03:12:46 | 4 | indicted out of the Milwaukee -- out of the Eastern District |
| 03:12:50 | 5 | of Wisconsin. |
| 03:12:51 | 6 | Q.  When were they indicted, sir, about? |
| 03:12:55 | 7 | A.  (No response.) |
| 03:12:56 | 8 | Q.  Prior to April? |
| 03:12:57 | 9 | A.  Yeah.  It was in approximately 2003 or ... |
| 03:12:59 | 10 | Q.  Oh, okay.  Before April? |
| 03:13:02 | 11 | A.  Yes. |
| 03:13:02 | 12 | Q.  That would clearly make them federal fugitives, wouldn't |
| 03:13:04 | 13 | it? |
| 03:13:05 | 14 | A.  Yes. |
| 03:13:05 | 15 | Q.  Okay.  Go ahead, sorry.  So now -- |
| 03:13:08 | 16 | A.  And then essentially until we met them face-to-face, it |
| 03:13:14 | 17 | was -- I guess, you could say it was a feeling-out process, |
| 03:13:16 | 18 | because they were looking to come back to the United States. |
| 03:13:20 | 19 | They knew that there is a federal indictment over their head, |
| 03:13:23 | 20 | and they are coming back, but -- and they want to -- you know, |
| 03:13:30 | 21 | they are looking for reassurances from us and at the same time |
| 03:13:33 | 22 | we're -- you know, we want them to come back to the United |
| 03:13:36 | 23 | States.  So there's sort of a negotiation going on. |
| 03:13:39 | 24 | Q.  Now, do you have -- does your agency have cooperation with |
| 03:13:42 | 25 | the Mexican government? |

| | | |
|---|---|---|
| 03:13:45 | 1 | A.  I believe so, yes. |
| 03:13:46 | 2 | Q.  Well, you knew the location -- |
| 03:13:50 | 3 | A.  No, we did not know the location at the time. |
| 03:13:52 | 4 | Q.  Well, at the meeting you did, of course? |
| 03:13:55 | 5 | A.  (No response.) |
| 03:13:56 | 6 | Q.  The meeting you knew the location of two federal |
| 03:13:58 | 7 | fugitives.  You knew you were going to meet them in person, |
| 03:14:01 | 8 | did you not? |
| 03:14:02 | 9 | A.  Yes. |
| 03:14:02 | 10 | Q.  Okay.  Why were they not arrested at that time? |
| 03:14:13 | 11 | A.  Essentially it was part of the negotiation, I guess you |
| 03:14:16 | 12 | could say. |
| 03:14:16 | 13 | Q.  Okay.  Now, were they asked in the phone calls -- because |
| 03:14:22 | 14 | you participated in the phone calls, correct? |
| 03:14:24 | 15 | A.  Right. |
| 03:14:25 | 16 | Q.  Were they asked in good faith -- if they wanted to enter |
| 03:14:30 | 17 | into an agreement with you folks -- were they asked in good |
| 03:14:35 | 18 | faith to stop their drug dealing, or were they allowed to |
| 03:14:38 | 19 | continue their drug dealing? |
| 03:14:39 | 20 | A.  They were not allowed to continue.  We didn't have control |
| 03:14:42 | 21 | of them at that time. |
| 03:14:43 | 22 | Q.  Did you know they were drug dealing after April? |
| 03:14:48 | 23 | A.  Yeah, they were -- yes, they were. |
| 03:14:51 | 24 | Q.  So they are down there.  While they are talking to you |
| 03:14:56 | 25 | trying to come back, they are also dealing drugs at the same |

| | | |
|---|---|---|
| 03:14:59 | 1 | time, you're telling me? |
| 03:15:01 | 2 | A. That's correct. They were still fugitives. We did not |
| 03:15:04 | 3 | know where they were. |
| 03:15:05 | 4 | Q. I understand. |
| 03:15:05 | 5 | A. Okay. |
| 03:15:05 | 6 | Q. Well, you obviously knew where they were when you met them |
| 03:15:08 | 7 | in person? |
| 03:15:09 | 8 | A. In August, yeah. But you're talking about the telephone |
| 03:15:12 | 9 | calls. |
| 03:15:13 | 10 | Q. Okay. And did you ask them during the phone calls to |
| 03:15:16 | 11 | cease their drug activities while you negotiated? |
| 03:15:24 | 12 | A. I don't recall. |
| 03:15:26 | 13 | Q. Would you have done that or would you not care if they |
| 03:15:29 | 14 | continued dealing drugs during this call? I mean, they are |
| 03:15:34 | 15 | sending drugs to the United States, aren't they? |
| 03:15:39 | 16 | A. I mean -- I don't recall that. What essentially the |
| 03:15:47 | 17 | conversations were, were they -- they were explaining |
| 03:15:51 | 18 | essentially what their value could be to us and us explaining |
| 03:15:55 | 19 | to them why it was important for them to turn themselves in. |
| 03:15:58 | 20 | Q. Were they valuable enough to you to let them continue |
| 03:16:02 | 21 | dealing drugs? Were they that valuable? |
| 03:16:04 | 22 | A. They weren't in our control. We couldn't stop them. |
| 03:16:09 | 23 | Q. Now, your first face-to-face meeting was August 6th, '08, |
| 03:16:13 | 24 | correct, sir? |
| 03:16:14 | 25 | A. That's correct. |

| | | |
|---|---|---|
| 03:16:15 | 1 | Q. And at that time they were not arrested, were they? |
| 03:16:19 | 2 | A. That's correct. |
| 03:16:20 | 3 | Q. Was there a second meeting after August 6th, '08? |
| 03:16:25 | 4 | A. Yes, there was. |
| 03:16:25 | 5 | Q. When was that face-to-face meeting? |
| 03:16:28 | 6 | A. Second meeting, yes, the second face-to-face meeting, that |
| 03:16:33 | 7 | was in approximately, I don't know, around November 6th of |
| 03:16:36 | 8 | 2008, sometime in early November. |
| 03:16:41 | 9 | Q. Okay. And you knew they were still dealing drugs then, |
| 03:16:48 | 10 | didn't you? |
| 03:16:49 | 11 | A. I suspected so. |
| 03:16:52 | 12 | Q. And, of course, they were still fugitives then? |
| 03:16:55 | 13 | A. That's correct. |
| 03:16:56 | 14 | Q. You don't stop being a fugitive until -- |
| 03:16:58 | 15 | A. That's correct. |
| 03:16:59 | 16 | Q. And on November 6th they weren't arrested again, correct? |
| 03:17:04 | 17 | A. That's correct. |
| 03:17:04 | 18 | Q. Though they met with agents of the Drug Enforcement |
| 03:17:08 | 19 | Administration? |
| 03:17:08 | 20 | A. Yes. |
| 03:17:08 | 21 | Q. Now, I appreciate you do not have arrest power in Mexico. |
| 03:17:12 | 22 | I understand that. But is it not uncommon for your agency to |
| 03:17:16 | 23 | ask a foreign government, whose country you are in, for their |
| 03:17:22 | 24 | assistance in arresting one of your fugitives? |
| 03:17:25 | 25 | A. Perhaps. |

| | | |
|---|---|---|
| 03:17:26 | 1 | Q.  You do this all the time, don't you? |
| 03:17:28 | 2 | A.  I mean, I personally haven't, so -- |
| 03:17:30 | 3 | Q.  Does your agency not ask foreign governments to arrest |
| 03:17:34 | 4 | fugitives for them? |
| 03:17:35 | 5 | MS. GUREN:  Objection, your Honor. |
| 03:17:36 | 6 | THE COURT:  Sustained. |
| 03:17:42 | 7 | BY MR. RUBINO: |
| 03:17:44 | 8 | Q.  Now, in -- on November 6th when you met with them, did you |
| 03:17:49 | 9 | ask them to do anything? |
| 03:17:53 | 10 | A.  We debriefed them. |
| 03:17:55 | 11 | Q.  Okay.  Did you ask them to record any phone calls on [sic] |
| 03:18:00 | 12 | that meeting? |
| 03:18:05 | 13 | A.  I don't recall specifically giving them those |
| 03:18:08 | 14 | instructions. |
| 03:18:09 | 15 | Q.  Okay.  Now, was there another face-to-face meeting after |
| 03:18:15 | 16 | November 6th? |
| 03:18:18 | 17 | A.  The end of November, approximately the 28th or 29th. |
| 03:18:25 | 18 | Q.  And where did that meeting occur? |
| 03:18:29 | 19 | A.  That -- it wasn't essentially a meeting.  I mean, |
| 03:18:32 | 20 | basically, went [sic] down to Guadalajara and picked them up |
| 03:18:37 | 21 | and escorted them out of the country. |
| 03:18:39 | 22 | Q.  Okay.  So at that time they were arrested, so to speak, |
| 03:18:43 | 23 | and removed from Mexico to face charges in the United States, |
| 03:18:47 | 24 | right? |
| 03:18:47 | 25 | A.  Correct. |

| | |
|---|---|
| 03:18:52 | 1 |
| 03:19:02 | 2 |
| 03:19:05 | 3 |
| 03:19:07 | 4 |
| 03:19:08 | 5 |
| 03:19:12 | 6 |
| 03:19:13 | 7 |
| 03:19:18 | 8 |
| 03:19:19 | 9 |
| 03:19:21 | 10 |
| 03:19:21 | 11 |
| 03:19:22 | 12 |
| 03:19:23 | 13 |
| 03:19:25 | 14 |
| 03:19:27 | 15 |
| 03:19:28 | 16 |
| 03:19:28 | 17 |
| 03:19:38 | 18 |
| 03:19:42 | 19 |
| 03:19:44 | 20 |
| 03:19:45 | 21 |
| 03:19:48 | 22 |
| 03:19:52 | 23 |
| 03:19:57 | 24 |
| 03:20:00 | 25 |

Q.  Okay.  Now, allegedly they made certain recorded phone calls.  Are you the one who asked or instructed them to do that?

      MS. GUREN:  Objection, your Honor, foundation.

      THE COURT:  Okay.  Sustained.

BY MR. RUBINO:

Q.  Do you know if they made recorded phone calls on behalf of the Government?

      MS. GUREN:  Objection, your Honor, foundation as to when.

      THE COURT:  Okay.  I think --

      MR. RUBINO:  Oh, I'm sorry.  When is --

      THE COURT:  It's the foundation, when.  And --

      MR. RUBINO:  Okay.  When is easy enough.  We can do that.

BY MR. RUBINO:

Q.  Do you know if in November of '08 they made recorded phone calls, do you know if they made recorded phone calls?

A.  In November of 2008?

Q.  Yes, sir.

A.  They did recorded phone calls in my presence right at the end of November 2008 and into December of 2008.

Q.  Were the ones in November '08 in your presence done in Mexico or done in the United States?

A.  In the United States.

| | |
|---|---|
| 03:20:02 | 1 |
| 03:20:06 | 2 |
| 03:20:11 | 3 |
| 03:20:15 | 4 |
| 03:20:20 | 5 |
| 03:20:24 | 6 |
| 03:20:26 | 7 |
| 03:20:28 | 8 |
| 03:20:30 | 9 |
| 03:20:30 | 10 |
| 03:20:32 | 11 |
| 03:20:34 | 12 |
| 03:20:35 | 13 |
| 03:20:40 | 14 |
| 03:20:41 | 15 |
| 03:20:42 | 16 |
| 03:20:43 | 17 |
| 03:20:43 | 18 |
| 03:20:43 | 19 |
| 03:20:50 | 20 |
| 03:20:55 | 21 |
| 03:20:55 | 22 |
| 03:20:58 | 23 |
| 03:20:59 | 24 |
| 03:20:59 | 25 |

Q.  Okay.  Let's -- do you know if they made -- in November of
'08 do you know if they made recorded phone calls in Mexico,
from Mexico to the United States?

A.  From -- I don't know specifically -- from -- my
understanding was that they did record some phone calls while
they were in Mexico, but I have no knowledge of dates or times
or anything like that.

Q.  So this was not done at your request --

A.  No.

Q.  -- you didn't furnish them equipment?

        Okay.  So you're not the guy on this, right?

A.  Right.

        MR. RUBINO:  Okay.  That's all.  Okay.  I have
nothing further.  Thank you.

        THE COURT:  Okay.  Redirect?

        MS. GUREN:  Thank you, your Honor.

