09:53:00

```
 1
 2
 3
 4                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 5                          EASTERN DIVISION
 6
 7   UNITED STATES OF AMERICA,        Case No. 1:09-cr-00673
 8     Plaintiff,                     Chicago, Illinois
                                      June 2, 2011
 9          v.                        Trial
                                      9:45 A.M. SESSION
10
     RON COLLINS,
11
       Defendant.
12   ------------------------------
13
14                          VOLUME 3-A
                        TRANSCRIPT OF TRIAL
15          BEFORE THE HONORABLE VIRGINIA M. KENDALL
            UNITED STATES DISTRICT JUDGE, AND A JURY
16
17
18   APPEARANCES:
19
20
     For the Government:   Office of the U.S. Attorney
21                         By:  Halley B. Guren, and
                                Renai S. Rodney
22                         219 S. Dearborn St., 5th Fl.
                           Chicago, IL 60604
23                         (312) 353-5300
24
25
```

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

1

2

3   <u>APPEARANCES (Cont'd)</u>:

4

5

    For the Defendant:       Frank A. Rubino
6                            1001 Brickell Bay Dr., Ste. 2206
                             Miami, FL 33131
7                            (305) 858-5300

8

9

10  <u>COURT REPORTER</u>:          FEDERAL OFFICIAL COURT REPORTER
                             April M. Metzler, RPR, CRR, FCRR
11                           219 South Dearborn St., Rm. 2318-A
                             Chicago, IL 60604
12                           (312) 408-5154
                             April_Metzler@ilnd.uscourts.gov
13

14

15

16

17

18

19

20

21

22

23

24
    **Proceedings recorded by mechanical stenography; transcript**
25  **produced by notereading.**

<u>**I N D E X**</u>

<u>DESCRIPTION</u>                                                    <u>PAGE</u>


ERIC DURANTE, DIRECT EXAMINATION (Continued)          575
BY MS. RODNEY


ERIC DURANTE, CROSS-EXAMINATION                       587
BY MR. RUBINO


ERIC DURANTE, REDIRECT EXAMINATION                    603
BY MS. RODNEY


PATRICK BAGLEY, DIRECT EXAMINATION                    609
BY MS. GUREN


PATRICK BAGLEY, CROSS-EXAMINATION                     617
BY MR. RUBINO


PATRICK BAGLEY, REDIRECT EXAMINATION                  619
BY MS. GUREN


JORGE LLAMAS, DIRECT EXAMINATION                      620
BY MS. GUREN

|     |     |
| --- | --- |
|     | 1   (Resumed at 9:53 a.m.) |
|     | 2   (Whereupon the following discussion was had in open |
| 09:53:11 | 3   court, outside the presence of the jury:) |
| 09:53:11 | 4   THE CLERK:  Case number 9CR673, USA versus Ron |
| 09:53:27 | 5   Collins. |
| 09:53:27 | 6   MS. GUREN:  Your Honor, before we get started.  I |
| 09:53:27 | 7   just want to hand you up the corrected summary charts. |
| 09:53:31 | 8   There's three copies -- there's three copies each to be |
| 09:53:34 | 9   replaced for two of the summary charts. |
| 09:53:36 | 10  THE COURT:  All right.  For the record, please, |
| 09:53:38 | 11  everyone state your name. |
| 09:53:39 | 12  MS. GUREN:  Halley Guren and Renai Rodney on behalf |
| 09:53:41 | 13  of the United States. |
| 09:53:42 | 14  THE COURT:  All right.  Good morning. |
| 09:53:43 | 15  MR. RUBINO:  Your Honor, Frank Rubino on behalf of |
| 09:53:46 | 16  Ron Collins.  Ron Collins is present for today. |
| 09:53:50 | 17  THE COURT:  Good morning. |
| 09:53:50 | 18  Good morning, Mr. Collins. |
| 09:53:52 | 19  THE DEFENDANT:  Good morning. |
| 09:53:53 | 20  THE COURT:  Are we ready to proceed? |
| 09:53:54 | 21  MS. GUREN:  We just have two issues to address with |
| 09:53:58 | 22  your Honor.  We wanted to discuss whether or not you wanted to |
| 09:53:59 | 23  have Court on Friday.  Both the defense counsel and I are |
| 09:54:02 | 24  actually in favor of not having court, based on how quickly |
| 09:54:04 | 25  we're moving and how fast we think the Government will be able |

| | |
|---|---|
| 09:54:07 | 1 | to rest as well as a witness scheduling issue. |
| 09:54:10 | 2 | THE COURT: Whose witness scheduling issue? |
| 09:54:11 | 3 | MS. GUREN: There's a witness named Sean Geraghty, |
| 09:54:15 | 4 | who produced two summary judgments, based on voluminous |
| 09:54:18 | 5 | telephone records. He is scheduled to be out of town first |
| 09:54:21 | 6 | thing in the morning. Obviously, we would adjust our |
| 09:54:24 | 7 | presentation if you were going to have court tomorrow, but we |
| 09:54:27 | 8 | think it's very possible we could finish all of our witnesses |
| 09:54:31 | 9 | in a two-day period. |
| 09:54:32 | 10 | THE COURT: Meaning what, finish your case on Monday |
| 09:54:34 | 11 | or go to arguments on Monday? |
| 09:54:36 | 12 | MS. GUREN: I think it's possible that we would |
| 09:54:37 | 13 | finish our case on Monday, if we took off Friday, and I think |
| 09:54:40 | 14 | it's possible we could finish our case on Friday, if we had |
| 09:54:43 | 15 | court on Friday. |
| 09:54:44 | 16 | THE COURT: This is coming from the woman who told me |
| 09:54:47 | 17 | last Thursday that we absolutely could not and that we needed |
| 09:54:52 | 18 | ten full trial days? |
| 09:54:53 | 19 | MS. GUREN: Your Honor, I was overestimating. I |
| 09:54:57 | 20 | anticipated a much longer cross-examination. And as |
| 09:55:01 | 21 | Mr. Rubino told me, he had told me before he was a disciplined |
| 09:55:04 | 22 | cross-examiner and I should have listened to him. |
| 09:55:07 | 23 | THE COURT: I think you've been a disciplined |
| 09:55:10 | 24 | cross-examiner, Mr. Rubino. I won't take that away from you. |
| 09:55:14 | 25 | I will take off Friday, once again, for the benefit |

|          |    |
|----------|----|
| 09:55:17 | 1  | of the parties and just let you know that about an 80 percent |
| 09:55:22 | 2  | miscalculation on trial time is a difficulty for me.  It opens |
| 09:55:27 | 3  | up what could have been -- as I told you, I am swamped with |
| 09:55:32 | 4  | trials and need every trial day that I can give and I can't |
| 09:55:35 | 5  | fill that any longer, but -- so I'll take off Friday, and |
| 09:55:38 | 6  | we'll start up again on Monday. |
| 09:55:40 | 7  | So anything else we need to address today? |
| 09:55:42 | 8  | MS. GUREN:  Just briefly, we have transcript binders |
| 09:55:45 | 9  | that we expect the jury to be reviewing for this -- after this |
| 09:55:49 | 10 | witness.  I don't know what your process is on passing them |
| 09:55:53 | 11 | out. |
| 09:55:53 | 12 | THE COURT:  I'll give you permission to do it, and |
| 09:55:56 | 13 | then I just give them an instruction to look to me to when |
| 09:56:00 | 14 | they turn to the transcript. |
| 09:56:00 | 15 | MS. GUREN:  Thank you, your Honor. |
| 09:56:01 | 16 | And then the very last thing is I just spoke briefly |
| 09:56:04 | 17 | to the defense counsel about Jorge Llamas, who has cooperated |
| 09:56:07 | 18 | in additional unrelated cases -- or an unrelated case to which |
| 09:56:12 | 19 | he doesn't have criminal exposure on that case and just to |
| 09:56:15 | 20 | limit any questioning and not have any questioning into that |
| 09:56:18 | 21 | cooperation, other than the fact of he's cooperating in other |
| 09:56:21 | 22 | cases and the defense counsel has agreed. |
| 09:56:23 | 23 | THE COURT:  Oh, okay.  You know, the issue would be |
| 09:56:26 | 24 | if you were to say that he was getting such a great deal, then |
| 09:56:32 | 25 | he would be able to -- that would open the door to some type |

| | | |
|---|---|---|
| 09:56:39 | 1 | of discussion about cooperation.  Is he going to mention any |
| 09:56:42 | 2 | cooperation in other cases? |
| 09:56:44 | 3 | MS. GUREN:  He's going to just briefly say that he |
| 09:56:44 | 4 | cooperated in an unrelated -- |
| 09:56:46 | 5 | THE COURT:  Oh, okay.  But you're not going to go |
| 09:56:48 | 6 | into the other matter.  And you're agreeing not to do so? |
| 09:56:52 | 7 | MR. RUBINO:  Yeah, the names of the people he |
| 09:56:52 | 8 | cooperated on, things like that are not relevant to this case. |
| 09:56:54 | 9 | I agree with that. |
| 09:56:55 | 10 | THE COURT:  Okay.  All right.  Are we ready? |
| 09:56:56 | 11 | MS. GUREN:  Yes, your Honor. |
| 09:56:57 | 12 | THE COURT:  Okay.  Let's call the jury in. |
| 09:57:00 | 13 | MS. GUREN:  Do you wish us to pass out the binders or |
| 09:57:03 | 14 | give them to the CSO? |
| 09:57:04 | 15 | THE COURT:  No, you can pass those out once they are |
| 09:57:08 | 16 | there -- once the jury's here. |
| 09:59:02 | 17 | (The jury enters the courtroom.) |
| 09:59:02 | 18 | THE COURT:  Please be seated. |
| 09:59:06 | 19 | You can take the stand again. |
| 09:59:06 | 20 | (Witness takes the stand.) |
| 09:59:08 | 21 | THE COURT:  Folks, I hope you had a nice night last |
| 09:59:10 | 22 | night.  It was a beautiful night in Chicago for the first time |
| 09:59:13 | 23 | in a while. |
| 09:59:15 | 24 | We're going to start up again with our evidence.  And |
| 09:59:19 | 25 | yesterday we started with this agent. |

| | | |
|---|---|---|
| 09:59:20 | 1 | And, sir, do you know that you are still under oath? |
| 09:59:24 | 2 | THE WITNESS:  Yes, your Honor, I do. |
| 09:59:25 | 3 | THE COURT:  Okay.  And you may continue, Ms. Rodney. |
| 09:59:25 | 4 | - - - |
| 09:59:25 | 5 | ERIC DURANTE, DIRECT EXAMINATION (Continued) |
| 09:59:25 | 6 | BY MS. RODNEY: |
| 09:59:31 | 7 | Q.  Agent Durante, yesterday you testified that you had |
| 09:59:32 | 8 | directed Peter Flores to make recordings with his suppliers |
| 09:59:33 | 9 | and customers in November of 2008, correct? |
| 09:59:36 | 10 | A.  Yes, I did. |
| 09:59:36 | 11 | Q.  What date in November did you give Peter Flores those |
| 09:59:39 | 12 | instructions? |
| 09:59:40 | 13 | A.  November 6, 2008. |
| 09:59:43 | 14 | Q.  Was Peter Flores cooperating with law enforcement when you |
| 09:59:46 | 15 | gave him those instructions? |
| 09:59:47 | 16 | A.  Yes, he was. |
| 09:59:47 | 17 | Q.  Did you provide Peter Flores with any other instructions |
| 09:59:50 | 18 | regarding his cooperation? |
| 09:59:52 | 19 | A.  Yes, I did. |
| 09:59:52 | 20 | Q.  What did you tell him? |
| 09:59:55 | 21 | A.  I explained to him how I wanted things done at that time, |
| 09:59:59 | 22 | and I told him that anything he did from that point on was to |
| 10:00:03 | 23 | be to -- to be directed by me -- through me. |
| 10:00:06 | 24 | Q.  Did you maintain contact with him after that date? |
| 10:00:09 | 25 | A.  Yes, I did. |

| | | |
|---|---|---|
| 10:00:10 | 1 | Q.  By phone? |
| 10:00:12 | 2 | A.  Yes, ma'am. |
| 10:00:13 | 3 | Q.  Now, yesterday we left off with your review of Government |
| 10:00:19 | 4 | Exhibit [sic] 1A, 1-B, and 1-C.  Were you able to determine a |
| 10:00:23 | 5 | date and time of the recorded calls on those exhibits? |
| 10:00:28 | 6 | A.  Yes, I was. |
| 10:00:30 | 7 | Q.  And how did you determine the date and time? |
| 10:00:35 | 8 | A.  By the digital stamp that originated from Government |
| 10:00:39 | 9 | Exhibit 1, from the digital recorder, and also by after |
| 10:00:43 | 10 | analyzing the toll records. |
| 10:00:45 | 11 | MS. RODNEY:  Your Honor, the Government wishes to |
| 10:00:47 | 12 | move into evidence Government Exhibit Recording 1 and |
| 10:00:49 | 13 | Government Exhibit 1A, 1-B, and 1-C. |
| 10:00:53 | 14 | MR. RUBINO:  My previous objections. |
| 10:00:56 | 15 | THE COURT:  Okay.  They will be admitted. |
| 10:00:58 | 16 | BY MS. RODNEY: |
| 10:00:59 | 17 | Q.  Agent Durante, were transcripts prepared on Government |
| 10:01:05 | 18 | Exhibits 1-A, 1-B, and 1-C? |
| 10:01:07 | 19 | A.  Yes, they were. |
| 10:01:08 | 20 | Q.  Were there occasions on the calls where you were not able |
| 10:01:11 | 21 | to hear all the words being spoken on 1-A, 1-B, and 1-C? |
| 10:01:16 | 22 | A.  Yes, I was -- yes, there were. |
| 10:01:18 | 23 | Q.  In cases where you could not make out the words, how is |
| 10:01:21 | 24 | that noted on the transcript? |
| 10:01:22 | 25 | A.  As UI, unintelligible. |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 10:01:25 | 1 | Q.  Now, I'd like to direct you to the red transcript binder. |
| 10:01:35 | 2 | Agent, if you could turn to the tab marked Transcript 1, do |
| 10:01:46 | 3 | you recognize that exhibit? |
| 10:01:48 | 4 | A.  Yes, I do. |
| 10:01:49 | 5 | Q.  And what is it? |
| 10:01:51 | 6 | A.  It's a transcript of the recorded call between Peter |
| 10:01:54 | 7 | Flores and Ron Collins on November 25th, 2008. |
| 10:01:58 | 8 | Q.  And how do you recognize that exhibit? |
| 10:02:00 | 9 | A.  My initial's in the bottom right-hand corner. |
| 10:02:03 | 10 | Q.  Prior to your testimony today, did you review the |
| 10:02:05 | 11 | transcript? |
| 10:02:06 | 12 | A.  Yes, I did. |
| 10:02:06 | 13 | Q.  Did you compare that transcript to the recording on |
| 10:02:10 | 14 | Government Exhibit 1A? |
| 10:02:11 | 15 | A.  Yes, I did. |
| 10:02:12 | 16 | Q.  Does Government Exhibit Transcript 1 correctly identify |
| 10:02:15 | 17 | the defendant as one of the speakers on the recorded phone |
| 10:02:19 | 18 | call on Government Exhibit 1A? |
| 10:02:21 | 19 | A.  Yes, it does. |
| 10:02:22 | 20 | Q.  And each time the defendant's voice is listed as a speaker |
| 10:02:27 | 21 | on the transcript, is it the same voice speaking the words? |
| 10:02:30 | 22 | A.  Yes, it is. |
| 10:02:32 | 23 | Q.  Does the transcript -- excuse me. |
| 10:02:35 | 24 | Does Transcript 1 correctly identify Peter Flores as |
| 10:02:38 | 25 | one of the speakers on the recorded phone call on Government |

| | | |
|---|---|---|
| 10:02:42 | 1 | Exhibit 1A? |
| 10:02:42 | 2 | A.  Yes, it does. |
| 10:02:43 | 3 | Q.  And each time Peter Flores' voice is listed as the speaker |
| 10:02:47 | 4 | on that transcript, is it the same voice speaking those words? |
| 10:02:50 | 5 | A.  Yes, it is. |
| 10:02:56 | 6 | MS. RODNEY:  Your Honor, may I publish Government |
| 10:02:58 | 7 | Exhibit T-Mobile 1 that's previously been admitted into |
| 10:03:01 | 8 | evidence? |
| 10:03:02 | 9 | THE COURT:  You may. |
| 10:03:23 | 10 | BY MS. RODNEY: |
| 10:03:24 | 11 | Q.  Agent, directing your attention to the screen to |
| 10:03:29 | 12 | T-Mobile 1, which should be in front of you, do you recognize |
| 10:03:32 | 13 | this exhibit? |
| 10:03:33 | 14 | A.  Yes, I do. |
| 10:03:33 | 15 | Q.  And what is it? |
| 10:03:36 | 16 | A.  There's T-Mobile toll records for phone number |
| 10:03:38 | 17 | (773) 691-1702. |
| 10:03:41 | 18 | Q.  How did you use that exhibit to determine a date and time |
| 10:03:45 | 19 | on the call in Government Exhibit 1A? |
| 10:03:47 | 20 | A.  After analyzing the toll records, I just matched up the |
| 10:03:51 | 21 | phone calls that was [sic] on the toll records with the time |
| 10:03:55 | 22 | stamp on the CD that I received, Government Exhibit 1, |
| 10:04:02 | 23 | Recording 1. |
| 10:04:02 | 24 | Q.  Were the time stamps on the CD recordings and the date and |
| 10:04:06 | 25 | time listed on the toll records the same? |

| | | |
|---|---|---|
| 10:04:10 | 1 | A.  Yes.  The date matched and the minutes matched.  The hours |
| 10:04:15 | 2 | on -- the hours on the CD were two hours different from on the |
| 10:04:19 | 3 | toll records because of the time zone. |
| 10:04:21 | 4 | Q.  Were the minute designations for the call the same between |
| 10:04:25 | 5 | the time stamp and the phone records? |
| 10:04:27 | 6 | A.  Yes, the minutes were, correct. |
| 10:04:29 | 7 | Q.  And which time zone is reflected on Transcript 1? |
| 10:04:32 | 8 | A.  Pacific Daylight Time. |
| 10:04:34 | 9 | Q.  Is that -- excuse me -- the same time zone on Government |
| 10:04:38 | 10 | Exhibit T-Mobile 1? |
| 10:04:39 | 11 | A.  Yes, it is. |
| 10:04:40 | 12 | Q.  Now, if you can next turn to the exhibit binder to the tab |
| 10:04:45 | 13 | marked Transcript 2, do you recognize that exhibit? |
| 10:04:53 | 14 | A.  Yes, I do. |
| 10:04:54 | 15 | Q.  And what is it? |
| 10:04:55 | 16 | A.  It's a recorded -- it's a transcript of a recorded call |
| 10:04:59 | 17 | between Peter Flores and Ron Collins, November 29th of 2008. |
| 10:05:02 | 18 | Q.  And what time is that call? |
| 10:05:04 | 19 | A.  Approximately 1:59 Pacific Daylight Time. |
| 10:05:07 | 20 | Q.  And how do you recognize this exhibit? |
| 10:05:09 | 21 | A.  From my initials in the bottom right-hand corner. |
| 10:05:12 | 22 | Q.  Prior to your testimony today, did you review this |
| 10:05:15 | 23 | transcript? |
| 10:05:15 | 24 | A.  Yes, I did. |
| 10:05:16 | 25 | Q.  Did you compare Transcript 2 to the recording of |

| | | |
|---|---|---|
| 10:05:19 | 1 | Government Exhibit 1B? |
| 10:05:22 | 2 | A.  Yes, I did. |
| 10:05:23 | 3 | Q.  Does Transcript 2 correctly identify the defendant as one |
| 10:05:26 | 4 | of the speakers on the recorded phone call on Government |
| 10:05:30 | 5 | Exhibit 1B? |
| 10:05:30 | 6 | A.  Yes, it does. |
| 10:05:32 | 7 | Q.  And each time the defendant's voice is listed as a speaker |
| 10:05:35 | 8 | on the transcript, is it the same voice speaking those words? |
| 10:05:39 | 9 | A.  Yes, it is. |
| 10:05:40 | 10 | Q.  Does Transcript 2 correctly identify Peter Flores as one |
| 10:05:44 | 11 | of the speakers on the recorded phone call on Government |
| 10:05:49 | 12 | Exhibit 1B? |
| 10:05:49 | 13 | A.  Yes, it does. |
| 10:05:50 | 14 | Q.  And each time Peter Flores' voice is listed as a speaker |
| 10:05:53 | 15 | on the transcript, is it the same voice speaking the words? |
| 10:05:57 | 16 | A.  Yes, it is. |
| 10:05:58 | 17 | Q.  Now, how did you determine the date and time of the call |
| 10:06:02 | 18 | on Government Exhibit 1B by using the toll records? |
| 10:06:06 | 19 | A.  In the same manner I analyzed the toll records and matched |
| 10:06:10 | 20 | them up with the date stamp that was on the original CD, |
| 10:06:15 | 21 | Government Exhibit Recording 1, and matched up the date and |
| 10:06:17 | 22 | time stamp. |
| 10:06:18 | 23 | Q.  So you found the call from Government Exhibit 1B on the |
| 10:06:22 | 24 | T-Mobile records? |
| 10:06:23 | 25 | A.  Yes, I did. |

| | | |
|---|---|---|
| 10:06:24 | 1 | Q. And is this reflected on the exhibit shown in the screen |
| 10:06:27 | 2 | in front of you? |
| 10:06:28 | 3 | A. Yes, it is. |
| 10:06:29 | 4 | Q. Did you find that the time stamp from the recording and |
| 10:06:33 | 5 | the time shown in the phone records were the same? |
| 10:06:37 | 6 | A. Yes, I did. |
| 10:06:38 | 7 | Q. Were the hours the same? |
| 10:06:40 | 8 | A. The hours were off again by two hours, because of the time |
| 10:06:42 | 9 | zone, and the minutes were the same. |
| 10:06:44 | 10 | Q. And what time zone is reflected on Transcript 2? |
| 10:06:47 | 11 | A. Pacific Daylight Time. |
| 10:06:50 | 12 | Q. Now, turning next to the tab marked Transcript 3, do you |
| 10:06:55 | 13 | recognize that exhibit? |
| 10:06:58 | 14 | A. Yes, I do. |
| 10:06:59 | 15 | Q. And what is it? |
| 10:07:00 | 16 | A. It's a transcript of a recorded conversation between Peter |
| 10:07:04 | 17 | Flores and Ron Collins on November 30th of 2008 at |
| 10:07:07 | 18 | approximately 12:13 p.m. Pacific Daylight Time. |
| 10:07:11 | 19 | Q. And how do you recognize Transcript 3? |
| 10:07:13 | 20 | A. My initials in the bottom right-hand corner. |
| 10:07:16 | 21 | Q. Prior to your testimony today, did you review |
| 10:07:18 | 22 | Transcript 3? |
| 10:07:20 | 23 | A. Yes, I did. |
| 10:07:21 | 24 | Q. Did you compare that transcript to the recording on |
| 10:07:23 | 25 | Government Exhibit 1C? |

