02:01:14

1

2

3

4          UNITED STATES DISTRICT COURT
5           NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

6

7   UNITED STATES OF AMERICA,        Case No. 1:09-cr-00673

8     Plaintiff,                     Chicago, Illinois
                                     June 6, 2011
9         v.                         Trial
                                     1:45 P.M. SESSION
10

RON COLLINS,
11

     Defendant.
12  -------------------------------

13

14                  VOLUME 4-B
              TRANSCRIPT OF TRIAL
15    BEFORE THE HONORABLE VIRGINIA M. KENDALL
       UNITED STATES DISTRICT JUDGE, AND A JURY

16

17

18  APPEARANCES:

19

20

    For the Government:    Office of the U.S. Attorney
21                         By:  Halley B. Guren, and
                                Renai S. Rodney
22                         219 S. Dearborn St., 5th Fl.
                           Chicago, IL 60604
23                         (312) 353-5300

24

25

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

1

2

3    <u>APPEARANCES (Cont'd)</u>:

4

5

6    For the Defendant:      Frank A. Rubino
                             1001 Brickell Bay Dr., Ste. 2206
                             Miami, FL 33131
7                            (305) 858-5300

8

9

10   <u>COURT REPORTER</u>:        FEDERAL OFFICIAL COURT REPORTER
                             April M. Metzler, RPR, CRR, FCRR
11                           219 South Dearborn St., Rm. 2318-A
                             Chicago, IL 60604
12                           (312) 408-5154
                             April_Metzler@ilnd.uscourts.gov
13

14

15

16

17

18

19

20

21

22

23

24
     **Proceedings recorded by mechanical stenography; transcript
25   produced by notereading.**

977

<u>I N D E X</u>

<u>DESCRIPTION</u>                                          <u>PAGE</u>

JURY INSTRUCTION CONFERENCE                          978

MS. RODNEY, CLOSING ARGUMENT                         987

MR. RUBINO, CLOSING ARGUMENT                         1014

MS. GUREN, FINAL ARGUMENT                            1044

JURY CHARGE, BY THE COURT                            1064

| | |
|---|---|
| 1 | (Resumed at 1:30 p.m.) |
| 2 | (Whereupon the following discussion was had in open |
| 02:01:26  3 | court, outside the presence of the jury:) |
| 02:01:26  4 | THE COURT:  Case 9CR673, USA versus Ron Collins. |
| 02:01:26  5 | - - - |
| 02:01:33  6 | JURY INSTRUCTION CONFERENCE |
| 02:01:33  7 | THE COURT:  Okay, folks.  What I would like to do is |
| 02:01:34  8 | go through your jury instructions.  So as they stand, when we |
| 02:01:37  9 | had our last conference, is the packet that my clerk just |
| 02:01:42 10 | handed to you, and I believe we've incorporated the |
| 02:01:45 11 | supplemental ones that came in throughout the course of the |
| 02:01:48 12 | trial. |
| 02:01:48 13 | So I am going to flip directly to those that need |
| 02:01:57 14 | modification.  First of all, page 3, we will exclude the last |
| 02:02:00 15 | bracketed section, since Mr. Collins has informed me that he |
| 02:02:04 16 | is not going to testify. |
| 02:02:05 17 | And then as far as the next one that was potentially |
| 02:02:11 18 | disputed, okay, we will give then page 10, which is his Fifth |
| 02:02:21 19 | Amendment right.  So that will be given. |
| 02:02:25 20 | And then page 12 is the one regarding identification |
| 02:02:32 21 | of a person, and I believe there was some discussion because |
| 02:02:37 22 | we have voice identification here.  Do we believe that this is |
| 02:02:40 23 | an accurate way to go about telling the jury, Mr. Rubino? |
| 02:02:46 24 | MR. RUBINO:  I'm just reading, please. |
| 02:03:15 25 | THE COURT:  I'm wondering whether time of the offense |

| | |
|---|---|
| 02:03:18 | 1 |
| 02:03:23 | 2 |
| 02:03:27 | 3 |
| 02:03:29 | 4 |
| 02:03:30 | 5 |
| 02:03:32 | 6 |
| 02:03:42 | 7 |
| 02:03:45 | 8 |
| 02:03:45 | 9 |
| 02:03:50 | 10 |
| 02:03:53 | 11 |
| 02:03:54 | 12 |
| 02:03:56 | 13 |
| 02:04:09 | 14 |
| 02:04:35 | 15 |
| 02:04:37 | 16 |
| 02:04:40 | 17 |
| 02:04:43 | 18 |
| 02:04:43 | 19 |
| 02:04:46 | 20 |
| 02:04:48 | 21 |
| 02:04:50 | 22 |
| 02:04:56 | 23 |
| 02:04:59 | 24 |
| 02:05:04 | 25 |

1 makes much sense here, whether the witness had the ability and

2 opportunity to hear.  First, we don't need observe, right?

3         MS. GUREN:  Well, your Honor, there was some in-court

4 identifications of the --

5         THE COURT:  Oh, we have both, right.

6         MS. GUREN:  -- defendant.

7         I do agree with you that it would be a little

8 confusing given how the voice ID was handled --

9         THE COURT:  Right, it's not necessarily at the --

10        MS. GUREN:  Maybe if we just strike, At the time of

11 the offense and later.

12        THE COURT:  To hear the person and to make a reliable

13 identification.  I think that makes a little more sense.

14        Mr. Rubino, any objection to those modifications?

15        MR. RUBINO:  No, I think I'm okay with it.

16        THE COURT:  Okay.  So I took out, At the time of the

17 offense, since we have kind of an oddity with the recordings.

18 Okay?

19        MS. GUREN:  And I think it maybe would then make

20 sense to take out the word later.

21        THE COURT:  Yes, I took that out as well.

22        MR. RUBINO:  The first line we have to add a.

23        THE COURT:  Of a person, okay, got it.

24        All right.  Then the next one that we had under

25 advisement was number 15, and this was the one you had

| | | |
|---|---|---|
| 02:05:08 | 1 | objected to regarding the truly and accurately summarizing the |
| 02:05:12 | 2 | contents.  And that was because you had not had a chance to go |
| 02:05:16 | 3 | through the voluminous records and documents.  This is, I |
| 02:05:23 | 4 | believe, a standard instruction. |
| 02:05:25 | 5 | How is it modified? |
| 02:05:29 | 6 | MS. GUREN:  Your Honor, I -- let me just check really |
| 02:05:31 | 7 | quickly to see how it's modified, because it's not readily |
| 02:05:35 | 8 | apparent to me right now. |
| 02:05:49 | 9 | I actually don't believe it is modified. |
| 02:05:51 | 10 | THE COURT:  I don't think it is either. |
| 02:06:11 | 11 | So 3.16 is the one that would be available to you, if |
| 02:06:16 | 12 | you were challenging the records.  But I think the last time |
| 02:06:19 | 13 | we were here together, you had not had a chance to review all |
| 02:06:26 | 14 | of those records to see if those summaries were accurate, and |
| 02:06:29 | 15 | you've not objected to those.  So I'm assuming that they are |
| 02:06:32 | 16 | an accurate summary. |
| 02:06:34 | 17 | MR. RUBINO:  I don't question the accuracy -- I think |
| 02:06:37 | 18 | that's the word -- of the documents.  Obviously, I question |
| 02:06:40 | 19 | the interpretation by the witness. |
| 02:06:43 | 20 | THE COURT:  Right, and that's still available for you |
| 02:06:45 | 21 | for closing. |
| 02:06:48 | 22 | MR. RUBINO:  Yes. |
| 02:06:48 | 23 | THE COURT:  Okay.  All right.  So that one will be |
| 02:06:48 | 24 | given. |
| 02:06:49 | 25 | The next one that was modified slightly was that we |

| | |
|---|---|
| 02:06:59 | 1 |
| 02:07:03 | 2 |
| 02:07:05 | 3 |
| 02:07:18 | 4 |
| 02:07:23 | 5 |
| 02:07:24 | 6 |
| 02:07:26 | 7 |
| 02:07:30 | 8 |
| 02:07:30 | 9 |
| 02:07:34 | 10 |
| 02:07:38 | 11 |
| 02:07:41 | 12 |
| 02:07:41 | 13 |
| 02:07:44 | 14 |
| 02:07:47 | 15 |
| 02:07:51 | 16 |
| 02:07:54 | 17 |
| 02:08:01 | 18 |
| 02:08:04 | 19 |
| 02:08:09 | 20 |
| 02:08:12 | 21 |
| 02:08:15 | 22 |
| 02:08:16 | 23 |
| 02:08:18 | 24 |
| 02:08:23 | 25 |

1  did add Pedro Flores' name to page 17.

2       MS. GUREN:  And we would just ask that this

3  instruction be under seal, if it goes into the public record.

4       THE COURT:  Okay.  Did you hear that Tresa?

5       THE CLERK:  No, Judge, I didn't.

6       THE COURT:  We need to seal Government instruction

7  number 17 --

8       THE CLERK:  Okay.

9       THE COURT:  -- when we file these.  Okay.

10       MR. RUBINO:  Your Honor, I objected to the wording --

11  the insertion in 16.

12       THE COURT:  Oh.

13       MR. RUBINO:  Which is the second sentence.  These

14  recordings were made legally by the Government.  That is not

15  in the original instruction.  That was inserted by the

16  Government.  I objected to it at our conference, and I still

17  object to that being added.

18       THE COURT:  Well, the second -- the third sentence

19  essentially says what needs to be said in the standard one,

20  and they were already instructed during voir dire that they

21  were legal, so I will sustain your objection and remove the

22  second line --

23       MR. RUBINO:  Thank you.

24       THE COURT:  -- and give the standard.

25       Okay.  Then 17 we'll keep under seal.

| | | |
|---|---|---|
| 02:08:25 | 1 | The next one I know you had an objection, but I said |
| 02:08:29 | 2 | I was going to give, which is on page 19, and that's the |
| 02:08:35 | 3 | conspiracy instruction. But the next one, 20, was the one |
| 02:08:40 | 4 | that we still took under advisement, and that was that, The |
| 02:08:45 | 5 | Government need not prove that the defendant knew each detail |
| 02:08:48 | 6 | of the conspiracy, or that the defendant played more than a |
| 02:08:51 | 7 | minor role in the conspiracy. The defendant need not have |
| 02:08:56 | 8 | participated in all of the events of the charged conspiracy to |
| 02:09:00 | 9 | be a member. |
| 02:09:03 | 10 | Now, I believe you had an objection to that? |
| 02:09:05 | 11 | MR. RUBINO: Yes, I did, your Honor. |
| 02:09:06 | 12 | THE COURT: Okay. |
| 02:09:06 | 13 | MR. RUBINO: I still maintain that objection. |
| 02:09:08 | 14 | THE COURT: And what is the basis of the objection, |
| 02:09:11 | 15 | not that it is an improper statement of the law. |
| 02:09:15 | 16 | MR. RUBINO: Your Honor, I -- I'm going to ask the |
| 02:09:17 | 17 | Court to give a mere presence instruction, and this almost |
| 02:09:21 | 18 | sounds to me like a reversal of a mere presence instruction. |
| 02:09:25 | 19 | THE COURT: Okay. Let's take a look at the mere |
| 02:09:27 | 20 | presence then. |
| 02:09:28 | 21 | MR. RUBINO: Which is 5.11. |
| 02:09:42 | 22 | THE COURT: So you would be seeking, I assume, the |
| 02:09:48 | 23 | bracketed language in A? |
| 02:09:50 | 24 | MR. RUBINO: Yes, I would, your Honor. |
| 02:09:51 | 25 | THE COURT: Not the first language. |

| | | |
|---|---|---|
| 02:09:54 | 1 | MR. RUBINO:  No, I would not ask the first, of |
| 02:09:57 | 2 | course. |
| 02:09:57 | 3 | THE COURT:  Right. |
| 02:09:59 | 4 | MS. GUREN:  I think based on the defendant's defense |
| 02:10:02 | 5 | of it not being his voice on the voice ID, that he doesn't |
| 02:10:06 | 6 | know these people, I don't believe the mere presence |
| 02:10:09 | 7 | association -- or presence instruction, there's been |
| 02:10:11 | 8 | sufficient evidence to establish giving that instruction. |
| 02:10:14 | 9 | MR. RUBINO:  We do know these people.  We know |
| 02:10:17 | 10 | Mr. Gregory.  We bought a car from him, met with him.  He was |
| 02:10:20 | 11 | present with Mr. Gregory at the body shop.  I think he was -- |
| 02:10:24 | 12 | could be construed as being merely present there for the |
| 02:10:27 | 13 | purpose of the car, not for the purpose of the drug deal. |
| 02:10:37 | 14 | MS. GUREN:  And I also believe that this mere |
| 02:10:39 | 15 | presence instruction -- regardless if the Court decides to |
| 02:10:41 | 16 | give it -- does not mean that the instruction in 20 is not, |
| 02:10:45 | 17 | first of all, an accurate statement of law, and, second of |
| 02:10:48 | 18 | all, different than the mere presence instruction, and, |
| 02:10:50 | 19 | therefore, necessary to give -- to help the jury's |
| 02:10:52 | 20 | understanding. |
| 02:11:21 | 21 | THE COURT:  Okay.  I believe that instruction number |
| 02:11:23 | 22 | 20 is a correct statement of the law, and it will be given, |
| 02:11:26 | 23 | over objection.  And I do believe that Mr. Rubino has |
| 02:11:29 | 24 | presented a theory of defense for the mere presence |
| 02:11:33 | 25 | instruction, especially based upon the scenario that he |

02:11:36  1    described at the car -- and so we will insert 5.11, and it

02:11:44  2    will be the bracketed language of A, which is the one that

02:11:47  3    comports with our evidence here.

02:11:49  4              MR. RUBINO:  Okay.  That is my request.

02:11:50  5              THE COURT:  Okay.  It will be added directly after

02:11:53  6    this at page 22.

02:11:57  7              Okay.  Then we have the supplemental instruction on

02:12:02  8    page 22, which charges a conspiracy to possess with intent to

02:12:07  9    distribute.  And it's just knowing the type of controlled

02:12:13  10   substance, and that is a correct statement of the law.

02:12:24  11             Okay.  So is there any objection to that one now?

02:12:27  12   This is a supplemental one that we didn't review originally.

02:12:30  13             MR. RUBINO:  We're on page 22, your Honor?

02:12:33  14             THE COURT:  Yes, we are.

02:12:33  15             MR. RUBINO:  No objection.

02:12:33  16             THE COURT:  Okay.  That'll be given then.

02:12:46  17             And then the other supplemental one was on page 29,

02:12:53  18   and we modified that to get rid of rouses and undercover

02:12:58  19   agents, and now we have consensual recordings and confidential

02:13:08  20   informants.  I've already instructed the jury -- voir dire

02:13:12  21   panel -- excuse me.  I've already instructed the panel during

02:13:14  22   voir dire that this is a proper statement of the law, so this

02:13:18  23   will be given also.

02:13:19  24             And then the next one that was taken under advisement

02:13:23  25   was page 31 about not speculating why any other person whose

02:13:30  1   name you may have heard during the trial is not currently on

02:13:33  2   trial before you.  That usually helps both sides, so that we

02:13:37  3   are not looking to determine why someone isn't here, but I

02:13:41  4   don't know if I had your position on the record.

02:13:43  5           MR. RUBINO:  No problem.

02:13:44  6           THE COURT:  Okay.  I'll give that one then.

02:13:46  7           And then the Government had proposed page 32 about

02:13:56  8   not speculating about punishment, and I believe we modified

02:13:59  9   that slightly.

02:14:07  10          MR. RUBINO:  (Shaking head.)

02:14:08  11          THE COURT:  I think before it was the one, If

02:14:09  12  convicted, and we took that out.  So this is a better one.

02:14:12  13          MR. RUBINO:  I think this is fine.

02:14:13  14          THE COURT:  Okay.  That'll be given then.

02:14:15  15          And then that leads us to the supplemental one

02:14:22  16  regarding the McHenry County Jail calls.  Do you need that

02:14:25  17  given at the end as well?  We gave that during trial.

02:14:31  18          It's page 36.  I'm sorry.

02:15:02  19          MR. RUBINO:  Your Honor, we don't see a need for

02:15:04  20  that.

02:15:04  21          THE COURT:  Okay.  All right.  Then with your -- then

02:15:07  22  since they were already instructed once --

02:15:09  23          MR. RUBINO:  Yes.

02:15:09  24          THE COURT:  -- regarding the limited purpose of that

02:15:11  25  call, we don't need to give it again.

| | | |
|---|---|---|
| 02:15:14 | 1 | And then it goes to our verdict form, and what's the |
| 02:15:19 | 2 | position on the verdict form? |
| 02:15:19 | 3 | (No response.) |
| 02:15:35 | 4 | THE COURT:  Any problems with it?  Anyone? |
| 02:15:37 | 5 | MS. GUREN:  No problems with it from the Government. |
| 02:16:00 | 6 | MR. RUBINO:  Acceptable. |
| 02:16:01 | 7 | THE COURT:  Okay.  All right then.  Give my staff -- |
| 02:16:05 | 8 | we'll start up at 2:30 with the closing arguments.  That'll |
| 02:16:08 | 9 | give us twenty minutes to edit these and get them printed out |
| 02:16:13 | 10 | for you and the jury.  Be ready to get started exactly at |
| 02:16:13 | 11 | 2:30. |
| 02:16:13 | 12 | Anything else?  Did you have any other instructions |
| 02:16:19 | 13 | other than the mere presence? |
| 02:16:19 | 14 | MR. RUBINO:  No, your Honor. |
| 02:16:20 | 15 | THE COURT:  Okay.  All right.  Thank you then.  We'll |
| 02:16:21 | 16 | start up at 2:30. |
| 02:41:48 | 17 | (Recess taken.) |
| 02:41:48 | 18 | THE COURT:  Okay, folks.  We're going to bring the |
| 02:41:50 | 19 | jury in.  My clerk will give you a copy of the jury |
| 02:41:54 | 20 | instructions, as they are printed out, during closings, so |
| 02:41:57 | 21 | we'll just drop them on the table. |
| 02:41:59 | 22 | And you can bring them in now, Jeff. |
| 02:42:32 | 23 | (The jury enters the courtroom.) |
| 02:43:00 | 24 | THE COURT:  Okay, folks.  Please be seated.  Thank |
| 02:43:02 | 25 | you for your patience.  We did a lot of legal work while you |

| | | |
|---|---|---|
| 02:43:04 | 1 | were waiting for us, so we are ready to actually proceed into |
| 02:43:08 | 2 | closing arguments.  Remember, as I told you, that the defense |
| 02:43:11 | 3 | has no obligation to put on a case, nor does the defendant |
| 02:43:14 | 4 | have any obligation to testify.  In fact, he has an absolute |
| 02:43:18 | 5 | right not to testify. |
| 02:43:19 | 6 | And so we are going to move directly into closing |
| 02:43:23 | 7 | arguments, so I will now recognize Ms. Rodney.  And, remember, |
| 02:43:28 | 8 | these are not evidence.  These are what the lawyers believe |
| 02:43:33 | 9 | the evidence has shown and the reasonable inferences from that |
| 02:43:38 | 10 | evidence.  You may proceed. |
| 02:43:39 | 11 | MS. RODNEY:  Thank you, your Honor. |
| 02:43:41 | 12 | - - - |
| 02:43:42 | 13 | MS. RODNEY, CLOSING ARGUMENT |
| 02:43:42 | 14 | MS. RODNEY:  The defendant had a business, a cocaine |
| 02:43:46 | 15 | business.  Over a three-year period, week after week, month |
| 02:43:52 | 16 | after month, the defendant purchased kilogram-quantities of |
| 02:43:57 | 17 | cocaine and he turned around and sold that cocaine to his |
| 02:44:02 | 18 | customers for a profit. |
| 02:44:04 | 19 | During this trial, you heard evidence of the |
| 02:44:08 | 20 | defendant's cocaine business.  You heard from the insider |
| 02:44:12 | 21 | witnesses, who were drug couriers, who delivered |
| 02:44:15 | 22 | multiple-kilogram-quantities of cocaine in various locations |
| 02:44:20 | 23 | around Chicago. |
| 02:44:21 | 24 | You heard from the insider drug customer witness who, |
| 02:44:25 | 25 | over a three-year period, bought between nine-ounce and |

| | |
|---|---|
| 02:44:30 | 1 |
| 02:44:32 | 2 |
| 02:44:36 | 3 |
| 02:44:40 | 4 |
| 02:44:46 | 5 |
| 02:44:49 | 6 |
| 02:44:52 | 7 |
| 02:44:56 | 8 |
| 02:45:01 | 9 |
| 02:45:04 | 10 |
| 02:45:06 | 11 |
| 02:45:07 | 12 |
| 02:45:12 | 13 |
| 02:45:15 | 14 |
| 02:45:19 | 15 |
| 02:45:24 | 16 |
| 02:45:28 | 17 |
| 02:45:32 | 18 |
| 02:45:35 | 19 |
| 02:45:39 | 20 |
| 02:45:51 | 21 |
| 02:45:53 | 22 |
| 02:45:55 | 23 |
| 02:46:02 | 24 |
| 02:46:12 | 25 |

1  four-kilogram quantities of cocaine from the defendant.

2      You heard three recorded phone calls between the

3  defendant and his supplier where the defendant ordered 30

4  kilograms of cocaine at $28,000 per kilogram.  And you saw the

5  financial records where you saw how the defendant spent some

6  of the money he made from his cocaine business.

7      Now, as a result of the defendant's business, he's

8  been charged with the crime of conspiracy.  And the evidence

9  that you have seen during this trial has proven beyond a

10  reasonable doubt that the defendant is guilty of that

11  conspiracy.

12      I'm going to begin by reviewing the charges against

13  the defendant and the instructions I expect Judge Kendall will

14  give you on the crime of conspiracy.  The indictment in this

15  case charges the defendant with conspiring to possess with

16  intent to distribute and to distribute a controlled substance,

17  namely, five kilograms or more of cocaine.

18      I expect that Judge Kendall will instruct you that in

19  order to find the defendant guilty of the charge of

20  conspiracy, the Government must prove two things.  First, that

21  the conspiracy, as charged in the indictment, existed; and,

22  second, that the defendant knowingly became a member of the

23  charged conspiracy with an intention to further it.

