01:30:14

```
 1
 2
 3
 4                  UNITED STATES DISTRICT COURT
 5                  NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
 6
 7
    UNITED STATES OF AMERICA,        Case No. 1:09-cr-00673-1
 8
        Plaintiff,                   Chicago, Illinois
 9                                   September 7, 2011
        v.                           Sentencing
10
    RON COLLINS,
11
    Defendant.
12  ----------------------------
13
                       TRANSCRIPT OF SENTENCING
14           BEFORE THE HONORABLE VIRGINIA M. KENDALL
             UNITED STATES DISTRICT JUDGE, AND A JURY
15
16
17  APPEARANCES:
18
19
    For the Government:   Office of the U.S. Attorney
20                        By:  Halley B. Guren, and
                              Renai S. Rodney
21                        219 S. Dearborn St., 5th Fl.
                          Chicago, IL 60604
22                        (312) 353-5300
23
24
25
```

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

<u>APPEARANCES (Cont'd)</u>:


For the Defendant:        Frank A. Rubino
                          1001 Brickell Bay Dr., Ste. 2206
                          Miami, FL 33131
                          (305) 858-5300


<u>Also present</u>:            Jodi Halleran
                          U.S. Probation Department


<u>COURT REPORTER</u>:          FEDERAL OFFICIAL COURT REPORTER
                          April M. Metzler, RPR, CRR, FCRR
                          219 South Dearborn St., Rm. 2318-A
                          Chicago, IL 60604
                          (312) 408-5154
                          April_Metzler@ilnd.uscourts.gov

**Proceedings recorded by mechanical stenography; transcript produced by notereading.**

1

## I N D E X

2

DESCRIPTION                                                    PAGE

3

4

  ALLOCUTION                                                    35

5

6   IMPOSITION OF SENTENCE                                      35

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 01:37:09 | 1 | (Commenced at 1:37 p.m.) |
| 01:37:09 | 2 | THE CLERK:  This is case 9CR673, USA versus Ron |
| 01:37:13 | 3 | Collins. |
| 01:37:14 | 4 | MS. GUREN:  Good morning, your Honor.  Renai Rodney |
| 01:37:16 | 5 | and Halley Guren -- good afternoon, your Honor. |
| 01:37:17 | 6 | THE COURT:  Good afternoon. |
| 01:37:18 | 7 | MS. GUREN:  Halley Guren and Renai Rodney on behalf |
| 01:37:21 | 8 | of the United States. |
| 01:37:22 | 9 | THE COURT:  Good afternoon. |
| 01:37:23 | 10 | MS. RODNEY:  Good afternoon, your Honor.  Frank |
| 01:37:24 | 11 | Rubino on behalf of Mr. Ron Collins and -- |
| 01:37:24 | 12 | THE COURT:  Good afternoon. |
| 01:37:24 | 13 | MR. RUBINO:  -- Mr. Collins is present in court |
| 01:37:26 | 14 | today. |
| 01:37:27 | 15 | THE COURT:  Good afternoon, Mr. Rubino. |
| 01:37:28 | 16 | Good afternoon, Mr. Collins. |
| 01:37:28 | 17 | (No response.) |
| 01:37:36 | 18 | THE COURT:  Okay, folks.  Has everyone reviewed the |
| 01:37:38 | 19 | Presentence Investigation Report for the sentencing today? |
| 01:37:41 | 20 | MS. GUREN:  Yes, your Honor. |
| 01:37:41 | 21 | THE COURT:  And are we ready to proceed today? |
| 01:37:43 | 22 | MR. RUBINO:  Yes, your Honor, we are. |
| 01:37:44 | 23 | MS. GUREN:  Yes. |
| 01:37:44 | 24 | THE COURT:  Okay.  So first and foremost, I did |
| 01:37:47 | 25 | receive some objections from Mr. Collins regarding the report. |

| | | |
|---|---|---|
| 01:37:50 | 1 | But before we get to those legal objections, is there anything |
| 01:37:56 | 2 | factual that you would like to change, Ms. Guren, in the |
| 01:37:58 | 3 | report? |
| 01:37:58 | 4 | MS. GUREN:  No, your Honor. |
| 01:37:58 | 5 | THE COURT:  Okay.  And how about you, Mr. Rubino, |
| 01:38:02 | 6 | anything factual? |
| 01:38:03 | 7 | MR. RUBINO:  No, your Honor. |
| 01:38:03 | 8 | THE COURT:  All right.  Then I will adopt the report |
| 01:38:05 | 9 | as written, and we'll go through those guideline calculations, |
| 01:38:08 | 10 | as we must, and address some of the objections as we do that. |
| 01:38:13 | 11 | We'll start out with the base offense level.  And the |
| 01:38:19 | 12 | Government's position and the probation officer's position is |
| 01:38:24 | 13 | that the defendant is accountable for more than 150 kilograms |
| 01:38:28 | 14 | of cocaine.  And it's the Government's position that the trial |
| 01:38:33 | 15 | testimony established that there was at least 500 kilograms of |
| 01:38:37 | 16 | cocaine, which would give him a base offense level of 28 -- |
| 01:38:42 | 17 | excuse me -- 38, pursuant to 2D1.1(a)(5). |
| 01:38:47 | 18 | And are you challenging that drug quantity? |
| 01:38:49 | 19 | MR. RUBINO:  We did not in our written objections nor |
| 01:38:52 | 20 | do we now, your Honor. |
| 01:38:53 | 21 | THE COURT:  Okay. |
| 01:38:53 | 22 | MR. RUBINO:  We make simply one challenge to the |
| 01:38:55 | 23 | guidelines. |
| 01:38:55 | 24 | THE COURT:  Okay.  So then we do start with a base |
| 01:38:58 | 25 | offense level of 38, and that is based upon the trial |

| | | |
|---|---|---|
| 01:39:04 | 1 | testimony. |
| 01:39:05 | 2 | And just for the record that testimony did include |
| 01:39:12 | 3 | the testimony of Mr. Torres and Mr. Aguilera and discussing |
| 01:39:19 | 4 | the numerous times that they fronted cocaine and then the |
| 01:39:25 | 5 | times that Aguilera delivered the cocaine with Cesar Perez. |
| 01:39:29 | 6 | And that accounts for -- oh, plus Mr. Llamas' testimony, which |
| 01:39:35 | 7 | accounts for approximately 515 kilograms of cocaine, based |
| 01:39:40 | 8 | upon the trial testimony. |
| 01:39:44 | 9 | All right.  Anything you want to add to that? |
| 01:39:46 | 10 | MS. GUREN:  Just, I don't know if this was starting |
| 01:39:48 | 11 | to be what you said, but Mr. Perez also separately testified |
| 01:39:51 | 12 | to delivering cocaine without Mr. Aguilera. |
| 01:39:54 | 13 | THE COURT:  That's right. |
| 01:39:55 | 14 | Okay.  And that is not objected to.  So we'll start |
| 01:39:58 | 15 | with the base offense level of 38. |
| 01:40:01 | 16 | Now, there's a role in the offense enhancement that |
| 01:40:06 | 17 | the Government supports and you object to, correct? |
| 01:40:10 | 18 | MR. RUBINO:  Yes, your Honor. |
| 01:40:11 | 19 | THE COURT:  All right.  So let me hear from you then, |
| 01:40:13 | 20 | Mr. Rubino, as to why you believe he should not be given any |
| 01:40:16 | 21 | enhancement. |
| 01:40:17 | 22 | MR. RUBINO:  Well, I have filed a written objection |
| 01:40:19 | 23 | to that particularly. |
| 01:40:20 | 24 | THE COURT:  And I have it. |
| 01:40:21 | 25 | MR. RUBINO:  Okay.  And essentially what I'm saying |

| | |
|---|---|
| 01:40:22 | 1 |
| 01:40:26 | 2 |
| 01:40:31 | 3 |

1    to the Court is that Mr. Collins, if the evidence be believed

2    as stated, was occupying a buyer-seller relationship with

3    Mr. Gregory.

4            At no time did Mr. Collins -- Mr. Collins determined,

5    of course, the price he would sell the drugs to Mr. Gregory,

6    as any seller determines the price.  But Mr. Gregory didn't

7    work for Mr. Collins.  It wasn't like Mr. Gregory was an

8    employee of Collins' and he was set up to go stand on this

9    particular corner or at this drug point or had this area and

10   Collins sent him in there to sell drugs on his behalf.

11           Collins simply, the evidence be believed, sold the

12   drugs to Gregory.  Gregory was free to do whatever he wanted

13   to do with the drugs and to sell the drugs at whatever price

14   he could get in the open market.  Gregory could sell the drugs

15   in kilo-quantities, if he wanted.  He could sell them in

16   half-kilos, quarter-kilos.  He could have sold them in grams

17   and brought it down to a position where he would have made ten

18   times as much money as Collins, if he took that risk to sell

19   grams.  This was Gregory's choice, not Collins' instructions

20   in any way, shape, or form.

