\*\*\*REDACTED\*\*\*

848

09:43:11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          Case No. 1:09-cr-00673

   Plaintiff,                      Chicago, Illinois
                                   June 6, 2011
        v.                         Trial
                                   9:45 A.M. SESSION

RON COLLINS,

   Defendant.
------------------------------

                        VOLUME 4-A
                   TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE VIRGINIA M. KENDALL
        UNITED STATES DISTRICT JUDGE, AND A JURY

APPEARANCES:

For the Government:    Office of the U.S. Attorney
                       By:  Halley B. Guren, and
                            Renai S. Rodney
                       219 S. Dearborn St., 5th Fl.
                       Chicago, IL 60604
                       (312) 353-5300

\*\*\*REDACTED\*\*\*

***REDACTED***

849

**APPEARANCES (Cont'd):**


For the Defendant:        Frank A. Rubino
                          1001 Brickell Bay Dr., Ste. 2206
                          Miami, FL 33131
                          (305) 858-5300



**COURT REPORTER:**       FEDERAL OFFICIAL COURT REPORTER
                          April M. Metzler, RPR, CRR, FCRR
                          219 South Dearborn St., Rm. 2318-A
                          Chicago, IL 60604
                          (312) 408-5154
                          April_Metzler@ilnd.uscourts.gov













Proceedings recorded by mechanical stenography; transcript
produced by notereading.

***REDACTED***

***REDACTED***

850

# I N D E X

**DESCRIPTION**                                                          **PAGE**


SEAN GERAGHTY, DIRECT EXAMINATION                                        859
BY MS. GUREN

SEAN GERAGHTY, CROSS-EXAMINATION                                         870
BY MR. RUBINO

SEAN GERAGHTY, REDIRECT EXAMINATION                                      872
BY MS. GUREN

BRUCE KILLIAN, DIRECT EXAMINATION                                        875
BY MS. GUREN

BRUCE KILLIAN, CROSS-EXAMINATION                                         917
BY MR. RUBINO

BRUCE KILLIAN, REDIRECT EXAMINATION                                      927
BY MS. GUREN

BRUCE KILLIAN, RECROSS-EXAMINATION                                       931
BY MR. RUBINO

BRUCE KILLIAN, REDIRECT EXAMINATION                                      932
BY MS. GUREN

ROBERT COLEMAN, DIRECT EXAMINATION                                       934
BY MS. RODNEY

ROBERT COLEMAN, CROSS-EXAMINATION                                        960
BY MR. RUBINO

***REDACTED***

* * *REDACTED* * *

851

1  ROBERT COLEMAN, REDIRECT EXAMINATION                     965
   BY MS. RODNEY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* * *REDACTED* * *

***REDACTED***

852

| | | |
|---|---|---|
| | 1 | (Resumed at 9:45 a.m.) |
| | 2 | (Whereupon the following discussion was had in open |
| 09:45:38 | 3 | court, outside the presence of the jury:) |
| 09:45:38 | 4 | THE CLERK:  Case number 9CR673, USA versus Ron |
| 09:46:22 | 5 | Collins. |
| 09:46:22 | 6 | MS. GUREN:  Good morning, your Honor.  Halley Guren |
| 09:46:24 | 7 | and Renai Rodney on behalf of the United States. |
| 09:46:27 | 8 | THE COURT:  Good morning. |
| 09:46:27 | 9 | MR. RUBINO:  Good morning, your Honor.  Frank Rubino |
| 09:46:29 | 10 | on behalf of Mr. Ron Collins.  Ron Collins is present in court |
| 09:46:32 | 11 | this morning. |
| 09:46:32 | 12 | THE COURT:  Good morning, Mr. Rubino. |
| 09:46:34 | 13 | Good morning, Mr. Collins. |
| 09:46:35 | 14 | THE DEFENDANT:  Good morning. |
| 09:46:36 | 15 | THE COURT:  All right, folks.  Are we ready to |
| 09:46:37 | 16 | proceed? |
| 09:46:37 | 17 | MS. GUREN:  We are ready.  I just want to hand up to |
| 09:46:40 | 18 | your Honor three copies for the replacements in the summary |
| 09:46:44 | 19 | charts and also one additional published document. |
| 09:46:47 | 20 | THE COURT:  Okay.  All right.  Then go ahead. |
| 09:46:50 | 21 | And did we have a witness on the stand?  I don't |
| 09:46:53 | 22 | recall. |
| 09:46:53 | 23 | MS. GUREN:  We do not. |
| 09:46:54 | 24 | THE COURT:  Okay.  All right.  Can you bring the jury |
| 09:46:56 | 25 | in Omar? |

* * *REDACTED* * *

853

| | | |
|---|---|---|
| 09:49:33 | 1 | (The jury enters the courtroom.) |
| 09:49:33 | 2 | THE COURT:  Okay.  Please be seated.  Good morning, |
| 09:49:35 | 3 | folks.  I hope you had a nice long weekend just because it's |
| 09:49:42 | 4 | going to be 90 outside, does not mean it will be 90 in here. |
| 09:49:42 | 5 | It might be colder, so be careful, remember your layers. |
| 09:49:46 | 6 | We're going to pick up where we left off, and I'm |
| 09:49:49 | 7 | going to have the Government call its next witness. |
| 09:49:51 | 8 | MS. GUREN:  And, your Honor, before we call our next |
| 09:49:53 | 9 | witness, we'd like to read three stipulations. |
| 09:49:56 | 10 | THE COURT:  That's fine.  Go right ahead. |
| 09:49:58 | 11 | MS. GUREN:  Stipulation 4:  It is hereby stipulated |
| 09:50:02 | 12 | and agreed by the United States of America by its attorney, |
| 09:50:04 | 13 | Patrick J. Fitzgerald, United States Attorney for the Northern |
| 09:50:10 | 14 | District of Illinois, and the defendant, individually and by |
| 09:50:11 | 15 | his attorney, that the following facts are true: |
| 09:50:13 | 16 | If called as a witness, a custodian of records for |
| 09:50:17 | 17 | JPMorgan Chase Bank would testify that he or she has knowledge |
| 09:50:21 | 18 | of the relevant recordkeeping system and that each of the |
| 09:50:23 | 19 | described records were made or received and maintained in the |
| 09:50:30 | 20 | regular course of JPMorgan Chase Bank business around the time |
| 09:50:32 | 21 | of the transactions reflected in the records.  And that it is |
| 09:50:35 | 22 | the regular practice of JPMorgan Chase Bank to make or receive |
| 09:50:40 | 23 | such records. |
| 09:50:40 | 24 | A, Government Exhibit Auto 2; B, Government Exhibits |
| 09:50:45 | 25 | Chase 1 through 10; and C, Government Exhibit Mortgage 4. |

* * *REDACTED* * *

* * *REDACTED* * *

854

09:50:48   1          If called as a witness, a custodian of records for

09:50:52   2   Citibank NA would testify that he or she has knowledge of the

09:50:57   3   relevant recordkeeping system, and that each of the described

09:51:00   4   records were made or received and maintained in the regular

09:51:03   5   course of business of Citibank NA around the time of the

09:51:09   6   transactions reflected in the records, and that it is the

09:51:11   7   regular practice of Citibank NA to make or receive such

09:51:14   8   records.

09:51:14   9          A, Government Exhibit Citibank 1.

09:51:17   10          Three, if called as a witness a custodian of records

09:51:19   11   for Sibley Boulevard and Calumet Expressway Currency Exchange

09:51:24   12   would testify that he or she has knowledge of the relevant

09:51:27   13   recordkeeping system and that each of the described records

09:51:30   14   were made or received and maintained in the regular course of

09:51:34   15   Sibley Boulevard and Calumet Expressway Currency Exchange's

09:51:38   16   business around the time of the transactions reflected in the

09:51:41   17   records, and that it is the regular practice of Sibley

09:51:45   18   Boulevard and the Calumet Expressway Currency Exchange to make

09:51:48   19   or receive such records.

09:51:49   20          A, Government Exhibit Money Order 1.

09:51:53   21          Four, if called as a witness, a custodian of records

09:51:56   22   for Michigan and 103 Currency Exchange Incorporated would

09:52:01   23   testify that he or she has knowledge of the relevant

09:52:05   24   recordkeeping system and that each of the described records

09:52:08   25   were made or received and maintained in the regular course of

***REDACTED***

855

09:52:11　1　Michigan and 103rd Currency Exchange Incorporated's business

09:52:16　2　around the time of the transactions reflected in the records,

09:52:18　3　and that it is the regular practice of Michigan and 103rd

09:52:21　4　Currency Exchange Incorporated to make or receive such

09:52:24　5　records.

09:52:24　6　　　　　A, Government Exhibit Money Order 2.

09:52:27　7　　　　　If called as a witness, a custodian of records for

09:52:30　8　Western Union Financial Services would testify that he or she

09:52:35　9　has knowledge of the relevant recordkeeping system, and that

09:52:37　10　each of the described records were made or received and

09:52:40　11　maintained in the regular course of Western Union Financial

09:52:44　12　Services Incorporated's business around the time of the

09:52:46　13　transactions reflected in the records, and that it is the

09:52:49　14　regular practice of Western Union Financial Services

09:52:52　15　Incorporated to make or receive such records.

09:52:53　16　　　　　A, Government Exhibit Money Order 3.

09:52:56　17　　　　　Six, if called as a witness, a custodian of records

09:53:00　18　for HomEq Servicing would testify that he or she has knowledge

09:53:05　19　of the relevant recordkeeping system and that each of the

09:53:07　20　described records were made or received and maintained in the

09:53:11　21　regular course of HomEq Servicing's business around the time

09:53:15　22　of the transactions reflected in the records, and that it is

09:53:17　23　the regular practice of HomEq Servicing to make or receive

09:53:21　24　such records.

09:53:22　25　　　　　A, Government Exhibit Mortgage 1 and Government

***REDACTED***

***REDACTED***

856

09:53:25  1  Exhibit Mortgage 2.

09:53:27  2       If -- seven, if called as a witness, a custodian for

09:53:30  3  Southport Bank would testify he or she has knowledge of the

09:53:33  4  relevant recordkeeping testimony and that each of the

09:53:36  5  described records were made or received and maintained in the

09:53:39  6  regular course of Southport Bank's business around the time of

09:53:42  7  the transactions reflected in the records, and that it is the

09:53:45  8  regular practice of Southport Bank to make or receive such

09:53:49  9  records.

09:53:49  10       A, Government Exhibit Mortgage 3, and, B, Government

09:53:53  11  Exhibit Mortgage 5.

09:53:53  12       If called as a witness, a custodian of records for

09:53:58  13  the Greater Lakes Bank of Choice would testify that he or she

09:54:01  14  has knowledge of the relevant recordkeeping system and that

09:54:06  15  each of the described records were made or received and

09:54:07  16  maintained in the regular course of Great -- of Great [sic]

09:54:11  17  Lakes Bank of Choice businesses -- business around the time of

09:54:15  18  the transactions reflected in the records, and that it is the

09:54:17  19  regular practice of Great [sic] Lakes Bank of Choice to make

09:54:20  20  or receive such records.

09:54:21  21       A, Government Exhibit Mortgage 6.

09:54:24  22       So stipulated?

09:54:24  23       (No response.)

09:54:27  24       MS. GUREN:  Defense counsel, so stipulated?

09:54:28  25       MR. RUBINO:  Yes.

***REDACTED***

* * *REDACTED* * *

857

| | |
|---|---|
| 09:54:30 | 1 |
| 09:54:32 | 2 |
| 09:54:37 | 3 |
| 09:54:44 | 4 |
| 09:54:50 | 5 |
| 09:54:53 | 6 |
| 09:54:58 | 7 |
| 09:55:02 | 8 |
| 09:55:05 | 9 |
| 09:55:08 | 10 |
| 09:55:11 | 11 |
| 09:55:19 | 12 |
| 09:55:22 | 13 |
| 09:55:22 | 14 |
| 09:55:25 | 15 |
| 09:55:29 | 16 |
| 09:55:31 | 17 |
| 09:55:34 | 18 |
| 09:55:36 | 19 |
| 09:55:39 | 20 |
| 09:55:42 | 21 |
| 09:55:44 | 22 |
| 09:55:48 | 23 |
| 09:55:52 | 24 |
| 09:55:54 | 25 |

MS. GUREN: At this time, your Honor, we would move into evidence: Government Exhibit Auto 2, Government Exhibits Chase 1 through 10, and Government Exhibit Mortgage 4, Government Exhibit Citibank 1, Government Exhibit Money Order 1, Government Exhibit Money Order 2, Government Exhibit Money Order 3, Government Exhibit Mortgage 1, Government Exhibit Mortgage 2, Government Exhibit Mortgage 3.

We've previously moved in Government Exhibit Mortgage 4, and Government Exhibit Mortgage 5, and Government Exhibit Mortgage 6.

THE COURT: They will be admitted.

MS. GUREN: And now the Government is going to read stipulation number 2:

It is hereby stipulated and agreed by the United States of America by its attorney, Patrick J. Fitzgerald, the United States Attorney for the Northern District of Illinois, and the defendant, individually and by his attorneys, that the following facts are true:

If called as a witness, a custodian of records for Sprint Nextel would testify that he or she has knowledge of the relevant recordkeeping system and that each of the described records were made or received and maintained in the regular course of Sprint Nextel's business around the time of the transactions reflected in the records, and that it is the regular practice of Sprint Nextel to make or receive such

* * *REDACTED* * *

* * *REDACTED* * *

858

09:55:59    1    records.

09:55:59    2          A, Government Exhibit Sprint 1 contains subscriber

09:56:02    3    information and cellular telephone call records for the period

09:56:05    4    of December 9th, 2006 to December 8th, 2007 for the account

09:56:10    5    number 830412518 and the mobile telephone number

09:56:18    6    (773) 858-6892.  The subscriber information in Government

09:56:27    7    Exhibit Sprint 1 lists the subscriber as Rodney Carter.

09:56:30    8          So stipulated, Counsel?

09:56:31    9          MR. RUBINO:  Yes.

09:56:32    10          MS. GUREN:  At this time, your Honor, we would move

09:56:34    11    into evidence Government Exhibit Sprint 1.

09:56:37    12          THE COURT:  Okay.  It will be admitted.

09:56:40    13          MS. GUREN:  And, finally, the Government reads -- I'm

09:56:42    14    sorry -- stipulation number 9:

09:56:43    15          It is hereby stipulated and agreed by the United

09:56:46    16    States of America by its attorney, Patrick J. Fitzgerald, the

09:56:50    17    United States Attorney for the Northern District of Illinois,

09:56:52    18    and the defendant, individually and by his attorney, that

09:56:56    19    Government Exhibit Sprint 2 is a true and accurate copy of

09:57:00    20    phone records for the phone number (773) 858-6892 that were

09:57:07    21    made by Sprint Nextel at or near the time of the occurrence of

09:57:10    22    the matters set forth therein, that were kept in the course of

09:57:12    23    regularly conducted business activities, and that were made by

09:57:16    24    Sprint Nextel as part of its regular recordkeeping practice.

09:57:20    25          Government Exhibit Sprint 2 accurately reflects the

* * *REDACTED* * *

* * *REDACTED* * *

859

09:57:22  1  calls made to or from phone number (773) 858-6892 from

09:57:30  2  January 1st, 2007 through January 8th, 2008 and from

09:57:35  3  February 23rd, 2009 through June 14, 2009.

09:57:38  4        So stipulated?

09:57:39  5        MR. RUBINO:  Yes.

09:57:41  6        MS. GUREN:  At this time the Government would move

09:57:43  7  into evidence Government Exhibit Sprint 2.

09:57:45  8        THE COURT:  Okay.  It will be admitted.

09:57:47  9        MS. GUREN:  At this time the Government calls Sean

09:57:50  10 Geraghty to the stand.

09:58:07  11       (Witness takes the stand.)

09:58:07  12       THE COURT:  Please raise your right hand.

09:58:09  13       (The witness was sworn.)

09:58:13  14       THE COURT:  Okay.  Have a seat.

09:58:15  15       MS. GUREN:  And, your Honor, we actually also have

09:58:18  16 summary binders to pass out.

09:58:20  17       THE COURT:  Okay.  Marty, could you please help them

09:58:23  18 pass that out?

09:58:25  19       THE COURT SECURITY OFFICER:  Sure.

09:58:25  20       THE COURT:  Thank you.

09:58:25  21                    - - -

09:58:25  22          SEAN GERAGHTY, DIRECT EXAMINATION

09:58:25  23 BY MS. GUREN:

09:59:01  24 Q.  Please state your name and spell your last name.

09:59:02  25 A.  Sean Geraghty, G-e-r-a-g-h-t-y.


* * *REDACTED* * *

* * *REDACTED* * *

860

| | | |
|---|---|---|
| 09:59:06 | 1 | Q. Where do you work? |
| 09:59:07 | 2 | A. I work for Chicago High Intensity Drug Trafficking Areas. |
| 09:59:11 | 3 | Q. Is that sometimes referred to as HIDTA? |
| 09:59:14 | 4 | A. Yes, it is. |
| 09:59:14 | 5 | Q. What is HIDTA? |
| 09:59:15 | 6 | A. HIDTA is a task force agency made up of FBI agents, DEA |
| 09:59:21 | 7 | agents, Chicago police, all sorts of law enforcement agencies. |
| 09:59:26 | 8 | Q. What is your position at HIDTA? |
| 09:59:28 | 9 | A. I'm an intel analyst. |
| 09:59:29 | 10 | Q. What is -- and does intel stand for intelligence? |
| 09:59:32 | 11 | A. Sorry.  Intelligence analyst, yes. |
| 09:59:35 | 12 | Q. How long have you been an intelligence analyst at HIDTA? |
| 09:59:38 | 13 | A. Eight years now. |
| 09:59:39 | 14 | Q. Before you were an intelligence analyst at HIDTA, what job |
| 09:59:42 | 15 | did you have? |
| 09:59:42 | 16 | A. I worked for TCF Bank.  I was fraud prevention. |
| 09:59:46 | 17 | Q. Did you receive any special training to become an |
| 09:59:49 | 18 | intelligence analyst? |
| 09:59:50 | 19 | A. Yes.  When I first started, I took a two-week fleet course |
| 09:59:56 | 20 | down in Missouri, which basically taught me law enforcement |
| 10:00:01 | 21 | law and what I'd be doing as an intelligence analyst. |
| 10:00:06 | 22 | I also had training with FINCEN and Pen-Link advance, |
| 10:00:11 | 23 | Pen-Link basic. |
| 10:00:12 | 24 | Q. What's Pen-Link? |
| 10:00:14 | 25 | A. Pen-Link is a phone database that we use at the HIDTA to |

***REDACTED***

861

10:00:20  1  analyze phone records.

10:00:20  2  Q.  What are your responsibilities as an intelligence analyst?

10:00:25  3  A.  I analyze phone records, financial documents, assist law

10:00:31  4  enforcement in identifying subjects and criminal backgrounds,

10:00:37  5  that type of stuff.

10:00:38  6  Q.  At this time I'm going to hand you a set of exhibits that

10:00:40  7  I'm going to be asking you to refer to throughout your

10:00:44  8  testimony.  I'm going to hand you Government Exhibit Summary

10:00:47  9  4-A and 4-B, as well as Sprint 1 and Sprint 2.

10:01:04  10      Turning to the records in Government Exhibit

10:01:09  11  Sprint 1, did you review those records?

10:01:14  12  A.  Yes, I did.

10:01:16  13  Q.  What are those records?

10:01:18  14  A.  These are phone call detail records on phone number

10:01:27  15  (773) 858-6892.

10:01:31  16      MS. GUREN:  Your Honor, permission to publish

10:01:33  17  Government Exhibit Sprint 1?

10:01:34  18      THE COURT:  Sure.

10:01:36  19  BY MS. GUREN:

10:01:37  20  Q.  I'm going to show you Government Exhibit Sprint 1, page

10:01:45  21  PRECS, underscore, 003, underscore, 0804, and I just want to

10:01:52  22  magnify for you that top part.

10:01:54  23      Who does it show is the subscriber for this phone

10:01:57  24  number?

10:01:58  25  A.  Rodney Carter, 1115 Harding Avenue, Calumet City,

***REDACTED***

* * *REDACTED* * *

862

10:02:06  1  Illinois.

10:02:06  2        MS. GUREN:  And, your Honor, permission to publish

10:02:09  3  Government Exhibit Mortgage 1?

10:02:10  4        THE COURT:  Sure.

10:02:12  5  BY MS. GUREN:

10:02:12  6  Q.  I'm now going to show you Government Exhibit Mortgage 1,

10:02:15  7  page FIN, underscore, 9, underscore, 2278.  And looking at

10:02:22  8  this -- is this a document that you saw previous to your

10:02:25  9  testimony?

10:02:26  10  A.  Yes, it is.

10:02:26  11  Q.  Does the top of that document read, Borrower's new

10:02:32  12  residential telephone number confirmation?

10:02:32  13  A.  Yes, it does.

10:02:36  14  Q.  Who does it list for the borrower's name?

10:02:36  15  A.  Ron Collins.

10:02:37  16  Q.  What new home phone number does it list?

10:02:39  17  A.  (773) 858-6892.

10:02:42  18  Q.  Is that the same phone number in the Sprint records?

10:02:45  19  A.  Yes, it is.

10:02:46  20  Q.  Turning to the bottom part, is there a signature there?

10:02:50  21  A.  Yes.

10:02:50  22  Q.  And what is the date under the signature?

10:02:53  23  A.  December 8th, 2006.

10:03:02  24  Q.  Did you also review records contained in Government

10:03:08  25  Exhibit Sprint 2?

* * *REDACTED* * *

***REDACTED***

863

| | | |
|---|---|---|
| 10:03:08 | 1 | A.  Yes, I did. |
| 10:03:08 | 2 | Q.  What are those records? |
| 10:03:11 | 3 | A.  Phone records, call detail records on the -- I believe |
| 10:03:19 | 4 | it's the same phone number.  Let me ... |
| 10:03:23 | 5 | This is call detail records and also pen register |
| 10:03:27 | 6 | records for (773) 858-6892. |
| 10:03:31 | 7 | Q.  And is that the same number for Government Exhibit |
| 10:03:33 | 8 | Sprint 1? |
| 10:03:33 | 9 | A.  Yes, it is. |
| 10:03:34 | 10 | Q.  Did you create a summary chart summarizing these phone |
| 10:03:38 | 11 | records? |
| 10:03:38 | 12 | A.  Yes, I did. |
| 10:03:40 | 13 | Q.  Handing you -- I think, actually, what's before you right |
| 10:03:43 | 14 | now, is Government Exhibit Summary 4-A.  I know I've given you |
| 10:03:50 | 15 | a lot of Redwells. |
| 10:03:52 | 16 | A.  That's okay. |
| 10:03:54 | 17 | Q.  Do you recognize Government Exhibit Summary 4-A? |
| 10:03:57 | 18 | A.  Yes, I do. |
| 10:03:58 | 19 | Q.  Is this the chart that you prepared from your review of |
| 10:04:01 | 20 | Government Exhibit Sprint 1 and Sprint 2? |
| 10:04:04 | 21 | A.  Yes, it is. |
| 10:04:04 | 22 | Q.  What does Government Exhibit 4-A summarize about those |
| 10:04:09 | 23 | records? |
| 10:04:09 | 24 | A.  It is the phone calls between (414) 807-1085 and |
| 10:04:16 | 25 | (773) 858-6892. |

* * *REDACTED* * *

864

| | |
|---|---|
| 10:04:19 | 1 |
| 10:04:22 | 2 |
| 10:04:28 | 3 |
| 10:04:29 | 4 |
| 10:04:31 | 5 |
| 10:04:32 | 6 |
| 10:04:33 | 7 |
| 10:04:39 | 8 |
| 10:04:44 | 9 |
| 10:04:45 | 10 |
| 10:04:48 | 11 |
| 10:04:55 | 12 |
| 10:04:56 | 13 |
| 10:04:57 | 14 |
| 10:05:02 | 15 |
| 10:05:03 | 16 |
| 10:05:05 | 17 |
| 10:05:05 | 18 |
| 10:05:05 | 19 |
| 10:05:10 | 20 |
| 10:05:12 | 21 |
| 10:05:12 | 22 |
| 10:05:15 | 23 |
| 10:05:20 | 24 |
| 10:05:21 | 25 |

Q.  Just to clarify, do you know from your personal knowledge
who used the phone number (414) 807-1085?

A.  No, I do not.

Q.  Are you familiar with the area code 414?

A.  Yes, I am.

Q.  What area code is that for?

A.  Milwaukee, Wisconsin.

Q.  Based on your review of Government Exhibit Sprint 1 and
Sprint 2, does the summary chart, Government Exhibit
Summary 4-A, accurately summarize calls between (414) 807-1085
and (773) 858-6892 contained in Sprint 1 and Sprint 2?

A.  Yes, it does.

        MS. GUREN:  At this time the Government would move
into evidence Government Exhibit Summary 4-A.

        THE COURT:  That's fine.

        MS. GUREN:  May we have permission to publish it to
the jury?

        THE COURT:  You may.

        MS. GUREN:  And I believe the jury has binders with
the summary chart.  May the jury look at Government Exhibit
Summary 4-A and 5-A.

        THE COURT:  Oh, and it matches, so, yes, you may.
Turn to Summary 4-A.