                        - - -

        MATTHEW McCARTHY, REDIRECT EXAMINATION
BY MS. GUREN:

Q.  I just want to clarify some things.

A.  Okay.

Q.  In November of 2008 were the Flores brothers cooperating
with the Government?

A.  Yes.

Q.  Had they been signed up by DEA as cooperators at that

| | | |
|---|---|---|
| 03:21:04 | 1 | time? |
| 03:21:04 | 2 | A.  No, no, they had not. |
| 03:21:05 | 3 | Q.  Well, in November -- at November 6th, 2008, had they been |
| 03:21:11 | 4 | signed up as cooperators -- |
| 03:21:12 | 5 | A.  No. |
| 03:21:12 | 6 | Q.  -- to your knowledge? |
| 03:21:13 | 7 | A.  Yes. |
| 03:21:15 | 8 | Q.  Before that, were they -- in August of 2008, were they |
| 03:21:22 | 9 | providing information? |
| 03:21:23 | 10 | A.  They were providing information, yes. |
| 03:21:26 | 11 | Q.  Were there safety concerns regarding the Flores brothers? |
| 03:21:30 | 12 | Without getting into the details. |
| 03:21:32 | 13 | A.  Yes. |
| 03:21:34 | 14 | Q.  At the time of November 2008 were there any promises made |
| 03:21:45 | 15 | regarding prosecution of the Flores brothers? |
| 03:21:47 | 16 | A.  No. |
| 03:21:48 | 17 | MS. GUREN:  No further questions. |
| 03:21:50 | 18 | THE COURT:  Okay.  How about you? |
| 03:21:51 | 19 | MR. RUBINO:  One question. |
| 03:21:51 | 20 | - - - |
| 03:21:51 | 21 | MATTHEW McCARTHY, RECROSS-EXAMINATION |
| 03:21:51 | 22 | BY MR. RUBINO: |
| 03:21:54 | 23 | Q.  In response to a question just asked, in August 6th, '08, |
| 03:22:00 | 24 | they were providing information to the Government? |
| 03:22:02 | 25 | A.  Yeah. |

| | | |
|---|---|---|
| 03:22:03 | 1 | Q. That's correct? |
| 03:22:03 | 2 | A. That's correct. |
| 03:22:04 | 3 | Q. And that's at the exact same time they are dealing drugs, |
| 03:22:08 | 4 | right? |
| 03:22:08 | 5 | A. We suspected them of dealing drugs. |
| 03:22:11 | 6 | MR. RUBINO: Thank you. |
| 03:22:11 | 7 | THE COURT: Anything else, Ms. Guren? |
| 03:22:14 | 8 | MS. GUREN: No, your Honor. |
| 03:22:14 | 9 | THE COURT: Okay. You can step down and be excused. |
| 03:22:19 | 10 | (Witness leaves the stand.) |
| 03:22:19 | 11 | THE COURT: And, folks, we'll take the afternoon |
| 03:22:21 | 12 | break right now for you. Okay, fifteen minutes. Thank you. |
| 03:22:35 | 13 | (The jury leaves the courtroom.) |
| 03:56:05 | 14 | (Recess taken.) |
| 03:56:13 | 15 | (The jury enters the courtroom.) |
| 03:56:23 | 16 | THE COURT: All right. Please be seated. I hope you |
| 03:56:25 | 17 | had a nice break, folks. You know what the rule is, is that |
| 03:56:29 | 18 | while you are doing your civic duty and you eat cookies and |
| 03:56:33 | 19 | drink pop on your break, none of the calories count, because |
| 03:56:36 | 20 | you're doing your civic duty. So you can tell your family |
| 03:56:38 | 21 | that. |
| 03:56:38 | 22 | (Laughter.) |
| 03:56:40 | 23 | THE COURT: All right. And now the Government can |
| 03:56:41 | 24 | call your next witness. |
| 03:56:42 | 25 | MS. RODNEY: Your Honor, the Government calls Karyn |

510

| | | |
|---|---|---|
| 03:57:03 | 1 | Mastricola. |
| 03:57:04 | 2 | (Witness takes the stand.) |
| 03:57:04 | 3 | THE COURT:  Please raise your right hand. |
| 03:57:07 | 4 | (The witness was sworn.) |
| 03:57:11 | 5 | THE COURT:  All right.  Have a seat. |
| 03:57:13 | 6 | And you may begin when you're ready, Ms. Rodney. |
| 03:57:13 | 7 | - - - |
| 03:57:13 | 8 | KARYN MASTRICOLA, DIRECT EXAMINATION |
| 03:57:13 | 9 | BY MS. RODNEY: |
| 03:57:19 | 10 | Q.  Good afternoon. |
| 03:57:20 | 11 | Will you please state and spell your name for the |
| 03:57:24 | 12 | record? |
| 03:57:24 | 13 | A.  Karyn Mastricola, K-a-r-y-n M-a-s-t-r-i-c-o-l-a. |
| 03:57:30 | 14 | THE COURT:  Hold on just a second. |
| 03:58:15 | 15 | BY MS. RODNEY: |
| 03:58:16 | 16 | Q.  Mrs. [sic] Mastricola, are you currently employed? |
| 03:58:18 | 17 | A.  Yes. |
| 03:58:18 | 18 | Q.  Where do you work? |
| 03:58:20 | 19 | A.  I work for the DEA. |
| 03:58:23 | 20 | Q.  And where are you assigned? |
| 03:58:26 | 21 | A.  Asuncion, Paraguay. |
| 03:58:29 | 22 | Q.  And what do you do for the DEA? |
| 03:58:30 | 23 | A.  I'm an intelligence research specialist. |
| 03:58:34 | 24 | Q.  And how long have you held that position? |
| 03:58:35 | 25 | A.  Seven and a half years. |

511

| | | |
|---|---|---|
| 03:58:42 | 1 | Q.  And how long have you been stationed in Paraguay? |
| 03:58:46 | 2 | A.  Eleven months. |
| 03:58:49 | 3 | Q.  And prior to working in Paraguay, where were you assigned? |
| 03:58:53 | 4 | A.  Chicago HIDTA office. |
| 03:58:55 | 5 | Q.  And is HIDTA -- does HIDTA stand for High Intensity Drug |
| 03:59:01 | 6 | Trafficking Areas? |
| 03:59:01 | 7 | A.  Yes. |
| 03:59:03 | 8 | Q.  And what was your title with HIDTA? |
| 03:59:06 | 9 | A.  The same, intelligence research specialist. |
| 03:59:09 | 10 | Q.  And how long did you work in Chicago as an intelligence |
| 03:59:13 | 11 | research specialist? |
| 03:59:14 | 12 | A.  A little over four years. |
| 03:59:19 | 13 | Q.  And prior to working in Chicago, where were you employed? |
| 03:59:22 | 14 | A.  In Washington, D.C. at the special operations division. |
| 03:59:27 | 15 | Q.  And what did you do there? |
| 03:59:28 | 16 | A.  The same, intelligence research specialist. |
| 03:59:32 | 17 | Q.  What does an intelligence research specialist do? |
| 03:59:35 | 18 | A.  In general, we do a lot of the background work for the |
| 03:59:40 | 19 | agents' cases, telephone analysis, and investigations into |
| 03:59:45 | 20 | targets, their backgrounds, addresses, telephones. |
| 03:59:50 | 21 | Q.  Did you receive any special training to become an |
| 03:59:52 | 22 | intelligence research specialist? |
| 03:59:54 | 23 | A.  Yeah.  I attended a nine-week training [sic] in Quantico, |
| 04:00:00 | 24 | Virginia, the basic intelligence research specialist class. |
| 04:00:04 | 25 | Q.  Have you received any training, since you've been employed |

| | | |
|---|---|---|
| 04:00:07 | 1 | with DEA? |
| 04:00:09 | 2 | A. We do periodic, like, retraining, and I've received |
| 04:00:15 | 3 | extensive telephone -- additional telephone training. |
| 04:00:22 | 4 | Q. Now, do your responsibilities, as an intelligence research |
| 04:00:25 | 5 | specialist, include the search and recovery of data on |
| 04:00:29 | 6 | cellular telephones? |
| 04:00:31 | 7 | A. Yes. |
| 04:00:31 | 8 | Q. Approximately how many cellular telephones have you |
| 04:00:34 | 9 | searched during your career as an intelligence research |
| 04:00:37 | 10 | specialist? |
| 04:00:38 | 11 | A. Probably over a hundred. |
| 04:00:40 | 12 | Q. And in your analysis of telephones, have you become |
| 04:00:43 | 13 | familiar with telephone records or what are also known as toll |
| 04:00:47 | 14 | records? |
| 04:00:48 | 15 | A. Yes. |
| 04:00:49 | 16 | Q. Approximately how many toll records have you reviewed in |
| 04:00:54 | 17 | your career? |
| 04:00:55 | 18 | A. Hundreds of thousands. |
| 04:01:04 | 19 | Q. Ms. Mastricola, I'm going to hand you a stack of exhibits |
| 04:01:09 | 20 | and direct you to each of them in turn. |
| 04:01:19 | 21 | Now, while you were employed at Chicago -- at |
| 04:01:23 | 22 | Chicago's HIDTA office, did you conduct the search of a |
| 04:01:26 | 23 | cellphone related to the investigation in this case? |
| 04:01:28 | 24 | A. Yes. |
| 04:01:29 | 25 | Q. If you could direct your attention to Government Exhibit |

| | | |
|---|---|---|
| 04:01:33 | 1 | Phone 1 in front of you, do you recognize that exhibit? |
| 04:01:39 | 2 | A.  I do. |
| 04:01:39 | 3 | Q.  And what is it? |
| 04:01:40 | 4 | A.  It's a telephone -- Telephone Exhibit 347. |
| 04:01:48 | 5 | Q.  Is that the phone that you searched related to this |
| 04:01:52 | 6 | investigation? |
| 04:01:52 | 7 | A.  Yes. |
| 04:01:53 | 8 | MS. RODNEY:  And just for the record, Government |
| 04:01:55 | 9 | Exhibit Phone 1 has previously been admitted into evidence? |
| 04:01:57 | 10 | THE COURT:  It is. |
| 04:01:59 | 11 | BY MS. RODNEY: |
| 04:02:00 | 12 | Q.  Ms. Mastricola, how do you recognize that exhibit? |
| 04:02:02 | 13 | A.  My initials are on one of the evidence labels here. |
| 04:02:08 | 14 | Q.  Now, from whom did you receive that phone before you |
| 04:02:11 | 15 | searched it? |
| 04:02:12 | 16 | A.  Special Agent Eric Durante. |
| 04:02:14 | 17 | Q.  Approximately when did you receive the phone from Agent |
| 04:02:21 | 18 | Durante? |
| 04:02:21 | 19 | A.  I received it on the date I opened it, which was |
| 04:02:24 | 20 | February 23rd. |
| 04:02:24 | 21 | Q.  What year? |
| 04:02:25 | 22 | A.  2009. |
| 04:02:26 | 23 | Q.  Was the phone in a sealed condition when you received it? |
| 04:02:30 | 24 | A.  Yes. |
| 04:02:30 | 25 | Q.  Is the phone in substantially the same condition now as it |

| | | |
|---|---|---|
| 04:02:33 | 1 | was when you first received it? |
| 04:02:36 | 2 | A.  Yes. |
| 04:02:38 | 3 | Q.  Now, when you received that phone, what were you asked to |
| 04:02:42 | 4 | do? |
| 04:02:42 | 5 | A.  I was asked to do a secondary search on the phone, to look |
| 04:02:46 | 6 | into its contents, to see what was saved in the phone, as |
| 04:02:52 | 7 | like -- |
| 04:02:53 | 8 | Q.  And what was your search secondary to? |
| 04:02:55 | 9 | A.  The Cellebrite automated search. |
| 04:02:58 | 10 | Q.  And what is Cellebrite? |
| 04:03:00 | 11 | A.  Cellebrite's a piece of equipment that you can plug into |
| 04:03:04 | 12 | most cellular phones, and it will automatically retrieve most |
| 04:03:08 | 13 | of the -- most of the things common to all phones, like the |
| 04:03:14 | 14 | phonebook, text messages, telephone calls. |
| 04:03:20 | 15 | Q.  Does Cellebrite generate a report of the search of the |
| 04:03:24 | 16 | phone? |
| 04:03:24 | 17 | A.  It does. |
| 04:03:25 | 18 | Q.  Now, how did you go about conducting your search of |
| 04:03:29 | 19 | Government Exhibit Phone 1? |
| 04:03:30 | 20 | A.  I turned it on, and I manually went through each of the |
| 04:03:34 | 21 | components in the phone. |
| 04:03:36 | 22 | Q.  And specifically which components did you go through? |
| 04:03:39 | 23 | A.  The text messages, the phone logs, the phonebook. |
| 04:03:44 | 24 | Q.  Did you alter the contents of Government Exhibit Phone 1 |
| 04:03:48 | 25 | during your search? |

| | | |
|---|---|---|
| 04:03:49 | 1 | A.  No. |
| 04:03:51 | 2 | Q.  Did you compare the results of your search with the report |
| 04:03:55 | 3 | generated by the Cellebrite device? |
| 04:03:58 | 4 | A.  Yes. |
| 04:03:58 | 5 | Q.  Did you find any additional information? |
| 04:04:01 | 6 | A.  No. |
| 04:04:02 | 7 | Q.  When you searched Government Exhibit Phone 1, was it able |
| 04:04:05 | 8 | to receive phone calls or text messages? |
| 04:04:08 | 9 | A.  No. |
| 04:04:10 | 10 | Q.  How do you know? |
| 04:04:13 | 11 | A.  It had no -- it was not connecting to a network.  The -- |
| 04:04:17 | 12 | you could tell that it was not picking up any kind of cell |
| 04:04:21 | 13 | service. |
| 04:04:21 | 14 | Q.  Did you determine that after you powered the phone on? |
| 04:04:25 | 15 | A.  Yes. |
| 04:04:25 | 16 | Q.  During your search of Government Exhibit Phone 1, were you |
| 04:04:28 | 17 | able to determine the telephone number associated with it? |
| 04:04:32 | 18 | A.  No. |
| 04:04:32 | 19 | Q.  And why not? |
| 04:04:34 | 20 | A.  It didn't have any service, and, also, when I turned it |
| 04:04:40 | 21 | on, the service provider was shown as Telcel, which is a |
| 04:04:44 | 22 | Mexican service provider.  And so Cellebrite will not pull |
| 04:04:50 | 23 | non-U.S. telephone numbers. |
| 04:04:53 | 24 | Q.  Now, are you familiar with the cellphone's phonebook or |
| 04:04:57 | 25 | contact list feature? |