| | | |
|---|---|---|
| 10:07:24 | 1 | A.  Yes, I did. |
| 10:07:26 | 2 | Q.  Does the transcript marked Transcript 3 correctly identify |
| 10:07:30 | 3 | the defendant as one of the speakers on the recorded phone |
| 10:07:33 | 4 | call on Government Exhibit 1C? |
| 10:07:35 | 5 | A.  Yes, it does. |
| 10:07:36 | 6 | Q.  And each time the defendant's voice is listed as a speaker |
| 10:07:39 | 7 | on this transcript, is it the same voice speaking the words on |
| 10:07:42 | 8 | the call? |
| 10:07:43 | 9 | A.  Yes, it is. |
| 10:07:45 | 10 | Q.  Now, does Transcript 3 correctly identify Peter Flores as |
| 10:07:48 | 11 | the other speaker on the recorded phone call on Government |
| 10:07:51 | 12 | Exhibit 1-C? |
| 10:07:52 | 13 | A.  Yes, it does. |
| 10:07:53 | 14 | Q.  And each time Peter Flores' voice is listed as a speaker |
| 10:07:57 | 15 | on the transcript, is it the same voice speaking those words |
| 10:08:01 | 16 | on the call? |
| 10:08:02 | 17 | A.  Yes, it is. |
| 10:08:02 | 18 | Q.  And how did you go about verifying the date and time of |
| 10:08:06 | 19 | that call on 1-C? |
| 10:08:08 | 20 | A.  In the same manner, by analyzing the toll records and |
| 10:08:11 | 21 | matching the date stamp on the CD with the toll records. |
| 10:08:14 | 22 | Q.  And did you find the call on Government Exhibit |
| 10:08:18 | 23 | T-Mobile 1? |
| 10:08:19 | 24 | A.  Yes, I did. |
| 10:08:20 | 25 | Q.  And does the time stamp match the date and time listed on |

| | | |
|---|---|---|
| 10:08:24 | 1 | T-Mobile 1? |
| 10:08:26 | 2 | A.  Yes, with the two hours' difference. |
| 10:08:29 | 3 | Q.  And the minute designation was the same? |
| 10:08:31 | 4 | A.  Yes, it was. |
| 10:08:32 | 5 | Q.  And what time zone is reflected on Transcript 3? |
| 10:08:35 | 6 | A.  Pacific Daylight Time. |
| 10:08:38 | 7 | MS. RODNEY:  Your Honor, at this time may I read a |
| 10:08:41 | 8 | stipulation between the parties? |
| 10:08:42 | 9 | THE COURT:  You may. |
| 10:08:43 | 10 | MS. RODNEY:  It is hereby stipulated and agreed by |
| 10:08:45 | 11 | the United States of America by its attorney, Patrick J. |
| 10:08:49 | 12 | Fitzgerald, United States Attorney for the Northern District |
| 10:08:52 | 13 | of Illinois, and the defendant individually and by his |
| 10:08:55 | 14 | attorneys, that the following facts are true: |
| 10:08:59 | 15 | Each of the transcripts contained -- excuse me -- |
| 10:09:03 | 16 | each of the transcripts contained in Government |
| 10:09:06 | 17 | Exhibits Transcripts 1, 2, and 3 is an accurate transcription |
| 10:09:12 | 18 | of the recorded conversations to which they respond -- |
| 10:09:16 | 19 | correspond. |
| 10:09:17 | 20 | So stipulated, Counsel? |
| 10:09:20 | 21 | MR. RUBINO:  Yes. |
| 10:09:23 | 22 | BY MS. RODNEY: |
| 10:09:24 | 23 | Q.  Now, Agent Durante, if I could direct your attention back |
| 10:09:28 | 24 | to December of 2008, other than the recordings from Mexico, |
| 10:09:34 | 25 | did you enter any other items into evidence? |

584

| | | |
|---|---|---|
| 10:09:37 | 1 | A.  Yes, I did. |
| 10:09:38 | 2 | Q.  And what were those items? |
| 10:09:39 | 3 | A.  Cellphones from Mexico. |
| 10:09:41 | 4 | Q.  Now, if I could direct your attention to the exhibit in |
| 10:09:43 | 5 | front of you marked Government Exhibit Phone 1, do you |
| 10:09:52 | 6 | recognize that exhibit? |
| 10:09:53 | 7 | A.  Yes, I do. |
| 10:09:54 | 8 | Q.  How do you recognize it? |
| 10:09:56 | 9 | A.  From my handwriting on the labels. |
| 10:10:00 | 10 | Q.  And what is that exhibit? |
| 10:10:05 | 11 | A.  I'm sorry.  I didn't hear. |
| 10:10:05 | 12 | Q.  What is that exhibit? |
| 10:10:06 | 13 | A.  Exhibit 347, cellphone, Nokia cellphone. |
| 10:10:11 | 14 | Q.  A cellphone from where? |
| 10:10:13 | 15 | A.  Mexico. |
| 10:10:14 | 16 |         MS. RODNEY:  And for the record Government |
| 10:10:16 | 17 | Exhibit Phone 1 has previously been admitted into evidence. |
| 10:10:19 | 18 | BY MS. RODNEY: |
| 10:10:20 | 19 | Q.  Agent, how did Government Exhibit Phone 1 first come into |
| 10:10:23 | 20 | your possession? |
| 10:10:23 | 21 | A.  Special Agent Matthew McCarthy turned it over to me. |
| 10:10:27 | 22 | Q.  And when did you receive it from Special Agent McCarthy? |
| 10:10:31 | 23 | A.  December 8th. |
| 10:10:32 | 24 | Q.  What year? |
| 10:10:32 | 25 | A.  2008. |

| | | |
|---|---|---|
| 10:10:34 | 1 | Q. And what condition was the exhibit when you received it? |
| 10:10:37 | 2 | A. It was this cellphone inside a backpack. |
| 10:10:43 | 3 | Q. Is the exhibit in front of you in substantially the same |
| 10:10:47 | 4 | condition now as it was when you first received it in December |
| 10:10:50 | 5 | of 2008? |
| 10:10:51 | 6 | A. Yes, it is. |
| 10:10:52 | 7 | Q. After you received the exhibit, did you alter the contents |
| 10:10:55 | 8 | of the exhibit in any way? |
| 10:10:56 | 9 | A. No, I didn't. |
| 10:10:57 | 10 | Q. What did you do with the exhibit after you received it |
| 10:11:00 | 11 | from Special Agent McCarthy? |
| 10:11:02 | 12 | A. I processed it for evidence and took it down to the |
| 10:11:07 | 13 | evidence vault. |
| 10:11:09 | 14 | Q. When you processed it for evidence, did you put it in that |
| 10:11:14 | 15 | bag before you -- |
| 10:11:14 | 16 | A. Yes, I did. |
| 10:11:15 | 17 | Q. And is that indicated on the evidence tag on the bag? |
| 10:11:18 | 18 | A. It's currently inside the bag now, because it had been |
| 10:11:21 | 19 | opened, but, yes, it's inside the bag on the evidence sealing |
| 10:11:26 | 20 | sticker. |
| 10:11:26 | 21 | Q. You testified that you took the phone and put it in DEA's |
| 10:11:30 | 22 | evidence vault? |
| 10:11:31 | 23 | A. Yes, I did. |
| 10:11:32 | 24 | Q. Did you later remove Government Exhibit Phone 1 from DEA's |
| 10:11:36 | 25 | evidence vault? |

| | | |
|---|---|---|
| 10:11:37 | 1 | A. Yes, I did, on the same day I put it in. |
| 10:11:40 | 2 | Q. And when did you put it in the evidence vault? |
| 10:11:43 | 3 | A. December 18th, 2008. |
| 10:11:46 | 4 | Q. And you removed it that same day for what purpose? |
| 10:11:49 | 5 | A. I removed -- I logged it into the evidence vault and |
| 10:11:52 | 6 | removed it and took it to the digital lab for analysis. |
| 10:11:57 | 7 | Q. When you transferred it to the digital lab, was the phone |
| 10:12:00 | 8 | in a sealed condition? |
| 10:12:01 | 9 | A. Yeah. It was in the same condition in the plastic bag |
| 10:12:05 | 10 | sealed. |
| 10:12:07 | 11 | Q. And when you took it to the digital lab, what did you do |
| 10:12:10 | 12 | with it? |
| 10:12:11 | 13 | A. I logged it into the digital lab and turned it over. |
| 10:12:16 | 14 | Q. Did you regain custody of Government Exhibit Phone 1 from |
| 10:12:19 | 15 | the digital lab after December of 2008? |
| 10:12:22 | 16 | A. No, not from the digital lab, no. |
| 10:12:25 | 17 | Q. Okay. Did you regain custody of the phone at some point |
| 10:12:30 | 18 | after December 2008? |
| 10:12:30 | 19 | A. Yes, I did. |
| 10:12:30 | 20 | Q. When did you regain custody of it? |
| 10:12:33 | 21 | A. February 25th, 2009. |
| 10:12:36 | 22 | Q. And who did you receive the exhibit from? |
| 10:12:38 | 23 | A. From IA Karen Mastricola, Mastricola. |
| 10:12:47 | 24 | Q. And who is Karen? |
| 10:12:48 | 25 | A. She's an intelligence analyst, an analyst. |

| | | |
|---|---|---|
| 10:12:54 | 1 | Q.  And when you received it from Karen Mastricola, was the |
| 10:12:57 | 2 | exhibit in the sealed condition? |
| 10:13:02 | 3 | A.  Yes, it was. |
| 10:13:02 | 4 | Q.  And what did you do with it when you received it from her? |
| 10:13:04 | 5 | A.  The next day I returned it back to the evidence vault in |
| 10:13:08 | 6 | the same condition I received it, sealed. |
| 10:13:12 | 7 | MS. RODNEY:  Now, your Honor, may I have one moment? |
| 10:13:15 | 8 | THE COURT:  You may. |
| 10:13:17 | 9 | MS. RODNEY:  Your Honor, I have no further questions |
| 10:13:19 | 10 | at this time. |
| 10:13:19 | 11 | THE COURT:  Okay.  Mr. Rubino? |
| 10:13:23 | 12 | - - - |
| 10:13:23 | 13 | ERIC DURANTE, CROSS-EXAMINATION |
| 10:13:23 | 14 | BY MR. RUBINO: |
| 10:13:33 | 15 | Q.  Good morning, Agent. |
| 10:13:35 | 16 | A.  Good morning, sir. |
| 10:13:36 | 17 | Q.  Sir, you told us that you had initially five months of |
| 10:13:40 | 18 | training in various forms of criminal investigation when you |
| 10:13:44 | 19 | started your career in the DEA? |
| 10:13:46 | 20 | A.  Correct, correct. |
| 10:13:47 | 21 | Q.  And you've received other training since then, I'm sure, |
| 10:13:50 | 22 | over the years you've been a DEA agent? |
| 10:13:52 | 23 | A.  Correct, sir. |
| 10:13:53 | 24 | Q.  Have you received any specialized training in voice |
| 10:13:57 | 25 | identification? |

| | | |
|---|---|---|
| 10:13:58 | 1 | A.  Not in voice ID, no, sir. |
| 10:14:00 | 2 | Q.  No training whatsoever in voice identification? |
| 10:14:03 | 3 | A.  No specific training, no. |
| 10:14:08 | 4 | Q.  Now, you told us that you spoke with Ron Collins, I think |
| 10:14:13 | 5 | you said, August '09; am I correct? |
| 10:14:16 | 6 | A.  That is correct, sir. |
| 10:14:17 | 7 | Q.  Okay.  In August '09. |
| 10:14:19 | 8 | And you spoke with him about 45 minutes? |
| 10:14:22 | 9 | A.  Yeah, approximately. |
| 10:14:23 | 10 | Q.  Okay.  So you listened.  You and he had a conversation |
| 10:14:28 | 11 | almost two years ago for about 45 minutes? |
| 10:14:30 | 12 | A.  Correct, correct. |
| 10:14:32 | 13 | Q.  And his voice was so unique that you would never forget it |
| 10:14:35 | 14 | the rest of your life? |
| 10:14:36 | 15 | A.  I won't say that.  I haven't spoke to him since. |
| 10:14:40 | 16 | Q.  You have not spoke to him since? |
| 10:14:42 | 17 | A.  No, sir. |
| 10:14:42 | 18 | Q.  So before you heard these tapes, if the phone rang and he |
| 10:14:47 | 19 | called your office and said, Hi, and started talking to you, |
| 10:14:50 | 20 | right away you would just know it was Ron Collins, wouldn't |
| 10:14:53 | 21 | you? |
| 10:14:53 | 22 | A.  Repeat the question?  I'm sorry. |
| 10:14:55 | 23 | Q.  The phone -- if the phone rang in your office, before you |
| 10:14:58 | 24 | heard these tapes, and Mr. Collins was on the phone and |
| 10:15:02 | 25 | started talking, from a two-year-old 45-minute conversation |

| | |
|---|---|
| 10:15:06 | 1 | you would know right away it was his voice? |
| 10:15:09 | 2 | A. Before I heard those tapes or talked to him? |
| 10:15:12 | 3 | Q. Yes. |
| 10:15:12 | 4 | A. I have no knowledge of his voice before I heard the |
| 10:15:15 | 5 | tape -- the recordings or before I talked to him in person. |
| 10:15:18 | 6 | Q. Now, you tell us that you were handling -- I think is the |
| 10:15:22 | 7 | word you used -- the cooperator speaking about Pedro Flores? |
| 10:15:29 | 8 | A. Yes. |
| 10:15:29 | 9 | Q. Is that a fair term? |
| 10:15:31 | 10 | A. Yes, I was handling the cooperating source. |
| 10:15:33 | 11 | Q. Explain to me what you mean by the word handling, please. |
| 10:15:36 | 12 | A. Just talking to him and trying to run the investigation |
| 10:15:39 | 13 | and controlling his movements -- or not controlling his |
| 10:15:43 | 14 | movements, but working with him in conjunction to gather |
| 10:15:46 | 15 | evidence for drug customers and drug suppliers to make a case. |
| 10:15:51 | 16 | Q. Now, this is -- you're speaking with him and dealing with |
| 10:15:54 | 17 | him as early as August '08; am I correct? |
| 10:15:58 | 18 | A. I initially talked to him on the phone in August '08 |
| 10:16:01 | 19 | correct. |
| 10:16:02 | 20 | Q. And then you had subsequent conversations with him, |
| 10:16:04 | 21 | correct? |
| 10:16:04 | 22 | A. Yes, there's a minimum, but I continued to talk to him |
| 10:16:08 | 23 | over the phone before I met him in person. |
| 10:16:10 | 24 | Q. When was this? |
| 10:16:11 | 25 | A. November 6th, 2008. |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 10:16:12 | 1 | Q.  November 6th. |
| 10:16:13 | 2 | Okay.  Now, you were aware as early as August '08 |
| 10:16:16 | 3 | that both Flores brothers were federal fugitives, were you |
| 10:16:21 | 4 | not? |
| 10:16:21 | 5 | A.  Yes, I was, sir. |
| 10:16:23 | 6 | Q.  And they are United States citizens, are they not?  They |
| 10:16:25 | 7 | are not Mexicans? |
| 10:16:27 | 8 | A.  Yes, sir, they are. |
| 10:16:30 | 9 | Q.  Now, are you aware that the Flores brothers were dealing |
| 10:16:36 | 10 | drugs at the same time they were working with the DEA? |
| 10:16:42 | 11 | A.  No, I was not aware -- I'm not aware of that.  I have no |
| 10:16:44 | 12 | knowledge of that. |
| 10:16:46 | 13 | Q.  Were you present when various witnesses have been |
| 10:16:51 | 14 | debriefed? |
| 10:16:54 | 15 | MS. RODNEY:  Objection, your Honor, can he be a |
| 10:16:56 | 16 | little bit more specific, time frame and what witnesses? |
| 10:16:58 | 17 | THE COURT:  Foundation objection is sustained.  It's |
| 10:17:02 | 18 | vague. |
| 10:17:04 | 19 | BY MR. RUBINO: |
| 10:17:05 | 20 | Q.  Do you know if any cooperating witness ever testified that |
| 10:17:11 | 21 | they picked up drugs -- or instructed to pick up drugs by the |
| 10:17:15 | 22 | Flores brothers as late as Thanksgiving '08? |
| 10:17:19 | 23 | MS. RODNEY:  Objection, your Honor, same objection, |
| 10:17:21 | 24 | vagueness. |
| 10:17:22 | 25 | THE COURT:  Sustained. |

| | | |
|---|---|---|
| 10:17:26 | 1 | BY MR. RUBINO: |
| 10:17:27 | 2 | Q.  Do you know if any -- if the Flores brothers instructed |
| 10:17:32 | 3 | anyone to pick up drugs and deliver them in the Chicago area |
| 10:17:37 | 4 | during the period you were working with the Flores brothers? |
| 10:17:41 | 5 | A.  Can you define the period?  You mean after November 6th? |
| 10:17:44 | 6 | Q.  August or November, I'm sorry. |
| 10:17:46 | 7 | A.  I wasn't working with them August through November.  I |
| 10:17:48 | 8 | talked to them on the phone, but I was -- my interaction |
| 10:17:51 | 9 | started with them mainly in [sic] November 6th. |
| 10:17:53 | 10 | Q.  Okay.  But August through November, do you know if they |
| 10:17:56 | 11 | were dealing drugs? |
| 10:17:58 | 12 | A.  I can't speculate to what they were doing during this |
| 10:18:01 | 13 | time. |
| 10:18:01 | 14 | Q.  Do you know or don't you, yes or no? |
| 10:18:04 | 15 | A.  Do I know if they were dealing drugs? |
| 10:18:06 | 16 | Q.  Do you know? |
| 10:18:08 | 17 | A.  I had no knowledge of that. |
| 10:18:09 | 18 | Q.  So today you have no knowledge that the Flores brothers |
| 10:18:13 | 19 | were involved in drug dealing from August through November |
| 10:18:17 | 20 | '08; is that your testimony? |
| 10:18:19 | 21 | A.  Yeah, I have no direct knowledge that they're -- I know |
| 10:18:22 | 22 | they were providing information, but I didn't know what they |
| 10:18:25 | 23 | were doing besides that. |
| 10:18:31 | 24 | Q.  You were not present when these recordings were made, were |
| 10:18:36 | 25 | you? |

| | | |
|---|---|---|
| 10:18:36 | 1 | A.  No, sir, I wasn't. |
| 10:18:37 | 2 | Q.  So you have no knowledge whatsoever as to any of the |
| 10:18:41 | 3 | details such as what kind of recorder was used, how it was |
| 10:18:45 | 4 | used, et cetera, would you? |
| 10:18:46 | 5 | A.  How the recorder was used, no, sir, I don't. |
| 10:18:49 | 6 | Q.  Was it turned off, turned on, was the entire |
| 10:18:53 | 7 | conversation -- that's what I'm asking. |
| 10:18:54 | 8 | A.  No, sir, I don't. |
| 10:18:55 | 9 | Q.  No knowledge and can't tell us a thing about how it was |
| 10:18:58 | 10 | recorded? |
| 10:18:59 | 11 | A.  No, sir, I can't. |
| 10:18:59 | 12 | Q.  Do you know even if it was recorded by holding the |
| 10:19:02 | 13 | recorder next to the phones or with it hard wired across with |
| 10:19:06 | 14 | plugs?  Do you have any idea of that? |
| 10:19:07 | 15 | A.  I have no knowledge of how they recorded those |
| 10:19:10 | 16 | conversations. |
| 10:19:19 | 17 | Q.  Do you know if any scientific tests were done to determine |
| 10:19:24 | 18 | whose voices are on the phone calls? |
| 10:19:28 | 19 | A.  No, they were not. |
| 10:19:29 | 20 | Q.  They were not. |
| 10:19:31 | 21 |     So basically when you make the statements, This is |
| 10:19:34 | 22 | the voice of Flores, This is the voice of Ron Collins, it's |
| 10:19:38 | 23 | nothing more than your opinion -- |
| 10:19:40 | 24 | A.  That is my opinion, correct. |
| 10:19:42 | 25 | Q.  -- correct? |

10:19:43  1    And that opinion is not based upon any schooling,
10:19:46  2  training, or experience in voice identification?
10:19:49  3  A.  Correct, sir, that's just my opinion.
10:19:53  4  Q.  Would you agree that your opinion would be no better than
10:19:54  5  mine or anybody else in the jury's on that field?
10:19:59  6  A.  That's my opinion and it would be the same as your
10:20:02  7  opinion, correct.
10:20:02  8  Q.  You don't have any greater skill than the average person
10:20:06  9  in voice identification, do you?
10:20:08  10    MS. RODNEY:  Objection, asked and answered, different
10:20:10  11  form of the question.
10:20:12  12    THE COURT:  Sustained.
10:20:17  13  BY MR. RUBINO:
10:20:18  14  Q.  How many conversations did Peter Flores record all told?
10:20:27  15    MS. RODNEY:  Objection, your Honor, relevance and in
10:20:30  16  the alternative, vague.
10:20:32  17    THE COURT:  To the extent that you're aware, you may
10:20:35  18  answer the question.  Overruled.
10:20:37  19    THE WITNESS:  Numerous I would say -- it's
10:20:42  20  approximate, it's probably between 50 and a hundred.
10:20:47  21  BY MR. RUBINO:
10:20:48  22  Q.  How many of those do you claim involved Ron Collins?
10:20:55  23  A.  Of his total recordings?
10:20:57  24  Q.  Yes.
10:20:59  25    How many recordings do you believe the Floreses made

10:21:03    1    with Mr. Collins?

10:21:06    2    A.  Approximately seven.

10:21:13    3    Q.  When was the first conversation recorded that you claim

10:21:18    4    was with Mr. Collins?

10:21:22    5    A.  November 25th, 2008.  Yeah, November 25th, 2008.

10:21:37    6    Q.  And the three recordings that you have before you were all

10:21:41    7    made in Mexico, were they not, sir?

10:21:44    8    A.  Correct, sir.

10:21:46    9    Q.  Are they the only three recordings made in Mexico of

10:21:52   10    Mr. Collins?

10:21:52   11    A.  With Mr. Collins, yes, sir, that I know of.

10:21:55   12    Q.  Okay.  And that's what, November -- I'm sorry -- what date

10:21:59   13    did you tell me?

10:21:59   14    A.  The first one was November 25th, 2008.

10:22:02   15    Q.  November 25th.