24      So what is a conspiracy?  A conspiracy is simply an

25  agreement between two or more people to commit an illegal act.

| | | |
|---|---|---|
| 02:46:13 | 1 | And in this case that illegal act is the distribution of |
| 02:46:17 | 2 | cocaine. |
| 02:46:19 | 3 | How do you go about proving a conspiracy?  Well, |
| 02:46:23 | 4 | criminals don't sit down and write on a piece of paper and |
| 02:46:26 | 5 | enter into a formal contract where they agree to distribute |
| 02:46:30 | 6 | drugs.  You prove a conspiracy by looking at the words and the |
| 02:46:33 | 7 | actions of the conspirators.  You prove the defendant's |
| 02:46:38 | 8 | participation in the conspiracy by looking at his words and |
| 02:46:41 | 9 | his actions. |
| 02:46:44 | 10 | Now, during this trial you've heard eight categories |
| 02:46:49 | 11 | of evidence that have proven the evidence of a conspiracy to |
| 02:46:53 | 12 | distribute cocaine, and it's also proven the defendant's |
| 02:46:57 | 13 | participation in that conspiracy as a wholesale purchaser and |
| 02:47:00 | 14 | distributor of cocaine. |
| 02:47:02 | 15 | You heard the insider testimony from four drug |
| 02:47:05 | 16 | couriers, who all identified the defendant as someone to whom |
| 02:47:10 | 17 | they delivered between 20 and 50 kilograms of cocaine between |
| 02:47:14 | 18 | 2005 and 2008.  You heard the insider testimony of one drug |
| 02:47:21 | 19 | customer, Robert Gregory, who purchased between nine ounces |
| 02:47:24 | 20 | and four kilograms of cocaine from the defendant between 2006 |
| 02:47:29 | 21 | and 2009. |
| 02:47:33 | 22 | You heard three recorded phone calls between the |
| 02:47:36 | 23 | defendant and his supplier, Peter Flores, where the defendant |
| 02:47:40 | 24 | ordered 30 kilograms of cocaine.  You saw the supplier's |
| 02:47:45 | 25 | cellphone and saw the contents of that cellphone, which lists |

02:47:49  1  the defendant as a contact and a Chicago phone number as the

02:47:54  2  only contact number in that phone.

02:47:57  3      You saw three cellphones from the defendant

02:48:01  4  customers -- from the defendant's customers and two SIM cards,

02:48:04  5  which list the defendant's nickname, Ron Ron, and his initials

02:48:08  6  and Chicago-area phone number.

02:48:11  7      You saw the defendant's phone records, which show

02:48:14  8  that the defendant called his supplier at the date and time

02:48:17  9  that the recorded calls took place.  You saw the defendant's

02:48:21  10  vehicle records, which corroborate the insider testimony about

02:48:26  11  four of the defendant's cars.  And you saw the defendant's

02:48:30  12  financial records, which show approximately $234,000 in cash

02:48:35  13  and payments with no legitimate source from which you can

02:48:38  14  infer came from the defendant's drug dealing.

02:48:43  15      Now, I'm going to turn to the evidence of the

02:48:46  16  defendant's actions that proves to you that he was in the

02:48:50  17  business of selling cocaine.  This evidence comes from five

02:48:54  18  insiders, who have firsthand knowledge of the defendant's

02:48:58  19  cocaine conspiracy.  Because a drug conspiracy is a secret

02:49:03  20  illegal business, its participants take precautions to avoid

02:49:07  21  getting caught.

02:49:08  22      Now, the defendant was a careful and cautious drug

02:49:12  23  dealer.  You heard from the various insiders that he

02:49:14  24  frequently switched cellphones, he'd switch vehicles, and he

02:49:20  25  switched the locations of his drug transactions.  Therefore,

| | | |
|---|---|---|
| 02:49:23 | 1 | in order to provide you with an inside look into this secret |
| 02:49:28 | 2 | conspiracy, we have to call the insiders, the people who |
| 02:49:31 | 3 | delivered cocaine to the defendant and the people who bought |
| 02:49:35 | 4 | cocaine from the defendant. |
| 02:49:36 | 5 | Now, you heard during this trial that these insiders |
| 02:49:39 | 6 | are criminals and that they have admitted to dealing drugs, |
| 02:49:43 | 7 | but we told you that in the opening statement. And we told |
| 02:49:47 | 8 | you that these witnesses' testimony will be corroborated. But |
| 02:49:51 | 9 | we didn't pick these witnesses. The defendant picked these |
| 02:49:55 | 10 | witnesses, when he decided to obtain hundreds of kilograms of |
| 02:49:58 | 11 | cocaine from them and also to sell them cocaine during the |
| 02:50:02 | 12 | charged conspiracy. |
| 02:50:03 | 13 | Now, four of those insiders are the drug couriers: |
| 02:50:09 | 14 | Daniel Torres, Antonio Aguilera, Jorge Llamas, and Cesar |
| 02:50:15 | 15 | Perez. Each of these insiders testified that they worked for |
| 02:50:18 | 16 | the Flores brothers by delivering kilograms of cocaine to each |
| 02:50:22 | 17 | of their customers. And each of these four drug courier |
| 02:50:26 | 18 | witnesses met with the defendant face-to-face multiple times |
| 02:50:29 | 19 | to deliver to him multiple kilos of cocaine. |
| 02:50:33 | 20 | The fifth insider is the defendant's drug customer, |
| 02:50:36 | 21 | Robert Gregory, who has no relation with those four drug |
| 02:50:40 | 22 | couriers nor does he know them. Robert Gregory testified that |
| 02:50:46 | 23 | he purchased nine-ounce to four-kilogram quantities of cocaine |
| 02:50:50 | 24 | from the defendant between 2006 and 2009. |
| 02:50:54 | 25 | Now, each of these insiders have pleaded guilty to |

| | |
|---|---|
| 02:50:57 | 1 |
| 02:51:03 | 2 |
| 02:51:07 | 3 |
| 02:51:11 | 4 |

1 their conduct and Torres, Perez, Llamas, and Gregory have
2 received benefits from the Government, namely, a plea
3 agreement calling for a reduced sentence in exchange for their
4 truthful cooperation.
5 I expect that Judge Kendall will instruct you that
6 you must consider the testimony of these witnesses with
7 caution and great care. And you certainly should. This is a
8 criminal case and a lot is at stake. But you should also
9 consider the testimony of these witnesses in light of all of
10 the other corroborating evidence that you have seen:  the
11 cellphone evidence, the phone records, the defendant's
12 recorded calls to his supplier, and the financial records
13 which show the money that he made from his cocaine business.
14 Now, the defendant obtained his supply of cocaine by
15 meeting these four drug courier witnesses in and around
16 Chicago. Each of the witnesses testified to meeting the
17 defendant in parking lots and garages in the suburbs and in
18 downtown Chicago, all testifying to common locations.
19 Now, witnesses Danny Torres and Antonio Aguilera both
20 recalled meeting the defendant at a pool hall which they
21 identified in this exhibit. They delivered the cocaine to the
22 defendant by exchanging their vehicles, which were already
23 loaded with cocaine in the hidden compartments.
24 Insider Aguilera specifically remembered 50 kilograms
25 of cocaine twice to the defendant at this pool hall.  Now,

1     Torres testified during the times he met the defendant at the

2     pool hall, the defendant was driving an Audi, an Infiniti

3     vehicle.  And Aguilera recalled seeing the defendant both at

4     the pool hall and across the street from a fire station on

5     West Monroe driving a Jeep Grand Cherokee.

6           Now, you saw in Government Exhibit's Auto 1 that the

7     defendant is the insurance policyholder of a 2004 Audi A8 and

8     the defendant also is the -- also is connected to the 2002

9     Jeep Grand Cherokee where the policyholder is Carolyn Collins

10     at that same Throop address, which is connected to the

11     defendant in the bank records, mortgage records, and auto loan

12     records.

13           Now, the defendant's vehicle records also corroborate

14     the testimony of insider Cesar Perez.  Government Auto 1

15     showed that the defendant is the insurance policyholder of a

16     2006 Land Rover, as well as the policyholder for a 1998 Lexus.

17     You remember hearing Cesar Perez talking about the times he

18     met the defendant and him having different cars, specifically

19     a Range Rover and a Lexus.

20           Now, insider Aguilera's testimony also overlapped

21     with that of Cesar Perez, as well as insider Jorge Llamas.  In

22     terms of Perez, both Aguilera and Perez testified to meeting

23     the defendant in an area on West Monroe across from a fire

24     station.  And, again, Aguilera remembered delivering twice

25     50 kilograms of cocaine to the defendant at this location.

02:54:19  1        Aguilera's testimony also overlaps with that of Jorge

02:54:24  2   Llamas in that they both recalled meeting the defendant at

02:54:26  3   this high-rise building at this intersection of 13th and

02:54:32  4   Prairie in the South Loop area of Chicago.

02:54:34  5        Now, during Aguilera's meeting with the defendant, he

02:54:37  6   testified he drove into the building's parking garage and he

02:54:40  7   gave the defendant a duffle bag holding 35 kilos of cocaine.

02:54:44  8   And Llamas twice met the defendant in this area to pick up

02:54:47  9   duffle bags filled with cash for previous deliveries of

02:54:51  10  cocaine.  The first cash pickup was five figures, and that

02:54:54  11  second cash pickup was six figures.

02:54:57  12       Now, insiders Perez and Torres both recalled meeting

02:55:03  13  the defendant in areas near downtown Chicago off of Indiana

02:55:07  14  and Michigan Streets.  Remember, Torres testified that during

02:55:12  15  his meeting with the defendant on Indiana, the defendant

02:55:15  16  relocated his vehicle three different times before parking and

02:55:20  17  taking custody of a duffle bag filled with cocaine.  The

02:55:24  18  defendant was careful and cautious in his movements relocating

02:55:29  19  his car to an area where he thought he would not be detected.

02:55:33  20       And the fifth common location is between Perez and

02:55:37  21  Llamas at the Outback Steakhouse where both remembered meeting

02:55:42  22  the defendant there to deliver cocaine to him.  Now, in

02:55:47  23  addition to meeting the defendant in most of the same

02:55:49  24  locations, the insider drug couriers also testified to

02:55:52  25  delivering cocaine to the defendant in the same way.

02:55:56  1      They loaded up the hidden compartments in their

02:56:00  2  vehicle with cocaine.  They met the defendant at a particular

02:56:03  3  location.  They turned over their car keys to the defendant,

02:56:05  4  and he took custody of their car and drove away.

02:56:08  5      Other times the defendant kept it simple.  He simply

02:56:12  6  just took a duffle bag of cocaine from the insider drug

02:56:16  7  couriers or he allowed them to put the duffle bag in his back

02:56:20  8  seat before they drove away.

02:56:22  9      When the defendant exchanged vehicles with these

02:56:25  10  insiders, you heard the testimony that when he returned the

02:56:28  11  car, the hidden compartment was empty of cocaine and sometimes

02:56:32  12  filled with bundles of cash for previous cocaine deliveries.

02:56:37  13      Now, it is true that Torres and Aguilera recalled the

02:56:42  14  details of their deliveries to the defendant differently at

02:56:45  15  the pool hall.  Torres remembered traveling by himself to the

02:56:51  16  pool hall to deliver cocaine, and Aguilera remembered

02:56:55  17  traveling with Torres at least once to the defendant to

02:56:58  18  deliver cocaine.  But what's important about their testimony

02:57:00  19  is that they both identified the defendant as the person they

02:57:04  20  met at that pool hall to deliver cocaine to him.

02:57:06  21      Now, Perez and Llamas also remember their trips to

02:57:10  22  the Outback Steakhouse differently.  Perez remembers traveling

02:57:15  23  to the steakhouse with Torres, and Llamas remembers traveling

02:57:20  24  to the steakhouse with Perez.  However, what they both

02:57:21  25  remember -- and what is important -- is that they both saw the

02:57:23  1   defendant inside of the restaurant, before they came outside
02:57:26  2   to give him the kilograms of cocaine.
02:57:29  3          Now, use your common sense.  People remember things
02:57:32  4   differently.  But these witnesses remembered the important
02:57:37  5   things -- and that's that they met the defendant to deliver
02:57:40  6   him cocaine at various locations around Chicago.
02:57:50  7          Now, you also heard from insider Robert Gregory, a
02:57:56  8   person who the defendant recruited as his drug customer at
02:58:00  9   this Lee's auto shop in early 2006.  And remember the
02:58:04  10  defendant's credit card statements.  It showed at least two
02:58:07  11  payments by him for charges at Lee's.
02:58:10  12         Now, you heard Robert Gregory testify about how the
02:58:14  13  defendant approached him when they were at the auto shop.  The
02:58:18  14  defendant had just bought food for everyone in the shop and he
02:58:22  15  walked over to Gregory.
02:58:23  16         He saw that Gregory was getting work done on his BMW
02:58:28  17  528, and he asked him a few questions, starting with, Where
02:58:32  18  are you from?  Gregory responded and said that he was from
02:58:36  19  Milwaukee.  The defendant followed up and asked Gregory, What
02:58:40  20  did he do?  Now Gregory, who had been in the drug game for
02:58:43  21  nearly ten years at this point, knew what the defendant was
02:58:46  22  talking about.  But he wasn't going to announce in the middle
02:58:50  23  of the auto shop that he sold cocaine for a living.
02:58:53  24         So Gregory responded, I do my thing.  The defendant
02:58:59  25  then asked Gregory, How much do they go for up there, meaning

| | | |
|---|---|---|
| 02:59:03 | 1 | how much do kilograms of cocaine sell for in Milwaukee. |
| 02:59:07 | 2 | Gregory responded 19, meaning $19,000 per kilogram. |
| 02:59:14 | 3 | Gregory's answer was within the range of the price of |
| 02:59:18 | 4 | cocaine at that time, as testified to by Lieutenant Coleman, |
| 02:59:23 | 5 | between $17,000 and $25,000, both in the Chicago and Milwaukee |
| 02:59:28 | 6 | area. |
| 02:59:29 | 7 | Now, after the defendant learned that Gregory was -- |
| 02:59:33 | 8 | what he was paying for cocaine in the Milwaukee area, he |
| 02:59:36 | 9 | seized on the chance to get a new customer. What did he say |
| 02:59:40 | 10 | to Gregory next? I can do better than that. The defendant |
| 02:59:45 | 11 | can sell Gregory cocaine for a better price than $19,000 per |
| 02:59:50 | 12 | kilo. |
| 02:59:51 | 13 | At that point the defendant and Gregory exchanged |
| 02:59:53 | 14 | phone numbers and Gregory stored the defendant's name under |
| 02:59:57 | 15 | Ron in his cellphone. And the next day he called him, Gregory |
| 03:00:02 | 16 | called the defendant, and he came back to Chicago to arrange |
| 03:00:05 | 17 | the purchase of cocaine. |
| 03:00:07 | 18 | But it didn't start off with business right away. |
| 03:00:10 | 19 | When Gregory came back to Chicago, the defendant, who was |
| 03:00:13 | 20 | wearing platinum and diamond jewelry, drove Gregory to dinner |
| 03:00:18 | 21 | in the Defendant's BMW 645, and at dinner he introduced |
| 03:00:26 | 22 | Gregory to his friends and then the defendant paid for dinner. |
| 03:00:28 | 23 | After dinner the defendant asked Gregory how much he could |
| 03:00:31 | 24 | buy, referring to cocaine, and Gregory said that he could buy |
| 03:00:33 | 25 | nine ounces or nine. And so began the defendant's drug |

| | |
|---|---|
| 03:00:38 | 1 |
| 03:00:43 | 2 |
| 03:00:45 | 3 |
| 03:00:50 | 4 |
| 03:00:54 | 5 |
| 03:00:58 | 6 |
| 03:01:00 | 7 |
| 03:01:03 | 8 |
| 03:01:09 | 9 |
| 03:01:13 | 10 |
| 03:01:17 | 11 |
| 03:01:22 | 12 |
| 03:01:25 | 13 |
| 03:01:28 | 14 |
| 03:01:33 | 15 |
| 03:01:36 | 16 |
| 03:01:39 | 17 |
| 03:01:44 | 18 |
| 03:01:47 | 19 |
| 03:01:51 | 20 |
| 03:01:55 | 21 |
| 03:01:59 | 22 |
| 03:02:00 | 23 |
| 03:02:06 | 24 |
| 03:02:10 | 25 |

1  conspiracy with Robert Gregory to sell him cocaine.

2       Now, as you heard from Gregory, over the next three

3  years he came to Chicago on a weekly and biweekly basis to buy

4  cocaine, starting off at nine ounces.  Gregory quickly

5  increased that to half-kilogram-quantities of cocaine that he

6  was buying from the defendant.

7       By the time Gregory stopped buying from the defendant

8  in early 2009, he was buying between two and four kilograms of

9  cocaine at a time from the defendant.  The defendant conducted

10  these transactions with Gregory all over Chicago, at Lee's,

11  downtown on Wabash, out in the suburbs of Dolton, and even at

12  a rest stop off the highway.

13       Now, like the other insiders in this case, you must

14  consider the testimony of Gregory with caution and great care.

15  However, you must also consider it in light of all of the

16  other corroborating evidence in this case.

17       Now, Gregory told you that he used several

18  cellphones, SIM cards, and phone numbers to stay in touch with

19  the defendant.  And during this trial we showed you three of

20  those phones and two of those SIM cards, and we also showed

21  you the results of analyst Nicole Smith's search of those SIM

22  cards and cellphones.

23       And let's take a look at what she found.  In

24  Government Exhibits Phone 2 and Phone 3, which Gregory

25  identified as phones he used to contact the defendant, she

| | | |
|---|---|---|
| 03:02:15 | 1 | found a 773 Chicago area number for the defendant, and the |
| 03:02:18 | 2 | name Ron, which is what Gregory testified he stored the |
| 03:02:22 | 3 | defendant's name in, when he first met him at Lee's in early |
| 03:02:24 | 4 | 2006. |
| 03:02:25 | 5 | This 773 number is also the same number listed on the |
| 03:02:30 | 6 | defendant's mortgage records.  There is his name, the 773 |
| 03:02:34 | 7 | number, and his signature, Ron Collins. |
| 03:02:37 | 8 | We also showed you Government Exhibit 4, which |
| 03:02:40 | 9 | Gregory identified as a phone that he used to contact the |
| 03:02:44 | 10 | defendant.  In that phone was the number 708 -- an area code |
| 03:02:48 | 11 | for the Chicago suburban area.  You also found the name RR, |
| 03:02:53 | 12 | the defendant's initials for Ron Ron.  Gregory testified that |
| 03:02:58 | 13 | the defendant programmed his name as RR in the phones that the |
| 03:03:02 | 14 | defendant gave Gregory to contact him. |
| 03:03:05 | 15 | You also saw two SIM cards that were recovered by law |
| 03:03:11 | 16 | enforcement from Robert Gregory's mother's home, and the |
| 03:03:14 | 17 | analyst searched these SIM cards and found the same 773 number |
| 03:03:19 | 18 | for both SIM cards, but SIM Card 1 had the RR initials for Ron |
| 03:03:24 | 19 | Ron, and the second SIM card had the name Ron. |
| 03:03:27 | 20 | In addition, the analyst also searched SIM Card 1 and |
| 03:03:32 | 21 | found several text messages.  These messages, as listed on |
| 03:03:37 | 22 | this exhibit, were incoming text messages from the contact |
| 03:03:41 | 23 | name RR to the SIM card that was found in Robert Gregory's |
| 03:03:45 | 24 | mother's home. |
| 03:03:46 | 25 | The range of these text messages is from July 2006 |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 03:03:50 | 1 | and August 2006, the first year of the defendant's drug |
| 03:03:54 | 2 | conspiracy relationship with Robert Gregory.  Some of the |
| 03:04:02 | 3 | texts the defendant sent Gregory are highlighted:  How long? |
| 03:04:02 | 4 | So what time you going to come?  When you coming?  I need you |
| 03:04:06 | 5 | to come to bring that change and come back tomorrow. |
| 03:04:09 | 6 | In these messages the defendant is reaching out to |
| 03:04:12 | 7 | Gregory to arrange his pickup of cocaine in Chicago.  And in |
| 03:04:16 | 8 | that very last text that's highlighted, he's arranging for |
| 03:04:20 | 9 | Gregory to bring him his money that he said for the previous |
| 03:04:24 | 10 | cocaine delivery that Gregory received. |
| 03:04:28 | 11 | We also showed you the results of the pen register |
| 03:04:31 | 12 | data and phone records obtained for the 773 number that was |
| 03:04:35 | 13 | found on the defendant's mortgage records.  This number was in |
| 03:04:40 | 14 | contact with the 414 number found on Government Exhibits |
| 03:04:46 | 15 | Phones 2 and 3.  These -- this pen register data corroborates |
| 03:04:50 | 16 | the testimony of Robert Gregory in terms of the frequency of |
| 03:04:55 | 17 | contacts between the defendant's phone number and the phone |
| 03:04:58 | 18 | Gregory used to contact the defendant. |
| 03:05:03 | 19 | As shown in this chart, there are a total of 153 |
| 03:05:07 | 20 | calls between January 2007 and June 2009, with the highest |
| 03:05:12 | 21 | number of calls occurring between the time period between |
| 03:05:14 | 22 | October 2007 and January 2008, with 31 being the highest |
| 03:05:19 | 23 | number of contacts in January of 2008. |
| 03:05:23 | 24 | The defendant was in touch with Gregory so |
| 03:05:26 | 25 | frequently, so he could arrange additional purchases of |

|   |   |
|---|---|
| 03:05:30 | 1 |
| 03:05:34 | 2 |
| 03:05:38 | 3 |
| 03:05:43 | 4 |
| 03:05:47 | 5 |
| 03:05:50 | 6 |
| 03:05:53 | 7 |
| 03:05:56 | 8 |
| 03:05:57 | 9 |
| 03:06:00 | 10 |
| 03:06:04 | 11 |
| 03:06:08 | 12 |
| 03:06:12 | 13 |
| 03:06:17 | 14 |
| 03:06:21 | 15 |
| 03:06:25 | 16 |
| 03:06:27 | 17 |
| 03:06:31 | 18 |
| 03:06:35 | 19 |
| 03:06:38 | 20 |
| 03:06:41 | 21 |
| 03:06:46 | 22 |
| 03:06:51 | 23 |
| 03:06:55 | 24 |
| 03:06:59 | 25 |

cocaine.  The defendant was not in touch with Gregory about a transaction for a VW Jetta.

Now, Robert Gregory's cellphones, the SIM cards, the search of those devices, and the pen register data and phone records for those phone numbers are all corroborating pieces of evidence that defense counsel told you in his opening statement you wouldn't see when you heard the testimony of the insider witnesses.

This evidence is also important because it shows you that you can believe the testimony of Robert Gregory when he identified the defendant as the person he knew as Ron Ron and from whom he purchased multi-kilogram-quantities of cocaine over a three-year period.

Now, so far I've summarized the testimony of the insider witnesses that you've heard from during this trial. That testimony showed how the defendant obtained his multi-kilogram-quantities of cocaine and how the defendant turned around and redistributed that to his customers.

But, of course, that's not the only evidence that you've seen in this case.  You also have the three recorded phone calls that the defendant made to his supplier, when he was ordering 30 kilograms of cocaine in November of 2008.