21           Collins simply, if the evidence be believed, was a

22   wholesale seller of drugs to Gregory.  Again, Gregory is free

23   to sell them to whomever he chose, where he chose, when he

24   chose, how he chose.  Collins in no way, shape, or form

25   exercised any control over Gregory after Gregory -- in fact,

| | | |
|---|---|---|
| 01:41:55 | 1 | he didn't exercise control when he sold it to him.  But he met |
| 01:42:00 | 2 | him on the corner or at the paint body shop, if you will, buy |
| 01:42:02 | 3 | the evidence, delivered the drugs to him, and then Gregory was |
| 01:42:06 | 4 | off on his own. |
| 01:42:07 | 5 | If Gregory wanted to go to New York and sell them, |
| 01:42:10 | 6 | Miami and sell them, it just didn't matter to Collins. |
| 01:42:14 | 7 | Collins -- he didn't reach out and exercise any form of |
| 01:42:17 | 8 | control or management over Gregory.  The fact that he may have |
| 01:42:21 | 9 | given Gregory a cellphone, that was for Collins' own |
| 01:42:25 | 10 | protection saying when you call me I don't want the phone |
| 01:42:29 | 11 | traced.  That wasn't exercising control over Gregory. |
| 01:42:32 | 12 | And the fact that he may have said to Gregory about |
| 01:42:35 | 13 | tinted windows on a car, that was, again, a matter of, Gee, I |
| 01:42:37 | 14 | hope you don't get caught because you're someone that I can |
| 01:42:40 | 15 | make money by selling to.  But these weren't instructions. |
| 01:42:44 | 16 | This wasn't the manifestation of control, as required under |
| 01:42:48 | 17 | the enhancement. |
| 01:42:49 | 18 | The enhancement requires that Collins has to in some |
| 01:42:53 | 19 | way manage him.  And manage means more than -- just fronting |
| 01:42:57 | 20 | drugs is not managing drugs.  It's -- what that's really for |
| 01:43:00 | 21 | is the type of person who has sellers of his own out on the |
| 01:43:04 | 22 | street and he's managing those sellers. |
| 01:43:09 | 23 | Clearly, Gregory was not a seller for the defendant. |
| 01:43:09 | 24 | Gregory was merely a purchaser thereof, and then free to do |
| 01:43:17 | 25 | what he wanted, when he wanted, where he wanted, how he |

| | |
|---|---|
| 01:43:18 | 1 |

wanted, why he wanted.  No control was exercised whatsoever.

That's our argument on that position, your Honor.

THE COURT:  Okay.  Let me hear from the Government in response.

MS. RODNEY:  Your Honor, I'm going to proceed on this argument on behalf of the Government.  We believe that your Honor's application of the enhancement should be guided by the guidelines in the case law that we cited in our position paper.  And for the record, that's United States versus Guyton, G-u-y-t-o-n, and United States versus Ruiz.

What Guyton points out is that organizing and enlisting others is sufficient for purposes of determining whether 3B1.1 applies.  And Ruiz goes a bit further and talks about a defendant who is the supplier of the cocaine, who set the price for the cocaine, and exercised decisionmaking authority.

And then the application note 4 to the guideline points to other factors that your Honor should consider in determining whether this enhancement is appropriate.  It's undisputed that Mr. Collins was a wholesale supplier of cocaine.  We ask the Court to look at not only his relationship to Robert Gregory, his customer, but also to his other customers that he referenced during the recorded phone calls that were admitted and played at trial.

The guideline directs the Court to look at whether

| | | |
|---|---|---|
| 01:44:44 | 1 | the defendant exercised decisionmaking authority.  Mr. Collins |
| 01:44:47 | 2 | set the price of $19,000 per kilogram when he dealt with |
| 01:44:52 | 3 | Mr. Gregory.  And he set the price of $29,500 per kilogram to |
| 01:44:59 | 4 | the individual he was speaking to in the background of his |
| 01:45:02 | 5 | conversation with the cooperating source in the recorded |
| 01:45:05 | 6 | calls. |
| 01:45:08 | 7 | Mr. -- you also should look at the nature of |
| 01:45:11 | 8 | Mr. Collins' participation in the criminal activity.  Again, |
| 01:45:13 | 9 | he was the supplier who supplied Mr. Gregory over a three-year |
| 01:45:17 | 10 | period in quantities that range between nine ounces and |
| 01:45:20 | 11 | 4 kilograms each time.  And he also references selling to his |
| 01:45:24 | 12 | own customers over the phone in amounts between 10, 15, and |
| 01:45:29 | 13 | ultimately 20 kilograms during that one phone call that was |
| 01:45:32 | 14 | played. |
| 01:45:35 | 15 | Mr. Collins exercised a degree of control over |
| 01:45:38 | 16 | Mr. Gregory by recruiting him at Mr. Lee's car shop on |
| 01:45:42 | 17 | Jefferson.  Not only did he ask him what cocaine was going for |
| 01:45:46 | 18 | in the Milwaukee area, after he realized that Mr. Gregory was |
| 01:45:50 | 19 | in the drug game, he took him out to dinner to further woo |
| 01:45:53 | 20 | him, in a sense, and then gave him 9 ounces, which he said to |
| 01:45:57 | 21 | Mr. Gregory didn't mean anything to him.  So either Gregory |
| 01:46:01 | 22 | could sell it and give him his money back or he could do with |
| 01:46:04 | 23 | it what he wanted.  But by giving him the nine ounces, he was |
| 01:46:08 | 24 | recruiting him and showing him that he could be a source of |
| 01:46:12 | 25 | supply for Mr. Gregory. |

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 01:46:13 | 1  | On the recorded phone calls Mr. Collins also                |
| 01:46:16 | 2  | referenced to having a lot of other people who could help him |
| 01:46:19 | 3  | run through them, meaning help him sell the kilograms of    |
| 01:46:23 | 4  | cocaine that he was hoping to be supplied by the cooperating |
| 01:46:26 | 5  | source.  Which -- and when you look at that particular aspect |
| 01:46:29 | 6  | of the call, Mr. Collins is referencing the scope of his    |
| 01:46:32 | 7  | operation.  He had multiple distributors who could help him |
| 01:46:36 | 8  | sell the cocaine that he was buying from the CS.            |
| 01:46:39 | 9  | Mr. Collins also made clear that he would be making         |
| 01:46:43 | 10 | more money than his distributors.  He had to make at least  |
| 01:46:47 | 11 | $1500 off of each kilo, and he references that in two areas of |
| 01:46:52 | 12 | that phone call that was plaid during his conversation with |
| 01:46:54 | 13 | the cooperating source.                                     |
| 01:46:56 | 14 | Just turning back to Gregory for my final point, in         |
| 01:47:01 | 15 | terms of the degree of control that he exercised over Gregory, |
| 01:47:05 | 16 | he set the time and location of their meetings over this    |
| 01:47:08 | 17 | three-year period.  He often sent him text messages, which  |
| 01:47:13 | 18 | were entered into evidence and played -- or I'm sorry --    |
| 01:47:16 | 19 | published for the jury.  Text messages where Mr. Collins said, |
| 01:47:19 | 20 | quote, I need you to come to bring that change and come back |
| 01:47:22 | 21 | tomorrow.  Clearly directing Gregory when he was to come to |
| 01:47:27 | 22 | Chicago with payment for the previously fronted cocaine.    |
| 01:47:29 | 23 | He provided Gregory cellphones and SIM cards starting       |
| 01:47:32 | 24 | about six months into their three-year relationship, SIM cards |
| 01:47:37 | 25 | and cellphones that the defendant, Mr. Collins, determined it |

| | | |
|---|---|---|
| 01:47:41 | 1 | was time to change to avoid detection from law enforcement. |
| 01:47:44 | 2 | He took Mr. Gregory to the cellphone store to |
| 01:47:47 | 3 | purchase those cellphones, and he provided him with the phone |
| 01:47:51 | 4 | number that Mr. Gregory would then use to contact Mr. Collins. |
| 01:47:54 | 5 | And, yes, he did advise Mr. Gregory to remove the tint from |
| 01:47:58 | 6 | his windows, because he didn't want his new customer getting |
| 01:48:01 | 7 | caught with drugs, because that would be a source of income |
| 01:48:03 | 8 | that he would lose. |
| 01:48:05 | 9 | So, your Honor, those examples provide evidence of |
| 01:48:12 | 10 | the degree of control that the defendant had over Mr. Gregory, |
| 01:48:17 | 11 | over his own customers. And it also established his position |
| 01:48:21 | 12 | separate and apart from his customers, as a supplier, who |
| 01:48:24 | 13 | directed the time, location, and pricing of the narcotics to |
| 01:48:28 | 14 | help facilitate his business. |
| 01:48:30 | 15 | So for those reasons, your Honor, we think that the |
| 01:48:35 | 16 | preponderance of the evidence -- or the evidence shows by a |
| 01:48:38 | 17 | preponderance that this application -- or this enhancement is |
| 01:48:41 | 18 | applicable to the defendant. |
| 01:48:42 | 19 | THE COURT: Okay. Mr. Rubino, do you want to reply? |
| 01:48:45 | 20 | MR. RUBINO: Yes. Your Honor, the Government relies |
| 01:48:47 | 21 | especially on the Ruiz case, and the holding in the Ruiz case |
| 01:48:51 | 22 | speaks about what Ruiz did with the person he supplied to and |
| 01:48:56 | 23 | how he controlled that person. And the holding says that he |
| 01:49:00 | 24 | set the price of the cocaine. But they are talking about Ruiz |
| 01:49:05 | 25 | set the price that his -- to the person he sold it to, whose |