BY MS. GUREN:

Q.  And I'm going to show you on your screen -- but you also

* * *REDACTED* * *

***REDACTED***

865

| | |
|---|---|
| 10:05:23 | 1 |
| 10:05:26 | 2 |
| 10:05:28 | 3 |
| 10:05:29 | 4 |
| 10:05:31 | 5 |
| 10:05:33 | 6 |
| 10:05:36 | 7 |
| 10:05:38 | 8 |
| 10:05:41 | 9 |
| 10:05:43 | 10 |
| 10:05:46 | 11 |
| 10:05:47 | 12 |
| 10:05:50 | 13 |
| 10:05:55 | 14 |
| 10:05:59 | 15 |
| 10:06:00 | 16 |
| 10:06:02 | 17 |
| 10:06:03 | 18 |
| 10:06:08 | 19 |
| 10:06:13 | 20 |
| 10:06:16 | 21 |
| 10:06:17 | 22 |
| 10:06:22 | 23 |
| 10:06:24 | 24 |
| 10:06:25 | 25 |

1   have it before you in hard copy -- is this the summary chart

2   that you created?

3   A.  Yes, it is.

4   Q.  I want to go through the organization of it.

5            Can you tell me what you meant by date when you have

6   that as a column heading?

7   A.  That was the date that the phone call was placed.

8   Q.  What does the column heading time refer to?

9   A.  The time that the phone call was placed.

10  Q.  Is that time in twelve-hour time or 24-hour time?

11  A.  24-hour time.

12  Q.  What does the column heading duration refer to?

13  A.  That is the -- how long the phone call took.

14  Q.  Do certain of these column rows show whole minutes?

15  A.  Yes, they do.

16  Q.  Is that -- what is your understanding of why they are in

17  whole minutes?

18  A.  Basically, just because certain phone companies will bill

19  a phone call in whole minutes.  So if it's a 30-second phone

20  call, they'll round it up to the nearest minute, so it would

21  be one minute long.

22  Q.  Are there also durations in here that are for longer than

23  one minute?

24  A.  Yes, there is [sic].

25  Q.  I'm not -- I'm sorry.  Not whole numbers.  I should ask

* * *REDACTED* * *

866

10:06:29  1   that differently.  Let me rephrase.

10:06:31  2          Are there also rows in here where you have durations

10:06:34  3   that are not in whole numbers?

10:06:36  4   A.  Oh, yes, there are.

10:06:38  5   Q.  And is that records that came from the pen data, as

10:06:42  6   opposed to the telephone records?

10:06:44  7   A.  Yes.

10:06:44  8   Q.  Turning to the next column that you have the heading

10:06:47  9   target phone, what does that refer to?

10:06:49  10  A.  That is the phone number that I took the analysis from

10:06:53  11  that I did my analysis with, from Government Exhibits Sprint 1

10:06:58  12  and 2.

10:06:59  13  Q.  Why did you choose the adjective target for target phone?

10:07:03  14  A.  That is the phone number where the phone records came

10:07:06  15  from.

10:07:06  16  Q.  Turning to the column heading that says direction, what

10:07:09  17  does that refer to?

10:07:10  18  A.  That's showing that the phone call is an incoming call or

10:07:16  19  an outgoing phone call.

10:07:18  20  Q.  And would that be an incoming call to the target phone

10:07:21  21  number?

10:07:22  22  A.  Correct.

10:07:22  23  Q.  Turning to the next heading that says number dialed, what

10:07:26  24  does that refer to?

10:07:27  25  A.  That's the phone number that the phone call came -- it was

* * *REDACTED* * *

867

10:07:31  1  an incoming or outgoing phone call to, or from.

10:07:34  2  Q.  -- summary chart is it always that number (414) 807-1085?

10:07:41  3  A.  Yes, it is.

10:07:41  4  Q.  In the last column, you've entitled it source exhibit.

10:07:43  5  What does source exhibit mean?

10:07:44  6  A.  That's basically showing where I got the analysis from, if

10:07:49  7  it was from Exhibit Sprint 1 or Sprint 2.

10:07:53  8  Q.  Could the jury go back to Sprint 1 or Sprint 2 and find

10:07:56  9  the information that you put in your summary chart?

10:07:59  10  A.  Yes, it can.

10:08:00  11  Q.  For the date range do these records start being summarized

10:08:05  12  on January 15, 2007?

10:08:07  13  A.  Yes, it does.

10:08:08  14  Q.  Turning to page 4 of this summary chart, is the last date

10:08:15  15  of this date range June 8th, 2009?

10:08:22  16  A.  Yes, it is.

10:08:23  17  Q.  What was the total number of calls that were between these

10:08:27  18  two phone numbers for this length of time in Government

10:08:30  19  Exhibit Sprint 1 and Sprint 2?

10:08:32  20  A.  153 phone calls.

10:08:34  21  Q.  I notice that you have breaks on this last page.  What do

10:08:38  22  these breaks refer to?

10:08:40  23  A.  They represent phone data that we do not have for that

10:08:46  24  time period.

10:08:47  25  Q.  So the phone records from January 8th, 2008 to

* * *REDACTED* * *

***REDACTED***

868

| | |
|---|---|
| 10:08:52 | 1 |

10:08:52    1   October 14th, 2008, you didn't have in your possession?

10:08:56    2   A.  No, I did not.

10:09:01    3   Q.  Now, I want to turn your attention to Government Exhibit

10:09:05    4   Summary 4-B.  Did you make a second summary based on your

10:09:09    5   review of Government Exhibit Sprint 1 and Sprint 2?

10:09:13    6   A.  Yes, I did.

10:09:14    7   Q.  And for that did you assist in creating a chart?

10:09:18    8   A.  Yes, I did.

10:09:18    9   Q.  Did you review it for accuracy?

10:09:20   10   A.  Yes, I did.

10:09:21   11   Q.  Looking at Government Exhibit Summary 4-B, is that the

10:09:24   12   chart that you prepared from your review of Government Exhibit

10:09:28   13   Sprint 1 and Sprint 2?

10:09:30   14   A.  Yes, it is.

10:09:31   15   Q.  What did that chart summarize?

10:09:33   16   A.  This is the total calls per month between (414) 807-1085

10:09:39   17   and (773) 858-6892.

10:09:42   18   Q.  Does Government Exhibit Summary Chart 4-B accurately

10:09:45   19   summarize those calls from Government Exhibits Sprint 1 and

10:09:49   20   Sprint 2?

10:09:50   21   A.  Yes, it does.

10:09:50   22          MS. GUREN:  We would move Government Exhibit Summary

10:09:54   23   Chart 4-B into evidence.

10:09:54   24          THE COURT:  Okay.  It will be admitted.

10:09:55   25          MS. GUREN:  Permission to publish?


***REDACTED***

***REDACTED***

869

10:09:56    1    THE COURT: Sure. Folks, you can turn to 4-B now in

10:09:58    2    your binder.

10:10:00    3    BY MS. GUREN:

10:10:01    4    Q. Showing you on your screen and before you in that folder,

10:10:04    5    is this the summary chart that you created?

10:10:07    6    A. Yes, it is.

10:10:08    7    Q. How is this chart organized?

10:10:12    8    A. The first column just shows the month starting at

10:10:15    9    January 2007 and ending June of 2009, and the second column

10:10:20    10    shows how many calls per month.

10:10:23    11    Q. Looking at this chart, I notice that you also have breaks

10:10:27    12    in it. What do those breaks represent?

10:10:29    13    A. They represent the time frame that I did not have for

10:10:34    14    the -- with the call records.

10:10:36    15    Q. You also have an asterisk next to certain months. What do

10:10:42    16    those asterisks represent?

10:10:43    17    A. The records did not include the full month.

10:10:45    18    Q. For these -- for this chart, which month has the highest

10:10:50    19    number of calls?

10:10:52    20    A. That would be January 2008.

10:10:55    21    Q. And is the bottom of total calls, is that the same number

10:10:59    22    that was in your other summary chart?

10:11:01    23    A. Yes, it is.

10:11:01    24    Q. What number is that for total amount of calls?

10:11:04    25    A. 153.

***REDACTED***

870

| | | |
|---|---|---|
| 10:11:06 | 1 | MS. GUREN:  May I have a moment, your Honor? |
| 10:11:07 | 2 | THE COURT:  You may. |
| 10:11:10 | 3 | MS. GUREN:  No further questions. |
| 10:11:11 | 4 | THE COURT:  Okay.  Mr. Rubino, any cross? |
| 10:11:11 | 5 | - - - |
| 10:11:11 | 6 | SEAN GERAGHTY, CROSS-EXAMINATION |
| 10:11:11 | 7 | BY MR. RUBINO: |
| 10:11:21 | 8 | Q.  Good morning, sir. |
| 10:11:21 | 9 | A.  Good morning. |
| 10:11:26 | 10 | Q.  Sir, these summary exhibits, specifically 4-A, it shows |
| 10:11:34 | 11 | calls made to and received from (414) 807-1085 to |
| 10:11:45 | 12 | (773) 858-6982, right? |
| 10:11:48 | 13 | A.  That's correct. |
| 10:11:49 | 14 | Q.  Now, sir, other calls were made from and received by the |
| 10:11:57 | 15 | 414 number besides these calls, correct? |
| 10:12:00 | 16 | A.  That is correct. |
| 10:12:01 | 17 | Q.  But you didn't put those on this chart; am I correct? |
| 10:12:07 | 18 | A.  Yes, you are correct. |
| 10:12:08 | 19 | Q.  And with respect to the 773 number, other calls were made |
| 10:12:12 | 20 | by that number outgoing and other calls were received incoming |
| 10:12:17 | 21 | by that number which are not reflected on this chart; am I |
| 10:12:21 | 22 | correct? |
| 10:12:22 | 23 | A.  That's correct. |
| 10:12:23 | 24 | Q.  Now, looking at page 1 of the summary, 4-A, with the |
| 10:12:30 | 25 | exception of 8/16/07, that date, every single call is exactly |

***REDACTED***

* * *REDACTED* * *

871

| | | |
|---|---|---|
| 10:12:38 | 1 | one minute.  Is that not true? |
| 10:12:44 | 2 | A.  Not exactly one minute.  If you go further, like |
| 10:12:50 | 3 | November 12th of 2007, there's -- |
| 10:12:51 | 4 | Q.  No.  I'm sorry to interrupt you. |
| 10:12:53 | 5 | A.  Okay. |
| 10:12:54 | 6 | Q.  I'm talking about page 1 only. |
| 10:12:57 | 7 | A.  Oh, I'm sorry, yes. |
| 10:12:59 | 8 | Q.  1/15 through 9/2/07.  We'll do page 2 next. |
| 10:13:03 | 9 | A.  Okay. |
| 10:13:03 | 10 | Q.  Page 1, every single call, with the exception of 8/16/07, |
| 10:13:08 | 11 | which is a two-minute call, every call is one minute? |
| 10:13:10 | 12 | A.  That's correct. |
| 10:13:11 | 13 | Q.  Now, was the call exactly one minute or is that the way |
| 10:13:16 | 14 | Sprint billed? |
| 10:13:16 | 15 | A.  That's the way it bills. |
| 10:13:17 | 16 | Q.  So, in other words, these could have been a 59-second |
| 10:13:20 | 17 | call, a 30-second call, but they are shown at one minute? |
| 10:13:24 | 18 | A.  That's correct. |
| 10:13:25 | 19 | Q.  That doesn't necessarily mean the conversation lasted one |
| 10:13:28 | 20 | minute, does it? |
| 10:13:29 | 21 | A.  No. |
| 10:13:31 | 22 | Q.  Now, turning over to the second page now, I notice it |
| 10:13:36 | 23 | stays that way until we reach 11/12/07.  Then we see |
| 10:13:43 | 24 | increments in seconds for the rest of the page; am I correct? |
| 10:13:49 | 25 | A.  Yes, that's correct. |

***REDACTED***

872

| | | |
|---|---|---|
| 10:13:50 | 1 | Q. What's the reason for that? |
| 10:13:52 | 2 | A. Because that was taken from -- taken from pen register |
| 10:13:57 | 3 | data. And so it is given an exact time when -- or how long |
| 10:14:01 | 4 | the exact phone call took place. |
| 10:14:12 | 5 | Q. There was a pen register on 414 or 773? |
| 10:14:23 | 6 | A. I believe it was 773. |
| 10:14:28 | 7 | Q. Okay. Now, the next page, the third page, again, are |
| 10:14:34 | 8 | exact amounts, correct? |
| 10:14:37 | 9 | A. That is correct. |
| 10:14:39 | 10 | Q. And the fourth page also, correct? |
| 10:14:43 | 11 | A. That is correct. |
| 10:14:45 | 12 | MR. RUBINO: Okay. I have nothing further. Thank |
| 10:14:46 | 13 | you. |
| 10:14:46 | 14 | THE COURT: Okay. Any redirect? |
| 10:14:48 | 15 | MS. GUREN: Yes, your Honor. |
| 10:14:49 | 16 | - - - |
| 10:14:49 | 17 | SEAN GERAGHTY, REDIRECT EXAMINATION |
| 10:14:49 | 18 | BY MS. GUREN: |
| 10:14:51 | 19 | Q. Just to clarify. Sprint 1 and 2, those are records for |
| 10:14:54 | 20 | the 773 number, correct? |
| 10:14:56 | 21 | A. That's correct. |
| 10:14:57 | 22 | Q. You didn't -- did you have records for 414 to analyze? |
| 10:15:01 | 23 | A. No, I did not. |
| 10:15:02 | 24 | Q. So you didn't -- so when you testified as to whether or |
| 10:15:05 | 25 | not there's other calls for 414, that's an assumption? |

***REDACTED***

* * *REDACTED* * *

873

| | | |
|---|---|---|
| 10:15:09 | 1 | A.  That's correct. |
| 10:15:10 | 2 | Q.  But for 773 there were other calls? |
| 10:15:13 | 3 | A.  Yes.  That's the phone analysis I took it from. |
| 10:15:16 | 4 | Q.  For -- you talked about it being a pen register. |
| 10:15:19 | 5 | A.  Yes. |
| 10:15:19 | 6 | Q.  What is a pen register? |
| 10:15:21 | 7 | A.  It's basically phone data that's taken directly from the |
| 10:15:28 | 8 | phone company that's brought into our Pen-Link system.  So |
| 10:15:33 | 9 | it'll show like, for instance, it's not just the billing |
| 10:15:36 | 10 | calls.  It'll show the exact phone call, and it's a live -- |
| 10:15:40 | 11 | it's a live system, so ... |
| 10:15:41 | 12 | Q.  So it happens at the time that a call comes through? |
| 10:15:45 | 13 | A.  Correct. |
| 10:15:46 | 14 | MS. GUREN:  No further questions, your Honor. |
| 10:15:47 | 15 | THE COURT:  Anything else? |
| 10:15:47 | 16 | MR. RUBINO:  Nothing further. |
| 10:15:48 | 17 | THE COURT:  Okay.  Sir, you can step down and be |
| 10:15:50 | 18 | excused. |
| 10:16:03 | 19 | (Witness leaves the stand.) |
| 10:16:03 | 20 | THE COURT:  Okay.  Your next witness. |
| 10:16:04 | 21 | MS. GUREN:  Your Honor, we have two more stipulations |
| 10:16:06 | 22 | to read. |
| 10:16:06 | 23 | THE COURT:  Okay. |
| 10:16:07 | 24 | MS. GUREN:  Stipulation number 3:  It is hereby |
| 10:16:10 | 25 | stipulated and agreed by the United States of America by its |

***REDACTED***

874

10:16:15   1   attorney, Patrick J. Fitzgerald, the United States Attorney

10:16:17   2   for the Northern District of Illinois, and the defendant,

10:16:20   3   individually and by his attorneys, that the following facts

10:16:23   4   are true:

10:16:24   5          If called as a witness, a custodian of records for

10:16:27   6   American Family Mutual Insurance Company and American Family

10:16:32   7   Standard Insurance Company would testify that he or she has

10:16:34   8   knowledge of the relevant recordkeeping system and that each

10:16:37   9   of the described records were made or received and maintained

10:16:40  10   in the regular course of business of American Family Mutual

10:16:45  11   Insurance Company and American Family Standard Insurance

10:16:48  12   Company around the time of the transactions reflected in the

10:16:50  13   records, and that it is the regular practice of American

10:16:55  14   Family Mutual Insurance Company and American Family Standard

10:16:57  15   Insurance Company to make or receive such records.

10:16:59  16          A, Government Exhibit Auto 1.

10:17:02  17          So stipulated?

10:17:02  18          MR. RUBINO:  Yes.

10:17:03  19          MS. GUREN:  At this time we would move into evidence

10:17:06  20   Government Exhibit Auto 1.

10:17:07  21          THE COURT:  It will be admitted.

10:17:08  22          MS. GUREN:  Stipulation 11 -- yeah, Stipulation 11:

10:17:14  23          It is hereby stipulated and agreed by the United

10:17:18  24   States of America by its attorney, Patrick J. Fitzgerald, the

10:17:22  25   United States Attorney for the Northern District of Illinois,

***REDACTED***

10:17:24  1   and the defendant, individually and by his attorney, that the

10:17:27  2   following facts are true:

10:17:28  3            Ron Collins' Social Security number ends with 7258.

10:17:34  4            Ron Collins used the address ███████████████

10:17:39  5   ████████  in Calumet Park, Illinois as a mailing address.

10:17:41  6            So stipulated?

10:17:42  7            MR. RUBINO:  Yes.

10:17:44  8            MS. GUREN:  At this time the Government calls Bruce

10:17:47  9   Killian.

10:17:48  10           THE COURT:  Okay.

10:18:04  11           (Witness takes the stand.)

10:18:08  12           THE COURT:  Right here, sir.

10:18:09  13           Please raise your right hand.

10:18:12  14           (The witness was sworn.)

10:18:16  15           THE COURT:  Okay.  Have a seat.

10:18:21  16                              - - -

10:18:21  17             BRUCE KILLIAN, DIRECT EXAMINATION

10:18:21  18   BY MS. GUREN:

10:18:24  19   Q.  Good morning.

10:18:26  20           Can you please state and spell your last name?

10:18:28  21   A.  Bruce Killian, last name K-i-l-l-i-a-n.

10:18:32  22   Q.  Where do you work?

10:18:33  23   A.  I work as a contractor with the U.S. Attorney's Office in

10:18:35  24   Chicago.  I do financial investigations.

10:18:38  25   Q.  How long have you worked as a contractor doing financial

* * *REDACTED* * *

876

10:18:42   1   investigations at the U.S. Attorney's Office?

10:18:44   2   A.  Since September -- I'm sorry -- November 2008.

10:18:47   3   Q.  What type of work agreement do you have with the

10:18:49   4   U.S. Attorney's Office?

10:18:51   5   A.  I'm a contractor.

10:18:53   6   Q.  When does your contract expire?

10:18:55   7   A.  It expires this year in September.

10:18:58   8   Q.  How long was your contract?

10:18:58   9   A.  I had three one-year contracts.

10:19:01  10   Q.  How were you paid for your work?

10:19:03  11   A.  I'm paid by the hour.  I get paid just so much per hour

10:19:07  12   worked.

10:19:07  13   Q.  Just to approximate, how many investigations have you

10:19:09  14   worked on while at the U.S. Attorney's Office being a

10:19:13  15   contractor?

10:19:14  16   A.  Well, in the preliminary stages of most investigations, I

10:19:18  17   do work in commercial databases to identify assets that might

10:19:23  18   be available for forfeiture.  And then in some investigations

10:19:27  19   I get into more detailed analysis of accounting records,

10:19:32  20   loans, documents of a financial nature.

10:19:34  21   Q.  For those more detailed investigations where you get into

10:19:37  22   more financial analysis, about how many investigations have

10:19:40  23   you worked on?

10:19:41  24   A.  I would estimate about ten.

10:19:43  25   Q.  What are your responsibilities as -- for your work?

* * *REDACTED* * *

| | | |
|---|---|---|
| 10:19:47 | 1 | A.  My responsibilities include identifying assets for |
| 10:19:51 | 2 | forfeiture, identifying real estate that might be owned by |
| 10:19:55 | 3 | some people under investigation, analyzing accounting records, |
| 10:20:02 | 4 | analysis on mortgage files, documents that might be contained |
| 10:20:07 | 5 | in various financial records. |
| 10:20:09 | 6 | Q.  What position did you have before becoming a contractor |
| 10:20:12 | 7 | for the U.S. Attorney's Office? |
| 10:20:14 | 8 | A.  I was an internal revenue agent for about 38 years. |
| 10:20:18 | 9 | Q.  What were your responsibilities as an internal revenue |
| 10:20:21 | 10 | agent? |
| 10:20:21 | 11 | A.  In general, internal revenue agents conduct examinations |
| 10:20:24 | 12 | of taxpayers, individuals, and various business entities to |
| 10:20:29 | 13 | determine the correct tax liability. |
| 10:20:32 | 14 | Q.  What is your formal educational background? |
| 10:20:34 | 15 | A.  I have a degree in accounting from the University of |
| 10:20:37 | 16 | Illinois in Chicago. |
| 10:20:38 | 17 | Q.  Are you licensed in any field? |
| 10:20:41 | 18 | A.  Yes.  I'm a licensed certified public accountant in |
| 10:20:45 | 19 | Illinois. |
| 10:20:45 | 20 | Q.  After finishing your formal training, did you complete any |
| 10:20:48 | 21 | training courses? |
| 10:20:50 | 22 | A.  At the IRS we continually had training to update our |
| 10:20:54 | 23 | knowledge of the current tax law, changes in the tax law, and |
| 10:20:58 | 24 | refresher information on things that are important to -- in |
| 10:21:04 | 25 | the tax law. |

* * *REDACTED* * *

878

10:21:05  1  Q.  Now, you've talked about your responsibilities using a

10:21:07  2  bunch of terms.  In just layman's terms, what are you doing

10:21:12  3  when you do your financial analysis?

10:21:13  4  A.  I'm trying to follow the money trail.

10:21:16  5  Q.  In the course of your work, do you look at voluminous

10:21:19  6  financial records?

10:21:20  7  A.  I do.

10:21:21  8  Q.  What types of financial records?

10:21:24  9  A.  Bank statements, loan documents, mortgage files tend to be

10:21:29  10  quite thick.  I do -- I seem to do a lot of real estate

10:21:33  11  research where I have access to the public databases and

10:21:37  12  develop information on real estate owned by subjects and try

10:21:43  13  to trace the ownership of cars, vehicles that might be owned.

10:21:47  14  Q.  Have you studied financial exhibits for this

10:21:50  15  investigation?

10:21:50  16  A.  I have.

10:21:52  17  Q.  What types of records are those?

10:21:55  18  A.  Bank statements, there's canceled checks for a bank

10:22:01  19  account, deposit items, checks deposited, withdrawals from the

10:22:07  20  bank account, loan documents including mortgage files, loans

10:22:11  21  for vehicles, loans -- insurance documents, that's about it.

10:22:19  22  Q.  Did you also look at credit card statements too?

10:22:22  23  A.  Yes, credit card statements.

10:22:23  24  Q.  Have you prepared a number of charts summarizing

10:22:25  25  information from these financial exhibits?

* * *REDACTED* * *

879

10:22:27  1   A.  I have.

10:22:28  2   Q.  Will you be giving any opinions or reaching any

10:22:31  3   conclusions with regard to those summaries?

10:22:34  4   A.  No.  They are just summaries I put in a format that might

10:22:38  5   be easier to understand for the Court.

10:22:40  6   Q.  I'm going to at this time hand you two boxes of financial

10:22:43  7   exhibits as well as Government Exhibit 3-A through 3-K.

10:22:57  8          I -- upon good advice from my co-counsel, so I don't

10:22:59  9   have to carry these boxes over to you, do you mind stepping

10:23:03  10  down to this table and just looking through these documents to

10:23:06  11  see whether or not these are the files that you reviewed in

10:23:09  12  terms of your analysis?  And then if you do need to refer to

10:23:13  13  them, I will hand them to you.

10:23:16  14  A.  (Complying.)

10:24:32  15  Q.  You've just stepped down to review a bunch of financial

10:24:36  16  exhibits.  Are these the financial exhibits that you relied on

10:24:39  17  for your summary charts?

10:24:40  18  A.  I have reviewed all of those, yes.

10:24:42  19  Q.  Among the records you reviewed, did you review the records

10:24:46  20  contained in Government Exhibit Chase 5?

10:24:53  21  A.  Yes.

10:24:54  22  Q.  What are the records in that exhibit?

10:24:56  23  A.  That would be the bank account that Mr. Collins opened at

10:25:02  24  Chase Bank.  The records include a signature card that

10:25:04  25  identified Mr. Collins by name and address, bank statements,

10:25:09   1   canceled checks, items of withdrawal, deposit items that
10:25:14   2   include the cash deposited, and there's one cashier's check.
10:25:22   3   Q.  Is that account a checking account?
10:25:25   4   A.  It's a checking account, yes.
10:25:27   5   Q.  Have you created a summary chart into [sic] Government
10:25:32   6   Exhibit 3-A?
10:25:32   7   A.  I have.
10:25:33   8   Q.  I'm sorry.  In Government Exhibit 3-A?
10:25:35   9   A.  Yes.
10:25:36  10   Q.  Looking at Government Exhibit Summary 3A that I've handed
10:25:41  11   up to you, is that the chart that you prepared for all the
10:25:44  12   deposits from that bank account record in Government
10:25:49  13   Exhibit Chase 5?
10:25:50  14   A.  Yes.
10:25:52  15   Q.  Have you reviewed this chart and underlying documents in
10:25:55  16   preparation for your testimony?
10:25:56  17   A.  I have.
10:25:57  18   Q.  Based on Government Exhibit Chase 5, does the summary
10:26:00  19   chart, Government Exhibit Summary 3A, accurately summarize
10:26:04  20   deposits into the Chase Bank checking account?
10:26:07  21   A.  I believe it does.
10:26:08  22          MS. GUREN:  At this time we would move into evidence
10:26:10  23   Government Exhibit Summary 3A.
10:26:11  24          THE COURT:  Okay.  It will be admitted.
10:26:14  25          MS. GUREN:  Permission to publish to the jury?