| | | |
|---|---|---|
| 04:04:58 | 1 | A. Yes. |
| 04:04:59 | 2 | Q. And what is a phonebook? |
| 04:05:01 | 3 | A. Phonebook is similar to like your paper telephone book |
| 04:05:04 | 4 | would be, would save a name, a phone number, any e-mail |
| 04:05:09 | 5 | address, any information you would want to save about a |
| 04:05:11 | 6 | particular person. |
| 04:05:12 | 7 | Q. During your search of Government Exhibit Phone 1, did you |
| 04:05:15 | 8 | find a phonebook? |
| 04:05:16 | 9 | A. Yes. |
| 04:05:17 | 10 | Q. How many contact names were included in the phonebook? |
| 04:05:20 | 11 | A. One. |
| 04:05:22 | 12 | Q. What name was in the phonebook? |
| 04:05:24 | 13 | A. Ron Ron. |
| 04:05:26 | 14 | Q. Did you find a phone number associated with the name Ron |
| 04:05:30 | 15 | Ron? |
| 04:05:30 | 16 | A. Yes. |
| 04:05:31 | 17 | Q. What was that phone number for Ron Ron? |
| 04:05:33 | 18 | A. (773) 691-1702. |
| 04:05:40 | 19 | Q. Did you find any other names or numbers in the phonebook |
| 04:05:43 | 20 | for Government Exhibit Phone 1? |
| 04:05:45 | 21 | A. No. |
| 04:05:47 | 22 | Q. Earlier you testified about searching for incoming and |
| 04:05:51 | 23 | outgoing phone calls. What is an incoming call? |
| 04:05:54 | 24 | A. It's a call received by the phone. |
| 04:05:57 | 25 | Q. Does the cellphone keep a record of its incoming calls? |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|--|--|--|
| 04:06:01 | 1 | A. Yes. |
| 04:06:02 | 2 | Q. During your search of Government Exhibit Phone 1, did you |
| 04:06:06 | 3 | find any record of incoming calls? |
| 04:06:07 | 4 | A. Yes. |
| 04:06:09 | 5 | Q. What name was associated with those incoming calls? |
| 04:06:12 | 6 | A. Ron Ron. |
| 04:06:13 | 7 | Q. What number was associated with the incoming calls to |
| 04:06:17 | 8 | Government Exhibit Phone 1? |
| 04:06:18 | 9 | A. (773) 691-1702. |
| 04:06:28 | 10 | Q. All right. Did you find other incoming calls to |
| 04:06:28 | 11 | Government Exhibit Phone 1? |
| 04:06:28 | 12 | A. Yes. |
| 04:06:30 | 13 | Q. Were you able to determine a name associated to those |
| 04:06:32 | 14 | calls from your search? |
| 04:06:33 | 15 | A. No. |
| 04:06:34 | 16 | Q. If I could direct your attention to the first folder |
| 04:06:37 | 17 | labeled Government Exhibit Summary 1A, do you have that in |
| 04:06:42 | 18 | front of you? |
| 04:06:43 | 19 | A. Yes. |
| 04:06:43 | 20 | Q. Do you recognize that exhibit? |
| 04:06:45 | 21 | A. Yes. |
| 04:06:46 | 22 | Q. And what is it? |
| 04:06:47 | 23 | A. It's a list of the incoming calls to this phone from Ron |
| 04:06:53 | 24 | Ron. |
| 04:06:53 | 25 | Q. Is it incoming calls from Ron Ron at number |

| | | |
|---|---|---|
| 04:06:58 | 1 | (773) 691-1702? |
| 04:07:02 | 2 | A.  Yes. |
| 04:07:03 | 3 | Q.  Is Government Exhibit Summary 1A a true and accurate |
| 04:07:06 | 4 | summary of the incoming phone calls from Ron Ron at |
| 04:07:10 | 5 | (773) 691-1702? |
| 04:07:14 | 6 | A.  Yes. |
| 04:07:15 | 7 |         MS. RODNEY:  Your Honor, the Government wishes to |
| 04:07:17 | 8 | move into evidence Government Exhibit Summary 1A and publish. |
| 04:07:20 | 9 |         THE COURT:  Okay.  It will be admitted, and you may |
| 04:07:24 | 10 | publish it. |
| 04:07:38 | 11 | BY MS. RODNEY: |
| 04:07:39 | 12 | Q.  Ms. Mastricola, directing your attention to either the |
| 04:07:41 | 13 | screen in front of you or the hard copy of Government Exhibit |
| 04:07:46 | 14 | Summary 1A, can you explain how this chart is organized? |
| 04:07:49 | 15 | A.  The column to the left is the type of call, incoming |
| 04:07:52 | 16 | versus outgoing.  The next column is the number from which the |
| 04:07:57 | 17 | call was received.  The next column is the name associated in |
| 04:08:02 | 18 | the phone with that phone number.  The next column is the date |
| 04:08:07 | 19 | the call was received, then the time the call was received, |
| 04:08:12 | 20 | and the duration, how long the call lasted. |
| 04:08:16 | 21 | Q.  How many incoming calls from Ron Ron did you find during |
| 04:08:19 | 22 | your search of Government Exhibit Phone 1? |
| 04:08:22 | 23 | A.  Five. |
| 04:08:23 | 24 | Q.  And what is the date range of these incoming calls from |
| 04:08:27 | 25 | Ron Ron? |

| | | |
|---|---|---|
| 04:08:27 | 1 | A.  August 3rd to August 5th, 2008. |
| 04:08:31 | 2 | Q.  And what is the longest duration of incoming calls -- what |
| 04:08:35 | 3 | is the longest incoming call during this time period? |
| 04:08:39 | 4 | A.  Three minutes and four seconds. |
| 04:08:41 | 5 | Q.  And what is the shortest incoming call during this time |
| 04:08:45 | 6 | period? |
| 04:08:45 | 7 | A.  Twelve seconds. |
| 04:08:49 | 8 | Q.  Now, during your search of Government Exhibit Phone 1, did |
| 04:08:52 | 9 | you find any outgoing calls? |
| 04:08:53 | 10 | A.  Yes. |
| 04:08:54 | 11 | Q.  And what is an outgoing call? |
| 04:08:56 | 12 | A.  It's a call placed by that phone to another. |
| 04:08:58 | 13 | Q.  Does the cellphone keep a record of outgoing calls? |
| 04:09:02 | 14 | A.  Yes. |
| 04:09:04 | 15 | Q.  And the outgoing calls that you found, what was the name |
| 04:09:07 | 16 | associated with those outgoing calls? |
| 04:09:10 | 17 | A.  Ron Ron. |
| 04:09:12 | 18 | Q.  And what number was associated with the outgoing calls |
| 04:09:15 | 19 | from Ron Ron -- excuse me -- outgoing calls to Ron Ron from |
| 04:09:20 | 20 | Government Exhibit Phone 1? |
| 04:09:21 | 21 | A.  (773) 691-1702. |
| 04:09:27 | 22 | Q.  Did you find other outgoing calls from Government Exhibit |
| 04:09:32 | 23 | Phone 1? |
| 04:09:32 | 24 | A.  Yes. |
| 04:09:32 | 25 | Q.  Were you able to determine the name associated with those |

| | | |
|---|---|---|
| 04:09:35 | 1 | calls from your search? |
| 04:09:36 | 2 | A.  No. |
| 04:09:37 | 3 | Q.  Now, if I could direct your attention to the second folder |
| 04:09:40 | 4 | in front of you, Government Exhibit Summary 1B, do you |
| 04:09:52 | 5 | recognize this document? |
| 04:09:53 | 6 | A.  Yes. |
| 04:09:54 | 7 | Q.  And what is it? |
| 04:09:55 | 8 | A.  It's a list of calls from this phone to Ron Ron. |
| 04:10:01 | 9 | Q.  I'm sorry.  Can you speak into the microphone? |
| 04:10:03 | 10 | A.  Sorry.  It's a list of phone calls from this phone to Ron |
| 04:10:08 | 11 | Ron. |
| 04:10:08 | 12 | Q.  And you're referring to Government Exhibit Phone 1 -- |
| 04:10:11 | 13 | A.  Yes. |
| 04:10:11 | 14 | Q.  -- to Ron Ron? |
| 04:10:12 | 15 |       Is Government Exhibit Summary 1B a true and accurate |
| 04:10:17 | 16 | summary of the outgoing phone calls to Ron Ron at number |
| 04:10:20 | 17 | (773) 691-1702 from Government Exhibit Phone 1? |
| 04:10:26 | 18 | A.  Yes. |
| 04:10:27 | 19 |       MS. RODNEY:  Your Honor, the Government moves into |
| 04:10:29 | 20 | evidence Government Exhibit Summary 1B. |
| 04:10:31 | 21 |       THE COURT:  It will be admitted, and you can publish. |
| 04:10:42 | 22 | BY MS. RODNEY: |
| 04:10:44 | 23 | Q.  Ms. Mastricola, can you please describe how Government |
| 04:10:48 | 24 | Exhibit Summary 1B is organized? |
| 04:10:49 | 25 | A.  The column to the farther left, again, is the type, and |

| | | |
|---|---|---|
| 04:10:52 | 1 | this is outgoing this time.  The next column is the phone |
| 04:10:56 | 2 | number and who the calls went to.  And the next column is the |
| 04:11:01 | 3 | name associated with that phone number.  The next column is |
| 04:11:05 | 4 | the date.  The next is the time.  And the final is the |
| 04:11:07 | 5 | duration, how long the call lasted. |
| 04:11:10 | 6 | Q.  And what do the dashes on the chart indicate? |
| 04:11:13 | 7 | A.  That the phone did not record the time. |
| 04:11:16 | 8 | Q.  How many outgoing calls to Ron Ron from Government Exhibit |
| 04:11:21 | 9 | Phone 1 did you find during your search? |
| 04:11:22 | 10 | A.  Five. |
| 04:11:23 | 11 | Q.  And what is the date range of those outgoing calls to Ron |
| 04:11:27 | 12 | Ron? |
| 04:11:27 | 13 | A.  They were all on August 5th, 2008. |
| 04:11:31 | 14 | Q.  What is the longest duration of an outgoing call for this |
| 04:11:37 | 15 | period? |
| 04:11:37 | 16 | A.  Five minutes and 22 seconds. |
| 04:11:40 | 17 | Q.  Now, did your search of Government Exhibit Phone 1 include |
| 04:11:43 | 18 | a search for any missed calls to the phone? |
| 04:11:46 | 19 | A.  Yes. |
| 04:11:48 | 20 | Q.  And does the cellphone keep a record of missed calls? |
| 04:11:52 | 21 | A.  Yes. |
| 04:11:52 | 22 | Q.  During your search of Government Exhibit Phone 1, did you |
| 04:11:55 | 23 | recover any record of missed calls? |
| 04:11:58 | 24 | A.  Yes. |
| 04:11:59 | 25 | Q.  And what name is associated with those missed calls? |

| | | |
|---|---|---|
| 04:12:03 | 1 | A.  Ron Ron. |
| 04:12:03 | 2 | Q.  And what number was associated with the missed calls to |
| 04:12:07 | 3 | Government Exhibit Phone 1 from Ron Ron? |
| 04:12:09 | 4 | A.  (773) 691-1702. |
| 04:12:14 | 5 | Q.  Did you find other missed calls to Government Exhibit |
| 04:12:19 | 6 | Phone 1? |
| 04:12:19 | 7 | A.  Yes. |
| 04:12:19 | 8 | Q.  Were you able to determine the name associated with those |
| 04:12:21 | 9 | calls? |
| 04:12:23 | 10 | A.  No. |
| 04:12:24 | 11 | Q.  If I could direct your attention to Government Exhibit |
| 04:12:32 | 12 | Summary 1C, do you recognize that exhibit? |
| 04:12:33 | 13 | A.  Yes. |
| 04:12:34 | 14 | Q.  And what is it? |
| 04:12:35 | 15 | A.  It's a list of calls to Exhibit Phone 1 from Ron Ron that |
| 04:12:42 | 16 | were missed, like they were not answered by that phone. |
| 04:12:45 | 17 | Q.  And what is the phone number for those missed calls? |
| 04:12:48 | 18 | A.  (773) 691-1702. |
| 04:12:53 | 19 | Q.  Is Government Exhibit Summary 1C a true and accurate |
| 04:12:57 | 20 | summary of missed phone calls from Ron Ron at (773) 691-1702 |
| 04:13:03 | 21 | to Government Exhibit Phone 1? |
| 04:13:08 | 22 | A.  Yes. |
| 04:13:08 | 23 |         MS. RODNEY:  Your Honor, the Government wishes to |
| 04:13:09 | 24 | move into evidence Government Exhibit Summary 1C. |
| 04:13:14 | 25 |         THE COURT:  It will be admitted, and you can publish. |

| | | |
|---|---|---|
| 04:13:20 | 1 | BY MS. RODNEY: |
| 04:13:21 | 2 | Q. Can you explain what Government Exhibit Summary 1C is? |
| 04:13:27 | 3 | A. The column to the far left is type, and it's missed, |
| 04:13:29 | 4 | meaning that the call was incoming but not answered. The next |
| 04:13:32 | 5 | column is the phone number from which those calls came from. |
| 04:13:35 | 6 | The next column is name associated with that phone number. |
| 04:13:39 | 7 | And the next column is date. And the last is time. |
| 04:13:43 | 8 | Q. How many missed calls from Ron Ron did you find during |
| 04:13:47 | 9 | your search of Government Exhibit Phone 1? |
| 04:13:49 | 10 | A. Five. |
| 04:13:50 | 11 | Q. And what is the date range of those missed calls from Ron |
| 04:13:54 | 12 | Ron? |
| 04:13:54 | 13 | A. August 4th through August 5th of 2008. |
| 04:13:58 | 14 | Q. Now, did your search of Government Exhibit Phone 1 include |
| 04:14:01 | 15 | the search for text messages? |
| 04:14:03 | 16 | A. Yes. |
| 04:14:03 | 17 | Q. And what is a text message? |
| 04:14:05 | 18 | A. A text message is a written message sent between two |
| 04:14:09 | 19 | telephones. |
| 04:14:10 | 20 | Q. Does the phone store text messages it receives and text |
| 04:14:15 | 21 | messages it sends? |
| 04:14:16 | 22 | A. Yes. |
| 04:14:17 | 23 | Q. During your search of Government Exhibit Phone 1, did you |
| 04:14:20 | 24 | find a record of incoming text messages to that phone? |
| 04:14:24 | 25 | A. Yes. |

| | | |
|---|---|---|
| 04:14:24 | 1 | Q.  And what name was associated with that text messages? |
| 04:14:28 | 2 | A.  Ron Ron. |
| 04:14:28 | 3 | Q.  What number was associated with the text messages from Ron |
| 04:14:33 | 4 | Ron? |
| 04:14:33 | 5 | A.  (773) 691-1702. |
| 04:14:38 | 6 | Q.  Did you find any other text messages in your search of the |
| 04:14:43 | 7 | phone? |
| 04:14:43 | 8 | A.  Yes. |
| 04:14:43 | 9 | Q.  And what name is associated with those text messages? |
| 04:14:47 | 10 | A.  There was no name associated. |
| 04:14:48 | 11 | Q.  Now, showing you -- if I could direct your attention, |
| 04:14:51 | 12 | actually, to the last summary chart in front of you, |
| 04:14:54 | 13 | Government Exhibit Summary Chart 1E, now do you recognize that |
| 04:15:00 | 14 | exhibit? |
| 04:15:00 | 15 | A.  Yes. |
| 04:15:00 | 16 | Q.  And what is it? |
| 04:15:01 | 17 | A.  It's a listing of the text messages from Ron Ron to |
| 04:15:08 | 18 | Exhibit Phone 1. |
| 04:15:09 | 19 | Q.  Is that exhibit a true and accurate summary of the |
| 04:15:12 | 20 | incoming text messages from Ron Ron at phone number |
| 04:15:16 | 21 | (773) 691-1702 to Government Exhibit Phone 1? |
| 04:15:21 | 22 | A.  Yes. |
| 04:15:22 | 23 |         MS. RODNEY:  The Government wishes to move into |
| 04:15:23 | 24 | evidence Government Exhibit Phone Summary 1E. |
| 04:15:27 | 25 |         THE COURT:  Okay.  It will be admitted, and you can |

04:15:30  1  publish it.