10:22:04   16         Okay.  Now, on November 6th you told Peter Flores to

10:22:10   17    start recording conversations, correct?

10:22:15   18    A.  Correct.  I told him before that as well.

10:22:17   19    Q.  Okay.  You told him before November 6th?

10:22:19   20    A.  Correct.

10:22:20   21    Q.  How much before or when -- when did you first tell him to

10:22:24   22    record conversations is what I'm really looking for.

10:22:27   23    A.  Back in August.

10:22:28   24    Q.  You told him to start recording conversations in August?

10:22:31   25    A.  Correct.

| | |
|---|---|
| 10:22:32 | 1 |
| 10:22:40 | 2 |
| 10:22:51 | 3 |
| 10:22:57 | 4 |
| 10:23:01 | 5 |
| 10:23:05 | 6 |
| 10:23:11 | 7 |
| 10:23:14 | 8 |
| 10:23:14 | 9 |
| 10:23:16 | 10 |
| 10:23:16 | 11 |
| 10:23:19 | 12 |
| 10:23:20 | 13 |
| 10:23:27 | 14 |
| 10:23:28 | 15 |
| 10:23:30 | 16 |
| 10:23:30 | 17 |
| 10:23:32 | 18 |
| 10:23:32 | 19 |
| 10:23:33 | 20 |
| 10:23:50 | 21 |
| 10:24:02 | 22 |
| 10:24:04 | 23 |
| 10:24:08 | 24 |
| 10:24:12 | 25 |

Q.  Okay.  Do you know if he had any conversations with Ron Collins before November -- from August to November 25th?

A.  I'm not sure if he did or not.  I have no knowledge of that.

Q.  So it would be your testimony that the reason the first conversation was recorded with Collins on November 25th is because there were no conversations between August and November?

        MS. RODNEY:  Objection, your Honor, form of the question.

        THE COURT:  Sustained.

BY MR. RUBINO:

Q.  Were there any conversations with Ron Collins from Pedro Flores between August and November?

        MS. RODNEY:  Objection, your Honor, asked and answered.

        THE COURT:  All right.  Overruled.

BY MR. RUBINO:

Q.  You may answer.

A.  I have no knowledge of that, sir.

Q.  Did the DEA intercept a drug payment from Elliot Buckner?

        MS. RODNEY:  Objection, your Honor, beyond the scope.

        THE COURT:  Okay.  I'm not sure of the relevance, so I might need to have a sidebar for you to inform me of it.

        MR. RUBINO:  Yes, ma'am.

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | |
|---|---|
| 10:24:13 | 1 |
| 10:24:14 | 2 |
| 10:24:37 | 3 |
| 10:24:37 | 4 |
| 10:24:39 | 5 |
| 10:24:41 | 6 |
| 10:24:43 | 7 |
| 10:24:48 | 8 |
| 10:24:56 | 9 |
| 10:24:58 | 10 |
| 10:24:59 | 11 |
| 10:24:59 | 12 |
| 10:25:02 | 13 |
| 10:25:03 | 14 |
| 10:25:07 | 15 |
| 10:25:10 | 16 |
| 10:25:10 | 17 |
| 10:25:12 | 18 |
| 10:25:16 | 19 |
| 10:25:16 | 20 |
| 10:25:19 | 21 |
| 10:25:23 | 22 |
| 10:25:27 | 23 |
| 10:25:30 | 24 |
| 10:25:33 | 25 |

1    THE COURT:  Okay.

2         (Whereupon the following discussion was had at the

3    bench, outside the hearing of the jury:)

4         THE COURT:  Okay.  Is it -- I don't know what you're

5    doing with it, so if you could just let me know.

6         MR. RUBINO:  Of course, your Honor.  Your Honor, it's

7    my opinion from reading various EA-6s, et cetera, that Elliot

8    Buckner received a shipment of drugs from the Flores brothers

9    not from Mexico but the Flores brothers, as previously

10   testified instructed --

11        THE COURT:  Okay.

12        MR. RUBINO:  -- to go to the warehouse, get it,

13   deliver it to him.  Buckner received it.

14        Then about two weeks later Buckner made a

15   hundred-thousand dollar payment back to the Flores brothers.

16        THE COURT:  Okay.

17        MR. RUBINO:  I understand that payment was

18   intercepted and then Buckner was arrested two days later.

19        THE COURT:  Okay.

20        MR. RUBINO:  Where I am going with that is that will

21   also show that during the period of the conversations being

22   recorded with this defendant that the Flores brothers were

23   sending drugs and receiving payments.

24        THE COURT:  Oh, to show that while they were

25   cooperating with the Government they were still dealing drugs.

| | |
|---|---|
| 10:25:36 | 1 |
| 10:25:36 | 2 |
| 10:25:38 | 3 |
| 10:25:41 | 4 |
| 10:25:47 | 5 |
| 10:25:51 | 6 |
| 10:25:56 | 7 |
| 10:25:59 | 8 |
| 10:26:02 | 9 |
| 10:26:04 | 10 |
| 10:26:07 | 11 |
| 10:26:08 | 12 |
| 10:26:14 | 13 |
| 10:26:16 | 14 |
| 10:26:20 | 15 |
| 10:26:23 | 16 |
| 10:26:26 | 17 |
| 10:26:31 | 18 |
| 10:26:31 | 19 |
| 10:26:33 | 20 |
| 10:26:34 | 21 |
| 10:26:36 | 22 |
| 10:26:39 | 23 |
| 10:26:40 | 24 |
| 10:26:43 | 25 |

MR. RUBINO:  Yes, ma'am.

THE COURT:  Okay.  Response.

MS. RODNEY:  Elliot Buckner is a defendant who was arrested after a controlled buy.  I don't know what DEA 6s he's referring to or if he's referring to information he received from his client about drugs delivered to Elliot Buckner before a hundred-thousand dollar payment was made.

That aside, that doesn't lay any foundation as to how this particular witness would know about that.

THE COURT:  Well, we don't know.  He was about to ask when I had the sidebar.

So it would be relevant if the Flores brothers are essentially working with this individual at his direction, and he said he didn't know they were dealing drugs and that they were doing illegal activity.  Essentially that's so the Government doesn't care that they are doing illegal activity while they are taking the fruits of his work.  That's fair impeachment.

But if it's that they are doing it at the behest of the Government, which I don't know --

MR. RUBINO:  No, that's not my point.

THE COURT:  No.  Well, she's saying maybe he was, because if this person has been arrested --

MR. RUBINO:  I've been wrong before and may be wrong again.  I don't know --

| | | |
|---|---|---|
| 10:26:44 | 1 | THE COURT: What's the basis -- |
| 10:26:45 | 2 | MR. RUBINO: That's the only way I know to ask. |
| 10:26:48 | 3 | THE COURT: -- you said the DEA-6s reports. |
| 10:26:50 | 4 | MR. RUBINO: During -- going through various reports |
| 10:26:52 | 5 | and conversations with my client. I can't pin it down to one |
| 10:26:56 | 6 | honestly. |
| 10:26:56 | 7 | THE COURT: Oh, okay. |
| 10:26:57 | 8 | MS. GUREN: Your Honor, there's just a broader |
| 10:26:59 | 9 | objection that we would like to raise regarding getting into |
| 10:27:01 | 10 | all this cooperation with the Flores brothers. |
| 10:27:03 | 11 | It is true that it's out there that they cooperated, |
| 10:27:06 | 12 | that's how we were able to make these recorded calls. We have |
| 10:27:09 | 13 | specifically said to the defendant and to you on the record |
| 10:27:12 | 14 | that we are not trying to use their statements as |
| 10:27:15 | 15 | coconspirator statements for the truth of the matter. |
| 10:27:16 | 16 | So all impeachment as to them and benefits they |
| 10:27:19 | 17 | received is not relevant to this case. |
| 10:27:21 | 18 | THE COURT: See, but that's not true, because what's |
| 10:27:24 | 19 | relevant is there's the DEA working with drug dealers and |
| 10:27:29 | 20 | cooperating with them and allowing them to be free, allowing |
| 10:27:33 | 21 | them to do their illegal trade while they are working to |
| 10:27:37 | 22 | arrest others, it shows that they are biased, for some reason, |
| 10:27:43 | 23 | against Mr. Collins as opposed to others, that they are |
| 10:27:47 | 24 | arbitrarily choosing which dealers to prosecute, and it's |
| 10:27:52 | 25 | really -- it goes -- it's impeachable material. |

| | |
|---|---|
| 10:27:57 | 1 |
| 10:28:01 | 2 |
| 10:28:05 | 3 |
| 10:28:08 | 4 |
| 10:28:09 | 5 |
| 10:28:10 | 6 |
| 10:28:13 | 7 |
| 10:28:14 | 8 |
| 10:28:17 | 9 |
| 10:28:24 | 10 |
| 10:28:28 | 11 |
| 10:28:32 | 12 |
| 10:28:36 | 13 |
| 10:28:39 | 14 |
| 10:28:44 | 15 |
| 10:28:49 | 16 |
| 10:28:55 | 17 |
| 10:28:57 | 18 |
| 10:29:01 | 19 |
| 10:29:03 | 20 |
| 10:29:08 | 21 |
| 10:29:13 | 22 |
| 10:29:16 | 23 |
| 10:29:19 | 24 |
| 10:29:22 | 25 |

1  MS. RODNEY:  Well, your Honor, a previous DEA agent,
2  McCarthy, Matt McCarthy, already testified that he suspected
3  that the Flores brothers were continuing to engage in drug
4  trafficking.
5  THE COURT:  Right, he did.
6  MS. RODNEY:  So at this point it's become cumulative.
7  I mean, I don't know what Agent Durante --
8  THE COURT:  I think he's probably going to say he
9  doesn't know, my guess is, based upon his answer.
10  I think that what -- what I don't want to do is have
11  a frolic and detour on all these other drug investigations,
12  which is why we keep coming up to this same sidebar issue.
13  What I do want to do is allow you to have your
14  impeachment ability to ask him whether the brothers were
15  engaging in this activity.  And I don't know how you're going
16  to prove up if he answers no or yes to this, since you don't
17  know where this information is coming from.
18  MR. RUBINO:  Let's say he says yes.  Then the next
19  question is, the Flores brothers have been instructed to
20  record conversations.  But obviously they are not recording
21  their own drug conversations when they are sending their
22  people to the warehouse to pick up drugs, when they are
23  calling the drug buyer and saying meet the person.
24  All the things that were testified to by the two
25  previous informers that have testified yesterday.  Both of

| | |
|---|---|
| 10:29:25 | 1 |
| 10:29:28 | 2 |
| 10:29:32 | 3 |
| 10:29:32 | 4 |
| 10:29:35 | 5 |
| 10:29:38 | 6 |
| 10:29:38 | 7 |
| 10:29:39 | 8 |
| 10:29:42 | 9 |
| 10:29:45 | 10 |
| 10:29:49 | 11 |
| 10:29:50 | 12 |
| 10:29:52 | 13 |
| 10:29:56 | 14 |
| 10:30:00 | 15 |
| 10:30:04 | 16 |
| 10:30:04 | 17 |
| 10:30:09 | 18 |
| 10:30:11 | 19 |
| 10:30:14 | 20 |
| 10:30:18 | 21 |
| 10:30:22 | 22 |
| 10:30:24 | 23 |
| 10:30:27 | 24 |
| 10:30:30 | 25 |

1  them testified that they went to the warehouse, picked up

2  drugs and delivered them to my client, all the way up to a

3  week before Thanksgiving --

4         THE COURT:  Okay.  But now let's talk about that,

5  because where does that bring you, though, for a closing

6  argument?

7             Ladies, listen.

8             I mean, is it a jury nullification issue then?

9  Aren't you essentially saying that it is an Executive Branch

10 decision, that they put their scopes upon my guy and not on

11 those other guys?

12            There's a difference between an argument that says

13 that the dirty drug cooperator, who's sitting on the stand, is

14 getting a break while the one in the courtroom is not.

15 Because then you're impeaching how he's motivated to do what

16 he's doing.

17            But when you start attacking them for not

18 prosecuting -- or recording the conversations, which might

19 lead to further prosecution, then you're really attacking an

20 area which is an Executive Branch decision as to why they

21 turned their scopes on Ron Collins and not on them.

22            MR. RUBINO:  Conversely maybe the Flores brothers

23 were good little informants and the two witnesses who said

24 they delivered in November were lying, because they never did,

25 because the Floreses stopped their activities in August.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:30:33 | 1  | If the Floreses stopped their activities in August           |
| 10:30:37 | 2  | then a lot of the testimony --                               |
| 10:30:37 | 3  | THE COURT: But that's all hearsay, and we don't have         |
| 10:30:39 | 4  | that -- that's like a collateral impeachment issue.          |
| 10:30:43 | 5  | MS. GUREN: And --                                            |
| 10:30:43 | 6  | THE COURT: I see where you're headed, but there is a         |
| 10:30:45 | 7  | distinction between the two types of cross. The one type is  |
| 10:30:48 | 8  | very fair game, which is that once that guy is on the stand  |
| 10:30:52 | 9  | that is getting that benefit --                              |
| 10:30:53 | 10 | MR. RUBINO: I understand.                                    |
| 10:30:53 | 11 | THE COURT: -- it makes complete sense.                       |
| 10:30:55 | 12 | But when you start now cross-examining this agent            |
| 10:30:58 | 13 | about whether he knew whether, for example, these guys were  |
| 10:31:01 | 14 | recording every conversation and if those conversations were |
| 10:31:04 | 15 | used for an indictment or in the grand jury or to charge them |
| 10:31:11 | 16 | versus whether they were doing so for Mr. Collins, now we are |
| 10:31:16 | 17 | in what was a jury nullification issue in the pretrial        |
| 10:31:20 | 18 | motions -- in the final pretrial conference, which you agreed |
| 10:31:23 | 19 | you weren't going to do --                                   |
| 10:31:24 | 20 | MR. RUBINO: I wouldn't dare go there.                        |
| 10:31:27 | 21 | THE COURT: -- which is questions what the Executive          |
| 10:31:28 | 22 | Branch's motivation is.                                      |
| 10:31:29 | 23 | But isn't that what you're doing?                           |
| 10:31:30 | 24 | MR. RUBINO: No. One of two people's [sic] wrong.            |
| 10:31:34 | 25 | Either the two informants so far who have testified that they |

| | |
|---|---|
| 10:31:37 | 1 |
| 10:31:41 | 2 |
| 10:31:41 | 3 |
| 10:31:43 | 4 |
| 10:31:44 | 5 |
| 10:31:47 | 6 |
| 10:31:48 | 7 |
| 10:31:51 | 8 |
| 10:31:54 | 9 |
| 10:31:57 | 10 |
| 10:32:01 | 11 |
| 10:32:01 | 12 |
| 10:32:04 | 13 |
| 10:32:07 | 14 |
| 10:32:11 | 15 |
| 10:32:14 | 16 |
| 10:32:17 | 17 |
| 10:32:19 | 18 |
| 10:32:21 | 19 |
| 10:32:25 | 20 |
| 10:32:28 | 21 |
| 10:32:30 | 22 |
| 10:32:35 | 23 |
| 10:32:39 | 24 |
| 10:32:42 | 25 |

1  picked up drugs and delivered them as late as the day before

2  Thanksgiving --

3  　　　　MS. RODNEY:  That is incorrect.

4  　　　　MS. GUREN:  Well -- and I also think that what you're

5  saying is a very skewed perspective.

6  　　　　They were cooperating and providing information on

7  their suppliers.  They provided information on their

8  customers.  They are actively still part of this in the sense

9  of the fact that there is a much larger DEA investigation into

10  all sorts of customers, all sorts of suppliers with the Flores

11  brothers' help.

12  　　　　I think exactly your point about the fact that you've

13  got to get into this huge detour into all of the investigation

14  that's being done, all of the use of their investigation to

15  understand what -- exactly what's going on in August and

16  November and it's not relevant, because it doesn't really

17  matter to Ron Collins' case.

18  　　　　It's not a -- I don't think that you have to view it

19  as either the cooperators are lying or the Flores brothers

20  were still delivering.  It's not an either or thing, because

21  they were working with law enforcement.  They were continuing

22  their business as part of this ongoing figuring out how to

23  work with DEA and gathering evidence for these longer

24  investigations, which ended up prosecuting the crew members

25  who were doing these deliveries and the customers.

| | |
|---|---|
| 10:32:44 | 1 |
| 10:32:49 | 2 |
| 10:32:53 | 3 |
| 10:32:56 | 4 |
| 10:33:01 | 5 |
| 10:33:05 | 6 |
| 10:33:07 | 7 |
| 10:33:09 | 8 |
| 10:33:13 | 9 |
| 10:33:17 | 10 |
| 10:33:21 | 11 |
| 10:33:26 | 12 |
| 10:33:28 | 13 |
| 10:33:31 | 14 |
| 10:33:32 | 15 |
| 10:33:56 | 16 |
| 10:33:56 | 17 |
| 10:33:56 | 18 |
| 10:33:58 | 19 |
| 10:33:59 | 20 |
| 10:34:01 | 21 |
| 10:34:03 | 22 |
| 10:34:07 | 23 |
| 10:34:07 | 24 |
| 10:34:07 | 25 |

1       THE COURT:  I think the problem is as I have outlined
2  it, that I think that this area of cross is an impermissible
3  line that suggests that the Executive Branch made decisions
4  that weren't appropriate and that it was targeting your client
5  as opposed to the Flores brothers, which would be also a
6  misstatement of what happened, because they did, of course,
7  have scopes on the Flores brothers.
8       And I think that it's also an improper impeachment of
9  this particular man on the stand not just for the Executive
10 Branch issue, but also because he is not the one that's making
11 that decision or that call and he's also the one not getting
12 the benefit.  So I think it is collateral and irrelevant in
13 that regard, so I'm going to strike that line of questioning.
14       MR. RUBINO:  Yes, your Honor.
15       THE COURT:  Thanks.
16       (End of sidebar discussion.)
17       THE COURT:  All set.
18       MR. RUBINO:  Your Honor, I have no further questions
19 of this witness.  Thank you.
20       THE COURT:  Oh, all right, Mr. Rubino.
21       Any redirect then?
22       MS. RODNEY:  Yes, your Honor.
23                          - - -
24            ERIC DURANTE, REDIRECT EXAMINATION
25 BY MS. RODNEY:

| | | |
|---|---|---|
| 10:34:12 | 1 | Q.  Agent Durante, you testified first on direct and then you |
| 10:34:18 | 2 | were asked about it on cross-examination about your interview |
| 10:34:21 | 3 | of the defendant in August of 2009? |
| 10:34:25 | 4 | A.  Correct. |
| 10:34:26 | 5 | Q.  After that interview, when did you conduct your voice |
| 10:34:31 | 6 | comparison between the defendant's voice and Government |
| 10:34:34 | 7 | Exhibits 1-A, 1-B, and 1-C? |
| 10:34:37 | 8 | A.  Right before and right after I had them with me on my |
| 10:34:40 | 9 | laptop. |
| 10:34:42 | 10 | Q.  When you say right after, can you just be a bit more |
| 10:34:46 | 11 | specific? |
| 10:34:47 | 12 | A.  Within -- within the hour, we went outside and I had them |
| 10:34:51 | 13 | right there on my laptop that I carried with me to the |
| 10:34:55 | 14 | interview. |
| 10:34:56 | 15 | Q.  And after you did this voice comparison, you determined |
| 10:34:58 | 16 | that the defendant's voice matched the speaker on the calls |
| 10:35:01 | 17 | with Peter Flores? |
| 10:35:02 | 18 | A.  Yes. |
| 10:35:05 | 19 | Q.  You were also asked about scientific tests for voice |
| 10:35:09 | 20 | identification.  In your experience -- as a law enforcement |
| 10:35:13 | 21 | agent and previously as a police officer, have you ever seen |
| 10:35:16 | 22 | any investigations where some sort of computer or scientific |
| 10:35:21 | 23 | voice analysis has been used? |
| 10:35:23 | 24 | A.  No.  In my thirteen and a half years in law enforcement, I |
| 10:35:26 | 25 | have never used one, I have never seen one used. |

| | | |
|---|---|---|
| 10:35:29 | 1 | Q. And how many cases have you worked on approximately where |
| 10:35:32 | 2 | there have been identifications from voice comparisons? |
| 10:35:36 | 3 | A. Numerous. I mean, I can't really approximate. Numerous |
| 10:35:41 | 4 | investigations. Pretty much all my investigations when we |
| 10:35:44 | 5 | have to identify voices with recordings. |
| 10:35:57 | 6 | Q. And you were also asked on cross-examination about your |
| 10:36:02 | 7 | instructions to Peter Flores in terms of making the |
| 10:36:06 | 8 | recordings. How did you instruct him to make those |
| 10:36:09 | 9 | recordings? |
| 10:36:12 | 10 | A. As I testified before, just instructed him to do them when |
| 10:36:16 | 11 | he can in a safe manner. I didn't give him specific |
| 10:36:19 | 12 | instructions on how to record, how to use the device. |
| 10:36:22 | 13 | Q. And when you say in a safe manner, does this mean outside |
| 10:36:25 | 14 | the presence of individuals who he was dealing drugs with? |
| 10:36:28 | 15 | A. Drug suppliers, drug customers, or anyone might be |
| 10:36:32 | 16 | suspicious into him cooperating with the police. |
| 10:36:35 | 17 | Q. And after your November 6th -- after your November 6th, |
| 10:36:40 | 18 | 2008 meeting with Peter Flores, where you provided him with |
| 10:36:44 | 19 | those instructions, do you know if any drugs were moved by him |
| 10:36:50 | 20 | without your knowledge? |
| 10:36:51 | 21 | A. Not that I'm aware of. |
| 10:36:53 | 22 | MS. RODNEY: Just one moment, your Honor. |
| 10:36:56 | 23 | Your Honor, I have nothing further. Thank you. |
| 10:36:58 | 24 | THE COURT: Okay. Nothing further? |
| 10:37:03 | 25 | MR. RUBINO: (Shaking head.) |

| | | |
|---|---|---|
| 10:37:04 | 1 | THE COURT:  Okay.  You can step down, sir. |
| 10:37:07 | 2 | THE WITNESS:  Thank you, your Honor. |
| 10:37:08 | 3 | (Witness leaves the stand.) |
| 10:37:09 | 4 | THE COURT:  You can call your next witness. |
| 10:37:10 | 5 | MS. RODNEY:  Your Honor, at this time the Government |
| 10:37:12 | 6 | would like to publish Government Exhibits 1-A, 1-B, 1-C, the |
| 10:37:16 | 7 | recordings. |
| 10:37:17 | 8 | THE COURT:  Okay.  Then before you do that, I would |
| 10:37:19 | 9 | like to read a -- is this the proper stipulation -- I mean, |
| 10:37:24 | 10 | limiting instruction, that's for later? |
| 10:37:26 | 11 | MS. GUREN:  That's for later. |
| 10:37:27 | 12 | THE COURT:  Okay.  That's fine.  You may do so. |
| 10:37:29 | 13 | MS. RODNEY:  And, your Honor, may we distribute |
| 10:37:31 | 14 | the -- |
| 10:37:31 | 15 | THE COURT:  Yes.  Could you, Marty, help them pass |
| 10:37:34 | 16 | out some transcript binders?  Thank you. |
| 10:38:14 | 17 | MS. RODNEY:  Your Honor, may I ask that you instruct |
| 10:38:16 | 18 | the jury to turn to Transcript 1. |
| 10:38:19 | 19 | THE COURT:  So this is the way we are going to do |
| 10:38:21 | 20 | this.  As we move along, if you can just look to me for |
| 10:38:25 | 21 | getting directions on when you can go through different |
| 10:38:29 | 22 | binders, that would be the best. |
| 10:38:30 | 23 | And, yes, you may now turn to transcript number 1. |
| 10:38:34 | 24 | MS. RODNEY:  Thank you. |
| 10:38:35 | 25 | For the record, I'm publishing Government |

| | | |
|---|---|---|
| 10:38:35 | 1 | Exhibit 1-A. |
| 10:39:10 | 2 | (Whereupon the audio recording is played.) |
| 10:42:32 | 3 | MS. RODNEY: Your Honor, may I publish Government |
| 10:42:36 | 4 | Exhibit 1-B? |
| 10:42:36 | 5 | THE COURT: You may. |
| 10:42:37 | 6 | Okay, folks -- is it 1-B, did you say? |
| 10:42:39 | 7 | MS. RODNEY: It's Recording 1-B, Transcript 2. |
| 10:42:42 | 8 | THE COURT: Oh, okay. There you go. Transcript 2. |
| 10:43:13 | 9 | (Whereupon the audio recording is played.) |
| 10:43:13 | 10 | MS. RODNEY: And now may I publish Recording 1-C? |
| 10:43:16 | 11 | THE COURT: Which is Transcript 3? |
| 10:43:18 | 12 | MS. RODNEY: Which is Transcript 3. |
| 10:43:19 | 13 | THE COURT: Okay. You can turn to 3 now, folks. |
| 10:43:47 | 14 | (Whereupon the audio recording is played.) |
| 10:44:50 | 15 | MS. RODNEY: Your Honor, that concludes the |
| 10:44:51 | 16 | presentation of the recordings. |
| 10:44:52 | 17 | THE COURT: Okay. You can close up your binders now, |
| 10:44:55 | 18 | folks. |
| 10:44:55 | 19 | And call your next witness. |
| 10:44:57 | 20 | MS. GUREN: Your Honor, before we call the next |
| 10:44:58 | 21 | witness, we do have a stipulation to read, and it relates to |
| 10:45:02 | 22 | the limiting instruction. |
| 10:45:02 | 23 | THE COURT: Okay. Hold on. I have to find it. |
| 10:45:20 | 24 | Okay. You want the stipulation first or the limiting |
| 10:45:23 | 25 | instruction first? |