Now, you know it's the defendant speaking on those calls from several pieces of evidence.  First, you heard from Agent Durante that he interviewed the defendant for 45 minutes

03:07:03　1　and then he sat down and listened to the recorded calls made

03:07:06　2　by Peter Flores.  And after comparing the voices on those

03:07:10　3　calls, he determined that the defendant was the other speaker

03:07:13　4　on the calls recorded by Flores.

03:07:16　5　　　　　You also heard from Agent Bagley who testified that

03:07:19　6　he listened to 20 to 25 separate recordings of the defendant's

03:07:24　7　voice and also listened to the three recorded phone calls from

03:07:28　8　November 2008 made by Peter Flores.  And after listening to

03:07:32　9　those two sets of recordings, he determined that the defendant

03:07:35　10　on those 20 to 25 jail calls was also the same person speaking

03:07:42　11　to Peter Flores on those three November calls.

03:07:45　12　　　　　In addition to the voice identification, you have the

03:07:47　13　content of Government Exhibit Phone 1, which was the phone

03:07:51　14　turned over by Peter Flores.  The search of that phone

03:07:53　15　revealed that there was one contact under the name Ron Ron

03:07:57　16　associated with a 773 number, which we know is for Chicago.

03:08:02　17　　　　　The name Ron Ron is also the same name that those

03:08:08　18　five insider witnesses identified the defendant as, for the

03:08:12　19　person for whom they met and picked up or either delivered to

03:08:16　20　multi-kilogram-quantities of cocaine.

03:08:19　21　　　　　We showed you the phone records for that 773 number

03:08:23　22　that was found in the supplier's phone, and those records list

03:08:28　23　the three phone calls on the recordings on the very dates and

03:08:32　24　at the very times that they took place.

03:08:35　25　　　　　Now, the lack of subscriber information for these

03:08:38 1  phone records does not undermine the fact that it was the
03:08:42 2  defendant who used this pre-paid phone to order 30 kilos.  Of
03:08:46 3  course, the defendant would not use a phone in his own name to
03:08:49 4  call his drug supplier and order cocaine.  Again, remember,
03:08:53 5  the defendant was careful and cautious.  He frequently
03:08:56 6  switched phones, as testified to by the witnesses Perez,
03:09:00 7  Llamas, and Aguilera, who delivered these phones to the
03:09:04 8  defendant, so that he could contact the Flores brothers.
03:09:07 9          So you had the agent's voice identification of the
03:09:10 10  defendant.  You have the content of Phone 1, which was used to
03:09:14 11  make or to record the calls.  And you have the phone records
03:09:17 12  themselves, of that 773 number, that all establish that the
03:09:21 13  defendant was the speaker on those November 2008 recordings.
03:09:33 14          Now, let's review what the defendant said during
03:09:35 15  those calls that showed beyond a reasonable doubt that the
03:09:39 16  defendant was a knowing participant in a conspiracy to sell
03:09:44 17  cocaine.  You'll have the recordings back in the jury room
03:09:48 18  with you, and you'll have an opportunity to listen to them and
03:09:51 19  further review them as you consider the charge in this case.
03:09:53 20          These calls are important, because they show a clear
03:09:59 21  picture of the defendant's cocaine business.  It also
03:10:02 22  establishes the defendant's conspiracy with his supplier to
03:10:06 23  obtain large quantities of cocaine.
03:10:10 24          And remember when you're listening to these calls,
03:10:14 25  the defendant didn't know he was speaking into a digital

|          |    |                                                                              |
|----------|----|------------------------------------------------------------------------------|
| 03:10:17 | 1  | recorder.  The defendant thought he was talking to someone he               |
| 03:10:21 | 2  | could trust.                                                                 |
| 03:10:21 | 3  | Now, in the November 25th call at 12:23 p.m., the                           |
| 03:10:29 | 4  | defendant orders 30 kilos of cocaine.  Flores says:  If I give              |
| 03:10:34 | 5  | them to you for like 28, how many do you think you want?  Now               |
| 03:10:38 | 6  | you know from the testimony of Lieutenant Coleman and the                   |
| 03:10:41 | 7  | context of this call that Flores is referring to $28,000 per                |
| 03:10:46 | 8  | kilogram.                                                                    |
| 03:10:48 | 9  | In response, the defendant again is talking to                              |
| 03:10:51 | 10 | someone in the background and he says, Hey, if I give this to               |
| 03:10:55 | 11 | you for like 29,5, and later, a dub?  How many?                             |
| 03:11:01 | 12 | Here, the defendant is responding to the offer of                          |
| 03:11:07 | 13 | $28,000 per kilo by talking to his own customer in the                      |
| 03:11:10 | 14 | background and offering him a price of $29,500 per kilo.  By                |
| 03:11:14 | 15 | increasing the price by $1500, the defendant is guaranteed to              |
| 03:11:19 | 16 | make a profit from the sale of that cocaine.                                |
| 03:11:21 | 17 | Now, later in the call you hear the defendant say, A                       |
| 03:11:24 | 18 | dub, which Lieutenant Coleman said, based on the content of                 |
| 03:11:27 | 19 | this call and his training and experience, means 20 kilos of               |
| 03:11:31 | 20 | cocaine.  You also know from the content of the call that the              |
| 03:11:34 | 21 | customer has just responded to the defendant's offer of 29,5.             |
| 03:11:39 | 22 | And in response, he said that he would take 20 kilos                        |
| 03:11:44 | 23 | of cocaine at that price.  So in this call the defendant has               |
| 03:11:47 | 24 | just agreed to sell his customer 20 kilos of cocaine at                     |
| 03:11:52 | 25 | $29,500.                                                                     |

03:12:01   1       Now, later in the call the defendant, who is assured

03:12:01   2 by his customer's representation that he can buy 20 kilos of

03:12:03   3 cocaine, tells Flores, Give me 30 up front, and I know I got a

03:12:06   4 lot of other people that can help me run through them.  Now,

03:12:10   5 here the defendant has just ordered 30 kilograms of cocaine

03:12:13   6 from Flores.  Lieutenant Coleman testified that when a drug

03:12:17   7 buyer has a relationship with his drug supplier, it's common

03:12:20   8 for that supplier to front or provide the drugs on credit.

03:12:25   9       When the defendant says, Up front, he's not

03:12:29  10 hesitating to demand 30 kilos of cocaine on credit less than a

03:12:35  11 minute into their conversation.  This shows that the defendant

03:12:37  12 is not a new customer and he's used to receiving his cocaine

03:12:41  13 without having to pay for it on delivery.

03:12:43  14       This payment method is also consistent with what you

03:12:47  15 heard from the insider drug couriers, who said that every time

03:12:52  16 they delivered cocaine to the defendant, they did not always

03:12:55  17 receive money from him back.

03:12:58  18       Now, the defendant later tells Flores in this call

03:13:01  19 that he has a lot of customers who can help him run through or

03:13:05  20 sell the 30 kilos of cocaine.  This is important because it

03:13:09  21 shows that the defendant plans to repay his supplier after he

03:13:14  22 has resold that 30 kilos to his customers.

03:13:19  23       Now, five days later on November 30th, the defendant

03:13:23  24 arranges a payment date for the cocaine that he ordered on

03:13:28  25 November 25th.  The defendant says, Just send me 30 of them,

| | |
|---|---|
| 03:13:33 | 1 |
| 03:13:37 | 2 |
| 03:13:41 | 3 |
| 03:13:45 | 4 |
| 03:13:49 | 5 |

1  give me about seven days.  Seven days, that's all the

2  defendant needed to sell 30 kilograms of cocaine.  And as

3  you'll recall from Lieutenant Coleman's testimony,

4  30 kilograms is the equivalent of approximately 30,000 dosage

5  units.

6       Flores continues, No, man, I'll send you -- I'll send

7  you a dub, yo, I'm not going to send you 30.  And in response

8  the defendant says, Okay, then, all right, all right, that's

9  cool, just send me a dub and I'll be straight in seven days.

10 The defendant finally agrees to accept just 20 kilos of

11 cocaine from his supplier, and he tells him that he'll be

12 straight, or he'll have his supplier's money, in seven days.

13 This portion of the call also shows that the defendant did not

14 plan to pay for the 20 kilos until after he -- his own

15 customers.

16       Now let's be clear when you listen to this portion of

17 the call.  The defendant was settling on 20 kilos of cocaine.

18 He wanted a much larger quantity.  And as other portions of

19 the recorded call showed you he was used to getting much

20 larger quantities from his supplier.

21       Back to the November 25th call at 12:23.  The

22 defendant says to his supplier, Like when you used to give me

23 like 50 or 60 at a time, 50 like that, I used to give him like

24 15.  You see what I'm saying?  50 or 60 at a time.  The

25 defendant has just told you that he previously has received 50

| | | |
|---|---|---|
| 03:15:08 | 1 | or 60 kilograms of cocaine per delivery from his supplier. |
| 03:15:14 | 2 | This call corroborates the testimony of insider |
| 03:15:18 | 3 | Antonio Aguilera, who told you that he remembered delivering |
| 03:15:23 | 4 | 50 kilograms of cocaine to the defendant on at least four |
| 03:15:28 | 5 | occasions. Now, of the 50 or 60 kilos that the defendant is |
| 03:15:31 | 6 | referencing in this part of the call, he gives 15 kilos to |
| 03:15:34 | 7 | just one of his customers. These are the defendant's words on |
| 03:15:38 | 8 | the recordings, no one else's. These are the words that the |
| 03:15:42 | 9 | defendant said when he didn't know that his call was being |
| 03:15:46 | 10 | recorded. |
| 03:15:47 | 11 | The defendant continues in this same call, What took |
| 03:15:51 | 12 | me so long, I was handling, giving people out one or two at a |
| 03:15:54 | 13 | time. I wasn't about to rush, man, because my people wasn't |
| 03:15:58 | 14 | like that, so people couldn't be replacing it. You see what |
| 03:16:02 | 15 | I'm saying? So this shows that by November of 2008, business |
| 03:16:07 | 16 | had slowed for the defendant and he was only distributing one |
| 03:16:09 | 17 | to two kilograms of cocaine at a time as opposed to the |
| 03:16:13 | 18 | 15 kilos he had previously been able to give to his customers. |
| 03:16:16 | 19 | And so defendant says next in the call, I used to |
| 03:16:19 | 20 | back then, I had some money to replace it myself, so I was |
| 03:16:24 | 21 | giving him 10, 15 at a time. Here, the defendant is talking |
| 03:16:27 | 22 | about an earlier time where he was able to give out 10 to |
| 03:16:32 | 23 | 15 kilos of cocaine to one of his customers on credit and |
| 03:16:36 | 24 | after giving out that amount of cocaine, the defendant had the |
| 03:16:39 | 25 | money to replenish his supply before he was repaid by that one |

| | |
|---|---|
| 03:16:44 | 1 |
| 03:16:44 | 2 |
| 03:16:48 | 3 |
| 03:16:51 | 4 |
| 03:16:55 | 5 |
| 03:17:00 | 6 |
| 03:17:02 | 7 |
| 03:17:05 | 8 |
| 03:17:09 | 9 |
| 03:17:13 | 10 |
| 03:17:15 | 11 |
| 03:17:23 | 12 |
| 03:17:27 | 13 |
| 03:17:28 | 14 |
| 03:17:31 | 15 |
| 03:17:35 | 16 |
| 03:17:40 | 17 |
| 03:17:43 | 18 |
| 03:17:47 | 19 |
| 03:17:49 | 20 |
| 03:17:53 | 21 |
| 03:17:57 | 22 |
| 03:18:02 | 23 |
| 03:18:05 | 24 |
| 03:18:09 | 25 |

customer.

Now, this excerpt of the call shows the defendant's relationship with his own customers where he gives them kilograms of cocaine on credit, just like Robert Gregory testified. This excerpt is also important, because it's additional evidence that the defendant conspired with his customers to sell them cocaine on credit.

Now, so far the defendant's statements in these calls have shown several things: the type of the defendant's drug business; the quantities of cocaine that he was supplied; and the price that he paid his supplier per kilogram. These calls also plainly state the amount that the defendant profited from his sale of cocaine.

Later in the same November 25th call, the defendant says, I can do the numbers, but the numbers was ridiculous. And then it wasn't no room for nobody else to make no money, because if I try to get me 1500 off each one of them, that's all I'm trying to get me, 1500.

Here, the defendant is trying to convince his supplier that he can sell the cocaine at the supplier's price per kilogram. But the defendant also tells his supplier that because he himself has to profit $1500, it makes it harder for his customers to make money when they have to sell it at a higher price to their customers, a higher price than what they bought it for from the defendant.

03:18:11  1          Now, you saw the evidence of the defendant's drug

03:18:13  2   profits during the financial record presentation in this case.

03:18:19  3   In Summary 3A we showed you total cash deposits of

03:18:25  4   approximately $37,105 that the defendant made into his Chase

03:18:32  5   checking account in increments between $200 all the way up to

03:18:38  6   $4500.  This means that the defendant had at least $37,105 as

03:18:44  7   cash in hand between the time period of August of 2006 and

03:18:49  8   April 2009.

03:18:53  9          You also saw evidence of the defendant's nearly

03:18:57  10  $200,000 in expenditures over a three-year period through

03:19:02  11  payments that could not be paid -- that could not be traced to

03:19:06  12  any legitimate source.  Summaries 3C through 3J totaled all of

03:19:13  13  the payments that the defendant made to these various areas,

03:19:17  14  and it reached a total of $197,107.52 that could not be traced

03:19:23  15  to the defendant's bank account.

03:19:25  16         Now, remember, the defendant also filed no tax

03:19:28  17  returns during the charged conspiracy, nor did the IRS find

03:19:32  18  any record of any wages or income reported by others as paid

03:19:36  19  to the defendant.

03:19:40  20         Now, from this evidence you can reasonably infer that

03:19:43  21  the cash deposits and the defendant's payments summarized in

03:19:47  22  Summary Chart 3K show at least $234,213.08 in money that came

03:19:54  23  from the defendant's drug dealing.

03:19:57  24         Now, returning back to this November 25th call at

03:20:01  25  12:23 p.m., the defendant is reassuring his supplier that he

| | |
|---|---|
| 03:20:06 | 1 |
| 03:20:11 | 2 |
| 03:20:15 | 3 |
| 03:20:18 | 4 |
| 03:20:20 | 5 |
| 03:20:24 | 6 |
| 03:20:30 | 7 |
| 03:20:33 | 8 |
| 03:20:37 | 9 |
| 03:20:40 | 10 |
| 03:20:44 | 11 |
| 03:20:47 | 12 |
| 03:20:51 | 13 |
| 03:20:55 | 14 |
| 03:20:58 | 15 |
| 03:21:01 | 16 |
| 03:21:06 | 17 |
| 03:21:12 | 18 |
| 03:21:18 | 19 |
| 03:21:22 | 20 |
| 03:21:26 | 21 |
| 03:21:29 | 22 |
| 03:21:32 | 23 |
| 03:21:33 | 24 |
| 03:21:36 | 25 |

1 can sell the cocaine at the price offered by the supplier.
2 Flores says, G, I'm behind on some paper, dog, and I just, I'd
3 rather push them off a little bit cheaper and try and get some
4 money back.
5     The defendant responds, Whody, I'm trying.  You know
6 what I'm capable of doing.  You know what I have did before.
7 When Flores doesn't offer a different price per kilo, the
8 defendant responds that he's trying.  He's trying to sell the
9 cocaine, so he can pay Flores his money.  And to make sure
10 that Flores believes him, the defendant reminds Flores of what
11 he's capable of doing and what he's done before.  The
12 defendant stands by his reputation of being able to sell large
13 quantities of cocaine and being able to sell it quickly.  And
14 he wants to make sure that his supplier remembers that.
15     Like the defendant says next in the call, I can do
16 the numbers, that ain't no problem.  About an hour after this
17 call on November 25th, 2008, the defendant calls Flores back
18 to find out when he will be getting his cocaine.  The
19 defendant says, Hey, hey, when you think so, though?  In
20 response Flores says, It should be tomorrow, for sure.  The
21 defendant replies, All right.  The defendant needs to know
22 when he can get his cocaine, so he can sell it to his
23 customers.
24     Now, you know from the recordings in this case and
25 the insider drug testimony that Robert Gregory was just one of

| | | |
|---|---|---|
| 03:21:41 | 1 | the defendant's customers.  Remember that while the defendant |
| 03:21:44 | 2 | was on the phone with Flores ordering the cocaine, he was |
| 03:21:47 | 3 | talking to another customer in the background offering to sell |
| 03:21:51 | 4 | him kilos at $29,500 per kilo. |
| 03:21:55 | 5 | The defendant also talks about his other customers |
| 03:21:57 | 6 | during this November 25th call.  The defendant says, Now, you |
| 03:22:03 | 7 | know, when y'all don't see me, everybody trying to steal my |
| 03:22:06 | 8 | customers.  You know what I'm saying?  The people that I |
| 03:22:10 | 9 | F with or whatever but some of them loyal just ain't going to |
| 03:22:13 | 10 | go that route and F with other people.  Here, the defendant |
| 03:22:16 | 11 | tells Flores that when he's not getting his cocaine from |
| 03:22:20 | 12 | Flores, his competitors try to go after the defendant's |
| 03:22:24 | 13 | customers.  But the defendant also tells Flores that some of |
| 03:22:26 | 14 | his customers are loyal and they're not going to run off to |
| 03:22:30 | 15 | another cocaine supplier. |
| 03:22:31 | 16 | Now, in these recorded conversations, the defendant |
| 03:22:36 | 17 | has just provided a blueprint of his cocaine trafficking |
| 03:22:40 | 18 | business.  The recording shows how the defendant contacts his |
| 03:22:45 | 19 | supplier by phone, how he negotiates the price per kilogram of |
| 03:22:50 | 20 | cocaine, how he orders a specific amount of cocaine, how he |
| 03:22:59 | 21 | arranges the pickup of that cocaine, and how he schedules |
| 03:23:02 | 22 | payment for the cocaine that he's ordered. |
| 03:23:05 | 23 | These recordings also corroborate the testimony of |
| 03:23:08 | 24 | those insider witnesses that you heard from that the defendant |
| 03:23:12 | 25 | picks up his kilograms of cocaine and he turns around and |

| | |
|---|---|
| 03:23:15 | 1 |
| 03:23:19 | 2 |
| 03:23:22 | 3 |
| 03:23:26 | 4 |

sells it to his own customers.  These calls are also
important, because they establish that the defendant had a
prior relationship with his supplier in which the defendant
was used to obtaining large quantities of cocaine.

Now, in addition to the recordings and the insider
testimony, you have the evidence from Government Exhibit
Phone 1, that the defendant had been contacting Flores on that
phone since August 2008.  Now, there are no contacts before
that, because as you heard from the insiders, Flores
frequently switched phones, and they were always delivering
new phones to Flores' customers so he could contact them.  And
this was for the purpose of detecting -- of preventing and
avoiding detection by law enforcement.

Now, we showed you Government Exhibit Summary 1D,
which summarized the text messages that the defendant sent to
his supplier on Government Exhibit Phone 1 between the time
period of September and November of 2008.

Some of the highlighted messages read, Hit me.  Yo.
What up?  I need to holler at you.  Yo.  Hit me up.  Now,
these are not normal text messages that you would send to your
friends or family members, rather, these messages are brief
and they are cryptic, with the defendant including just enough
information to get his supplier's attention.

We already know from the insider drug customers --
excuse me -- the insider drug couriers that the defendant had

| | | |
|---|---|---|
| 03:24:58 | 1 | been buying cocaine from Flores from 2005.  By the time of |
| 03:25:02 | 2 | these text messages in 2008, the defendant didn't need to be |
| 03:25:06 | 3 | any more explicit in his communications with his supplier. |
| 03:25:10 | 4 | The defendant also avoided including plainly |
| 03:25:13 | 5 | incriminating information in these messages, such as |
| 03:25:17 | 6 | referencing numbers or drug quantity.  These messages are |
| 03:25:23 | 7 | important, because they show the defendant regularly reaching |
| 03:25:27 | 8 | out to his supplier to get more cocaine. |
| 03:25:30 | 9 | And the defendant was in touch with his supplier so |
| 03:25:33 | 10 | frequently because like the defendant stated in those |
| 03:25:36 | 11 | recordings, he could do the numbers.  That wasn't a problem. |
| 03:25:40 | 12 | And what he meant in those recordings was that he could turn |
| 03:25:44 | 13 | around large quantities of cocaine and he could do it quickly. |
| 03:25:47 | 14 | Now, you know from the other evidence in this case what the |
| 03:25:50 | 15 | defendant is capable of and what he's done before. |
| 03:25:54 | 16 | So the evidence in this case has proven beyond a |
| 03:25:57 | 17 | reasonable doubt that the defendant was responsible for |
| 03:25:59 | 18 | conspiring to possess with intent to distribute and to |
| 03:26:02 | 19 | distribute hundreds of kilograms of cocaine.  However, after |
| 03:26:06 | 20 | you find the defendant guilty, all you need to find is that |
| 03:26:09 | 21 | the defendant was responsible for at least five kilograms of |
| 03:26:14 | 22 | cocaine.  Therefore, when you arrive to this portion of the |
| 03:26:18 | 23 | verdict form, we ask that you check the first box. |
| 03:26:26 | 24 | So in closing, you've heard eight categories of |
| 03:26:30 | 25 | evidence proving that the defendant conspired to possess and |

03:26:35 1 sell cocaine. You heard the insider testimony, you heard the

03:26:40 2 recorded phone calls between the defendant and his supplier.

03:26:44 3 You saw the supplier's cellphone and its contents. You saw

03:26:47 4 the defendant's customers' cellphones and its SIM cards. You

03:26:52 5 saw the defendant's phone records, vehicle records, and his

03:26:55 6 financial records.

03:26:56 7 All this evidence has shown that the defendant ran a

03:26:59 8 very profitable business that served multiple customers. But

03:27:03 9 the defendant's business savvy didn't lead him to Wall Street.

03:27:07 10 It didn't lead him to a listing in Forbes Magazine. It led

03:27:12 11 him right here to this courtroom today sitting before you.

03:27:16 12 Therefore, we ask that you return the only verdict commanded

03:27:18 13 by the proof in this case, and that is a verdict of guilty.

03:27:28 14 THE COURT: Mr. Rubino.

03:27:31 15 MR. RUBINO: Thank you, your Honor.

03:27:31 16 - - -

03:27:37 17 MR. RUBINO, CLOSING ARGUMENT

03:27:37 18 MR. RUBINO: Good afternoon, ladies and gentlemen.

03:27:40 19 As the judge told you in the beginning of the case, the

03:27:43 20 defendant in any criminal trial, and in particular this trial,

03:27:47 21 is presumed innocent of all of the charges.