01:49:09  1   name is not in the decision.  He said how much that person

01:49:13  2   would sell it for.

01:49:14  3          Collins didn't set how much Gregory would sell it

01:49:18  4   for.  Collins didn't care how much Gregory would sell it for.

01:49:21  5          Secondly, he had decisionmaking authority over the

01:49:25  6   location of the deal, says the Ruiz case.  They are not

01:49:29  7   talking about when Ruiz sold it to his person.  They are

01:49:33  8   talking about Ruiz controlled when his man went out and sold

01:49:37  9   it to someone else, the 2 kilos.

01:49:40  10         Then they talk about -- Marquez (phonetic) -- I'm

01:49:43  11  sorry, the name was Marquez.  So they are talking about when

01:49:46  12  Ruiz -- not when Ruiz sold it to Marquez, but how Ruiz

01:49:52  13  controlled when Marquez went out and sold it and where that

01:49:56  14  deal went down.

01:49:57  15         Then he physically oversaw the two-kilo deal.

01:50:01  16  They're saying that Ruiz physically watched Marquez make the

01:50:05  17  sale.  Marquez was Ruiz's employee.  Ruiz kept his finger on

01:50:10  18  him, his thumb on him, if you will.  Ruiz kept watch upon

01:50:17  19  Marquez and controlled everything Marquez did when he made

01:50:18  20  these sales.

01:50:18  21         On the other hand, this defendant did absolutely

01:50:21  22  nothing, was never present when Gregory made a sale, didn't

01:50:26  23  know where he made them, how he made them, why he made them.

01:50:29  24  Again, I'm repeating myself, and I don't mean to be.

01:50:32  25         And then the Government is talking about he set the

01:50:34  1   price.  Well, of course, he set the price he sold it to

01:50:36  2   Gregory.  The seller always does.  Gregory set his own price

01:50:40  3   to his clients.  This defendant did not set the price for

01:50:44  4   Gregory to make his sales.

01:50:46  5        This defendant did not choose who Gregory sold it to.

01:50:50  6   This defendant didn't go oversee Gregory making sales.  In

01:50:55  7   fact, this defendant -- once he sold to Gregory at the body

01:50:58  8   shop, he walked away.  He was done.  Gregory was off on his

01:51:01  9   own.

01:51:01  10        Now, the Government says this defendant made more

01:51:04  11  money than Gregory.  Well, Gregory chose to sell by the kilo.

01:51:08  12  Gregory could have made more had he broke it down to quarter

01:51:13  13  kilos.  Could have made a fortune if he broke it down to

01:51:17  14  grams, but he chose not to.

01:51:19  15        It wasn't that this defendant instructed Gregory, You

01:51:21  16  must only sell it in full kilos and here's what you must sell

01:51:26  17  it for, or half kilos.  This defendant didn't care how much

01:51:30  18  Gregory sold it for.  Gregory made $1,000, 2,000, 10,000 a

01:51:35  19  kilo.  This defendant didn't care, as long as Gregory paid him

01:51:38  20  his price.  But he didn't care -- he had no interest in how

01:51:41  21  much Gregory made, because he didn't receive any percentage of

01:51:46  22  that profit.  He just sold an object and got a price for it.

01:51:50  23        So there's a misplaced reliance on Ruiz, because Ruiz

01:51:58  24  managed Marquez.  He (indicating) didn't manage Gregory.

01:52:02  25        THE COURT:  Okay.  Anything else that anyone wants to

01:52:04  1  add on that?

01:52:05  2       MS. RODNEY:  Just to remind your Honor that the

01:52:07  3  application note provides the factors that should be relied

01:52:11  4  on.  Ruiz is but an example but not determinative.  Yes, it

01:52:15  5  can be distinguished in some aspects.  But you still have the

01:52:18  6  presence of the defendant recruiting accomplices, claiming a

01:52:22  7  larger share of the fruits of the crime, and being very

01:52:25  8  involved in the participation of the crime in his relationship

01:52:30  9  to Gregory, in terms of providing him with cellphones over a

01:52:34  10  two-and-a-half-year period and directing the time and location

01:52:37  11  of their meetings.

01:52:38  12       So -- and, finally, he, in fact, had an interest in

01:52:40  13  how Gregory sold his drugs, because he would not get paid if

01:52:44  14  he did not sell them, so there was certainly an interest

01:52:48  15  there.  And he maintained that relationship by contacting him

01:52:53  16  by phone, providing him with means of communication, and

01:52:56  17  carrying on that relationship for at least a three-year

01:52:57  18  period.

01:52:58  19       THE COURT:  Okay.  I have failed to identify you,

01:53:01  20  Ms. Stern.  Could you, for the record, put your name.

01:53:04  21       MS. HALLERAN:  Good afternoon, Judge Kendall.  Jodi

01:53:06  22  Halleran standing in for Ms. Stern today for the Probation

01:53:09  23  Department.

01:53:09  24       THE COURT:  Thank you.  And please extend my thanks

01:53:11  25  to her for a very well done report.  I appreciate it.

01:53:15  1    MS. HALLERAN:  Will do, your Honor.

01:53:16  2    THE COURT:  Excuse me for leaving probation out of

01:53:18  3  the picture for a moment.

01:53:19  4    Okay.  But now turning back to the sentencing

01:53:23  5  guideline calculation, under 3B1.1, the defendant needs to be

01:53:29  6  a manager or a supervisor of criminal activity involving five

01:53:34  7  or more participants, or that is otherwise extensive, in order

01:53:40  8  for the three levels to be added.  And the guidance that we

01:53:44  9  have from the notes talk about the role that the individual

01:53:50 10  have over the other participants and also speak to what it

01:53:54 11  means to be otherwise extensive.

01:53:56 12    So in this case what we have is we have the defendant

01:54:02 13  at trial, the trial testimony revealed, that he was someone

01:54:09 14  who had recruited Mr. Gregory out of the dealership or the car

01:54:14 15  place, and this was disputed at trial.  It was cross-examined

01:54:18 16  at trial.  But the jury clearly credited the testimony of

01:54:22 17  Mr. Gregory and others who testified regarding the

01:54:26 18  relationship to the defendant.  And so first we have that

01:54:31 19  initial contact of bringing him into his sale of cocaine.

01:54:36 20    What we have then is a very long period of time where

01:54:41 21  there was a relationship that I cannot describe as a

01:54:48 22  buyer-seller relationship, because during that period of time

01:54:52 23  the cocaine is being fronted, money is being fronted, and

01:54:56 24  there is an ongoing relationship about when the cocaine will

01:55:00 25  be delivered to others.

01:55:02   1          Now, I understand Mr. Rubino's argument that this is

01:55:07   2   something where Mr. Collins might not know the end result of

01:55:13   3   the sale, as in not knowing who he's going to sell to or how

01:55:19   4   Mr. Gregory is actually going to put the cocaine on the

01:55:22   5   street.

01:55:22   6          But there's a number of other factors that support a

01:55:27   7   managerial role here, and the first is that, aside from

01:55:31   8   recruiting, he is the person who is setting the price of the

01:55:35   9   product, and he is the person who is arranging the timing and

01:55:40  10   the location of each transaction.  And what's critical about

01:55:45  11   that is that he's directing Mr. Gregory at each one of these

01:55:50  12   moments that this will be the place and this will be the time

01:55:52  13   for either the delivery of cash or of drugs.