***REDACTED***

| | |
|---|---|
| 10:26:16 | 1 |
| 10:26:18 | 2 |
| 10:26:26 | 3 |
| 10:26:27 | 4 |
| 10:26:29 | 5 |
| 10:26:31 | 6 |
| 10:26:37 | 7 |
| 10:26:42 | 8 |
| 10:26:43 | 9 |
| 10:26:47 | 10 |
| 10:26:51 | 11 |
| 10:26:52 | 12 |
| 10:26:55 | 13 |
| 10:26:58 | 14 |
| 10:27:00 | 15 |
| 10:27:04 | 16 |
| 10:27:07 | 17 |
| 10:27:11 | 18 |
| 10:27:15 | 19 |
| 10:27:16 | 20 |
| 10:27:19 | 21 |
| 10:27:23 | 22 |
| 10:27:23 | 23 |
| 10:27:26 | 24 |
| 10:27:27 | 25 |

1      THE COURT:  Sure.  And you can turn to this one now
2  in your binders, folks.
3  BY MS. GUREN:
4  Q.  Mr. Killian, I'm going to show you on the screen -- but
5  you also have in hard copies before you -- the first page of
6  Government Exhibit Summary 3A.  Looking at the column
7  headings, can you go through what you meant by each of the
8  headings?
9  A.  I can.  The first column to the left is the date.  That
10  would be the adds as reflected on the bank statement by the
11  bank.
12  Q.  What does the total deposit refer to?
13  A.  That would be the total amount deposited on that
14  particular day for that particular deposit.
15  Q.  Then there's the cash deposited and the checks deposited
16  columns.  What do those two columns refer to?
17  A.  I categorize the deposits into two types.  The cash
18  deposited, which is the next column, and checks deposited into
19  the account.
20  Q.  So will the columns cash deposited and checks deposited
21  add up to the total deposit column?
22  A.  They should.
23  Q.  Turning to the next column, check payors, what does that
24  refer to?
25  A.  If there was a check deposited, that would be the maker of

***REDACTED***

* * *REDACTED* * *

882

10:27:30   1   the check that was payable to Mr. Collins or whoever -- there

10:27:34   2   were others, so, yes, that's the maker.

10:27:37   3   Q.  What does the check memo column refer to?

10:27:40   4   A.  If there was a memo comment on the check, that would be

10:27:44   5   listed there.

10:27:46   6   Q.  For the date column, is the date in chronological order?

10:27:51   7   A.  I believe it is.

10:27:52   8   Q.  What is the date range for this summary chart that you've

10:27:56   9   created?

10:27:57   10   A.  March 14th, 2006 to May 19th, 2009.

10:28:06   11   Q.  Turning to the last page of this exhibit, which is page 3,

10:28:14   12   I notice that you've got some additional notations at the

10:28:20   13   bottom.  You have a line that says less, and then it says cash

10:28:27   14   withdrawals Government Exhibit 3-B.  And you have also cash

10:28:33   15   withdrawals, withdrawn Double R Construction and cash received

10:28:36   16   from Government Exhibit Chase 4.  Just in general, what does

10:28:40   17   this section represent?

10:28:41   18   A.  I was trying to account for the cash that I could find

10:28:45   19   that Mr. Collins took out of -- got from various sources that

10:28:50   20   could have been redeposited into the bank account or used to

10:28:53   21   pay some of the expenses or expenditures that are detailed in

10:28:57   22   later schedules.

10:28:58   23   Q.  So was this done just to make sure that your chart was

10:29:02   24   conservative?

10:29:03   25   A.  Yes.

* * *REDACTED* * *

***REDACTED***

| | |
|---|---|
| 10:29:03 | 1 |
| 10:29:06 | 2 |
| 10:29:07 | 3 |
| 10:29:10 | 4 |
| 10:29:13 | 5 |
| 10:29:18 | 6 |
| 10:29:22 | 7 |
| 10:29:26 | 8 |
| 10:29:28 | 9 |
| 10:29:32 | 10 |
| 10:29:34 | 11 |
| 10:29:38 | 12 |
| 10:29:41 | 13 |
| 10:29:42 | 14 |
| 10:29:46 | 15 |
| 10:29:47 | 16 |
| 10:29:52 | 17 |
| 10:29:55 | 18 |
| 10:29:56 | 19 |
| 10:30:01 | 20 |
| 10:30:03 | 21 |
| 10:30:05 | 22 |
| 10:30:08 | 23 |
| 10:30:11 | 24 |
| 10:30:12 | 25 |

Q. For the first line, cash withdrawals Government Exhibit 3-B, what does that refer to?

A. Government Exhibit 3-B is a schedule of all the withdrawals from this same checking account.

Q. What is cash withdrawn Double R Construction refer to?

A. Mr. Collins started a -- well, he opened a bank account at Chase Bank, I believe, in September of 2009 for a company called Double R Construction.

Q. Do you know whether or not that company exists?

A. I just know about the bank account.

Q. For Double -- and for Double R Construction, did you then put the amount of cash that was withdrawn from that account?

A. I did.

Q. For cash received from Government Exhibit Chase 4, what does that refer to?

A. Mr. Collins received a $2,000 cash advance on a credit card, a Chase credit card, so that was cash that he had available to him.

Q. I also notice that at the bottom you have notes where you have, Deposited checks were payable to Ron Collins unless noted. What does that mean?

A. That means if there was a check that was deposited into the bank account, the maker of the check had made it payable to Ron Collins.

Q. There's also a double asterisk where it says, Deposit slip

* * *REDACTED* * *

884

10:30:16  1  only.  What does that refer to?

10:30:17  2  A.  The bank for four, five deposits could not supply a copy

10:30:23  3  of what's usually known as the cash confirmation slip or a

10:30:28  4  cash-in slip for the bank.  So all that I have for that

10:30:32  5  deposit item is a copy of the deposit slip indicating that

10:30:37  6  cash was deposited, because cash goes on the first line of the

10:30:40  7  deposit slip.

10:30:41  8  Q.  So turning to page 2 of Government Exhibit 3-A and just

10:30:45  9  looking at the bottom section where it shows the dates

10:30:49  10  March 2nd, 2009, and March 25th, 2009, and April 29, 2009,

10:30:54  11  with those double asterisks, are those times where there was

10:30:58  12  not that cash confirmation notice, but there was a deposit

10:31:03  13  slip that said there was cash on it?

10:31:05  14  A.  That's correct.

10:31:10  15  Q.  Turning to the first page of that exhibit, on this very

10:31:15  16  first line where it says March 14, 2006, you've got cash

10:31:20  17  deposited with a parenthetical, and then a check deposited and

10:31:25  18  a check payor of Luxury Motors of Orland Park.  What does that

10:31:30  19  parenthetical around the 500 refer to?

10:31:32  20  A.  That total check was for $1626.69.  The net deposit to

10:31:37  21  this account was $500 less.  That $500 went to a savings

10:31:43  22  account that Mr. Collins had at the same bank.  So in the

10:31:46  23  negative means that subtraction of cash.

10:31:53  24  Q.  Now, going to page 2 again.  You've got on line

10:32:01  25  February 27, 2009 a $5,000 total deposit and you've got

* * *REDACTED* * *

885

| | | |
|---|---|---|
| 10:32:06 | 1 | unknown in the check payor column.  What does that refer to? |
| 10:32:10 | 2 | A.  For that particular item all there was was a deposit slip |
| 10:32:13 | 3 | with an amount $5,000 at the bottom.  It wasn't denoted cash |
| 10:32:20 | 4 | or checks and the bank didn't supply any additional |
| 10:32:23 | 5 | information.  So I just had it as unscheduled, I couldn't tell |
| 10:32:26 | 6 | what it was. |
| 10:32:26 | 7 | Q.  Starting in about August 4th, 2008, on this second page |
| 10:32:31 | 8 | through the last page, are the only check deposits the ones on |
| 10:32:40 | 9 | September 22nd, 2008 and February 2nd, 2009? |
| 10:32:48 | 10 | A.  February 22nd, 2008 -- |
| 10:32:50 | 11 | Q.  I'm sorry.  September 22nd, 2008 and February 2, 2009, are |
| 10:32:55 | 12 | those the only check deposits? |
| 10:32:57 | 13 | A.  Yes. |
| 10:32:58 | 14 | Q.  After August 4th, 2008? |
| 10:33:00 | 15 | A.  Yes. |
| 10:33:03 | 16 | Q.  Turning now to the very last page, what was the total |
| 10:33:06 | 17 | amount of deposits that you found in this account? |
| 10:33:08 | 18 | A.  The total amount was $145,223.45 for the period that I |
| 10:33:16 | 19 | described. |
| 10:33:17 | 20 | Q.  What was the cash deposits total? |
| 10:33:20 | 21 | A.  $53,800. |
| 10:33:22 | 22 | Q.  And after you took out those cash withdrawals, what was |
| 10:33:25 | 23 | the net cash deposits? |
| 10:33:27 | 24 | A.  $37,105.56. |
| 10:33:30 | 25 | Q.  So is that cash that the defendant had on hand? |

* * *REDACTED* * *

886

10:33:34  1   A.  That's accounting for cash that the defendant used.  That

10:33:38  2   was one -- he used that money to put it in the bank accounts.

10:33:42  3   He had it available and he put it in the bank account.

10:33:46  4   Q.  And what is the total amount of check deposits that are

10:33:48  5   there?

10:33:48  6   A.  $86,423.54.

10:33:53  7   Q.  Now, I want to turn your attention to Government

10:33:57  8   Exhibit Summary 4-B.  Did you create this summary chart?

10:34:06  9   A.  (No response.)

10:34:06  10  Q.  I think I said Government Exhibit 4-B and I meant

10:34:10  11  Government Exhibit Summary 3-B.

10:34:18  12  A.  I did.

10:34:19  13  Q.  What is this chart?

10:34:21  14  A.  This is a summary of the same checking account, all the

10:34:25  15  withdrawals from that account.

10:34:27  16  Q.  What -- did you use Government Exhibit Chase 5 for this

10:34:31  17  summary chart as well?

10:34:33  18  A.  Yes.

10:34:33  19  Q.  Specifically what was the types [sic] of information that

10:34:35  20  you included in this chart?

10:34:37  21  A.  That would be canceled checks, if there were checks that

10:34:42  22  were written, that would be withdrawal slips, if Mr. Collins

10:34:44  23  took cash out of the account.  It would be point of sales,

10:34:51  24  debits where Mr. Collins would have used a debit card at a

10:34:55  25  commercial vendor to make an expense or transfers or fees.

* * *REDACTED* * *

* * *REDACTED* * *

887

10:35:01  1   Q.  Based on Government Exhibit Chase 5, does Government

10:35:05  2   Exhibit Summary 3-B accurately summarize these withdrawals and

10:35:07  3   checks drawn from the Chase checking bank account?

10:35:11  4   A.  I believe it does.

10:35:12  5        MS. GUREN:  At this time we would move Government

10:35:14  6   Exhibit Summary 3-B into evidence.

10:35:15  7        THE COURT:  Okay.  It will be admitted.

10:35:17  8        MS. GUREN:  Permission to publish, your Honor?

10:35:19  9        THE COURT:  Sure.  You can turn to 3-B now, folks, in

10:35:22  10  your binder.

10:35:24  11  BY MS. GUREN:

10:35:25  12  Q.  Now, turning to the first page of this exhibit and going

10:35:28  13  through the organization, what does date, as the column

10:35:33  14  heading, refer to?

10:35:34  15  A.  The date would be the date identified the transaction was

10:35:38  16  posted to Chase Bank.

10:35:39  17  Q.  What does type refer to?

10:35:41  18  A.  I tried to categorize some of the withdrawals into

10:35:44  19  different categories, so I put the different categories I used

10:35:49  20  in that column.

10:35:50  21  Q.  What does amount refer to?

10:35:51  22  A.  That should be the total amount of the withdrawal from the

10:35:54  23  account.

10:35:55  24  Q.  For the next four columns, withdrawal, checks amount, POS

10:36:00  25  debit, transfers, fees, and other, are those then just

* * *REDACTED* * *

888

| | |
|---|---|
| 10:36:03 | 1 |
| 10:36:05 | 2 |
| 10:36:08 | 3 |

1  categories of that amount column?

2  A.  That's correct.  I tried to put them in different

3  categories.

4  Q.  What does withdrawal refer to?

5  A.  That should be where there was a withdrawal slip and

6  Mr. Collins withdrew cash from the account.

7  Q.  What does check amount refer to?

8  A.  That would be the amount of the check that was made

9  payable from that bank account.

10  Q.  What does POS debit mean?

11  A.  That's use of a debit card.  I called it point of sales

12  transactions.  That might be what they identified it as at the

13  bank.

14  Q.  So that's just the debit card that the bank might give

15  you?

16  A.  Correct.

17  Q.  What does transfers, fees, and other refer to?

18  A.  There were monthly transfers to a savings account, so I

19  would put the transfers there.  There were some service fees.

20  There's miscellaneous payments.

21  Q.  For the last payment you've got payee or description.

22  What does that refer to?

23  A.  That would be the vendor that received the payment, if

24  identified, either the check or the debit card or in some

25  cases fees.

* * *REDACTED* * *

889

10:37:07    1    Q.  What is the total date range for Government Exhibit

10:37:11    2    Summary 3-B?

10:37:12    3    A.  March 21st, 2006 to May 19th, 2009.

10:37:20    4    Q.  I want to first go to that first column where you've got

10:37:23    5    types and just go through some of these.

10:37:28    6              You've got fee listed on that column.  What is that

10:37:31    7    referring to?

10:37:31    8    A.  Occasionally there would be a service fee from the bank.

10:37:34    9    The first one is where he purchased checks, Mr. Collins

10:37:37   10    purchased checks.

10:37:39   11    Q.  The next label that you've got is tran.  What does tran

10:37:43   12    stand for?

10:37:44   13    A.  That would be the transfers to the savings account.

10:37:48   14    Q.  I also see a line that says CK 301.  What does that mean?

10:37:52   15    A.  That would be check 301.

10:37:55   16    Q.  Then there's one that says POS.  What does that refer to?

10:37:58   17    A.  Point of sales transaction, the debit card.

10:38:05   18    Q.  When you were talking about those transfers from the

10:38:07   19    savings account, did you review records of that savings

10:38:09   20    account?

10:38:09   21    A.  I did.

10:38:14   22    Q.  Is that Chase Exhibit 6?

10:38:16   23    A.  I believe it is.

10:38:16   24    Q.  What activity, if any, did you see in that savings account

10:38:20   25    that's in Government Exhibit Chase 6?

* * *REDACTED* * *

* * *REDACTED* * *

890

A.  There was the initial $500, that was part of the initial deposit.  The check from Luxury Motors.  And then every month there was a $25 transfer into the account, and a little later the bank started charging a $12 fee on the savings account. So those were the only transactions I noticed.

Q.  What was the $12 fee for?

A.  I'm not sure.

Q.  Turning your attention back to the chart, where you've got POS as the type, how -- does the last column where you have description describe what that debit card use was for?

A.  Yes.  That would be listed on the bank statement.

Q.  So, for example, looking at this would there -- for the date August 10, 2006, what was the debit card description there?

A.  The description is Twelve Atlantic Station, Atlanta, Georgia.

Q.  And for the dates October 3rd, 2006 through October 11, 2006, what's the description for the debit card?

A.  AirTran Air.

Q.  Turning now to the fifth page of Government Exhibit Summary 3-B and bringing your attention to -- I apologize -- bringing your attention to May 6, 2008, which I actually believe is page 4.

So on May 6, 2008, you've got a different description there in the type.  It says cash check -- or cash CK.  What

* * *REDACTED* * *

891

| | | |
|---|---|---|
| 10:40:19 | 1 | does that refer to? |
| 10:40:20 | 2 | A.  That refers to a cashier's check. |
| 10:40:24 | 3 | Q.  And what was that cashier's check for? |
| 10:40:27 | 4 | A.  That was part of Mr. Collins' payment at the closing when |
| 10:40:32 | 5 | he purchased real estate on Calumet. |
| 10:40:39 | 6 | Q.  Turning now to October 9, 2008, which is on page 5 -- oh, |
| 10:40:54 | 7 | there is no October 9th, so I've clearly gotten that wrong. |
| 10:40:58 | 8 | Was there a date that you have where you didn't know |
| 10:41:01 | 9 | if it was a cash or a check? |
| 10:41:05 | 10 | A.  I believe there was, yes. |
| 10:41:12 | 11 | Q.  How did you indicate that? |
| 10:41:15 | 12 | A.  I think I put it as unknown. |
| 10:41:20 | 13 | Q.  Turning now to the last page, this page 7 of Government |
| 10:41:26 | 14 | Exhibit Summary 3-B, what were the total withdrawals from the |
| 10:41:30 | 15 | checking account that came out for money? |
| 10:41:38 | 16 | A.  You know, backing up, the one I wasn't sure if it was a |
| 10:41:41 | 17 | cash or check I categorized as a cash withdrawal.  It was on |
| 10:41:45 | 18 | October 9th, 2008. |
| 10:41:51 | 19 | Q.  Oh, I see.  It's on page 6.  Thank you for that. |
| 10:41:54 | 20 | So page 6 at the top where it says October 9, 2008, I |
| 10:42:00 | 21 | see for the type you put W, slash, D? |
| 10:42:03 | 22 | A.  Correct. |
| 10:42:03 | 23 | Q.  And that's that not known [sic] if it was a cash or a |
| 10:42:06 | 24 | check? |
| 10:42:06 | 25 | A.  Cash or check withdrawal, I didn't know it, so I put it as |

* * *REDACTED* * *

* * *REDACTED* * *

892

10:42:11 1 cash.

10:42:11 2 Q. Thank you, Mr. Killian.

10:42:12 3 Turning now to the last page, page 7, what was the

10:42:17 4 total amount of withdrawals from this account for this time

10:42:22 5 period?

10:42:22 6 A. $143,047.04.

10:42:27 7 Q. And can the jury determine from the next couple of columns

10:42:30 8 which types of withdrawals came out?

10:42:33 9 A. Yes.

10:42:39 10 Q. Did you review other records of bank accounts linked to

10:42:43 11 the defendant?

10:42:44 12 A. I did.

10:42:45 13 Q. And are those in Government Exhibit Chase 6 through 10?

10:42:49 14 A. I believe that's the categorization, yes.

10:42:55 15 Q. What names were used for accounts in Government

10:42:58 16 Exhibit Chase 7 through 10?

10:43:00 17 A. I believe one was Hilarious Entertainment and one was

10:43:04 18 Double R Construction.

10:43:05 19 Q. Did you do a summary chart for those accounts?

10:43:08 20 A. I did.

10:43:09 21 Q. Is it included in this financial analysis?

10:43:11 22 A. I don't believe so.

10:43:12 23 Q. Why not?

10:43:13 24 A. Because the activity in both accounts was minimal.

10:43:17 25 Q. Turning your attention now to Government Exhibit

* * *REDACTED* * *

893

10:43:21  1  Summary 3C through 3E, did you also prepare these summary

10:43:26  2  charts summarizing real estate records?

10:43:28  3  A.  I did.

10:43:29  4  Q.  For these charts what records did you review?

10:43:33  5  A.  Most of the records were included in the mortgage files,

10:43:36  6  provided either by the title companies or the mortgagors.

10:43:40  7  Q.  Are the exhibits that you relied on referenced in each of

10:43:44  8  those summary charts?

10:43:46  9  A.  Yes.

10:43:46  10  Q.  And are those Government Exhibit Mortgage 1 through 6 and

10:43:50  11  some money order exhibits as well?

10:43:53  12  A.  I think it's Mortgage 1, 2, 3.

10:43:58  13  Q.  And were there also --

10:44:00  14  A.  And the money order exhibit, yes.

10:44:03  15  Q.  First, turning to Government Exhibit Summary 3C, what does

10:44:06  16  this chart summarize?

10:44:08  17  A.  It summarizes payments made by Mr. Collins that were

10:44:12  18  attributed to the purchase of real estate that I could not

10:44:15  19  trace to the bank account.

10:44:19  20  Q.  Looking at Government Exhibit Summary 3C, what exhibits

10:44:23  21  did you use to prepare this chart?

10:44:28  22  A.  I used Exhibits GX Mortgage 1, 2, 3, and GX Money Order 2.

10:44:40  23  Q.  Specifically what were the types of documents in those

10:44:45  24  exhibits?

10:44:48  25  A.  The documents in the mortgage files would include the

* * *REDACTED* * *

894

10:44:54  1   initial contract for purchase signed by Mr. Collins.  It would

10:44:58  2   include the credit reports.  It would include mortgage

10:45:04  3   documents.  It would include internal bank -- or lender

10:45:09  4   verifications.  It would include the actual mortgage, the

10:45:15  5   note, things of that nature in the mortgage file.

10:45:18  6   Q.  In reviewing those exhibits and this chart, is this chart

10:45:23  7   an accurate summary of the initial payments for real estate

10:45:28  8   purchases that are not traced to his Chase checking account?

10:45:32  9   A.  I believe it is.

10:45:33  10        MS. GUREN:  At this time we would move into evidence

10:45:35  11  Government Exhibit Summary 3C.

10:45:36  12        THE COURT:  Okay.  It will be admitted, and, folks,

10:45:39  13  you can turn to 3C now.

10:45:44  14  BY MS. GUREN:

10:45:45  15  Q.  Now, I asked you if these were payments not traced to the

10:45:48  16  checking account.  For the remaining summary charts, are all

10:45:53  17  of the summary charts, except for that very last summary

10:45:57  18  chart, what -- summaries of payments not traced to that Chase

10:46:02  19  checking account?

10:46:02  20  A.  That's correct.  I tried to find the payments that I could

10:46:05  21  document that did not come out of the Chase Bank account.

10:46:10  22  Q.  So these are sources that are external to that?

10:46:13  23  A.  Correct.

10:46:14  24  Q.  Looking at this exhibit for the first part of it, you've

10:46:17  25  got earnest money.  What is earnest money?

***REDACTED***

895

| | | |
|---|---|---|
| 10:46:21 | 1 | A.  Earnest money is a payment that a buyer in, particularly, |
| 10:46:26 | 2 | real estate would make to ensure that -- to the seller that |
| 10:46:30 | 3 | they are earnest about purchasing the property.  So it's like |
| 10:46:33 | 4 | a down payment, I would say. |
| 10:46:35 | 5 | Q.  And I see that you've got two different earnest money |
| 10:46:38 | 6 | payments summarized.  You have payment source column.  What |
| 10:46:43 | 7 | does the payment source column refer to? |
| 10:46:45 | 8 | A.  For those two I was able to identify the source of the |
| 10:46:47 | 9 | payment as money orders purchased at that currency exchange. |
| 10:46:51 | 10 | Q.  For this source exhibit, is that where you found those |
| 10:46:56 | 11 | money orders? |
| 10:46:56 | 12 | A.  That's correct. |
| 10:46:57 | 13 | Q.  What is the total amount of earnest money? |
| 10:47:00 | 14 | A.  $7,500. |
| 10:47:04 | 15 | Q.  The next section of this chart has real estate closings. |
| 10:47:08 | 16 | What's a real estate closing? |
| 10:47:09 | 17 | A.  The real estate closing is when the buyer and seller and |
| 10:47:12 | 18 | the title company and various others sit down at a table, I |
| 10:47:16 | 19 | suppose, and sign papers and actually close the deal, they |
| 10:47:20 | 20 | sign the deeds, and the money is transferred to effectuate the |
| 10:47:24 | 21 | sale of the property. |
| 10:47:25 | 22 | Q.  You've got two listed here as well.  What is the payment |
| 10:47:30 | 23 | source column referring to in this section? |
| 10:47:34 | 24 | A.  The payment source refers to a document that's in the |
| 10:47:39 | 25 | file, that's a HUD, Housing and Urban Development 1, where it |

***REDACTED***

10:47:46  1  indicates how much is paid by the buyer or seller -- how much

10:47:50  2  money is due at the closing when the property is transferred.

10:47:57  3  Q.  Source exhibit, is that where you found this information?

10:48:01  4  A.  I found it on the HUD 1, yes.

10:48:04  5  Q.  And is that Government Exhibit Mortgage 1 for the first

10:48:06  6  one, and Government Exhibit Mortgage 3 for the next one?

10:48:12  7  A.  It should be.

10:48:13  8  Q.  For the closing section, you've got ▮▮▮▮ -- or ▮▮▮▮▮▮▮.

10:48:18  9  Is that one of the properties that you found that the

10:48:20  10  defendant owned?

10:48:21  11  A.  Yes, it is.

10:48:22  12  Q.  And you also have ▮▮▮▮▮▮▮, is that another property

10:48:26  13  that the defendant owned?

10:48:26  14  A.  It is.

10:48:26  15  Q.  What was the total amount at closings that you found?

10:48:29  16  A.  $21,859.86.

10:48:33  17  Q.  And then what was the total amount for initial real estate

10:48:36  18  payments that were not traced to the Chase checking account?

10:48:39  19  A.  $29,359.86.

10:48:44  20  Q.  Turning your attention now to Government Exhibit

10:48:49  21  Summary 3D.  Did you also create this chart?

10:48:55  22  A.  I did.

10:48:56  23  Q.  What does this chart summarize?