04:15:44  2  BY MS. RODNEY:

04:15:44  3  Q.  If I could direct you just to the top of the exhibit, can

04:15:47  4  you describe the different columns there?

04:15:49  5  A.  The first column is the number that the call -- that the

04:15:55  6  text message came from.  The next column is the name

04:15:58  7  associated with that number.  The next is the date for that

04:16:03  8  text message.  The next is the time.  And the last column is

04:16:08  9  the actual content of the message.

04:16:11  10  Q.  Going back to the time column, what does the reference GMT

04:16:17  11  minus five refer to?

04:16:17  12  A.  It references the time zone they were recorded in.  So

04:16:21  13  for -- central time is GMT minus five, which is Greenwich Mean

04:16:30  14  Time.

04:16:30  15  Q.  Is that time as indicated in the phone?

04:16:31  16  A.  Yes.

04:16:32  17  Q.  And going to the next column, which reflects the text of

04:16:37  18  the call, are the text messages entered as you found them in

04:16:41  19  the phone?

04:16:43  20  A.  Yes.

04:16:50  21  Q.  How many incoming text messages from Ron Ron did you find

04:16:53  22  during your search of Government Exhibit Phone 1?

04:16:56  23  A.  24.

04:16:57  24  Q.  And what is the date range of those incoming text messages

04:17:01  25  from Ron Ron?

04:17:02  1   A.  September 13th through November 28th of 2008.

04:17:10  2   Q.  And during your search of Government Exhibit Phone 1, did

04:17:12  3   you recover any outgoing text messages from the phone?

04:17:16  4   A.  Yes.

04:17:16  5   Q.  Into what contact name were those outgoing text messages

04:17:21  6   sent?

04:17:21  7   A.  Ron Ron.

04:17:22  8   Q.  And what number was associated with the name Ron Ron?

04:17:25  9   A.  (773) 691-1702.

04:17:29  10  Q.  And how many outgoing text messages from Government

04:17:33  11  Exhibit Phone 1 to Ron Ron at (773) 691-1702 did you find

04:17:39  12  during your search of Government Exhibit Phone 1?

04:17:42  13  A.  Nine.

04:17:43  14  Q.  Now, after you completed your search of Government Exhibit

04:17:46  15  Phone 1, what did you do with it?

04:17:48  16  A.  I put it back in the evidence bag and resealed it.

04:17:52  17  Q.  And did you give it to anyone?

04:17:53  18  A.  I gave it back to our digital evidence laboratory with

04:17:57  19  DEA.

04:18:01  20        MS. RODNEY:  At this time, your Honor, may I read a

04:18:03  21  stipulation between the parties?

04:18:04  22        THE COURT:  Okay.

04:18:05  23        MS. RODNEY:  It is hereby stipulated and agreed

04:18:08  24  between the United States of America, by its attorney, Patrick

04:18:12  25  J. Fitzgerald, United States Attorney for the Northern

04:18:15  1  District of Illinois, and the defendant, individually and by

04:18:17  2  his attorneys, that the following facts are true:

04:18:20  3      If called as a witness, a custodian of records for

04:18:24  4  T-Mobile would testify that he or she has knowledge of the

04:18:29  5  relevant recordkeeping system and that each of the described

04:18:33  6  records were made or received and maintained in the regular

04:18:36  7  course of T-Mobile's business around the time of the

04:18:40  8  transaction reflected in the records and that it is the

04:18:43  9  regular practice of T-Mobile to make or receive such records.

04:18:48  10      Government Exhibit T-Mobile 1 contains subscriber

04:18:52  11  information and cellular telephone call records for the period

04:18:55  12  of November 17th, 2008 through December 11th, 2008 for account

04:19:01  13  number 45051569 and mobile telephone number (773) 691-1702.

04:19:15  14  Times for the cellular telephone call records are listed in

04:19:20  15  Pacific Daylight Time, or PDT, and the subscriber information.

04:19:26  16  There is no subscriber name listed.

04:19:27  17      So stipulated, Counsel?

04:19:29  18      MR. RUBINO:  Yes.

04:19:33  19      MS. RODNEY:  Your Honor, at this time the Government

04:19:34  20  wishes to move into evidence Government Exhibit T-Mobile 1.

04:19:37  21      THE COURT:  Okay.  There's no objection, it will be

04:19:42  22  admitted.

04:19:42  23  BY MS. RODNEY:

04:19:42  24  Q.  Ms. Mastricola, if you could refer to the folder marked

04:19:45  25  Government Exhibit T-Mobile 1.

04:19:51   1    And, your Honor, may I publish Government

04:19:54   2  Exhibit T-Mobile 1?

04:19:55   3    THE COURT:  You may.

04:20:05   4  BY MS. RODNEY:

04:20:06   5  Q.  Ms. Mastricola, do you recognize Government

04:20:09   6  Exhibit T-Mobile 1?

04:20:10   7  A.  I do.

04:20:10   8  Q.  And what is it?

04:20:11   9  A.  It's a listing of the telephone calls from T-Mobile, so

04:20:17  10  it's like the telephone bill for this period of time.

04:20:21  11  Q.  And what type of information is listed on Government

04:20:24  12  Exhibit T-Mobile 1?

04:20:26  13  A.  The first column is the telephone number of the account.

04:20:31  14  The next is the date.  The next is the direction.

04:20:38  15  Q.  When you say direction, you mean incoming or outgoing?

04:20:41  16  A.  Yes.  The next is the time of the call.  The next column

04:20:47  17  is the phone number that called or was called by this

04:20:52  18  telephone.  Call type, if there's a D listed, is when there

04:20:58  19  was a text message.  And the last column is the number of

04:21:01  20  minutes that were billed, the duration of that call.

04:21:07  21  Q.  If I could back you up to the time column, is that listed

04:21:11  22  in Pacific Daylight Time?

04:21:13  23  A.  Yes.

04:21:14  24  Q.  And how many hours is that behind Central Standard Time?

04:21:17  25  A.  Two.

| | |
|---|---|
| 04:21:19 | 1 |
| 04:21:23 | 2 |
| 04:21:25 | 3 |
| 04:21:29 | 4 |
| 04:21:29 | 5 |
| 04:21:32 | 6 |
| 04:21:35 | 7 |
| 04:21:47 | 8 |
| 04:21:47 | 9 |
| 04:21:49 | 10 |
| 04:22:06 | 11 |
| 04:22:09 | 12 |
| 04:22:11 | 13 |
| 04:22:20 | 14 |
| 04:22:27 | 15 |
| 04:22:27 | 16 |
| 04:22:30 | 17 |
| 04:22:30 | 18 |
| 04:22:39 | 19 |
| 04:22:41 | 20 |
| 04:22:42 | 21 |
| 04:22:44 | 22 |
| 04:22:48 | 23 |
| 04:22:52 | 24 |
| 04:22:57 | 25 |

Q.  And going to the number of minutes column, is that the exact duration of the call?

A.  No.  Most telephone companies round up to the next nearest minute.

Q.  And for the record, are you referring to the second page of Government Exhibit T-Mobile 1?

A.  Yes.

MS. RODNEY:  If I may just have one moment, your Honor?

THE COURT:  Sure.

BY MS. RODNEY:

Q.  Now, Ms. Mastricola, if I could direct your attention to the outgoing call from (773) 691-1702 on November 25th, 2008, at 12:23 p.m., do you see that line in the exhibit?

A.  Yes.

Q.  And what was the number dialed as listed in the phone records?

A.  011521331458962.

Q.  Is that the complete number dialed?

A.  No.

Q.  And how do you know?

A.  We have subsequent call records that show the complete phone number, but for -- from my work experience, that's a Mexican phone number that was dialed.  And they have the same ten digits at the end of their phone number as we do.

04:23:01 | 1 | Q.  Now, just to back up a bit, is the complete phone number
04:23:04 | 2 | listed elsewhere in the T-Mobile 1 records?
04:23:08 | 3 | A.  Yes.
04:23:08 | 4 | Q.  And is that found on page 3 of the exhibit?
04:23:11 | 5 | A.  Yes.
04:23:16 | 6 | Q.  And what is the complete phone number, if you could direct
04:23:20 | 7 | your attention to page 3 of the exhibit, that was dialed at
04:23:24 | 8 | that date and time?
04:23:24 | 9 | A.  0115213314589626.
04:23:34 | 10 | Q.  So the exhibit page depicted on the screen is missing that
04:23:38 | 11 | last six digits?
04:23:40 | 12 | A.  Yes.
04:23:40 | 13 | Q.  But it's found on page 3 of the exhibit?
04:23:43 | 14 | A.  Yes.
04:23:43 | 15 | Q.  Now, are you familiar with the prefix in this number of
04:23:47 | 16 | 01152?
04:23:48 | 17 | A.  Yes.
04:23:49 | 18 | Q.  And what is that?
04:23:50 | 19 | A.  011 is dialed from U.S. to make an international phone
04:23:55 | 20 | call, and 52 is the country code for Mexico.
04:23:59 | 21 | Q.  And what is the number of minutes of that call from
04:24:06 | 22 | 12/23 p.m. on November 25th of 2008?
04:24:07 | 23 | A.  Four minutes.
04:24:09 | 24 | Q.  Now, if I could direct your attention a few lines down to
04:24:12 | 25 | an outgoing call from (773) 691-1702 on November 29th, 2008,

| | | |
|---|---|---|
| 04:24:20 | 1 | at 1359 p.m.  What does 1359 p.m. translate for nonmilitary |
| 04:24:30 | 2 | time? |
| 04:24:30 | 3 | A.  11:59. |
| 04:24:32 | 4 | Q.  11 -- |
| 04:24:34 | 5 | A.  I'm sorry, 1:59 p.m. |
| 04:24:37 | 6 | Q.  And what was the number dialed on that date and time? |
| 04:24:44 | 7 | A.  It's the same number, 011521331458962. |
| 04:24:52 | 8 | Q.  And is the complete number listed on the following page of |
| 04:24:56 | 9 | the exhibit? |
| 04:24:57 | 10 | A.  Yes. |
| 04:24:57 | 11 | Q.  Does the complete number include one additional digit of |
| 04:25:02 | 12 | six? |
| 04:25:02 | 13 | A.  Yes. |
| 04:25:02 | 14 | Q.  And what was the number of minutes of that call? |
| 04:25:05 | 15 | A.  One. |
| 04:25:06 | 16 | Q.  Now, directing your attention to an outgoing call from |
| 04:25:09 | 17 | (773) 691-1702 on November 30th, 2008, at 12:13 p.m., what |
| 04:25:19 | 18 | number was dialed on that date and time? |
| 04:25:29 | 19 | A.  The same number, 011521331458962. |
| 04:25:37 | 20 | Q.  And is the complete number found on page 3 of the exhibit? |
| 04:25:42 | 21 | A.  It's on page 4 of the exhibit, yes. |
| 04:25:45 | 22 | Q.  Page 4 of the exhibit. |
| 04:25:47 | 23 | It's the complete number -- does the complete number |
| 04:25:50 | 24 | include that additional digit of six? |
| 04:25:53 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 04:25:54 | 1 | Q. And what was the number of minutes of that call? |
| 04:26:01 | 2 | A. Two. |
| 04:26:06 | 3 | Q. If I could just direct your attention to the screen, is |
| 04:26:12 | 4 | the highlighted portion the information you just read into the |
| 04:26:14 | 5 | record? |
| 04:26:15 | 6 | A. Yes. |
| 04:26:18 | 7 | MS. RODNEY: Your Honor, may I have one moment? |
| 04:26:20 | 8 | THE COURT: Sure. |
| 04:26:27 | 9 | MS. RODNEY: I have no further questions at this |
| 04:26:29 | 10 | time. |
| 04:26:29 | 11 | THE COURT: Okay. Mr. Rubino, any cross? |
| 04:26:31 | 12 | MR. RUBINO: Yes, your Honor. |
| 04:26:32 | 13 | - - - |
| 04:26:32 | 14 | KARYN MASTRICOLA, CROSS-EXAMINATION |
| 04:26:32 | 15 | BY MR. RUBINO: |
| 04:26:37 | 16 | Q. Good afternoon. |
| 04:26:38 | 17 | A. Good afternoon. |
| 04:26:41 | 18 | Q. The phone that you have analyzed, you received from agent |
| 04:26:48 | 19 | Eric Durante, correct? |
| 04:26:50 | 20 | A. Yes. |
| 04:26:51 | 21 | Q. Do you know where he got it? |
| 04:26:53 | 22 | A. I do not. |
| 04:26:55 | 23 | Q. You don't know the phone number of that phone, correct? |
| 04:26:59 | 24 | A. I do not. |
| 04:27:01 | 25 | Q. And when you went into the phone, you found only one |

| | | |
|---|---|---|
| 04:27:07 | 1 | number in the memory -- in the phonebook memory, which was |
| 04:27:12 | 2 | (773) 691-1702; am I correct? |
| 04:27:18 | 3 | A.  Yes. |
| 04:27:19 | 4 | Q.  And that phone number in the phonebook memory was |
| 04:27:23 | 5 | associated or hooked up to the name Ron Ron, correct? |
| 04:27:28 | 6 | A.  Yes. |
| 04:27:29 | 7 | Q.  Now, then you showed us that there were incoming calls, |
| 04:27:39 | 8 | outgoing calls, and missed calls; am I correct? |
| 04:27:43 | 9 | A.  Yes. |
| 04:27:44 | 10 | Q.  And we had charts -- not this chart -- but we had charts |
| 04:27:47 | 11 | on the board earlier, did we not? |
| 04:27:49 | 12 | A.  Yes. |
| 04:27:49 | 13 | Q.  Okay.  And those charts showed calls either incoming or |
| 04:27:58 | 14 | outgoing or missed from the unknown number phone or to the |
| 04:28:04 | 15 | unknown number phone, correct? |
| 04:28:06 | 16 | A.  Yes. |
| 04:28:07 | 17 | Q.  And we know exactly when the calls were made, do we not? |
| 04:28:12 | 18 | A.  Yes. |
| 04:28:13 | 19 | Q.  But do we know exactly when the name Ron Ron was put in |
| 04:28:16 | 20 | the phone? |
| 04:28:17 | 21 | A.  No. |
| 04:28:18 | 22 | Q.  Could the name Ron Ron have been put in the phone after |
| 04:28:22 | 23 | the calls were made? |
| 04:28:24 | 24 | A.  Yes. |
| 04:28:24 | 25 | Q.  So we don't know then that that name was placed in there |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

04:28:30  1  before the calls were made, when the calls were made, or

04:28:33  2  substantially after the calls were made, correct?