10:45:23  1    MS. GUREN:  I think the limiting instruction should
10:45:26  2    go first.  The stipulation relates to the topic.
10:45:29  3    THE COURT:  All right.  Although it's in past tense.
10:45:32  4    Okay, folks.  Here's a limiting instruction on the
10:45:35  5    evidence you are about to hear.  You are going to hear
10:45:37  6    evidence of a recording and recorded telephone calls made from
10:45:40  7    the McHenry County Jail by Ron Collins.  You may consider this
10:45:45  8    evidence only for the limited purpose of the circumstances
10:45:49  9    under which the calls were recorded.  You may not consider
10:45:52  10   this evidence for any other purpose.  The fact that the calls
10:45:56  11   were recorded from jail is not evidence of the defendant's
10:45:59  12   guilt of any crime for which he is charged.
10:46:02  13   Okay.  Now, you can read your stip.
10:46:04  14   MS. GUREN:  Thank you, your Honor.  The Government
10:46:06  15   now reads stipulation 8.
10:46:08  16   It is hereby stipulated and agreed by the United
10:46:11  17   States of America, by its attorney, Patrick J. Fitzgerald, the
10:46:15  18   United States Attorney for the Northern District of Illinois,
10:46:17  19   and the defendant, individually and by his attorneys, that the
10:46:21  20   following facts are true:
10:46:22  21   Government Exhibit Recording 2 is a disk containing
10:46:25  22   one recording, which truly and accurately records portions of
10:46:29  23   a telephone call made from the McHenry County Jail by Ron
10:46:34  24   Collins on December 24th, 2010 at approximately 12:33 p.m.
10:46:39  25   Government Exhibit Transcript 4 consists of a

| | | |
|---|---|---|
| 10:46:42 | 1 | transcript of the recorded telephone call in Government |
| 10:46:47 | 2 | Exhibit Recording 2.  The transcript contained in Government |
| 10:46:51 | 3 | Exhibit Transcript 4 is an accurate transcription of the |
| 10:46:53 | 4 | recorded conversation. |
| 10:46:54 | 5 | So stipulated? |
| 10:46:58 | 6 | (No response.) |
| 10:46:58 | 7 | THE COURT:  Mr. Rubino, do you agree to the |
| 10:47:00 | 8 | stipulation, sir? |
| 10:47:01 | 9 | MR. RUBINO:  Yes, your Honor. |
| 10:47:01 | 10 | THE COURT:  Okay. |
| 10:47:02 | 11 | MS. GUREN:  Thank you, your Honor. |
| 10:47:03 | 12 | At this time we would call Special Agent Pat Bagley |
| 10:47:08 | 13 | to the stand. |
| 10:47:09 | 14 | THE COURT:  Okay. |
| 10:47:16 | 15 | (Witness takes the stand.) |
| 10:47:17 | 16 | THE COURT:  Please raise your right hand. |
| 10:47:20 | 17 | (The witness was sworn.) |
| 10:47:22 | 18 | THE COURT:  Okay.  Have a seat. |
| 10:47:22 | 19 | - - - |
| 10:47:22 | 20 | PATRICK BAGLEY, DIRECT EXAMINATION |
| 10:47:22 | 21 | BY MS. GUREN: |
| 10:47:31 | 22 | Q.  Good morning. |
| 10:47:32 | 23 | A.  Good morning. |
| 10:47:33 | 24 | Q.  Can you introduce yourself and spell your last name for |
| 10:47:35 | 25 | the jury? |

610

| | | |
|---|---|---|
| 10:47:36 | 1 | A.  Patrick Bagley, B-a-g-l-e-y. |
| 10:47:40 | 2 | Q.  Where do you work? |
| 10:47:41 | 3 | A.  I'm a special agent with the Drug Enforcement |
| 10:47:44 | 4 | Administration, here in Chicago. |
| 10:47:45 | 5 | Q.  Can I refer to that as DEA? |
| 10:47:47 | 6 | A.  Yes. |
| 10:47:49 | 7 | Q.  What is your -- and you said you were a special agent? |
| 10:47:51 | 8 | A.  Yes. |
| 10:47:52 | 9 | Q.  What are your responsibilities as a special agent? |
| 10:47:55 | 10 | A.  To enforce federal and state narcotics violations. |
| 10:47:59 | 11 | Q.  How long have you worked as a special agent for DEA in |
| 10:48:02 | 12 | Chicago? |
| 10:48:02 | 13 | A.  In Chicago it will be nine years shortly. |
| 10:48:06 | 14 | Q.  Before that, where were you working? |
| 10:48:08 | 15 | A.  I was a special agent in New York City. |
| 10:48:11 | 16 | Q.  How long were you a special agent in New York City? |
| 10:48:14 | 17 | A.  Almost six years. |
| 10:48:16 | 18 | Q.  Before becoming a special agent with DEA, what was your |
| 10:48:19 | 19 | job? |
| 10:48:19 | 20 | A.  I was a police officer. |
| 10:48:20 | 21 | Q.  How long were you a police officer? |
| 10:48:22 | 22 | A.  Eight and a half years. |
| 10:48:23 | 23 | Q.  At what location? |
| 10:48:25 | 24 | A.  For the Village of Bridgeview here in Illinois. |
| 10:48:28 | 25 | Q.  How long have you been involved in this investigation? |

| | | |
|---|---|---|
| 10:48:31 | 1 | A.  Since approximately August of 2009. |
| 10:48:35 | 2 | Q.  What is your role currently in this case? |
| 10:48:37 | 3 | A.  Currently, I'm one of the co-case agents. |
| 10:48:40 | 4 | Q.  When did you become a co-case agent for this |
| 10:48:43 | 5 | investigation? |
| 10:48:44 | 6 | A.  Approximately one year ago. |
| 10:48:46 | 7 | Q.  What have been your responsibilities as a case agent? |
| 10:48:52 | 8 | A.  Oversee this international investigation. |
| 10:48:57 | 9 | MS. GUREN:  I'm going to hand you a packet of |
| 10:49:00 | 10 | documents and exhibits, and I'm just going to ask that you |
| 10:49:05 | 11 | refer to them one at a time as I ask about them. |
| 10:49:25 | 12 | And, your Honor, at this time, pursuant to the |
| 10:49:27 | 13 | stipulation, we would move into evidence Government Exhibit |
| 10:49:30 | 14 | Recording 2. |
| 10:49:30 | 15 | THE COURT:  Okay.  This will be admitted. |
| 10:49:33 | 16 | BY MS. GUREN: |
| 10:49:34 | 17 | Q.  Looking first to Government Exhibit Recording 2, do you |
| 10:49:38 | 18 | recognize that? |
| 10:49:40 | 19 | A.  (No response.) |
| 10:49:41 | 20 | Q.  It's in the folder. |
| 10:49:43 | 21 | A.  Thank you. |
| 10:49:52 | 22 | Yes, I do. |
| 10:49:53 | 23 | Q.  What is it? |
| 10:49:53 | 24 | A.  It's a recording.  My initials are on it. |
| 10:49:57 | 25 | Q.  Have you listened to Government Exhibit Recording 2? |

612

| | | |
|---|---|---|
| 10:49:59 | 1 | A.  Yes, I have. |
| 10:50:00 | 2 | Q.  Specifically, what is this a recording of? |
| 10:50:03 | 3 | A.  It's a recording from the McHenry County Jail. |
| 10:50:07 | 4 | Q.  Who is on the recording? |
| 10:50:09 | 5 | A.  Subject identified as Ron Collins and another subject |
| 10:50:14 | 6 | who's identified as Chella. |
| 10:50:16 | 7 | Q.  When did you review this recording? |
| 10:50:18 | 8 | A.  February 14th of this year. |
| 10:50:22 | 9 | Q.  Did you also review other recordings, from the McHenry |
| 10:50:26 | 10 | County Jail, of calls from Ron Collins on this day, |
| 10:50:29 | 11 | February 14th? |
| 10:50:30 | 12 | A.  Yes. |
| 10:50:30 | 13 | Q.  Just on February 14th, how long did you spend reviewing |
| 10:50:34 | 14 | this recording and those other McHenry County recordings? |
| 10:50:38 | 15 | A.  Approximately one hour. |
| 10:50:39 | 16 | Q.  Were there other days that you reviewed additional |
| 10:50:42 | 17 | recordings received from McHenry County Jail from Ron Collins, |
| 10:50:46 | 18 | other than these recordings? |
| 10:50:48 | 19 | A.  Yes. |
| 10:50:48 | 20 | Q.  What period of time -- or I should first ask you. |
| 10:50:50 | 21 | Did you review those recordings too? |
| 10:50:53 | 22 | A.  Yes. |
| 10:50:55 | 23 | Q.  What period of time -- over what period of time did you |
| 10:50:58 | 24 | review those other recordings? |
| 10:51:00 | 25 | A.  I started reviewing recordings in December of 2010. |

| | | |
|---|---|---|
| 10:51:06 | 1 | Q.  In total about how many calls from McHenry County Jail did |
| 10:51:11 | 2 | you review? |
| 10:51:11 | 3 | A.  Approximately 20 or 25. |
| 10:51:13 | 4 | Q.  In total, about how long did you spend reviewing these |
| 10:51:16 | 5 | calls, besides from that date on February 14th? |
| 10:51:19 | 6 | A.  Several hours. |
| 10:51:22 | 7 | Q.  Turning to the red binder in front of you, which is a |
| 10:51:26 | 8 | transcript binder, and turning to the tab of Government |
| 10:51:30 | 9 | Exhibit Transcript 4, do you recognize Government Exhibit |
| 10:51:33 | 10 | Transcript 4? |
| 10:51:33 | 11 | A.  I do. |
| 10:51:34 | 12 | Q.  What is Government Exhibit Transcript 4? |
| 10:51:36 | 13 | A.  It's a transcript from Government Exhibit, I believe it's, |
| 10:51:40 | 14 | 2 here, the recording.  It's a transcript of the recording. |
| 10:51:44 | 15 | Q.  How do you recognize this transcript? |
| 10:51:46 | 16 | A.  I reviewed it and I initialed each page.  There's three |
| 10:51:50 | 17 | pages. |
| 10:51:50 | 18 | Q.  Did you previously go through Government Exhibit |
| 10:51:54 | 19 | Transcript 4 while going through Government Exhibit |
| 10:51:57 | 20 | Recording 2? |
| 10:51:57 | 21 | A.  I did. |
| 10:51:58 | 22 | Q.  Were you able to hear all the words on Government Exhibit |
| 10:52:01 | 23 | Recording 2? |
| 10:52:01 | 24 | A.  No. |
| 10:52:01 | 25 | Q.  In cases where you couldn't make out all the words, how is |

10:52:05  1  that noted on Government Exhibit Transcript 4?

10:52:09  2  A.  It's marked in parentheses with UI, which stands for

10:52:11  3  unintelligible.

10:52:13  4  Q.  To the best of your hearing, does Government Exhibit

10:52:14  5  Transcript 4 accurately reflect the recording on Government

10:52:17  6  Exhibit Transcript -- Recording 2?

10:52:18  7  A.  Yes.

10:52:19  8        MS. GUREN:  At this time, your Honor, before we play

10:52:22  9  the recordings, we would just like to publish Government

10:52:24  10  Exhibit Transcript 4 to refer to it during Special Agent

10:52:27  11  Bagley's testimony.

10:52:28  12        THE COURT:  Okay.  Now, that's fine.  Now, is that in

10:52:30  13  the same binder?

10:52:32  14        MS. GUREN:  It is in the same binder.

10:52:33  15        THE COURT:  Okay.

10:52:34  16        MS. GUREN:  It is the last tab.

10:52:36  17        THE COURT:  Okay.  So we'll be listening to this one.

10:52:39  18  It's your last tab.  Go ahead, folks, and turn to it.

10:52:43  19  BY MS. GUREN:

10:52:44  20  Q.  You started to testify about this already, but who are --

10:52:46  21  that there are speakers identified on this transcript, and one

10:52:49  22  of those speakers is identified as Ron Collins.

10:52:52  23        How did you identify this voice on the recording as

10:52:55  24  Ron Collins?

10:52:55  25  A.  On the recording the subject identifies himself as Ron

| | | |
|---|---|---|
| 10:53:00 | 1 | Ron, and he also says, Collins, in the recording. |
| 10:53:03 | 2 | Q.  The other voice you identified as Chella, why is that the |
| 10:53:07 | 3 | identity of the transcript? |
| 10:53:09 | 4 | A.  This subject identifies herself as Chella when she's |
| 10:53:13 | 5 | asked. |
| 10:53:14 | 6 | Q.  Turning to the top of this transcript where it says, Date |
| 10:53:17 | 7 | and time, where did that information come from? |
| 10:53:20 | 8 | A.  It came from the recording from the McHenry County Jail. |
| 10:53:24 | 9 | Q.  Also, turning to that first page, there's a set of |
| 10:53:29 | 10 | asterisks some ways down. |
| 10:53:33 | 11 | What do the asterisks refer to? |
| 10:53:35 | 12 | A.  The asterisks indicate that this transcript is a partial |
| 10:53:37 | 13 | transcript from the actual recording that the jail made. |
| 10:53:42 | 14 | Q.  Turning to the very last page, are there also asterisks at |
| 10:53:48 | 15 | the end? |
| 10:53:49 | 16 | A.  Correct. |
| 10:53:49 | 17 | Q.  Looking at the three CDs that I handed to you, Government |
| 10:53:52 | 18 | Exhibit Recordings 1-A through 1-C, do you see those? |
| 10:53:56 | 19 | A.  I do. |
| 10:54:00 | 20 | MS. GUREN:  And at this time we can put away the |
| 10:54:03 | 21 | transcripts, and we'll go back to them. |
| 10:54:09 | 22 | BY MS. GUREN: |
| 10:54:10 | 23 | Q.  Looking at Government Exhibits Recordings 1-A through 1-C, |
| 10:54:15 | 24 | what are they, first? |
| 10:54:16 | 25 | A.  They are recordings of telephone -- telephone calls. |

616

| | | |
|---|---|---|
| 10:54:18 | 1 | Q. How do you recognize those recordings? |
| 10:54:21 | 2 | A. I initialed each CD. |
| 10:54:24 | 3 | Q. Have you previously reviewed the recordings on Government |
| 10:54:27 | 4 | Exhibit Recordings 1-A through 1-C? |
| 10:54:29 | 5 | A. I have. |
| 10:54:30 | 6 | Q. When did you review those recordings for the first time? |
| 10:54:34 | 7 | A. February 14th of this year. |
| 10:54:36 | 8 | Q. Was that the same date you listened to Government Exhibit |
| 10:54:41 | 9 | Recording 2? |
| 10:54:41 | 10 | A. Yes. |
| 10:54:42 | 11 | Q. Prior to listening to the recordings from the McHenry |
| 10:54:47 | 12 | County Jail and Recordings 1-A through 1-C, did you have any |
| 10:54:50 | 13 | other information about the identity of the speakers on |
| 10:54:52 | 14 | Government Exhibits Recordings 1-A through 1-C? |
| 10:54:55 | 15 | A. Yes. |
| 10:54:55 | 16 | Q. Without getting into the information, from whom did you |
| 10:54:58 | 17 | receive that information? |
| 10:54:59 | 18 | A. From other members of this investigation. |
| 10:55:03 | 19 | Q. How many speakers were on each of the recordings, |
| 10:55:06 | 20 | Recording 1-A through 1-C? |
| 10:55:08 | 21 | A. There's two main speakers. |
| 10:55:10 | 22 | Q. Did you recognize either of the two speakers on Government |
| 10:55:13 | 23 | Exhibit Recording 1-A through 1-C from in-person interactions? |
| 10:55:17 | 24 | A. With one of the subjects, yes. |
| 10:55:20 | 25 | Q. Who was that? |

| | | |
|---|---|---|
| 10:55:21 | 1 | A.  Pedro Flores. |
| 10:55:22 | 2 | Q.  Who was the other many voice on Government Exhibit |
| 10:55:26 | 3 | Recording 1-A through 1-C, did you come to recognize this |
| 10:55:29 | 4 | voice? |
| 10:55:29 | 5 | A.  Yes. |
| 10:55:29 | 6 | Q.  How did you come to recognize that voice? |
| 10:55:32 | 7 | A.  From the recordings from the McHenry County Jail. |
| 10:55:35 | 8 | Q.  Based on your comparison based on Government Recording 2 |
| 10:55:39 | 9 | and McHenry Jail recordings and Recordings 1-A through 1-C, |
| 10:55:44 | 10 | who is the other main speaker on Government Exhibit 1-A |
| 10:55:48 | 11 | through 1-C? |
| 10:55:49 | 12 | A.  Ron Collins. |
| 10:55:50 | 13 | MS. GUREN:  May I have a moment, your Honor? |
| 10:55:51 | 14 | THE COURT:  You may. |
| 10:56:01 | 15 | MS. GUREN:  No further questions at this time. |
| 10:56:02 | 16 | THE COURT:  Okay.  Mr. Rubino? |
| 10:56:02 | 17 | - - - |
| 10:56:02 | 18 | PATRICK BAGLEY, CROSS-EXAMINATION |
| 10:56:02 | 19 | BY MR. RUBINO: |
| 10:56:07 | 20 | Q.  Agent Bagley, you listened to more calls than the one that |
| 10:56:13 | 21 | was -- that we're speaking of, correct, the one we have the |
| 10:56:17 | 22 | transcript of? |
| 10:56:17 | 23 | A.  From the jail? |
| 10:56:18 | 24 | Q.  Yes. |
| 10:56:19 | 25 | A.  Yes, sir. |

618

| | | |
|---|---|---|
| 10:56:20 | 1 | Q.  Okay.  And in those jail calls was not -- Ron Collins also |
| 10:56:30 | 2 | used the nickname of Hollywood? |
| 10:56:36 | 3 | A.  I don't know if I recall the nickname Hollywood, no. |
| 10:56:40 | 4 | Q.  Do you know if anyone else in this investigation also used |
| 10:56:42 | 5 | the nickname of Hollywood? |
| 10:56:45 | 6 | A.  Not to my knowledge. |
| 10:56:48 | 7 | Q.  Do you know a Keeley Merry (phonetic)? |
| 10:56:52 | 8 | A.  Sorry.  What's his name? |
| 10:56:53 | 9 | Q.  Keeley Merry, a suspect or defendant in this overall |
| 10:56:57 | 10 | investigation? |
| 10:56:58 | 11 | A.  I heard of the name, yes. |
| 10:56:59 | 12 | Q.  And did he not use the name of Hollywood? |
| 10:57:03 | 13 | A.  I don't know. |
| 10:57:06 | 14 | Q.  Do you know if Ron Collins was ever called whody, |
| 10:57:12 | 15 | w-h-o-d-y? |
| 10:57:14 | 16 | A.  It's referred to on the phone calls. |
| 10:57:17 | 17 | Q.  It's more than referred to. |
| 10:57:19 | 18 |         Is he not called that, if that's him? |
| 10:57:23 | 19 | A.  Yes, they -- yeah, they call each other that in the phone |
| 10:57:26 | 20 | call. |
| 10:57:27 | 21 | Q.  In other words, the person who you claim -- you or the |
| 10:57:30 | 22 | Government claims on the calls is Ron Collins was never |
| 10:57:33 | 23 | referred to on the calls as Ron Ron, but was referred to as |
| 10:57:38 | 24 | whody, correct? |
| 10:57:39 | 25 | A.  That is correct. |

| | | |
|---|---|---|
| 10:57:40 | 1 | MR. RUBINO:  Thank you, sir.  I have nothing else. |
| 10:57:44 | 2 | THE COURT:  Anything else from the Government? |
| 10:57:52 | 3 | MS. GUREN:  Just briefly, your Honor. |
| 10:57:52 | 4 | - - - |
| 10:57:52 | 5 | PATRICK BAGLEY, REDIRECT EXAMINATION |
| 10:57:52 | 6 | BY MS. GUREN: |
| 10:57:55 | 7 | Q.  Agent Bagley, do you know whether or not the term whody |
| 10:57:59 | 8 | that is on Recordings 1-A through 1-C is a term that is a |
| 10:58:03 | 9 | specific nickname or something of the equivalent of dude? |
| 10:58:09 | 10 | A.  It sounded more like a whody.  I have -- I have no idea. |
| 10:58:15 | 11 | I don't -- I don't know. |
| 10:58:16 | 12 | MS. GUREN:  No further questions. |
| 10:58:20 | 13 | THE COURT:  Anything else? |
| 10:58:21 | 14 | MR. RUBINO:  No. |
| 10:58:21 | 15 | THE COURT:  Okay.  You can step down. |
| 10:58:23 | 16 | THE WITNESS:  Thank you. |
| 10:58:25 | 17 | (Witness leaves the stand.) |
| 10:58:25 | 18 | THE COURT:  You can call your next witness. |
| 10:58:26 | 19 | MS. GUREN:  At this time, your Honor, we would |
| 10:58:29 | 20 | publish Government Exhibit 2 with accompanying transcript. |
| 10:58:33 | 21 | THE COURT:  Transcript 4. |
| 10:58:35 | 22 | I don't know why they are not the same number, folks. |
| 10:58:37 | 23 | Transcript 4, you may follow along. |
| 10:58:39 | 24 | MS. GUREN:  That would be my fault. |
| 10:58:41 | 25 | (Laughter.) |

620

10:59:11  1        (Whereupon the audio recording is played.)