03:27:50 22 He's presumed innocent throughout the course of the

03:27:53 23 trial and, indeed, he's presumed innocent this very moment as

03:27:57 24 he sits here, Ron Collins, before you. The presumption of

03:28:03 25 innocence is only overcome when, and if and unless, you are

| | | |
|---|---|---|
| 03:28:11 | 1 | satisfied beyond a reasonable doubt the Government has |
| 03:28:15 | 2 | fulfilled its burden, a burden that never shifts to the |
| 03:28:20 | 3 | defendant, Ron Collins. |
| 03:28:22 | 4 | Now, it's a heavy burden. It's particularly heavy in |
| 03:28:25 | 5 | this case. And as we go through what I contend the evidence |
| 03:28:29 | 6 | will show, you'll see that the Government has failed in its |
| 03:28:33 | 7 | attempt to prove Ron Collins guilty beyond a reasonable doubt. |
| 03:28:39 | 8 | Proof is not speculation. Proof is not conjecture. |
| 03:28:44 | 9 | Proof is not innuendos. Proof is not rumors, and certainly |
| 03:28:51 | 10 | proof is not hearsay. Proof is proof of hard, cold facts, and |
| 03:28:59 | 11 | it comes through the mouth of what? Of believable witnesses. |
| 03:29:05 | 12 | Not just witnesses, but believable witnesses. |
| 03:29:13 | 13 | Trustworthy witnesses, truthful witnesses, honest witnesses. |
| 03:29:17 | 14 | Witnesses that you can embrace and feel comfortable with their |
| 03:29:22 | 15 | testimony. Witnesses that you can say, That's the kind of |
| 03:29:27 | 16 | person that I can believe in. |
| 03:29:30 | 17 | That's not the kind of witnesses the Government |
| 03:29:34 | 18 | offered in this trial. These were not believable witnesses. |
| 03:29:40 | 19 | Think about this. Each and every one of you took an oath when |
| 03:29:44 | 20 | you first came here to become a juror, to be fair and to judge |
| 03:29:48 | 21 | this case without prejudice, without fear, without favor to |
| 03:29:53 | 22 | the Government or the defendant, but solely on the evidence, |
| 03:29:57 | 23 | the quality of the evidence, not conjecture, not speculation, |
| 03:30:02 | 24 | not innuendo, not rumor, not hearsay, but high-quality |
| 03:30:10 | 25 | evidence. |

| | | |
|---|---|---|
| 03:30:10 | 1 | The defendant, although -- and Ron Collins |
| 03:30:13 | 2 | specifically -- begins the trial with a clean slate.  There's |
| 03:30:17 | 3 | no evidence against him.  The law permits nothing but legal |
| 03:30:21 | 4 | evidence.  And you have the right to judge that evidence. |
| 03:30:29 | 5 | The presumption of innocence alone is sufficient to |
| 03:30:32 | 6 | acquit Ron Collins, unless you, the jurors, find beyond a |
| 03:30:39 | 7 | reasonable doubt, after careful and impartial consideration |
| 03:30:42 | 8 | and evaluation of all the evidence, that the Government has |
| 03:30:46 | 9 | proved [sic] beyond a reasonable doubt.  If they haven't, you |
| 03:30:52 | 10 | must vote not guilty, not proved. |
| 03:30:57 | 11 | You know, you have the right to accept and believe |
| 03:31:04 | 12 | all of the evidence, some of the evidence, or none of the |
| 03:31:07 | 13 | evidence.  Just because it comes from that witness stand, just |
| 03:31:13 | 14 | because it comes from a witness, doesn't mean you have to |
| 03:31:17 | 15 | believe it.  It doesn't mean you have to embrace it.  It |
| 03:31:21 | 16 | doesn't mean because they come up there, they speak only |
| 03:31:26 | 17 | truth.  That's your job, to separate the lies from the truth |
| 03:31:34 | 18 | and believe the truth.  That's part of your job. |
| 03:31:39 | 19 | The Government's not required to prove guilt beyond |
| 03:31:42 | 20 | all possible doubt.  Of course not.  The test is one of |
| 03:31:46 | 21 | reasonable doubt. |
| 03:31:48 | 22 | You, the jury, should remember that a defendant is |
| 03:31:51 | 23 | never to be convicted on mere suspicion, conjecture, |
| 03:31:57 | 24 | speculation, and least of all on the theory or assumption of |
| 03:32:03 | 25 | the Government.  It's on the evidence.  The burden is always |

03:32:13   1   on the Government, always on the prosecution to prove guilt

03:32:16   2   beyond a reasonable doubt.  The burden never shifts to Ron

03:32:20   3   Collins.  The law never imposes any burden on him to produce

03:32:23   4   any evidence or to call any witnesses.

03:32:27   5         That is the attitude you should have in the

03:32:30   6   presumption of innocence.  You should be of a mind-set that

03:32:34   7   resists accusations that you have and you should have this

03:32:41   8   belief in them.  You should insist that proof, solid proof,

03:32:46   9   quality proof from solid and quality witnesses be given to

03:32:55   10  you.  Without that, you have reasonable doubt.  You have not

03:32:59   11  guilty.  You have not proved.

03:33:02   12        Your oath really requires nothing less from you that

03:33:06   13  you be a good juror.  You have to think differently than you

03:33:11   14  ordinarily do in life, in your regular affairs.  We're all

03:33:15   15  subject to suspicion.  We hear a story.  We have inclinations

03:33:20   16  to believe it.  We hear rumors.  The same thing.  We believe

03:33:23   17  them.  You can't do that here.  You must check and challenge

03:33:27   18  every single thing that comes into this courtroom.

03:33:30   19        Especially when the evidence comes from criminals who

03:33:35   20  have a reason to lie, criminals trying to lessen their time in

03:33:41   21  prison.  You, as a juror, have got to reverse that inclination

03:33:47   22  you have, a very human tendency, you've got to sit there and

03:33:52   23  resist just believing it because you hear it.

03:33:55   24        What does this mean?  It means you've got to take

03:34:02   25  every piece of evidence and every word that comes from a

| | | |
|---|---|---|
| 03:34:06 | 1 | witness and you've got to examine it. You've got to be |
| 03:34:09 | 2 | skeptical of it. You've got to be disbelieving of it. You've |
| 03:34:13 | 3 | got to turn it upsidedown, right-side up, and you've got to |
| 03:34:17 | 4 | look at every facet of it. And you've got to say, Is there |
| 03:34:20 | 5 | any taint to it? Is there anything wrong with it? Is this |
| 03:34:24 | 6 | something that I can believe in? Is this something that I can |
| 03:34:26 | 7 | embrace? Is this person the kind of person that I can accept |
| 03:34:33 | 8 | his word as truth? |
| 03:34:36 | 9 | And the one thing you can't do is jump to |
| 03:34:40 | 10 | conclusions. Just because the Government has a theory, that |
| 03:34:45 | 11 | doesn't make it true. |
| 03:34:47 | 12 | The presumption of innocence is a practical thing. |
| 03:34:49 | 13 | The presumption of innocence places the burden on the |
| 03:34:52 | 14 | Government, places it on one side and one side only. You |
| 03:34:57 | 15 | can't look at Ron Collins and say, But he didn't prove himself |
| 03:35:02 | 16 | innocent. But he didn't testify. But he didn't fight against |
| 03:35:08 | 17 | the accusations. He did fight against the accusations by |
| 03:35:14 | 18 | entering a plea of not guilty. He denied the accusations, and |
| 03:35:19 | 19 | he said to the Government, Prove it. And I say to you, they |
| 03:35:24 | 20 | haven't proven it. In other words, the presumption of |
| 03:35:30 | 21 | innocence says that the prosecution and only the prosecution |
| 03:35:33 | 22 | has that burden, because the defendant does not have to prove |
| 03:35:37 | 23 | innocence. |
| 03:35:39 | 24 | As the judge told you, the defendant is presumed |
| 03:35:42 | 25 | innocent and the defendant shall remain innocent throughout |

03:35:45  1    the entire trial, unless and until, you embrace that

03:35:51  2    testimony, you accept that testimony, you believe that

03:35:56  3    testimony, and you believe it beyond a reasonable doubt.

03:36:00  4         If you believe those five drug criminals beyond a

03:36:04  5    reasonable doubt, then you vote guilty for Ron Collins.  But

03:36:08  6    if you question them, if you question their motives, if you

03:36:12  7    question their reasons, if you question their deals, if you

03:36:15  8    question their words, then you have a reasonable doubt and you

03:36:21  9    must vote not guilty, not proved.

03:36:27  10        You know, in this country no one should have their

03:36:30  11   liberty taken away, unless the prosecution offers proof beyond

03:36:35  12   a reasonable doubt.  In other words, the presumption that Ron

03:36:40  13   Collins is innocent -- but you have to keep in mind throughout

03:36:44  14   this whole time -- is enough for you to rely upon, unless and

03:36:49  15   until they have knocked that presumption down to the point you

03:36:54  16   have no reasonable doubt.

03:36:58  17        You know, this calls upon you to break with your

03:37:00  18   ordinary thought patterns, because at the end of the case you

03:37:03  19   may have suspicion of guilt.  You may think there's a

03:37:09  20   possibility of guilt.  You may even think he's probably

03:37:16  21   guilty, maybe he's guilty, he's possibly guilty.  But you have

03:37:22  22   to ask yourself, Do I have no reasonable doubt whatsoever that

03:37:30  23   he's guilty?  Or do I think maybe he's guilty?

03:37:35  24        Well, maybe isn't good enough.  Probably, isn't good

03:37:40  25   enough.  Possibly, isn't good enough to take a man's liberty.

| | |
|---|---|
| 03:37:45 | 1 |
| 03:37:53 | 2 |
| 03:37:57 | 3 |
| 03:38:01 | 4 |
| 03:38:04 | 5 |
| 03:38:08 | 6 |
| 03:38:13 | 7 |
| 03:38:19 | 8 |
| 03:38:25 | 9 |
| 03:38:29 | 10 |
| 03:38:34 | 11 |
| 03:38:37 | 12 |
| 03:38:42 | 13 |
| 03:38:46 | 14 |
| 03:38:52 | 15 |
| 03:38:57 | 16 |
| 03:39:04 | 17 |
| 03:39:10 | 18 |
| 03:39:16 | 19 |
| 03:39:20 | 20 |
| 03:39:25 | 21 |
| 03:39:32 | 22 |
| 03:39:33 | 23 |
| 03:39:37 | 24 |
| 03:39:43 | 25 |

It must be beyond reasonable doubt.

You know, oftentimes jurors have walked out of a courtroom voting not guilty for someone they thought might have committed the crime, maybe have committed the crime, again, possibly could have committed the crime. Well, you know, something? They have done their duty well. They performed their job, because they didn't say, I have no reasonable doubt of his guilt. There's a big difference in maybe did, possibly did, he could have, than I have no reasonable doubt. In order to vote guilty, you must have no reasonable doubt.

Your function, actually, is a narrow function in law. The question before you really is a question -- is not a question of guilt or innocence. Nowhere on that verdict form will you see a box for innocent, because Ron Collins doesn't have to prove his innocence. The box says guilty, not guilty. Not guilty means not proved. There's no third box. There's no box for him to prove his innocence. Either they proved him guilty or they didn't prove him guilty. That's the question before you, the question -- and jurors stumble over this. They think the verdict is guilty or innocent. It's not. You'll see. It's guilty or not guilty.

So the sole question is, has the prosecution offered enough evidence -- not in quantity, but in quality -- to make you believe that you have no reasonable doubt as to Ron

| | | |
|---|---|---|
| 03:39:49 | 1 | Collins' guilt in this case? |
| 03:39:53 | 2 | So we're engaged in this process.  The question that |
| 03:39:56 | 3 | has been presented to you is, have they provided you -- and I |
| 03:40:00 | 4 | said this earlier -- with enough quality evidence from quality |
| 03:40:04 | 5 | witnesses, witnesses you could put your arms around and feel |
| 03:40:09 | 6 | good with, feel comfortable with, trust, believe in, witnesses |
| 03:40:17 | 7 | that you have no doubt about their honesty? |
| 03:40:25 | 8 | You know, I told you in my opening statement, the |
| 03:40:27 | 9 | federal government has charged Ron Collins with a crime, but |
| 03:40:30 | 10 | it's not the federal government that's accusing Ron Collins. |
| 03:40:34 | 11 | We all know that.  If you remember my opening statement -- I |
| 03:40:37 | 12 | told you and it came true -- Ron Collins' accusers were not |
| 03:40:42 | 13 | the FBI agents, were not DEA agents, were not local police. |
| 03:40:47 | 14 | His accusers were not law enforcement officers.  Not one law |
| 03:40:55 | 15 | enforcement officer testified in this courtroom that they saw |
| 03:40:58 | 16 | Ron Collins commit a crime. |
| 03:40:59 | 17 | Who are his accusers?  We know who they were.  They |
| 03:41:05 | 18 | were five criminals, delinquent drug dealers, people who were |
| 03:41:10 | 19 | trading testimony for freedom.  As I told you in my opening |
| 03:41:13 | 20 | statement, not one federal agent, not one DEA agent, not one |
| 03:41:18 | 21 | local policeman would tell you that they ever saw Ron Collins |
| 03:41:24 | 22 | with drugs.  Think about that.  Has one Government agent taken |
| 03:41:29 | 23 | that witness stand and said to you, I observed him, Ron |
| 03:41:33 | 24 | Collins, with drugs?  And the answer is no. |
| 03:41:42 | 25 | Has one federal agent told you that they conducted |

| | | |
|---|---|---|
| 03:41:46 | 1 | any type of surveillance and they saw Ron Collins with drugs, |
| 03:41:52 | 2 | near drugs, deal drugs, sell drugs, buy drugs?  Have you heard |
| 03:41:58 | 3 | that?  No, not from one federal agent or local law enforcement |
| 03:42:05 | 4 | officer.  They haven't accused him.  The five drug dealers are |
| 03:42:11 | 5 | the only accusers. |
| 03:42:14 | 6 | No one testified that they did an undercover buy from |
| 03:42:18 | 7 | Ron Collins.  No one testified that Ron Collins got them |
| 03:42:22 | 8 | drugs, delivered them drugs, transported them drugs, not one |
| 03:42:27 | 9 | Government agent told you this. |
| 03:42:31 | 10 | They also told you that they found no physical |
| 03:42:38 | 11 | evidence.  They seized no drugs from Ron Collins' house.  They |
| 03:42:42 | 12 | seized no drugs from Ron Collins' car.  They seized no drugs |
| 03:42:45 | 13 | from Ron Collins' person on the day of his arrest.  In fact, |
| 03:42:51 | 14 | there is not one microscopic drop of drugs in this courtroom. |
| 03:42:59 | 15 | There's been a lot of talk about drugs, but have you seen one |
| 03:43:04 | 16 | seizure by any Government agent of one microscopic drop of |
| 03:43:09 | 17 | drugs from him or anyone else for that matter?  You've seen no |
| 03:43:14 | 18 | drugs in this courtroom, and you're not going to.  It's over. |
| 03:43:18 | 19 | It's too late now.  And trust me, if they had them, you would |
| 03:43:21 | 20 | have seen them. |
| 03:43:24 | 21 | I told you this in opening too.  Think about this. |
| 03:43:28 | 22 | With all the modern science, the tools available to the |
| 03:43:31 | 23 | federal government, I mean, they've got satellite tracking, |
| 03:43:36 | 24 | they've got satellite photography, GPS, aircraft, helicopters, |
| 03:43:41 | 25 | surveillance on foot, surveillance by automobile, I mean, |

| | | |
|---|---|---|
| 03:43:45 | 1 | they've got it all.  And with all of those resources and with |
| 03:43:49 | 2 | all of that scientific evidence not one time was Ron Collins |
| 03:43:56 | 3 | surveilled, followed, or observed buying drugs, selling drugs, |
| 03:44:03 | 4 | near drugs, with drug people.  Nothing.  Nothing. |
| 03:44:08 | 5 | You haven't seen the face of Ron Collins on any |
| 03:44:11 | 6 | photo.  You haven't seen any videos of him doing any drug |
| 03:44:14 | 7 | deals.  None.  You haven't seen any of that, because none of |
| 03:44:19 | 8 | it existed.  There was not one piece of scientific evidence |
| 03:44:23 | 9 | introduced in this courtroom against Ron Collins. |
| 03:44:27 | 10 | Couple that with no observations by law enforcement |
| 03:44:30 | 11 | of him committing any crime whatsoever.  All you have heard |
| 03:44:38 | 12 | was the unsupported, uncorroborated, untested, unproven, |
| 03:44:43 | 13 | unreliable word of five criminals trying to save their skin. |
| 03:44:50 | 14 | Yeah, a bunch of criminals took the witness stand and said, |
| 03:44:54 | 15 | Ron's involved in drugs.  We know this because we're a bunch |
| 03:44:58 | 16 | of criminals.  And you could believe us because, you know, |
| 03:45:01 | 17 | we'd rather spend the rest of our life in prison and die there |
| 03:45:08 | 18 | before we would lie to you.  That was the biggest lie you |
| 03:45:11 | 19 | heard in this courtroom. |
| 03:45:12 | 20 | Come on.  These people will do and say anything they |
| 03:45:16 | 21 | have to or can do to get out of prison.  They didn't provide |
| 03:45:20 | 22 | you any times, any dates, any details.  It's just wave their |
| 03:45:26 | 23 | hand and say, It happened.  Nobody backed them up.  To the |
| 03:45:30 | 24 | contrary, they didn't corroborate each other.  They tripped |
| 03:45:33 | 25 | over each other.  They couldn't get their story straight. |

| | |
|---|---|
| 03:45:36 | 1 |
| 03:45:41 | 2 |
| 03:45:49 | 3 |
| 03:45:54 | 4 |
| 03:45:57 | 5 |
| 03:46:01 | 6 |
| 03:46:06 | 7 |
| 03:46:12 | 8 |

Now, let's talk about that. First witness, Daniel Torres, he pled guilty to distributing cocaine. He admitted to more than a thousand kilos of cocaine. He tells you, as everyone else, he was facing ten years to life, which he was. But he expects to get eleven years or less for his testimony in this courtroom. He claims that he didn't use any drugs during this period, but his good buddy Jose Perez used cocaine regularly.

He testified he delivered to Ron Collins -- he wasn't sure -- if it was five, six, seven, or eight times. He said all the deliveries sort of blended together. Remember, it's sort of like you put it in a blender and just spun it around. Yeah, I don't remember anything. And the reason he didn't remember anything is because there was nothing to remember. He was just making it up. He testified, he said, all the -- excuse me. He gave you no details, and he said, there were no witnesses to any of these deliveries. He testified that he was always alone when he delivered to Ron Collins.

Daniel Torres, I was always alone. And I asked him on cross, So you're telling us that there were no witnesses, there was no one who could corroborate you, we just have to take your word? I asked him that on cross, and he said, Yeah, you just have to take my word.

He said he always delivered to Ron Collins at the pool hall, the billiard hall, always. He never told you that

he went to the Outback Steakhouse.  His testimony -- there's not one word by him of the Outback Steakhouse.  He certainly never told you that he went to the Outback Steakhouse and Cesar Perez was with him.  His testimony was he was always alone, always at the billiard hall, and never mentioned the word Outback Steakhouse once in his testimony.

He also never testified that he delivered cocaine to Ron Collins on two occasions when Anthony Aguilera was with him.  He told you, I was always alone, and it was always at the billiard hall.  He never said Anthony Aguilera was with him.

Torres never said he ever delivered cocaine to Ron Collins at the apartment building on 13th Street.  He never testified to that.  Torres insisted that he was always alone. It was Aguilera who said he delivered with Torres.  Torres denied it.

Second witness, Anthony Aguilera, he pled guilty to distributing cocaine, thousands of kilos.  He's facing ten to life.  He expects a substantial reduction.  Now, he admitted that he's talked to Daniel Torres, that he's talked to Cesar Perez, and he's talked to Jorge Llamas.  He admitted that.

But, now, Cesar Perez says he never talked to anybody.  Jorge Llamas says he never talked to anybody. Somebody's lying.

He claims he delivered to Ron Collins five times at

03:49:46  1  an apartment building by the firehouse.  Remember the

03:49:49  2  firehouse?  They showed you a picture of it.  He claims that

03:49:53  3  the first two times Cesar Perez was with him.

03:49:59  4      Now, Cesar Perez denies this.  Perez says he was

03:50:06  5  alone and not with Aguilera.  Perez on cross-examination, I

03:50:14  6  was alone, Collins was alone, there were no witnesses.

03:50:24  7      Aguilera also claims that on his third delivery at

03:50:28  8  the apartment building, Daniel Torres was with him.  Now,

03:50:34  9  Torres denies this.  Torres says he was always alone and only

03:50:38  10 delivered to the billiard hall.  I mean, these guys are

03:50:42  11 tripping all over each other.  Think about this.

03:50:44  12     But the Government, in their opening, says, That's

03:50:48  13 okay that they got mixed up who they were with, it's okay, as

03:50:52  14 long as they point at him, it's okay.  Don't pay attention to

03:50:57  15 the rest.  Don't pay attention that they are tripping over

03:51:00  16 each other, that they are pointing like this (indicating):  I

03:51:04  17 was with him, but he was with me, and he was with him.  I

03:51:07  18 mean, I'm confused and I hope you are too.

03:51:10  19     But it's okay, because they pointed at him.  And

03:51:13  20 that's all, that's all we want you to do is just point at him.

03:51:24  21     Torres never -- excuse me.

03:51:27  22     Aguilera never testified -- or excuse me.

03:51:31  23     Torres never -- I get confused too the way they are

03:51:35  24 going around in circles.

03:51:36  25     Torres never testified he delivered to Collins at the

03:51:39    1   apartment building.  Went alone with Aguilera; Torres, I was

03:51:44    2   always alone, I was at the billiard hall.

03:51:47    3          So either Torres is lying, he was with Aguilera, or

03:51:52    4   Aguilera's lying, he wasn't with Torres, or they are both

03:51:55    5   lying and they are just making it up.  I mean, somebody's

03:52:03    6   lying.  This isn't a mistake.  Oh, it gets worse if you

03:52:08    7   analyze this.

03:52:09    8          Now, we get Llamas.  Let's put him in the mix.

03:52:13    9   Again, like everybody else he's facing ten to life, the most

03:52:16   10   serious drug charge.  Get ready.  He expects a little over

03:52:24   11   five years, 67 months.  Wow.  From life to 67 months.  That's

03:52:35   12   what he expects.  Because he only delivered nine tons of

03:52:40   13   cocaine.  That's 18,000 pounds.  And he made a deal for

03:52:48   14   67 months.  It's a wonder they don't send a limo to bring him

03:52:52   15   to the courthouse.

03:52:54   16          You remember him?  He tested positive four or five

03:52:58   17   times for marijuana.  He's the guy who admitted he was

03:53:02   18   addicted to marijuana.  But he said he stopped using drugs

03:53:13   19   when he was released on bond.  But after being released, he

03:53:17   20   tested positive four or five times.  And do you remember his

03:53:23   21   explanation to you, why he tested positive?  He told you, I

03:53:28   22   tested positive because I was fat.  I was fat.  These tests

03:53:35   23   don't work on fat people.