01:55:57  14          What's also important about that is that he's giving

01:56:00  15   him advice and the tools on how to support this continued

01:56:05  16   relationship, so as to avoid law enforcement.  So he's aiding

01:56:10  17   this ongoing relationship of managing Mr. Gregory by buying

01:56:16  18   him these new cellphones every few months, deciding when it's

01:56:20  19   time to change that cellphone, deciding when it is appropriate

01:56:25  20   to take the tint off of the windows of the car so as not to

01:56:30  21   cause attention from law enforcement to Mr. Gregory.

01:56:35  22          And it's that type of managerial advice and that type

01:56:39  23   of provision of tools that's enabling the cocaine trafficking

01:56:44  24   to continue beneath him.  He doesn't need to know exactly

01:56:48  25   where it goes or for what price.  What matters is that in

| | |
|---|---|
| 01:56:52 | 1 |
| 01:56:56 | 2 |
| 01:57:01 | 3 |
| 01:57:05 | 4 |

1  order for him to continue in his ongoing relationship of

2  making money through the sale, he is directing and controlling

3  the cocaine that's going to Mr. Gregory.  So I do see that

4  that's a managerial role.

5          So then the next question becomes is it a managerial

6  role in a situation where we have either five or more

7  participants or one where it is otherwise extensive.  I think

8  that the otherwise extensive language fits best here, because

9  of our own known individuals who may have been distributing

10  below Mr. Gregory.  But when we're dealing with a three-year

11  period of time, where cocaine is continually fronted, and

12  we're talking about hundreds of kilos of cocaine, we do have

13  an otherwise extensive crime.

14          And for that reason, I will overrule the objection to

15  the Presentence Investigation Report and apply the three-level

16  enhancement for the managerial role, for 3B1.1(b).  And that

17  brings us then up to a level of 41, under the guidelines, the

18  advisory guidelines.

19          Now, there's no others that are addressed at this

20  point in this part of the guidelines.

21          There's no acceptance given, based upon the trial.

22          However, we do have a question regarding some

23  criminal history.  So let's go to that criminal history

24  calculation, which is currently set as a criminal history

25  category VI.  And that criminal history is based upon thirteen

| | |
|---|---|
| 01:58:30 | 1 |
| 01:58:34 | 2 |
| 01:58:40 | 3 |
| 01:58:43 | 4 |
| 01:58:48 | 5 |
| 01:58:52 | 6 |
| 01:58:58 | 7 |
| 01:59:02 | 8 |

1  criminal history points, and it includes the 1989 conviction

2  for receiving or possessing a stolen motor vehicle, when he

3  was fifteen years old, for three points; for violation of

4  bail, when he was fifteen, which is another three points; and

5  then 3 points, again when he was fifteen, for possession of a

6  stolen motor vehicle; and then we move forward to the one

7  point for interfering with the official acts, when he is 23,

8  back in 1997, out of Iowa.

9          And I believe that gives us our thirteen points.  So

10  with that in mind, let me hear from you, Mr. Rubino, as to why

11  you think that's overstated.

12          MR. RUBINO:  Your Honor, twelve, we only argue on

13  twelve of the thirteen points.  We do not make argument to the

14  last point, when he was 27 years old.

15          Obviously, this is a 37-year-old defendant standing

16  before the Court.  These are offenses that occurred 22 years

17  ago.  These offenses would not be counted, if they were in

18  juvenile court.  For reasons I can't explain to the Court,

19  other than I understand that when the defendant was arrested

20  at age fifteen, he may have misrepresented to the police that

21  he was seventeen years old, and, hence, they charged him as an

22  adult instead of a juvenile.  This is speculation.  I don't

23  know that this is fact.  Be that as it may, these are offenses

24  that should be juvenile offenses at age fifteen and should not

25  be counted.

| | | |
|---|---|---|
| 02:00:08 | 1 | If the Court notes, every one of the twelve points |
| 02:00:12 | 2 | all come from a one-time resolution. It's not like he went to |
| 02:00:16 | 3 | court twelve different times. He went to court once. These |
| 02:00:20 | 4 | were all packaged together in a one-time resolution. 22 years |
| 02:00:26 | 5 | ago this happened. |
| 02:00:28 | 6 | I think that that should not be used against this |
| 02:00:31 | 7 | defendant, who's 37 years old today. I think it truly does |
| 02:00:35 | 8 | overrepresent his criminal history, and I think that it should |
| 02:00:37 | 9 | not be counted, because it should have been counted only as a |
| 02:00:41 | 10 | juvenile offense, which then wouldn't factor. He would then |
| 02:00:45 | 11 | have one criminal history point. And that's our argument on |
| 02:00:47 | 12 | that, your Honor. |
| 02:00:49 | 13 | THE COURT: Okay. So let me hear from the Government |
| 02:00:51 | 14 | on this issue. |
| 02:00:52 | 15 | MS. GUREN: Your Honor, there is a couple different |
| 02:00:54 | 16 | points. The first is the reason why this counts under the |
| 02:00:58 | 17 | guidelines is because he was sentenced at age 18. That is a |
| 02:01:02 | 18 | valid reason under the guidelines. The guidelines permit for |
| 02:01:05 | 19 | this type of calculation. |
| 02:01:07 | 20 | With regard to this idea that all of these crimes |
| 02:01:10 | 21 | were packaged together into one sentencing, that doesn't make |
| 02:01:13 | 22 | a difference and it certainly isn't mitigating. It's just as |
| 02:01:17 | 23 | a matter of judicial resources and probably for the benefit of |
| 02:01:21 | 24 | Mr. Collins, in terms of the fact that he wouldn't |
| 02:01:23 | 25 | individually receive separate sentences on each of these. |

| | |
|---|---|
| 02:01:27 | 1 |
| 02:01:30 | 2 |
| 02:01:32 | 3 |
| 02:01:36 | 4 |
| 02:01:39 | 5 |

It still means and the guidelines still are calculated as such that each of these crimes were individual crimes that he committed on separate occasions. That's the reason why they count as different crimes under the guidelines.

The other thing that I want to point out, with regard to his youth during this time period versus other arguments, is that, yes, these crimes happened -- he was sentenced for these crimes when he was eighteen. However, he was released when he was 20, which was still within an eleven-year period of the start of this conspiracy and still again count under the guidelines. The guidelines do permit for that.

To the extent that this really ends up being in some ways a 3553(a) argument about whether or not the properly calculated criminal history points do count, I want to point out a couple different things.

The first is that with regard to this sentence -- or with regard to this crime, this crime started in 2005. Mr. Collins was -- after being released from prison when he was 20, he didn't learn his lesson. Instead, he does this crime at -- I believe, if he's 37 today, it would be when he was 31 he started this crime.

In between that period of time, he was arrested for drug trafficking in 2002. Now, he was found not guilty of that and I, in no way, want to infer any guilt on him from

| | | |
|---|---|---|
| 02:02:48 | 1 | that arrest, but I think what is really important there is |
| 02:02:56 | 2 | that he had exposure to the criminal justice system.  And |
| 02:02:57 | 3 | instead of learning his lesson, he continues to be a part of |
| 02:03:00 | 4 | it with this conspiracy.  In fact, he was acquitted in 2006. |
| 02:03:04 | 5 | This conspiracy was in 2005.  So to the extent that this |
| 02:03:08 | 6 | somehow overstates his criminal history, I don't believe that |
| 02:03:11 | 7 | it does. |
| 02:03:12 | 8 | The next factor -- I do just want to point out, which |
| 02:03:16 | 9 | I think is also important -- is that even if your Honor |
| 02:03:19 | 10 | considered only one of these convictions in addition to the |
| 02:03:22 | 11 | interference -- the point from the interference crime, it |
| 02:03:27 | 12 | would end up giving him a guideline range of 41 for the total |
| 02:03:34 | 13 | offense level and a criminal history of II, which still |
| 02:03:37 | 14 | results in a 360-to-life guideline range. |
| 02:03:40 | 15 | So to the extent that somehow or another this |
| 02:03:41 | 16 | overstates his criminal history resulting in a range that is |
| 02:03:45 | 17 | too high for him, even if your Honor did take that into |
| 02:03:48 | 18 | account and went down on his criminal history, unless your |
| 02:03:51 | 19 | Honor went down and only calculated that one criminal history |
| 02:03:54 | 20 | point, he would still be within that 360-to-life range. |
| 02:03:58 | 21 | THE COURT:  Okay.  Anything else you want to add, |
| 02:04:00 | 22 | Mr. Rubino? |
| 02:04:00 | 23 | MR. RUBINO:  No, your Honor.  I just don't think -- |
| 02:04:01 | 24 | simply stated.  I don't think it's fair that a 15 -- a |
| 02:04:04 | 25 | conviction 22 years ago when he's fifteen years old should |

1    count.