10:49:00  24  A.  This is a summary of payments that the lender credited to

10:49:03  25  Mr. Collins' account, as being paid on the mortgages that were

***REDACTED***

***REDACTED***

897

| | |
|---|---|
| 10:49:07 | 1 |

not traced to the Chase Bank account.

Q.  Looking at Government Exhibit Summary 3D, did you use to prepare this exhibit Government Exhibit Mortgage 1 and 2?

A.  I did.

Q.  In reviewing Government Exhibit Mortgage 1 and 2 and Government Exhibit Summary 3D, did you accurately summarize the mortgages on the first and second mortgage on this property that were not traced to the Chase checking account?

A.  I believe I did.

          MS. GUREN:  At this time we would move into evidence Government Exhibit Summary 3D.

          THE COURT:  Okay.  It will be admitted, and you can turn now, folks, to that in your binder.

BY MS. GUREN:

Q.  What property are these mortgage payments for?

A.  ████████████.

Q.  In terms of how you organized this summary chart, is the first set of columns that first mortgage?

A.  Yes, there were two mortgages on the property.  The column to the left should be the payments that were credited as being made by Mr. Collins for the first mortgage.

Q.  What is the date range for these mortgage payments?

A.  April 19th, 2007 to June 2006, 2009.

Q.  How much in total was paid for this first mortgage that was not traced to the Chase checking account?

***REDACTED***

* * *REDACTED* * *

898

10:50:29    1   A.  $34,782.54.

10:50:34    2   Q.  Turning to the second column, what is the second column?

10:50:39    3   A.  The second column represents payments that were credited

10:50:42    4   to Mr. Collins' account at Home Equity Mortgage on payments on

10:50:46    5   the second mortgage.

10:50:47    6   Q.  What's the date range for this second mortgage?

10:50:50    7   A.  April 19th, 2007 to May 22nd, 2009.

10:50:55    8   Q.  What's the total amount that was paid for this second

10:50:59    9   mortgage not traced to the defendant's checking account?

10:51:01   10   A.  $6,392.50.

10:51:08   11   Q.  Turning your attention now to Government Exhibit

10:51:12   12   Summary 3E.  What is Government Exhibit Summary 3E?

10:51:18   13   A.  Summary 3E are the payments that were credited to

10:51:23   14   Mr. Collins' account by Chase Mortgage that were not traced to

10:51:28   15   the Chase Bank account.

10:51:31   16   Q.  What exhibit did you use -- what bank underlying exhibit

10:51:36   17   did you use when using Government Exhibit Summary 3E?

10:51:39   18   A.  Government Exhibit Mortgage 4.

10:51:41   19   Q.  Have you reviewed this chart and the documents in

10:51:46   20   Government Exhibit Mortgage 4 in preparation for your

10:51:48   21   testimony?

10:51:48   22   A.  I have.

10:51:49   23   Q.  And based on your review, does Government Exhibit Summary

10:51:53   24   Chart 3E accurately summarize the payments for that mortgage

10:51:57   25   that were not traced to the Chase checking account?

\* \* \*REDACTED\* \* \*

899

| | | |
|---|---|---|
| 10:52:00 | 1 | A.  I believe it does. |
| 10:52:01 | 2 | MS. GUREN:  At this time we would move into evidence |
| 10:52:03 | 3 | Government Exhibit Summary 3E. |
| 10:52:04 | 4 | THE COURT:  Okay.  It will be admitted, and you can |
| 10:52:07 | 5 | turn to it, folks. |
| 10:52:09 | 6 | BY MS. GUREN: |
| 10:52:15 | 7 | Q.  Showing you Government Exhibit 3E, what property is this |
| 10:52:18 | 8 | for? |
| 10:52:18 | 9 | A.  ▮▮▮▮▮▮▮▮▮▮. |
| 10:52:22 | 10 | Q.  What is the date range of payments for this mortgage that |
| 10:52:26 | 11 | weren't traced to the Chase checking account? |
| 10:52:28 | 12 | A.  October 9, 2008 to May 28th, 2009. |
| 10:52:32 | 13 | Q.  How much in total was paid? |
| 10:52:34 | 14 | A.  $9,792.44. |
| 10:52:52 | 15 | Q.  Turning now to Government Exhibit 3F and 3G.  Did you also |
| 10:53:02 | 16 | prepare summary charts relating to payments for cars? |
| 10:53:07 | 17 | A.  I did. |
| 10:53:09 | 18 | Q.  For the first Government -- for Government |
| 10:53:15 | 19 | Exhibit Summary 3F, what does this chart summarize? |
| 10:53:19 | 20 | A.  It summarizes the payments made on behalf of Mr. Collins |
| 10:53:25 | 21 | for auto loans that he had through Chase Bank, and it also |
| 10:53:30 | 22 | lists the down payment that he made on the first vehicle |
| 10:53:33 | 23 | listed. |
| 10:53:34 | 24 | Q.  What -- what Government Exhibit did you use as your |
| 10:53:38 | 25 | underlying documents for this summary chart? |

\* \* \*REDACTED\* \* \*

* * *REDACTED* * *

900

10:53:40  1   A.  Government Exhibit Auto 2.

10:53:45  2   Q.  And are these all payments that were not traced to that

10:53:49  3   Chase checking account?

10:53:50  4   A.  That's correct.

10:53:51  5   Q.  In your review of Government Exhibit Summary 3F and your

10:53:55  6   review of the exhibit -- or the documents in Government

10:54:00  7   Exhibit Auto 2, are -- is the summary chart an accurate

10:54:04  8   summary of these payments?

10:54:06  9   A.  Yes.

10:54:07  10          MS. GUREN:  At this time we would move into evidence

10:54:09  11  Government Exhibit Summary 3F.

10:54:10  12          THE COURT:  Okay.  It will be admitted, and you can

10:54:13  13  turn to 3F now, folks.

10:54:19  14  BY MS. GUREN:

10:54:19  15  Q.  Turning to this summary chart, how is this summary chart

10:54:24  16  organized, in terms of the column headings?

10:54:27  17  A.  The date would be the date that the payment was credited

10:54:29  18  to Mr. Collins' account by the bank, so it's the date they

10:54:33  19  received it.

10:54:34  20  Q.  What's the payment refer to?

10:54:36  21  A.  That should be the amount of the payment that was credited

10:54:38  22  to Mr. Collins' account.

10:54:40  23  Q.  What does Chase auto loan number refer to?

10:54:43  24  A.  That's the auto loan number that the bank assigned to that

10:54:46  25  particular loan.

* * *REDACTED* * *

10:54:47    1    Q.   How many auto loans are in this summary chart?

10:54:50    2    A.   Three.

10:54:51    3    Q.   What's the vehicle purchase refer to?

10:54:53    4    A.   That's the type of vehicle that was purchased by

10:54:56    5    Mr. Collins.

10:54:57    6    Q.   What does the down payment refer to?

10:55:00    7    A.   The initial purchase had one -- had a down payment in the

10:55:05    8    amount listed there.

10:55:06    9    Q.   And what does the cash price value refer to?

10:55:09   10    A.   That would be the value that the dealer put on the bill of

10:55:12   11    sale when the vehicle was purchased.

10:55:15   12    Q.   To clarify, that's not the amount that the defendant paid

10:55:19   13    at that time?

10:55:19   14    A.   Probably not, no.

10:55:21   15    Q.   Going through this summary chart, you've got on the down

10:55:26   16    payment column for the second and the third vehicle, a 2006

10:55:31   17    Land Rover Range Rover, another 2006 Land Rover Range Rover,

10:55:38   18    none trade.  What did you mean when you wrote, None trade?

10:55:41   19    A.   That the previous vehicle was traded in and there was no

10:55:46   20    down payment.

10:55:47   21    Q.   I should have asked you this first, but what's the date

10:55:50   22    range for this summary chart?

10:55:53   23    A.   The date range is August 28th, 2006 to May 2008, 2009.

10:56:00   24    Q.   Looking at this bottom section for the last loan, you've

10:56:04   25    got double asterisks next to the loan.  What do those double

* * *REDACTED* * *

902

10:56:09  1    asterisks refer to?

10:56:10  2    A.  That's the third loan that the bank was [sic] identified

10:56:12  3    that all the payments were made in cash.

10:56:15  4    Q.  What was the total amount of loan payments made for all

10:56:17  5    three vehicles?

10:56:19  6    A.  The loan payments were $44,597.54.

10:56:24  7    Q.  What was the total down payment amount?

10:56:28  8    A.  $4,645.22.

10:56:31  9    Q.  What was the total for this summary chart of loan payments

10:56:34  10   and down payments?

10:56:36  11   A.  $49,242.76.

10:56:40  12   Q.  Finally, looking at this, I notice that you've got two

10:56:44  13   colors listed next to the vehicles.  You've got for the very

10:56:48  14   first car it's a 2006 Land Rover Range Rover black, and then

10:56:53  15   you've got 2006 Land Rover Range Rover silver.  Where did you

10:56:58  16   get that information from?

10:56:58  17   A.  For those two vehicles the dealer's bill of sale

10:57:01  18   identified the color.

10:57:02  19   Q.  For the third vehicle you don't have a color listed, why

10:57:06  20   is that?

10:57:06  21   A.  I didn't see one on the bill of sale.

10:57:09  22   Q.  Going through Government Exhibit -- turning now to

10:57:21  23   Government Exhibit Summary 3G.  What does this chart

10:57:26  24   summarize?

10:57:30  25   A.  3G is a summary of payments that were credited to

***REDACTED***

903

10:57:34    1    Mr. Collins' insurance payments at American Family Insurance
10:57:41    2    that were not traced to the Chase Bank account.
10:57:44    3    Q.  What exhibits did you use to prepare Government
10:57:47    4    Exhibit Summary 3G?
10:57:48    5    A.  Government Exhibit Auto 1.
10:57:51    6    Q.  Specifically, what types of documents and records gave you
10:57:54    7    information to put in that chart?
10:57:56    8    A.  That would be a receipt from the insurance agent when the
10:58:01    9    money was paid.  There were copies of money orders.  And that
10:58:06   10    might have the address, but it certainly had his name on
10:58:09   11    there, and copies of money orders that were used to make
10:58:15   12    payment.
10:58:15   13    Q.  Based on your review of Government Exhibit Auto 1, does
10:58:19   14    Government Exhibit Summary 3G accurately summarize the
10:58:22   15    payments for auto insurance that were not traced to the Chase
10:58:25   16    checking account?
10:58:26   17    A.  Yes.
10:58:26   18            MS. GUREN:  At this time we would move into evidence
10:58:28   19    Government Exhibit Summary 3G.
10:58:29   20            THE COURT:  Okay.  It will be admitted, and you can
10:58:33   21    turn to that one now, folks.
10:58:40   22    BY MS. GUREN:
10:58:40   23    Q.  For Government Exhibit Summary 3G, what does that first
10:58:44   24    column heading money order or receipt date refer to?
10:58:49   25    A.  All but one of the payments were confirmed by money order

***REDACTED***

* * *REDACTED* * *

904

10:58:55  1  that had Mr. Collins as the remitter, so that would be the

10:58:56  2  date of the money order.

10:58:58  3  Q.  The next column says money order or receipt number.  What

10:59:00  4  does that refer to?

10:59:02  5  A.  That would be the money order number as purchased from a

10:59:07  6  currency exchange or in one case that would be the number of

10:59:10  7  the receipt signed by the insurance agent.

10:59:13  8  Q.  What is the column that says money order or receipt amount

10:59:17  9  refer to?

10:59:17  10  A.  That's the amount of the total payment.

10:59:19  11  Q.  What does the column currency exchange refer to?

10:59:21  12  A.  For all but one that would be where the money order was

10:59:25  13  purchased, and for the lone cash payment, that would be an

10:59:30  14  American Family receipt, that indicated that cash was paid.

10:59:33  15  Q.  And you said all but one was paid with a money order.  Is

10:59:37  16  that one that was not paid by money order March 27, 2007?

10:59:41  17  A.  According to the records of the insurance agent, yes.

10:59:43  18  Q.  And did you indicate that by writing, Cash per American

10:59:47  19  Family Insurance receipt?

10:59:47  20  A.  I did.

10:59:48  21  Q.  And for the rest of the money orders, were all but one

10:59:52  22  purchased at the New Riverdale Currency Exchange?

10:59:56  23  A.  They were.

10:59:57  24  Q.  Was the one that wasn't purchased at the New Riverdale

11:00:01  25  Currency Exchange purchased at the New Dolton Currency

* * *REDACTED* * *

* * *REDACTED* * *

905

11:00:06  1  Exchange?

11:00:06  2  A.  It was.

11:00:06  3  Q.  And you also have a column that says receipt name.  What

11:00:10  4  does that refer to?

11:00:11  5  A.  When the insurance agent wrote a receipt, they would put

11:00:14  6  the name of the person for whom the payment was credited, and

11:00:17  7  that was Ron Collins.

11:00:18  8  Q.  What was the total amount of payments for insurance that

11:00:22  9  were not traced to the Chase checking account?

11:00:25  10  A.  $9,118.30.

11:00:29  11       MS. GUREN:  And in reviewing this you said you had

11:00:31  12  reviewed Government Exhibit Auto 1.  Your Honor, permission to

11:00:36  13  show several pages from Government Exhibit Auto 1?

11:00:39  14       THE COURT:  Sure, that's fine.

11:00:40  15  BY MS. GUREN:

11:00:41  16  Q.  Turning to Government Exhibit Auto 1, page FIN 42 1, and I

11:00:51  17  know it's a little bit hard to see, so I'm going to try to

11:00:53  18  magnify it on the screen for you.  Is this one of the pages

11:00:54  19  that you looked at?

11:00:55  20  A.  Yes.

11:00:56  21  Q.  And does this show a 2006 Land Rover Range Rover on this

11:01:00  22  page?

11:01:00  23  A.  It does.

11:01:01  24  Q.  And does it show that the operator was Ron Collins?

11:01:04  25  A.  Yes.

***REDACTED***

906

| 11:01:04 | 1 | Q.  Does it show garaged at location and that Throop address? |
| 11:01:10 | 2 | A.  It does. |
| 11:01:11 | 3 | Q.  Turning now to another page of Government Exhibit Auto 1, |
| 11:01:15 | 4 | which is FIN 42 50.  Does this page show a 2004 Audi A8 in the |
| 11:01:25 | 5 | name of Ron Collins? |
| 11:01:27 | 6 | A.  Yes. |
| 11:01:28 | 7 | Q.  Finally, turning to another page of Government |
| 11:01:33 | 8 | Exhibit Auto 4, FIN 42 208.  Does this page show a 2002 Jeep |
| 11:01:43 | 9 | Grand Cherokee Laredo in the name of the operator Carolyn |
| 11:01:48 | 10 | Collins? |
| 11:01:49 | 11 | A.  Yes. |
| 11:01:49 | 12 | Q.  Does it show that same mailing address at Throop? |
| 11:01:53 | 13 | A.  Yes. |
| 11:01:53 | 14 | Q.  Now, were there payments, insurance payments, in the name |
| 11:01:56 | 15 | of Carolyn Collins for this car in the records? |
| 11:01:59 | 16 | A.  There were -- there were records that indicated Carolyn |
| 11:02:04 | 17 | Collins was making payments on insurance from American Family, |
| 11:02:07 | 18 | yes. |
| 11:02:07 | 19 | Q.  Did you include that in your summary charts at all? |
| 11:02:11 | 20 | A.  No. |
| 11:02:19 | 21 | Q.  Did you also prepare two summary charts summarizing |
| 11:02:22 | 22 | payments to credit card companies? |
| 11:02:23 | 23 | A.  I did. |
| 11:02:24 | 24 | Q.  Turning first to Government Exhibit Summary 3H, what does |
| 11:02:28 | 25 | this chart summarize? |

* * *REDACTED* * *

907

11:02:30  1  A.  3H is a summary of payments that were credited to

11:02:34  2  Mr. Collins' credit card account at Chase Bank.

11:02:38  3  Q.  And were these payments traced to the original, Chase 5,

11:02:44  4  checking account?

11:02:45  5  A.  No.  I could not find where they came out of the Chase

11:02:49  6  checking account.

11:02:49  7  Q.  Were the exhibits that you used contained in Government

11:02:53  8  Exhibit Chase 1 through 4?

11:02:54  9  A.  1 through 4, yes.

11:02:56  10 Q.  Specifically, what types of documents were you looking at?

11:02:59  11 A.  That would be the credit card application by Mr. Collins

11:03:02  12 with the identifiers on there, and summaries of payments, and

11:03:06  13 the actual credit card statements would have been included,

11:03:11  14 the monthly statements listing the charges.

11:03:14  15 Q.  Were there four different sets of credit cards -- credit

11:03:17  16 card numbers that you were looking at?

11:03:19  17 A.  There were.

11:03:19  18      MS. GUREN:  Permission to publish several pages from

11:03:22  19 Government Exhibit Chase 1.

11:03:24  20      THE COURT:  Sure.

11:03:26  21 BY MS. GUREN:

11:03:27  22 Q.  Showing you Government Exhibit Chase 1-3, and I know it's

11:03:33  23 very hard to read it, so I'm going to try to magnify it as

11:03:36  24 best I can -- is this one of the Chase statements that you

11:03:38  25 looked at?

* * *REDACTED* * *

* * *REDACTED* * *

908

11:03:39  1   A.  Sure looks like it.

11:03:41  2   Q.  Does it show a date range of what looks like March 2007 to

11:03:47  3   April 2007?

11:03:49  4   A.  It does.

11:03:50  5   Q.  Going into the transaction section -- and magnifying that

11:03:55  6   for you on your screen -- do you see a payment on what looks

11:04:01  7   like March 20th, 2007 to Lee's Foreign Car Service for a

11:04:08  8   thousand dollars?

11:04:09  9   A.  It's a charge to there, yes.

11:04:10  10  Q.  A charge.

11:04:11  11       And do you also see a second charge on what looks

11:04:16  12  like a date in April for a thousand dollars to Lee's Foreign

11:04:19  13  Car Service?

11:04:19  14  A.  I do.

11:04:21  15       MS. GUREN:  Turning now -- and just for the record,

11:04:24  16  this is Chase 1, FIN 9 101.

11:04:28  17  BY MS. GUREN:

11:04:28  18  Q.  Turning now to another page of Chase 1, that's FIN 9 128,

11:04:37  19  what does it look like the date range is for this one?

11:04:40  20  A.  August 2008 -- no.  March 2008 to April 2008.

11:04:49  21  Q.  And going to the transaction information, can you see on

11:04:54  22  there that very first charge?  Where is that very first charge

11:05:00  23  made to?

11:05:01  24  A.  A shell station Darien, Illinois.

11:05:07  25  Q.  Turning now to another page of Chase 1, FIN 9 137.  What

* * *REDACTED* * *

| | | |
|---|---|---|
| 11:05:15 | 1 | is the date range for this, the best you can see? |
| 11:05:21 | 2 | A. It looks like June 2008 to July 4th, 2008. |
| 11:05:27 | 3 | Q. And going to the transaction section, do you see something |
| 11:05:39 | 4 | that I'm highlighting on the screen right there? |
| 11:05:42 | 5 | A. The highlighted section is Shell Oil in Darien, Illinois. |
| 11:05:47 | 6 | Q. And, finally -- I'm going to use the ELMO for this one. |
| 11:06:00 | 7 | Finally, I'm going to show you another page from Chase Bank 1. |
| 11:06:23 | 8 | And I recognize that I will not have the powers of the |
| 11:06:26 | 9 | sanction to highlight in the same sort of way, but to the |
| 11:06:29 | 10 | extent you can read it, what is the date range there? |
| 11:06:33 | 11 | THE COURT: Okay. Well, my glasses -- |
| 11:06:37 | 12 | THE WITNESS: This is a tough one. |
| 11:06:39 | 13 | (Laughter.) |
| 11:06:39 | 14 | THE COURT: You can zoom in on it, can't you? |
| 11:06:43 | 15 | MS. GUREN: Yes, I can, and I will try. |
| 11:06:45 | 16 | I actually asked Mr. Killian if he's got a magnifying |
| 11:06:49 | 17 | glass in his pocket. |
| 11:06:51 | 18 | THE WITNESS: I do. |
| 11:06:51 | 19 | BY MS. GUREN: |
| 11:06:52 | 20 | Q. Do you see the date range for this? |
| 11:06:54 | 21 | A. March 2007 -- no, February 2007 to March 2007, I think, |
| 11:07:02 | 22 | yes, payment due date would be April. Yes, I think that's |
| 11:07:06 | 23 | correct. |
| 11:07:06 | 24 | Q. And do you see two Shell Station charges on there? |
| 11:07:11 | 25 | A. Two Shell Station charges in Dolton, Illinois. |

***REDACTED***

910

| | | |
|---|---|---|
| 11:07:17 | 1 | THE COURT:  Okay, folks.  Let's take a morning break |
| 11:07:20 | 2 | for fifteen minutes, all right, and we will come back then. |
| 11:07:20 | 3 | (The jury leaves the courtroom.) |
| 11:31:00 | 4 | (Recess taken.) |
| 11:31:24 | 5 | (The jury enters the courtroom.) |
| 11:31:24 | 6 | THE COURT:  Okay.  Please be seated, folks, and we |
| 11:31:27 | 7 | will pick up where we left off. |
| 11:31:29 | 8 | BY MS. GUREN: |
| 11:31:30 | 9 | Q.  Mr. Killian, before we took the break, you were talking |
| 11:31:32 | 10 | about Government Exhibit Summary Chart 3H, and your use of |
| 11:31:39 | 11 | Government Exhibit Chase 1 through 4 in creating this chart. |
| 11:31:44 | 12 | In reviewing Government Exhibit Chase 1 through 4 and |
| 11:31:48 | 13 | Government Exhibit Summary Chart 3H, does Government |
| 11:31:53 | 14 | Exhibit Summary 3H accurately summarize the records with |
| 11:31:57 | 15 | regard to credit card payments not traced to that Chase |
| 11:32:01 | 16 | checking account in Government Exhibits Chase 1 through 4? |
| 11:32:05 | 17 | A.  Yes. |
| 11:32:06 | 18 | MS. GUREN:  At this time we would move into evidence |
| 11:32:08 | 19 | Government Exhibit Summary 3H. |
| 11:32:09 | 20 | THE COURT:  Okay.  It will be admitted, and you can |
| 11:32:11 | 21 | now turn to that, folks, 3H. |
| 11:32:18 | 22 | BY MS. GUREN: |
| 11:32:18 | 23 | Q.  Going through Government Exhibit 3H's organization, what |
| 11:32:23 | 24 | are the dates referring to? |
| 11:32:26 | 25 | A.  The date would be the date that the payment was credited |

* * *REDACTED* * *

911

| | | |
|---|---|---|
| 11:32:28 | 1 | to Mr. Collins' credit card account at Chase Bank for that |
| 11:32:33 | 2 | particular card. |
| 11:32:34 | 3 | Q.  What does the amount refer to? |
| 11:32:36 | 4 | A.  That's the amount that was credited to Mr. Collins' |
| 11:32:39 | 5 | account. |
| 11:32:40 | 6 | Q.  What is the column that says card's last four numbers |
| 11:32:45 | 7 | mean? |
| 11:32:45 | 8 | A.  That's the last four numbers of Mr. Collins' credit |
| 11:32:48 | 9 | cards -- card. |
| 11:32:49 | 10 | Q.  What does the source exhibit refer to? |
| 11:32:51 | 11 | A.  That would be a group of exhibits from Chase, which would |
| 11:32:55 | 12 | include the actual credit card statements and the summary of |
| 11:32:59 | 13 | the information that the bank provided and his signature card |
| 11:33:04 | 14 | or application. |
| 11:33:05 | 15 | Q.  What does Chase comment refer to? |
| 11:33:09 | 16 | A.  For some particular payments received from Mr. Collins, |
| 11:33:12 | 17 | they were able to identify them as OTC cash. |
| 11:33:16 | 18 | Q.  What is the date range for this summary chart? |
| 11:33:20 | 19 | A.  It's May 17th, 2007 to June 1st, 2009. |
| 11:33:28 | 20 | Q.  And going through this very first page -- and I'm just |
| 11:33:32 | 21 | going to magnify some of it -- is this where it shows the |
| 11:33:36 | 22 | different credit cards that you were summarizing? |
| 11:33:40 | 23 | A.  Yes. |
| 11:33:40 | 24 | Q.  When I say this, I'm referring to the Chase 2, Chase 3, |
| 11:33:45 | 25 | Chase 1, and Chase 4 -- |

* * *REDACTED* * *

| | | |
|---|---|---|
| 11:33:47 | 1 | A.  The exhibits, yes. |
| 11:33:52 | 2 | Q.  You had mentioned this Chase comment where you said OTC |
| 11:33:58 | 3 | cash.  What does OTC cash refer to? |
| 11:34:02 | 4 | A.  That's a bank abbreviation I took to mean over the counter |
| 11:34:06 | 5 | cash. |
| 11:34:08 | 6 | Q.  Going to the last page of the exhibit, which is page 2, |
| 11:34:17 | 7 | what is the total amount of payments that you found not traced |
| 11:34:21 | 8 | to that Chase checking account in Chase 5? |
| 11:34:25 | 9 | A.  $43,720. |
| 11:34:29 | 10 | Q.  Turning next to Government Exhibit 3 -- Summary 3I, what |
| 11:34:34 | 11 | does this chart summarize? |
| 11:34:38 | 12 | A.  3I is a summary of payments that were credited to |
| 11:34:43 | 13 | Mr. Collins' credit card at the Home Depot company. |
| 11:34:47 | 14 | Q.  And are these credit card payments not traced to that |
| 11:34:50 | 15 | Chase checking account in Government Exhibit Chase 5? |
| 11:34:53 | 16 | A.  Correct. |
| 11:34:55 | 17 | Q.  What exhibits did you use to prepare Government Exhibit |
| 11:34:59 | 18 | Summary 3I? |
| 11:35:00 | 19 | A.  Citibank 1. |
| 11:35:05 | 20 | Q.  When you reviewed Government Exhibit Citibank 1 and |
| 11:35:08 | 21 | compared it, is Government Exhibit Summary 3I an accurate |
| 11:35:12 | 22 | summary of the payments made to the Home Depot credit card not |
| 11:35:16 | 23 | traced to the Chase checking account? |
| 11:35:18 | 24 | A.  Yes. |
| 11:35:18 | 25 |          MS. GUREN:  At this time we would move into evidence |

***REDACTED***

913

| | |
|---|---|
| 11:35:20 | 1 |
| 11:35:23 | 2 |
| 11:35:23 | 3 |
| 11:35:30 | 4 |
| 11:35:30 | 5 |
| 11:35:35 | 6 |
| 11:35:36 | 7 |
| 11:35:43 | 8 |
| 11:35:45 | 9 |
| 11:35:47 | 10 |
| 11:35:48 | 11 |
| 11:35:50 | 12 |
| 11:35:55 | 13 |
| 11:35:58 | 14 |
| 11:36:02 | 15 |
| 11:36:05 | 16 |
| 11:36:09 | 17 |
| 11:36:11 | 18 |
| 11:36:11 | 19 |
| 11:36:14 | 20 |
| 11:36:20 | 21 |
| 11:36:23 | 22 |
| 11:36:27 | 23 |
| 11:36:28 | 24 |
| 11:36:34 | 25 |

1 Government Exhibit Summary 3I.

2 THE COURT: Okay. It will be admitted, and you can

3 turn to that one now.