04:28:35  3  A.  Correct.

04:28:40  4  Q.  Can you tell us who placed the incoming calls?

04:28:43  5  A.  No.

04:28:44  6  Q.  Can you tell us who received them?

04:28:46  7  A.  No.

04:28:47  8  Q.  Can you tell us what they spoke about?

04:28:49  9  A.  No.

04:28:51  10  Q.  Can you tell us whose number is (773) 691-1702?

04:28:58  11  A.  No.

04:28:59  12  Q.  Don't the T-Mobile records reflect that?

04:29:02  13  A.  It's -- a prepaid phone does not require a name.

04:29:06  14  Q.  So we have a phone that is not registered to anyone

04:29:15  15  calling a phone we don't know the number of, correct?

04:29:18  16  A.  Yes.

04:29:19  17  Q.  And receiving calls from a phone we don't know the number

04:29:21  18  of.

04:29:22  19       Now, you went through this phone number of

04:29:34  20  011521331458962, and you said, of course, there's a digit

04:29:40  21  missing?

04:29:41  22  A.  Correct.

04:29:41  23  Q.  And you said the missing digit was 6 because you found it

04:29:46  24  on the next page?

04:29:47  25  A.  Correct.

04:29:48  1    Q.  How do you know it was six?

04:29:50  2    A.  The T-Mobile records, this record that's being displayed

04:29:55  3    right now is actually what you would receive as your phone

04:29:58  4    bill.  So there's only a standard number of digits that show

04:30:03  5    up in those records.

04:30:04  6    Q.  I understand.

04:30:05  7    A.  The phone company keeps complete records that encompass

04:30:09  8    the entire digits that were saved from that.

04:30:13  9    Q.  Okay.  And do you have those complete records?

04:30:18  10   A.  Yes.

04:30:18  11   Q.  And does it show every single call that had the first

04:30:24  12   group of numbers that six was the last number?

04:30:27  13   A.  Yes.

04:30:28  14   Q.  Okay.  Okay.  With respect to the text messages, the text

04:30:43  15   messages are basically in the same category as voice messages,

04:30:49  16   in that it's the same phone that transmits them; am I correct?

04:30:55  17   A.  Correct.

04:30:55  18   Q.  Okay.  So if we don't know who made the phone calls, we

04:30:59  19   also don't know who sent the text messages, do we?

04:31:03  20   A.  Correct.

04:31:03  21   Q.  And if we don't know who received the phone calls, we

04:31:06  22   don't know who received the text messages, do we?

04:31:09  23   A.  Correct.

04:31:09  24          MR. RUBINO:  Okay.  Thank you very much.  I have

04:31:11  25   nothing further.

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

04:31:12    1          THE COURT:  Ms. Rodney, do you have any redirect?

04:31:14    2          MS. RODNEY:  Yes, your Honor.  May I publish an

04:31:17    3   exhibit?

04:31:17    4          THE COURT:  Sure, if it's admitted, of course.

04:31:19    5          MS. RODNEY:  Let's publish again Government

04:31:22    6   Exhibit T-Mobile 1.

04:31:24    7          THE COURT:  All right.

04:31:24    8                          - - -

04:31:24    9          KARYN MASTRICOLA, REDIRECT EXAMINATION

04:31:24   10   BY MS. RODNEY:

04:31:40   11   Q.  Ms. Mastricola, referring to the screen in front of you,

04:31:43   12   is this the third page of Government Exhibit T-Mobile 1 that

04:31:47   13   you were referring to when you cited the complete number

04:31:50   14   dialed during those three days --

04:31:52   15   A.  Yes.

04:31:53   16   Q.  -- on direct examination?

04:31:55   17   A.  Yes.

04:31:59   18   Q.  Is this the fourth page of Government Exhibit T-Mobile 1

04:32:05   19   where you were able to retrieve the complete number dialed for

04:32:09   20   this November 30th call at 12:13 in the afternoon?

04:32:13   21   A.  Yes.

04:32:15   22   Q.  And when you talked about the complete phone records on

04:32:19   23   cross-examination, were you referring to these additional

04:32:23   24   pages of Government Exhibit T-Mobile 1?

04:32:26   25   A.  Yes.

| | | |
|---|---|---|
| 04:32:30 | 1 | Q.  Now, during your search of Government Exhibit Phone 1, you |
| 04:32:33 | 2 | didn't put the name Ron Ron in the phone, did you? |
| 04:32:36 | 3 | A.  No. |
| 04:32:37 | 4 | Q.  And you also talked about not knowing who the 773 number |
| 04:32:44 | 5 | belonged to.  Do you know what area code 773 is? |
| 04:32:48 | 6 | A.  Chicago. |
| 04:32:52 | 7 | MS. RODNEY:  I don't have anything further. |
| 04:32:53 | 8 | THE COURT:  Okay.  Anything from you, Mr. Rubino? |
| 04:32:56 | 9 | MR. RUBINO:  No, ma'am. |
| 04:32:56 | 10 | THE COURT:  Okay.  You may step down and be excused. |
| 04:33:00 | 11 | (Witness leaves the stand.) |
| 04:33:00 | 12 | THE COURT:  And you may call your next witness. |
| 04:33:02 | 13 | MS. GUREN:  Thank you, your Honor.  The Government |
| 04:33:03 | 14 | calls Special Agent Jacob Galvan. |
| 04:33:46 | 15 | THE COURT:  Right up here, sir. |
| 04:33:49 | 16 | (Witness takes the stand.) |
| 04:33:49 | 17 | THE COURT:  Please raise your right hand. |
| 04:33:52 | 18 | (The witness was sworn.) |
| 04:33:53 | 19 | THE COURT:  You may take a seat. |
| 04:33:55 | 20 | And whenever you're ready, Ms. Guren. |
| 04:33:58 | 21 | MS. GUREN:  Thank you, your Honor. |
| 04:33:59 | 22 | - - - |
| 04:33:59 | 23 | JACOB GALVAN, DIRECT EXAMINATION |
| 04:33:59 | 24 | BY MS. GUREN: |
| 04:34:03 | 25 | Q.  Good afternoon. |

| | | |
|---|---|---|
| 04:34:04 | 1 | A.  Good afternoon. |
| 04:34:04 | 2 | Q.  Can you state and spell your name for the record? |
| 04:34:07 | 3 | A.  Jacob Galvan, G-a-l-v-a-n. |
| 04:34:13 | 4 | Q.  Where do you work? |
| 04:34:14 | 5 | A.  For the Drug Enforcement Administration. |
| 04:34:15 | 6 | Q.  Can I call that DEA? |
| 04:34:17 | 7 | A.  Yes. |
| 04:34:17 | 8 | Q.  Where specifically, what location are you from? |
| 04:34:19 | 9 | A.  San Diego, California. |
| 04:34:21 | 10 | Q.  What's your position there? |
| 04:34:23 | 11 | A.  I'm a special agent. |
| 04:34:24 | 12 | Q.  How long have you worked as a special agent for the DEA? |
| 04:34:27 | 13 | A.  Approximately thirteen years. |
| 04:34:29 | 14 | Q.  What are your responsibilities as a DEA agent? |
| 04:34:32 | 15 | A.  To investigate narcotics violations. |
| 04:34:37 | 16 | Q.  In November 2008, what was your position within DEA? |
| 04:34:41 | 17 | A.  I was assigned to the Guadalajara, Mexico resident office |
| 04:34:46 | 18 | in Guadalajara, Mexico. |
| 04:34:49 | 19 | Q.  Are you familiar with an individual named Pete or Pedro |
| 04:34:52 | 20 | Flores? |
| 04:34:52 | 21 | A.  Yes. |
| 04:34:54 | 22 | MS. GUREN:  Your Honor, permission to publish |
| 04:34:57 | 23 | Government Exhibit Photo 1? |
| 04:34:58 | 24 | THE COURT:  That's fine. |
| 04:35:00 | 25 | BY MS. GUREN: |

| | |
|---|---|
| 04:35:01 | 1 |
| 04:35:07 | 2 |
| 04:35:10 | 3 |
| 04:35:10 | 4 |
| 04:35:11 | 5 |
| 04:35:15 | 6 |
| 04:35:21 | 7 |
| 04:35:23 | 8 |
| 04:35:25 | 9 |
| 04:35:25 | 10 |
| 04:35:30 | 11 |
| 04:35:32 | 12 |
| 04:35:34 | 13 |
| 04:35:36 | 14 |
| 04:35:38 | 15 |
| 04:35:39 | 16 |
| 04:35:40 | 17 |
| 04:35:41 | 18 |
| 04:35:45 | 19 |
| 04:35:48 | 20 |
| 04:35:48 | 21 |
| 04:35:54 | 22 |
| 04:35:57 | 23 |
| 04:36:01 | 24 |
| 04:36:01 | 25 |

Q.  Showing you Government Exhibit Photo 1 on the screen, do you recognize that photo?

A.  Yes.

Q.  Who is that?

A.  That's Margarito Flores.

Q.  And are Margarito -- who is Margarito Flores?

A.  The brother of Pedro Flores.

Q.  And are they twins?

A.  Yes.

MS. GUREN:  I wanted to show you two photos side by side.  Permission to publish Photo 2 as well?

THE COURT:  That's fine.

BY MS. GUREN:

Q.  Showing you Government Exhibit Photo 2, do you recognize that photo?

A.  Yes.

Q.  Who is that?

A.  That's Pedro Flores on the right.

Q.  Is that the new photo that I put up?

A.  Yes.

Q.  How often did you -- actually ...

Turning to the fall of 2008, what, if anything, was your role in the investigation involving Pete and Margarito Flores?

A.  I was a liaison between Pedro and Margarito and the

04:36:07  1   Chicago Field Division.

04:36:08  2   Q.  Were you -- were you given any instructions by the Chicago

04:36:14  3   Field Office for DEA regarding recording phone calls?

04:36:18  4   A.  Yes.

04:36:18  5   Q.  What were those instructions?

04:36:20  6   A.  That Pedro and Margarito would be making phone calls,

04:36:24  7   recording them, and turning them over to me, so I can forward

04:36:29  8   them to Chicago.

04:36:30  9   Q.  What, if anything, did you instruct Pedro Flores with

04:36:34  10  regard to a recording device?

04:36:36  11  A.  I instructed him to purchase a digital audio recording

04:36:42  12  device.

04:36:42  13  Q.  Did you purchase that device for him at all?

04:36:45  14  A.  No.

04:36:45  15  Q.  Turning your attention to on or about December 1st, 2008,

04:36:50  16  did you receive anything from Pedro Flores?

04:36:52  17  A.  Yes.

04:36:52  18  Q.  What was that?

04:36:53  19  A.  A digital audio recording device.

04:36:56  20  Q.  What, if anything, did you do with that digital audio

04:36:59  21  recording device?

04:37:00  22  A.  I downloaded its contents.

04:37:02  23  Q.  On to what?

04:37:03  24  A.  On to a CD-ROM disk.

04:37:06  25  Q.  Once you downloaded it on to a CD-ROM, what, if anything,

| | | |
|---|---|---|
| 04:37:10 | 1 | did you do with it? |
| 04:37:10 | 2 | A.  I forwarded it to Chicago. |
| 04:37:12 | 3 | Q.  How did you send it? |
| 04:37:14 | 4 | A.  Via FedEx. |
| 04:37:15 | 5 | Q.  Did you send it to anyone in particular? |
| 04:37:17 | 6 | A.  Yes. |
| 04:37:18 | 7 | Q.  Who was that? |
| 04:37:18 | 8 | A.  Special Agent Eric Durante. |
| 04:37:21 | 9 | Q.  When you received that recording device, what did it look |
| 04:37:25 | 10 | like to you in terms of describing it? |
| 04:37:27 | 11 | A.  I don't specifically remember the color, but it was a |
| 04:37:31 | 12 | small electronic digital recording device.  It's similar in |
| 04:37:35 | 13 | appearance to a small tape recorder. |
| 04:37:40 | 14 | MS. GUREN:  One moment, your Honor? |
| 04:37:42 | 15 | THE COURT:  Sure. |
| 04:37:44 | 16 | MS. GUREN:  Thank you.  No further questions. |
| 04:37:54 | 17 | THE COURT:  Okay.  Mr. Rubino? |
| 04:37:54 | 18 | - - - |
| 04:37:54 | 19 | JACOB GALVAN, CROSS-EXAMINATION |
| 04:37:54 | 20 | BY MR. RUBINO: |
| 04:38:01 | 21 | Q.  Good afternoon, sir. |
| 04:38:02 | 22 | A.  Good afternoon. |
| 04:38:07 | 23 | Q.  You were the liaison between Pedro and Margarito Flores |
| 04:38:14 | 24 | and the Chicago Field Office of the DEA, correct? |
| 04:38:18 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 04:38:19 | 1 | Q.  Now, at the time you were the liaison between them and the |
| 04:38:23 | 2 | field office, they were federal fugitives, were they not? |
| 04:38:29 | 3 | A.  I believe so. |
| 04:38:30 | 4 | Q.  The Flores brothers are United States citizens, are they |
| 04:38:34 | 5 | not? |
| 04:38:34 | 6 | A.  I believe so, yes. |
| 04:38:36 | 7 | Q.  And how long had you been their liaison? |
| 04:38:42 | 8 | A.  From what time to what time?  In what -- |
| 04:38:46 | 9 | Q.  That's what I'm asking you. |
| 04:38:47 | 10 | When did you start in this liaison role? |
| 04:38:50 | 11 | A.  Approximately a month to a month and a half before I sent |
| 04:38:55 | 12 | the recordings to Chicago.  So some time probably in October, |
| 04:39:00 | 13 | the earliest. |
| 04:39:03 | 14 | Q.  Now, and exactly what did you do -- define to me what you |
| 04:39:12 | 15 | mean by liaison.  I don't think I really understand the |
| 04:39:15 | 16 | meaning of that word. |
| 04:39:16 | 17 | A.  I would pass instructions from Chicago to them, pass their |
| 04:39:23 | 18 | responses from Pedro and Margarito to Chicago. |
| 04:39:29 | 19 | Q.  Did you actually meet with the Flores brothers in person |
| 04:39:34 | 20 | in Mexico? |
| 04:39:34 | 21 | A.  On some occasions. |
| 04:39:36 | 22 | Q.  On how many? |
| 04:39:38 | 23 | A.  I can't recall a specific number. |
| 04:39:40 | 24 | Q.  A guess? |
| 04:39:42 | 25 | A.  A handful, two, three. |