11:01:50  2        MS. GUREN:  At this time, your Honor, would you like

11:01:52  3  us to collect the transcripts?

11:01:53  4        THE COURT:  Sure, that would be fine.  Folks, if

11:01:56  5  you'll just pass them to the end here.  And then, Marty, would

11:02:00  6  you grab them for me, please?

11:02:02  7        THE COURT SECURITY OFFICER:  Sure.

11:02:11  8        THE COURT:  You can give them to the Government.

11:02:13  9  Thank you.

11:02:16  10       THE COURT:  Okay.  Call your next witness, folks.

11:02:17  11       MS. GUREN:  At this time we would call Jorge Llamas.

11:02:33  12       THE COURT:  Right up here, sir.

11:02:37  13       (Witness takes the stand.)

11:02:37  14       THE COURT:  Okay.  Please raise your right hand.

11:02:40  15       (The witness was sworn.)

11:02:44  16       THE COURT:  Okay.  Have a seat.

11:02:44  17                           - - -

11:02:44  18          JORGE LLAMAS, DIRECT EXAMINATION

11:02:44  19  BY MS. GUREN:

11:02:53  20  Q.  Good morning.

11:02:54  21  A.  Good morning.

11:02:54  22  Q.  Can you introduce yourself and spell your last name for

11:02:58  23  the record?

11:02:58  24  A.  Yes.  Jorge Llamas, Llamas is double L, -a-m-a-s.

11:03:04  25  Q.  How old are you?

| | | |
|---|---|---|
| 11:03:05 | 1 | A.  34. |
| 11:03:06 | 2 | Q.  Where do you live, generally? |
| 11:03:07 | 3 | A.  South Side of Chicago. |
| 11:03:09 | 4 | Q.  How long have you lived in the South Side of Chicago? |
| 11:03:12 | 5 | A.  32 out of my 34 years. |
| 11:03:15 | 6 | Q.  So is that where you grew up? |
| 11:03:16 | 7 | A.  Yes, ma'am. |
| 11:03:17 | 8 | Q.  How far did you go in school? |
| 11:03:19 | 9 | A.  I got my equivalency, which is my GED, and I got some |
| 11:03:24 | 10 | college. |
| 11:03:25 | 11 | Q.  What do you currently do during the day? |
| 11:03:28 | 12 | A.  I'm a stay-at-home father. |
| 11:03:31 | 13 | Q.  Do you have a nickname? |
| 11:03:32 | 14 | A.  Yes, Sosa. |
| 11:03:33 | 15 | Q.  Turning your attention now to March 2010, at that time did |
| 11:03:38 | 16 | you plead guilty to a federal drug charge? |
| 11:03:40 | 17 | A.  Yes, ma'am. |
| 11:03:40 | 18 | Q.  In your own words what did you plead guilty to? |
| 11:03:43 | 19 | A.  I believe it's no less than 5 kilograms of cocaine and no |
| 11:03:49 | 20 | less than 1 kilogram of heroin. |
| 11:03:51 | 21 | Q.  And what did you plead guilty to, doing with the no less |
| 11:03:55 | 22 | than 5 kilograms of cocaine and no less than 1 kilogram of |
| 11:03:59 | 23 | heroin? |
| 11:03:59 | 24 | A.  Trafficking. |
| 11:04:00 | 25 | Q.  Are you aware of the maximum penalties for that charge? |

622

| | | |
|---|---|---|
| 11:04:03 | 1 | A.  Yes, ma'am. |
| 11:04:04 | 2 | Q.  What are the maximum penalties? |
| 11:04:06 | 3 | A.  Life. |
| 11:04:07 | 4 | Q.  Is there also a minimum prison penalty? |
| 11:04:10 | 5 | A.  Ten. |
| 11:04:11 | 6 | Q.  And when you say ten, is that ten years? |
| 11:04:14 | 7 | A.  Yes, ma'am. |
| 11:04:14 | 8 | Q.  Is there also a maximum fine associated with your charge? |
| 11:04:17 | 9 | A.  Yes, ma'am. |
| 11:04:18 | 10 | Q.  What is that? |
| 11:04:19 | 11 | A.  $4 million. |
| 11:04:20 | 12 | Q.  At the time that you pleaded guilty, did you plead guilty |
| 11:04:24 | 13 | pursuant to a plea agreement with the Government? |
| 11:04:26 | 14 | A.  Yes. |
| 11:04:26 | 15 | Q.  As part of that plea agreement, did you agree to cooperate |
| 11:04:29 | 16 | with the Government? |
| 11:04:30 | 17 | A.  Yes. |
| 11:04:31 | 18 | Q.  Under the terms of your cooperation, what do you have to |
| 11:04:37 | 19 | do here today?  And do you mind actually speaking a little bit |
| 11:04:40 | 20 | more into the microphone?  It's a little hard to hear. |
| 11:04:44 | 21 | A.  Oh.  Basically just tell the truth. |
| 11:04:46 | 22 | Q.  As part of that plea agreement, have you also cooperated |
| 11:04:48 | 23 | in an unrelated federal investigation involving narcotics? |
| 11:04:51 | 24 | A.  Yes, ma'am. |
| 11:04:52 | 25 | Q.  In exchange for your truthful testimony and cooperation, |

| | | |
|---|---|---|
| 11:04:56 | 1 | what recommendation do you expect the Government to make |
| 11:04:59 | 2 | regard to your sentence? |
| 11:05:01 | 3 | A.  50 percent. |
| 11:05:03 | 4 | Q.  50 percent.  Is there a total month amount that you are |
| 11:05:07 | 5 | expecting? |
| 11:05:08 | 6 | A.  Yes, ma'am. |
| 11:05:08 | 7 | Q.  What is that month amount? |
| 11:05:10 | 8 | A.  The total amount after the 50 percent or before? |
| 11:05:13 | 9 | Q.  Yes [sic]. |
| 11:05:13 | 10 | A.  67 months. |
| 11:05:15 | 11 | Q.  What do you understand your defense counsel is allowed to |
| 11:05:18 | 12 | argue for, with regard to your sentence? |
| 11:05:21 | 13 | A.  Well, he's -- he could argue for me to go home. |
| 11:05:24 | 14 | Q.  Have you agreed to have your sentence postponed until |
| 11:05:28 | 15 | after you're done cooperating? |
| 11:05:30 | 16 | A.  Yes, ma'am. |
| 11:05:30 | 17 | Q.  Do you know what your sentence will be, as you sit here |
| 11:05:32 | 18 | now? |
| 11:05:33 | 19 | A.  No. |
| 11:05:33 | 20 | Q.  Who ultimately determines the sentence for your case? |
| 11:05:36 | 21 | A.  Judge James Zagel. |
| 11:05:39 | 22 | Q.  And just to clarify, that's not the judge who's here |
| 11:05:41 | 23 | today? |
| 11:05:41 | 24 | A.  Oh, no, no. |
| 11:05:42 | 25 | Q.  What is your understanding of what you have to do today to |

| | | |
|---|---|---|
| 11:05:45 | 1 | receive a recommendation from the Government for a reduced |
| 11:05:48 | 2 | sentence? |
| 11:05:48 | 3 | A.  Just tell the truth. |
| 11:05:50 | 4 | Q.  What is your understanding of what would happen if you |
| 11:05:52 | 5 | don't tell the truth today? |
| 11:05:53 | 6 | A.  Just -- well, if I don't tell the truth, I perjure myself, |
| 11:05:57 | 7 | so ... |
| 11:05:58 | 8 | Q.  And would you get the recommendation? |
| 11:05:59 | 9 | A.  No. |
| 11:06:00 | 10 | Q.  Have you previously used any drugs? |
| 11:06:02 | 11 | A.  Yes. |
| 11:06:03 | 12 | Q.  What kind? |
| 11:06:04 | 13 | A.  Marijuana. |
| 11:06:05 | 14 | Q.  How long did you use marijuana for? |
| 11:06:08 | 15 | A.  Well, approximately fifteen years. |
| 11:06:10 | 16 | Q.  When did you stop using marijuana? |
| 11:06:13 | 17 | A.  Pretrial. |
| 11:06:14 | 18 | Q.  When you say pretrial, what does that mean? |
| 11:06:18 | 19 | A.  It's a condition of the bond. |
| 11:06:21 | 20 | Q.  Is that for when you were charged in court? |
| 11:06:23 | 21 | A.  Yes, ma'am. |
| 11:06:24 | 22 | Q.  And that -- you said pretrial is part of the conditions of |
| 11:06:27 | 23 | bond? |
| 11:06:27 | 24 | A.  Yes, ma'am. |
| 11:06:29 | 25 | Q.  Towards the end, how much marijuana were you using? |

| | | |
|---|---|---|
| 11:06:33 | 1 | A.  It depended on where I was, if I was here or Mexico. |
| 11:06:38 | 2 | Anywhere from a pound to a key. |
| 11:06:40 | 3 | Q.  And when you say key, how much is that? |
| 11:06:42 | 4 | A.  Kilogram. |
| 11:06:43 | 5 | Q.  When you say a pound to a kilogram, for what period of |
| 11:06:46 | 6 | time were you using this amount? |
| 11:06:47 | 7 | A.  Roughly a month. |
| 11:06:48 | 8 | Q.  About how much did that work out to a day? |
| 11:06:51 | 9 | A.  It depends.  If it's a pound, up to an ounce a day.  If |
| 11:06:57 | 10 | it's a key, up to two ounces a day. |
| 11:07:00 | 11 | Q.  How long did you use that amount of marijuana for? |
| 11:07:03 | 12 | A.  For about ten years. |
| 11:07:05 | 13 | Q.  And -- I'm sorry.  Can you speak up? |
| 11:07:06 | 14 | A.  Oh, for about ten years.  Sorry about that. |
| 11:07:08 | 15 | Q.  After you were charged, you talked about these bond |
| 11:07:11 | 16 | conditions.  Was [sic] that bond conditions that the judge |
| 11:07:14 | 17 | gave you? |
| 11:07:14 | 18 | A.  Yes. |
| 11:07:14 | 19 | Q.  As part of those bond conditions, are you tested for drug |
| 11:07:18 | 20 | use? |
| 11:07:20 | 21 | A.  Yes, ma'am. |
| 11:07:20 | 22 | Q.  Did you ever test positive for any sentence -- or any |
| 11:07:23 | 23 | substance?  Excuse me. |
| 11:07:25 | 24 | A.  Yes, I did. |
| 11:07:25 | 25 | Q.  What substance was that? |

| | | |
|---|---|---|
| 11:07:27 | 1 | A. Marijuana. |
| 11:07:28 | 2 | Q. How many times have you tested positive for marijuana? |
| 11:07:32 | 3 | A. Roughly four or five times. |
| 11:07:35 | 4 | Q. Over what period of time? |
| 11:07:39 | 5 | A. No more than three months after I stopped, four months, |
| 11:07:44 | 6 | roughly. |
| 11:07:44 | 7 | Q. What is your understanding of why you were testing |
| 11:07:47 | 8 | positive for marijuana? |
| 11:07:48 | 9 | A. Because -- |
| 11:07:48 | 10 | MR. RUBINO: Objection, that would be opinion. |
| 11:07:50 | 11 | THE COURT: Sustained. |
| 11:07:56 | 12 | BY MS. GUREN: |
| 11:07:56 | 13 | Q. Were you using marijuana at the time? |
| 11:07:58 | 14 | A. Excuse me. Sorry about that. |
| 11:08:01 | 15 | Q. Yeah. |
| 11:08:01 | 16 | Were you using marijuana at the time? |
| 11:08:03 | 17 | A. At the time of when? |
| 11:08:04 | 18 | Q. At the time that you were testing positive for marijuana. |
| 11:08:06 | 19 | A. Oh, no, no, no. I had stopped, but it's just since I'm |
| 11:08:09 | 20 | fat, you know, the marijuana, the THC stores in your fat |
| 11:08:12 | 21 | cells. |
| 11:08:13 | 22 | Q. Were you -- did one of those positive tests also come back |
| 11:08:17 | 23 | for a positive for opiates? |
| 11:08:19 | 24 | A. Yes, ma'am. |
| 11:08:19 | 25 | Q. Were you using opiates at the time? |

| | | |
|---|---|---|
| 11:08:21 | 1 | A.  No, ma'am. |
| 11:08:22 | 2 | Q.  Do you know why you tested positive for opiates? |
| 11:08:24 | 3 | A.  From what I got, it was just a false positive. |
| 11:08:27 | 4 | Q.  Besides for marijuana in the past, did you ever use any |
| 11:08:30 | 5 | other drugs? |
| 11:08:32 | 6 | A.  Yeah, cocaine once in a blue moon. |
| 11:08:36 | 7 | Q.  When would you use cocaine? |
| 11:08:39 | 8 | A.  Basically -- basically was like sometimes just to check |
| 11:08:45 | 9 | the product. |
| 11:08:46 | 10 | Q.  When you say product, are you referring to the product of |
| 11:08:49 | 11 | cocaine? |
| 11:08:49 | 12 | A.  Yes, ma'am. |
| 11:08:50 | 13 | Q.  Did you ever use hallucinogenics? |
| 11:08:52 | 14 | A.  Yes. |
| 11:08:53 | 15 | Q.  When was the last time you used hallucinogenics? |
| 11:08:57 | 16 | A.  I'm 34.  Fourteen years ago. |
| 11:08:58 | 17 | Q.  How often were you using them at that time? |
| 11:09:03 | 18 | A.  Just a typical used [sic], whenever, basically. |
| 11:09:08 | 19 | Q.  Directing your attention to the late '90s, were you |
| 11:09:13 | 20 | working in the late '90s? |
| 11:09:15 | 21 | A.  Yes, ma'am. |
| 11:09:15 | 22 | Q.  What was your job? |
| 11:09:17 | 23 | A.  I was -- at first I started off as a dispatcher, sending |
| 11:09:23 | 24 | people to work a temporary labor.  And then afterwards, I |
| 11:09:30 | 25 | became a manager of a different temporary agency. |

| | | |
|---|---|---|
| 11:09:35 | 1 | Q.  At some point did you stop working for the second |
| 11:09:38 | 2 | temporary agency? |
| 11:09:39 | 3 | A.  Yes. |
| 11:09:39 | 4 | Q.  When was that? |
| 11:09:41 | 5 | A.  Roughly 2002. |
| 11:09:43 | 6 | Q.  When you stopped working for that second temporary agency, |
| 11:09:47 | 7 | did you do anything to make money on your own? |
| 11:09:50 | 8 | A.  Yeah.  I nickel-and-dimed marijuana. |
| 11:09:54 | 9 | Q.  How long did you do that for? |
| 11:09:55 | 10 | A.  It depended on the product, basically.  It's, you know -- |
| 11:10:00 | 11 | it wasn't much, you know. |
| 11:10:01 | 12 | Q.  What's not much? |
| 11:10:03 | 13 | A.  Maybe a couple months, a month. |
| 11:10:06 | 14 | Q.  Did you do anything else to make money? |
| 11:10:11 | 15 | A.  Well, I assisted -- well, I was already assisting the |
| 11:10:16 | 16 | Flores DTO. |
| 11:10:17 | 17 | Q.  When you say DTO, what does that stand for? |
| 11:10:19 | 18 | A.  Drug trafficking organization. |
| 11:10:21 | 19 | Q.  How did you first meet the Flores brothers? |
| 11:10:25 | 20 | A.  Like in '97, somebody was assaulting one of the -- one of |
| 11:10:34 | 21 | the Flores brothers, and I -- basically someone was beating |
| 11:10:41 | 22 | them up, and I stuck up for him. |
| 11:10:44 | 23 | Q.  Showing you at this time -- your Honor, may we have |
| 11:10:47 | 24 | permission to publish Government Exhibit Photo 1? |
| 11:10:49 | 25 | THE COURT:  You may. |

| | |
|---|---|
| 11:10:50 | 1 |
| 11:10:51 | 2 |
| 11:11:01 | 3 |
| 11:11:04 | 4 |
| 11:11:07 | 5 |
| 11:11:09 | 6 |
| 11:11:10 | 7 |
| 11:11:11 | 8 |
| 11:11:12 | 9 |
| 11:11:15 | 10 |
| 11:11:16 | 11 |
| 11:11:18 | 12 |
| 11:11:21 | 13 |
| 11:11:22 | 14 |
| 11:11:26 | 15 |
| 11:11:28 | 16 |
| 11:11:34 | 17 |
| 11:11:36 | 18 |
| 11:11:41 | 19 |
| 11:11:50 | 20 |
| 11:11:52 | 21 |
| 11:11:57 | 22 |
| 11:12:01 | 23 |
| 11:12:01 | 24 |
| 11:12:05 | 25 |

BY MS. GUREN:

Q.  Showing you, this time on your screen, Government Exhibit Photo 1.  Do you recognize this photo?

A.  Yeah, that's Pedro Flores.

        MS. GUREN:  Your Honor, permission to publish Government Exhibit Photo 2.

        THE COURT:  Sure.

BY MS. GUREN:

Q.  Showing you now on the screen Government Exhibit Photo 2, do you recognize that photo?

A.  Yes, that's Margarito Flores.

Q.  Did you also know him by any other name?

A.  Junior.

Q.  What did the Flores brothers do to make money?

A.  Traffic cocaine.

Q.  Did they do any other drugs besides -- did they traffic any other drugs besides cocaine?

A.  Marijuana once in a blue moon, but it wasn't -- it wasn't around.  And then heroin in approximately '06-ish and on.

Q.  When did you start getting paid by the Flores brothers?

A.  I want to say roughly July of '02.

Q.  Before this, were you sporadically paid by them?

A.  Yes, yes.

Q.  And when did you start getting sporadically paid by them?

A.  Oh, maybe the winter of '01.  Sometime after the

| | |
|---|---|
| 11:12:11 | 1 |
| 11:12:13 | 2 |
| 11:12:17 | 3 |
| 11:12:19 | 4 |
| 11:12:26 | 5 |
| 11:12:26 | 6 |
| 11:12:30 | 7 |
| 11:12:31 | 8 |
| 11:12:33 | 9 |
| 11:12:35 | 10 |
| 11:12:38 | 11 |
| 11:12:41 | 12 |
| 11:12:45 | 13 |
| 11:12:51 | 14 |
| 11:12:55 | 15 |
| 11:12:58 | 16 |
| 11:13:02 | 17 |
| 11:13:05 | 18 |
| 11:13:06 | 19 |
| 11:13:08 | 20 |
| 11:13:08 | 21 |
| 11:13:09 | 22 |
| 11:13:10 | 23 |
| 11:13:12 | 24 |
| 11:13:17 | 25 |

1 unfortunate 9/11 accident.

2 Q.  How did you first get involved in getting paid by the

3 Flores brothers?

4 A.  Cesar Perez, he used to live with me, and -- well, you

5 know, like --

6 Q.  Based on your observations, what was Cesar Perez doing for

7 the twins?

8 A.  He was a runner, basically.

9 Q.  What does it mean to be a runner?

10 A.  He was their legs, you know, the twins' legs.

11 Q.  What types of things did he do as their legs?

12 A.  Whatever, whatever was needed, necessary, pick up, pick up

13 money, drop off money, pick up coke, drop off coke, and

14 phones, you know, miscellaneous things.

15 Q.  When you were first getting paid -- or when you were

16 getting paid by the Flores brothers starting in about July

17 2002, where were you living at first, just generally?