03:53:39   24          You think the federal government pretrial, who gives

03:53:42   25   these people drug tests, you think they know it don't work on

| | | |
|---|---|---|
| 03:53:46 | 1 | fat people?  It works on everybody.  He's just lying.  It's |
| 03:53:51 | 2 | that simple. |
| 03:53:52 | 3 | And then he tells you -- then he got -- on another |
| 03:53:57 | 4 | test he failed for opiates, which are more serious drugs.  He |
| 03:54:01 | 5 | said, These tests are just no good.  They are unreliable.  The |
| 03:54:06 | 6 | tests the Government gives people to see if they are using |
| 03:54:09 | 7 | drugs, they are just no good.  They are unreliable. |
| 03:54:13 | 8 | You believe that?  You know that's not true.  You |
| 03:54:17 | 9 | know the tests are good.  You know the tests works.  He's |
| 03:54:22 | 10 | using drugs.  He just sat there and lied about it.  He set the |
| 03:54:26 | 11 | stage for the rest of his testimony by saying, Oh, I'm fat, |
| 03:54:29 | 12 | that's why it didn't work.  Oh, it didn't work because they |
| 03:54:33 | 13 | are not reliable tests.  You know, that set the stage for the |
| 03:54:36 | 14 | rest of his testimony.  It was going downhill from there.  It |
| 03:54:41 | 15 | was just going to go down from there. |
| 03:54:43 | 16 | He tells you the first time he delivered to Ron |
| 03:54:48 | 17 | Collins was at the Outback Steakhouse.  Now, we've got three |
| 03:54:52 | 18 | people going to the Outback Steakhouse.  And he says Cesar |
| 03:54:57 | 19 | Perez was with him.  He said they had never seen Collins |
| 03:55:01 | 20 | before, but they figured out it was him, because he was |
| 03:55:04 | 21 | wearing flashy jewelry.  That was his testimony, Llamas'. |
| 03:55:11 | 22 | All other times he claimed he was alone when he |
| 03:55:15 | 23 | delivered to Ron Collins.  But now in this time when he claims |
| 03:55:19 | 24 | it was the first time that they didn't know Ron Collins and |
| 03:55:24 | 25 | they figured it was him because he had flashy jewelry. |

| | |
|---|---|
| 03:55:27 | 1 |
| 03:55:31 | 2 |
| 03:55:36 | 3 |
| 03:55:43 | 4 |
| 03:55:46 | 5 |
| 03:55:49 | 6 |
| 03:55:53 | 7 |
| 03:55:59 | 8 |

1        Perez testified that he went to the Outback, but

2  Perez doesn't testify he went with Llamas.  No.  Perez says he

3  went to the Outback with Torres.  And that he already knew Ron

4  Collins well and recognized him right away.  Now, which is it?

5  Is it the first time and they didn't know who he was and he

6  was just some guy in flashy jewelry?  Or had they delivered to

7  him numerous times in the past and they knew who he was?  It

8  can't be both.  It just can't be.

9        And was Llamas with Perez?  Perez says Llamas wasn't

10  with me.  Perez says he was with Torres.  But Torres says he

11  was alone.  So which is it?  Was Torres alone?  Was Perez with

12  Llamas?  Was Perez with Torres?  Or did it never happen at

13  all?  I mean, which one of the three do you want to pick?

14        But according to the Government, it doesn't matter

15  that they got their stories mixed up.  What matters is they

16  pointed to him.  That's what counts.  That's what they want to

17  hear.  He did it.  Forget the fact that I can't remember that

18  I was -- I think I was -- I say I was with him, but you say I

19  was with him, and you say I wasn't.  I mean, this gets

20  confusing.  That's the testimony you're hearing.

21        What you're hearing is a bunch of lies from each and

22  every one of them.  Now, you've got Cesar Perez.  He also pled

23  guilty, ten to life, because, again, he's facing a serious

24  crime.  He expects to get eleven years or less.  Now, he told

25  us that he made over a million and a half dollars in drug

| | |
|---|---|
| 03:57:15 | 1 |
| 03:57:22 | 2 |
| 03:57:26 | 3 |
| 03:57:32 | 4 |
| 03:57:36 | 5 |
| 03:57:41 | 6 |

1  money, and he expects to get eleven years or less.

2      He admits he used cocaine regularly from '01 through

3  '08.  God knows how high he was and how often he was high.  He

4  was the one who picked up and delivered all of the guns.

5  Remember that?  For the Torres [sic] brothers, including the

6  machine gun for the Torres brothers.  That's who Perez was.

7      Perez said he delivered cocaine to Ron Collins at the

8  Outback Steakhouse, after he had made other deliveries to him

9  in the past.  Well, if that's true, then it can't be true that

10  they recognized him because he was wearing fancy jewelry and

11  they had never seen him before in their life.  It can't be

12  both ways.

13      This isn't credible testimony.  This isn't reliable

14  testimony.  This is made up testimony.

15      You know, according to him, this was not his first

16  delivery to Collins.  He knew Collins well.  He said he was

17  with Danny Torres, not Jorge Llamas, but right before him,

18  Llamas said Perez was with me -- or Perez says, I was with

19  Torres.  And Torres says, I was alone.

20      Now, remember, Torres said he was alone.  Llamas said

21  he went with Perez.  It wasn't their first delivery.  None of

22  these guys can get their stories straight.

23      Next, Perez said he delivered to Ron Collins downtown

24  and was always alone.  Always alone, he delivered downtown,

25  was his testimony.  But Aguilera, before him, claimed he was

| | |
|---|---|
| 03:59:06 | 1 |
| 03:59:10 | 2 |
| 03:59:19 | 3 |
| 03:59:24 | 4 |
| 03:59:28 | 5 |
| 03:59:31 | 6 |
| 03:59:35 | 7 |
| 03:59:39 | 8 |
| 03:59:46 | 9 |
| 03:59:50 | 10 |
| 03:59:52 | 11 |
| 03:59:57 | 12 |
| 04:00:03 | 13 |
| 04:00:06 | 14 |
| 04:00:09 | 15 |
| 04:00:12 | 16 |
| 04:00:17 | 17 |
| 04:00:20 | 18 |
| 04:00:24 | 19 |
| 04:00:31 | 20 |
| 04:00:33 | 21 |
| 04:00:37 | 22 |
| 04:00:41 | 23 |
| 04:00:44 | 24 |
| 04:00:48 | 25 |

with Perez when he delivered to the apartment building by the firehouse. Now, was he alone or was he with Aguilera? He says he was alone. Aguilera says he's with him. Who's lying? They are both lying, that's who's lying, they both are.

But that's okay, says the Government. They pointed at him. They said he's involved. So that's okay that they can't quite get their stories straight, as long as they point at him. You know, they just can't get these stories straight, and they are never going to get them straight, because they are not true.

You heard the last officer to testify, he's interviewed informants, he's interviewed cooperating witnesses, and he's caught them lying on more than one occasion. He said, They'll lie for a host of reasons. They'll lie to protect their sources. They'll lie to protect their friends. They'll lie to protect their family. They'll lie to protect their drug money. They'll lie to protect their assets. And, boy, most of all, what do you think they'll lie to do? You know as well as I. They'll look you straight in the eyes, and they'll lie to you before they'll spend the rest of their life in prison and die there.

Now, let's take a look at Robert Gregory. Robert Gregory's the guy who drives an hour and a half to two hours to get to Chicago to get his car repaired, because there's nobody in all of Milwaukee who can fix a BMW. He has to come

| | | |
|---|---|---|
| 04:00:54 | 1 | all the way to Lee's. |
| 04:00:56 | 2 | Now, Ron Collins is there, because Ron Collins lives |
| 04:01:00 | 3 | in Chicago.  Ron Collins is getting his car fixed at Lee's, |
| 04:01:05 | 4 | the neighborhood shop.  Not an hour and a half, two hours from |
| 04:01:09 | 5 | his house.  And here's what Gregory wants you to believe. |
| 04:01:15 | 6 | Gregory wants you to believe that Ron Collins, who he's never |
| 04:01:17 | 7 | met in his entire life walks up to him and goes, Hi, what's |
| 04:01:23 | 8 | the price of cocaine in Milwaukee?  If you were the biggest |
| 04:01:30 | 9 | drug dealer in the world or the smallest drug dealer in the |
| 04:01:33 | 10 | world or anybody in between, do you really think you would |
| 04:01:36 | 11 | walk up to a total stranger and burst out with a statement |
| 04:01:42 | 12 | like that?  Wouldn't you be afraid he may a cop?  He may be |
| 04:01:45 | 13 | the son of a cop?  He may be the father of a cop?  He may be |
| 04:01:48 | 14 | the friend of a cop?  He may be a husband of a cop?  You're |
| 04:01:52 | 15 | just going to walk up to a total stranger. |
| 04:01:54 | 16 | And then the total stranger is going to say back to |
| 04:01:57 | 17 | you, Oh, it's 19.  And then the third sentence out of his |
| 04:02:01 | 18 | mouth is -- or second out of his mouth, Well, suppose I can |
| 04:02:07 | 19 | beat that?  Suppose I can get it for you, or I can meet that |
| 04:02:09 | 20 | price?  In 30 seconds or less, two total strangers have now |
| 04:02:16 | 21 | formed this drug relationship that is utterly preposterous. |
| 04:02:24 | 22 | That is ridiculous.  That couldn't happen in real life.  Total |
| 04:02:30 | 23 | strangers, and in 30 seconds they're dealing drugs together. |
| 04:02:33 | 24 | Well, did you find it interesting that Gregory didn't |
| 04:02:36 | 25 | tell you on his direct examination how he knew Ron Collins, |

04:02:42  1   that he knew Ron Collins because Ron Collins bought a car from

04:02:45  2   him, a Volkswagen Jetta?  Remember that?  That didn't come out

04:02:51  3   'til I asked him about it.  He didn't volunteer that on

04:02:54  4   direct.  He didn't tell you, That's how I knew Ron Collins.  I

04:02:57  5   bought a car from him.  No.  I know Ron Collins because I met

04:03:01  6   him and three seconds later we're buddies, we're tight, and

04:03:05  7   we're going to do drug deals together, first words out of my

04:03:09  8   mouth.

04:03:10  9        No, the first words out of his mouth probably to Ron

04:03:13  10  Collins were, Hey, I've got a Volkswagen Jetta.  You know

04:03:17  11  anybody looking to buy one?  That's how he knows him.

04:03:21  12       Gregory is protecting someone.  Gregory's protecting

04:03:24  13  his source.  Is his source at Lee's?  Does his source work

04:03:29  14  there?  Does his source meet him there?  There's something

04:03:32  15  going on that Gregory drives an hour and a half to two hours

04:03:36  16  to go to Lee's.  There's something going on, and Gregory's got

04:03:40  17  some relationship with somebody at Lee's and he's protecting

04:03:44  18  them.

04:03:44  19       He tells you he paid Collins $9500 for nine ounces, a

04:03:51  20  quarter of a kilo, on three separate occasions.  He was

04:03:55  21  positive, $9500, three separate times.  Then on

04:04:01  22  cross-examination I said, Woe, the math doesn't work.

04:04:05  23  Shouldn't it be half of that, 4750?  Oh, yeah.  If he really

04:04:14  24  bought cocaine, you think he would have forgot how much he

04:04:20  25  paid for it?  If he really bought cocaine from Ron Collins, do

| | |
|---|---|
| 04:04:24 | 1 you think he would have forgotten? |
| 04:04:27 | 2          Now, he was just making it up as he went along.  He's |
| 04:04:32 | 3 making up the whole thing.  It's not believable.  He's not |
| 04:04:37 | 4 honest.  Now, in his phone he had Ron, R-o-n, and he had RR. |
| 04:04:49 | 5 This doesn't make much sense to me either.  He says both of |
| 04:04:54 | 6 them are Ron Collins.  Why did you have two separate listings |
| 04:04:57 | 7 or two separate numbers for the same person?  Why wouldn't you |
| 04:05:04 | 8 have Ron or RR for Ron Ron.  But he never referred to him as |
| 04:05:09 | 9 Ron Ron.  He always called him Ron. |
| 04:05:12 | 10          So why does he have two separate listings, RR and |
| 04:05:17 | 11 Ron, with two separate numbers and claim that they are the |
| 04:05:19 | 12 same person?  Because one of them is Ron Collins' number and |
| 04:05:24 | 13 the other's not.  And why does he have Ron Collins' number? |
| 04:05:28 | 14 Because Ron Collins bought a car from him.  They negotiated |
| 04:05:31 | 15 it.  Collins saw it.  Collins drove it.  They met.  They |
| 04:05:36 | 16 talked about it.  He had to go back to Milwaukee and get a |
| 04:05:39 | 17 title.  Collins had to go get money and pay him.  They had to |
| 04:05:42 | 18 meet again.  Oh, they met and they talked numerous times.  He |
| 04:05:45 | 19 knows Collins.  Collins knows him.  They know each other from |
| 04:05:49 | 20 the car. |
| 04:05:50 | 21          You know, let's ask ourselves, why would these |
| 04:05:55 | 22 criminals do this?  And I don't think the answer could be more |
| 04:05:58 | 23 obvious than if I put instead of a slide show up there I put a |
| 04:06:04 | 24 blinking neon sign saying, I want to get out of jail.  I will |
| 04:06:06 | 25 do anything I can to do that.  I will say anything.  I will do |

1    anything.  I want to get out of jail.

2         These people aren't good citizens doing civic duty.

3    They are criminals.  They are delinquents.  They are drug

4    dealers.  Don't let them fool you.  Don't let them use you to

5    get out of jail.

6         They made a deal with the Government.  They know how

7    the system works.  The Government bought and paid for this

8    testimony with something more valuable than money, with time.

9    Did you notice -- and I told you this in opening statement,

10   guaranteed you this -- every one of them was going to come

11   here and at least on two or three occasions say, I'm only here

12   to tell the truth.  I said, You're not here to save your skin?

13   You're not here to -- No, no, no, I'm here to tell the truth,

14   for the beauty of the truth.  That's the only reason I'm here.

15        One of them was honest enough, Torres.  Torres told

16   you, I'd lie to save myself.  I'd lie to see my kids.  I'd do

17   anything, Torres said.

18        I'm here to tell the truth.  I don't care if I get

19   time off or not.  Insider testimony.  I'd rather spend the

20   rest of my life in prison.  I have morals.  I deal drugs.  But

21   where I draw the line is lying to you people in court.  That's

22   something I would never do.  That is ridiculous.  That's

23   ludicrous.

24        You know, you've got to consider the testimony of

25   these people with particular caution.  It's almost like when

04:08:04   1    you go in a grocery store and there's certain products like

04:08:09   2    drain cleaner and it's got the skull and crossbones on it?

04:08:13   3    That's a warning sticker that this is caustic.  God forbid you

04:08:18   4    or your child picks this up and drinks it.  You could die.

04:08:22   5    It's a warning label.  Well, let me tell you.  Every one of

04:08:26   6    these people were coming in here with skulls and crossbones

04:08:30   7    all over them warning you not to believe them, not to trust

04:08:34   8    them.

04:08:39   9          What physical evidence did you see in this trial?

04:08:44   10   You didn't see any drugs.  None from him.  You didn't see

04:08:50   11   drugs from anybody, because there were none.  Fancy expensive

04:08:55   12   cars.  We know about one car he bought and others they claim

04:09:04   13   he drove.  None of them are fancy, expensive cars.

04:09:10   14         And what have you learned?  You learned how he paid

04:09:13   15   for his car.  Paid for it the way we all do.  Made payments

04:09:18   16   every single month.  Did he walk into the dealer and throw 65

04:09:22   17   grand in hundred-dollar bills or twenty-dollar bills on a

04:09:26   18   table or in a briefcase?  No.  He put, what was it, $4200

04:09:32   19   down, and he made payments every month.  Wow.  That's

04:09:35   20   certainly the way a drug dealer would do it, isn't it?  $4200

04:09:42   21   down payment and payments every month.

04:09:44   22         No guns.  No drugs.

04:09:52   23         The Government introduced three recordings that they

04:09:53   24   claim were made by Ron Collins and Pedro Flores.  I found the

04:10:00   25   Flores brothers really interesting.  Clearly, they were

|   |   |
|---|---|
| 04:10:05 | 1 |
| 04:10:11 | 2 |
| 04:10:17 | 3 |
| 04:10:22 | 4 |
| 04:10:28 | 5 |
| 04:10:35 | 6 |
| 04:10:38 | 7 |
| 04:10:41 | 8 |
| 04:10:44 | 9 |
| 04:10:47 | 10 |

1  playing the Government, weren't they?  The agents, the

2  meetings with them, talking to them while they were federal

3  fugitives.  From April through November, eight months the

4  Government's dealing with federal fugitives and doesn't arrest

5  them.  And they were still dealing drugs during this whole

6  period of time that they were negotiating a deal in with the

7  Government.  They didn't stop dealing drugs 'til they got here

8  in the United States.  You heard witnesses say, The Flores

9  brothers are dealing drugs right before -- right up to

10  Thanksgiving.

11       One of the agents testified, We suspected they were

12  dealing drugs.  God, it was as plain as the nose on their

13  face.  How they couldn't figure it out is beyond me.  Or did

14  they?  And did they turn their back, and figure whatever it

15  was they wanted from the Flores brothers was valuable enough

16  to let them continue dealing drugs?

17       Now, the Flores brothers didn't identify Ron Collins'

18  voice.  The Flores brothers didn't tell you they made that

19  tape.  In fact, not one single witness can or did tell you

20  when the tape was made.  They can guess, because there's a

21  date-stamp on it.  But if any of you have digital cameras, you

22  know you set the date on a camera.  So if I want to say a

23  picture was taken on Christmas Day, December 25th, I could set

24  that date right this minute, take that picture, and six

25  months, a year from now show, See there, it was taken on

1    Christmas.

2        No one's told you when these conversations were made.

3    No one really knows where they were made.  No one, who's

4    testified in this courtroom, was present when they were made,

5    not one single witness was present.  All they did was get

6    handed in Mexico a recorder and then downloaded and then sent

7    the disk here.

8        We don't know when they were made, by whom they were

9    made, under what circumstances were they made, was the

10   recorder shut on and off during various sentences?  We don't

11   know anything.  All we know is that an agent got a recorder,

12   downloaded it, sent the disk here.

13       Now, we have voice identification by two Government

14   agents.  As the agents told you under cross-examination, they

15   have no special training in voice identification.  They can't

16   do it any better than you and I, the agent told you.  It's

17   just his opinion that it's Ron Collins.  Well, it's supposed

18   to be Ron Collins.  Of course it's his opinion it's him.

19       And then Agent Durante told you that he heard Ron

20   Collins -- he spoke to Ron Collins for 45 minutes, then two

21   years later he listened to the tape.

22       MS. GUREN:  Objection, misstates the record.

23       MR. RUBINO:  I disagree.

24       THE COURT:  Okay.  Hold on, folks.

25       So when they disagree about what the evidence is,

| | |
|---|---|
| 04:13:50 | 1 |
| 04:13:57 | 2 |
| 04:13:58 | 3 |
| 04:14:01 | 4 |
| 04:14:01 | 5 |
| 04:14:03 | 6 |
| 04:14:03 | 7 |
| 04:14:07 | 8 |
| 04:14:10 | 9 |
| 04:14:14 | 10 |
| 04:14:19 | 11 |
| 04:14:23 | 12 |
| 04:14:28 | 13 |
| 04:14:33 | 14 |
| 04:14:39 | 15 |
| 04:14:43 | 16 |
| 04:14:47 | 17 |
| 04:14:51 | 18 |
| 04:14:57 | 19 |
| 04:15:01 | 20 |
| 04:15:04 | 21 |
| 04:15:08 | 22 |
| 04:15:13 | 23 |
| 04:15:19 | 24 |
| 04:15:21 | 25 |

1 it's your collective memory that overrules what either side
2 says. You heard the evidence. You discuss it during your
3 deliberations, and you make the decision about the facts as
4 they were.
5         You may proceed.
6         MR. RUBINO:  Thank you.
7         I have a recollection of what the evidence is.  The
8 prosecutor has a recollection of what the evidence is.  And as
9 the judge just told you, your recollection is what counts.
10 What I'm telling you is not evidence, and what they tell you
11 is not evidence.  It is my opinion.  It is my recollection.
12         My recollection is that the agent told you that I
13 spoke with him for 45 minutes two years ago and then I
14 listened to the tapes from the jail.  And based on that, it
15 was Agent Durante's opinion that it was Ron Collins.  Well,
16 you have the -- we use the word -- I guess I'm dating myself,
17 they're not tapes anymore.  They are disks.  But you have the
18 recordings.  Take them back there.  Listen to the two of them.
19 You're just as good an expert as they are.  They admit that.
20 They have no training, no experience, no -- they are not
21 experts.  Neither am I.  Neither are you.
22         After you listen to them, can you say to yourself, I
23 have no reasonable doubt that is the voice of Ron Collins?  If
24 you can say you have no doubt whatsoever that's his voice,
25 then come back with a guilty verdict, come back with one.  But

| | | |
|---|---|---|
| 04:15:25 | 1 | when you listen to those two tapes and you compare them, you |
| 04:15:29 | 2 | will have reasonable doubt.  You'll say, I don't know if |
| 04:15:34 | 3 | that's him.  I don't know.  All I can tell you it's a man's |
| 04:15:39 | 4 | voice. |
| 04:15:46 | 5 | In summation, who have you heard from?  Who has |
| 04:15:51 | 6 | accused Ron Collins?  People that are sending hundreds of |
| 04:15:57 | 7 | kilos, thousands across this whole area.  People that are |
| 04:16:01 | 8 | distributing thousands of kilos.  People who possess guns, |
| 04:16:06 | 9 | machine guns.  People who are facing up to life in prison. |
| 04:16:13 | 10 | Witnesses who, I have repeatedly said, would rather spend the |
| 04:16:17 | 11 | rest of their life in prison and die there than lie to you. |
| 04:16:21 | 12 | Now, that's the biggest lie you've ever heard alone. |
| 04:16:24 | 13 | People are facing millions of dollars of fines, |
| 04:16:28 | 14 | forfeiture of all their assets.  They need to find a way out. |
| 04:16:35 | 15 | Ron Collins, that's the way out.  That's the ticket.  That's |
| 04:16:42 | 16 | the bus that's going to pick them up at the jail and take them |
| 04:16:47 | 17 | home.  They want to blame him.  They want to trade places with |
| 04:16:52 | 18 | him.  They want to put him in prison to get themselves out. |
| 04:16:56 | 19 | This is what they have to do.  This is what they did do.  This |
| 04:16:59 | 20 | is what they come into this courtroom and do. |
| 04:17:03 | 21 | They got nothing to lose.  Think about it.  What a |
| 04:17:07 | 22 | wonderful position they are in.  They got nothing to lose. |
| 04:17:11 | 23 | Oh, the Government will tell you, I'm sure, Oh, I have my deal |
| 04:17:16 | 24 | to lose if I lie.  No, I've got my deal to lose if I get |
| 04:17:21 | 25 | caught lying.  If I get caught. |

| | |
|---|---|
| 04:17:29 | 1 |
| 04:17:32 | 2 |
| 04:17:39 | 3 |
| 04:17:45 | 4 |
| 04:17:48 | 5 |
| 04:17:53 | 6 |
| 04:17:57 | 7 |
| 04:18:02 | 8 |
| 04:18:08 | 9 |
| 04:18:12 | 10 |
| 04:18:15 | 11 |
| 04:18:19 | 12 |
| 04:18:24 | 13 |
| 04:18:34 | 14 |
| 04:18:37 | 15 |
| 04:18:46 | 16 |
| 04:18:50 | 17 |
| 04:18:55 | 18 |
| 04:18:57 | 19 |
| 04:19:03 | 20 |
| 04:19:07 | 21 |
| 04:19:10 | 22 |
| 04:19:15 | 23 |
| 04:19:20 | 24 |
| 04:19:25 | 25 |

You know, the Government will tell you that the witness said this, the witness said that. The question isn't did the witness say it. The question is, is it true? Of course the witness said it. I mean, if you take the Outback, which is the most confusing point-around I've ever seen in my life, yeah, they said it. But it can't be true. It can't be true, because he can't be with him when he is with him, when he is with him. It can't be true. But what counts is they'll blame him. They all blamed him.