2         THE COURT:  Right.

3         Under the 4A1 guideline, I think that this does

4    overestimate his criminal history.  To give him essentially

5    eleven points; is that correct?

6         MR. RUBINO:  Twelve.

7         THE COURT:  For the convictions that occurred.  Now,

8    let's take a look at how they occurred.

9         So when he's fifteen years old, in November of '89,

10   and then we move out to -- so November 15th to November 17th

11   of '89.  And then a little longer than two months later to

12   February of '90 and then April of '90.  We have -- he's

13   getting this criminal history category of VI from what are

14   essentially nonviolent crimes of possession of a stolen motor

15   vehicle, of a motor vehicle, which is an extremely atypical

16   characterization for a criminal history category VI defendant,

17   especially based upon the period of time that has elapsed

18   since these occurred and based upon the fact that when they

19   did occur, when he was a young boy, he also had them occur in

20   a very short period of time.  And that's where he amassed his

21   criminal history category of VI.

22        And that, in the Court's opinion, overestimates his

23   criminal history.  And so I'm going to count them as being one

24   conviction for three points.

25        And that means I am going to depart downward from the

02:05:55  1  sentencing guideline advisory range from a category VI

02:05:58  2  criminal history to a category II.  And I think that is a more

02:06:02  3  accurate reflection of the criminal history that the defendant

02:06:08  4  has in his past than looking at him here saying a criminal

02:06:15  5  history 13, based upon that 22-year-old juvenile record.

02:06:20  6          Okay.  So that unfortunately for the guideline

02:06:24  7  calculation still leaves him at an advisory range level 41,

02:06:32  8  criminal history category II, 360 to life for his advisory

02:06:37  9  guideline range.

02:06:38  10         Now, other than that dispute in our guideline

02:06:42  11 calculations, is there anything under the guidelines we need

02:06:45  12 to address from either side?

02:06:47  13         MS. GUREN:  No, your Honor.

02:06:48  14         THE COURT:  Okay.

02:06:49  15         MR. RUBINO:  No, your Honor.

02:06:50  16         THE COURT:  So now let's turn to the 3553 factors,

02:06:54  17 and let me hear first from the prosecution as to where they

02:06:58  18 believe Mr. Collins should be sentenced, based upon all of

02:06:59  19 those factors.

02:07:00  20         MS. GUREN:  Your Honor, first, if I may make a

02:07:02  21 correction to the sentencing memo.  On page 11, three lines

02:07:06  22 down, I said, Credit card and bank account applications.  It

02:07:11  23 is actually just two credit card applications, which is Chase

02:07:15  24 2 and 4, not Chase 1 through 6, and not bank applications.  I

02:07:19  25 did want to make that correction.

02:07:21  1      THE COURT:  Three lines down from the top, are you
02:07:24  2  saying?
02:07:24  3      MS. GUREN:  Yes, from the top.  Where it says:  Bank
02:07:28  4  account applications.  And then on the fourth line down I cite
02:07:34  5  to Government Exhibits Chase 1 through 6.  It should be
02:07:36  6  Government Exhibits Chase 2 and 4 --
02:07:39  7      THE COURT:  Okay.
02:07:39  8      MS. GUREN:  -- in addition to the mortgage documents.
02:07:41  9      THE COURT:  Okay.  I will accept those corrections to
02:07:44  10  your filing.
02:07:44  11      MS. GUREN:  And just as a second point, I do have the
02:07:47  12  pages that I relied on printed out.
02:07:47  13      THE COURT:  Okay.
02:07:51  14      MS. GUREN:  Should defense counsel or your Honor like
02:07:53  15  to review them, I have easy access to them.
02:07:55  16      THE COURT:  Okay.  All right.
02:07:56  17      MS. GUREN:  Your Honor, there are two main areas that
02:07:58  18  I want to focus on.  I'm not going to address the criminal
02:08:02  19  history, because you have already addressed it.  But the
02:08:04  20  first --
02:08:04  21      THE COURT:  Well, you can, though.
02:08:06  22      MS. GUREN:  Okay.
02:08:06  23      THE COURT:  I mean, what I have done, under the
02:08:09  24  criminal history guideline calculation, is to say that the
02:08:12  25  criminal history category VI overstates what was a juvenile

| | | |
|---|---|---|
| 02:08:17 | 1 | record.  But now in the 3553 factors, you should feel free to |
| 02:08:22 | 2 | address his criminal history in any way you feel |
| 02:08:25 | 3 | appropriate -- |
| 02:08:26 | 4 | MS. GUREN:  Okay. |
| 02:08:26 | 5 | THE COURT:  -- using those factors. |
| 02:08:27 | 6 | MS. GUREN:  Okay.  Thank you, your Honor.  Then I |
| 02:08:31 | 7 | have three areas to address to your Honor.  The first is the |
| 02:08:32 | 8 | drug quantity.  And I think that it's very important to |
| 02:08:35 | 9 | recognize that the conservative estimate that the Government |
| 02:08:39 | 10 | made is at the lowest end of what the crew members testified |
| 02:08:44 | 11 | to. |
| 02:08:44 | 12 | So when they testified, for example, for delivering |
| 02:08:48 | 13 | four to six times at 10 to 20 kilograms, we took the ten and |
| 02:08:53 | 14 | we also took the four in order to make our calculation. |
| 02:08:57 | 15 | That's actually not required by the case law.  There is a |
| 02:08:59 | 16 | case, which we cited in our memo, that actually states that |
| 02:09:03 | 17 | you can take the average.  We chose not to do that, because we |
| 02:09:07 | 18 | wanted to make sure that it was an extremely conservative |
| 02:09:10 | 19 | calculation. |
| 02:09:11 | 20 | But that points to the fact that 515 kilograms is the |
| 02:09:15 | 21 | absolute low end of this, and I think that you can reasonably |
| 02:09:18 | 22 | infer from Gregory's testimony about how frequently |
| 02:09:23 | 23 | Mr. Collins was selling to them, that the kilogram quantity |
| 02:09:26 | 24 | was much more than just that testified to by what these four |
| 02:09:31 | 25 | specific crew members delivered to Mr. Collins. |

When you look at the guidelines, there's a commentary that talks about taking into account an upward departing if the kilograms are actually ten times the 150-kilogram number. In this case we have three -- nearly 3.5 times the 150-kilogram, for a very conservative estimate.

This is a substantial amount of drugs. Mr. Collins was a large-scale drug trafficker and did it for a three-year period. This is one of the more serious types of drug trafficking offenses that the Government prosecutes in terms of quantities. This is not just a one-time seven-kilogram amount. This is not 150, but this is a very large scale drug trafficker.

And we are asking for a sentence within the guideline range to reflect the seriousness of that, both in part because it is a serious crime that harms the community, but also because of the strong deterrent message that it sends.

In the evidence that was presented at trial, Mr. Collins lived a good life. He had many cars, an Audi, a Bentley, Land Rovers. He had three houses that he bought.

He came -- it came out in testimony that he also had, I believe, a nightclub that he owned a share of in Atlanta. These are all things that show this, sort of, high leading life that he led, as a result of his drug trafficking.

And a message needs to be sent to discourage people from entering into that with these dreams of getting these

02:11:01  1   types of cars, this type of lifestyle, and it's a hard message

02:11:05  2   to resist.  And that's why a sentence of 360 to life is so

02:11:10  3   significant and so important, as a message that it sends.

02:11:13  4          The second part of this is that Mr. Collins did not

02:11:16  5   just harm the community with his drug trafficking.  He

02:11:19  6   actually economically harmed the community.  This is a case

02:11:23  7   where you are not just dealing with a large-scale drug

02:11:27  8   trafficker, which in and of itself, I believe, warrants a

02:11:27  9   360-to-life sentence.  You are also dealing with someone who

02:11:30  10  committed mortgage fraud on three occasions and failed to file

02:11:33  11  his taxes.

02:11:34  12         He submitted forged documents for three properties,

02:11:41  13  and those forged documents stated that he worked for a store,

02:11:42  14  a clothing store named Mr. Kay's (phonetic).  In his

02:11:46  15  documentation that he submitted to the mortgage company, he

02:11:48  16  forged a 1040, which the evidence came out at trial that he

02:11:51  17  never submitted any tax returns, so he never had a 1040.

02:11:54  18         He submitted false paystubs and W-2s.  Well, there

02:11:58  19  was ERPs that came out also with the tax returns that showed

02:12:02  20  there was no reported 1020 -- W-2 income.  And in the

02:12:06  21  Presentence Report it shows as well that he never worked at

02:12:10  22  Mr. Kay's.