4 BY MS. GUREN:

5 Q. For Government Exhibit 3I, Summary 3I, what is the date

6 range?

7 A. The date range is December 28th, 2006 to September 2nd,

8 2008.

9 Q. You've got a column entitled payment, what does that refer

10 to?

11 A. That's the amount of payment that was credited to

12 Mr. Collins' account at Home Depot.

13 Q. What does the column credit card refer to?

14 A. That's the actual credit card, the Home Depot credit card

15 the payments were processed by Citibank.

16 Q. For this summary chart, are all the payments referring to

17 that Home Depot card payment?

18 A. They are.

19 Q. What is the total amount of payments for that Home Depot

20 credit card not traced to the Government Exhibit Chase 5?

21 A. $13,449.12.

22 Q. Did you also summarize records from Western Union?

23 A. I did.

24 Q. And is that in exhibit -- Government Exhibit Money

25 Order 3, the documents from Western Union?

* * *REDACTED* * *

914

11:36:36  1  A.  Government Exhibit Money Order 3, correct.

11:36:41  2  Q.  Did you summarize those Western Union documents in Summary

11:36:46  3  Chart 3J?

11:36:46  4  A.  I did.

11:36:47  5  Q.  What specifically did those documents contain that you

11:36:50  6  summarized?

11:36:51  7  A.  The documents contained information that a Ron Collins was

11:36:56  8  wiring money to recipients in Georgia.

11:37:01  9  Q.  In comparing the records in Government Exhibit Money

11:37:03  10  Order 3 to the Summary Chart 3J, is Summary Chart 3J an

11:37:09  11  accurate summary of money order payments from Western Union

11:37:12  12  not traced to that Chase checking account?

11:37:15  13  A.  It is.

11:37:17  14       MS. GUREN:  Okay.  At this time we would like to

11:37:18  15  admit Government Exhibit Summary Chart 3J.

11:37:18  16       THE COURT:  Okay.  It will be admitted, and you can

11:37:20  17  look at that one now, folks.

11:37:24  18  BY MS. GUREN:

11:37:25  19  Q.  For Government Exhibit 3J, were these the two Western

11:37:29  20  Union transfers?

11:37:29  21  A.  They are.

11:37:31  22  Q.  Where was the -- where did you get the information for the

11:37:35  23  recipient and recipient location?

11:37:38  24  A.  The information provided by Western Union included who the

11:37:44  25  recipient was.

* * *REDACTED* * *

***REDACTED***

11:37:45   1   Q.  And did it -- and in this case was the recipient locations

11:37:48   2   both in Georgia?

11:37:50   3   A.  They were.

11:37:50   4   Q.  Where did you get the information about who the sender

11:37:53   5   was?

11:37:54   6   A.  The sender is listed on the information provided by

11:37:57   7   Western Union as Ron Collins.

11:38:00   8   Q.  What was the total amount of Western Union money transfers

11:38:03   9   not traced to that Chase checking account?

11:38:06  10   A.  $1,250.

11:38:09  11   Q.  After you did these summaries that we've gone through, did

11:38:15  12   you prepare Government Exhibit Summary 3K?

11:38:22  13   A.  I did.

11:38:23  14   Q.  What exhibits did you use to prepare Government

11:38:28  15   Exhibit 3K?

11:38:28  16   A.  Summary 3A through 3J.

11:38:31  17   Q.  What is Government Exhibit Summary 3K summarizing?

11:38:35  18   A.  It summarizes what I consider the total uses of cash by

11:38:41  19   Mr. Collins during the period described in the top of the

11:38:44  20   exhibit.

11:38:45  21   Q.  Based on the underlying exhibits and the summaries that

11:38:48  22   you used, does summary chart -- does Government

11:38:52  23   Exhibit Summary 3K accurately summarize these records of cash

11:38:56  24   usage?

11:38:57  25   A.  I believe it does.

* * *REDACTED* * *

916

11:38:58  1      MS. GUREN:  At this time we would move Government

11:39:01  2   Exhibit Summary 3K into evidence.

11:39:03  3      THE COURT:  Okay.  It will be admitted, and you can

11:39:04  4   look at it now, folks.

11:39:08  5   BY MS. GUREN:

11:39:09  6   Q.  Government Exhibit 3K, what is the date range of this

11:39:14  7   summary chart?

11:39:15  8   A.  It starts from March 14th, 2006 to June 1st, 2009.

11:39:24  9   Q.  You said -- at the top it's entitled summary of cash

11:39:28  10  deposits and payments not drawn from Government Exhibit

11:39:31  11  Chase 5.  What does that refer to?

11:39:32  12  A.  That means that these payments could not -- I did not

11:39:35  13  trace them to the Chase checking account.

11:39:37  14  Q.  And turning -- just to clarify that first line, where it

11:39:42  15  says Chase checking account with the last four digits 8993 net

11:39:47  16  cash deposits.  What does that mean?

11:39:49  17  A.  That's the net cash that Mr. Collins deposited into that

11:39:53  18  checking account.

11:39:54  19  Q.  And was that that $37,000 -- $37,105 that we saw at the

11:39:58  20  end as net cash deposits from Summary 3K?

11:40:02  21  A.  Correct, it was the direct use of cash.

11:40:05  22  Q.  And the next line where you have real estate purchase

11:40:09  23  initial payments, where did that come from?

11:40:12  24  A.  It came from the records provided by the mortgage company.

11:40:15  25  Q.  And so for each of these lines are these taken from those

* * *REDACTED* * *

* * *REDACTED* * *

917

| | |
|---|---|
| 11:40:18 | 1 |
| 11:40:21 | 2 |
| 11:40:30 | 3 |
| 11:40:31 | 4 |
| 11:40:32 | 5 |
| 11:40:34 | 6 |
| 11:40:38 | 7 |
| 11:40:38 | 8 |
| 11:40:45 | 9 |
| 11:40:48 | 10 |
| 11:40:53 | 11 |
| 11:40:55 | 12 |
| 11:40:59 | 13 |
| 11:41:03 | 14 |
| 11:41:04 | 15 |
| 11:41:12 | 16 |
| 11:41:12 | 17 |
| 11:41:13 | 18 |
| 11:41:16 | 19 |
| 11:41:18 | 20 |
| 11:41:18 | 21 |
| 11:41:18 | 22 |
| 11:41:29 | 23 |
| 11:41:29 | 24 |
| 11:41:31 | 25 |

1  total amounts on the summary charts that we've just gone

2  through for Summary 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, 3I, and

3  3J?

4  A.  They are.

5  Q.  What is the total amount of cash that you found that was

6  used during this time period not traced to that Chase checking

7  account?

8  A.  $234,213.08.

9  Q.  What were you trying to summarize?

10  A.  I was trying to summarize Mr. Collins' use of cash during

11  the period that these schedules cover.

12  Q.  And were you able to identify a source for this

13  $234,213.08?

14  A.  No.

15       MS. GUREN:  One moment, your Honor?

16       THE COURT:  Okay.

17       MS. GUREN:  No further questions.

18       THE COURT:  Okay.  Mr. Rubino, any cross?

19       MR. RUBINO:  Yes, your Honor.

20                        - - -

21            BRUCE KILLIAN, CROSS-EXAMINATION

22  BY MR. RUBINO:

23  Q.  Good morning, sir.

24  A.  Hello.

25  Q.  Mr. Killian, is the United States Attorney's Office your

* * *REDACTED* * *

***REDACTED***

918

11:41:35  1   only client?

11:41:37  2   A.  I have a small, small tax business, so I have a couple of

11:41:42  3   tax prep clients, but basically it's by far the biggest one.

11:41:48  4   Q.  What percentage of your income does the U.S. Attorney's

11:41:52  5   Office furnish you?

11:41:53  6   A.  99 percent.

11:41:56  7   Q.  So basically you're retired from the Government and you

11:41:59  8   went right back working for them again?

11:42:01  9   A.  Basically, I did.  There was a two-month lull, but, yes.

11:42:10  10  Q.  Looking at these various charts, if I may turn your

11:42:12  11  attention to 3A, and 3A, in summary, covers almost a

11:42:22  12  three-year period; am I correct?

11:42:23  13  A.  I believe so, yes.

11:42:24  14  Q.  And after you adjusted it, the net cash deposits in three

11:42:30  15  years was $37,000, correct?

11:42:34  16  A.  Approximately, yes.

11:42:40  17  Q.  Now, referring you to chart 3C, under real estate closings

11:42:53  18  we have an amount of $1,364.92 dated 12/6/06, correct?

11:43:00  19  A.  Correct.

11:43:01  20  Q.  Now, that was money that was used to close a property at

11:43:07  21  16003 Wabash, correct?

11:43:10  22  A.  Correct.

11:43:11  23  Q.  And was that $1300 and change, was that cash or check?

11:43:16  24  A.  I believe it was a $2,000 money order.

11:43:21  25  Q.  Why do you believe that?

***REDACTED***

* * *REDACTED* * *

919

11:43:22   1   A.  Although it's not in evidence, I saw a copy of it.

11:43:25   2   Q.  Okay.  Are you positive -- well, how do we have $1300 out

11:43:29   3   of a 2,000 [sic] money order?

11:43:32   4   A.  If you look at the bank deposits, the difference was

11:43:36   5   deposited into the checking account, the 600-and-some-odd

11:43:41   6   dollars.

11:43:42   7   Q.  I see.

11:43:43   8        Now, what about the 20,494, was that cash or check?

11:43:48   9   A.  I don't know.

11:43:50   10  Q.  Now, you're familiar, as a former IRS agent, with the form

11:43:54   11  8300; are you not?

11:43:56   12  A.  I am.

11:43:56   13  Q.  And tell the ladies and gentlemen of the jury what an IRS

11:43:58   14  8300 form is, please.

11:44:01   15  A.  An 8300 is a form where someone, who is in business,

11:44:05   16  receives $10,000 in cash or equivalents in a transaction or a

11:44:11   17  series of transactions, should file the form 8300 to notify

11:44:16   18  the FINCEN, I believe, that this transaction occurred.

11:44:21   19  Q.  Now, if Mr. Collins walked into a real estate closing and

11:44:25   20  opened a brown paper bag and took $20,494 worth in dollar

11:44:33   21  bills and threw it on the table, wouldn't the real estate

11:44:35   22  company be required to file an 8300 form on this transaction?

11:44:40   23  A.  If all the money was paid in cash, I believe that maybe

11:44:43   24  they should have, yes.

11:44:44   25  Q.  Not should have.  Aren't they required to?

* * *REDACTED* * *

* * *REDACTED* * *

920

| | | |
|---|---|---|
| 11:44:47 | 1 | A.  I think it's -- I think the requirement could be on either |
| 11:44:52 | 2 | the title company or the real estate company, the mortgagor, |
| 11:44:58 | 3 | or some other person at the closing, perhaps the attorney. |
| 11:45:03 | 4 | Q.  Okay.  So -- |
| 11:45:03 | 5 | A.  I think either one of those -- |
| 11:45:05 | 6 | Q.  Somebody had that responsibility, if that happened, |
| 11:45:08 | 7 | correct? |
| 11:45:09 | 8 | A.  Cash, yes. |
| 11:45:10 | 9 | Q.  And were you shown any 8300 form for cash for that |
| 11:45:14 | 10 | transaction? |
| 11:45:14 | 11 | A.  I was not. |
| 11:45:19 | 12 | Q.  Looking at 3D, sir, these are mortgage payments that were |
| 11:45:25 | 13 | made, correct? |
| 11:45:28 | 14 | A.  Yes. |
| 11:45:28 | 15 | Q.  Mortgage 1, Mortgage 2. |
| 11:45:32 | 16 |        Now, it says:  These were payments that were traced |
| 11:45:39 | 17 | to -- payments other than those -- let me rephrase that -- |
| 11:45:44 | 18 | payments other than those traced to Chase 5. |
| 11:45:47 | 19 |        Chase 5 is Mr. Collins' account that ends in 8993, |
| 11:45:52 | 20 | correct? |
| 11:45:52 | 21 | A.  Correct. |
| 11:45:53 | 22 | Q.  Okay.  So these didn't come from that account? |
| 11:45:57 | 23 | A.  I believe that's true. |
| 11:45:58 | 24 | Q.  Could they have come from some other account? |
| 11:46:00 | 25 | A.  They could. |

* * *REDACTED* * *

***REDACTED***

921

| | | |
|---|---|---|
| 11:46:01 | 1 | Q. So you're not positive, and you can't tell these jurors, |
| 11:46:05 | 2 | that all of this money here under Mortgage 1 was cash, can |
| 11:46:09 | 3 | you? |
| 11:46:09 | 4 | A. I don't know that it was cash, no. |
| 11:46:11 | 5 | Q. We don't know if a penny of it was cash, do we? |
| 11:46:14 | 6 | A. For that particular one, no. |
| 11:46:16 | 7 | Q. And Mortgage 2, we don't know if a penny of that was cash, |
| 11:46:22 | 8 | do we? |
| 11:46:23 | 9 | A. No. |
| 11:46:23 | 10 | Q. So it very well could have been from another checking |
| 11:46:26 | 11 | account or savings account, could it not? |
| 11:46:29 | 12 | A. If there was one, yes, it could have. |
| 11:46:32 | 13 | Q. Now, we move to E, 3E, sir. 3E are payments made for |
| 11:46:43 | 14 | what? |
| 11:46:47 | 15 | A. For the mortgage on the property -- |
| 11:46:50 | 16 | Q. -- property? |
| 11:46:50 | 17 | A. -- at 5421 Calumet, I believe. |
| 11:46:53 | 18 | Q. And can you tell these ladies and gentlemen of the jury |
| 11:46:58 | 19 | with certainty that every one of these payments were made in |
| 11:47:02 | 20 | cash? |
| 11:47:03 | 21 | A. I believe they were made in cash, based on bank records. |
| 11:47:07 | 22 | I think there was some records of transmittal that said that |
| 11:47:11 | 23 | they were paid in cash. |
| 11:47:12 | 24 | Q. Okay. Can you show me the record for the first one, |
| 11:47:15 | 25 | 1342.44 and show me it was paid in cash? |

***REDACTED***

***REDACTED***

922

| | | |
|---|---|---|
| 11:47:19 | 1 | A.  There is a letter -- I don't have access to it -- but |
| 11:47:24 | 2 | there is. |
| 11:47:24 | 3 | Q.  So you don't have that with you today to show to us? |
| 11:47:27 | 4 | A.  It's in evidence. |
| 11:47:30 | 5 | Q.  Now, let me just bring you down to the fourth one, |
| 11:47:37 | 6 | 2/27/09.  That was a $1450 payment, correct? |
| 11:47:41 | 7 | A.  Correct. |
| 11:47:42 | 8 | Q.  And you say that payment was not associated with the |
| 11:47:47 | 9 | account ending in 8993, correct? |
| 11:47:50 | 10 | A.  I believe that's true. |
| 11:47:53 | 11 | Q.  Would you take a look at Summary B and go to the page |
| 11:48:03 | 12 | where 2/27/09 is?  There's a withdrawal three from the bottom |
| 11:48:09 | 13 | on 2/27/09. |
| 11:48:16 | 14 | A.  Correct. |
| 11:48:17 | 15 | Q.  Do you see it? |
| 11:48:18 | 16 | A.  Yes. |
| 11:48:18 | 17 | Q.  Now, on 2/27/09, according to this, Mr. Collins withdrew |
| 11:48:25 | 18 | $1450 from his bank account, correct? |
| 11:48:29 | 19 | A.  Correct. |
| 11:48:30 | 20 | Q.  Now, also going to 3E on 2/27/09, he paid $1450 in cash on |
| 11:48:42 | 21 | that payment, did he not? |
| 11:48:44 | 22 | A.  That's correct. |
| 11:48:46 | 23 | Q.  So what he did was he took the money out in cash and he |
| 11:48:49 | 24 | went and paid it, right? |
| 11:48:50 | 25 | A.  Probably that's why I subtracted it at the end of the |

***REDACTED***

* * *REDACTED* * *

923

11:48:53  1  summary of the cash deposits.

11:48:56  2  Q.  So he basically took money out of one account, took it out

11:49:00  3  of there in cash, and paid a bill in cash, right?  That's what

11:49:03  4  he did, didn't he?

11:49:04  5  A.  Yes.

11:49:06  6  Q.  Now, looking at 3F, there's three vehicles there; am I

11:49:15  7  correct, sir?

11:49:16  8  A.  I'm not there yet.

11:49:17  9  Q.  I'm sorry.

11:49:19  10  A.  Three ...

11:49:21  11  Q.  F.

11:49:22  12  A.  F.  Yes.

11:49:24  13  Q.  Now, he didn't simultaneously own all three vehicles,

11:49:28  14  according to this, did he?

11:49:29  15  A.  Correct.  I believe he traded them.

11:49:31  16  Q.  Bought the first one and traded on the second, and traded

11:49:34  17  the second on the third; am I correct?

11:49:37  18  A.  I believe that's correct.

11:49:39  19  Q.  Referring you to 3H.  3H is a summary of payments to his

11:49:49  20  credit card, correct?

11:49:55  21  A.  3H, yes.

11:49:57  22  Q.  And the bank indicated in their comments that ten of them

11:50:03  23  were paid in cash, correct?

11:50:05  24  A.  I didn't count them, but ...

11:50:07  25  Q.  Well, please do.


* * *REDACTED* * *

***REDACTED***

924

11:50:08  1   A.  I believe you're right.

11:50:15  2          Yes, ten.

11:50:16  3   Q.  Okay.  So the bank indicated that ten of these were paid

11:50:18  4   in cash.  The rest were paid how?

11:50:28  5   A.  I don't know.

11:50:28  6   Q.  Well, you don't know as a fact they were paid in cash, do

11:50:32  7   you?

11:50:32  8   A.  No.  I just know they didn't come from the Chase checking

11:50:35  9   account.

11:50:35  10  Q.  Which means they could have come from some other checking

11:50:38  11  account, couldn't they?

11:50:39  12  A.  If there were one, yes.

11:50:41  13  Q.  Or some other savings account?

11:50:44  14  A.  If there were one, yes.

11:50:45  15  Q.  So in no way, shape, or form can you tell us that all of

11:50:48  16  these payments were made in cash, can you?

11:50:51  17  A.  That's correct.

11:50:53  18  Q.  Referring you to 3I.  3I is the Home Depot credit card?

11:51:02  19  A.  Correct.

11:51:02  20  Q.  Is there any indication on 3I that any of these payments

11:51:06  21  were made in cash?

11:51:08  22  A.  No.

11:51:09  23  Q.  Could any -- could all of these payments have been made

11:51:12  24  from another checking account?

11:51:14  25  A.  If there were one, yes, they could have.

***REDACTED***

* * *REDACTED* * *

925

| 11:51:16 | 1 | Q. And they could have been made from another savings |
| 11:51:19 | 2 | account? |
| 11:51:19 | 3 | A. If there were one, yes. |
| 11:51:20 | 4 | Q. There is nothing on this chart to tell us that they were |
| 11:51:25 | 5 | paid in cash, is there? |
| 11:51:27 | 6 | A. Correct. |
| 11:51:27 | 7 | Q. Do you have anything to prove they were paid in cash? |
| 11:51:32 | 8 | A. No. |
| 11:51:32 | 9 | Q. Then it is just simply your opinion they were paid in |
| 11:51:36 | 10 | cash, correct? |
| 11:51:38 | 11 | A. It was my analysis that the money didn't come from the |
| 11:51:42 | 12 | Chase checking account.  So it could have been paid in cash, |
| 11:51:46 | 13 | money order, certified check.  It could have been paid in a |
| 11:51:49 | 14 | lot of ways. |
| 11:51:50 | 15 | Q. Right. |
| 11:51:50 | 16 | It could have been paid in numerous ways, but you |
| 11:51:53 | 17 | can't unequivocally tell us that every one of these payments |
| 11:51:57 | 18 | were done in cash, can you? |
| 11:51:59 | 19 | A. That's correct. |
| 11:52:07 | 20 | Q. Now, J.  J are two money orders, $1200, 1250 [sic]? |
| 11:52:14 | 21 | A. They are money transfers, sir.  They are not money orders. |
| 11:52:18 | 22 | Q. Oh, I'm sorry.  My mistake. |
| 11:52:19 | 23 | They are Western Union wire transfers? |
| 11:52:21 | 24 | A. Correct. |
| 11:52:22 | 25 | Q. Okay.  And how were these paid for? |

* * *REDACTED* * *

* * *REDACTED* * *

926

11:52:26   1   A.  I believe you need to pay those in cash from a currency

11:52:30   2   exchange.

11:52:30   3   Q.  They don't take credit cards?

11:52:32   4   A.  I don't know.

11:52:35   5   Q.  You're not positive you have to pay in cash, are you?

11:52:38   6   A.  I'm not positive, no.

11:52:46   7   Q.  And K -- now in K you've just testified that you added

11:52:53   8   these up.  They add up to $234 -- or excuse me -- $234,213.08,

11:53:04   9   correct?

11:53:04  10   A.  Correct.

11:53:05  11   Q.  And you told us that all of this money was cash; am I

11:53:11  12   correct?

11:53:12  13   A.  I believe I said I was trying to trace the cash.

11:53:16  14   Q.  Okay.  But you're not telling us that all of this $234,213

11:53:22  15   that was spent was cash, are you?

11:53:24  16   A.  I was trying to trace the money that was spent not traced

11:53:28  17   to the Chase checking account, that's correct.

11:53:30  18   Q.  That's not my question.

11:53:31  19          My question is simply:  Are you telling us that the

11:53:34  20   $234,213 was all cash?  That's my question.

11:53:38  21   A.  No.

11:53:41  22   Q.  A great portion of this could easily have come from

11:53:45  23   another bank account, be it a checking account or savings

11:53:48  24   account, could it not?

11:53:49  25   A.  If there were one, it could.

* * *REDACTED* * *

***REDACTED***

927

| | | |
|---|---|---|
| 11:53:51 | 1 | Q.  And it could come from other sources not necessarily cash, |
| 11:53:54 | 2 | correct? |
| 11:53:55 | 3 | A.  It could. |
| 11:53:56 | 4 | Q.  So you cannot tell us today that you are positive that |
| 11:54:00 | 5 | every penny in this summary, 3K, was cash, can you? |
| 11:54:05 | 6 | A.  Correct. |
| 11:54:08 | 7 | MR. RUBINO:  I have nothing further.  Thank you. |
| 11:54:10 | 8 | Strike it.  One question. |
| 11:54:13 | 9 | BY MR. RUBINO: |
| 11:54:14 | 10 | Q.  Were you aware that during the period of '06, 2006, that |
| 11:54:18 | 11 | Mr. Collins owned a half interest in a sports bar in Atlanta, |
| 11:54:24 | 12 | Georgia? |
| 11:54:24 | 13 | A.  A sports bar in Atlanta, Georgia? |
| 11:54:26 | 14 | Q.  Were you told of that? |
| 11:54:28 | 15 | A.  I don't recall seeing that in evidence. |
| 11:54:33 | 16 | MR. RUBINO:  Okay.  I have nothing further. |
| 11:54:33 | 17 | - - - |
| 11:54:33 | 18 | BRUCE KILLIAN, REDIRECT EXAMINATION |
| 11:54:33 | 19 | BY MS. GUREN: |
| 11:54:43 | 20 | Q.  I just want to give you a chance, because you started to |
| 11:54:46 | 21 | try to say it. |
| 11:54:47 | 22 | Were you trying to say that all of these things were |
| 11:54:50 | 23 | cash? |
| 11:54:51 | 24 | A.  No.  I just wanted to show what he spent that wasn't |
| 11:54:55 | 25 | attributed to the Chase checking account. |

***REDACTED***

***REDACTED***

928

11:54:57  1   Q.  And, in fact, looking at Government Exhibit Summary 3K is

11:55:00  2   the title of that, Summary of cash deposits and payments?