| | | |
|---|---|---|
| 04:39:52 | 1 | Q. Now, when you met with them, where would you meet with |
| 04:39:54 | 2 | them? |
| 04:39:54 | 3 | A. In various locations in the city. |
| 04:39:58 | 4 | Q. Did they ever come to the DEA office? |
| 04:40:01 | 5 | A. No. |
| 04:40:01 | 6 | Q. Did you ever go to their residence? |
| 04:40:03 | 7 | A. No. |
| 04:40:03 | 8 | Q. Did you ever go to their office? |
| 04:40:07 | 9 | A. No. |
| 04:40:07 | 10 | Q. If they had one. I don't know. I'm asking. |
| 04:40:09 | 11 | A. No. |
| 04:40:10 | 12 | Q. Okay. So what kind of places would you meet them in? |
| 04:40:15 | 13 | A. Public places. |
| 04:40:16 | 14 | Q. Well, give me a hint what a public place is. |
| 04:40:20 | 15 | Anything from a shopping center, restaurant, or bar, |
| 04:40:26 | 16 | or what? |
| 04:40:26 | 17 | A. A shopping center parking lot. |
| 04:40:27 | 18 | Q. Okay. And, obviously, you would arrange in advance this |
| 04:40:30 | 19 | meeting. It wasn't by happenstance or chance you met them, |
| 04:40:33 | 20 | was it? |
| 04:40:34 | 21 | A. Correct, it was arranged in advance. |
| 04:40:36 | 22 | Q. Okay. Now, you've got a meeting arranged in advance with |
| 04:40:42 | 23 | two United States federal fugitives, and you don't arrest |
| 04:40:46 | 24 | them. Why is that? |
| 04:40:49 | 25 | A. I didn't have any arrest authority in Mexico. |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 04:40:53 | 1 | Q. Let me ask you this: Does your agency cooperate with the |
| 04:40:59 | 2 | Mexican government? |
| 04:41:03 | 3 | A. To a certain degree on some occasions. |
| 04:41:06 | 4 | Q. Okay. You have heard of United States citizens being |
| 04:41:10 | 5 | arrested in foreign countries and extradited to the United |
| 04:41:13 | 6 | States? |
| 04:41:13 | 7 | MS. GUREN: Objection. |
| 04:41:14 | 8 | THE COURT: All right. I'm going to sustain that |
| 04:41:16 | 9 | regarding the legal analysis of what you know to be treaty |
| 04:41:22 | 10 | law, which we would have to have a little primer on if we |
| 04:41:26 | 11 | continued. Okay? |
| 04:41:27 | 12 | MR. RUBINO: Sure. |
| 04:41:27 | 13 | THE COURT: All right. |
| 04:41:28 | 14 | BY MR. RUBINO: |
| 04:41:29 | 15 | Q. Let me ask you this: Could you have asked the Mexican |
| 04:41:34 | 16 | authorities to accompany you to this meeting with the United |
| 04:41:39 | 17 | States fugitives and arrest them for you? |
| 04:41:41 | 18 | MS. GUREN: Same objection, your Honor. |
| 04:41:46 | 19 | THE COURT: Okay. Sustained. |
| 04:41:46 | 20 | BY MR. RUBINO: |
| 04:41:47 | 21 | Q. Have you ever arrested a U.S. fugitive or participated in |
| 04:41:51 | 22 | the arrest of a U.S. fugitive in Mexico? |
| 04:41:54 | 23 | MS. GUREN: Objection, your Honor. |
| 04:41:55 | 24 | THE COURT: Overruled. |
| 04:41:57 | 25 | THE WITNESS: Yes. |

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 04:41:58 | 1  | BY MR. RUBINO:                                              |
| 04:41:58 | 2  | Q.  You have done that?                                     |
| 04:41:59 | 3  | A.  Yes.                                                    |
| 04:42:00 | 4  | Q.  So it's been done before.                              |
| 04:42:01 | 5  |        This wouldn't be some brand new thing that's never  |
| 04:42:04 | 6  | been done, would it?                                       |
| 04:42:05 | 7  | A.  Arresting --                                            |
| 04:42:06 | 8  | Q.  Arresting a United States federal fugitive in Mexico.  |
| 04:42:10 | 9  | A.  Yes, it's been done before.                            |
| 04:42:11 | 10 | Q.  And it could have been done then, couldn't it?         |
| 04:42:13 | 11 |        MS. GUREN:  Objection, your Honor.                  |
| 04:42:15 | 12 |        THE COURT:  Sustained.                              |
| 04:42:16 | 13 | BY MR. RUBINO:                                              |
| 04:42:17 | 14 | Q.  Can you explain to me why it wasn't done then.         |
| 04:42:19 | 15 |        MS. GUREN:  Objection, your Honor.                  |
| 04:42:20 | 16 |        THE COURT:  Overruled.                              |
| 04:42:23 | 17 |        THE WITNESS:  No, I can't.                          |
| 04:42:24 | 18 | BY MR. RUBINO:                                              |
| 04:42:25 | 19 | Q.  You don't know why?                                     |
| 04:42:26 | 20 | A.  No, I don't know why.                                   |
| 04:42:30 | 21 | Q.  Now, you told -- which Flores did you tell to purchase the |
| 04:42:36 | 22 | digital recorder?                                           |
| 04:42:37 | 23 | A.  Pedro.                                                  |
| 04:42:41 | 24 | Q.  And do you know if he, in fact, did such?              |
| 04:42:48 | 25 | A.  I believe he did.                                       |

| 04:42:51 | 1 | Q. Because he turned over a digital recorder to you? |
| 04:42:54 | 2 | A. Correct. |
| 04:42:55 | 3 | Q. Now, do you know where he got this digital recorder? |
| 04:42:59 | 4 | A. No, I don't. |
| 04:43:03 | 5 | Q. Do you know if he used this digital recorder to record any |
| 04:43:08 | 6 | phone calls? |
| 04:43:11 | 7 | A. I assume he did, since he turned it over to me and I sent |
| 04:43:15 | 8 | it to Chicago. |
| 04:43:16 | 9 | Q. Okay. Do you know -- were you present when he made -- |
| 04:43:22 | 10 | when he used this digital recorder to record phone calls? |
| 04:43:26 | 11 | A. No. |
| 04:43:26 | 12 | Q. Actually, you don't even know if he recorded any calls. |
| 04:43:29 | 13 | Someone else could have, right? |
| 04:43:31 | 14 | A. I don't know what the contents of the recorder was, no. |
| 04:43:34 | 15 | Q. No. |
| 04:43:35 | 16 | And you didn't see it being done, did you? |
| 04:43:37 | 17 | A. No, I didn't see him making recorded calls. |
| 04:43:40 | 18 | Q. Right. |
| 04:43:40 | 19 | So we don't know as a fact whether he, in fact, made |
| 04:43:44 | 20 | them or someone else, do we? |
| 04:43:46 | 21 | A. Correct. |
| 04:43:48 | 22 | Q. Now, do you know if the recorder was working perfectly at |
| 04:43:53 | 23 | the time he made the calls? |
| 04:43:56 | 24 | A. No, I don't know anything as to the functionality of the |
| 04:44:00 | 25 | recorder. |

547

| | | |
|---|---|---|
| 04:44:01 | 1 | Q.  So it wasn't checked in advance to see if it was working |
| 04:44:04 | 2 | properly? |
| 04:44:05 | 3 | A.  Correct. |
| 04:44:05 | 4 | Q.  Do you know if it was turned off during any portions of |
| 04:44:08 | 5 | the calls? |
| 04:44:09 | 6 | A.  No, I don't know that. |
| 04:44:10 | 7 | Q.  Turned off, turned back on. |
| 04:44:12 | 8 | In other words, omitting certain things during the |
| 04:44:16 | 9 | calls? |
| 04:44:17 | 10 | A.  No, I don't know that. |
| 04:44:18 | 11 | Q.  Is there anything you know about those calls being made? |
| 04:44:24 | 12 | A.  Specifically about the calls being made? |
| 04:44:27 | 13 | Q.  Mm-hmm. |
| 04:44:29 | 14 | A.  No. |
| 04:44:30 | 15 | Q.  Would it be fair to say your entire knowledge is that this |
| 04:44:35 | 16 | federal fugitive met you, handed you a recorder, and you then |
| 04:44:39 | 17 | sent the recorder to somebody else? |
| 04:44:42 | 18 | A.  Yes. |
| 04:44:44 | 19 | Q.  Did you listen to the calls? |
| 04:44:46 | 20 | A.  No. |
| 04:44:50 | 21 | Q.  You don't know who placed the call, you don't know what |
| 04:44:53 | 22 | was said, and you don't know who received the call; am I |
| 04:44:57 | 23 | correct? |
| 04:44:57 | 24 | A.  No, I don't know the contents of the recording. |
| 04:44:59 | 25 | Q.  And you have no idea under what circumstance the calls |

| | | |
|---|---|---|
| 04:45:02 | 1 | were, in fact, made? |
| 04:45:04 | 2 | A.  No. |
| 04:45:05 | 3 | Q.  Okay.  During the period that you were the liaison between |
| 04:45:10 | 4 | two federal fugitives and your Chicago office, did you have |
| 04:45:16 | 5 | any discussions with these federal fugitives about stopping |
| 04:45:20 | 6 | their drug dealing in America? |
| 04:45:24 | 7 | MS. GUREN:  Objection, hearsay. |
| 04:45:26 | 8 | THE COURT:  Sustained. |
| 04:45:28 | 9 | BY MR. RUBINO: |
| 04:45:29 | 10 | Q.  Were they -- was any request made of them to stop their |
| 04:45:33 | 11 | drug dealing in America? |
| 04:45:35 | 12 | MS. GUREN:  Objection, foundation. |
| 04:45:36 | 13 | THE COURT:  Okay.  It's sustained for the same |
| 04:45:39 | 14 | reason.  It still calls for a hearsay answer, so it's |
| 04:45:44 | 15 | sustained on hearsay, even what he said to them.  Out of the |
| 04:45:48 | 16 | court statement offered for the truth of the matter asserted. |
| 04:45:51 | 17 | Just because he's here, doesn't mean he can say it. |
| 04:45:55 | 18 | Sustained. |
| 04:45:58 | 19 | BY MR. RUBINO: |
| 04:45:59 | 20 | Q.  Do you know if the two brothers continued drug dealing |
| 04:46:06 | 21 | during the period you were their liaison? |
| 04:46:10 | 22 | A.  No, I don't know that. |
| 04:46:12 | 23 | Q.  Do you know if -- during that period if they voluntarily |
| 04:46:17 | 24 | turned over their stash houses full of drugs and money? |
| 04:46:20 | 25 | A.  No, I don't know that. |

| | | |
|---|---|---|
| 04:46:22 | 1 | Q.  Is it standard policy of the DEA to negotiate with |
| 04:46:29 | 2 | fugitives? |
| 04:46:30 | 3 | MS. GUREN:  Objection, your Honor. |
| 04:46:32 | 4 | THE COURT:  I'm going to sustain that.  You can ask a |
| 04:46:37 | 5 | more narrow question, if you can, but we're not going to get |
| 04:46:41 | 6 | into the DEA policy -- |
| 04:46:42 | 7 | MR. RUBINO:  Okay. |
| 04:46:43 | 8 | THE COURT:  -- of negotiations. |
| 04:46:44 | 9 | MR. RUBINO:  Yes, your Honor. |
| 04:46:46 | 10 | BY MR. RUBINO: |
| 04:46:47 | 11 | Q.  Have you ever negotiated with federal fugitives in the |
| 04:46:50 | 12 | past? |
| 04:46:51 | 13 | A.  Me personally, no. |
| 04:46:53 | 14 | Q.  Have you ever been assigned as a liaison to a federal |
| 04:46:57 | 15 | fugitive? |
| 04:47:01 | 16 | A.  Yes. |
| 04:47:02 | 17 | MR. RUBINO:  You have. |
| 04:47:05 | 18 | And in this case -- no.  I'm finished.  Thank you |
| 04:47:13 | 19 | very much. |
| 04:47:14 | 20 | THE COURT:  Okay.  Any redirect? |
| 04:47:20 | 21 | MS. GUREN:  No redirect, your Honor. |
| 04:47:22 | 22 | THE COURT:  Okay.  You may step down. |
| 04:47:22 | 23 | (Witness leaves the stand.) |
| 04:47:25 | 24 | THE COURT:  And you can call your next witness. |
| 04:47:26 | 25 | MS. RODNEY:  Your Honor, the Government calls Special |

550

| | | |
|---|---|---|
| 04:47:29 | 1 | Agent Eric Durante. |
| 04:47:31 | 2 | THE COURT:  Okay. |
| 04:47:48 | 3 | (Witness takes the stand.) |
| 04:47:52 | 4 | THE COURT:  Raise your right hand. |
| 04:47:54 | 5 | (The witness was sworn.) |
| 04:47:57 | 6 | THE COURT:  All right.  Have a seat. |
| 04:47:59 | 7 | And you may begin when you are ready, Mr. Rubino. |
| 04:47:59 | 8 | - - - |
| 04:47:59 | 9 | ERIC DURANTE, DIRECT EXAMINATION |
| 04:47:59 | 10 | BY MS. RODNEY: |
| 04:48:05 | 11 | Q.  Agent, will you please state and spell your name for the |
| 04:48:08 | 12 | record? |
| 04:48:08 | 13 | A.  Eric Durante, D-u-r-a-n-t-e. |
| 04:48:12 | 14 | Q.  And where are you currently employed? |
| 04:48:14 | 15 | A.  Nassau Country Office, DEA. |
| 04:48:17 | 16 | Q.  And what is your title with the DEA? |
| 04:48:19 | 17 | A.  Special Agent. |
| 04:48:22 | 18 | Q.  Just to clarify, where is the Nassau Country Office? |
| 04:48:26 | 19 | A.  In the Bahamas. |
| 04:48:28 | 20 | Q.  And how long have you been assigned to that location? |
| 04:48:31 | 21 | A.  Approximately one year. |
| 04:48:33 | 22 | Q.  And how long have you been employed as a special agent? |
| 04:48:36 | 23 | A.  Approximately seven and a half years. |
| 04:48:39 | 24 | Q.  Now, prior to being assigned to the Nassau Country Office, |
| 04:48:43 | 25 | where were you stationed? |

04:48:44  1    A.  Chicago Field Division.