18 A.  South Side of Chicago.

19 Q.  At some point did you leave Chicago?

20 A.  Yes.

21 Q.  Where did you go to?

22 A.  Mexico.

23 Q.  When was that?

24 A.  Roughly March 3rd of '04.

25 Q.  So I'm just going to focus for right now on the period of

| | | |
|---|---|---|
| 11:13:21 | 1 | July 2002 to about March 2004. |
| 11:13:24 | 2 | A.  Yes. |
| 11:13:24 | 3 | Q.  What were the types of things that you did when you worked |
| 11:13:27 | 4 | for the Flores brothers, when you worked during that time |
| 11:13:31 | 5 | period? |
| 11:13:31 | 6 | A.  I was basically a runner as well, which were [sic] |
| 11:13:34 | 7 | basically the same thing as I described as the other |
| 11:13:38 | 8 | gentleman, picking up/dropping off money, picking up/dropping |
| 11:13:41 | 9 | off coke, phones, miscellaneous stuff. |
| 11:13:45 | 10 | Q.  And I want to first talk about the picking up of and |
| 11:13:49 | 11 | dropping off coke, is that cocaine? |
| 11:13:50 | 12 | A.  Yes, ma'am. |
| 11:13:51 | 13 | Q.  Who did you pick up cocaine from? |
| 11:13:53 | 14 | A.  Various sources of theirs. |
| 11:13:57 | 15 | Q.  Where would you meet those various sources? |
| 11:13:59 | 16 | A.  Various areas throughout the Chicagoland area. |
| 11:14:02 | 17 | Q.  What types of areas were those? |
| 11:14:04 | 18 | A.  Public basically. |
| 11:14:06 | 19 | Q.  Were they -- |
| 11:14:07 | 20 | A.  Like shopping malls and restaurants, et cetera. |
| 11:14:11 | 21 | Q.  What did you -- where did you take the cocaine that you |
| 11:14:14 | 22 | picked up to? |
| 11:14:15 | 23 | A.  Wherever, wherever the Flores brothers are -- already |
| 11:14:21 | 24 | predetermined. |
| 11:14:22 | 25 | Q.  What types of places would be predetermined? |

632

| | | |
|---|---|---|
| 11:14:24 | 1 | A. Oh, the stash houses, you know. It just depended. |
| 11:14:27 | 2 | Sometimes it was, you know, take it to stash houses for a |
| 11:14:31 | 3 | couple days, sometimes it was just take it and, you know, get |
| 11:14:35 | 4 | a load and drop it off to a customer. |
| 11:14:38 | 5 | Q. And now I'll get to the dropping off to a customer in a |
| 11:14:42 | 6 | minute. |
| 11:14:42 | 7 | A. Okay. |
| 11:14:43 | 8 | Q. What is a stash house? |
| 11:14:44 | 9 | A. Just clandestine house, you know, just -- some were not |
| 11:14:49 | 10 | the -- somewhere not the general public is to know that it's |
| 11:14:52 | 11 | anything but a house. |
| 11:14:53 | 12 | Q. Were there different types of stash houses used in the |
| 11:14:57 | 13 | Flores brothers' operation? |
| 11:14:58 | 14 | A. At first, no. But like everything, you know, yes, you |
| 11:15:03 | 15 | know, you simplify, you know, one's for money, one's for |
| 11:15:08 | 16 | drugs, you know. |
| 11:15:09 | 17 | Q. When did it start being one for money, one for drugs? |
| 11:15:12 | 18 | A. Ooh. Roughly sometime late '02, '03, early '03. |
| 11:15:18 | 19 | Q. How would you bring the -- how did you bring the cocaine |
| 11:15:22 | 20 | to the stash houses that you were picking up? |
| 11:15:23 | 21 | A. How did I bring it? Mini-vans, the SUVs. |
| 11:15:29 | 22 | Q. About how much at a time did you pick up? |
| 11:15:32 | 23 | A. It depended, anywhere from 50 to 350 kilograms. |
| 11:15:37 | 24 | Q. How did you know to pick up the cocaine from these |
| 11:15:39 | 25 | sources? |

| | | |
|---|---|---|
| 11:15:40 | 1 | A.  One of the brothers would have instructed me beforehand. |
| 11:15:43 | 2 | Q.  How did they contact you? |
| 11:15:45 | 3 | A.  Phone. |
| 11:15:47 | 4 | Q.  When you worked for the Flores brothers, did you use one |
| 11:15:50 | 5 | phone the whole time? |
| 11:15:51 | 6 | A.  Oh, no, no, no, many clandestine phones. |
| 11:15:54 | 7 | Q.  And you started to say this already, but about how many |
| 11:15:57 | 8 | phones did you use? |
| 11:15:58 | 9 | A.  Hundreds. |
| 11:15:59 | 10 | Q.  And would it be hundreds at a time or -- |
| 11:16:01 | 11 | A.  No, no, no, no.  For me, personally, no.  It was -- it was |
| 11:16:07 | 12 | never -- it was always like one and then you'd switch and then |
| 11:16:11 | 13 | one and then switch and, you know ... |
| 11:16:13 | 14 | Q.  How often during 2002 and March 2004 did you pick up |
| 11:16:18 | 15 | cocaine from these sources? |
| 11:16:20 | 16 | A.  Ooh.  I don't even remember.  It was -- it was -- it was |
| 11:16:24 | 17 | quite a few times. |
| 11:16:25 | 18 | Q.  I'm sorry.  Say again? |
| 11:16:26 | 19 | A.  It was quite a few times. |
| 11:16:28 | 20 | Q.  Can you estimate how much in a month, for example? |
| 11:16:33 | 21 | A.  Let me see.  The cocaine business is very unstable with |
| 11:16:36 | 22 | law enforcement and thieves, et cetera, so in one -- in one |
| 11:16:43 | 23 | month maybe we probably got seen once and maybe we wouldn't |
| 11:16:47 | 24 | get seen for two months.  And then maybe the next month we got |
| 11:16:51 | 25 | seen three times in a week.  Seen meaning that we received |

| | | |
|---|---|---|
| 11:16:55 | 1 | drugs, cocaine. |
| 11:16:56 | 2 | Q.  In total how much cocaine did you pick up from these |
| 11:17:00 | 3 | sources between 2002 and March 2004 only? |
| 11:17:04 | 4 | A.  Okay.  Roughly, roughly between six and a half to seven |
| 11:17:12 | 5 | and a half tons of cocaine. |
| 11:17:18 | 6 | Q.  Now, you mentioned that you would bring the cocaine to the |
| 11:17:20 | 7 | stash house or you might immediately make a delivery? |
| 11:17:23 | 8 | A.  Yes. |
| 11:17:23 | 9 | Q.  Who did you deliver to? |
| 11:17:24 | 10 | A.  The customers. |
| 11:17:27 | 11 | Q.  Between 2002 and March 2004, about how many customers in |
| 11:17:32 | 12 | total did you deliver to? |
| 11:17:33 | 13 | A.  I want to say we never had more than twenty customers at a |
| 11:17:37 | 14 | time, but it could -- you know, it could have been more.  But |
| 11:17:40 | 15 | I want to say, roughly, it was about twenty, fifteen. |
| 11:17:44 | 16 | Q.  And, again, just between 2002 to March 2004, approximately |
| 11:17:48 | 17 | how much cocaine in total did you deliver to these customers? |
| 11:17:51 | 18 | A.  From 2002 to what? |
| 11:17:53 | 19 | Q.  To March 2004, just that time period. |
| 11:17:55 | 20 | A.  Oh, like I said, approximately six and a half to seven and |
| 11:17:58 | 21 | a half tons -- |
| 11:17:58 | 22 | Q.  Did you ever go with -- |
| 11:17:59 | 23 | A.  -- give or take. |
| 11:17:59 | 24 | Q.  -- other workers of the Flores brothers to deliver cocaine |
| 11:18:03 | 25 | to customers? |

| | | |
|---|---|---|
| 11:18:04 | 1 | A.  Yes, ma'am. |
| 11:18:05 | 2 | Q.  From your observations, was that typical of how the Flores |
| 11:18:08 | 3 | brothers operated for customer deliveries? |
| 11:18:09 | 4 | A.  No, no.  Normally it was just one person, one, you know, |
| 11:18:14 | 5 | but -- |
| 11:18:14 | 6 | Q.  Why did you do it differently? |
| 11:18:16 | 7 | A.  Sometimes -- well, the reason that I started to do it |
| 11:18:20 | 8 | different was just because I wanted some time to myself.  When |
| 11:18:25 | 9 | you're working anywhere from 90 to 120 hours a week, you know, |
| 11:18:32 | 10 | you have money, but you don't have any time to do anything. |
| 11:18:37 | 11 | So, therefore, you know, I three-wayed certain things with |
| 11:18:39 | 12 | certain of the Flores brothers' DTO members. |
| 11:18:42 | 13 | Q.  Was there also time that you delivered alone to the |
| 11:18:45 | 14 | customers? |
| 11:18:46 | 15 | A.  Yes. |
| 11:18:46 | 16 | Q.  How did you know when to deliver cocaine to a customer? |
| 11:18:49 | 17 | A.  The brothers called me. |
| 11:18:50 | 18 | Q.  What types of instructions did the brothers give you? |
| 11:18:53 | 19 | A.  An example would be, Go see X with Y and take it to Z, for |
| 11:19:03 | 20 | example. |
| 11:19:03 | 21 | Q.  Who are X, Y, and Z in that circumstance? |
| 11:19:06 | 22 | A.  X is the customer. |
| 11:19:08 | 23 | Q.  Y? |
| 11:19:08 | 24 | A.  The amount of bricks or coke -- excuse me -- coke, drugs, |
| 11:19:13 | 25 | and Z would be the place that they predetermined. |

| | | |
|---|---|---|
| 11:19:17 | 1 | Q. And when you say bricks, is that kilograms? |
| 11:19:18 | 2 | A. Yes, yes. It's just another terminology. |
| 11:19:21 | 3 | Q. And if you want water, Mr. Llamas -- |
| 11:19:23 | 4 | A. Yes. |
| 11:19:24 | 5 | Q. -- there is a pitcher right there, if you need -- |
| 11:19:26 | 6 | A. Yes, just to clear my throat. |
| 11:19:29 | 7 | Q. -- any to drink it. |
| 11:19:33 | 8 | A. No water. |
| 11:19:35 | 9 | Q. Oh, let me exchange pitchers with you. |
| 11:19:38 | 10 | A. Okay. |
| 11:19:42 | 11 | Q. This was my responsibility. |
| 11:19:46 | 12 | A. Thank you. Oh, sorry. It probably did have water. I |
| 11:19:52 | 13 | just didn't know how to do it. |
| 11:19:54 | 14 | Q. Well, we'll leave this up here for ... |
| 11:19:59 | 15 | Now, we're just talking about these instructions. |
| 11:20:05 | 16 | A. Yes. |
| 11:20:05 | 17 | Q. After you got these instructions, how did you get the |
| 11:20:07 | 18 | cocaine to deliver it? |
| 11:20:09 | 19 | A. How? Well, it depended on where I was at the time. You |
| 11:20:16 | 20 | know, there was times that I would already be at a stash |
| 11:20:19 | 21 | house, so I wouldn't have to make an extra trip. If I wasn't |
| 11:20:24 | 22 | at a stash house, well, I'd have to go to wherever they |
| 11:20:27 | 23 | predetermined, you know, of which stash house to go to and |
| 11:20:31 | 24 | then just go pick up the load and take it. |
| 11:20:34 | 25 | Q. At what types of locations did you meet these customers? |

11:20:37  1   A.  What do you mean like?

11:20:38  2   Q.  What types of areas?

11:20:39  3   A.  Oh, it depended.  Anywhere -- anywhere in the city,

11:20:43  4   anywhere in the city.  It could have been, like I said, public

11:20:46  5   places or it could have been their houses.

11:20:47  6   Q.  When you talk about public places, is there -- can you

11:20:50  7   give me examples of the different types of public places?

11:20:53  8   A.  Like I said, stores, streets, just anything where there's

11:21:01  9   generally a high-traffic of people, so it wouldn't look like

11:21:06  10  something obvious, in other words.

11:21:10  11  Q.  Was it different places for different customers?

11:21:13  12  A.  Yes, ma'am.

11:21:15  13  Q.  During 2002 to March 2004, about how many times did you

11:21:17  14  deliver kilograms of cocaine to customers of the Flores

11:21:19  15  brothers?

11:21:19  16  A.  From 2002 to 2004?

11:21:21  17  Q.  Yes.

11:21:22  18  A.  Hundreds.

11:21:23  19  Q.  How did you transport the cocaine to deliver to those

11:21:26  20  customers?

11:21:27  21  A.  It depended.  It depended.  Most of the times the way you

11:21:34  22  are supposed to -- you were supposed to do it was to trap the

11:21:37  23  cocaine, you know, just to put it in a concealed hiding place

11:21:42  24  in the car.  But if I was getting followed by someone, well,

11:21:47  25  just throw it in the back of the -- you know, the back, like

11:21:50  1    the trunk or X.

11:21:51  2    Q.  When you say followed by someone, who would be the type of

11:21:54  3    person that would be following you?

11:21:55  4    A.  One of my coworkers.

11:21:57  5    Q.  Why would they be following you?

11:22:00  6    A.  For safety, maybe to try to hurry it up.  You know, it

11:22:09  7    could have been any reason, but basically it was for safety.

11:22:12  8    Q.  Once you met up with a customer, what were the different

11:22:14  9    ways that you gave the cocaine to the customers?

11:22:18  10   A.  Well, if it wasn't trapped, it was real easy, because it

11:22:22  11   was already in the suitcases, the suitcases or duffle bags.

11:22:26  12   So, you know, that's easy.  It's just like unloading

11:22:30  13   groceries.

11:22:30  14           If it's -- if it's trapped, then it could be a little

11:22:35  15   bit more complicated for the simple fact that a lot of the

11:22:41  16   traps, you know, they are concealed hiding places in cars, and

11:22:45  17   they could be anywhere, you know.  So, therefore, you might --

11:22:50  18   for certain cars, certain traps you might need to be inside

11:22:55  19   someone's house instead of being on the street, because it

11:22:57  20   would attract attention.

11:23:02  21   Q.  Specifically when you dropped off cocaine to these

11:23:05  22   customers, did these customers ever give you anything back?

11:23:09  23   A.  Yeah, sometimes money or bad coke.

11:23:13  24   Q.  When you say bad coke, what is that?

11:23:15  25   A.  Just bad coke.  In any product that you deal with,

| | |
|---|---|
| 11:23:19 | 1 |
| 11:23:23 | 2 |
| 11:23:27 | 3 |
| 11:23:31 | 4 |
| 11:23:37 | 5 |
| 11:23:40 | 6 |
| 11:23:42 | 7 |
| 11:23:45 | 8 |
| 11:23:49 | 9 |
| 11:23:51 | 10 |
| 11:23:52 | 11 |
| 11:23:57 | 12 |
| 11:23:57 | 13 |
| 11:23:58 | 14 |
| 11:24:01 | 15 |
| 11:24:03 | 16 |
| 11:24:07 | 17 |
| 11:24:08 | 18 |
| 11:24:12 | 19 |
| 11:24:16 | 20 |
| 11:24:19 | 21 |
| 11:24:22 | 22 |
| 11:24:23 | 23 |
| 11:24:23 | 24 |
| 11:24:26 | 25 |

1  sometimes you have bad product, and the product didn't come in
2  back right, it's not getting cooked.  It could be X reasons
3  why the product is bad.  But it's just bad, you know, the
4  brothers would be kind enough, I guess, to take it back.
5  Because most of the times when you get drugs, you know,
6  whatever you get you got.
7  Q.  When you say kind enough, was it a business practice?
8  A.  Yeah, it was their good business practice, I would say,
9  because, like I said, a lot of people, whatever you get you
10  got, and ...
11  Q.  And you also said you picked up money.  What was the money
12  for?
13  A.  For coke.
14  Q.  Was it for this particular delivery that you would be
15  giving or a previous delivery?
16  A.  It depended, it depended.  But most of the time it was for
17  a previous consignment.
18  Q.  You mentioned money pickups.  How many times did you pick
19  up money for customers where you weren't dropping off cocaine
20  to them, just during 2002 to March 2004?
21  A.  Oh, when I was just picking up -- it could have been
22  hundreds.
23  Q.  And just counting the times where you delivered cocaine to
24  customers and got money back, about how many times during 2002
25  to March 2004 did that happen?

| | | |
|---|---|---|
| 11:24:28 | 1 | A. Ooh. When you get money back? Anywhere from 35 to |
| 11:24:36 | 2 | 50 percent. |
| 11:24:40 | 3 | Q. I'm jumping the gun in asking you this. Were there times |
| 11:24:44 | 4 | where you would just pick up money from the customers? |
| 11:24:46 | 5 | A. Yes, yes. |
| 11:24:47 | 6 | Q. How would you know to -- |
| 11:24:48 | 7 | A. The brothers would instruct us. |
| 11:24:50 | 8 | Q. From 2002 to March 2004 were you responsible at all for |
| 11:24:53 | 9 | counting that money that you picked up? |
| 11:24:55 | 10 | A. Yes. |
| 11:24:56 | 11 | Q. On average how much money did you pick up from the |
| 11:24:58 | 12 | customers? |
| 11:24:59 | 13 | A. Anywhere from five to seven figures. |
| 11:25:02 | 14 | Q. At any given time did you know ahead of time how much |
| 11:25:05 | 15 | money you would be picking up? |
| 11:25:07 | 16 | A. Rarely, rarely. Sometimes the customers would tell you. |
| 11:25:09 | 17 | Sometimes the brothers would tell you, but, rarely. |
| 11:25:12 | 18 | Q. You mentioned phones. What, if anything, was your |
| 11:25:14 | 19 | responsibility with phones from 2002 to March 2004? |
| 11:25:17 | 20 | A. Just to buy them in bulk at different locations, so |
| 11:25:21 | 21 | that -- you know, so it could be clandestine, you know. |
| 11:25:25 | 22 | Q. Did you give those phones to anyone? |
| 11:25:26 | 23 | A. Yes. |
| 11:25:26 | 24 | Q. Who did you give them to? |
| 11:25:28 | 25 | A. Either the brothers or the customers. |

| | | |
|---|---|---|
| 11:25:30 | 1 | Q. On whose instructions -- |
| 11:25:33 | 2 | A. The brothers'. |
| 11:25:34 | 3 | Q. And just so the record is clear, because the court |
| 11:25:36 | 4 | reporter is taking down notes -- |
| 11:25:37 | 5 | A. Yes. |
| 11:25:38 | 6 | Q. -- will you just say your answer again to my question? |
| 11:25:40 | 7 | A. The brothers', the Flores brothers'. |
| 11:25:43 | 8 | Q. About how many phones did you drop off in total to |
| 11:25:47 | 9 | customers from 2002 to March 2004? |
| 11:25:49 | 10 | A. Hundreds. |
| 11:25:51 | 11 | Q. From 2002 to March 2004 did you get paid for your work |
| 11:25:55 | 12 | with the Flores brothers? |
| 11:25:56 | 13 | A. From 2002 -- yes. |
| 11:25:57 | 14 | Q. How much did you get paid? |
| 11:25:59 | 15 | A. Oh. Well, if I said six and a half to seven and a half |
| 11:26:05 | 16 | tons, that's basically 650- to 750-grand. |
| 11:26:10 | 17 | Q. And is that because your payment was based on -- |
| 11:26:13 | 18 | A. Per kilo. |
| 11:26:14 | 19 | Q. -- the amount per kilo? |
| 11:26:15 | 20 | A. Yes, per kilo. |
| 11:26:16 | 21 | Q. And so how much were you paid per kilogram of cocaine? |
| 11:26:20 | 22 | A. A hundred. |
| 11:26:22 | 23 | Q. And is that kilogram you picked up or whatever or what? |
| 11:26:25 | 24 | A. No, it was for delivery. |
| 11:26:26 | 25 | Q. In what form did you get paid? |

| | | |
|---|---|---|
| 11:26:28 | 1 | A. Cash. |
| 11:26:30 | 2 | Q. You testified that you went to Mexico in March 2004. What |
| 11:26:34 | 3 | prompted you to go to Mexico? |
| 11:26:35 | 4 | A. A seizure at a warehouse. |
| 11:26:37 | 5 | Q. When you say a seizure, who did the seizure? |
| 11:26:39 | 6 | A. From my -- whatchamacallit -- recollection or whatever, |
| 11:26:46 | 7 | DEA, federal -- well, law enforcement. |
| 11:26:48 | 8 | Q. Law enforcement? |
| 11:26:48 | 9 | A. Yes, law enforcement. |
| 11:26:49 | 10 | Q. What did they seize? |
| 11:26:51 | 11 | A. To my knowledge, 325 kilos inside the warehouse plus |
| 11:26:57 | 12 | whatever the -- plus whatever -- whoever got arrested, they |
| 11:27:05 | 13 | gave -- they also handed in something, what it was. |
| 11:27:08 | 14 | Q. And just to be clear, did you get arrested that day? |
| 11:27:11 | 15 | A. No. |
| 11:27:12 | 16 | Q. How long -- did you know whether there was any warrant out |
| 11:27:16 | 17 | for your arrest for that? |
| 11:27:17 | 18 | A. Oh, no, there was no warrant. |
| 11:27:19 | 19 | Q. How long were you in Mexico for? |
| 11:27:21 | 20 | A. Roughly 25 months. |
| 11:27:22 | 21 | Q. While you were in Mexico, what did you do? |
| 11:27:25 | 22 | A. Just whatever, whatever needed to get done, you know, buy |
| 11:27:31 | 23 | phones, you know, miscellaneous things. |
| 11:27:33 | 24 | Q. Who were you working for when you were in Mexico? |
| 11:27:35 | 25 | A. The Flores brothers. |

| | | |
|---|---|---|
| 11:27:36 | 1 | Q. Who were you living with? |
| 11:27:40 | 2 | A. The Flores brothers. |
| 11:27:40 | 3 | Q. When you say whatever needed to get done, can you just go |
| 11:27:42 | 4 | through some of those tasks? |
| 11:27:43 | 5 | A. Yeah. Like I said phones, sometimes -- more towards the |
| 11:27:49 | 6 | end of the stay, once they met more people, sometimes to go |
| 11:27:53 | 7 | count money at the stash houses from the Mexicans. That was |
| 11:28:00 | 8 | it. |
| 11:28:00 | 9 | Q. What did you understand the money you were counting was |
| 11:28:05 | 10 | from? |
| 11:28:05 | 11 | A. Narcotics. |
| 11:28:06 | 12 | Q. How much were you paid in Mexico? |
| 11:28:08 | 13 | A. It depended. When I was in Mexico, it was basically |
| 11:28:11 | 14 | retainer, you know, could have been two grand, could have been |
| 11:28:14 | 15 | five grand, could have been ten grand, could have been one. |
| 11:28:18 | 16 | Q. And you talked about phones. Can you explain more about |
| 11:28:21 | 17 | what you did with phones in Mexico? |
| 11:28:23 | 18 | A. Yeah, same thing. Just get these guys a phone, so they |
| 11:28:26 | 19 | could communicate with their customers. |
| 11:28:28 | 20 | Q. Did you ever see phones being used by the Flores brothers? |
| 11:28:30 | 21 | A. Oh, yeah. That was the -- at any given time there was |
| 11:28:35 | 22 | anywhere from 30 to 50 phones, so ... |
| 11:28:39 | 23 | Q. And that was all -- that was at the same time? |
| 11:28:41 | 24 | A. Yes, yes. |
| 11:28:42 | 25 | Q. So during the time that there's these 30 to 50 phones |

| | | |
|---|---|---|
| 11:28:47 | 1 | around, did you see whether or not the phones had any markings |
| 11:28:49 | 2 | on them? |
| 11:28:51 | 3 | A.  Yeah.  All of them had stickers on the back, you know, |
| 11:28:53 | 4 | just like decals, just stickers so that you could write the |
| 11:28:57 | 5 | name or the code name of someone, so that you could |
| 11:28:59 | 6 | distinguish them. |
| 11:29:00 | 7 | Q.  What, if anything, did the stickers have on them? |
| 11:29:03 | 8 | A.  Just the customer name. |
| 11:29:07 | 9 | Q.  When you came back to the United States, do you remember |
| 11:29:10 | 10 | what month that was around? |
| 11:29:11 | 11 | A.  Roughly April 15th of '06. |
| 11:29:17 | 12 | Q.  Were you still working for the Flores brothers when you |
| 11:29:19 | 13 | came back? |
| 11:29:20 | 14 | A.  Yes. |
| 11:29:20 | 15 | Q.  What city or ... |
| 11:29:23 | 16 | A.  Chicago, Chicago. |
| 11:29:24 | 17 | Q.  Chicago? |
| 11:29:25 | 18 | What did you do for the Flores brothers, when you |
| 11:29:27 | 19 | came back to Chicago? |
| 11:29:29 | 20 | A.  At first, nothing, just made sure that I wasn't hot, I |
| 11:29:35 | 21 | guess you'd say, meaning that law enforcement wasn't hovering |
| 11:29:40 | 22 | around me. |
| 11:29:42 | 23 | Q.  After you -- a period of time that you didn't do anything, |
| 11:29:48 | 24 | did you start to do anything? |
| 11:29:49 | 25 | A.  Yeah, you know, the same old things. |

| | | |
|---|---|---|
| 11:29:50 | 1 | Q. How long did it take you to start doing things again? |
| 11:29:55 | 2 | A. If I came back in April, maybe July. |
| 11:30:01 | 3 | Q. So in July 2006 when you say doing the same things, what |
| 11:30:05 | 4 | things were those? |
| 11:30:06 | 5 | A. Just, you know, the same narcotics stuff, you know, just, |
| 11:30:11 | 6 | you know, picking up money, dropping off money. |
| 11:30:14 | 7 | Q. Were you still delivering cocaine to customers? |
| 11:30:17 | 8 | A. Not as much, not as much. When I came back, I was |
| 11:30:22 | 9 | primarily seeing one person. |
| 11:30:25 | 10 | Q. Why were you primarily just seeing one person? |
| 11:30:28 | 11 | A. Because of my smoking habit. The brothers didn't want, |
| 11:30:33 | 12 | for instance, law enforcement to pull me over. And because I |
| 11:30:36 | 13 | was always smelling like marijuana, you know, they didn't want |
| 11:30:41 | 14 | them to go into the car. |
| 11:30:43 | 15 | Q. Did you sometimes still deliver cocaine to other |
| 11:30:48 | 16 | customers? |
| 11:30:49 | 17 | A. Yeah, sometimes, but it wasn't -- it wasn't -- it wasn't |
| 11:30:50 | 18 | like before. |
| 11:30:51 | 19 | Q. About how many other customers did you also deliver |
| 11:30:53 | 20 | cocaine to, even if it's at this lesser amount? |
| 11:31:00 | 21 | A. No more than maybe five. |
| 11:31:03 | 22 | Q. About how much cocaine were you delivering to each |
| 11:31:06 | 23 | customer? |
| 11:31:07 | 24 | A. When I came back? |
| 11:31:08 | 25 | Q. Yes. |

| | |
|---|---|
| 11:31:09 | 1 |
| 11:31:14 | 2 |
| 11:31:18 | 3 |
| 11:31:18 | 4 |
| 11:31:22 | 5 |
| 11:31:23 | 6 |
| 11:31:26 | 7 |
| 11:31:28 | 8 |
| 11:31:36 | 9 |
| 11:31:39 | 10 |
| 11:31:41 | 11 |
| 11:31:42 | 12 |
| 11:31:43 | 13 |
| 11:31:44 | 14 |
| 11:31:47 | 15 |
| 11:31:50 | 16 |
| 11:31:53 | 17 |
| 11:31:56 | 18 |
| 11:32:00 | 19 |
| 11:32:00 | 20 |
| 11:32:05 | 21 |
| 11:32:08 | 22 |
| 11:32:08 | 23 |
| 11:32:12 | 24 |
| 11:32:12 | 25 |