So the Government can tell you all day long that the witness said it, but the question isn't whether the witness said it. The question is, is the witness who said it believable? Can you trust that witness?

There's been no testimony that illegal money came from Ron Collins to his bank accounts. In order to say that all that money, or any of that money, is illegal, you just have to assume it. You just have to guess it. You just have to speculate.

30-some-thousand dollars in cash went into his account. No question it did. The remainder of the money -- at first the witness, my recollection is, said that that was cash money, 300-some-thousand dollars. But then we sort of dissected it page by page, if you remember. And he admitted that he didn't know whether the money was cash or whether the money was a check from another account, whether the money was

| | | |
|---|---|---|
| 04:19:27 | 1 | a transfer from a savings account. He didn't know where it |
| 04:19:31 | 2 | came from. Actually, his testimony was simply, It didn't come |
| 04:19:34 | 3 | from that one bank account that they told me about. |
| 04:19:39 | 4 | Well, could it have come from anywhere else on cross? |
| 04:19:44 | 5 | And his answer is yes, it could have. Just because he wasn't |
| 04:19:51 | 6 | given other bank accounts don't mean they don't exist. All he |
| 04:19:56 | 7 | told you, if you think about it, was, That I got money that I |
| 04:19:59 | 8 | can't -- that it didn't come from this bank account. Could it |
| 04:20:03 | 9 | have come from other bank accounts? He readily admits it. I |
| 04:20:08 | 10 | said, Can you tell this jury that you're positive that money |
| 04:20:10 | 11 | was cash? And his answer was, No, no, I can't tell them that. |
| 04:20:15 | 12 | But that's the spin they want to put on it. That's what they |
| 04:20:19 | 13 | want you to believe. Unaccounted-for cash. |
| 04:20:36 | 14 | Demand quality witnesses. Demand quality testimony. |
| 04:20:42 | 15 | Do you have witnesses? Yes. Do you have testimony? Yes. Is |
| 04:20:45 | 16 | it testimony you can believe? No. |
| 04:20:49 | 17 | You know, the Court told you that an indictment is |
| 04:20:56 | 18 | merely an accusation. But if that weren't true, if everybody |
| 04:21:00 | 19 | that got indicted was guilty, there would be no need for you, |
| 04:21:04 | 20 | no need for me, and no need for this courtroom. We'd just |
| 04:21:09 | 21 | take them out back and string them up. We wouldn't need to |
| 04:21:14 | 22 | prove anything. |
| 04:21:15 | 23 | Well, in this wonderful country of ours we don't do |
| 04:21:18 | 24 | that. We have this system and this system works, and it works |
| 04:21:24 | 25 | because of you. And I'm asking you to take this evidence and |

| | | |
|---|---|---|
| 04:21:29 | 1 | turn it every different way and look at it every possible way |
| 04:21:33 | 2 | and say, Is it tainted in some way?  Is it flawed in some way? |
| 04:21:40 | 3 | Or is it something that I can embrace and trust in and have no |
| 04:21:45 | 4 | reasonable doubt whatsoever? |
| 04:21:48 | 5 | Well, it's simply not the truth.  You know this |
| 04:21:52 | 6 | evidence is tainted.  You know this evidence smells like old |
| 04:21:56 | 7 | garbage.  You know those people would do or say anything to |
| 04:22:01 | 8 | save their skin.  That's the whole case against Ron Collins. |
| 04:22:06 | 9 | There's nothing more to it.  It's five informants, five |
| 04:22:13 | 10 | cooperators, five snitches, five whatever word you want to |
| 04:22:18 | 11 | give these people, five people who are desperate to trade |
| 04:22:24 | 12 | places with Ron Collins, five people that you can't rely upon, |
| 04:22:31 | 13 | five people that you have to have a reasonable doubt about |
| 04:22:37 | 14 | their testimony. |
| 04:22:37 | 15 | And if you have a reasonable doubt, the law requires |
| 04:22:42 | 16 | that you find Ron Collins not guilty, not proved.  They didn't |
| 04:22:49 | 17 | prove to you -- they didn't provide you with the quality |
| 04:22:54 | 18 | needed to make you have no reasonable doubt. |
| 04:23:00 | 19 | When you go back in that jury room, you're going to |
| 04:23:03 | 20 | have plenty of doubts and they are all going to be fair and |
| 04:23:06 | 21 | they are all going to be reasonable, because you just can't |
| 04:23:09 | 22 | put your arms around those witnesses and trust them and say, I |
| 04:23:14 | 23 | feel good with this witness.  I would trust this witness in |
| 04:23:21 | 24 | the most important of my personal affairs.  I would believe in |
| 04:23:26 | 25 | him.  I would take his word.  You can't do that, and you can't |

| | | |
|---|---|---|
| 04:23:32 | 1 | do it to Ron Collins.  You've got to do the right thing.  You |
| 04:23:35 | 2 | come back with a verdict of not guilty.  Thank you. |
| 04:23:40 | 3 | THE COURT:  How are you folks doing?  The Government |
| 04:23:42 | 4 | has a rebuttal argument.  Does anyone need a five-minute break |
| 04:23:46 | 5 | before we start the rebuttal argument? |
| 04:23:48 | 6 | (Jury nodding.) |
| 04:23:49 | 7 | THE COURT:  Okay.  Five minutes only, and we'll come |
| 04:23:52 | 8 | right back. |
| 04:23:58 | 9 | (The jury leaves the courtroom.) |
| 04:35:05 | 10 | (Recess taken.) |
| 04:35:05 | 11 | (The jury enters the courtroom.) |
| 04:35:22 | 12 | THE COURT:  Okay, folks.  Please be seated. |
| 04:35:24 | 13 | And I am now going to recognize Ms. Guren for the |
| 04:35:27 | 14 | Government's rebuttal argument. |
| 04:35:27 | 15 | - - - |
| 04:35:32 | 16 | MS. GUREN, FINAL ARGUMENT |
| 04:35:32 | 17 | MS. GUREN:  Now the defense counsel told you to |
| 04:35:36 | 18 | demand quality witnesses, witnesses that you could embrace, |
| 04:35:40 | 19 | that you could confide in.  I wish that our witnesses could |
| 04:35:45 | 20 | have been priests and ministers and rabbis and churchgoing |
| 04:35:49 | 21 | grandmas.  I wish they could have been.  But the problem is |
| 04:35:53 | 22 | that's not who the defendant was dealing drugs with. |
| 04:35:56 | 23 | And so he chose our witnesses, not us, and so we |
| 04:36:02 | 24 | called the drug couriers and we called the drug customers, and |
| 04:36:05 | 25 | we put on their evidence, because that is who the defendant |

1    chose to conspire with.

2          And you can't find out what is going on inside a
3    secret conspiracy without calling the conspirators.  But the
4    defense counsel was very wrong on one point, several points,
5    which I'll get to.  He told you that their testimony was
6    untested, uncorroborated, unsupported, and a couple other un-
7    adjectives.  That's not true.

8          You have a recollection of the testimony, and it is
9    your recollection that matters.  The defense counsel's
10   recollection is not what matters.  You were taking notes.  You
11   were listening.  You were paying attention.  It is your
12   decision and it's your recollection, and it's not my
13   recollection either.

14         I'm going to go through and try to tell you, to the
15   best of my recollection, some of the points that I think
16   defense counsel got wrong, but it does go with what you
17   remember.  It is your memory; that's what matters.

18         The witnesses were not unsupported, uncorroborated,
19   untested.  First of all, the witness testimony, that's
20   evidence.  You'll hear in the jury instructions that the judge
21   gives you that that is evidence that you can consider.

22         And their testimony, it, first of all, corroborated
23   each other.  Yes, there are some things that they got wrong.
24   They misremembered.  They didn't remember.  But overall, the
25   main things were there, and I'm going to go through some of

| | |
|---|---|
| 04:37:45 | 1 |
| 04:37:48 | 2 |
| 04:37:54 | 3 |
| 04:37:58 | 4 |
| 04:38:01 | 5 |
| 04:38:03 | 6 |
| 04:38:06 | 7 |
| 04:38:10 | 8 |
| 04:38:14 | 9 |
| 04:38:16 | 10 |
| 04:38:18 | 11 |
| 04:38:22 | 12 |
| 04:38:25 | 13 |
| 04:38:28 | 14 |
| 04:38:31 | 15 |
| 04:38:33 | 16 |
| 04:38:33 | 17 |
| 04:38:36 | 18 |
| 04:38:40 | 19 |
| 04:38:44 | 20 |
| 04:38:47 | 21 |
| 04:38:51 | 22 |
| 04:38:54 | 23 |
| 04:38:54 | 24 |
| 04:38:58 | 25 |

those points more carefully.

Starting with the famous Outback Steakhouse, now, the Outback steakhouse and the event you heard about the Outback steakhouse, that's what should reassure you, that's what should make you feel good. Because if the witnesses were getting up there and they were testifying to the same exact story with the same exact details, that's what should have made you nervous, because that's not how memory works. That should have completely scared you.

But the fact that they didn't always remember the same details -- and you know what happened at that Outback steakhouse. You can use your common sense in terms of how many there were. Jorge Llamas and Cesar Perez went to that Outback Steakhouse together. Cesar Perez, for whatever reason, remembers it being Danny Torres.

But what do you remember about their testimony? Their testimony about the main details at the Outback steakhouse is the same. They got there. It was Cesar Perez. It was Jorge Llamas' first time meeting the defendant, not Cesar Perez. You heard from Cesar Perez. The defense attorney's wrong. Cesar Perez had previously delivered to the defendant. It was Jorge Llamas' first time, because he had been in Mexico.

And he went along with Cesar Perez to the Outback steakhouse. They parked in the parking lot. They didn't see

| | |
|---|---|
| 04:39:01 | 1 |
| 04:39:04 | 2 |
| 04:39:07 | 3 |
| 04:39:10 | 4 |
| 04:39:16 | 5 |
| 04:39:19 | 6 |
| 04:39:21 | 7 |
| 04:39:25 | 8 |
| 04:39:27 | 9 |
| 04:39:32 | 10 |
| 04:39:36 | 11 |
| 04:39:41 | 12 |
| 04:39:45 | 13 |
| 04:39:48 | 14 |
| 04:39:52 | 15 |
| 04:39:54 | 16 |
| 04:39:57 | 17 |
| 04:40:00 | 18 |
| 04:40:06 | 19 |
| 04:40:09 | 20 |
| 04:40:13 | 21 |
| 04:40:16 | 22 |
| 04:40:21 | 23 |
| 04:40:24 | 24 |
| 04:40:26 | 25 |

the defendant.  They went inside the restaurant.  And where do both of them say they went?  To the bar.  Looking around the restaurant, they both saw the defendant eating there.  Then they approached -- then Cesar Perez approached him.  And why was he exchanging keys?  Because he was trading cars to deliver the cocaine that he brought.

Danny Torres never said he went to the Outback steakhouse.  He probably didn't.  It was Jorge Llamas and Cesar Perez.  They told you very similar details of what happened there.  That's what they remember.  It doesn't matter if it was Cesar Perez.  Or -- in fact, that should reassure you, because if he was testifying exactly the same, that's a problem.  That's where your antenna should start to go up thinking maybe something's not right.

What about Antonio Aguilera?  Now, first, my recollection of the testimony is different from the defense counsel.  My recollection is that Antonio Aguilera never said he went to the West Loop apartment with Danny Torres.  He said he went to Cue Billiard with Danny Torres.  It's true Danny Torres, when he testified, he told you he went alone to Cue Billiards.  Antonio Aguilera recalls following in the car.  They both found -- pointed to that same photo of Cue Billiards.  That's the same location they both identified.  They both testified about meeting the defendant there.

So Danny Torres may not remember that Antonio

| | |
|---|---|
| 04:40:31 | 1 |
| 04:40:36 | 2 |
| 04:40:39 | 3 |
| 04:40:43 | 4 |
| 04:40:48 | 5 |
| 04:40:51 | 6 |

1    Aguilera followed him.  Again, these are details that
2    should -- you know, if they were trying to collude, if they
3    were trying to come up with the same story, if they were
4    trying to make their testimony the same, that point would have
5    been exactly straight on.  Their testimony would have been
6    exactly alike.

7         And I think it's really interesting that the defense
8    counsel pointed out that Antonio Aguilera said that he spoke
9    to the witnesses about their testimony.  That is not what the
10   defense counsel asked him.  The defense counsel asked him,
11   Have you spoken to these individuals?  And he told you, Yeah,
12   a couple times.  The defense counsel did not ask Antonio
13   Aguilera if he spoke about his testimony to these individuals.

14        And Cesar Perez told you he hadn't spoken to Danny
15   Torres.  But notice defense counsel hadn't asked Cesar Perez
16   when he was up on the stand if he spoke to Antonio?  He didn't
17   ask him that.  But Cesar Perez told you and Jorge Llamas told
18   you, they never spoke about their testimony to anyone.  And
19   it's clear they didn't speak about it with each other, because
20   otherwise they would have gotten that Outback steakhouse thing
21   sorted out.

22        So that is how you can trust some of these things
23   that the witnesses said, because they corroborate each other,
24   but they are not exactly the same, because that's not how
25   memory is, that's not how normal people recall events.

| | |
|---|---|
| 04:41:52 | 1 |
| 04:42:10 | 2 |
| 04:42:13 | 3 |
| 04:42:17 | 4 |
| 04:42:20 | 5 |
| 04:42:23 | 6 |
| 04:42:26 | 7 |
| 04:42:31 | 8 |
| 04:42:34 | 9 |
| 04:42:39 | 10 |
| 04:42:41 | 11 |
| 04:42:44 | 12 |
| 04:42:46 | 13 |
| 04:42:49 | 14 |
| 04:42:52 | 15 |
| 04:42:58 | 16 |
| 04:43:01 | 17 |
| 04:43:05 | 18 |
| 04:43:09 | 19 |
| 04:43:14 | 20 |
| 04:43:17 | 21 |
| 04:43:20 | 22 |
| 04:43:23 | 23 |
| 04:43:27 | 24 |
| 04:43:30 | 25 |

1        Now, I'm going to focus a lot of time on the
2  evidence.  The defense counsel spent a lot of time talking to
3  you at first about the burden of proof, and the burden of
4  proof is very important.  It is the Government's burden of
5  proof to prove to you beyond a reasonable doubt the evidence
6  in this case and the evidence that proves the defendant is
7  guilty, and that burden does not shift to the defense counsel.
8  But I'm not going to spend that much time talking about that,
9  because I know you're going to be instructed on it, and I know
10  you're going to take that seriously.
11        I'm going to spend my time talking to you about the
12  evidence.  And the evidence shows more that these cooperators,
13  these witnesses were corroborated.  They talked to you about
14  the locations that they did their drug dealing in and it
15  overlapped.  Aguilera and Torres told you about Cue Billiard.
16  Aguilera and Perez told you about West Loop.  Aguilera and
17  Llamas told you about the South Loop apartment.  Torres and
18  Perez told you about Michigan and Indiana.  Llamas and Perez
19  told you about -- about the Outback steakhouse.  These are
20  locations that you heard about.  They weren't picked at
21  random.  They were picked from their recollections.
22        Danny Torres, he said -- the defense attorney wants
23  to have it both ways.  Danny Torres said at certain parts that
24  he didn't remember.  He didn't remember.  And Danny Torres
25  said at certain parts he didn't know.  He was testifying about

04:43:33  1  these things.  And, yet, the defense counsel wants you to

04:43:36  2  believe that somehow or another he was making up this whole

04:43:39  3  story.  This doesn't make sense.

04:43:41  4       Why would he testify that he didn't remember, that he

04:43:42  5  didn't know certain things, that he was just making up a

04:43:45  6  story?  He would just make up the answer.  He wouldn't say, I

04:43:48  7  don't remember.  He wouldn't say, I don't know.  He would just

04:43:51  8  make up some fact.  But he didn't say that.  He said, I don't

04:43:55  9  remember, when he didn't remember.  He said, I don't know,

04:43:57  10  when he didn't know.

04:44:00  11       You all also heard about the same way of operating

04:44:03  12  that switching of cars, the duffle bag, the money payments,

04:44:08  13  the fact that the defendant did not speak very much to these

04:44:12  14  couriers.  He didn't talk a lot to them.  It was a quick

04:44:15  15  exchange.

04:44:16  16       And you also heard -- what else corroborates them?

04:44:18  17  The cars.  You heard Gregory, Perez, and Torres talk about an

04:44:24  18  Audi and an Infiniti.  In fact, Gregory, a car guy -- he

04:44:28  19  really knows his cars -- he told you that it was an A8.  What

04:44:32  20  did you see in the financial documents?  The defendant owns an

04:44:35  21  Audi A8.  What else did you see?  Gregory and Aguilera told

04:44:40  22  you about the silver Jeep Cherokee.  Financial documents

04:44:43  23  showed you he had access to a Jeep Cherokee.

04:44:45  24       There was also talk about the black Lincoln truck.

04:44:49  25  Both Gregory and Llamas talked about that black Lincoln truck

| | |
|---|---|
| 04:44:54 | 1 |
| 04:44:55 | 2 |
| 04:44:57 | 3 |
| 04:45:02 | 4 |
| 04:45:04 | 5 |
| 04:45:08 | 6 |
| 04:45:11 | 7 |
| 04:45:15 | 8 |
| 04:45:17 | 9 |
| 04:45:18 | 10 |
| 04:45:21 | 11 |
| 04:45:25 | 12 |
| 04:45:27 | 13 |
| 04:45:32 | 14 |
| 04:45:35 | 15 |
| 04:45:39 | 16 |
| 04:45:42 | 17 |
| 04:45:48 | 18 |
| 04:45:55 | 19 |
| 04:46:00 | 20 |
| 04:46:06 | 21 |
| 04:46:06 | 22 |
| 04:46:08 | 23 |
| 04:46:10 | 24 |
| 04:46:14 | 25 |

and how nice it was.  And both Gregory and Perez told you about the Land Rover.  You saw the financial documents.  There was a Land Rover.  They also all talked about the same nice jewelry that the defendant was wearing.  That was a commonality in their testimony that they talked about.

So the details may not have been perfect, they may not have been precise, but that's how you know.  That's how you can judge, using your common sense, that their testimony was truthful.

And what else?  Defense counsel spent a lot of time talking to you about their motivations.  And he told you I would say this and I am going to say that and I'm going to say it because it's a very important point.  They have positive motivation to tell the truth up there.  Their deal doesn't happen if they lie on the stand.  And you know that they didn't lie, because you saw the corroborating evidence.  You saw with Robert Gregory the phones that said Ron and RR.

You saw in there the phone calls, 153 calls.  Those are not 153 calls about a Volkswagen Jetta.  Mr. Gregory didn't tell you about a Volkswagen Jetta on direct, because he wasn't asked about it.  But when defense counsel asked him about that Volkswagen Jetta, Oh, yeah, I talked to him about a Volkswagen Jetta.  That was after I met him, though.

153 calls are not about Robert Gregory selling a Volkswagen Jetta to the defendant.  And how else do you know

04:46:17  1  that?  The text messages from RR that you saw.  Look at text

04:46:21  2  message number 11 when you get back to the jury room.  It

04:46:24  3  says, Can you bring back down -- I need to meet you to bring

04:46:27  4  back down that change.  That is the defendant sending the text

04:46:31  5  message to Robert Gregory about the -- about Robert Gregory

04:46:35  6  bringing down change, money, payment.  Why would Robert

04:46:39  7  Gregory need to bring down money, if he was the one selling

04:46:42  8  the Volkswagen Jetta to the defendant and that was the

04:46:46  9  entirety of their relationship and nothing more?

04:46:48  10       And what else?  The defense counsel -- and he raised

04:46:51  11  a couple questions about this to Nicole Smith about how

04:46:55  12  perhaps Ron and RR were different people.  Well, Robert

04:46:59  13  Gregory told you exactly what happened, and it's corroborated

04:47:01  14  by his phone records.  When he first met the defendant and he

04:47:05  15  got that phone number of the defendant's, he put Ron in his

04:47:08  16  thing.  But he knew him as Ron Ron.  But he had just met him.

04:47:11  17  He put Ron in his cellphone.

04:47:14  18       What else did you see?  Look at SIM card 1 and SIM

04:47:18  19  card 2.  RR and Ron, same phone number.  RR is Ron Ron.  Ron

04:47:24  20  is also Ron Ron.  It's the same phone number, and it's that

04:47:27  21  same phone number that those text messages came from, and that

04:47:31  22  whole message about bringing down change.  That's because

04:47:34  23  Robert Gregory was Ron Collins' customer.

04:47:39  24       The defense counsel also spent some time saying that

04:47:42  25  it was unreasonable, it was beyond belief that Robert Gregory

| | |
|---|---|
| 04:47:46 | 1 |
| 04:47:48 | 2 |
| 04:47:51 | 3 |
| 04:47:55 | 4 |
| 04:47:59 | 5 |
| 04:48:02 | 6 |
| 04:48:05 | 7 |
| 04:48:08 | 8 |
| 04:48:12 | 9 |
| 04:48:17 | 10 |
| 04:48:22 | 11 |
| 04:48:25 | 12 |
| 04:48:29 | 13 |
| 04:48:32 | 14 |
| 04:48:35 | 15 |
| 04:48:38 | 16 |
| 04:48:41 | 17 |
| 04:48:42 | 18 |
| 04:48:45 | 19 |
| 04:48:48 | 20 |
| 04:48:52 | 21 |
| 04:48:55 | 22 |
| 04:48:58 | 23 |
| 04:49:01 | 24 |
| 04:49:04 | 25 |

just met the defendant and the defendant just approached him and got customers. Well, let's talk about that too. First of all, Robert Gregory told you -- and I think it was clear from his testimony -- he's clearly a car guy. And he told you he went down to Lee's, because Lee's had special performance parts, parts he couldn't get in Milwaukee. He said that in his testimony. So he went down to Lee's and he's down there and he has his BMW 528.