02:12:11  23         And all of this was to obtain these three properties,

02:12:13  24  which had very real consequences on the economy.  One of those

02:12:17  25  properties was sold by short sale and one was foreclosed on.

| | | |
|---|---|---|
| 02:12:22 | 1 | So he took advantage of these lacks verification measures that |
| 02:12:25 | 2 | were in place at the time at these financial institutions to |
| 02:12:28 | 3 | not just drug traffic, but also actually undermine stability |
| 02:12:33 | 4 | in the financial institution context.  So he's not just a drug |
| 02:12:40 | 5 | trafficker, but he -- he continues to harm the community. |
| 02:12:42 | 6 | And he also continues, to some degree, in the course |
| 02:12:43 | 7 | of his fraud.  He told Probation that he ran Double R |
| 02:12:49 | 8 | Construction and Hilarious Entertainment in 2008 to 2009, and |
| 02:12:53 | 9 | he suggested to Probation that those were actual businesses. |
| 02:12:58 | 10 | But if you look at the bank records, which were admitted at |
| 02:13:01 | 11 | trial, these bank records show very minimal activity and |
| 02:13:03 | 12 | suggests that these were not, in fact, legitimate businesses |
| 02:13:05 | 13 | in any way.  So he has continued in those lies. |
| 02:13:08 | 14 | The third point that I want to raise is the criminal |
| 02:13:12 | 15 | history that Mr. Collins has accumulated.  It's true that he |
| 02:13:15 | 16 | had the majority of his points from when he was fifteen and |
| 02:13:19 | 17 | several arrests and convictions that happened at that time. |
| 02:13:23 | 18 | But when he got out of prison, when he was 20, rather than |
| 02:13:26 | 19 | take this as an opportunity and a lesson that he got |
| 02:13:28 | 20 | three years and move on with his life and not continue to |
| 02:13:31 | 21 | commit crimes, what he did instead was he ended up committing |
| 02:13:34 | 22 | this crime at a very large scale level and also mortgage |
| 02:13:39 | 23 | fraud. |
| 02:13:39 | 24 | And, in addition, he had opportunities to reassess |
| 02:13:42 | 25 | and redetermine his life.  When he was arrested in 2002 for |

02:13:45  1    drug trafficking, he ultimately was acquitted in 2006.  But
02:13:49  2    rather than take that experience with the criminal justice
02:13:52  3    system and think, Wow, that's a really scary place, I don't
02:13:55  4    want to be here again, he went forward and continued with
02:13:59  5    his -- and he drug trafficked in this large scale conspiracy.
02:14:03  6             And I'm going to say just for the record again, I'm
02:14:07  7    not in any way holding him accountable for guilt in the drug
02:14:09  8    trafficking case, but I do think that it is something you can
02:14:12  9    take into account in the sense that he should have learned his
02:14:14  10   lesson and he should have been deterred from just that
02:14:16  11   exposure alone, let alone the exposure from when he was
02:14:21  12   fifteen.
02:14:21  13            And because of all of these things, I don't think in
02:14:23  14   any way this is a typical case.  I do recognize that 360 to
02:14:24  15   life is a large penalty to be facing, but I think that it is a
02:14:28  16   well-deserved penalty, because this is not a typical case in
02:14:31  17   any way.
02:14:32  18            There is a huge amount of drugs that he is
02:14:34  19   responsible for.  He not just did [sic] drug trafficking, but
02:14:37  20   then also in his personal life committed fraud, failed to file
02:14:41  21   his taxes, and his criminal history shows that he actually in
02:14:44  22   fact needs that deterrence, along with the general deterrence,
02:14:47  23   that comes from sending a message to drug traffickers that you
02:14:50  24   can't -- you are not excused from the law and that you
02:14:53  25   actually do need to follow it and there will be real

| | |
|---|---|
| 02:14:56 | 1 |
| 02:14:56 | 2 |
| 02:14:59 | 3 |
| 02:15:00 | 4 |
| 02:15:03 | 5 |
| 02:15:09 | 6 |
| 02:15:09 | 7 |
| 02:15:12 | 8 |
| 02:15:15 | 9 |
| 02:15:19 | 10 |
| 02:15:24 | 11 |
| 02:15:26 | 12 |
| 02:15:30 | 13 |
| 02:15:33 | 14 |
| 02:15:36 | 15 |
| 02:15:38 | 16 |
| 02:15:42 | 17 |
| 02:15:46 | 18 |
| 02:15:49 | 19 |
| 02:15:51 | 20 |
| 02:15:57 | 21 |
| 02:16:03 | 22 |
| 02:16:08 | 23 |
| 02:16:13 | 24 |
| 02:16:17 | 25 |

1  consequences.

2       Because of that the Government is asking for a

3  sentence within the guideline range.

4       THE COURT:  And where did you come up with your

5  $3.2 million in the motion for the entry of the preliminary

6  order of forfeiture?

7       MS. GUREN:  Your Honor, the motion -- that was a

8  reference -- the forfeiture order is actually only reflective

9  of the 515 kilograms.  You'll see later on, I think, that

10  we're only asking for 772,000.  The 3.2 was a reference to

11  what was initially alleged in the indictment and just a

12  recitation of that and not a request for 3.2 million.

13       THE COURT:  Okay.  Okay.  Mr. Rubino?

14       MR. RUBINO:  Well, your Honor, I take no solace that

15  the Government is not asking you to go outside the guidelines

16  and impose the death penalty, because that's the only thing

17  beyond life.  So I take no solace in that.  I don't see

18  anything benevolent about that in the Government's asking you

19  to be merciful and just stay within the guideline.

20       3553, as we both know, requires a sentence that's

21  sufficient, but, comma, no greater than necessary.  You know,

22  how much is enough?  That's really the question.  How much

23  time do we give a 37-year-old man to spend in prison for this

24  crime?  Do we want to give him 30 years and have him get out

25  when he's 65, 67 years old?  Do we want to give him 40 years

| | |
|---|---|
| 02:16:22 | 1 |
| 02:16:24 | 2 |

and he'll probably die in prison?  That's probably -- anything

40 or beyond is probably a life sentence.

So, really, the question is, do he want him to get

him out of jail at all, or do we want him to spend the rest of

his natural life in prison and die there?  Because anything

beyond that -- anything probably beyond 35 is really a death

penalty, for all practical purposes, life in prison with no

parole.

So the question we have to ask ourselves, what's

necessary?  How much is necessary?  I think, as I asked the

Court in my motion, a level 38 at a Level 1, which is

19-and-a-half, 19-year, 7 months to be exact.

I mean, I think back, what was I doing 20 years ago?

That was a long time ago.  What is this -- this man will be

57 years old, if this the Court imposes that upon him.  Or

anything higher we start getting to a point where -- what I'm

saying to the Court is, is that really necessary?  Does that

really comply with 3553?

When we're sending a message, are we sending a

message that, We're going to punish you, or are we sending a

message that we are going to bury you?  That's the question we

have to ask ourselves.

Twenty years would scare the devil out of me.  I

think 20 years will scare anybody.  I don't think you need to

give 30, 35, 40, life.  I don't think you need to send that

02:17:46  1   kind of message.

02:17:47  2        I mean, I'm not, by far, minimizing drug dealing, but

02:17:52  3   there's far more heinous and serious crimes out there where

02:17:57  4   people receive less than 25, 30 years in prison.  What this

02:18:06  5   gentleman did is not acceptable.  It's against the law.  It's

02:18:08  6   reprehensible.  In no way, shape, or form am I trying to

02:18:09  7   justify it.  But, again, how -- when is enough enough, is

02:18:13  8   really my question I'm asking you.

02:18:16  9        He's going to get out of jail -- if he gets

02:18:19  10  20 years -- at 57.  If he gest 30, 67.  Anything beyond that

02:18:21  11  he'll probably die there.  So we've got to say, Do we want him

02:18:25  12  to get out of jail at all?

02:18:27  13       You know, I can't picture what it'll be like to walk

02:18:30  14  out of a prison at 67 years old, after spending the last

02:18:34  15  30 years of my life there.  I would be literally

02:18:38  16  institutionalized.  In fact, the first thing I would do is

02:18:41  17  commit a new crime, so I could go back there, because it would

02:18:45  18  be the best assisted living facility I could find, because I

02:18:49  19  would be 67 years old with no possibility of getting a job.

02:18:54  20  All my friends and family haven't seen me in 30 years.  I've

02:18:58  21  long since gone out of their life.  I'm going to be a homeless

02:19:00  22  67-year-old person with no chance of getting a job, and that's

02:19:03  23  the life I'm going to face.