11:55:04  3   A.  Yes.

11:55:05  4   Q.  And payments refers to other sources like you were saying,

11:55:08  5   like money orders and cashier checks and ...

11:55:11  6   A.  Correct.

11:55:12  7   Q.  And when you were talking about whether or not there

11:55:14  8   were -- you started to say if there were other accounts.  Did

11:55:17  9   you look at Government Exhibit Chase 4?

11:55:24  10  A.  Chase 4, I don't remember --

11:55:26  11  Q.  Was that -- oh, I'm sorry.  Chase 4 was the credit card.

11:55:29  12          Were there other credit -- were there other accounts

11:55:32  13  that you reviewed, besides for the one that you summarized in

11:55:37  14  Government Exhibit 3A and 3B?

11:55:39  15  A.  No, there weren't.

11:55:40  16  Q.  Did --

11:55:41  17  A.  Oh, no, there were two other accounts.  There was the

11:55:43  18  Hilarious Entertainment and the Double R Construction or

11:55:48  19  Contractors.

11:55:49  20  Q.  And did you also not -- did you also look at that savings

11:55:52  21  account as well?

11:55:52  22  A.  The savings account, yes.

11:55:54  23  Q.  And when you were looking through this evidence, did you

11:55:57  24  come across a credit report for Mr. Collins?

11:55:59  25  A.  I did.

***REDACTED***

***REDACTED***

929

11:56:00  1   Q.  Did that show any other accounts that you could find?

11:56:04  2   A.  I don't recall seeing any other bank accounts, no.

11:56:08  3   Q.  In doing your financial analysis of Mr. Collins, were you

11:56:11  4   able to find any other accounts, other than the ones that you

11:56:14  5   have reviewed?

11:56:15  6   A.  I did not.

11:56:24  7   Q.  You started to also get cut off when you were talking

11:56:27  8   about the February 27th payment.  You started to talk about

11:56:32  9   how you had accounted for that in Government Exhibit

11:56:35  10  Summary 3A?

11:56:37  11  A.  Yes.  I subtracted it from the cash deposits.

11:56:42  12  Q.  So that, for example, if there had been the payment that

11:56:44  13  was withdrawn from Government Exhibit Summary 3B, that's

11:56:47  14  actually not part of that final amount of $234,000?

11:56:52  15  A.  That's correct.

11:57:06  16      MS. GUREN:  One moment?

11:57:28  17  BY MS. GUREN:

11:57:29  18  Q.  Mr. Killian, did you also review tax information in this

11:57:33  19  case?

11:57:33  20  A.  There was tax information available in the file.

11:57:35  21  Q.  As a former IRS agent, are you able to understand that tax

11:57:39  22  information?

11:57:39  23  A.  I believe I am.

11:57:41  24  Q.  And looking at the tax information was it for the years --

11:57:43  25      MR. RUBINO:  Excuse me.  Excuse me.  I think we're

***REDACTED***

* * *REDACTED* * *

930

11:57:45  1    way outside the scope of cross.

11:57:47  2         THE COURT:  Overruled, based upon the questions that

11:57:50  3    you have regarding his knowledge of various tax forms.

11:57:55  4    BY MS. GUREN:

11:57:55  5    Q.  Did you review tax records from 1998 -- or tax information

11:58:00  6    from 1998 through 2008 in this case?

11:58:03  7    A.  The information that the IRS provided, yes.

11:58:06  8    Q.  Did it show a record from the IRS of any capital gains

11:58:13  9    information?

11:58:13  10   A.  Capital gains, no.

11:58:15  11   Q.  And what does capital gains usually refer to?

11:58:18  12   A.  In generalities, a gain from the sale of an asset, like

11:58:22  13   stock or a home or real estate or land, that's --

11:58:25  14   Q.  Would it also be an investment?

11:58:27  15   A.  An investment, like stock in a company, yes.

11:58:31  16   Q.  Did it also -- what, if anything, did the IRS tax records

11:58:37  17   show about sources of income?

11:58:41  18   A.  Sources of income for Mr. Collins, as I recall --

11:58:46  19   Q.  And I'm sorry.  Let me just limit you to the period of

11:58:49  20   what we're talking about, 2005 to 2008.

11:58:51  21   A.  I do not recall that he received any income per the IRS

11:58:55  22   records.

11:58:56  23   Q.  And when we're talking about these IRS records, are these

11:58:59  24   different from tax returns where it's self-reported by the

11:59:03  25   individual?


* * *REDACTED* * *

***REDACTED***

931

11:59:04   1   A.  I'm basically referring to what at the IRS they call an

11:59:08   2   ERP (phonetic).

11:59:08   3   Q.  What's an ERP?

11:59:09   4   A.  An ERP would be a summary of documents filed for a

11:59:14   5   particular taxpayer, based -- that would include W-2s, 1099s,

11:59:20   6   1098s.

11:59:25   7   Q.  And can these things be supplied by the IRS by people,

11:59:29   8   other than the individual taxpayer?

11:59:30   9   A.  Usually the information is supplied by the payor.  In

11:59:34   10  other words, your wages are reported on a summary W-2 given in

11:59:39   11  [sic] the IRS, 1099s, things of that nature.

11:59:42   12          MS. GUREN:  One moment, your Honor?

11:59:47   13          No further questions.

11:59:47   14                          - - -

11:59:47   15          BRUCE KILLIAN, RECROSS-EXAMINATION

11:59:47   16  BY MR. RUBINO:

11:59:53   17  Q.  Sir, you only looked at the bank accounts that were

11:59:56   18  provided to you by the U.S. Attorney's Office, correct?

11:59:59   19  A.  The bank accounts that I mentioned today, yes.

12:00:03   20  Q.  Okay.  And you told us you couldn't find other accounts?

12:00:08   21  A.  I did not find other accounts.

12:00:10   22  Q.  Now, is that your contention that since you couldn't find

12:00:13   23  other accounts that none exist?

12:00:15   24  A.  It's possible that some exist.

12:00:17   25  Q.  And you were asked about tax records.  In your experience

***REDACTED***

***REDACTED***

932

12:00:25   1   as an IRS agent, have you ever come upon people that were

12:00:30   2   paid, quote, off the books, unquote?

12:00:32   3   A.  Yes.

12:00:32   4   Q.  What's that term mean?

12:00:35   5   A.  To me, it means that people that were paid in cash and

12:00:41   6   maybe the employer, if it was wages, did not record it in

12:00:45   7   their records because it was cash.

12:00:47   8   Q.  It's commonly done, isn't it?

12:00:50   9   A.  Probably more than the IRS would like, yes.

12:00:53   10          MR. RUBINO:  Thank you.  I have nothing further.

12:00:53   11                          - - -

12:00:53   12          BRUCE KILLIAN, REDIRECT EXAMINATION

12:01:05   13  BY MS. GUREN:

12:01:05   14  Q.  As part of your financial analysis of the defendant and as

12:01:08   15  part of just your duties when you're working with the

12:01:11   16  U.S. Attorney's Office, if you need to obtain records that you

12:01:14   17  would think would be necessary for your financial analysis,

12:01:17   18  what do you usually do?

12:01:18   19  A.  I would talk to the attorney or attorneys in charge and

12:01:22   20  see if we could get those records.

12:01:24   21          MS. GUREN:  No further questions.

12:01:27   22          THE COURT:  Anything else?

12:01:28   23          MR. RUBINO:  No, ma'am.

12:01:28   24          THE COURT:  Okay.  You can step down now and be

12:01:31   25  excused.

***REDACTED***

* * *REDACTED* * *

933

| | | |
|---|---|---|
| 12:01:33 | 1 | (Witness leaves the stand.) |
| 12:01:33 | 2 | THE COURT:  And you can call your next witness. |
| 12:01:35 | 3 | MS. GUREN:  Your Honor, we've got one more |
| 12:01:36 | 4 | stipulation to read. |
| 12:01:37 | 5 | THE COURT:  Okay. |
| 12:01:38 | 6 | MS. GUREN:  It is -- oh, stipulation number 7. |
| 12:01:41 | 7 | It is hereby stipulated and agreed by the United |
| 12:01:43 | 8 | States of America by its attorney, Patrick J. Fitzgerald, the |
| 12:01:47 | 9 | United States Attorney for the Northern District of Illinois, |
| 12:01:50 | 10 | and the defendant, individually and by his attorneys, that the |
| 12:01:54 | 11 | following facts are true: |
| 12:01:55 | 12 | If called as a witness, a witness for the Internal |
| 12:02:00 | 13 | Revenue Service, IRS, would testify that he or she has made a |
| 12:02:03 | 14 | diligent search for United States individual income tax |
| 12:02:06 | 15 | returns pertaining to Ron C. Collins at ███████████ |
| 12:02:13 | 16 | ██████ in Calumet Park, Illinois with a Social Security number |
| 12:02:15 | 17 | ending in 7258 and that no such records for the tax years 1998 |
| 12:02:20 | 18 | through December 31st, 2007 exist. |
| 12:02:23 | 19 | If called as a witness, a witness for the IRS would |
| 12:02:26 | 20 | further testify that IRS records for the tax years 1998 |
| 12:02:29 | 21 | through December 31st, 2007 show that individual Ron C. |
| 12:02:36 | 22 | Collins at ████████████ in Calumet Park, Illinois |
| 12:02:42 | 23 | with a Social Security number ending in 7258 had no wages or |
| 12:02:45 | 24 | capital gains income reported. |
| 12:02:46 | 25 | If called as a witness, a witness for the IRS would |

* * *REDACTED* * *

***REDACTED***

934

| | |
|---|---|
| 12:02:50 | 1 |

further testify that he or she has knowledge of relevant

recordkeeping systems at the IRS and that the records in

Government Exhibit Tax 1 was made or received and maintained

in the regular course of the IRS' conducted activity around

the time of the transactions reflected in the records and that

it is the regular practice of the IRS to make such records.

The parties agree that the Government Exhibit Tax 1 may be

received into evidence without the need of any other

evidentiary foundation.

      So stipulated?

      MR. RUBINO:  Yes.

      MS. GUREN:  At this time we would move into evidence

Government Exhibit Tax 1.

      THE COURT:  Okay.  It will be admitted.

      MS. RODNEY:  Your Honor, the Government calls

Lieutenant Robert Coleman.

      THE COURT:  Okay.

      (Witness takes the stand.)

      THE COURT:  Please raise your right hand.

      (The witness was sworn.)

      THE COURT:  Okay.  Have a seat, and you may begin

when you're ready, Ms. Rodney.

      - - -

      ROBERT COLEMAN, DIRECT EXAMINATION

BY MS. RODNEY:

***REDACTED***

***REDACTED***

935

12:04:01  1   Q.  Lieutenant Coleman, would you please state and spell your
12:04:03  2   last name for the record?
12:04:03  3   A.  Robert Coleman, C-o-l-e-m-a-n.
12:04:09  4   Q.  Are you currently employed?
12:04:10  5   A.  Yes.
12:04:10  6   Q.  And where do you work?
12:04:11  7   A.  I'm a lieutenant with the Will County Sheriff's Office.
12:04:14  8   Q.  What is your current assignment?
12:04:15  9   A.  I'm assigned as a task force officer with the Drug
12:04:19  10  Enforcement Administration, based out of Chicago.
12:04:21  11  Q.  And how long have you worked as a task force officer for
12:04:24  12  DEA?
12:04:25  13  A.  Since April of 1995.
12:04:28  14  Q.  I'm going to ask you more about that role in a moment, but
12:04:31  15  first I want to ask you about your background.
12:04:33  16       How long have you worked in law enforcement?
12:04:35  17  A.  Since 1980.
12:04:38  18  Q.  And what was your first position in law enforcement?
12:04:40  19  A.  I was hired as a police officer by the University Park
12:04:43  20  Police Department in 1980.
12:04:45  21  Q.  And what training did you have to become a police officer
12:04:48  22  with University Park?
12:04:49  23  A.  Initially I attended the police training institute at the
12:04:52  24  University of Illinois in Champaign.
12:04:55  25  Q.  And can you describe your duties and responsibilities as a

***REDACTED***

* * *REDACTED* * *

936

12:04:58　1　police officer?

12:04:59　2　A.　Initially my duties were I was in a uniform in a squad car

12:05:03　3　patrolling areas of the village.

12:05:05　4　Q.　Did you have an opportunity to work on drug cases during

12:05:08　5　that time?

12:05:09　6　A.　Occasionally.

12:05:10　7　Q.　About how many drug cases did you work?

12:05:12　8　A.　Perhaps a few dozen.

12:05:14　9　Q.　And how many years were you with University Park?

12:05:17　10　A.　About five years.

12:05:19　11　Q.　Why did you leave University Park?

12:05:21　12　A.　I was hired by Handy Andy Corporation as their chief

12:05:25　13　corporate investigator.　Handy Andy is a home improvement

12:05:29　14　chain much like Menards or Home Depot.

12:05:31　15　Q.　And how long did you work for Handy Andy?

12:05:35　16　A.　About three years.

12:05:35　17　Q.　And what did you do after then?

12:05:36　18　A.　I was hired by the Will County Sheriff's Office as a

12:05:39　19　sheriff's deputy.

12:05:41　20　Q.　And where is Will County in relationship to Cook County?

12:05:42　21　A.　Will County is southwest of Chicago.　It's one of the

12:05:45　22　collar counties surrounding Chicago.

12:05:47　23　Q.　And what was your first job with Will County?

12:05:49　24　A.　I was initially assigned to the jail division for the

12:05:51　25　first eight months.

* * *REDACTED* * *

***REDACTED***

937

12:05:54  1  Q.  All right.  Did you have any other responsibilities after

12:05:56  2  that?

12:05:57  3  A.  I rotated out after eight months into the patrol division.

12:06:01  4  Q.  And how long did you work in patrol?

12:06:03  5  A.  Until about 1990.

12:06:05  6  Q.  And what did you do in patrol?

12:06:07  7  A.  In patrol, I was in a uniform in a squad car patrolling

12:06:10  8  different areas of Will County.

12:06:12  9  Q.  During your work in patrol, did you receive any training

12:06:15  10  in narcotics investigations?

12:06:17  11  A.  Some, yes.

12:06:18  12  Q.  And can you describe that training?

12:06:20  13  A.  I received training in both drug identification and drug

12:06:24  14  trends, concealed compartment training, and some other type of

12:06:28  15  training as well.

12:06:29  16  Q.  Did you have any experience with drug crimes -- excuse

12:06:34  17  me -- with drug crimes during your time in patrol?

12:06:37  18  A.  Just occasionally making a traffic stop on individuals

12:06:40  19  that investigation would later uncover some contraband,

12:06:43  20  arrests of that nature, in addition to assisting in search

12:06:47  21  warrants for the drug units from time to time.

12:06:49  22  Q.  What was your next position at Will County?

12:06:51  23  A.  I was assigned to a state police drug task force in 1990.

12:06:56  24  Q.  And what is the name of that task force?

12:06:59  25  A.  It was called MANS, Metropolitan Area Narcotics Squad.

***REDACTED***

* * *REDACTED* * *

938

12:07:05    1   Q.  And what is MANS?

12:07:06    2   A.  MANS is a MEG unit, Metropolitan Enforcement Group.  There

12:07:08    3   are about a dozen MEG units throughout the State of Illinois.

12:07:12    4   Each MEG unit is responsible for conducting drug

12:07:13    5   investigations in a specific geographic area.  The MANS unit

12:07:17    6   was responsible for Will and Grundy Counties.

12:07:20    7   Q.  And is that where you did your work?

12:07:22    8   A.  Yes.

12:07:22    9   Q.  And what was your title within MANS?

12:07:25   10   A.  All police officers assigned to the MEG units are

12:07:28   11   cross-designated as state police inspectors.

12:07:32   12   Q.  And can you describe your day-to-day duties as a state

12:07:35   13   police inspector?

12:07:36   14   A.  We would conduct drug investigations.  Sometimes we would

12:07:39   15   do surveillance on the streets on targets.  Sometimes we would

12:07:42   16   make undercover drug buys.  Sometimes we would execute search

12:07:45   17   warrants.  Sometimes we would conduct electronic surveillance.

12:07:48   18   Q.  Approximately how many drug investigations did you work on

12:07:51   19   when you were with MANS?

12:07:53   20   A.  Over a hundred.

12:07:54   21   Q.  And while you were with MANS, did you receive any criminal

12:07:58   22   training with regards to narcotics investigations?

12:08:01   23   A.  Yes.

12:08:01   24   Q.  And what training -- or can you describe that training?

12:08:04   25   A.  I attended DEA's two-week drug school.  I attended DEA's

| | | |
|---|---|---|
| 12:08:09 | 1 | narcotic officer survival school.  I attended classes on |
| 12:08:12 | 2 | concealed compartment training, clandestine laboratory |
| 12:08:17 | 3 | training, drug trends, drug identification, financial crimes |
| 12:08:20 | 4 | investigation, and asset forfeiture investigation. |
| 12:08:25 | 5 | Q.  While you were with MANS, did you serve as an undercover |
| 12:08:28 | 6 | officer? |
| 12:08:28 | 7 | A.  Yes. |
| 12:08:28 | 8 | Q.  And what is an undercover officer? |
| 12:08:30 | 9 | A.  An undercover officer is a police officer who serves in an |
| 12:08:34 | 10 | undercover capacity portraying some type of criminal element |
| 12:08:36 | 11 | in an attempt to further an investigation. |
| 12:08:39 | 12 | Q.  What are some of the criminal roles you played as an |
| 12:08:42 | 13 | undercover officer? |
| 12:08:43 | 14 | A.  I portrayed somebody who was buying drugs, anywhere from |
| 12:08:47 | 15 | dime bags of crack cocaine up to multi-ounce quantities and |
| 12:08:51 | 16 | even kilo-quantities at the MANS unit. |
| 12:08:54 | 17 | In addition to that, I portrayed an individual who |
| 12:08:57 | 18 | had large quantities of drugs to sell, kilogram-quantities of |
| 12:09:02 | 19 | cocaine in conducting reverse undercover operations. |
| 12:09:06 | 20 | Q.  Approximately how many undercover investigations did you |
| 12:09:08 | 21 | work on at MANS? |
| 12:09:09 | 22 | A.  Dozens. |
| 12:09:11 | 23 | Q.  And what were the types of drugs involved in your cases at |
| 12:09:18 | 24 | MANS? |
| 12:09:18 | 25 | A.  Cocaine, crack cocaine, methamphetamine, marijuana, |

12:09:21   1   heroin, club drugs, LSD, and some others.

12:09:25   2   Q.  How long did you work on MANS?

12:09:27   3   A.  About two years.

12:09:29   4   Q.  And where did you go after that?

12:09:30   5   A.  I rotated back to the sheriff's office to the patrol

12:09:33   6   division.

12:09:34   7   Q.  Now, was that just a two-year temporary assignment?

12:09:37   8   A.  Yes.  All assignments to the MANS units or MEG units are

12:09:41   9   temporary.

12:09:43  10   Q.  And what was your next position after you rotated out of

12:09:46  11   MANS?

12:09:46  12   A.  I served in the patrol division for a period of time until

12:09:49  13   I was assigned to the Drug Enforcement Administration in April

12:09:51  14   of '95.

12:09:53  15   Q.  And are you still in that current -- in that position

12:09:57  16   today?

12:09:58  17   A.  Yes.

12:09:58  18   Q.  But you're still technically employed by the Will County

12:10:01  19   Sheriff's Office?

12:10:01  20   A.  Correct.  I'm a lieutenant with the sheriff's office.

12:10:03  21   They pay my salary and benefits, and I'm under the day-to-day

12:10:07  22   control of DEA.

12:10:08  23   Q.  Now, what are your current duties as a task force officer

12:10:11  24   with DEA?

12:10:12  25   A.  As a task force officer, I work side by side with DEA

***REDACTED***

941

| | | |
|---|---|---|
| 12:10:16 | 1 | special agents and we conduct investigations into drug |
| 12:10:19 | 2 | trafficking organizations. |
| 12:10:20 | 3 | Q.  Are you familiar with the term case agent? |
| 12:10:23 | 4 | A.  Yes. |
| 12:10:24 | 5 | Q.  And have you served in that role? |
| 12:10:26 | 6 | A.  Yes, both as case agent and co-case agent. |
| 12:10:29 | 7 | Q.  And is the case agent the leader of the investigation? |
| 12:10:33 | 8 | A.  Pardon me? |
| 12:10:33 | 9 | Q.  Is the case agent the leader of an investigation? |
| 12:10:36 | 10 | A.  Yes.  A case agent is the one that calls the shots on the |
| 12:10:39 | 11 | investigation, what direction it's going to take, what steps |
| 12:10:42 | 12 | are taken next in the investigation. |
| 12:10:44 | 13 | Q.  And approximately how many times have you served as the |
| 12:10:47 | 14 | case agent? |
| 12:10:48 | 15 | A.  Dozens. |
| 12:10:49 | 16 | Q.  Have you conducted surveillance during your time as a TFO? |
| 12:10:56 | 17 | A.  Yes. |
| 12:10:56 | 18 | Q.  Approximately how many times have you conducted |
| 12:10:58 | 19 | surveillance? |
| 12:10:58 | 20 | A.  Hundreds of times. |
| 12:11:00 | 21 | Q.  Have you worked in the capacity as an undercover agent -- |
| 12:11:03 | 22 | A.  Yes. |
| 12:11:03 | 23 | Q.  -- as a TFO? |
| 12:11:05 | 24 | A.  Yes. |
| 12:11:06 | 25 | Q.  Approximately how many times have you worked as an |

***REDACTED***

942

12:11:10   1   undercover agent?

12:11:10   2   A.  Over a hundred.

12:11:11   3   Q.  Have you been involved in wiretap investigations?

12:11:14   4   A.  Yes.

12:11:15   5   Q.  And can you just give a layman's description of what a

12:11:18   6   wiretap is?

12:11:18   7   A.  A wiretap is a court authorized -- it's a court-authorized

12:11:24   8   interception of communications between a target and another

12:11:27   9   individual.  A wiretap can either be intercepting phone calls

12:11:32   10   on a target telephone used by an individual or an

12:11:35   11   organization, or it can be a listening device placed into a

12:11:39   12   room or a car in which the target is located to intercept

12:11:43   13   conversations from that target.

12:11:45   14   Q.  Approximately how many wiretap investigations have you

12:11:50   15   been a part of?

12:11:50   16   A.  Dozens.

12:11:50   17   Q.  And what have you done in those investigations?

12:11:53   18   A.  Pardon me?

12:11:54   19   Q.  What have you done as part of those investigations?

12:11:56   20   A.  Assisted in surveillance, conducted -- engaged in

12:11:59   21   undercover roles, monitored the wiretaps in the wire room,

12:12:05   22   helped prepare the case for presentation to court.

12:12:09   23   Q.  What training have you received from DEA since you've

12:12:12   24   become a TFO?

12:12:13   25   A.  I received training, again, in clandestine laboratories,

* * *REDACTED* * *

943

12:12:16 1 concealed compartment training, drug trans both domestic and

12:12:21 2 international.  I received training in complex conspiracy

12:12:24 3 investigations, telephone investigations, financial crimes

12:12:28 4 investigations, asset forfeiture investigations.  I attended

12:12:31 5 training at the drug unit commander academy at DEA's Quantico

12:12:36 6 training facility, and I've attended the FBI National Academy

12:12:40 7 at Quantico.

12:12:41 8 Q.  As a task force officer with DEA, how many drug cases have

12:12:45 9 you worked on?

12:12:46 10 A.  Hundreds.

12:12:47 11 Q.  What amounts of drugs have been involved in the cases

12:12:50 12 you've worked on?

12:12:51 13 A.  A wide variety, from dime bags of crack cocaine or

12:12:54 14 one-tenth of one gram up to multi-hundred kilogram-quantities

12:12:58 15 of cocaine.

12:13:01 16 Q.  Now, you've talked about being an undercover agent as a

12:13:05 17 TFO with DEA.  What are some of the roles you played as an

12:13:09 18 undercover agent --

12:13:11 19 A.  Again, as an individual purchasing large quantities of

12:13:14 20 drugs from organizations.  Also, in an undercover capacity,

12:13:20 21 conducting reverse undercover operations where I'm purchasing

12:13:23 22 large quantities of drugs from an organization.  Also, I've

12:13:26 23 been hired as a transporter by drug organizations.

12:13:32 24 Q.  Approximately how many of your investigations involved

12:13:36 25 wholesale-quantities of cocaine?