04:48:46  2    Q.  And how long did you work in the Chicago office?

04:48:48  3    A.  Approximately six and a half years.

04:48:50  4    Q.  And during what years did you work as a special agent in

04:48:53  5    the Chicago Field Division?

04:48:54  6    A.  From 2004 through 2010.

04:48:58  7    Q.  Prior to becoming a special agent, did you work in law

04:49:02  8    enforcement elsewhere?

04:49:02  9    A.  Yes, I did, in the State of Arizona.

04:49:05  10   Q.  And what did you do there?

04:49:06  11   A.  I was a police officer for the State of Arizona for

04:49:09  12   approximately six years.

04:49:12  13   Q.  Now, returning to your current assignment as a special

04:49:13  14   agent, did you receive any training prior to becoming a

04:49:17  15   special agent?

04:49:17  16   A.  Yes, I did.

04:49:18  17   Q.  Can you describe that training?

04:49:20  18   A.  It was approximately five months in the -- Quantico,

04:49:23  19   Virginia.  At that time we were taught how to run criminal

04:49:25  20   investigations, include gathering of evidence, interviewing

04:49:29  21   subjects, making arrests, analyzing toll analysis, driving,

04:49:35  22   among other things.

04:49:38  23   Q.  And what do your responsibilities include as a special

04:49:41  24   agent?

04:49:41  25   A.  To run criminal investigations, mainly enforce federal

04:49:46  1  drug laws, Title 21, to include the same things, gathering
04:49:50  2  evidence, making arrests, interviewing subjects, controlling
04:49:54  3  confidential sources, confidential defendants -- cooperating
04:49:58  4  defendants.
04:49:58  5  Q.  Agent Durante, I'd like to direct your attention to the
04:50:01  6  time period of November of 2008.  Were you working as a
04:50:07  7  special agent in DEA Chicago Field Division then?
04:50:09  8  A.  Yes, I was.
04:50:11  9  Q.  Now, during that same period were you involved in the
04:50:14  10  Chicago DEA's investigation of Ron Collins?
04:50:16  11  A.  Yes, I was.
04:50:18  12  Q.  As part of the investigation did you speak to Ron Collins?
04:50:21  13  A.  Yes, I did.
04:50:22  14  Q.  When did you speak to him?
04:50:24  15  A.  In August of 2009.
04:50:26  16  Q.  Did you speak to Ron Collins in person?
04:50:28  17  A.  Yes, I did.
04:50:29  18  Q.  Approximately how long did you speak with him?
04:50:32  19  A.  It was about 45 minutes or so, approximately.
04:50:36  20  Q.  During that August 2009 conversation with Mr. Collins, did
04:50:40  21  you become familiar with his voice?
04:50:43  22  A.  Yes, I did.
04:50:44  23  Q.  Looking around the courtroom, do you see the person you
04:50:46  24  spoke to in August 2009?
04:50:48  25  A.  Yes, I do.

553

04:50:49  1   Q.  Can you please point that person out and identify him by a

04:50:52  2   piece of clothing?

04:50:53  3   A.  He's sitting next to the defense counsel in a blue suit,

04:50:57  4   white shirt.

04:50:58  5           MS. RODNEY:  Your Honor, may the record reflect that

04:51:00  6   the witness has identified the defendant?

04:51:02  7           THE COURT:  It will.

04:51:03  8   BY MS. RODNEY:

04:51:03  9   Q.  Now, Agent Durante, directing your attention back to

04:51:06  10  November of 2008, can you describe your role in the

04:51:11  11  investigation at that time?

04:51:11  12  A.  I was the lead case agent.  I was handling cooperating

04:51:15  13  defendants, among other things.

04:51:18  14  Q.  And where was the cooperator located that you were

04:51:21  15  handling?

04:51:22  16  A.  In Mexico.

04:51:23  17  Q.  Did you meet that cooperator in person?

04:51:26  18  A.  Yes, I did.

04:51:27  19  Q.  Approximately when did you meet the cooperator?

04:51:29  20  A.  In November of 2008.

04:51:35  21  Q.  Now, prior to meeting him in person, did you talk to the

04:51:38  22  cooperator by phone?

04:51:39  23  A.  Yes, yes, I did.

04:51:40  24  Q.  Approximately how many times?

04:51:44  25  A.  It was sporadic from August 'til November, when I met him

04:51:49  1   in person.

04:51:50  2        MS. RODNEY:  Your Honor, may I publish Government

04:51:53  3   Exhibit Photo 1?

04:51:53  4        THE COURT:  You may.

04:52:05  5   BY MS. RODNEY:

04:52:05  6   Q.  Agent Durante, directing your attention to Government

04:52:08  7   Exhibit Photo 1, do you recognize the individual depicted in

04:52:11  8   that exhibit?

04:52:12  9   A.  Yes, I do.

04:52:13  10  Q.  Who is it?

04:52:14  11  A.  It's Peter Flores.

04:52:15  12  Q.  Is this the cooperator that you were -- that you met in

04:52:18  13  November of 2008 in Mexico?

04:52:20  14  A.  Yes, it is.

04:52:21  15  Q.  And during your meeting with Peter Flores -- in your prior

04:52:24  16  phone conversations with him, did you become familiar with his

04:52:27  17  voice?

04:52:28  18  A.  Yes, I did.

04:52:29  19  Q.  In November of 2008 how was Peter Flores working with law

04:52:33  20  enforcement?

04:52:33  21  A.  He was providing us with information about drug suppliers

04:52:37  22  and customers and was recording telephone conversations with

04:52:41  23  drug suppliers and drug customers.

04:52:43  24  Q.  And who instructed Peter Flores to make those recordings?

04:52:47  25  A.  I did.

| | | |
|---|---|---|
| 04:52:48 | 1 | Q. Approximately when did you give him these instructions? |
| 04:52:50 | 2 | A. I first told him back in August, but I -- when I met him |
| 04:52:54 | 3 | in person, I told him again. |
| 04:52:55 | 4 | Q. So again in November 2008? |
| 04:52:58 | 5 | A. Correct. |
| 04:52:58 | 6 | Q. And what were those instructions? |
| 04:53:01 | 7 | A. When he can do so in a safe manner, to record phone |
| 04:53:05 | 8 | conversations with his drug suppliers and drug customers, so |
| 04:53:08 | 9 | we can use it for evidence. |
| 04:53:10 | 10 | Q. And when you say, Do so in a safe manner, what do you mean |
| 04:53:13 | 11 | by that? |
| 04:53:14 | 12 | A. Because where he was in Mexico, he couldn't be seen with a |
| 04:53:19 | 13 | recorder. And his drug suppliers would come over to his house |
| 04:53:24 | 14 | unannounced, so any time that he had a chance to record and he |
| 04:53:30 | 15 | felt it was safe -- a safe time to do it, I told him to do so. |
| 04:53:33 | 16 | Q. Were you when -- were you present when Peter made these |
| 04:53:38 | 17 | recordings? |
| 04:53:38 | 18 | A. No, I was not. |
| 04:53:40 | 19 | Q. Why weren't you present when Peter Flores made these |
| 04:53:42 | 20 | recordings? |
| 04:53:43 | 21 | A. Because agents with him in Mexico would have been |
| 04:53:45 | 22 | identified by his drug suppliers, and it would cause a safety |
| 04:53:48 | 23 | issue to his -- for his safety. |
| 04:53:50 | 24 | Q. Why couldn't you participate in the recording by phone? |
| 04:53:53 | 25 | A. Because we -- we had certain phones that we used to |

| | | |
|---|---|---|
| 04:53:57 | 1 | communicate. And at times down in Mexico you're not sure |
| 04:54:01 | 2 | who's listening to what phone, so we did not want to have him |
| 04:54:04 | 3 | call an agent before he called any drug supplier or customers |
| 04:54:08 | 4 | to make recorded calls. It's, again, another safety issue. |
| 04:54:19 | 5 | Q. Did Peter Flores make recorded calls after you gave him |
| 04:54:23 | 6 | those instructions? |
| 04:54:24 | 7 | A. Yes, he did. |
| 04:54:25 | 8 | Q. And what did you do with the recordings after he made |
| 04:54:27 | 9 | them? |
| 04:54:28 | 10 | A. After he made them, he later turned them over to an agent |
| 04:54:32 | 11 | down in Mexico. |
| 04:54:33 | 12 | MR. RUBINO: Objection, hearsay. |
| 04:54:34 | 13 | MS. RODNEY: We're talking about -- |
| 04:54:34 | 14 | THE COURT: Okay. Wait. |
| 04:54:35 | 15 | Sustained. It's not hearsay. It's speculation. |
| 04:54:38 | 16 | Sustained. |
| 04:54:39 | 17 | BY MS. RODNEY: |
| 04:54:40 | 18 | Q. Just to back up, how did -- how do you know what Peter |
| 04:54:43 | 19 | Flores did with the recordings? |
| 04:54:45 | 20 | A. I directed Peter Flores to turn over his recordings to an |
| 04:54:48 | 21 | agent in Mexico, after -- when he could do so in a safe |
| 04:54:52 | 22 | manner. |
| 04:54:54 | 23 | Q. Did you ultimately receive those recordings? |
| 04:54:57 | 24 | A. Yes, I did. |
| 04:54:58 | 25 | Q. How did you receive the recordings? |

| | | |
|---|---|---|
| 04:55:00 | 1 | A. By FedEx. |
| 04:55:01 | 2 | Q. And where were you when you received them? |
| 04:55:04 | 3 | A. Chicago. |
| 04:55:05 | 4 | Q. Who sent the recordings to you? |
| 04:55:07 | 5 | A. Special Agent Jake Galvan. |
| 04:55:11 | 6 | Q. What form were the recordings in when you received them? |
| 04:55:14 | 7 | A. They were downloaded on to CD. |
| 04:55:17 | 8 | Q. What did you do with the recordings when you received |
| 04:55:19 | 9 | them? |
| 04:55:19 | 10 | A. When I opened the package, I labeled the CD and made a |
| 04:55:23 | 11 | copy of it and downloaded the original CD into evidence. |
| 04:55:27 | 12 | Q. And was it just one CD that you received? |
| 04:55:30 | 13 | A. At that time, yes. |
| 04:55:37 | 14 | Q. Agent, I'm going to hand you a stack of exhibits. We'll |
| 04:55:41 | 15 | go through them one at a time. |
| 04:55:56 | 16 | Agent, if you could direct your attention to the |
| 04:55:59 | 17 | exhibit marked Government Exhibit Recordings 1, do you have |
| 04:56:01 | 18 | that in front of you? |
| 04:56:03 | 19 | A. Yes, I do. |
| 04:56:04 | 20 | Q. And do you recognize this exhibit? |
| 04:56:07 | 21 | A. Yes, I do. |
| 04:56:08 | 22 | Q. And what is it? |
| 04:56:09 | 23 | A. This is a CD containing the recorded phone conversations |
| 04:56:13 | 24 | made by Peter Flores at my direction. |
| 04:56:16 | 25 | Q. And how do you recognize these exhibits? |

| | | |
|---|---|---|
| 04:56:20 | 1 | A.  The markings on the label and the markings on the CD are |
| 04:56:24 | 2 | my handwriting. |
| 04:56:30 | 3 | Q.  And when did you receive the exhibit? |
| 04:56:33 | 4 | A.  In December of 2008. |
| 04:56:35 | 5 | Q.  When in December 2008? |
| 04:56:37 | 6 | A.  December 10th, 2008. |
| 04:56:41 | 7 | Q.  Did you listen to the recordings on Government Exhibit |
| 04:56:45 | 8 | Recordings 1? |
| 04:56:46 | 9 | A.  Yes, I did. |
| 04:56:49 | 10 | Q.  And when did you listen to those recordings? |
| 04:56:52 | 11 | A.  I listened to it the day I received it and numerous times |
| 04:56:56 | 12 | thereafter. |
| 04:56:57 | 13 | Q.  And if you could put that exhibit to the side, can I |
| 04:57:00 | 14 | direct your attention to the photos marked Government |
| 04:57:02 | 15 | Exhibit 1A, 1B, and 1C?  Do you have those photos in front of |
| 04:57:10 | 16 | you? |
| 04:57:11 | 17 | A.  Yes, I do. |
| 04:57:13 | 18 | Q.  Can you tell the contents of those exhibit photos? |
| 04:57:13 | 19 | A.  (No response.) |
| 04:57:32 | 20 | Q.  And do you recognize Government Exhibit 1A, 1B, and 1C? |
| 04:57:37 | 21 | A.  Yes, I do. |
| 04:57:38 | 22 | Q.  And what are those three exhibits? |
| 04:57:41 | 23 | A.  All three of them, 1A, 1B, and 1C, are CDs containing |
| 04:57:46 | 24 | recorded conversations from Peter Flores that were originally |
| 04:57:50 | 25 | contained on Government Exhibit Recording 1. |