A.   Between 20 a 40 keys.

Q.   How often, when you came back, did you deliver cocaine to the customers?

A.   Whenever they called me and told me.  It just depended on if there was product or not.

Q.   For what length of time did you continue making these deliveries of cocaine to customers?

A.   'Til roughly September of '08, because I went to Mexico from October to December.

Q.   And when you say October to when?

A.   To December.

Q.   And is that 2008?

A.   Yes.

Q.   Were you also doing other things during this time period, when you came back from Mexico in April 2006 and started working again in July 2006?

A.   Wait a minute.  Was I doing anything?

Q.   Besides just delivering cocaine, were you doing anything else?

A.   Just miscellaneous things they needed, pick up a car, drop off a car, phones, you know, miscellaneous stuff, so I was around.

Q.   Did you have anything to do with money during this time period?

A.   Well, yeah, picking up money sometimes.

| | | |
|---|---|---|
| 11:32:14 | 1 | Q. Who were you picking up money from? |
| 11:32:17 | 2 | A. From the Flores DTO. |
| 11:32:21 | 3 | Q. The Flores DTO? |
| 11:32:23 | 4 | A. Yes. |
| 11:32:23 | 5 | Q. Did you ever collect any money from customers? |
| 11:32:26 | 6 | A. Yes. |
| 11:32:26 | 7 | Q. When did you collect money from customers? |
| 11:32:28 | 8 | A. When did I collect? Whenever one of the brothers would |
| 11:32:32 | 9 | call me to send me. |
| 11:32:33 | 10 | Q. Did you start to -- was there any point where that |
| 11:32:35 | 11 | increased in any way? |
| 11:32:39 | 12 | A. When I came back, that just depended on the time and the |
| 11:32:43 | 13 | circumstances, basically. |
| 11:32:45 | 14 | Q. While you were in Chicago, you talked about that you were |
| 11:32:49 | 15 | doing -- still doing miscellaneous things with the phones. |
| 11:32:53 | 16 | What were you doing with those phones? |
| 11:32:55 | 17 | A. Just buying them, you know, sending them the codes, you |
| 11:33:01 | 18 | know, for the phones, you know, to keep the numbers as secret |
| 11:33:05 | 19 | as possible. |
| 11:33:06 | 20 | Q. How many phones did you deliver during this time period? |
| 11:33:09 | 21 | A. Could have been a hundred. |
| 11:33:10 | 22 | Q. Who were you delivering them to? |
| 11:33:13 | 23 | A. The customers of the Flores DTO or some of my coworkers. |
| 11:33:17 | 24 | Q. When you got back from Mexico, how were you paid? |
| 11:33:20 | 25 | A. Cash. |

| | | |
|---|---|---|
| 11:33:21 | 1 | Q. And what -- and at what types of amounts? |
| 11:33:25 | 2 | A. It depended. It depended basically on what I took, you |
| 11:33:32 | 3 | know, so it could have been anywhere from two to twenty. |
| 11:33:36 | 4 | Q. Was that still a hundred dollars per kilogram -- |
| 11:33:40 | 5 | A. Yes, yes. |
| 11:33:40 | 6 | Q. -- of cocaine? |
| 11:33:41 | 7 | A. Yes, yes. |
| 11:33:42 | 8 | Q. And was that still just based on cocaine you were |
| 11:33:44 | 9 | delivering? |
| 11:33:45 | 10 | A. Yes. |
| 11:33:45 | 11 | Q. In total the entire time you worked for the Flores |
| 11:33:48 | 12 | brothers, how much cocaine did you deliver to customers? |
| 11:33:51 | 13 | A. Roughly I estimated at -- I want to say nine tons. |
| 11:33:57 | 14 | Q. And in total how much money did you earn approximately |
| 11:34:00 | 15 | during the entire time you worked for the Flores brothers? |
| 11:34:03 | 16 | A. Roughly about $900,000. |
| 11:34:05 | 17 | Q. Around what date did you stop working for the Flores |
| 11:34:09 | 18 | brothers? |
| 11:34:09 | 19 | A. December of '08. |
| 11:34:11 | 20 | Q. Looking around this courtroom, can you identify any |
| 11:34:16 | 21 | customer of the Flores brothers with whom you met? |
| 11:34:17 | 22 | A. Yes. |
| 11:34:18 | 23 | Q. And could you please identify him by an article of |
| 11:34:21 | 24 | clothing that he's wearing? |
| 11:34:23 | 25 | A. Black, black or Navy suit. |

| | | |
|---|---|---|
| 11:34:25 | 1 | MS. GUREN: May the record reflect the witness has |
| 11:34:27 | 2 | identified the defendant? |
| 11:34:29 | 3 | THE COURT: Well, I think he needs a little bit more |
| 11:34:31 | 4 | of a description than that, please. |
| 11:34:32 | 5 | THE WITNESS: Oh, okay. Well, the bald gentleman |
| 11:34:35 | 6 | that's standing next to an attorney, an African-American, |
| 11:34:41 | 7 | semi-goatee, like me. |
| 11:34:42 | 8 | THE COURT: Okay. |
| 11:34:43 | 9 | THE WITNESS: And I'm not sure, like I said, the |
| 11:34:44 | 10 | color, it could be black or it could be Navy blue. |
| 11:34:47 | 11 | THE COURT: Okay. I didn't want you to be |
| 11:34:48 | 12 | identified, Mr. Rubino, for the record. |
| 11:34:51 | 13 | So the record will reflect the defendant is |
| 11:34:53 | 14 | identified. |
| 11:34:54 | 15 | (Laughter.) |
| 11:34:55 | 16 | MS. GUREN: I didn't notice that they were wearing |
| 11:34:57 | 17 | the same color. |
| 11:34:58 | 18 | THE COURT: Right. |
| 11:34:59 | 19 | BY MS. GUREN: |
| 11:34:59 | 20 | Q. What did you know the defendant -- what name did you know |
| 11:35:02 | 21 | the defendant by? |
| 11:35:03 | 22 | A. Ron Ron. |
| 11:35:04 | 23 | Q. Were there any other customers of the Flores brothers that |
| 11:35:07 | 24 | used the nickname Ron Ron? |
| 11:35:09 | 25 | A. No. |

| | | |
|---|---|---|
| 11:35:09 | 1 | Q. When did you first meet Ron Ron in person? |
| 11:35:12 | 2 | A. In person? |
| 11:35:13 | 3 | Q. Yes. |
| 11:35:14 | 4 | A. Roughly the fall of '06. |
| 11:35:19 | 5 | Q. Where was that? |
| 11:35:20 | 6 | A. Outback. |
| 11:35:21 | 7 | Q. Is that -- what neighborhood or area? |
| 11:35:24 | 8 | A. Well, Outback is a steakhouse. It's in -- the one that we |
| 11:35:30 | 9 | went to was somewhere in the south suburbs in the hundreds. |
| 11:35:34 | 10 | Q. Now, prior to that fall 2006 at the Outback Steakhouse, |
| 11:35:39 | 11 | did you ever meet the defendant in person before? |
| 11:35:41 | 12 | A. No. |
| 11:35:42 | 13 | Q. While you were in Mexico, did you ever see the name Ron |
| 11:35:46 | 14 | Ron? |
| 11:35:46 | 15 | A. Yes. |
| 11:35:46 | 16 | Q. Where did you see it? |
| 11:35:47 | 17 | A. On the phone, on the back of the phone. |
| 11:35:49 | 18 | Q. And when you say on the back of the phones -- |
| 11:35:52 | 19 | A. The stickers, you know, that we used to identify the |
| 11:35:55 | 20 | people, because that was -- like I said, there was so many |
| 11:35:58 | 21 | phones. |
| 11:35:58 | 22 | Q. Did you ever see a phone that had a sticker on the back of |
| 11:36:01 | 23 | it that said Ron Ron ring? |
| 11:36:02 | 24 | A. Excuse me. What was that? |
| 11:36:03 | 25 | Q. Did you ever see one of the phones that had a sticker on |

| | | |
|---|---|---|
| 11:36:06 | 1 | the back that Ron Ron ring while -- |
| 11:36:08 | 2 | A. Ron Ron ring? |
| 11:36:09 | 3 | Q. Did the phone ever ring? |
| 11:36:10 | 4 | A. Oh, yeah, yeah, yeah. |
| 11:36:12 | 5 | Q. I think I made a tongue twister. |
| 11:36:14 | 6 | Did you ever answer that phone when it rang? |
| 11:36:17 | 7 | A. Yes. |
| 11:36:17 | 8 | Q. What would you do after you answered the phone? |
| 11:36:21 | 9 | A. Well, basically everybody -- |
| 11:36:22 | 10 | Q. And I just want to stop you, because I don't want you to |
| 11:36:25 | 11 | get into any conversation you had on the phone. I just want |
| 11:36:27 | 12 | to know what you did with the phone after it rang and you |
| 11:36:31 | 13 | answered it? |
| 11:36:31 | 14 | A. Basically, whoever was calling them would know -- my voice |
| 11:36:35 | 15 | and their voices are totally different, so they would know |
| 11:36:38 | 16 | that someone else was answering. So basically the thing would |
| 11:36:42 | 17 | go like this -- |
| 11:36:43 | 18 | Q. And, again, I want to stop you, because you're starting to |
| 11:36:46 | 19 | get into the conversation. |
| 11:36:48 | 20 | A. Oh. |
| 11:36:48 | 21 | Q. I want to know what action you took? |
| 11:36:52 | 22 | A. Oh, none. I just would pass them the phone. |
| 11:36:54 | 23 | Q. Who did you pass the phone to? |
| 11:36:56 | 24 | A. One of the brothers, either Peter or Junior. |
| 11:36:59 | 25 | Q. Turning to the first time in 2007 when you met the |

| | | |
|---|---|---|
| 11:37:00 | 1 | defendant at that Outback Steakhouse, who, if anyone, was with |
| 11:37:03 | 2 | you? |
| 11:37:03 | 3 | A.  Cesar Perez. |
| 11:37:05 | 4 | Q.  Why were you meeting the defendant there? |
| 11:37:07 | 5 | A.  Perez was going to drop him off some coke. |
| 11:37:09 | 6 | Q.  Do you know how much coke? |
| 11:37:12 | 7 | A.  No, no. |
| 11:37:15 | 8 | Q.  And did you know -- did you see the cocaine yourself? |
| 11:37:19 | 9 | A.  No. |
| 11:37:19 | 10 | Q.  How did you know that you were bringing cocaine? |
| 11:37:23 | 11 | A.  Perez told me, so I wouldn't smoke on the way there. |
| 11:37:26 | 12 | Q.  And when you say you wouldn't smoke -- |
| 11:37:28 | 13 | A.  Marijuana, marijuana. |
| 11:37:29 | 14 | Q.  So you weren't smoking that day -- or at that time? |
| 11:37:32 | 15 | A.  No, no -- well, I was always smoking, but when we were |
| 11:37:37 | 16 | dropping off, no, no, no, no, no. |
| 11:37:40 | 17 | Q.  Were you aware of which cars that the Flores brothers' |
| 11:37:43 | 18 | employees used had hidden compartments or traps? |
| 11:37:47 | 19 | A.  Roughly all of them did. |
| 11:37:48 | 20 | Q.  Did the car that you were driving that day have any |
| 11:37:53 | 21 | compartment or trap? |
| 11:37:53 | 22 | A.  I wasn't driving it.  Perez was, but it had a trap. |
| 11:37:55 | 23 | Q.  Were you in the passenger seat? |
| 11:37:56 | 24 | A.  Yes, ma'am. |
| 11:37:57 | 25 | Q.  Did you see -- and you already testified you hadn't seen |

| | | |
|---|---|---|
| 11:38:00 | 1 | the defendant before in person.  But did you see him at all in |
| 11:38:03 | 2 | the parking lot when you arrived? |
| 11:38:04 | 3 | A.  No, not in the parking lot. |
| 11:38:06 | 4 | Q.  Once in the parking lot, did you get any directions from |
| 11:38:09 | 5 | the Flores brothers? |
| 11:38:10 | 6 | A.  Yes, to go inside. |
| 11:38:11 | 7 | Q.  And how did you hear those directions? |
| 11:38:13 | 8 | A.  On the chirp, on the chirp.  I want to say Perez had it |
| 11:38:18 | 9 | on -- not speaker, you know -- well, yes, sorry, speaker, so |
| 11:38:23 | 10 | that everybody could hear. |
| 11:38:24 | 11 | Q.  And is that what you're saying when you say chirp phone? |
| 11:38:27 | 12 | A.  Yes, it was a boost. |
| 11:38:30 | 13 | Q.  Can you describe what a chirp phone is? |
| 11:38:31 | 14 | A.  It's basically a two-way. |
| 11:38:33 | 15 | Q.  Is that like a two-way walkie-talkie-type thing? |
| 11:38:37 | 16 | A.  Yes, yes. |
| 11:38:37 | 17 | Q.  Where did you and Perez go? |
| 11:38:39 | 18 | A.  Inside the restaurant. |
| 11:38:40 | 19 | Q.  Where did you see Perez go specifically inside the |
| 11:38:43 | 20 | restaurant? |
| 11:38:43 | 21 | A.  Perez went and looked for the customer.  I went to the |
| 11:38:48 | 22 | bar. |
| 11:38:48 | 23 | Q.  What did you do once you were at the bar? |
| 11:38:51 | 24 | A.  Ordered a beer. |
| 11:38:52 | 25 | Q.  What, if anything, did you see while you were at the bar? |

11:38:54  1    A.  Oh, I cased the establishment, of course, you know, just

11:38:57  2    to make sure that no law enforcement's there.  And as I was

11:39:01  3    casing the establishment, the defendant caught my attention.

11:39:05  4    Q.  Why did the defendant catch your attention, if you had

11:39:07  5    never seen him before?

11:39:08  6    A.  Diamonds.

11:39:09  7    Q.  Diamonds where?

11:39:10  8    A.  Earring, earring and his chain.  He had a -- I want to say

11:39:15  9    he had a big cross or -- see, he had some kind of a

11:39:19  10   distinguishable piece.

11:39:21  11   Q.  Where did you see him specifically?

11:39:23  12   A.  Roughly 45 degrees from me, so roughly like -- kind of

11:39:27  13   like this.

11:39:28  14   Q.  And what was he doing?

11:39:29  15   A.  Eating.

11:39:30  16   Q.  Was he eating alone?

11:39:32  17   A.  No.

11:39:32  18   Q.  Who was he with?

11:39:33  19   A.  I don't know, maybe family, friends, don't know.

11:39:36  20   Q.  And I'm not asking you to guess who he was with, just how

11:39:39  21   many people?

11:39:39  22   A.  I want to say it was -- they were in a booth, so I want to

11:39:43  23   say the booth was full, so it could have been four.

11:39:49  24   Q.  When you noticed this person -- well, first of all, did

11:39:54  25   you end up talking to Perez inside that Outback steakhouse?

11:39:59   1   A.  Yeah, yeah.  He -- when he went and looked -- well, when

11:39:59   2   he went around to -- looking for him, he didn't find him, he

11:40:02   3   went into the restroom.  He came back.  He's like, Man, I

11:40:05   4   can't find him.  I was like, Is that dude right there?  And I

11:40:08   5   pointed slightly, you know -- you know, like, you know, like,

11:40:12   6   Is that the dude right there?  And he's like, Where?  And I

11:40:16   7   was like, Right there.  And he's like, How the fuck you know?

11:40:19   8   I'm sorry.  Sorry, sorry, sorry.

11:40:20   9         But he is like, How do you know?  And I was like,

11:40:24   10  Look, look at the jewelry, you know, it's kind of obvious.

11:40:27   11  Q.  And so once you pointed this out to Perez, what, if

11:40:31   12  anything, did you see Perez do?

11:40:32   13  A.  Oh, he -- he made a straight line.  They exchanged keys

11:40:38   14  and we left.

11:40:39   15  Q.  And what -- when you say you left, how did you leave?

11:40:42   16  A.  We left in whatever car, I want to say, the defendant was

11:40:47   17  driving.  We switched cars.  Sometimes we would switch cars

11:40:51   18  when we're -- when we're, you know, giving drugs.

11:40:54   19  Q.  What did you do with the car -- or what did Perez do with

11:40:58   20  the car that you were in?

11:40:59   21  A.  Nothing from -- well, what I recall, we just drove back to

11:41:02   22  the city.  He dropped me off, and he did whatever the twins

11:41:05   23  advised him to do.