The defendant knew that he had -- the defendant was down there too, probably saw his BMW 528, and he approached him. You heard from those recordings -- and I'll get more into those recordings later. The defendant needed customers. He needed to be able to move his product. He needed to be able to get rid of that -- those kilograms of cocaine, so he could pay back his supplier. He was worried about his commerce being stolen from him. He was -- he was worried about it.

So he did approach Robert Gregory. And you know what? He made the right choice, because Robert Gregory was a drug dealer. And how did he find out that they were both in the game? Because Robert Gregory and him spoke in code. They didn't say that they were just drug dealers. I do my thing. Read between the lines. What does that mean? Robert Gregory told you on the stand. It meant I was -- it meant that I was a drug dealer to another drug dealer.

| | |
|---|---|
| 04:49:07 | 1 |
| 04:49:16 | 2 |
| 04:49:20 | 3 |
| 04:49:23 | 4 |
| 04:49:27 | 5 |
| 04:49:31 | 6 |
| 04:49:34 | 7 |
| 04:49:38 | 8 |
| 04:49:38 | 9 |
| 04:49:41 | 10 |
| 04:49:45 | 11 |
| 04:49:49 | 12 |
| 04:49:52 | 13 |
| 04:49:55 | 14 |
| 04:49:58 | 15 |
| 04:50:03 | 16 |
| 04:50:12 | 17 |
| 04:50:15 | 18 |
| 04:50:20 | 19 |
| 04:50:26 | 20 |
| 04:50:31 | 21 |
| 04:50:34 | 22 |
| 04:50:39 | 23 |
| 04:50:45 | 24 |
| 04:50:50 | 25 |

Also, the defense counsel speculated about Robert Gregory's possible motivation for making this whole thing up, that he was protecting his source, his real source.  He told you about his other source on the stand, Juan, that was his other source.  He told you.  He got drugs from Juan, and he got drugs from the defendant.  He wasn't protecting anyone. You can use your common sense.  He was up there.  He was giving you details.

He's corroborated.  He's corroborated by financial records showing gas station purchases at Dolton, at Lee's Foreign Auto Shop.  He's corroborated by his phones that were found in his mother's house.  He wasn't manipulating these phones and then giving them to the Government.  Those phones were found during a search of his mother's house.  And those phones had on them -- on them -- on the day that they were found this information.

How else are these witnesses corroborated?  The nickname Ron Ron.  They all knew him as Ron Ron.  He's in the phone as RR.  And where else is he Ron Ron?  He's Ron Ron on those recordings that Special Agent Bagley listened to, that you heard, where he identifies himself as Ron Ron.  And through Double R Construction, just like RR on his financial records.  And where else is he Ron Ron?  On the phone that law enforcement got from Pedro Flores from Mexico, where the only contact in that phone was Ron Ron.

| | | |
|---|---|---|
| 04:50:53 | 1 | Yeah, the subscriber information showed it was a |
| 04:50:59 | 2 | prepaid phone without ID. And we'll get to all the various |
| 04:51:02 | 3 | ways in which the defendant and the supplier took precautions. |
| 04:51:05 | 4 | But you heard they were switching phones every other month to |
| 04:51:10 | 5 | evade law enforcement. There was one contact name in there, |
| 04:51:14 | 6 | Ron Ron. |
| 04:51:14 | 7 | And what's the greatest corroboration of all? The |
| 04:51:23 | 8 | recordings. Notice how little time defense counsel spent |
| 04:51:27 | 9 | talking about the content of those recordings and talking |
| 04:51:29 | 10 | about those recordings. Not that much time, because those |
| 04:51:33 | 11 | recordings are the greatest corroboration of all. That's the |
| 04:51:37 | 12 | defendant's voice you heard confirming and corroborating all |
| 04:51:41 | 13 | the details that those witnesses told you up on the stand. |
| 04:51:44 | 14 | The defendant got fronted cocaine, sometimes up to 50 |
| 04:51:48 | 15 | kilograms at a time, and he would get -- he would set up the |
| 04:51:52 | 16 | deal with his supplier, and then he would pick up the cocaine |
| 04:51:54 | 17 | from the drug couriers. And then what did he do? Just like |
| 04:51:58 | 18 | on those phone calls. He sold it to his customers. He had |
| 04:52:01 | 19 | customers at the ready, and he sold it to them and he fronted |
| 04:52:04 | 20 | it to them. |
| 04:52:05 | 21 | And what else did you see? That 1500 that he earned |
| 04:52:09 | 22 | per kilogram, where did you see that? In the financial |
| 04:52:13 | 23 | records. And I want to talk to you just briefly about the |
| 04:52:15 | 24 | financial records, because I think that there was some |
| 04:52:18 | 25 | confusion there too. |

| | |
|---|---|
| 04:52:19 | 1 |
| 04:52:23 | 2 |
| 04:52:27 | 3 |
| 04:52:29 | 4 |
| 04:52:34 | 5 |
| 04:52:37 | 6 |
| 04:52:41 | 7 |
| 04:52:44 | 8 |
| 04:52:48 | 9 |
| 04:52:51 | 10 |
| 04:52:54 | 11 |
| 04:52:58 | 12 |
| 04:53:01 | 13 |
| 04:53:04 | 14 |
| 04:53:06 | 15 |
| 04:53:13 | 16 |
| 04:53:13 | 17 |
| 04:53:16 | 18 |
| 04:53:21 | 19 |
| 04:53:24 | 20 |
| 04:53:27 | 21 |
| 04:53:33 | 22 |
| 04:53:38 | 23 |
| 04:53:41 | 24 |
| 04:53:45 | 25 |

The defense counsel seems to believe that Mr. Killian originally said that it was all cash that he was finding.  He told you he was following the money, he was trying to look at the defendant's use of cash.  Look at summary chart 3K.  This was before defense counsel ever cross-examined Mr. Killian.

Up on the top of the title, it says, Summary of cash and payments, payments.  And what did Mr. Killian tell you what those payments could possibly be?  Money orders, cashier's checks, he didn't know.  It could be various different things.  What else did he tell you -- and I think this point got a little confused too -- he told you he looked for other bank accounts, that that was part of his financial analysis.  He was looking for other bank accounts.  He didn't find any other bank accounts.  He candidly told you, that's not to say that they are not out there.  But he didn't find any.  He was looking.

What else?  The defense counsel asked Mr. Killian about whether or not there was off-the-books money possibly, that people had money off the books that they didn't report?  Well, what's the greatest off-the-books money?  Money from drug dealing.  And you can look at that $234,000, and you can look at that.  It has no identifiable source, and you can reasonably infer, taken with all the other evidence you heard, and when you hear that 1500 per kilogram profit, you know exactly where that money came from.  You can reasonably infer

| | |
|---|---|
| 04:53:48 | 1 |
| 04:53:49 | 2 |
| 04:53:53 | 3 |
| 04:53:57 | 4 |
| 04:53:59 | 5 |
| 04:54:00 | 6 |
| 04:54:03 | 7 |
| 04:54:07 | 8 |
| 04:54:09 | 9 |
| 04:54:11 | 10 |
| 04:54:15 | 11 |
| 04:54:19 | 12 |
| 04:54:22 | 13 |
| 04:54:26 | 14 |
| 04:54:29 | 15 |
| 04:54:32 | 16 |
| 04:54:36 | 17 |
| 04:54:38 | 18 |
| 04:54:44 | 19 |
| 04:54:47 | 20 |
| 04:54:50 | 21 |
| 04:54:54 | 22 |
| 04:54:56 | 23 |
| 04:55:01 | 24 |
| 04:55:04 | 25 |

it was drug dealing.

Now, the defendant told you in his opening statement that there would be no evidence of large sums of cash. However, there's your evidence of large sums of cash right there.

He also told you that you would hear no evidence of Bentleys. Well, Robert Gregory told you about two he saw the defendant in.

He also told you that you would hear no evidence of guns from the defendant. Well, what did you hear from the witnesses? None of them carried guns when they went to do this drug courier thing. In fact, Cesar Perez told you about the gun deal he did. And he said, It was against the rules to keep the guns and the drugs at the same stash house, but they were doing it just this once. This organization didn't use guns to deliver their drugs. They used duffle bags and hidden compartments and switching cars.

Defense counsel also talked to you a lot about Pedro Flores and Margarito Flores and their cooperation. And he talked about the fact that they were selling drugs during this time period, the Government knew, and they were negotiating. Well, first of all, let's just clear up some facts.

What you heard during your time of testimony was that the Government did not know exactly where they were during the time period when they were first contacted in April, that

| | |
|---|---|
| 04:55:07 | 1 |
| 04:55:11 | 2 |
| 04:55:14 | 3 |
| 04:55:17 | 4 |
| 04:55:21 | 5 |
| 04:55:23 | 6 |
| 04:55:25 | 7 |
| 04:55:28 | 8 |
| 04:55:31 | 9 |

there was F -- there was some communication.  In August there was a meeting, and in November they officially started cooperating.  And in November what happened as well?  They started making phone calls at law enforcement's direction. They started recording conversations.

And, in fact, they were told as early as August to start recording with their customers.  Sure, their organization kept dealing drugs and going on.  They were recording it at the direction of law enforcement.

And as far as whether or not they were dealing drugs during this time period, first of all, as you heard, they were not in the Government's control until November.  Second of all, there was not definite knowledge of whether or not they were doing it.  But most importantly, it doesn't matter.  They are not the ones before you right now.  And you're going to get an instruction about that from the judge, I expect, after you're done.  And that instruction is going to say:  You should not speculate why any other person whose name you may have heard during the trial is not currently on trial before you.

They are not here before you.  Your job -- and it is a very important one -- is to decide the guilt of the defendant.  Not Pedro Flores, not Margarito Flores.  It's a red herring.  It's meant to distract you.  It's meant to make you angry.  Don't let it.  Stay focused.  Look at the

04:56:29  1    information in front of you and the evidence in front of you.

04:56:32  2         Pedro Flores made recordings.  You heard them in

04:56:37  3    November.  He made them at the direction of law enforcement,

04:56:39  4    and he made them with the defendant.  And how do you know?

04:56:44  5    You know this, because there is corroborating evidence.

04:56:49  6    First, you heard already about the voice comparison.  And

04:56:52  7    defense counsel and I disagree again about what the evidence

04:56:55  8    was, but it's your recollections that matter.

04:56:57  9         In my recollection of the evidence, Special Agent

04:57:02  10   Eric Durante testified to you that he spoke to the defendant

04:57:04  11   for 45 minutes in August 2009, before and after that -- on

04:57:09  12   that day, he listened to the recordings and he made a voice ID

04:57:13  13   that day comparing the recordings.

04:57:16  14        What else did you hear?  Special Agent Bagley

04:57:19  15   listened to several hours of recordings of the defendant's

04:57:23  16   voice, and one of which you heard.  And he made a voice ID,

04:57:29  17   after he listened to the recordings from November and the

04:57:32  18   recordings on the same day, and he determined it was the

04:57:35  19   defendant.

04:57:35  20        And you will have those recordings back there and you

04:57:38  21   can listen to them too.  And you can think about whether or

04:57:40  22   not there's differences in voice, based on the quality of the

04:57:44  23   recording.  And there is differences in the quality of the

04:57:46  24   recording.  And you can think about whether or not there's

04:57:49  25   differences, based on the circumstance.  The defendant being

```
04:57:51    1    very stressed out about where his kilograms were coming from
04:57:54    2    versus talking to a girl on the phone.  But at bottom, two
04:57:59    3    agents listened to those recordings and they identified them.
04:58:02    4    And you heard the recording yourself in court.
04:58:04    5            That is sufficient evidence.  You are not going to
04:58:08    6    find in here anywhere that says that the Government has to use
04:58:11    7    some sort of computerized voice ID.
04:58:13    8            And what else?  This isn't CSI, and this isn't NCIS,
04:58:18    9    and this isn't even Law and Order.  And I'm sure law
04:58:22   10    enforcement wishes it was, but there are certain technologies
04:58:25   11    that are not used in law enforcement.  And Special Agent
04:58:29   12    Durante told you about that.  He was asked about the science
04:58:32   13    and the computer.  And what did he tell you?  He said, Not in
04:58:35   14    his thirteen years has he ever seen that used.
04:58:38   15            But what else did he tell you?  He told you in almost
04:58:40   16    every case there's voice ID.  So it's true.  He's not an
04:58:45   17    expert, but he's familiar with this.  It happens in almost
04:58:50   18    every case.  This isn't unusual.  It's not atypical.  It's a
04:58:57   19    legitimate law enforcement tool.  And there's also evidence
04:59:01   20    besides, for this voice ID, that corroborates them.
04:59:04   21            There's evidence from the Mexican phone that Pedro
04:59:08   22    Flores gave to Special Agent McCarthy.  In that phone there
04:59:13   23    was the contact Ron Ron and also there's text messages.  Those
04:59:21   24    text messages that special -- that Karyn Mastricola got from
04:59:27   25    the phone, look at the T-Mobile records.  Those T-Mobile
```

| | |
|---|---|
| 04:59:31 | 1 |
| 04:59:37 | 2 |
| 04:59:40 | 3 |
| 04:59:43 | 4 |
| 04:59:47 | 5 |
| 05:00:04 | 6 |
| 05:00:09 | 7 |
| 05:00:12 | 8 |
| 05:00:16 | 9 |
| 05:00:20 | 10 |
| 05:00:24 | 11 |
| 05:00:26 | 12 |
| 05:00:26 | 13 |
| 05:00:29 | 14 |
| 05:00:32 | 15 |
| 05:00:35 | 16 |
| 05:00:36 | 17 |
| 05:00:39 | 18 |
| 05:00:42 | 19 |
| 05:00:46 | 20 |
| 05:00:50 | 21 |
| 05:00:54 | 22 |
| 05:00:57 | 23 |
| 05:01:00 | 24 |
| 05:01:06 | 25 |

1  records show those text messages on the T-Mobile records for

2  the phone that started with 773, the defendant's phone that he

3  was using.  Those text messages, taking into account that

4  Pacific Daylight Time, corroborate.

5          And what else do you know?  What else do you know?

6  You also know that when you're looking at that phone and

7  you're looking at and you're remembering those recordings and

8  those transcripts, they made sense.  They made sense in

9  context.  The whole stopping and starting.  Their voices were

10 overlapping with each other.  The conversation flowed.  You

11 can read those, and you can understand exactly what's

12 happening.

13         It would be difficult -- you can use your common

14 sense.  It would be difficult to start and stop and do a

15 tampering job on those recordings.  They flowed from one

16 another.  They made sense.

17         In fact, you had a November 29th call and that

18 November 29th call said, Oh, I'll call you later.  And then

19 what did you get on November 30th?  The very beginning of the,

20 Oh, sorry I didn't call you back later.  They all made sense

21 chronologically.  They corroborate the digital time stamp on

22 there.  And if you look at the T-Mobile records you can see --

23 what do you see?  You see an outgoing call from the

24 defendant's phone to the Mexican phone for four minutes.  It

25 is the only outgoing call for four minutes on the November

| | |
|---|---|
| 05:01:08 | 1 |
| 05:01:09 | 2 |
| 05:01:13 | 3 |
| 05:01:17 | 4 |
| 05:01:23 | 5 |
| 05:01:31 | 6 |
| 05:01:35 | 7 |
| 05:01:38 | 8 |
| 05:01:41 | 9 |
| 05:01:45 | 10 |
| 05:01:50 | 11 |
| 05:01:55 | 12 |
| 05:01:57 | 13 |
| 05:02:00 | 14 |
| 05:02:00 | 15 |
| 05:02:03 | 16 |
| 05:02:06 | 17 |
| 05:02:10 | 18 |
| 05:02:13 | 19 |
| 05:02:16 | 20 |
| 05:02:20 | 21 |
| 05:02:23 | 22 |
| 05:02:26 | 23 |
| 05:02:27 | 24 |
| 05:02:31 | 25 |

1  T-Mobile bill.

2       How long was that first recording?  Just a little

3  less -- between three minutes and four minutes, rounded up for

4  T-Mobile to four minutes.  That's how you know that phone call

5  was made.  That's how it's corroborated.

6       You also heard defense counsel talk about the lack of

7  surveillance, the lack of aerial photos, the lack of GPS

8  tracking devices.  Nowhere in the jury instructions you get

9  from the judge will it say, You cannot convict the defendant

10 unless there are aerial pictures, unless there are GPS

11 tracking devices.  It won't say it, because you just need

12 evidence beyond a reasonable doubt, which is an important

13 standard and a high standard, but it doesn't require specific

14 kinds ...

15       And why weren't there surveillance?  Why weren't

16 there GPS?  Why weren't all these things?  Because the

17 defendant was careful.  And you heard evidence about how

18 careful the defendant was.  He switched phones every couple

19 months.  He told Robert -- Robert Gregory told you why.

20 Because if the phone got hot, he switched it.  Danny Torres

21 and him moved three times before he finally took that delivery

22 of cocaine.  Why?  Because something was wrong.  That's what

23 he said.

24       And you also heard about him talking in code?  You

25 heard him talking in code to the Mexicans.  You heard him

| | |
|---|---|
| 05:02:35 | 1 |
| 05:02:39 | 2 |
| 05:02:42 | 3 |
| 05:02:45 | 4 |
| 05:02:49 | 5 |
| 05:02:53 | 6 |
| 05:02:56 | 7 |
| 05:03:00 | 8 |
| 05:03:01 | 9 |
| 05:03:04 | 10 |
| 05:03:06 | 11 |
| 05:03:10 | 12 |
| 05:03:13 | 13 |
| 05:03:17 | 14 |
| 05:03:21 | 15 |
| 05:03:33 | 16 |
| 05:03:37 | 17 |
| 05:03:41 | 18 |
| 05:03:45 | 19 |
| 05:03:49 | 20 |
| 05:03:52 | 21 |
| 05:03:56 | 22 |
| 05:04:00 | 23 |
| 05:04:04 | 24 |
| 05:04:13 | 25 |

1   taking precautions.  He took the drugs in duffle bags and
2   hidden compartments.  He was careful.  He was careful, and it
3   allowed him to do it for three years without getting caught.
4   What else -- by the way, that also corroborates.
5          The telephone calls.  Robert Gregory, he doesn't know
6   the Flores brothers.  He doesn't know the drug couriers.  He
7   didn't know a single one of those names.  Those were not his
8   suppliers.  The defendant was.
9          And what did he tell you?  He told you at the end
10  when he asked the defendant what was going on why he wasn't
11  able to get as much cocaine?  The Mexicans are telling.  The
12  Mexicans are telling.  Robert Gregory doesn't know who the
13  Mexicans are, but you do.  Pedro and Margarito Flores.  And
14  what did the defendant realize?  They were working with law
15  enforcement, and he was right.
16         The defense counsel told you in the beginning that
17  you will see financial records where the defendant is making
18  car payments, like normal people, and mortgage payments, like
19  normal people, and he has credit cards at the Home Depot, like
20  normal people.  Normal people do not switch phones every three
21  months.  Normal people do not approach people in Lee's Auto
22  Shop and talk about making a drug deal.  Normal people do not
23  talk in code on text messages.  They don't talk in code on
24  phone calls.  Drug dealers do, and this drug dealer did.
25         When you go back to the jury room, you are going to

| | |
|---|---|
| 05:04:17 | 1 |
| 05:04:19 | 2 |
| 05:04:22 | 3 |
| 05:04:26 | 4 |
| 05:04:29 | 5 |
| 05:04:32 | 6 |
| 05:04:36 | 7 |
| 05:04:36 | 8 |
| 05:04:41 | 9 |
| 05:04:41 | 10 |
| 05:04:46 | 11 |
| 05:04:49 | 12 |
| 05:04:51 | 13 |
| 05:04:57 | 14 |
| 05:04:59 | 15 |
| 05:05:01 | 16 |
| 05:05:04 | 17 |
| 05:05:06 | 18 |
| 05:05:07 | 19 |
| 05:05:10 | 20 |
| 05:05:13 | 21 |
| 05:05:16 | 22 |
| 05:05:20 | 23 |
| 05:05:24 | 24 |
| 05:05:29 | 25 |

1  have the evidence that you have heard.  You are going to have

2  your recollection of the testimony.  And the most important

3  thing that you are going to have is your common sense.  Do not

4  check your common sense at the door.  Use your common sense

5  when you look at this evidence and when you look at the

6  testimony, and return the only verdict that is supported by

7  that evidence and that testimony, a verdict of guilty.

8                              - - -

9                    JURY CHARGE, BY THE COURT

10            THE COURT:  Okay, folks.  Now, you have seen and

11  heard all of the evidence and the arguments in this case, and

12  I am going to instruct you on the law.

13            You have two duties as a jury, and your first duty is

14  to decide the facts from the evidence in the case, and this is

15  your job and your job alone.

16            Don't worry about writing down any of this, because

17  I'm going to give you these back there in the jury room, so

18  just listen.

19            Okay.  Your second duty is to apply the law that I

20  give to you to the facts, and you must follow these

21  instructions, even if you disagree with them.  Each of the

22  instructions is important, and you must follow all of them.

23            Perform these duties fairly and impartially.  Do not

24  allow sympathy, prejudice, fear, or public opinion to

25  influence you.  You should not be influenced by any person's

05:05:32   1   race, color, religion, national ancestry, or sex.

05:05:36   2          And nothing that I say now, nor nothing that I said

05:05:40   3   or did during the trial, is meant to indicate any opinion on

05:05:43   4   my part about what the facts are or about what your verdict

05:05:48   5   should be.

05:05:51   6          Now, the evidence consists of the testimony of the

05:05:53   7   witness, the exhibits admitted into evidence, and

05:05:55   8   stipulations.

05:05:56   9          A stipulation is an agreement between both sides that

05:06:01  10   certain facts are true or that a person would have given

05:06:03  11   certain testimony.

05:06:05  12          You are to decide whether the testimony of each

05:06:08  13   witness is truthful and accurate, in part, in whole, or not at

05:06:12  14   all, as well as what weight, if any, that you give to the

05:06:17  15   testimony of each witness.