02:19:05  24       If he gets out of jail after 20 years, which is still

02:19:08  25  a long time, he's at least 57.  He's employable to some

02:19:14  1   degree.  He can function on his own.  He can find himself a

02:19:17  2   place to live.  He's not 67 years old, after 30 years of being

02:19:22  3   institutionalized, who basically won't be able to function in

02:19:25  4   society.

02:19:26  5         So I ask the Court anything -- 30 years up we're

02:19:30  6   basically talking about a life sentence.  Isn't that too much?

02:19:36  7   Does that -- is that no greater?  No, I don't think it is.  I

02:19:42  8   think it is greater than necessary.  That's the question we've

02:19:44  9   got to ask ourselves.  What is necessary and what is greater

02:19:48 10   than necessary?

02:19:48 11         I think we could end 30-year sentences, 40, 50, it

02:19:48 12   doesn't matter.  I think that's greater than necessary to send

02:19:56 13   a message to the community.  Twenty years scares the devil out

02:19:58 14   of anybody.  To send a message and to at least have some hope

02:20:01 15   for some life.  Otherwise, it's really life in prison.

02:20:05 16         Thank you, your Honor.

02:20:08 17         THE COURT:  Okay.  Anything else that anyone wants to

02:20:10 18   add?

02:20:12 19         (No response.)

02:20:13 20         THE COURT:  All right.  Before I sentence you,

02:20:14 21   Mr. Collins, you are free to address the Court.  You have a

02:20:18 22   right to do that, if you would like.

02:20:19 23         MR. RUBINO:  He would like to do that, your Honor.

02:20:19 24         THE COURT:  Okay.

02:20:19 25                             - - -

| | | |
|---|---|---|
| 02:20:23 | 1 | ALLOCUTION |
| 02:20:23 | 2 | THE DEFENDANT: Yes. First of all, I would like to |
| 02:20:25 | 3 | apologize to my family for the pain and distress that I done |
| 02:20:27 | 4 | caused them. I apologize to the Court. And hopefully, while |
| 02:20:31 | 5 | I'm serving this time, you know, I can -- I guess I can get |
| 02:20:34 | 6 | my -- well, I'm not going to say I guess. You know, I'll get |
| 02:20:37 | 7 | my GED and take some college courses, so upon my release date, |
| 02:20:42 | 8 | you know, I can -- hopefully I'll have a little time to start |
| 02:20:45 | 9 | a year and be helpful to my family, and hopefully someday I |
| 02:20:51 | 10 | can be helpful to the community as well. That's it. |
| 02:20:51 | 11 | - - - |
| 02:20:56 | 12 | IMPOSITION OF SENTENCE |
| 02:20:56 | 13 | THE COURT: Okay. Thank you. |
| 02:21:05 | 14 | We start with the understanding that there is an |
| 02:21:08 | 15 | advisory guideline range that I have calculated that is |
| 02:21:11 | 16 | 360 months to life, based upon a category II criminal history |
| 02:21:19 | 17 | and a level 41 for the guideline calculation. |
| 02:21:22 | 18 | And then we turn to the 3553 factors. First, we |
| 02:21:28 | 19 | address under the 3553 factors the seriousness of the offense. |
| 02:21:32 | 20 | You know, these very extreme sentences in the guidelines are |
| 02:21:37 | 21 | reserved -- these harsh sentences are reserved for those very |
| 02:21:41 | 22 | large quantity of drug cases. Quantity, meaning something |
| 02:21:45 | 23 | over hundreds of kilograms. I think that the 515 kilograms |
| 02:21:52 | 24 | has been calculated is a conservative number. |
| 02:21:55 | 25 | Based upon the testimony here that occurred in this |

| | |
|---|---|
| 02:21:58 | 1 |
| 02:22:01 | 2 |
| 02:22:11 | 3 |
| 02:22:18 | 4 |
| 02:22:21 | 5 |
| 02:22:25 | 6 |
| 02:22:28 | 7 |
| 02:22:33 | 8 |
| 02:22:38 | 9 |
| 02:22:39 | 10 |
| 02:22:41 | 11 |
| 02:22:42 | 12 |
| 02:22:47 | 13 |
| 02:22:52 | 14 |
| 02:22:59 | 15 |
| 02:23:05 | 16 |
| 02:23:08 | 17 |
| 02:23:15 | 18 |
| 02:23:20 | 19 |
| 02:23:22 | 20 |
| 02:23:27 | 21 |
| 02:23:30 | 22 |
| 02:23:36 | 23 |
| 02:23:39 | 24 |
| 02:23:41 | 25 |

1 courtroom, the credibility of those witnesses, you were a very
2 big drug dealer.  And the magnitude of that crime is something
3 that I'm not sure even today you might have an appreciation
4 for.  Because even if we were to limit it to 515 kilograms --
5 which I think is your lowest amount to limit it to -- you're
6 talking about the distribution of massive quantities of drugs
7 on the streets and the impact that those drugs have on
8 breaking down families, preventing people from working,
9 preventing people from being good fathers to their children
10 and mothers to their children and caregivers and students is
11 devastating.
12         So you just can't underestimate the impact that that
13 massive drug distribution had on the community.  And you have
14 to juxtapose that with how you were living your life at that
15 time, and you were living it very comfortably.  So you had a
16 lot of benefits.  You had your cars and your homes and cash
17 and a lifestyle that was comfortable and if not luxurious in
18 comparison to those individuals who were becoming addicted to
19 the drugs that you pumped on to the streets.
20         So it's under the first category of 3553 factors,
21 it's an extremely aggravating crime.
22         Now, as far as who you are personally and whether you
23 will recidivate, I did give the downward departure under the
24 guidelines based upon what I believe the juvenile history
25 reflected as being an overexaggeration of the points that you

02:23:47  1  should have received for those juvenile crimes when you were

02:23:51  2  fifteen.

02:23:51  3          But now under the 3553 factors, we need to address

02:24:00  4  who you are as far as the type of criminal activity that you

02:24:00  5  have engaged in and it is quite pervasive.  It's pervasive in

02:24:05  6  that the drug dealing occurred over years, and the

02:24:09  7  coordination of those drug deals occurred over years.  And

02:24:13  8  there was a sophistication in your ability to avoid law

02:24:17  9  enforcement that included your mortgage fraud schemes, your

02:24:21  10  failure to file tax returns, this testimony regarding

02:24:24  11  businesses that is questionable at best and false at worst.

02:24:30  12          And so you have a sophisticated long-term criminal

02:24:39  13  here who has not received a wake-up call back in 2002 when

02:24:45  14  there was an arrest, and I am not taking into account

02:24:49  15  acquitted conduct.  But simply the fact that the arrest for

02:24:53  16  that criminal activity should be the gong that wakes one up in

02:24:58  17  the middle of the night to say, I don't want to be 65 years

02:25:02  18  old in jail and it's time to put this behind me.

02:25:06  19          But I assume that it wasn't put behind you because of

02:25:09  20  this lifestyle that was very comfortable and helpful to the

02:25:16  21  family at the time and to you at the time.  So I am not

02:25:19  22  convinced that that pervasive criminal nature means that you

02:25:23  23  would not recidivate.  In fact, it indicates that you would

02:25:28  24  recidivate, if you were here, out on the streets again.  So

02:25:34  25  that is another aggravating factor under 3553.

| 02:25:37 | 1 | So then I need to think about the sentence and how |
| 02:25:40 | 2 | it's imposed to others who might consider committing the |
| 02:25:46 | 3 | crime.  And it is quite a lure for young men to look at a |
| 02:25:51 | 4 | large-scale drug trafficking operation and see someone riding |
| 02:25:57 | 5 | around in a Bentley and having nightclubs and homes and think, |
| 02:26:00 | 6 | Well, this is the way to go, this is what I should be doing. |
| 02:26:03 | 7 | So the sentence does need to be significant enough to send a |
| 02:26:07 | 8 | message to those who would consider this crime that there is a |
| 02:26:09 | 9 | significant penalty to it. |
| 02:26:11 | 10 | I also need to take into account the impact of this |
| 02:26:17 | 11 | crime on the community as a whole, and the communities that |
| 02:26:21 | 12 | are impacted by this drug dealing, as I mentioned earlier, |
| 02:26:25 | 13 | impacted detrimentally for years.  Because the addictions that |
| 02:26:30 | 14 | come from the drug use do not just come and vanish within a |
| 02:26:33 | 15 | day, but they continue on for years and years and break down |
| 02:26:38 | 16 | that fabric of the community that we need so badly to be |
| 02:26:42 | 17 | strong, in order to raise another generation of youth that |
| 02:26:45 | 18 | will be leaders and not drug addicts. |
| 02:26:48 | 19 | So overarching I don't see mitigating factors here to |
| 02:26:53 | 20 | enable you to get out from underneath what Congress has |
| 02:26:58 | 21 | imposed as a potential advisory sentence, because I think it's |
| 02:27:02 | 22 | appropriate under the circumstances, so I'm sentencing you to |
| 02:27:05 | 23 | 360 months in prison. |
| 02:27:07 | 24 | And that will be five years of supervised release. |
| 02:27:11 | 25 | And I'm not recommending any restitution. |