* * *REDACTED* * *

* * *REDACTED* * *

944

| | | |
|---|---|---|
| 12:13:41 | 1 | A.  Probably 95 percent. |
| 12:13:46 | 2 | Q.  Now, as an undercover agent with DEA, have you ever |
| 12:13:49 | 3 | portrayed the role as a purchaser of cocaine? |
| 12:13:52 | 4 | A.  Yes. |
| 12:13:53 | 5 | Q.  Approximately how many times? |
| 12:13:55 | 6 | A.  Dozens of times. |
| 12:13:58 | 7 | Q.  And what types and quantities of cocaine have you |
| 12:14:01 | 8 | purchased during your undercover work with DEA? |
| 12:14:03 | 9 | A.  I purchased both crack cocaine and also powder cocaine, or |
| 12:14:09 | 10 | cocaine hydrochloride.  As far as quantities go, anywhere from |
| 12:14:14 | 11 | a dime bag or one-tenth of a gram of crack up to 50 kilograms |
| 12:14:20 | 12 | of powder cocaine. |
| 12:14:21 | 13 | Q.  In your training and experience, have you become familiar |
| 12:14:23 | 14 | with the process by which powder cocaine comes into the United |
| 12:14:28 | 15 | States and is thereafter trafficked within the United States? |
| 12:14:31 | 16 | A.  Yes. |
| 12:14:38 | 17 | Q.  And in your training and experience, have you become |
| 12:14:40 | 18 | familiar with the means by which drug traffickers prepare, |
| 12:14:44 | 19 | package, transport, and thereafter sell drugs? |
| 12:14:47 | 20 | A.  Yes. |
| 12:14:48 | 21 | Q.  In your training and experience, have you become familiar |
| 12:14:51 | 22 | with the ways in which cocaine traffickers operate? |
| 12:14:54 | 23 | A.  Yes. |
| 12:14:56 | 24 | Q.  In your training and experience, have you become familiar |
| 12:14:59 | 25 | with the common weights and measures for wholesale-quantities |

* * *REDACTED* * *

***REDACTED***

945

12:15:02  1  of cocaine?

12:15:03  2  A.  Yes.

12:15:05  3  Q.  In your training and experience, have you become familiar

12:15:07  4  with how cocaine is ingested?

12:15:10  5  A.  Yes.

12:15:11  6  Q.  Do you keep abreast of the latest trends in drug

12:15:14  7  trafficking?

12:15:15  8  A.  Yes.

12:15:15  9  Q.  How do you do so?

12:15:17  10  A.  By continuing to work active cases at DEA as a case agent

12:15:20  11  and co-case agent, by debriefing informants who have agreed to

12:15:24  12  cooperate with DEA, by conducting proffers of defendants who

12:15:29  13  have been charged with drug activity and who have agreed to

12:15:32  14  cooperate, by speaking with other agents and co-case agents

12:15:35  15  who are involved in active drug investigations, by monitoring

12:15:40  16  Title III wiretap investigations, and also by continuing to

12:15:44  17  attend additional training.

12:15:48  18  Q.  If you need, there's water in the pitcher right next to

12:15:51  19  you.

12:15:52  20  A.  Thank you.

12:15:53  21  Q.  Do you also review any journals on the topic put out by

12:15:59  22  DEA?

12:15:59  23  A.  Yes.

12:15:59  24  Q.  Now, are you familiar with the distribution of cocaine in

12:16:01  25  the Chicago area?

***REDACTED***

* * *REDACTED* * *

946

12:16:03　1　A.　Yes.

12:16:08　2　Q.　And are you familiar with the prices and payment methods

12:16:09　3　used for wholesale quantities of cocaine in the Chicago area?

12:16:13　4　A.　Yes.

12:16:15　5　Q.　In your training and experience, have you become familiar

12:16:18　6　with the various street names and descriptors for cocaine?

12:16:21　7　A.　Yes.

12:16:22　8　Q.　Lieutenant, have you interviewed anyone on the witness

12:16:25　9　list related to this case?

12:16:27　10　A.　No.

12:16:29　11　Q.　Have you been provided any of the legal documents in this

12:16:32　12　case?

12:16:32　13　A.　No.

12:16:32　14　Q.　Do you know the facts involved in this case?

12:16:34　15　A.　No.

12:16:38　16　Q.　Have you ever been qualified to give an opinion on cocaine

12:16:43　17　trafficking before?

12:16:43　18　A.　Yes.

12:16:43　19　Q.　Approximately how many times?

12:16:46　20　A.　68 times.

12:16:47　21　Q.　In what courts have you been qualified as an opinion

12:16:51　22　witness?

12:16:52　23　A.　Mostly here in Federal Court in Chicago and a couple of

12:16:54　24　times in state court in Joliet.

12:16:57　25　　　　MS. RODNEY:　Your Honor, at this time the Government

* * *REDACTED* * *

* * *REDACTED* * *

947

| | | |
|---|---|---|
| 12:16:59 | 1 | moves under Rule 702 to qualify Lieutenant Coleman to provide |
| 12:17:03 | 2 | opinion testimony in the field of cocaine and narcotics |
| 12:17:05 | 3 | trafficking. |
| 12:17:05 | 4 | THE COURT:  Okay.  Do you want to voir dire the |
| 12:17:08 | 5 | witness? |
| 12:17:08 | 6 | MR. RUBINO:  Not necessary. |
| 12:17:09 | 7 | THE COURT:  Okay.  Then he will be permitted to do |
| 12:17:11 | 8 | so. |
| 12:17:12 | 9 | MS. RODNEY:  Thank you. |
| 12:17:13 | 10 | BY MS. RODNEY: |
| 12:17:14 | 11 | Q.  Lieutenant, what is cocaine? |
| 12:17:16 | 12 | A.  Cocaine, powder cocaine is an illegal drug. |
| 12:17:20 | 13 | Q.  And where does it come from? |
| 12:17:22 | 14 | A.  It's manufactured in South America. |
| 12:17:25 | 15 | Q.  In what forms does it take when it's manufactured? |
| 12:17:28 | 16 | A.  Well, the end product -- there are two end products for |
| 12:17:33 | 17 | cocaine.  One is powder cocaine or cocaine hydrochloride, and |
| 12:17:37 | 18 | then there's another conversion process in which you could put |
| 12:17:39 | 19 | the powder cocaine through to convert it to cocaine base or |
| 12:17:43 | 20 | crack cocaine. |
| 12:17:44 | 21 | Q.  How is powder cocaine imported into the United States? |
| 12:17:48 | 22 | A.  Through a variety of methods.  Usually it comes from |
| 12:17:51 | 23 | Columbia into Mexico, and then from Mexico into the United |
| 12:17:55 | 24 | States.  Sometimes it's concealed within passenger cars that |
| 12:18:00 | 25 | are crossing the border from Mexico into the United States. |

* * *REDACTED* * *

* * *REDACTED* * *

948

| | |
|---|---|
| 12:18:03 | 1 |
| 12:18:08 | 2 |
| 12:18:11 | 3 |
| 12:18:13 | 4 |
| 12:18:18 | 5 |
| 12:18:22 | 6 |
| 12:18:26 | 7 |
| 12:18:29 | 8 |
| 12:18:33 | 9 |
| 12:18:37 | 10 |
| 12:18:37 | 11 |
| 12:18:37 | 12 |
| 12:18:39 | 13 |
| 12:18:42 | 14 |
| 12:18:45 | 15 |
| 12:18:47 | 16 |
| 12:18:50 | 17 |
| 12:18:53 | 18 |
| 12:18:57 | 19 |
| 12:19:02 | 20 |
| 12:19:05 | 21 |
| 12:19:09 | 22 |
| 12:19:12 | 23 |
| 12:19:15 | 24 |
| 12:19:17 | 25 |

Sometimes it's concealed inside tractor-trailers, transporting legitimate product or produce from Mexico into the United States.  It's concealed within that cover load.

Sometimes it can be transported in go-fast boats from Mexico into the United States.  Sometimes it can be actually integrated into legitimate products, shipped into the United States, and then extracted from those products.  And there are a variety of other methods in which it's transported as well.

Q.  Are there various transshipment points within the United States?

A.  Yes.

Q.  Is Chicago one of them?

A.  Yes.

Q.  Once the cocaine makes it into the United States, how is it distributed down to the street level?

A.  Well, once it crosses the border into the United States, it goes usually to a staging area just across the border, and then from there it'll get transported to a transshipment city, such as Chicago.  Once Chicago receives a large quantity of cocaine, a couple hundred kilos or so, then it would be distributed further down the chain to other wholesale distributors and then to midlevel distributors until it finally makes it down to the consumer.

Q.  What does powder cocaine look like?

A.  It's a white powder, sometimes it can be off-white,

***REDACTED***

949

| | | |
|---|---|---|
| 12:19:22 | 1 | sometimes yellowish or a pinkish tint, but generally it's |
| 12:19:25 | 2 | white in color. |
| 12:19:26 | 3 | Q.  Are you familiar with how a kilogram of cocaine looks? |
| 12:19:29 | 4 | A.  Yes. |
| 12:19:30 | 5 | Q.  And what does that look like? |
| 12:19:31 | 6 | A.  Well, a kilogram of cocaine or 1,000 grams has the |
| 12:19:35 | 7 | appearance of about the size of a cigar box. |
| 12:19:39 | 8 | Q.  Of a cigar box? |
| 12:19:40 | 9 | A.  Correct. |
| 12:19:41 | 10 | Q.  How is cocaine consumed? |
| 12:19:45 | 11 | A.  There's a couple of different ways.  Powder cocaine can be |
| 12:19:47 | 12 | snorted through the nose.  It can also be mixed in solution |
| 12:19:52 | 13 | and injected.  And then crack cocaine can only be smoked. |
| 12:19:56 | 14 | Q.  What is a dosage amount or a user quantity of cocaine? |
| 12:20:01 | 15 | A.  A dosage amount, a typical dosage amount would be about |
| 12:20:07 | 16 | one-tenth of one gram of cocaine. |
| 12:20:10 | 17 | Q.  And can you give a visual to the jury about how much one |
| 12:20:15 | 18 | gram is or a quantity smaller than that? |
| 12:20:18 | 19 | A.  Yeah, sure.  One-tenth of one gram, if you can imagine an |
| 12:20:21 | 20 | aspirin tablet, a typical aspirin tablet weighs about |
| 12:20:26 | 21 | one-third of a gram, so it would take three aspirin tablets to |
| 12:20:31 | 22 | equal roughly one gram. |
| 12:20:35 | 23 | Q.  So there are approximately ten dosage units in one gram of |
| 12:20:39 | 24 | cocaine? |
| 12:20:40 | 25 | A.  Correct. |

***REDACTED***

***REDACTED***

950

12:20:45  1   Q.  And what are the various user quantities of cocaine?

12:20:49  2   A.  For powder cocaine?

12:20:51  3   Q.  Yes.

12:20:51  4   A.  User quantities, well, the smallest amount of powder

12:20:59  5   cocaine, that I'm aware of, that's purchased at the street

12:21:02  6   level is one half of one gram.  And then it goes up from there

12:21:05  7   to one gram, and then from one gram it goes to a sixteenth or

12:21:12  8   1.75 grams.  And the sixteenth is in reference to

12:21:15  9   one-sixteenth of an ounce.  From the sixteenth it goes up to

12:21:19  10  an eightball or one-eighth of an ounce, which is 3.5 grams.

12:21:23  11  And then a quarter gram -- I mean, a quarter ounce, a half

12:21:25  12  ounce, and then up to an ounce.

12:21:27  13  Q.  Have you seen a user be in possession of more than one

12:21:30  14  ounce of cocaine for personal use?

12:21:32  15  A.  No.

12:21:35  16  Q.  Now, what are some examples of distribution quantities of

12:21:39  17  cocaine?

12:21:41  18  A.  A distribution quantity would start at the lowest end,

12:21:47  19  would be one ounce of cocaine.  And then it would go upwards

12:21:50  20  from there, multi-ounce quantities, to finally

12:21:53  21  kilogram-quantities and upwards from there.

12:21:58  22  Q.  How many dosage units are in one kilogram of cocaine?

12:22:04  23  A.  10,000.

12:22:08  24  Q.  Does that 10,000 refer to an uncut kilo of cocaine?

12:22:14  25  A.  Well, it refers to a -- yes.  It refers to a thousand

***REDACTED***

***REDACTED***

951

12:22:17　1　grams.  There's 10,000 dosage units in a thousand grams

12:22:22　2　regardless of the purity level of the kilo.

12:22:24　3　Q.  And I've used the term uncut, are you familiar with that

12:22:27　4　term?

12:22:27　5　A.  Yes.

12:22:28　6　Q.  And what is that?

12:22:29　7　A.  Uncut is a reference to the cocaine or whatever drug not

12:22:36　8　having been diluted or cut with a cutting agent.

12:22:41　9　Q.  And what is the purpose of diluting cocaine?

12:22:44　10　A.  Well, to make more money.  If a person has an ounce of

12:22:49　11　cocaine, for example, 28 grams, if he wants to make more

12:22:53　12　money, he'll take a cutting agent of another 28 grams and mix

12:22:57　13　that with the 28 grams of cocaine, and then he has a mixture

12:23:00　14　of two ounces of cocaine to sell on the street.

12:23:10　15　Q.  And what is the street reference for diluting cocaine?

12:23:16　16　A.  There's a couple of them.  Cutting it, breaking it down,

12:23:21　17　stepping on it.

12:23:27　18　Q.  Now, earlier you testified that you've become familiar

12:23:29　19　with the prices for wholesale-quantities of cocaine in the

12:23:32　20　Chicago area?

12:23:33　21　A.  Yes.

12:23:34　22　Q.  In 2005 what was the price of a kilogram of cocaine in

12:23:38　23　Chicago?

12:23:39　24　A.  It would have run between 17,000 and $25,000 per kilo.

12:23:46　25　Q.  Do you know if it would have been within that same range

***REDACTED***

* * *REDACTED* * *

952

| | | |
|---|---|---|
| 12:23:49 | 1 | in the Milwaukee area just two hours north of here? |
| 12:23:52 | 2 | A.  It would have. |
| 12:23:54 | 3 | Q.  Now, between 2006 and 2008, did that range change at all? |
| 12:24:00 | 4 | A.  When in 2008? |
| 12:24:03 | 5 | Q.  I'm sorry.  Let me back up. |
| 12:24:06 | 6 | Between 2006 and 2008, is the range of price you just |
| 12:24:11 | 7 | gave for one kilo of cocaine in the Chicago area, did that |
| 12:24:14 | 8 | price remain stable? |
| 12:24:16 | 9 | A.  It remained stable until May of 2008 when prices |
| 12:24:19 | 10 | escalated. |
| 12:24:20 | 11 | Q.  And how high did prices go to in approximately May of |
| 12:24:24 | 12 | 2008? |
| 12:24:25 | 13 | A.  From that point until today's date, it ranges between 28- |
| 12:24:29 | 14 | and 32,000 per kilo. |
| 12:24:34 | 15 | Q.  What, if anything, affects the price of cocaine at the |
| 12:24:37 | 16 | wholesale distribution level? |
| 12:24:41 | 17 | A.  There are a couple of factors.  One is availability.  If |
| 12:24:45 | 18 | there's a shortage of cocaine, then, of course, it's going to |
| 12:24:48 | 19 | drive the price up.  Some other factors that might affect the |
| 12:24:53 | 20 | price that an individual pays for kilos would be the |
| 12:24:55 | 21 | relationship between the buyer and the seller.  If there's a |
| 12:24:58 | 22 | longstanding relationship, then the buyer should get a break |
| 12:25:00 | 23 | from the seller. |
| 12:25:01 | 24 | Also, volume discount.  If the buyer is selling large |
| 12:25:05 | 25 | quantities of cocaine from the wholesaler, then he should get |

* * *REDACTED* * *

953

12:25:08    1    a break on the price then.  And also purity level.  If it's

12:25:13    2    known that the purity level of the kilos are less than what

12:25:16    3    they should be, then they should be worth less.

12:25:20    4    Q.  Does a purchaser of kilogram-quantities of cocaine pay for

12:25:25    5    that quantity of cocaine up front?

12:25:28    6    A.  It depends on the relationship between the buyer and

12:25:31    7    seller.  Oftentimes kilograms of cocaine are paid in cash COD.

12:25:36    8    Sometimes when there's a relationship between the buyer and

12:25:38    9    the seller, the seller will front kilos to the buyer or give

12:25:42   10    them those kilos on credit, until he sells those kilos and he

12:25:46   11    pays his source.

12:25:48   12    Q.  Until the buyer sells those kilos and pays his supplier?

12:25:53   13    A.  Correct.

12:25:59   14    Q.  Lieutenant Coleman, I'm going to hand you three exhibits

12:26:04   15    that have previously been admitted into evidence.  Government

12:26:08   16    Exhibit 1A, Government Exhibit 1B, Government Exhibit 1C, and

12:26:16   17    Government Transcripts 1 through 3.

12:26:25   18         And for the record, Government Exhibits 1A through 1C

12:26:29   19    are each recordings.

12:26:31   20         Lieutenant, are you familiar with the exhibits that

12:26:33   21    I've just handed you?

12:26:42   22    A.  Yes.

12:26:43   23    Q.  And how are you familiar with them?

12:26:47   24    A.  You and your partner gave me copies of these transcripts

12:26:50   25    and the audios several weeks ago for review.

* * *REDACTED* * *

954

| | | |
|---|---|---|
| 12:26:53 | 1 | Q. Did you have an opportunity to listen to those recordings |
| 12:26:56 | 2 | and review the transcripts? |
| 12:26:58 | 3 | A. Yes. |
| 12:26:59 | 4 | Q. In your review of those recordings, were you able to |
| 12:27:02 | 5 | determine, based on your training and experience, whether the |
| 12:27:04 | 6 | speakers on the calls were using slang or code words during |
| 12:27:08 | 7 | the calls? |
| 12:27:09 | 8 | A. Yes. |
| 12:27:10 | 9 | Q. In your experience, have you overheard conversations |
| 12:27:13 | 10 | between drug traffickers where code words are commonly used? |
| 12:27:18 | 11 | A. Yes. |
| 12:27:19 | 12 | Q. And why is that? |
| 12:27:20 | 13 | A. Well, members of drug organizations who are engaging in |
| 12:27:26 | 14 | criminal activity will often talk in coded language to thwart |
| 12:27:33 | 15 | law enforcement's ability to conduct an investigation. If |
| 12:27:36 | 16 | they are talking on a telephone or even in person, they'll |
| 12:27:39 | 17 | oftentimes use coded language, so individuals who overhear the |
| 12:27:43 | 18 | conversation, either through a wiretap or somebody standing |
| 12:27:46 | 19 | right next to them, would have a difficult time determining |
| 12:27:48 | 20 | that they are talking about criminal activity. |
| 12:27:52 | 21 | Q. Were you able to decipher the meaning of the words used by |
| 12:27:55 | 22 | the speakers in Recordings 1A, 1B, and 1C? |
| 12:28:00 | 23 | A. Yes. |
| 12:28:02 | 24 | MS. RODNEY: Your Honor, at this time I would like to |
| 12:28:04 | 25 | publish Transcript 1. Is it possible to hand the copies out |

* * *REDACTED* * *

* * *REDACTED* * *

955

| | | |
|---|---|---|
| 12:28:07 | 1 | to the jury as well? |
| 12:28:08 | 2 | THE COURT:  That's fine. |
| 12:28:09 | 3 | Marty, can you help with that again, please? |
| 12:28:11 | 4 | THE MARSHAL:  Yes. |
| 12:28:12 | 5 | THE COURT:  It's the red binders. |
| 12:28:54 | 6 | MS. RODNEY:  May I publish Transcript 1? |
| 12:28:57 | 7 | THE COURT:  You may.  Okay, folks, you can look at it |
| 12:28:59 | 8 | now.  It's that first tab. |
| 12:29:06 | 9 | BY MS. RODNEY: |
| 12:29:13 | 10 | Q.  Lieutenant, I'd like to direct your attention to line 23 |
| 12:29:18 | 11 | of Transcript 1.  It's the first tab in the red binder.  Do |
| 12:29:23 | 12 | you see the reference 28 in line 23? |
| 12:29:27 | 13 | A.  Yes. |
| 12:29:29 | 14 | Q.  Based on your training and experience and the context of |
| 12:29:32 | 15 | this call, in your opinion, what does 28 refer to in line 23? |
| 12:29:37 | 16 | A.  $28,000. |
| 12:29:41 | 17 | Q.  Now, moving down to line 28 in the same transcript? |
| 12:29:45 | 18 | A.  Which line? |
| 12:29:46 | 19 | Q.  Line 28, Transcript 1.  Do you see the reference to 29,5 |
| 12:29:54 | 20 | at the end of line 28? |
| 12:29:56 | 21 | A.  Yes. |
| 12:29:57 | 22 | Q.  Now, based on your training and experience and the context |
| 12:30:01 | 23 | of this call, in your opinion, what does 29,5 refer to? |
| 12:30:04 | 24 | A.  $29,500. |
| 12:30:09 | 25 | Q.  And from your reading of the call, do you know what |

* * *REDACTED* * *

* * *REDACTED* * *

956

| | | |
|---|---|---|
| 12:30:12 | 1 | $29,500 is in reference to? |
| 12:30:16 | 2 | A. Yes. |
| 12:30:16 | 3 | Q. And what is that? |
| 12:30:17 | 4 | A. Well, the 28,000 is reference to the purchase price of the |
| 12:30:23 | 5 | kilo of cocaine, and the 29,5 is in reference to what |
| 12:30:26 | 6 | Mr. Collins wants to sell the kilo for. |
| 12:30:26 | 7 | MR. RUBINO: Objection. He's never identified the |
| 12:30:28 | 8 | voice as being that of Mr. Collins. |
| 12:30:30 | 9 | THE COURT: Okay. |
| 12:30:30 | 10 | MR. RUBINO: Speaker, I think, would be more |
| 12:30:32 | 11 | appropriate. |
| 12:30:33 | 12 | THE COURT: Sustained. |
| 12:30:34 | 13 | BY MS. RODNEY: |
| 12:30:35 | 14 | Q. Can you repeat your answer using the word speaker instead |
| 12:30:38 | 15 | of Collins? |
| 12:30:39 | 16 | A. On line 28, the 29,5 is in reference to the speaker |
| 12:30:44 | 17 | wanting to sell the kilos for that much. |
| 12:30:47 | 18 | Q. And that's $29,500? |
| 12:30:51 | 19 | A. Correct. |
| 12:30:51 | 20 | Q. Now, moving right below that to line 29 on Transcript 1, |
| 12:30:55 | 21 | do you see the reference to a dub? |
| 12:30:58 | 22 | A. Yes. |
| 12:30:58 | 23 | Q. And based on your training and experience and the context |
| 12:31:02 | 24 | of the call, in your opinion, what does a dub refer to? |
| 12:31:05 | 25 | A. 20. |

* * *REDACTED* * *

* * *REDACTED* * *

957

| | | |
|---|---|---|
| 12:31:07 | 1 | Q.  And from your reading of the transcript, do you know if it |
| 12:31:12 | 2 | refers to 20 as some type of measurement? |
| 12:31:17 | 3 | A.  It refers to 20 units.  The speaker -- a dub refers to 20, |
| 12:31:25 | 4 | so they are talking about 20 kilos. |
| 12:31:31 | 5 | Q.  Now, if I can refer you down further to line 42 in |
| 12:31:37 | 6 | Transcript 1.  Do you see the reference to in the second half |
| 12:31:41 | 7 | of the line, Give me 30 up front? |
| 12:31:45 | 8 | A.  Yes. |
| 12:31:45 | 9 | Q.  From your reading of the transcript and based on your |
| 12:31:49 | 10 | training and experience, do you know what the reference to, |
| 12:31:51 | 11 | Give me 30 up front, means? |
| 12:31:53 | 12 | A.  Yes. |
| 12:31:53 | 13 | Q.  And what does it mean? |
| 12:31:55 | 14 | A.  30 kilos on credit. |
| 12:31:57 | 15 | Q.  Now, moving two lines down to line 43 in Transcript 1 at |
| 12:32:05 | 16 | the end of the sentence, do you see the phrase, He had to |
| 12:32:08 | 17 | break them down? |
| 12:32:10 | 18 | A.  Yes. |
| 12:32:11 | 19 | Q.  From your reading of the transcript and based on your |
| 12:32:13 | 20 | training and experience, what does the phrase, He had to break |
| 12:32:16 | 21 | them down, refer to? |
| 12:32:18 | 22 | A.  It's in reference to taking the kilogram in its pure form |
| 12:32:22 | 23 | and breaking it down and stepping on it and mixing it with a |
| 12:32:26 | 24 | dilutant or a cutting agent and in order to expand its value |
| 12:32:30 | 25 | and make more money. |

* * *REDACTED* * *

***REDACTED***

958

| | | |
|---|---|---|
| 12:32:34 | 1 | Q.  Now, I'm going to move to the second page of Transcript 1. |
| 12:32:42 | 2 | If I could refer you to line 65 to 66.  In line 65, do you |
| 12:32:54 | 3 | see -- and continuing on to 66 -- do you see the phrase, If I |
| 12:32:58 | 4 | try to get me 1500 off each one of them? |
| 12:33:03 | 5 | A.  Yes. |
| 12:33:04 | 6 | Q.  Based on your reading of the transcript and your training |
| 12:33:08 | 7 | and experience, what does, 1500 off each one of them, refer |
| 12:33:12 | 8 | to? |
| 12:33:12 | 9 | A.  It means that the speaker is trying to make $1500 off each |
| 12:33:17 | 10 | kilo that he sells. |
| 12:33:19 | 11 | Q.  Now, moving a few lines down to line 63, do you see the |
| 12:33:24 | 12 | reference to paper in that sentence? |
| 12:33:30 | 13 | A.  On which line? |
| 12:33:32 | 14 | Q.  Excuse me.  Line 68, the reference to paper. |
| 12:33:36 | 15 | A.  Yes. |
| 12:33:37 | 16 | Q.  And based on your training and experience, does paper have |
| 12:33:40 | 17 | another meaning in that sentence? |
| 12:33:43 | 18 | A.  Yes. |
| 12:33:44 | 19 | Q.  And what is that meaning? |
| 12:33:45 | 20 | A.  Paper is a common code word for money. |
| 12:33:50 | 21 | Q.  Now, if you could go down to line 78, in line 78 do you |
| 12:34:02 | 22 | see the reference to the phrase, I can do the numbers. |
| 12:34:05 | 23 | A.  Yes. |
| 12:34:07 | 24 | Q.  And based on your reading of this transcript and your |
| 12:34:10 | 25 | training and experience, what does the phrase, I can do the |