| | | |
|---|---|---|
| 04:57:53 | 1 | Q. And how do you recognize Government Exhibit 1A, 1B, and |
| 04:57:57 | 2 | 1C? |
| 04:57:58 | 3 | A. By my initials. |
| 04:58:00 | 4 | Q. Prior to your testimony today, did you listen to the |
| 04:58:03 | 5 | recordings on Government Exhibit 1A, 1B, and 1C? |
| 04:58:07 | 6 | A. Yes, I did. |
| 04:58:09 | 7 | Q. And when you listened to those exhibits, did you hear |
| 04:58:11 | 8 | voices on them? |
| 04:58:12 | 9 | A. Yes, I did. |
| 04:58:13 | 10 | Q. Did you recognize any of the voices? |
| 04:58:15 | 11 | A. Yes, I do. |
| 04:58:16 | 12 | Q. Whose voices did you recognize? |
| 04:58:18 | 13 | A. Peter Flores and Ronald Collins. |
| 04:58:23 | 14 | Q. On which exhibits did you recognize those voices? |
| 04:58:25 | 15 | A. On all three, 1A, 1B, and 1C. |
| 04:58:31 | 16 | Q. How did you recognize Peter Flores' voice? |
| 04:58:33 | 17 | A. From meeting with him in person numerous times and talking |
| 04:58:39 | 18 | to him over the phone. |
| 04:58:40 | 19 | Q. And how did you recognize defendant Ron Collins'? |
| 04:58:44 | 20 | A. From after I met with him in person and voice comparing. |
| 04:58:49 | 21 | Q. So prior to speaking to the defendant in 2009, did you |
| 04:58:49 | 22 | have other information about the identity of the speakers on |
| 04:58:51 | 23 | Government Exhibit 1A, 1B, and 1C? |
| 04:58:54 | 24 | A. Yes, I did. |
| 04:58:55 | 25 | Q. And from whom did you receive that information? |

| | |
|---|---|
| 04:58:57 | 1 |
| 04:58:59 | 2 |
| 04:59:04 | 3 |
| 04:59:07 | 4 |
| 04:59:10 | 5 |
| 04:59:11 | 6 |
| 04:59:15 | 7 |
| 04:59:19 | 8 |
| 04:59:23 | 9 |
| 04:59:27 | 10 |
| 04:59:29 | 11 |
| 04:59:31 | 12 |
| 04:59:34 | 13 |
| 04:59:36 | 14 |
| 04:59:40 | 15 |
| 04:59:44 | 16 |
| 04:59:47 | 17 |
| 04:59:50 | 18 |
| 04:59:51 | 19 |
| 04:59:51 | 20 |
| 04:59:53 | 21 |
| 04:59:55 | 22 |
| 04:59:58 | 23 |
| 05:00:03 | 24 |
| 05:00:04 | 25 |

A.  Peter Flores.

Q.  Now, does Government Exhibit 1A, 1B, and 1C contain a true and accurate copy of the three recorded phone conversations that originated on Government Exhibit Recordings 1?

A.  Yes, they do.

Q.  Do each of the recordings on Government Exhibit 1A, 1B, and 1C accurately reproduce both the words spoken and the sounds of the speakers' voices as those words were spoken and as those sounds occurred in the original conversation reproduced in each of these recordings?

        MR. RUBINO:  Objection, that will be out of the scope of his knowledge.  He was not there when it was made.

        THE COURT:  I don't believe that that's what the foundational question was, but, rather, whether the recordings that he transferred on the disk sounded the same, the same words that came from the tape recording to the disk.  Isn't that where we're at, Mr. Rubino, that's what you're moving in at this moment?

        MS. RODNEY:  Yes.

        THE COURT:  So that's overruled.

        But do you want to place an objection for the record?

        MR. RUBINO:  He's never listened to the tape recording -- to the recorder, better phrased -- the recorder was downloaded --

        THE COURT:  Understood.  Understood.  Got it.  But

05:00:06  1    the objection's overruled, based upon the foundation she laid.

05:00:11  2         THE WITNESS:  Yes, they are.

05:00:13  3    BY MS. RODNEY:

05:00:14  4    Q.  When you listened to the calls and copied them, did you

05:00:17  5    determine when they were made?

05:00:19  6    A.  Yes, they were time stamped on the CD from the digital

05:00:24  7    recorder.

05:00:24  8    Q.  And when were those calls made --

05:00:26  9         MR. RUBINO:  Objection.

05:00:28  10   BY MS. RODNEY:

05:00:28  11   Q.  -- recordings made?

05:00:29  12        MR. RUBINO:  He doesn't have the foundation --

05:00:31  13        THE COURT:  All right.  Objection, foundation --

05:00:33  14        MR. RUBINO:  Thank you.

05:00:34  15        THE COURT:  -- is sustained.  You may lay the

05:00:36  16   foundation.

05:00:37  17   BY MS. RODNEY:

05:00:38  18   Q.  Backing up to when you first received Government Exhibit

05:00:41  19   Recordings 1, you testified that you listened to those

05:00:44  20   recordings when you received it?

05:00:45  21   A.  Yes, I did.

05:00:46  22   Q.  You also made a copy of the recordings?

05:00:48  23   A.  Yes, I did.

05:00:49  24   Q.  When you made the copies of the recordings, were you able

05:00:52  25   to determine when the calls occurred?

| | |
|---|---|
| 05:00:54 | 1 |
| 05:00:55 | 2 |
| 05:00:56 | 3 |
| 05:01:00 | 4 |
| 05:01:04 | 5 |
| 05:01:08 | 6 |
| 05:01:11 | 7 |
| 05:01:13 | 8 |
| 05:01:15 | 9 |
| 05:01:18 | 10 |
| 05:01:20 | 11 |
| 05:01:23 | 12 |
| 05:01:26 | 13 |
| 05:01:30 | 14 |
| 05:01:34 | 15 |
| 05:01:39 | 16 |
| 05:01:46 | 17 |
| 05:02:01 | 18 |
| 05:02:17 | 19 |
| 05:02:19 | 20 |
| 05:02:22 | 21 |
| 05:02:22 | 22 |
| 05:02:23 | 23 |
| 05:02:25 | 24 |
| 05:02:26 | 25 |

A.  Yes, I was.

Q.  How did you do that?

A.  Because on the CD itself -- they were downloaded from a digital recorder onto the CD.  And when the download has the track, it also has a time stamp for the day and the time that they were made, based off what the digital recorder was set to, which was set to the correct day and time.

Q.  So from that information --

MR. RUBINO:  Objection.  He wouldn't know if it was set to the correct time or not.

THE COURT:  Okay.  Here you go, folks.  It is late in the day, and I will deal with them for a few minutes, and you may go home, okay, so have a nice evening.  Be safe and remember my rule.  No internet use, no discussion with each other, no discussion at home, no blogging, no Twittering, no Tweeting, no Facebooking, no Wikipediaing, no Googling.

Okay.  Have a nice night.

(The jury leaves the courtroom.)

THE COURT:  All right.  Please be seated.  You can step down, sir, and go out of the courtroom if you would, please.

THE WITNESS:  Okay.

(Witness leaves the stand.)

(Exit witness.)

THE COURT:  All right.  So, Mr. Rubino, the

05:02:28  1  foundation that she laid wasn't that he heard the original

05:02:31  2  conversation, but, rather, that he listened to the

05:02:33  3  recording --

05:02:34  4          MR. RUBINO:  Understand.

05:02:35  5          THE COURT:  -- and then he put the recording that he

05:02:36  6  got off the tape onto this.  So that's why I overruled the

05:02:40  7  objection.

05:02:40  8          MR. RUBINO:  The pending question -- the question was

05:02:43  9  about the date they were made.

05:02:45  10         THE COURT:  Oh, I'm just going back to the previous

05:02:48  11 objection, first, to make the record.

05:02:49  12         MR. RUBINO:  I understand.

05:02:50  13         THE COURT:  Okay.  And now this one is the date that

05:02:53  14 he made this recording.

05:02:55  15         MR. RUBINO:  The date someone made it.

05:02:56  16         THE COURT:  No, this one where he transferred.

05:02:59  17         MR. RUBINO:  The question is the date the

05:03:02  18 conversations were made.

05:03:03  19         THE COURT:  Okay.

05:03:04  20         MR. RUBINO:  And he is basing that upon a time stamp

05:03:08  21 that the recorder put on it.

05:03:11  22         THE COURT:  Right.

05:03:12  23         MR. RUBINO:  And he said -- and I might even have to

05:03:16  24 ask the court reporter to read it back -- but he said to the

05:03:19  25 effect of, Assuming that that was done correctly.  And what

05:03:22    1    he's talking about, your Honor, is just like one can take --

05:03:24    2         THE COURT: Oh, I understand. You don't need to

05:03:26    3    explain to me.

05:03:27    4         MR. RUBINO: You can date a camera, you can put the

05:03:28    5    wrong date on it, all the photos have the wrong date. It

05:03:31    6    doesn't mean they were taken the date is stamped on the photo.

05:03:35    7         THE COURT: Right. Okay.

05:03:59    8         (Record read.)

05:03:59    9         THE COURT: Your objection goes to the weight and not

05:04:02    10    to the admissibility of this. This is cross-examine [sic]

05:04:06    11    material. All of what you just said, that it may not be the

05:04:09    12    same, that it can be changed, that it can be altered. But it

05:04:14    13    doesn't change his answer that that's his belief that that's

05:04:17    14    why it was made at that time. So he may testify to it, and

05:04:22    15    then you have all of that fair, effective cross that I know

05:04:24    16    you'll give us tomorrow.

05:04:24    17         Okay. Anything we need to raise before the day is

05:04:28    18    over?

05:04:28    19         MS. GUREN: Just briefly. For -- are you still

05:04:31    20    deciding whether or not to have court on Friday?

05:04:33    21         THE COURT: Yes. I need to know where we're going as

05:04:36    22    far as how far along we've gotten.

05:04:38    23         MS. GUREN: We are going very fast.

05:04:39    24         THE COURT: That's what I figured.

05:04:41    25         MS. GUREN: Yes, which is great. I think that it is

05:04:43  1   possible that if we had court on Friday, the Government may

05:04:46  2   rest on Friday, if we go super fast, but almost positively by

05:04:52  3   Monday.  I think it's possible if we didn't have court on

05:04:54  4   Friday that we would rest Monday and maybe early in the

05:04:57  5   morning on Tuesday.  We are flying.

05:04:59  6            THE COURT:  Okay.  I'll let you know in the morning.

05:05:01  7   I assumed that you would go faster than you thought.

05:05:04  8            The other thing is Mr. Rubino said to me earlier in

05:05:08  9   the day, I invoke the rule, and I did not know what he was

05:05:11 10   saying.  I asked him in the hallway if it was a Florida thing.

05:05:15 11   What he said is invoking the rule about no witnesses in the

05:05:18 12   courtroom.  I don't know if a witness came in --

05:05:20 13            MR. RUBINO:  I haven't seen or suspect any, no.

05:05:22 14            THE COURT:  Fair enough.  But we do --

05:05:23 15            MR. RUBINO:  I always do that in every trial.

05:05:25 16            THE COURT:  Fair enough.  We do have the exclusion of

05:05:27 17   witnesses, and it's up to the two -- or three of you, rather,

05:05:30 18   to let me know if you see one walk in that I am not familiar

05:05:33 19   with, since we have an effectively open courtroom and people

05:05:37 20   come and go.  Okay.

05:05:38 21            MS. GUREN:  And the only two people we have had are

05:05:40 22   Case Agent Pat Bagley and Case Agent --

05:05:42 23            THE COURT:  No, he wasn't saying that --

05:05:44 24            MR. RUBINO:  I didn't claim.

05:05:45 25            THE COURT:  He just invoked a rule that I didn't know

| | | |
|---|---|---|
| 05:05:48 | 1 | what he was invoking, but now I do. |
| 05:05:50 | 2 | Okay. Anything else from anyone else? Yes, sir. |
| 05:05:53 | 3 | MR. RUBINO: Yes. Your Honor, just to save time and |
| 05:05:55 | 4 | not waste the jury's time, not that I mean to waste yours. |
| 05:05:57 | 5 | THE COURT: That's fine. |
| 05:05:57 | 6 | MR. RUBINO: The Government is any minute going to |
| 05:05:59 | 7 | attempt to put these three recordings in. |
| 05:06:02 | 8 | THE COURT: Right. |
| 05:06:02 | 9 | MR. RUBINO: Of course, I'm going to object. |
| 05:06:04 | 10 | THE COURT: I know. |
| 05:06:04 | 11 | MR. RUBINO: Can I put -- I'm trying to save the |
| 05:06:06 | 12 | lengthy objection to put on the record now. |
| 05:06:08 | 13 | THE COURT: You should put it on the record. First |
| 05:06:11 | 14 | of all, we -- |
| 05:06:11 | 15 | MR. RUBINO: Do you prefer we do it now? |
| 05:06:11 | 16 | THE COURT: You may do it now. |
| 05:06:11 | 17 | MR. RUBINO: Thank you. |
| 05:06:12 | 18 | THE COURT: And we had at the final pretrial |
| 05:06:15 | 19 | conference a discussion regarding this and your motion |
| 05:06:17 | 20 | before -- |
| 05:06:18 | 21 | MR. RUBINO: Exactly. |
| 05:06:18 | 22 | THE COURT: -- and my ruling remains the same that it |
| 05:06:21 | 23 | goes to weight. So go ahead and make it now. |
| 05:06:22 | 24 | MR. RUBINO: I object to all the reasons stated in |
| 05:06:24 | 25 | writing, all the reasons previously argued, plus all the |

05:06:27  1  reasons made today. Therefore, when they do, if I can just

05:06:31  2  say, I have an objection, or whatever words you'd like me to

05:06:34  3  use --

05:06:34  4          THE COURT:  That's fine.

05:06:34  5          MR. RUBINO:  -- we can just move right along.

05:06:36  6          THE COURT:  Okay.  Very well.

05:06:37  7          All right.  Anything else from anyone tonight?

05:06:40  8          MR. RUBINO:  No.

05:06:40  9          THE COURT:  All right.  Have a nice evening, folks.

05:06:43  10          MS. GUREN:  Thank you.

05:06:45  11          MS. RODNEY:  Thank you, your Honor.

05:06:47  12          (Adjourned at 5:06 p.m.)

13                              - - -

14

15

16

17               C E R T I F I C A T E

18

19     I certify that the foregoing is a correct transcript from

20     the record of proceedings in the above-entitled matter.

21

22     /s/April M. Metzler, RPR, CRR, FCRR   June 1, 2011

23     April M. Metzler, RPR, CRR, FCRR       Date

24     Official Federal Court Reporter

25