11:41:07   24  Q.  So were you not there -- were you ever present when Perez

11:41:10   25  gave the car back this time?

| | | |
|---|---|---|
| 11:41:12 | 1 | A.  When he -- no, no, no, no. |
| 11:41:14 | 2 | Q.  Did you ever deliver cocaine to the defendant on your own? |
| 11:41:17 | 3 | A.  No. |
| 11:41:17 | 4 | Q.  Did you ever go with for any other cocaine deliveries to |
| 11:41:20 | 5 | the defendant, besides for that one time? |
| 11:41:22 | 6 | A.  That I recall, no. |
| 11:41:23 | 7 | Q.  Were there other times that you saw the defendant? |
| 11:41:26 | 8 | A.  Yes, a couple times. |
| 11:41:27 | 9 | Q.  For what purposes? |
| 11:41:29 | 10 | A.  To get -- a couple times to drop him off a phone.  One |
| 11:41:35 | 11 | time specifically to give him the phone code for himself. |
| 11:41:39 | 12 | Another time -- a couple other times he gave me money.  And |
| 11:41:43 | 13 | then the last time that I seen the defendant, I believe was |
| 11:41:50 | 14 | when I returned his MKX that he had given them to track. |
| 11:41:54 | 15 | Q.  And we're going to slowly work down that list? |
| 11:41:57 | 16 | A.  Okay. |
| 11:41:57 | 17 | Q.  The first thing I want to focus on is the money. |
| 11:42:00 | 18 |      You said that you picked up payments from him? |
| 11:42:02 | 19 | A.  Yes. |
| 11:42:03 | 20 | Q.  About how many times did you pick up payments from him? |
| 11:42:05 | 21 | A.  That I recall, it was a couple times, no more than five. |
| 11:42:11 | 22 | Q.  When was the first time? |
| 11:42:13 | 23 | A.  Sometime in '07. |
| 11:42:15 | 24 | Q.  Do you remember if it was late or early '07 or middle '07? |
| 11:42:21 | 25 | A.  No, not exactly.  It was just '07. |

| | | |
|---|---|---|
| 11:42:24 | 1 | Q.  Where did you meet -- |
| 11:42:25 | 2 | A.  You know what?  It was summertime.  One time I know -- I |
| 11:42:28 | 3 | know once was in the summer, and then the other time it had |
| 11:42:32 | 4 | been cold, because it could have been fall or it could have |
| 11:42:35 | 5 | been early spring, so -- but we were wearing coats. |
| 11:42:38 | 6 | Q.  Where did you meet the defendant the first time that you |
| 11:42:42 | 7 | picked up money from him? |
| 11:42:44 | 8 | A.  By the buildings right off -- right off the lakeshore, |
| 11:42:52 | 9 | right off like Prairie and 13th, which is like right off of |
| 11:42:56 | 10 | Lakeshore and Roosevelt. |
| 11:42:58 | 11 | MS. GUREN:  At this time I'm going to hand you |
| 11:43:01 | 12 | Government Exhibit Photo 10 and Government Exhibit Photo 12. |
| 11:43:05 | 13 | THE WITNESS:  Okay. |
| 11:43:05 | 14 | MS. GUREN:  And I'll direct your attention to each |
| 11:43:08 | 15 | one at a time. |
| 11:43:09 | 16 | THE WITNESS:  Okay. |
| 11:43:10 | 17 | BY MS. GUREN: |
| 11:43:15 | 18 | Q.  And you can also look at your screen that's next to you -- |
| 11:43:18 | 19 | A.  Okay. |
| 11:43:19 | 20 | Q.  -- if that would be easier. |
| 11:43:20 | 21 | At this time I want to show you Government Exhibit |
| 11:43:23 | 22 | Photo 12.  Do you recognize that? |
| 11:43:26 | 23 | A.  Yeah.  That's roughly the area where -- where I seen the |
| 11:43:29 | 24 | gentleman. |
| 11:43:30 | 25 | Q.  And I know that it's an aerial view, but is that a fair |

| | | |
|---|---|---|
| 11:43:33 | 1 | and accurate representation -- |
| 11:43:34 | 2 | A.  Yes. |
| 11:43:34 | 3 | Q.  -- of what that area looks like? |
| 11:43:36 | 4 | A.  Yes. |
| 11:43:37 | 5 | MS. GUREN:  At this time we would move Government |
| 11:43:40 | 6 | Exhibit Photo 12 into evidence. |
| 11:43:40 | 7 | THE COURT:  Okay.  It will be admitted. |
| 11:43:41 | 8 | MS. GUREN:  May we have permission to publish? |
| 11:43:43 | 9 | THE COURT:  Sure. |
| 11:43:44 | 10 | BY MS. GUREN: |
| 11:43:44 | 11 | Q.  Looking at this area, can you describe for me, using the |
| 11:43:48 | 12 | street names that are there, where you would meet the |
| 11:43:52 | 13 | defendant or where you met the defendant that first time? |
| 11:43:55 | 14 | A.  Roughly I met him at the same place, the times, which was |
| 11:44:00 | 15 | like right where the buildings are.  You see -- see where it |
| 11:44:04 | 16 | says South Prairie and then it goes Avenue?  Well, right in |
| 11:44:08 | 17 | front of where it says the words [sic] Prairie, I want to say |
| 11:44:11 | 18 | there's townhouses right there, and that's where it would have |
| 11:44:16 | 19 | been. |
| 11:44:16 | 20 | Q.  And tell me if this is accurate.  If I draw this box right |
| 11:44:19 | 21 | here? |
| 11:44:20 | 22 | A.  Yeah. |
| 11:44:20 | 23 | Q.  Is that where you met him? |
| 11:44:21 | 24 | A.  Yeah, yeah, yeah, because right down there is, like I |
| 11:44:25 | 25 | said, the townhouses are. |

| | | |
|---|---|---|
| 11:44:27 | 1 | MS. GUREN:  And just for the record, I've drawn in a |
| 11:44:30 | 2 | box around the word Prairie on the exhibit, Government |
| 11:44:33 | 3 | Exhibit 12. |
| 11:44:33 | 4 | THE WITNESS:  Yes. |
| 11:44:34 | 5 | BY MS. GUREN: |
| 11:44:36 | 6 | Q.  Now, I'm going to just turn your attention to Government |
| 11:44:39 | 7 | Exhibit Photo 10 -- |
| 11:44:40 | 8 | A.  Okay. |
| 11:44:40 | 9 | Q.  -- which has already been admitted into evidence. |
| 11:44:43 | 10 | Your Honor, may we have permission to publish |
| 11:44:45 | 11 | Government Exhibit Photo 10? |
| 11:44:46 | 12 | THE COURT:  You may. |
| 11:44:47 | 13 | BY MS. GUREN: |
| 11:44:49 | 14 | Q.  Do you recognize that? |
| 11:44:50 | 15 | A.  Yeah. |
| 11:44:50 | 16 | Q.  What is that? |
| 11:44:51 | 17 | A.  That's one of the buildings.  The -- that building and the |
| 11:44:56 | 18 | building across the street was where the defendant lived, in |
| 11:45:00 | 19 | one of the two buildings. |
| 11:45:01 | 20 | Q.  Do you know if the defendant lived there or if that's |
| 11:45:04 | 21 | where you met him? |
| 11:45:05 | 22 | A.  Well, that's where I met him, but -- well, hearsay from |
| 11:45:09 | 23 | other people that lived -- |
| 11:45:10 | 24 | Q.  Yeah, I don't want to get into hearsay. |
| 11:45:12 | 25 | A.  Okay. |

| | | |
|---|---|---|
| 11:45:12 | 1 | Q. Do you have any personal knowledge of what the defendant's |
| 11:45:17 | 2 | relationship was with those buildings, from your own -- |
| 11:45:20 | 3 | A. From my personal experience, he had to have lived in one |
| 11:45:22 | 4 | of the two buildings. |
| 11:45:23 | 5 | Q. And then -- again, I understand that that's your |
| 11:45:26 | 6 | assumption. |
| 11:45:27 | 7 | A. Yes. |
| 11:45:27 | 8 | Q. But did you understand -- what did you personally observe |
| 11:45:32 | 9 | about the defendant and those buildings? |
| 11:45:35 | 10 | A. Well, he'd bring money or something. |
| 11:45:37 | 11 | Q. Did you ever see him leaving those buildings? |
| 11:45:39 | 12 | A. I want to say I observed him coming from this area, |
| 11:45:45 | 13 | because there's another building like right across the street |
| 11:45:47 | 14 | from this one, not to -- not where Prairie's at, where 13th |
| 11:45:51 | 15 | is, where East 13th Street is, there's another building across |
| 11:45:54 | 16 | the street. So I want to say I seen him coming out of either |
| 11:45:57 | 17 | maybe this building or the other building. |
| 11:45:59 | 18 | Q. Okay. Did you -- |
| 11:46:00 | 19 | A. But I don't recall which one exactly. |
| 11:46:02 | 20 | Q. Okay. So you had seen him coming out of a building in |
| 11:46:04 | 21 | that area? |
| 11:46:04 | 22 | A. Yes, yes. |
| 11:46:05 | 23 | Q. Did you ever go inside the building up to a -- |
| 11:46:08 | 24 | A. No, no. |
| 11:46:08 | 25 | Q. -- or up to an apartment? |

| | | |
|---|---|---|
| 11:46:10 | 1 | A. No, no, no. |
| 11:46:11 | 2 | Q. How did you know to meet him in this area? |
| 11:46:13 | 3 | A. The brothers. |
| 11:46:14 | 4 | Q. How did the brothers tell you this? |
| 11:46:16 | 5 | A. Phone. |
| 11:46:18 | 6 | Q. And just to clarify, did you ever talk directly to the |
| 11:46:20 | 7 | defendant on the phone, when you were delivering and picking |
| 11:46:25 | 8 | up money? |
| 11:46:25 | 9 | A. No, no, no.  It was whatever, whatever, whoever -- |
| 11:46:29 | 10 | whatever and whoever it was, it was always directed through |
| 11:46:31 | 11 | them. |
| 11:46:32 | 12 | Q. When you first arrived that first time on 13th Street and |
| 11:46:35 | 13 | Prairie? |
| 11:46:36 | 14 | A. Yes. |
| 11:46:36 | 15 | Q. Or on Prairie, I guess, specifically, what did you see? |
| 11:46:39 | 16 | A. What do you mean what did I see? |
| 11:46:41 | 17 | Q. What, if anything, did you see?  Was the defendant there? |
| 11:46:43 | 18 | A. Yeah, yeah. |
| 11:46:44 | 19 | Q. How did -- what did you see specifically? |
| 11:46:47 | 20 | A. Just the gentleman walking up to my car. |
| 11:46:51 | 21 | Q. When you say gentleman -- |
| 11:46:52 | 22 | A. Well, truck, the defendant walking up to my truck. |
| 11:46:56 | 23 | Q. What, if anything, was he carrying? |
| 11:46:58 | 24 | A. Well, on the multiple occasions he gave me money. |
| 11:47:04 | 25 | Q. And I'm just talking about this first occasion. |

| | | |
|---|---|---|
| 11:47:06 | 1 | A. Oh. |
| 11:47:07 | 2 | Q. What was the defendant carrying? |
| 11:47:09 | 3 | A. The first time, I want to say, he gave me five figures, |
| 11:47:14 | 4 | money, a black duffle bag. |
| 11:47:16 | 5 | Q. Did the defendant say anything to you this first time you |
| 11:47:19 | 6 | were picking up money? |
| 11:47:20 | 7 | A. No. He just said, It's for dude, meaning the brothers. |
| 11:47:24 | 8 | Q. What, if anything -- did -- did you look inside the bag at |
| 11:47:28 | 9 | all? |
| 11:47:28 | 10 | A. Yes, money. |
| 11:47:30 | 11 | Q. How did he hand the bag to you? |
| 11:47:32 | 12 | A. Just like -- |
| 11:47:33 | 13 | Q. Or did he hand the bag to you? |
| 11:47:34 | 14 | A. No, actually, no. He just threw it in the -- in the back |
| 11:47:38 | 15 | seat of the truck. |
| 11:47:41 | 16 | Q. And you looked inside the bag? |
| 11:47:43 | 17 | A. Yes. |
| 11:47:43 | 18 | Q. Can you describe how the money was? |
| 11:47:45 | 19 | A. Sloppily thousands. |
| 11:47:47 | 20 | Q. When did you look inside the bag? |
| 11:47:51 | 21 | A. Well, after he left but before I left, because I had to |
| 11:47:56 | 22 | trap it. |
| 11:47:56 | 23 | Q. When you say trap it, what does that mean? |
| 11:47:58 | 24 | A. Stash it. |
| 11:47:59 | 25 | Q. Stash it where? |

| | | |
|---|---|---|
| 11:48:00 | 1 | A.  In the trap in the car. |
| 11:48:05 | 2 | Q.  Did you end up counting the money at any point? |
| 11:48:09 | 3 | A.  Yeah.  I want to say a couple hours afterwards. |
| 11:48:11 | 4 | Q.  Where did you count the money? |
| 11:48:13 | 5 | A.  Whatever, whatever place they directed me to, the Flores |
| 11:48:17 | 6 | brothers. |
| 11:48:17 | 7 | Q.  And when you say whatever place, what type of place? |
| 11:48:19 | 8 | A.  A stash house. |
| 11:48:20 | 9 | Q.  To the best of your recollection, do you remember how much |
| 11:48:23 | 10 | was in there? |
| 11:48:23 | 11 | A.  The first time, I want to say, it was five figures. |
| 11:48:26 | 12 | Q.  Did you meet the defendant any other time to pick up |
| 11:48:29 | 13 | money? |
| 11:48:29 | 14 | A.  Yeah.  I met him again at the previous picture, what was |
| 11:48:33 | 15 | it, 10 or 12? |
| 11:48:35 | 16 | Q.  And -- |
| 11:48:36 | 17 | A.  And by the townhouses to give him a phone and to give him |
| 11:48:40 | 18 | his code. |
| 11:48:41 | 19 | Q.  And I actually was asking if you met the defendant -- and |
| 11:48:44 | 20 | I apologize, because I don't think I was specific enough in my |
| 11:48:47 | 21 | question. |
| 11:48:47 | 22 | Did you meet the defendant any other time to pick up |
| 11:48:50 | 23 | money from? |
| 11:48:51 | 24 | A.  Oh, yeah, yeah, yeah, they sent me. |
| 11:48:53 | 25 | Q.  When was that approximately? |

664

| | | |
|---|---|---|
| 11:48:55 | 1 | A. Within a couple months of this one. |
| 11:48:57 | 2 | Q. Where did you meet the defendant -- |
| 11:48:58 | 3 | A. Same place, same place. But like I said, on the other |
| 11:49:01 | 4 | picture where you drew the box. |
| 11:49:04 | 5 | Q. And I'm going to put this other picture on the screen, if |
| 11:49:07 | 6 | I can. May I have permission to publish Government Exhibit -- |
| 11:49:10 | 7 | THE COURT: You may. |
| 11:49:12 | 8 | MS. GUREN: Photo 12? |
| 11:49:13 | 9 | BY MS. GUREN: |
| 11:49:14 | 10 | Q. So -- just so you don't have to refer to something that's |
| 11:49:18 | 11 | not on your screen -- |
| 11:49:18 | 12 | A. Yes. |
| 11:49:18 | 13 | Q. -- say again where -- |
| 11:49:19 | 14 | A. Roughly where you have the box, there's townhouses right |
| 11:49:23 | 15 | there. |
| 11:49:23 | 16 | Q. Oh? |
| 11:49:25 | 17 | And this second time when you arrived to the area, |
| 11:49:28 | 18 | did you see the defendant? |
| 11:49:29 | 19 | A. Yes. |
| 11:49:30 | 20 | Q. And how did you know to meet the defendant when you were |
| 11:49:34 | 21 | going here? |
| 11:49:35 | 22 | A. The brothers directed me. |
| 11:49:37 | 23 | Q. When you saw the defendant, what happened? |
| 11:49:40 | 24 | A. He came into my car, threw the duffle bag in the same |
| 11:49:44 | 25 | place, you know, just right over the back, and that was it. |

| | | |
|---|---|---|
| 11:49:46 | 1 | Q. Did the defendant say anything to you at the time? |
| 11:49:48 | 2 | A. Not -- no, not to my recollection. |
| 11:49:51 | 3 | Q. What did you do next? |
| 11:49:52 | 4 | A. Trapped the money. |
| 11:49:54 | 5 | Q. When you say trapped the money, what do you mean? |
| 11:49:58 | 6 | A. Stash it, you know, put it in the concealed compartment. |
| 11:49:59 | 7 | Q. When you did that, did you see the money? |
| 11:50:01 | 8 | A. Yes. |
| 11:50:01 | 9 | Q. How was it packaged? |
| 11:50:02 | 10 | A. Same way, sloppily thousands. |
| 11:50:05 | 11 | Q. At that time did you count the money? |
| 11:50:07 | 12 | A. Not then, but roughly a couple hours later. |
| 11:50:10 | 13 | Q. Where did you take the money to? |
| 11:50:12 | 14 | A. Whatever predetermined stash house they wanted me to go |
| 11:50:15 | 15 | to. |
| 11:50:15 | 16 | Q. Do you remember how much you counted the money for this |
| 11:50:18 | 17 | time? |
| 11:50:18 | 18 | A. I want to say this time was seven figures. |
| 11:50:21 | 19 | Q. Seven figures? |
| 11:50:22 | 20 | A. Yes -- no, no, no. Sorry, sorry, sorry. Six figures. I |
| 11:50:25 | 21 | jumped one too many. |
| 11:50:26 | 22 | Q. First five figures. This time six figures? |
| 11:50:30 | 23 | A. Yes, yes, yes, yes, yes. |
| 11:50:31 | 24 | Q. Do you remember the next time you met the defendant to |
| 11:50:35 | 25 | pick up money? |

| | | |
|---|---|---|
| 11:50:36 | 1 | A. Money, no. Like I said, I could have picked up the money |
| 11:50:39 | 2 | five times from him. But that I recall -- and I'm being |
| 11:50:42 | 3 | truthful -- is them couple of times and then the phones. |
| 11:50:45 | 4 | Q. And talking about the phones, how often did you meet the |
| 11:50:48 | 5 | defendant -- |
| 11:50:49 | 6 | A. I want to say I gave him two phones. |
| 11:50:51 | 7 | Q. Two phones? |
| 11:50:52 | 8 | A. Yeah. |
| 11:50:53 | 9 | Q. Where would you meet him to give -- |
| 11:50:55 | 10 | A. On Prairie. |
| 11:50:56 | 11 | Q. Same location? |
| 11:50:57 | 12 | A. Yes. |
| 11:50:58 | 13 | Q. At whose direction did you drop off those phones to the |
| 11:51:01 | 14 | defendant? |
| 11:51:02 | 15 | A. That would have had to have been Pedro. |
| 11:51:05 | 16 | Q. Would you have dropped off the phones, if you hadn't been |
| 11:51:08 | 17 | instructed to do so? |
| 11:51:09 | 18 | A. No. Because there's no way I would have even been able to |
| 11:51:11 | 19 | get ahold of dude. |
| 11:51:12 | 20 | Q. When you say dude what -- |
| 11:51:14 | 21 | A. The defendant. |
| 11:51:15 | 22 | Q. You also mentioned at -- when you were talking previously |
| 11:51:18 | 23 | that there was one last time that you saw the defendant? |
| 11:51:21 | 24 | A. Yes. |
| 11:51:21 | 25 | Q. When was that? |

| | | |
|---|---|---|
| 11:51:23 | 1 | A. Well, this ain't the last time, because, remember, the |
| 11:51:26 | 2 | last time was when I gave him back the truck. |
| 11:51:29 | 3 | Q. Okay. So the second-to-last time. |
| 11:51:31 | 4 | A. Yes, yes, yes. This would have been to drop off a phone |
| 11:51:34 | 5 | and to give him his code. |
| 11:51:35 | 6 | Q. To give him his what? |
| 11:51:37 | 7 | A. His phone and his code. |
| 11:51:38 | 8 | Q. And his code? |
| 11:51:40 | 9 | A. Yes. |
| 11:51:40 | 10 | Q. And referring to that car, when did you deal with the |
| 11:51:42 | 11 | defendant and the car? |
| 11:51:43 | 12 | A. In the car? Well, in '08 was when he gave me the car. |
| 11:51:49 | 13 | Q. Okay. So -- |
| 11:51:50 | 14 | A. In the summertime. |
| 11:51:51 | 15 | Q. So tell me about that very first time. How did you |
| 11:51:54 | 16 | know -- what did the -- what did you meet the defendant for |
| 11:51:57 | 17 | when the defendant gave you his car? |
| 11:51:58 | 18 | A. Oh. Pedro instructed me to go meet the defendant to go -- |
| 11:52:03 | 19 | just he was going to give me his car, so it could get trapped, |
| 11:52:07 | 20 | so that whoever would install the traps for the Flores DTO was |
| 11:52:13 | 21 | going to install his trap in his car. |
| 11:52:16 | 22 | Q. When did you meet the defendant? |
| 11:52:17 | 23 | A. Summer of '08. |
| 11:52:18 | 24 | Q. Was anyone with you when you met the defendant? |
| 11:52:20 | 25 | A. Yes. I want to say it was Monkey, Hector. |

| | | |
|---|---|---|
| 11:52:26 | 1 | Q. What was Monkey's job? |
| 11:52:27 | 2 | A. To assist me, you know, to assist these guys. |
| 11:52:31 | 3 | Q. Who are these guys? |
| 11:52:32 | 4 | A. The Flores brothers. |
| 11:52:35 | 5 | Q. Where did you meet the defendant to pick up this car? |
| 11:52:38 | 6 | A. I want to say on Prairie, right there, right by the -- |
| 11:52:42 | 7 | that one, I want to say, it's right in front of the |
| 11:52:45 | 8 | townhouses. |
| 11:52:47 | 9 | Q. What did you do -- what, if anything, did the defendant |
| 11:52:50 | 10 | say to you? |
| 11:52:51 | 11 | A. Take care of his car. |
| 11:52:53 | 12 | Q. Did he say that? |
| 11:52:54 | 13 | A. Yeah.  He's like, Man, make sure they don't F it up. |
| 11:52:58 | 14 | Q. What, if anything, did you do with his car? |
| 11:53:01 | 15 | A. Nothing really.  I just parked it at different garages |
| 11:53:07 | 16 | 'til they are ready for the trap guy to install. |
| 11:53:09 | 17 | Q. Do you know whether or not a trap was ever installed? |
| 11:53:12 | 18 | A. No, no, no.  We wound up giving him the car back a couple |
| 11:53:15 | 19 | months later. |
| 11:53:16 | 20 | Q. Were you the one that actually gave him the car back? |
| 11:53:18 | 21 | A. Yes, yes. |
| 11:53:19 | 22 | Q. When was that? |
| 11:53:20 | 23 | A. I want to say that was in September of -- of '08. |
| 11:53:26 | 24 | Q. What kind of car was it? |
| 11:53:28 | 25 | A. A Lincoln MKX, a black one.  I want to say it was an '08 |

| | | |
|---|---|---|
| 11:53:33 | 1 | or an '07 at that -- but I want to say it was an '08, because |
| 11:53:37 | 2 | if my memory serves correct, it had less than -- less than |
| 11:53:41 | 3 | 500 miles.  It was like a brand new car, really brand new. |
| 11:53:45 | 4 |         MS. GUREN:  May I have a moment, your Honor? |
| 11:53:47 | 5 |         THE COURT:  You may. |
| 11:53:56 | 6 | BY MS. GUREN: |
| 11:53:59 | 7 | Q.  Now, you knew Cesar Perez through this? |
| 11:54:01 | 8 | A.  Yes. |
| 11:54:01 | 9 | Q.  Did you also know Antonio Aguilera? |
| 11:54:04 | 10 | A.  Yes. |
| 11:54:04 | 11 | Q.  Did you also know Danny Torres? |
| 11:54:07 | 12 | A.  Yes. |
| 11:54:07 | 13 | Q.  Did you ever discuss your testimony today here with any of |
| 11:54:09 | 14 | them? |
| 11:54:09 | 15 | A.  Oh, no. |
| 11:54:12 | 16 |         MS. GUREN:  No further questions. |
| 11:54:13 | 17 |         THE COURT:  Okay.  You know, folks.  You haven't had |
| 11:54:16 | 18 | a morning break, and I have a noontime meeting today, so let's |
| 11:54:19 | 19 | take our lunch break now and come back at 1:00 o'clock.  Okay. |
| 11:54:27 | 20 |         (The jury leaves the courtroom.) |
| 11:54:27 | 21 |         THE COURT:  Sir, since you're on cross, you cannot |
| 11:54:29 | 22 | talk with the attorneys for the Government on your lunch |
| 11:54:33 | 23 | break. |
| 11:54:34 | 24 |         THE WITNESS:  So I just go away on my own? |
| 11:54:37 | 25 |         THE COURT:  You cannot talk to them during your lunch |

| | |
|---|---|
| 11:54:39 | 1 |
| 11:54:40 | 2 |
| 11:54:42 | 3 |
| 11:54:42 | 4 |
| 11:54:44 | 5 |
| 11:54:45 | 6 |
| 11:54:47 | 7 |
| 11:54:48 | 8 |
| 11:55:06 | 9 |

1   break about the testimony.

2           THE WITNESS:  Yeah, yeah.  So I can just go on my

3   own?

4           THE COURT:  So you can talk to them about anything

5   else, but your testimony.

6           THE WITNESS:  Okay.  Ma'am, can I give them back

7   their things?

8           THE COURT:  Sure, you can.

9           (Witness leaves the stand.)

10          (Lunch recess taken at 11:55 a.m.)

11                            - - -

12

13

14

15              C E R T I F I C A T E

16

17     I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.

19

20   /s/April M. Metzler, RPR, CRR, FCRR   June 2, 2011

21   April M. Metzler, RPR, CRR, FCRR      Date

22   Official Federal Court Reporter

23

24

25