05:06:18  16          In evaluating the testimony of any witness, you may

05:06:22  17   consider, among other things:

05:06:24  18          The witness' intelligence;

05:06:26  19          The ability and the opportunity the witness had to

05:06:29  20   see, hear, or know the things that the witness testified

05:06:29  21   about;

05:06:34  22          The witness' memory;

05:06:36  23          Any interest, bias, or prejudice that the witness may

05:06:40  24   have;

05:06:41  25          The manner of the witness while testifying; and

| | |
|---|---|
| 05:06:44 | 1 |
| 05:06:47 | 2 |
| 05:06:51 | 3 |
| 05:06:54 | 4 |
| 05:06:57 | 5 |
| 05:06:58 | 6 |
| 05:07:02 | 7 |
| 05:07:06 | 8 |
| 05:07:11 | 9 |
| 05:07:15 | 10 |
| 05:07:19 | 11 |
| 05:07:22 | 12 |
| 05:07:24 | 13 |
| 05:07:28 | 14 |
| 05:07:32 | 15 |
| 05:07:35 | 16 |
| 05:07:40 | 17 |
| 05:07:43 | 18 |
| 05:07:47 | 19 |
| 05:07:51 | 20 |
| 05:07:54 | 21 |
| 05:07:57 | 22 |
| 05:08:00 | 23 |
| 05:08:03 | 24 |
| 05:08:03 | 25 |

The reasonableness of the witness' testimony in light of all of the evidence in the case.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law, we call this an inference. A jury is allowed to make reasonable inferences. Any inferences you make must be reasonable, and they must be based on the evidence in the case.

Some of you may have heard the phrases circumstantial evidence and direct evidence. Direct evidence is the testimony of someone who claims to have personal knowledge of the commission of the crime which has been charged, such as an eyewitness. And circumstantial evidence is the proof of a series of facts which tend to show whether the defendant is guilty or not guilty. The law makes no distinction between the weight to be given either direct or circumstantial evidence. You should decide how much weight to give any of the evidence, and all of the evidence in the case, including the circumstantial evidence, should be considered by you in reaching your verdict.

Certain things are not evidence, and I will list them for you:

First, any testimony that I struck from the record,

05:08:07  1    or that I told you to disregard, is not evidence and must not

05:08:11  2    be considered.

05:08:12  3            Second, anything you may have seen or heard outside

05:08:15  4    of the courtroom is not evidence and must entirely be

05:08:19  5    disregarded.

05:08:20  6            And, third, questions and objections by the lawyers

05:08:22  7    are not evidence.  Attorneys have a duty to object when they

05:08:27  8    believe a question is improper, and you should not be

05:08:30  9    influenced by any objection or by my ruling on it.

05:08:35  10           Fourth, the lawyers' statements to you are not

05:08:36  11   evidence.  The purpose of these statements is to discuss the

05:08:40  12   issues and the evidence.  If the evidence, as you remember it,

05:08:43  13   differs from what the lawyers said, your memory is what

05:08:47  14   counts.

05:08:49  15           It is proper for an attorney to interview any witness

05:08:52  16   in preparation for trial.

05:08:56  17           The indictment in this case is the formal method of

05:08:59  18   accusing the defendant of offenses and of placing the

05:09:03  19   defendant on trial.  It is not evidence against the defendant,

05:09:06  20   and it does not create any inference of guilt.

05:09:09  21           The indictment charges the defendant with conspiring

05:09:13  22   to possess with intent to distribute and to distribute a

05:09:18  23   controlled substance, namely, mixtures and substances

05:09:22  24   containing a detectable amount of cocaine.

05:09:26  25           The defendant has pleaded not guilty to the charge in

the indictment.

The defendant is presumed to be innocent of each of the charges.  This presumption continues during every stage of the trial and your deliberations on the verdict.  It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.  The Government has the burden of proving the guilt of the defendant beyond a reasonable doubt.

This burden of proof stays with the Government throughout the case.  The defendant is never required to prove his innocence or to produce any evidence at all.

The defendant has an absolute right not to testify. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict.

You have heard a witness give opinions about matters requiring special knowledge or skill.  You should judge this testimony in the same way that you judge the testimony of any other witness.  The fact that such a person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness' qualifications, and all of the other evidence in the case.

You have heard testimony of an identification of a person.  Identification testimony is an expression of belief or impression by the witness.  You should consider whether, or

| | | |
|---|---|---|
| 05:11:02 | 1 | to what extent, the witness had the ability and the |
| 05:11:06 | 2 | opportunity to observe or to hear the person and to make a |
| 05:11:10 | 3 | reliable identification.  You should also consider the |
| 05:11:13 | 4 | circumstances under which the witness later made the |
| 05:11:17 | 5 | identification. |
| 05:11:17 | 6 | The Government has the burden of proving beyond a |
| 05:11:21 | 7 | reasonable doubt that the defendant was the person who |
| 05:11:23 | 8 | committed the crime charged. |
| 05:11:26 | 9 | You have heard evidence that Daniel Torres has been |
| 05:11:29 | 10 | convicted of crimes.  You may consider this evidence only in |
| 05:11:33 | 11 | deciding whether Daniel Torres' testimony is truthful in |
| 05:11:37 | 12 | whole, in part, or not at all.  You may not consider this |
| 05:11:40 | 13 | evidence for any other purpose. |
| 05:11:44 | 14 | You have heard testimony from Antonio Aguilera, |
| 05:11:47 | 15 | Robert Gregory, Jorge Llamas, Cesar Perez, and Daniel Torres, |
| 05:11:54 | 16 | each of whom has: |
| 05:11:55 | 17 | In the case of Robert Gregory, Jorge Llamas, Cesar |
| 05:12:00 | 18 | Perez, and Daniel Torres, received benefits from the |
| 05:12:03 | 19 | Government, namely, a plea agreement calling for a reduced |
| 05:12:07 | 20 | sentence in exchange for truthful cooperation; |
| 05:12:10 | 21 | Stated that he was involved in the commission of the |
| 05:12:13 | 22 | offense as charged against the defendant; and |
| 05:12:16 | 23 | Pleaded guilty to an offense arising out of the same |
| 05:12:20 | 24 | occurrence for which the defendant is now on trial.  Their |
| 05:12:23 | 25 | guilty pleas are not to be considered as evidence against the |

| | | |
|---|---|---|
| 05:12:26 | 1 | defendant. |
| 05:12:26 | 2 | You may give the testimony of each of these witnesses |
| 05:12:30 | 3 | such weight as you feel it deserves, keeping in mind that it |
| 05:12:34 | 4 | must be considered with caution and great care. |
| 05:12:38 | 5 | Certain summaries are in evidence. They truly and |
| 05:12:42 | 6 | accurately summarize the contents of voluminous books, |
| 05:12:46 | 7 | records, or documents, and should be considered together with |
| 05:12:48 | 8 | and in the same way as all of the other evidence in the case. |
| 05:12:53 | 9 | You have heard recorded conversations. These |
| 05:12:56 | 10 | recordings are proper evidence and you may consider them, just |
| 05:13:00 | 11 | as any other evidence. |
| 05:13:01 | 12 | When the recordings were played during the trial, you |
| 05:13:05 | 13 | were furnished transcripts of the recorded conversations, |
| 05:13:08 | 14 | prepared by Government agents. The recordings are the |
| 05:13:11 | 15 | evidence, and the transcripts were provided to you only as a |
| 05:13:15 | 16 | guide to help you follow as you listen to those recordings. |
| 05:13:19 | 17 | The transcripts are not evidence of what was actually said or |
| 05:13:23 | 18 | who said it. It is up to you to decide whether the |
| 05:13:27 | 19 | transcripts correctly reflect what was said and who said it. |
| 05:13:31 | 20 | If you noticed any difference between what you heard on the |
| 05:13:34 | 21 | recordings and what you read in the transcripts, you must rely |
| 05:13:38 | 22 | on what you heard, not on what you read. And if, after |
| 05:13:42 | 23 | careful listening, you could not hear or understand certain |
| 05:13:45 | 24 | parts of recordings, you must ignore the transcripts as far as |
| 05:13:48 | 25 | those parts concerned. |

| | | |
|---|---|---|
| 05:13:51 | 1 | I am providing you with the recordings and computer |
| 05:13:54 | 2 | on which you can play them.  You are not required to play the |
| 05:13:57 | 3 | recordings, in part or in whole.  You may rely, instead, on |
| 05:14:01 | 4 | your recollections of these recordings as you heard them at |
| 05:14:04 | 5 | trial.  I am also providing you with a set of transcripts to |
| 05:14:08 | 6 | aid in your deliberations.  You may choose to review the |
| 05:14:10 | 7 | recordings with or without the transcripts. |
| 05:14:14 | 8 | The recordings contain statements allegedly made by |
| 05:14:17 | 9 | the defendant and another individual, Pedro Flores.  You are |
| 05:14:21 | 10 | not to consider the statements made on the recordings by Pedro |
| 05:14:25 | 11 | Flores for the truth.  However, you may consider the |
| 05:14:28 | 12 | statements made on the recordings by Pedro Flores to place |
| 05:14:32 | 13 | context -- to place in context and help you understand the |
| 05:14:35 | 14 | statements allegedly made by the defendant on the recordings. |
| 05:14:40 | 15 | A conspiracy is an agreement between two or more |
| 05:14:43 | 16 | persons to accomplish an unlawful purpose.  To sustain the |
| 05:14:47 | 17 | charge of conspiracy in the indictment, the Government must |
| 05:14:50 | 18 | prove: |
| 05:14:51 | 19 | First, that the conspiracy as charged in the |
| 05:14:54 | 20 | indictment existed; |
| 05:14:55 | 21 | And, second, that the defendant knowingly became a |
| 05:14:58 | 22 | member of the charged conspiracy with an intention to further |
| 05:15:02 | 23 | the conspiracy. |
| 05:15:03 | 24 | If you find, from your consideration of all of the |
| 05:15:07 | 25 | evidence, that each of these propositions has been proved |

beyond a reasonable doubt as to the defendant, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved beyond a reasonable doubt as to the defendant, then you should find the defendant not guilty.

A conspiracy may be established even if its purpose was not accomplished.

To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which its purpose was to be accomplished. The Government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and he was a willing participant.

To establish the existence of the conspiracy charged in the indictment, the Government need not establish an agreement which was express or formal. A conspiracy may be proved by circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct.

The Government need not prove that the defendant knew each detail of the conspiracy, or that the defendant played more than a minor role in the conspiracy. Defendant need not have participated in all of the events of the charged

| | |
|---|---|
| 05:16:24 | 1 |
| 05:16:27 | 2 |
| 05:16:30 | 3 |
| 05:16:35 | 4 |
| 05:16:39 | 5 |

conspiracy to be a member of the conspiracy.

A defendant's association with conspirators or persons involved in a criminal enterprise is not by itself sufficient to prove his participation or membership in a conspiracy or criminal enterprise.

The Government is not required to prove that the conspiracy charged in the indictment involved the specific quantity of controlled substance alleged. However, the Government must prove that the conspiracy charged in the indictment involved a measurable quantity of some type of controlled substance.

The indictment charges a conspiracy to possess with intent to distribute and to distribute a controlled substance, namely, mixtures and substances containing a detectable amount of cocaine. It is not necessary for the Government to prove that the defendant knew that the conspiracy involved cocaine. It is sufficient if the Government proves beyond a reasonable doubt that the defendant knew that the conspiracy involved some type of a controlled substance.

And you are instructed that cocaine is a controlled substance.

Possession of an object is the ability to control it. Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction and control over it, either

directly or through others.

Distribution is the transfer or the attempted transfer of possession from one person to another.

Intent to distribute can be inferred from the possession of a quantity of a controlled substance larger than needed for personal use.

When the word knowingly or the phrase the defendant knew is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, or accident.  Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

In an effort to detect violations of the law, it is sometimes necessary for the Government to use consensual recordings and confidential informants.  It is not improper or illegal for the Government to use these techniques, which are permissible and recognized means of criminal investigation.

The indictment charges that offenses were committed on or about certain dates.  The Government must prove that each offense happened reasonably close to that date, but it is not required to prove that the alleged offense happened on that exact date.

You should not speculate why any other person whose name you may have heard during the trial is not currently on

1  trial before you.

2          In considering the evidence and arguments that have

3  been given during the trial, you should not guess or speculate

4  about the punishment in this case.  It should not enter into

5  your consideration or discussions at any time.

6          I do not anticipate that you will need to communicate

7  with me.  If you do, however, the only proper way is in

8  writing, signed by the foreperson, or if he or she is

9  unwilling to do so, by some other juror, and then given to the

10  Marshal.  I caution you, however, that you should never state

11  or specify your numerical division in any note or message that

12  you send to me.  I also caution you that it does take some

13  time for us to gather the parties, if you send a note.  So the

14  response is not immediate, because we do run your note by both

15  parties.  And you should also note that although April is

16  taking very nice notes here of the entire transcript, it's

17  very rough form, and you do not have access to transcripts in

18  order to do your deliberation.

19          Upon retiring to the jury room, select one of your

20  number as your foreperson.  The foreperson will preside over

21  your deliberations and be your representative here in court.

22  And forms of a verdict have been prepared for you.  It's a

23  two-page form, and the first page reads:

24          With respect to the offense charged in the indictment

25  we, the jury, find as follows as to defendant, Ron Collins,

05:20:39   1   and there's either a box for guilty or a box for not guilty.

05:20:44   2      If you find that the defendant is guilty of the count

05:20:48   3   charged in the indictment, then -- you must then go to the

05:20:50   4   bottom portion of the first page.  And you must make a

05:20:54   5   determination of the amount of controlled substance involved

05:20:57   6   in the offense, and you just check one.  It's either five

05:21:01   7   kilograms or more, 500 grams or more, or less than 500 grams,

05:21:06   8   and you just check one on the bottom, only if you find the

05:21:10   9   defendant guilty.

05:21:10  10      Then on the second page, there's a line for each of

05:21:14  11   you to sign, and the foreperson signs where it says

05:21:18  12   foreperson, and then it's dated, and then you let the Marshal

05:21:21  13   know that you've reached a verdict.

05:21:23  14      So take these forms to the jury room with you, and

05:21:26  15   when you've reached a unanimous verdict -- unanimous agreement

05:21:30  16   on the verdict, your foreperson will fill it in and date it

05:21:33  17   and then each of you will sign it.

05:21:36  18      Now, the verdict must represent the considered

05:21:39  19   judgment of each juror.  Your verdict, whether it be guilty or

05:21:43  20   not guilty, must be unanimous.

05:21:44  21      You should make every reasonable effort to reach a

05:21:49  22   verdict.  And in doing so, you should consult with one

05:21:52  23   another.  You should express your own views and you should

05:21:55  24   listen to the opinions of your fellow jurors.  Discuss your

05:21:58  25   differences with an open mind.  Do not hesitate to reexamine

| | | |
|---|---|---|
| 05:22:02 | 1 | your own views and change your opinion if you come to believe |
| 05:22:06 | 2 | it is wrong.  But you shouldn't surrender your honest beliefs |
| 05:22:11 | 3 | about the weight or the effect of evidence solely because of |
| 05:22:14 | 4 | the opinions of your fellow jurors, or for the purpose of |
| 05:22:17 | 5 | returning a unanimous verdict. |
| 05:22:18 | 6 | The twelve of you should give fair and equal |
| 05:22:22 | 7 | consideration to all the evidence and deliberate with the goal |
| 05:22:26 | 8 | of reaching an agreement, which is consistent with the |
| 05:22:29 | 9 | individual judgment of each juror. |
| 05:22:31 | 10 | You are impartial judges of the facts.  Your sole |
| 05:22:35 | 11 | interest is to determine whether the Government has proved its |
| 05:22:40 | 12 | case beyond a reasonable doubt. |
| 05:22:44 | 13 | Now, you heard me say twelve, and you know that |
| 05:22:47 | 14 | there's fourteen of you sitting in the box.  And what that |
| 05:22:50 | 15 | means is that I do have two alternates who were selected for |
| 05:22:54 | 16 | this jury.  And, unfortunately, they are the two last ones who |
| 05:23:00 | 17 | were selected, and I believe that's Jesus Gomez and Cheryle |
| 05:23:05 | 18 | Long.  Now, what that means, unfortunately, is that you will |
| 05:23:07 | 19 | not be able to deliberate, but you are still under oath. |
| 05:23:12 | 20 | And what I am going to do is I am going to excuse |
| 05:23:15 | 21 | you, but with my order not to discuss the case at all until |
| 05:23:20 | 22 | you get a phone call from me.  And the reason for that is that |
| 05:23:24 | 23 | occasionally during deliberations one of the twelve need to be |
| 05:23:29 | 24 | excused for health reasons or otherwise, and then we do call |
| 05:23:34 | 25 | in our alternates to gather with the rest of the team and |

1    deliberate.

2         So you are under the Court's order not to discuss the

3    case, not to do research, just as you have been.  And in

4    return for your promise to do that, I promise we'll call you

5    and let you know when the verdict comes in and what the

6    verdict is.

7         So if I could, please, have Mr. Gomez and Ms. Long

8    stand and go to the jury room.  You can walk around that way

9    and gather your belongings before we get the rest of you back

10   there to deliberate.

11        If you could just let those two get their things,

12   sir?

13        Thank you for your service.

14        THE JUROR:  Thank you.

15        (Exit alternate jurors.)

16        THE COURT:  And then, folks, if you'll just wait one

17   moment, I'm going to have the Marshal sworn in.

18        And tomorrow morning -- now it's 5:19, and my rule is

19   that you can stay 'til 6:00, if you want, or you can go home

20   tonight if you're tired enough and have trains to catch.

21        So you start at 9:00 a.m. in the morning, and you can

22   only go until 6:00.  The reason for that is because the

23   Marshals go down to a smaller security staff at 6:00, and I

24   want to make sure everybody gets out safely back to their

25   trains.

05:24:51  1      So when you go back into the room for the first time,
05:24:54  2  you may talk.  However, you are still under my order not to do
05:25:00  3  any outside research, not to be on the internet, or any of
05:25:04  4  those electronic devices I told you about, until you are all
05:25:07  5  done with your jury duty.
05:25:09  6      Okay.  So now you get to talk about the case, but
05:25:12  7  only with each other.  All right.  Let's wait 'til we get our
05:25:15  8  Marshal back.
05:26:08  9          (Enter Court Security Officer.)
05:26:11  10         THE COURT:  Okay.  Sir, please raise your right hand.
05:26:34  11         (The Court Security Officer was sworn.)
05:26:34  12         THE COURT:  Okay.  All right, folks.  You can go back
05:26:35  13  and start discussing.  You can pick your foreperson, and let
05:26:39  14  me know, through the Marshal, if you intend to stay tonight or
05:26:41  15  whether you are going to leave.
05:26:43  16         MS. GUREN:  Your Honor, do you want them to keep
05:26:45  17  their binders?
05:26:46  18         THE COURT:  Why don't you leave your binders on the
05:26:49  19  chair, but you can take the notebooks, of course.  They are
05:26:52  20  yours.
05:27:01  21         (The jury leaves the courtroom.)
05:27:13  22         THE COURT:  Okay.  Gentlemen and ladies, it is my
05:27:16  23  practice to have you put on the record that you are in
05:27:20  24  agreement about the exhibits that are going back to the jury.
05:27:23  25  So take a moment to look at them, Mr. Rubino.

1080

05:27:26  1         MR. RUBINO:  Yes, your Honor.

05:27:26  2         THE COURT:  And make sure that everybody's in

05:27:28  3  agreement as to what goes back, and that is on the record

05:27:31  4  before it goes back.  Okay.

05:27:34  5         You can be seated, folks.

05:31:16  6         I think they are going to go home, just so you know.

05:31:20  7         So as soon as we get this on the record, you can

05:31:23  8  bring him up.

05:36:18  9         Okay, folks.  Have you had a chance to review all the

05:36:21  10  evidence.

05:36:22  11        MR. RUBINO:  Yes, your Honor, I have.

05:36:22  12        THE COURT:  Okay.  And is everything satisfactory as

05:36:24  13  to what was admitted and what's going back to the jury to you,

05:36:27  14  Mr. Rubino?

05:36:28  15        MR. RUBINO:  Yes, your Honor.

05:36:28  16        THE COURT:  Okay.

05:36:29  17        MR. RUBINO:  I have gone through each piece.  I

05:36:31  18  recognize everything as having been previously provided to me

05:36:35  19  by the Government, and I've checked it against my list and

05:36:38  20  it's my opinion everything the Court has admitted.

05:36:38  21        THE COURT:  Perfect.

05:36:39  22        And how about you, Ms. Guren, same with you?

05:36:41  23        MS. GUREN:  Yes, your Honor.

05:36:41  24        THE COURT:  Okay.  Well, then that will all go back.

05:36:43  25        Now, is there -- are there instructions for the

| | | |
|---|---|---|
| 05:36:45 | 1 | computer? |
| 05:36:45 | 2 | MS. GUREN:  There are. |
| 05:36:46 | 3 | THE COURT:  Okay.  All right. |
| 05:36:47 | 4 | MS. GUREN:  It's in the computerized thing.  And if |
| 05:36:49 | 5 | the jury should need someone to actually assist, please let us |
| 05:36:52 | 6 | know.  We've got an ALS person who can help. |
| 05:36:56 | 7 | THE COURT:  Got it.  Okay.  Wonderful.  Thank you. |
| 05:36:56 | 8 | We need cellphone numbers for everyone, if you could |
| 05:36:59 | 9 | give to Mr. Baltruzak, I'd appreciate it, so that we can reach |
| 05:37:02 | 10 | you in case we have a question or a verdict. |
| 05:37:04 | 11 | All right.  Thanks very much. |
| 05:37:06 | 12 | MR. RUBINO:  How much time do you want for us to be |
| 05:37:10 | 13 | back here? |
| 05:37:10 | 14 | THE COURT:  Oh, are you staying nearby? |
| 05:37:13 | 15 | MR. RUBINO:  Yes. |
| 05:37:13 | 16 | THE COURT:  Oh, okay. |
| 05:37:13 | 17 | MR. RUBINO:  Probably 15, 20 minutes on the outside. |
| 05:37:16 | 18 | THE COURT:  Okay.  That's -- |
| 05:37:17 | 19 | MR. RUBINO:  I make it in five with the cab, but just |
| 05:37:19 | 20 | assuming the cab is late. |
| 05:37:19 | 21 | THE COURT:  Well, I'll just notify you, and then as |
| 05:37:22 | 22 | soon as you can make it back.  Okay. |
| 05:37:22 | 23 | MR. RUBINO:  No problem. |
| 05:37:23 | 24 | THE COURT:  All right.  And thank you for the |
| 05:37:25 | 25 | professional trial, folks. |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

1082

MS. GUREN:  Thank you, your Honor.

MR. RUBINO:  Thank you, your Honor.

(Adjourned at 5:37 p.m.)

- - -


C E R T I F I C A T E


   I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.


/s/April M. Metzler, RPR, CRR, FCRR   June 6, 2011

April M. Metzler, RPR, CRR, FCRR      Date

Official Federal Court Reporter