| | | |
|---|---|---|
| 02:27:14 | 1 | You do have a $100 special assessment. |
| 02:27:18 | 2 | Based upon the forfeiture, I'm not imposing a fine. |
| 02:27:22 | 3 | And when you are released from prison, you will need |
| 02:27:26 | 4 | to report to the probation officer within 72 hours of your |
| 02:27:32 | 5 | release, and you will need to engage in the random drug |
| 02:27:39 | 6 | testing through the probation officer at that time. |
| 02:27:41 | 7 | You must cooperate with the collection of a DNA |
| 02:27:46 | 8 | sample and not possess a firearm or destructive device. |
| 02:27:50 | 9 | If you're unemployed after the first 60 days of |
| 02:27:53 | 10 | supervision, then you shall perform at least 20 hours of |
| 02:27:57 | 11 | community service per week. |
| 02:27:57 | 12 | I'm going to order that you participate in the drug |
| 02:28:01 | 13 | aftercare treatment program, both in prison and the supervised |
| 02:28:07 | 14 | release period, and that you participate in the GED |
| 02:28:10 | 15 | preparation course and get your GED during supervision, if you |
| 02:28:12 | 16 | don't get it while you're incarcerated. |
| 02:28:13 | 17 | You're required to provide the probation officer with |
| 02:28:16 | 18 | access to any requested financial information. |
| 02:28:19 | 19 | And you are not allowed to incur any new credit |
| 02:28:23 | 20 | charges or open additional lines of credit within -- without |
| 02:28:27 | 21 | the approval of the probation officer. |
| 02:28:29 | 22 | Now, you can appeal this sentence, and you have |
| 02:28:32 | 23 | fourteen days from the entry of the judgment and conviction |
| 02:28:36 | 24 | order. |
| 02:28:36 | 25 | And is there anything, Ms. Halleran, that I've |

02:28:40  1  forgotten from the probation officer's department?

02:28:41  2         MS. HALLERAN:  Not necessarily forgotten, your Honor.

02:28:43  3  Just to clarify.  It's the Court's intent that Mr. Collins

02:28:47  4  enters a facility at the Bureau of Prisons that has a

02:28:50  5  residential drug and alcohol treatment program?

02:28:53  6         THE COURT:  Well, it's a long sentence, so my guess

02:28:55  7  is, is that it could be at any part along the period of time,

02:28:57  8  so that it is at some point that he is enabled to participate

02:29:00  9  in that.

02:29:01  10         MS. HALLERAN:  Thank you, Judge.

02:29:02  11         THE COURT:  Okay.  Anything from the Government's

02:29:05  12  perspective?

02:29:07  13         MS. GUREN:  Just the issue of forfeiture, your Honor.

02:29:07  14         THE COURT:  Oh, right.  Now, there is a preliminary

02:29:07  15  order of forfeiture here.

02:29:10  16         Do you have a position regarding that?  Are you

02:29:12  17  objecting in any way to it, Mr. Rubino?

02:29:14  18         MR. RUBINO:  I don't think --

02:29:15  19         THE COURT:  I believe that you waived --

02:29:17  20         MR. RUBINO:  Yeah.

02:29:17  21         THE COURT:  -- the jury's determination, correct?

02:29:20  22         MR. RUBINO:  Right.

02:29:21  23         THE COURT:  And I didn't hear what you said.

02:29:23  24         MS. GUREN:  I believe there's actually not waiver in

02:29:25  25  the situation where it's just monetary funds and not property.

02:29:28　1　　　　　THE COURT:  Oh, okay.  Well -- oh, but even in a --

02:29:31　2　with the jury's determination of the forfeited amounts?  I was

02:29:35　3　referring back to after the jury trial that he had waived the

02:29:38　4　jury's determination of it.

02:29:42　5　　　　　(No response.)

02:29:43　6　　　　　THE COURT:  I believe --

02:29:43　7　　　　　MS. GUREN:  I don't think that that happened, but I'm

02:29:45　8　under the understanding from research that there's no need --

02:29:48　9　　　　　THE COURT:  Did you object to the preliminary order?

02:29:50　10　　　　　MR. RUBINO:  No.

02:29:50　11　　　　　THE COURT:  You don't?

02:29:52　12　　　　　MR. RUBINO:  Just being practical.

02:29:53　13　　　　　THE COURT:  Okay.

02:29:53　14　　　　　MR. RUBINO:  30 years from now, I don't think he's

02:29:55　15　going to hit the lottery and have tons of money.

02:30:01　16　　　　　THE COURT:  Okay.  I'm going to enter, there being no

02:30:02　17　objection, the preliminary order of forfeiture, which will be

02:30:05　18　part of this sentence as well.

02:30:06　19　　　　　Okay.  Anything else from you, Mr. Rubino?

02:30:08　20　　　　　MR. RUBINO:  Not with respect to sentencing.  But I

02:30:10　21　do have something else, when the Court is finished with

02:30:13　22　sentencing to raise.

02:30:14　23　　　　　THE COURT:  Okay.  I'm done with the sentence.

02:30:17　24　　　　　MR. RUBINO:  Okay.  Your Honor, at this time on

02:30:17　25　behalf of Mr. Collins I would like to ask the Court if the

| | |
|---|---|
| 02:30:19 | 1 | Court would appoint counsel to represent him for the purpose |
| 02:30:22 | 2 | of appeal.  I was not hired -- though chosen by Mr. Collins, I |
| 02:30:27 | 3 | was hired by his father.  I was paid by his father. |
| 02:30:30 | 4 | Mr. Collins was indigent at the time I was hired.  My contract |
| 02:30:34 | 5 | with his father specifically stated that it was for trial |
| 02:30:38 | 6 | purposes only, that it did not -- and it boldly says, It did |
| 02:30:43 | 7 | not include appeals because I don't write appeals. |
| 02:30:44 | 8 | THE COURT:  Okay. |
| 02:30:44 | 9 | MR. RUBINO:  I made that very clear with the family. |
| 02:30:48 | 10 | Mr. Collins knows that also.  He -- and the reason I bring |
| 02:30:50 | 11 | this up now, instead of filing a motion, he's here and the |
| 02:30:52 | 12 | Court may want to inquire about his financial condition to see |
| 02:30:55 | 13 | if he fulfills the appointment of counsel. |
| 02:30:57 | 14 | THE COURT:  Isn't it appropriately raised before the |
| 02:31:00 | 15 | Appellate Court? |
| 02:31:00 | 16 | MR. RUBINO:  No. |
| 02:31:00 | 17 | THE COURT:  It's appropriately raised here? |
| 02:31:03 | 18 | MR. RUBINO:  No, not -- at least not in our district. |
| 02:31:05 | 19 | I apologize if it is here, I didn't mean to shout no. |
| 02:31:06 | 20 | THE COURT:  Okay.  Any position from the Government? |
| 02:31:08 | 21 | MS. GUREN:  Your Honor, we would take no position on |
| 02:31:10 | 22 | whether or not he's indigent. |
| 02:31:12 | 23 | THE COURT:  Okay.  Based upon the fact that he is |
| 02:31:14 | 24 | going to be incarcerated and there's a large forfeiture, I |
| 02:31:18 | 25 | will appoint counsel to him for his appeal and we'll move |

02:31:21   1   forward from there.  Okay.

02:31:23   2          MR. RUBINO:  Thank you very much, your Honor?

02:31:24   3          THE COURT:  All right.  Anything else?

02:31:25   4          MR. RUBINO:  No.

02:31:25   5          THE COURT:  All right.  Good luck to you,

02:31:27   6   Mr. Collins.

02:31:28   7          MS. GUREN:  Thank you, your Honor.

02:31:31   8          MR. RUBINO:  Thank you, your Honor.

02:31:34   9          (Concluded at 2:31 p.m.)

          10                              - - -

          11

          12

          13

          14

          15

          16                  C E R T I F I C A T E

          17

          18     I certify that the foregoing is a correct transcript from

          19   the record of proceedings in the above-entitled matter.

          20

          21   /s/April M. Metzler, RPR, CRR, FCRR   September 7, 2011

          22   April M. Metzler, RPR, CRR, FCRR      Date

          23   Official Federal Court Reporter

          24

          25