***REDACTED***

***REDACTED***

959

| 12:34:12 | 1 | numbers, mean? |
| 12:34:18 | 2 | A.  It means that the speaker is assuring the other individual |
| 12:34:24 | 3 | that he can sell those quantities. |
| 12:34:28 | 4 | Q.  Quantities of drugs? |
| 12:34:30 | 5 | A.  Pardon me? |
| 12:34:30 | 6 | Q.  Quantities of drugs? |
| 12:34:32 | 7 | A.  Yes. |
| 12:34:33 | 8 | Q.  Now, moving just a few lines down to lines 81 to 82, do |
| 12:34:41 | 9 | you see the phrase, in the line 81 that says, He not a, the, |
| 12:34:48 | 10 | the type to break it down? |
| 12:34:52 | 11 | A.  Yes. |
| 12:34:52 | 12 | Q.  Based on your training and experience and your reading of |
| 12:34:53 | 13 | this call, do you know what the phrase, Not the type to break |
| 12:34:56 | 14 | it down, refers to? |
| 12:34:58 | 15 | A.  Yes. |
| 12:34:58 | 16 | Q.  And what does that mean? |
| 12:35:00 | 17 | A.  Again, breaking it down means taking the kilo in its pure |
| 12:35:04 | 18 | form and then breaking it down and adding an adulterant or a |
| 12:35:09 | 19 | cut to it to expand the volume and make more money. |
| 12:35:11 | 20 | Q.  Now, moving just a few lines down to lines 83 to 84, do |
| 12:35:17 | 21 | you see the reference that says, So now he can't sell them |
| 12:35:21 | 22 | whole like you.  Based on your training and experience and |
| 12:35:25 | 23 | your reading of this transcript, do you know what the |
| 12:35:27 | 24 | reference, He can't sell them whole like you, refers to? |
| 12:35:30 | 25 | A.  Yes. |

***REDACTED***

* * *REDACTED* * *

960

| | | |
|---|---|---|
| 12:35:31 | 1 | Q.  And what does that mean? |
| 12:35:32 | 2 | A.  Well, it means that whoever can't sell the entire kilo one |
| 12:35:36 | 3 | kilo at a time.  He has to break them down and sell them in |
| 12:35:39 | 4 | multi-ounce quantities, once he's stepped on them and diluted |
| 12:35:43 | 5 | them. |
| 12:35:44 | 6 | MS. RODNEY:  Your Honor, may I have a moment? |
| 12:35:45 | 7 | THE COURT:  Sure. |
| 12:35:57 | 8 | BY MS. RODNEY: |
| 12:35:59 | 9 | Q.  Lieutenant Coleman, just to clarify, your interpretation |
| 12:36:02 | 10 | of these code words was based on your reading of |
| 12:36:05 | 11 | Transcripts 1, 2, and 3? |
| 12:36:09 | 12 | A.  In addition to listening to the audio recordings, yes. |
| 12:36:12 | 13 | MS. RODNEY:  Your Honor, I have no further questions |
| 12:36:13 | 14 | at this time. |
| 12:36:14 | 15 | THE COURT:  Okay.  Mr. Rubino? |
| 12:36:14 | 16 | - - - |
| 12:36:14 | 17 | ROBERT COLEMAN, CROSS-EXAMINATION |
| 12:36:14 | 18 | BY MR. RUBINO: |
| 12:36:19 | 19 | Q.  Good afternoon, sir. |
| 12:36:20 | 20 | A.  Good afternoon. |
| 12:36:22 | 21 | Q.  Sir, you told us that you participated in numerous |
| 12:36:27 | 22 | surveillances of people involved in the drug trade, correct? |
| 12:36:32 | 23 | A.  Yes. |
| 12:36:33 | 24 | Q.  Sir, did you ever participate in any surveillance of Ron |
| 12:36:37 | 25 | Collins? |

* * *REDACTED* * *

***REDACTED***

961

| | | |
|---|---|---|
| 12:36:37 | 1 | A.  No. |
| 12:36:38 | 2 | Q.  Do you know if any surveillance was ever done of Ron |
| 12:36:41 | 3 | Collins? |
| 12:36:41 | 4 | A.  I don't. |
| 12:36:43 | 5 | Q.  Now, you told us that you've acted as an undercover agent, |
| 12:36:46 | 6 | correct? |
| 12:36:47 | 7 | A.  Yes. |
| 12:36:47 | 8 | Q.  And in that capacity you acted as a purchaser, correct? |
| 12:36:52 | 9 | A.  Yes. |
| 12:36:52 | 10 | Q.  Tells the ladies and gentlemen of the jury how much drugs |
| 12:36:55 | 11 | you purchased from Ron Collins? |
| 12:36:58 | 12 | A.  None. |
| 12:36:58 | 13 | Q.  You never met with Ron Collins as an undercover agent, did |
| 12:37:01 | 14 | you? |
| 12:37:01 | 15 | A.  I've never met Ron Collins. |
| 12:37:05 | 16 | Q.  And, therefore, he never hired you as a transporter |
| 12:37:08 | 17 | either, which you testified about? |
| 12:37:10 | 18 | A.  That's correct. |
| 12:37:11 | 19 | Q.  Now, tell the ladies and gentlemen of the jury if during |
| 12:37:13 | 20 | the course of this investigation if you ever saw Ron Collins |
| 12:37:19 | 21 | possess drugs? |
| 12:37:20 | 22 | A.  I did not. |
| 12:37:22 | 23 | Q.  Did you ever see him use drugs? |
| 12:37:23 | 24 | A.  No. |
| 12:37:23 | 25 | Q.  Did you ever see him buy drugs? |

***REDACTED***

***REDACTED***

962

| | | |
|---|---|---|
| 12:37:26 | 1 | A. No. |
| 12:37:28 | 2 | Q. Sell drugs? |
| 12:37:30 | 3 | A. No. |
| 12:37:30 | 4 | Q. Deliver drugs? |
| 12:37:31 | 5 | A. No. |
| 12:37:32 | 6 | Q. Import drugs? |
| 12:37:33 | 7 | A. No. |
| 12:37:33 | 8 | Q. Export drugs? |
| 12:37:35 | 9 | A. No. |
| 12:37:35 | 10 | Q. Do you know if any other government agent ever saw Ron |
| 12:37:38 | 11 | Collins ever do any of the above I've discussed with you? |
| 12:37:41 | 12 | A. I don't know. |
| 12:37:44 | 13 | Q. Did you ever seize any drugs from Ron Collins? |
| 12:37:47 | 14 | A. No. |
| 12:37:47 | 15 | Q. Do you know if any agent of the United States Government |
| 12:37:51 | 16 | ever seized any drugs from Ron Collins? |
| 12:37:53 | 17 | A. I don't know. |
| 12:37:55 | 18 | Q. Now, you told us about debriefing informants, correct? |
| 12:37:59 | 19 | A. Yes. |
| 12:38:00 | 20 | Q. Have you ever caught an informant lying? |
| 12:38:04 | 21 | A. Yes. |
| 12:38:05 | 22 | Q. And in truth and in fact, they lie sometimes to protect |
| 12:38:08 | 23 | their sources, don't they? |
| 12:38:10 | 24 | MS. RODNEY: Objection, your Honor. |
| 12:38:11 | 25 | THE COURT: Overruled. |

***REDACTED***

***REDACTED***

963

| 12:38:12 | 1 | THE WITNESS: They lie for a variety of reasons. |
| 12:38:14 | 2 | BY MR. RUBINO: |
| 12:38:15 | 3 | Q. Sometimes to protect their sources, right? |
| 12:38:18 | 4 | A. That could be a reason. |
| 12:38:19 | 5 | Q. And sometimes to protect their friends? |
| 12:38:21 | 6 | A. That could be a reason. |
| 12:38:23 | 7 | Q. And sometimes to protect their family members? |
| 12:38:25 | 8 | A. Yes. |
| 12:38:26 | 9 | Q. Sometimes to protect their money? |
| 12:38:28 | 10 | A. Yes. |
| 12:38:28 | 11 | Q. Sometimes to protect their assets? |
| 12:38:31 | 12 | A. Yes. |
| 12:38:32 | 13 | Q. And sometimes to get benefits, right? |
| 12:38:34 | 14 | A. To get benefits? |
| 12:38:36 | 15 | Q. Yes. |
| 12:38:36 | 16 | A. I'm not clear. |
| 12:38:38 | 17 | Q. Well, sometimes informants are paid, aren't they? |
| 12:38:40 | 18 | A. Yes. |
| 12:38:40 | 19 | Q. Have you ever caught a paid informant lying? |
| 12:38:43 | 20 | A. Yes. |
| 12:38:44 | 21 | Q. So by and large they are not a very reliable group, are |
| 12:38:48 | 22 | they? |
| 12:38:49 | 23 | A. Well -- |
| 12:38:50 | 24 | MS. RODNEY: Objection, your Honor. |
| 12:38:52 | 25 | THE COURT: Sustained. |

***REDACTED***

***REDACTED***

964

| | | |
|---|---|---|
| 12:38:53 | 1 | BY MR. RUBINO: |
| 12:38:56 | 2 | Q.  Now, you talked about the recordings that were made, |
| 12:38:59 | 3 | correct? |
| 12:39:00 | 4 | A.  Yes. |
| 12:39:01 | 5 | Q.  You have no personal knowledge whatsoever of when those |
| 12:39:05 | 6 | recordings were made, do you? |
| 12:39:07 | 7 | A.  I think the dates were listed on the top of the |
| 12:39:10 | 8 | transcripts. |
| 12:39:13 | 9 | Q.  Okay.  Do you personally know that that date is correct? |
| 12:39:14 | 10 | A.  I do not. |
| 12:39:15 | 11 | Q.  And do you have any personal knowledge of where these |
| 12:39:18 | 12 | recordings were made? |
| 12:39:19 | 13 | A.  No. |
| 12:39:20 | 14 | Q.  And do you have any personal knowledge of how they were |
| 12:39:22 | 15 | made? |
| 12:39:23 | 16 | A.  No. |
| 12:39:24 | 17 | Q.  And do you have any personal knowledge of who made them? |
| 12:39:27 | 18 | A.  No. |
| 12:39:27 | 19 | Q.  And any personal knowledge of the circumstances under |
| 12:39:30 | 20 | which they were made? |
| 12:39:32 | 21 | A.  No. |
| 12:39:33 | 22 | Q.  And you cannot tell these ladies and gentlemen of the jury |
| 12:39:39 | 23 | that the voice on that transcript is that of Ron Collins, can |
| 12:39:43 | 24 | you? |
| 12:39:43 | 25 | A.  I cannot. |

***REDACTED***

* * *REDACTED* * *

965

12:39:44  1    MR. RUBINO:  I have nothing further -- oh, one, one

12:39:46  2  thing.  I'm sorry.  One other thing.

12:39:49  3  BY MR. RUBINO:

12:39:49  4  Q.  The transcripts, the three transcripts, 1, 2, and 3, and

12:39:54  5  the three corresponding recordings, which are 1A, 1B, and 1C,

12:40:02  6  isn't it true, sir, that nowhere in these three transcripts or

12:40:07  7  recordings is the name Ron, Ron Ron, or Ron Collins ever used?

12:40:13  8  A.  That's correct.

12:40:14  9    MR. RUBINO:  Thank you.  I now have nothing further.

12:40:16  10    THE COURT:  Okay.

12:40:22  11    MS. RODNEY:  Just one moment, your Honor?

12:40:23  12    THE COURT:  Sure.

12:40:23  13              - - -

12:40:23  14    ROBERT COLEMAN, REDIRECT EXAMINATION

12:40:23  15  BY MS. RODNEY:

12:40:33  16  Q.  Lieutenant Coleman, was your involvement in this

12:40:35  17  investigation limited to your interpretation of certain words

12:40:39  18  in the transcripts and on those recordings?

12:40:41  19  A.  Yes.

12:40:42  20  Q.  So you had no other involvement, except for reviewing

12:40:45  21  those exhibits in front of you?

12:40:47  22  A.  That's correct.

12:40:48  23    MS. RODNEY:  Your Honor, I don't have anything

12:40:49  24  further.

12:40:50  25    THE COURT:  Okay.  You can step down then.

* * *REDACTED* * *

* * *REDACTED* * *

966

| | | |
|---|---|---|
| 12:40:54 | 1 | (Witness leaves the stand.) |
| 12:40:54 | 2 | THE COURT:  You can call your next witness. |
| 12:40:58 | 3 | MS. RODNEY:  Your Honor, may we have a sidebar? |
| 12:40:59 | 4 | THE COURT:  Sure. |
| 12:40:59 | 5 | (Whereupon the following discussion was had at the |
| 12:41:36 | 6 | bench, outside the hearing of the jury:) |
| 12:41:36 | 7 | MS. RODNEY:  Your Honor, that was the Government's |
| 12:41:37 | 8 | last witness. |
| 12:41:37 | 9 | THE COURT:  Okay. |
| 12:41:38 | 10 | MS. RODNEY:  And after we just review our exhibit |
| 12:41:40 | 11 | list, we'll be prepared to rest. |
| 12:41:42 | 12 | THE COURT:  Okay.  Do you want to make a motion at |
| 12:41:44 | 13 | this time then? |
| 12:41:44 | 14 | MR. RUBINO:  Yes, your Honor.  I would make a motion |
| 12:41:46 | 15 | that under Rule 29 of the Federal Rules of Criminal Procedure |
| 12:41:51 | 16 | the Government has not put forth a sufficient case even in |
| 12:41:54 | 17 | light of the evidence most favorable to the Government for the |
| 12:41:56 | 18 | following reasons. |
| 12:41:57 | 19 | One, each and every one of the Government informant |
| 12:42:00 | 20 | witnesses, all five of them, I think, have been severely |
| 12:42:03 | 21 | impeached.  I don't think that their testimony stands up to |
| 12:42:06 | 22 | enough credibility that a reasonable jury could, on that |
| 12:42:10 | 23 | testimony, convict the defendant. |
| 12:42:11 | 24 | Further, I don't believe that there has been |
| 12:42:14 | 25 | sufficient evidence brought forth that the voice on the |

* * *REDACTED* * *

* * *REDACTED* * *

967

| | |
|---|---|
| 12:42:17 | 1 |
| 12:42:20 | 2 |
| 12:42:23 | 3 |
| 12:42:27 | 4 |
| 12:42:30 | 5 |
| 12:42:34 | 6 |
| 12:42:37 | 7 |
| 12:42:37 | 8 |
| 12:42:41 | 9 |
| 12:42:46 | 10 |
| 12:42:50 | 11 |
| 12:42:53 | 12 |
| 12:42:58 | 13 |
| 12:42:59 | 14 |
| 12:43:02 | 15 |
| 12:43:05 | 16 |
| 12:43:06 | 17 |
| 12:43:06 | 18 |
| 12:43:06 | 19 |
| 12:43:08 | 20 |
| 12:43:09 | 21 |
| 12:43:12 | 22 |
| 12:43:13 | 23 |
| 12:43:17 | 24 |
| 12:43:20 | 25 |

1  recording is, in fact, that of Ron Collins.  Only one person

2  has testified to that, and that was the agent who said that

3  two years ago he spoke with Ron Collins for 45 minutes, has

4  never seen -- never spoke to him since then, and he's basing

5  that upon a two-year-old recollection having no training and

6  experience.  I think basically that's the sum and substance of

7  the case.

8          As far as the financial evidence goes, it was pretty

9  clear to me that the gentleman who testified could only say

10  what did not come from a particular bank account but could not

11  attribute it to unknown bank accounts.  Obviously that

12  gentleman has not went [sic] to every single bank in the

13  entire United States and asked them about Ron Collins or

14  served a subpoena upon them, if you will.  So he's basing it

15  upon what is provided to him by the Government and not what

16  his knowledge is.

17          THE COURT:  Okay.

18          MR. RUBINO:  Thank you, your Honor.

19          THE COURT:  Would you like to respond?

20          MS. GUREN:  Yes, your Honor.  First of all, I just

21  want to correct an incorrect statement of fact that Mr. Rubino

22  just made about voice ID.

23          First, Special Agent Eric Durante testified that he

24  had listened to the recordings on the same day before and

25  after he talked to Mr. Collins for 45 minutes, when he made

* * *REDACTED* * *

968

12:43:22　1　that voice comparison.  Second, Mr. Rubino forgot that

12:43:26　2　Mr. Bagley also made an ID of Mr. Collins after listening to

12:43:32　3　jailhouse recordings.  So that's just to correct the record.

12:43:34　4　　　　In addition, in terms of responding to Mr. Rubino's

12:43:38　5　arguments, we have insider testimony that are not impeached as

12:43:41　6　to facts and dates about Ron Collins.  They corroborate each

12:43:44　7　other, and they are corroborated by evidence in the record,

12:43:48　8　including the recordings on which two agents identified Ron

12:43:50　9　Collins' voice.

12:43:51　10　　　　And, in addition, there's corroboration with those

12:43:53　11　recordings, with regard to the T-Mobile phone calls and the

12:43:56　12　forensic analysis of the phone.  The financial records also

12:43:59　13　corroborate both the insiders and the fact that Mr. Collins

12:44:03　14　had $234,000 of unaccounted-for wealth.

12:44:06　15　　　　Mr. Killian testified as to looking for other bank

12:44:09　16　accounts and not being able to find any.  That along with

12:44:13　17　Robert Gregory and the telephone records and text messages

12:44:15　18　that corroborate him thoroughly show when the evidence is

12:44:19　19　taken in favor of the Government that Mr. Collins -- there's

12:44:21　20　enough evidence for this case to go to the jury.

12:44:23　21　　　　THE COURT:  Okay.  Well, in reviewing the evidence,

12:44:25　22　we definitely have credibility findings that need to go to our

12:44:29　23　jury here, because Mr. Rubino has effectively impeached

12:44:33　24　certain witnesses who were receiving benefits from the

12:44:35　25　Government, based upon their own involvement within the

* * *REDACTED* * *

* * *REDACTED* * *

969

narcotics organization.

        And if the jury believes them, then there is sufficient evidence for the jury to convict.  The question is what they will do with that credibility finding.  So that's first and foremost.

        Secondly, the voice identification, there's two witnesses who have identified.  Again, this is going to be an opportunity for the jury to make its own comparison as well with the evidence that has been presented, since we have tape recordings of both the McHenry County Jail as well as the ones that were presented to support the Government's case in chief.  Again, an issue that the jury should make a determination regarding.

        And then, finally, if they were to determine that it was the defendant's voice on those recordings and that the financial evidence that was presented was the world-view of financial evidence, it would be reasonable for the jury to reach a conclusion that he, in fact, had been making money from the organization and that he did not pay taxes on that money, not that there's a tax charge, but, rather, that it would corroborate the type of illegal activity that the Government's alleged he's been engaged in.

        So there's a sufficient amount of evidence for the Government to support its allegations and for a jury to convict and at least make those credibility findings, so the

* * *REDACTED* * *

970

| | |
|---|---|
| 12:46:01 | 1 |

motion is denied.

12:46:02  2   MR. RUBINO:  Yes, your Honor.

12:46:03  3   THE COURT:  Okay.  Do you want to do anything else

12:46:06  4   before the jury, before we break for lunch then?

12:46:08  5   MS. GUREN:  I just want to correct the stipulation

12:46:10  6   before --

12:46:10  7   THE COURT:  That's fine.  Okay.  Thanks very much.

12:46:32  8   (End of sidebar discussion.)

12:46:32  9   THE COURT:  Okay.  Anything else from the Government?

12:46:33  10  MS. GUREN:  Just briefly, the Government previously

12:46:36  11  read stipulation number 7, which had to do with tax records.

12:46:39  12  And in that stipulation I had said that no such records for

12:46:42  13  the tax years 1998 through December 31st, 2007 exist, as well

12:46:48  14  as tax years -- records related to capital gains and income

12:46:53  15  and wages.

12:46:54  16  Just to correct that as a typo.  It is 1998 through

12:46:59  17  December 31st, 2008.

12:47:01  18  And I have spoken with defense counsel, and it is my

12:47:03  19  understanding that he agrees as well.

12:47:05  20  MR. RUBINO:  I do.

12:47:06  21  MS. GUREN:  Thank you.

12:47:06  22  THE COURT:  Okay.  Anything else?

12:47:07  23  MS. GUREN:  No, your Honor.

12:47:08  24  THE COURT:  Okay.

12:47:10  25  MS. GUREN:  At this time Government would rest,

* * *REDACTED* * *

* * *REDACTED* * *

971

12:47:12  1  subject for an opportunity to just double-check all of their

12:47:16  2  exhibits during the lunch break and make sure everything's

12:47:18  3  been properly admitted.

12:47:19  4          THE COURT:  Okay.  That's fine.

12:47:21  5          So we have finished with the Government's case in

12:47:23  6  chief, and after lunch we will turn to the defense case, if he

12:47:26  7  intends to present one.  So we'll take our lunch break now,

12:47:29  8  and you can come back at a quarter to 2:00, please.  Thank

12:47:32  9  you.  Remember, no talking over lunch.  Thank you.

12:47:55  10          (The jury leaves the courtroom.)

12:48:17  11          THE COURT:  So, Mr. Collins, now is the point where

12:48:21  12  we will -- you can be seated, folks -- where we would turn to

12:48:25  13  the defense case.  And your attorney has no obligation to put

12:48:28  14  on a case, as I have instructed this jury, I think, three

12:48:31  15  times now.  But you do have an opportunity to testify, if you

12:48:35  16  would like.  You also can refuse to testify, because of your

12:48:38  17  Fifth Amendment right not to incriminate yourself.

12:48:41  18          So have you had an opportunity to talk to your

12:48:44  19  attorney about whether you would like to testify, sir?

12:48:46  20          THE DEFENDANT:  Yes.

12:48:46  21          THE COURT:  Okay.  And do you want to testify?

12:48:49  22          THE DEFENDANT:  No.

12:48:49  23          THE COURT:  Okay.  With that understanding that you

12:48:52  24  have had an opportunity to discuss that with him, I'll make

12:48:55  25  sure that the jury is instructed at the end of the trial that

* * *REDACTED* * *

* * *REDACTED* * *

972

| | |
|---|---|
| 12:48:58 | 1 |
| 12:49:01 | 2 |
| 12:49:04 | 3 |

they can make no inference of guilt from your refusal to
testify. And I've already, in fact, told them that twice
before we started.

4　　　Anything from you, Mr. Rubino?

5　　　MR. RUBINO: Yes, your Honor. May I advise the Court
6 that this decision has not come lightly.

7　　　THE COURT: Okay.

8　　　MR. RUBINO: Mr. Collins and I have spent hours
9 discussing this. We've discussed the pros. We've discussed
10 the cons, the benefits, the detriments, et cetera. And I was
11 at the jail on Friday, and I was at the jail yesterday, so I
12 don't want -- I want the record to reflect that this is a well
13 thought out decision with input from me as recently as
14 yesterday, on Sunday.

15　　　THE COURT: Okay.

16　　　MR. RUBINO: Is that correct, Mr. Collins?

17　　　THE DEFENDANT: Yes.

18　　　THE COURT: Okay.

19　　　MR. RUBINO: So it's his knowing and intelligent
20 decision to invoke his right in not to testify.

21　　　THE COURT: Okay. And that is your right not to
22 testify. It is your right not to incriminate yourself for
23 that reason.

24　　　So with that understanding then, do you have a case
25 that you'll be presenting?

* * *REDACTED* * *

***REDACTED***

973

| | | |
|---|---|---|
| 12:49:50 | 1 | MR. RUBINO:  For your scheduling purposes, your |
| 12:49:52 | 2 | Honor, I wanted -- I should have told you at sidebar. |
| 12:49:54 | 3 | THE COURT:  That's okay. |
| 12:49:54 | 4 | MR. RUBINO:  We are not calling any witnesses, so we |
| 12:49:57 | 5 | will immediately rest -- |
| 12:49:57 | 6 | THE COURT:  Okay. |
| 12:49:58 | 7 | MR. RUBINO:  -- so the Court's aware already. |
| 12:50:00 | 8 | THE COURT:  Okay.  All right.  And then I assume then |
| 12:50:02 | 9 | there would be no rebuttal case? |
| 12:50:03 | 10 | MS. GUREN:  That's correct, your Honor. |
| 12:50:04 | 11 | THE COURT:  Okay.  Well, in that case then we |
| 12:50:06 | 12 | would -- I probably should have told the jury to hold off, so |
| 12:50:09 | 13 | that we could go through our jury instructions conference. |
| 12:50:12 | 14 | So when we come back at a quarter to 2:00 let's do |
| 12:50:16 | 15 | that, and I'll let the jury know that they'll have a little |
| 12:50:19 | 16 | bit more time, and then you'll close this afternoon.  Okay? |
| 12:50:22 | 17 | MR. RUBINO:  Yes, your Honor. |
| 12:50:22 | 18 | THE COURT:  All right.  Thanks very much. |
| | 19 | (Lunch recess taken at 12:50 p.m.) |
| | 20 | - - - |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

***REDACTED***

\* \* \*REDACTED\* \* \*

974

```
1
2
3                      C E R T I F I C A T E
4
5      I certify that the foregoing is a correct transcript from
6   the record of proceedings in the above-entitled matter.
7
8   /s/April M. Metzler, RPR, CRR, FCRR   June 6, 2011
9   April M. Metzler, RPR, CRR, FCRR        Date
10  Official Federal Court Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

\* \* \*REDACTED\* \* \*